UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-Against-

JOSEPH PERCOCO,
a/k/a "Herb,"
ALAIN KALOYEROS,
a/k/a "Dr. K,"
PETER GALBRAITH KELLY, JR.,
a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

                    Defendants.

No. S1 16 CR 776 (VEC)

**Oral Argument Requested**

# Memorandum of Law in Support of
# Joseph Percoco's Motion to Dismiss the Superseding Indictment

SCHULTE ROTH & ZABEL LLP

Barry A. Bohrer
Michael L. Yaeger
Andrew D. Gladstein
Abigail F. Coster

919 Third Avenue
New York, NY 10022
Telephone: 212.756.2000

*Attorneys for Joseph Percoco*

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................. iii

Preliminary Statement ................................................................................. 1

Background ................................................................................................. 5

    A.    The allegations. ............................................................................. 5

    B.    The charges. .................................................................................. 7

Legal Standard ........................................................................................... 8

Discussion .................................................................................................. 9

I.    "Official Acts" Are Necessarily Acts by People Officially Working for
Government Entities ............................................................................ 9

    A.    The Supreme Court held in McDonnell that an official act is a formal
decision or action on a specific and focused matter .............................. 9

    B.    McDonnell and other precedent establishes that only people with official
government responsibilities can perform official acts. ....................... 13

    C.    Percoco cannot have performed any official acts between his resignation
from state government in April 2014 and his return in December 2014. ............. 17

II.    Percoco Cannot Have Deprived the Public of His Services During the Period that He
Was Not a Public Employee .............................................................. 20

III.    The § 666 Charges Cannot Be Proven by Acts that Percoco    Performed During the
Period that He Was Not a Government Agent. ......................................... 22

    A.    Under § 666, an "agent" must have actual legal authority to act on behalf of
an organization or government. ...................................................... 22

    B.    Percoco lacked the actual legal authority to act on behalf of the state
government between April 21, 2014 and December 8, 2014. .......................... 25

IV.    Counts Six, Eight, Ten, and Twelve Must Be Dismissed Because the Payments    that
Constitute the Alleged Bribes Were Made When Percoco Was Not an    Official .......... 26

V.    The Indictment Must Be Dismissed Because It Does Not Allege that Percoco Agreed
or Intended to Perform an Official Act on a Specific and Focused Matter ................ 29

VI.    After McDonnell, § 666 Is Unconstitutional ................................................. 32

    A.       McDonnell's narrow definition of "official action" was guided by
constitutional principles and thus applies to all federal bribery statutes ............... 32

    B.       The text of § 666 is unconstitutionally vague, overbroad, and contrary to
principles of federalism because it does not contain an official act
requirement ......................................................................................................... 34

    C.       If the Court finds that § 666 is constitutional, it must be because the text
contains an implicit "official act" requirement ..................................................... 36

    D.       No alleged conduct of Percoco between April and December of 2014 can
constitute the "quo" required for criminal liabilty under § 666 ........................... 37

VII.    To the Extent that Counts Eleven and Twelve Charge a Gratuity Offense, Dismissal
Is Required ............................................................................................................................ 37

Conclusion ....................................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Bond v. United States*,
    134 S. Ct. 2077 (2014) ................................................................. 35

*Dixson v. United States*,
    465 U.S. 482 (1984) ............................................................... *passim*

*Evans v. United States*,
    504 U.S. 255 (1992) ............................................................ 29, 36

*Ingber v. Enzor*,
    841 F.2d 450 (2d Cir. 1988) ...................................................... 16

*Laverpool v. N.Y. City Transit Auth.*,
    835 F. Supp. 1440 (E.D.N.Y. 1993),
    *aff'd*, 41 F.3d 1501 (2d Cir. 1994) .............................................. 14

*McDonnell v. United States*,
    136 S.Ct. 2355 (2016) ........................................................... *passim*

*Ocasio v. United States*,
    136 S. Ct. 1423 (2016) ............................................................ 20

*People v. Ginsberg*,
    80 Misc. 2d 921 (Cnty. Ct., Nassau Cnty. 1974) ............................ 35

*Porcelli v. United States*,
    404 F.3d 157 (2d Cir. 2005) ...................................................... 35

*Sabri v. United States*
    541 U.S. 600 (2004) ............................................................... 26

*Salinas v. United States*,
    522 U.S. 52 (1997) ................................................................. 34

*Skilling v. United States*,
    561 U.S. 358 (2010) .............................................................. *passim*

*United States v. Adler*,
    274 F. Supp. 2d 583 (S.D.N.Y. 2003) .......................................... 16

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) ................................................. 38, 39

*United States v. Beldini*,
   443 F. App'x 709 (3d Cir. 2011) .................................................................. 23, 39

*United States v. Birdsall*,
   233 U.S. 223 (1914) ........................................................................................ 11

*United States v. Cody*,
   722 F.2d 1052 (2d Cir. 1983) .......................................................................... 19

*United States v. ex rel. Ali, Daniel, Mann, Johnson & Mendenhall*,
   355 F.3d 1140 (9th Cir. 2004) ......................................................................... 19

*United States ex rel. Joseph v. Cannon*,
   642 F.2d 1373 (D.C. Cir. 1981) ....................................................................... 19

*United States v. Fernandez*,
   722 F.3d 1 (1st Cir. 2013) ................................................................................ 39

*United States v. Ford*,
   435 F.3d 204 (2d Cir. 2006) .......................................................................... 27, 36

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007) ............................................................................ 32

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir. 1998) ......................................................................... 39

*United States v. Kenney*,
   185 F.3d 1217 (11th Cir. 1999) ....................................................................... 14

*United States v. Langston*,
   590 F.3d 1226 (11th Cir. 2009) ....................................................................... 24

*United States v. Lupton*,
   620 F.3d 790 (7th Cir. 2010) ........................................................................... 24

*United States v. Manzo*,
   636 F.3d 56 (3d Cir. 2011) ................................................................... 19, 27, 28

*United States v. Margiotta*,
   688 F.2d 108 (2d Cir.1982) .......................................................................... 15, 16

*United States v. Mazer*,
   631 F. App'x 57 (2d Cir. 2015) ..................................................................... 23, 25

*United States v. Milovanovic*,
   678 F.3d 713 (9th Cir. 2012),
   *cert. denied*, 133 S. Ct. 929 (2013) ............................................................... 21

iv

*United States v. Murphy,*
323 F.3d 102 (3d Cir. 2003) ...........................................................16

*United States v. Phillips,*
219 F.3d 404 (5th Cir. 2000) ...................................................*passim*

*United States v. Pirro,*
212 F.3d 86 (2d Cir. 2000) ......................................................*passim*

*United States v. Quinones,*
313 F.3d 49 (2d Cir. 2002) ...............................................................9

*United States v. R.L.C.,*
503 U.S. 291 (1992) ........................................................................14

*United States v. Romano,*
879 F.2d 1056 (2d Cir. 1989)..........................................................14

*United States v. Rooney,*
37 F.3d 847 (2d Cir. 1994) .............................................................37

*United States v. Shoemaker,*
746 F.3d 614 (5th Cir. 2014) ..........................................................24

*United States v. Silver,*
203 F. Supp. 3d 370 (S.D.N.Y. 2016) ......................................30, 36

*United States v. Skelos,*
No. 15 Cr. 317 (KMW) (S.D.N.Y. July 25, 2016).........................36

*United States v. Smith,*
394 F. App'x 742 (2d Cir. 2010) ....................................................22

*United States v. Spano,*
401 F.3d 837 (7th Cir. 2005) .............................................................4

*United States v. Stevens,*
559 U.S. 460 (2010) ........................................................................35

*United States v. Sun-Diamond Growers of California,*
526 U.S. 398 (1999) ................................................................*passim*

*United States v. Sunia,*
643 F. Supp. 2d 51 (D.D.C. Cir. 2009) ..........................................24

*United States v. Terry,*
707 F.3d 607 (6th Cir. 2013) ..........................................................30

*United States v. Tomblin*,
    46 F.3d 1369 (5th Cir. 1995) ............................................................... 19, 27, 28

*United States v. Toro*,
    No. 89 CR 0268 (RWS), 1989 WL 63118 (S.D.N.Y. June 8, 1989) ....................................23

*United States v. Whitfield*,
    590 F.3d 325 (5th Cir. 2009) ............................................................23

*United States v. Willis*,
    844 F.3d 155 (3d Cir. 2016) ............................................................24

*United States v. Wolf*,
    No. 12 CR 968 (JFK), 2013 WL 2359107 (S.D.N.Y. May 30, 2013) ....................................1

**Statutes**

18 U.S.C. § 201.............................................................................*passim*

    18 U.S.C. § 201(a)(1) .............................................................13

    18 U.S.C. § 201(a)(3) ............................................................. 12, 13, 36

    18 U.S.C. § 201(b)(1) .............................................................28

18 U.S.C. § 666.............................................................................*passim*

    18 U.S.C. § 666(a)(1)(B) .............................................................*passim*

    18 U.S.C. § 666(a)(2) ............................................................4

    18 U.S.C. § 666(b) ............................................................2, 26

    18 U.S.C. § 666(d)(1) ............................................................. 22, 23, 25

18 U.S.C. § 1346.............................................................. 21, 27, 33

18 U.S.C. § 1349.............................................................................7

18 U.S.C. § 1951.............................................................................7, 36

N.Y. Penal Law § 200.00-200.04 ............................................................35

**Rules of Procedure**

Fed R. Crim. P. 7(c) .............................................................................18

Fed. R. Crim. P. 7(c)(1).............................................................................2, 8, 9

Fed. R. Crim. P. 12(b)(3)..................................................................................................1

Fed. R. Crim. P. 12(b)(3)(B) ...........................................................................................8

**Senate Reports**

S. Rep. No. 98-225, 370, *reprinted in* 1984 U.S.C.C.A.N. 3182 .................................34

**Other Authorities**

John C. Coffee, Jr., *Modern Mail Fraud: The Restoration of the Public/Private
    Distinction*, 35 Am. Crim. L. Rev. 427, 436 (Spring 1998)....................................16

Leonard B. Sand, Et Al., Modern Federal Jury Instructions § 27A-10
    (2015) (hereinafter, "Sand") ................................................................................22

Defendant Joseph Percoco respectfully submits this memorandum of law in support of his motion to dismiss the Superseding Indictment[1] pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

A federal bribery charge requires proof of an "official act." At a minimum, official acts must be acts performed by officials: people officially working for, or vested with official authority by, government entities. The Indictment against Joseph Percoco attempts to meet this requirement by alleging that Percoco himself performed the official acts at issue while serving in "the office of the Governor." (S1 ¶¶ 49, 51, 53, 56, 59, 61, 63.) Thus, on their own terms, the charges against Percoco must be supported by proof of official acts that Percoco performed at a time when he was officially in government.

But all of the charges against Percoco include the period from 2014 to 2015, and therefore all include a 7 ½ month period within 2014 during which Percoco was *not* officially working in government or vested with official authority by the government. Specifically, the Indictment states that "[o]n or about April 21, 2014, … PERCOCO … *officially* left New York State employment…and returned to State employment on or about December 8, 2014." (*Id.* at ¶ 4 (emphasis added).) Nevertheless, the Indictment's alleged examples of official acts by Percoco include some acts that the Complaint places between April 21 and December 8, 2014—a time period when Percoco was not a public official. Because the charges in this case cannot be proven by official acts purportedly taken by Percoco during that period, to the extent that it relies upon such acts, the Indictment must be dismissed for failure to state an offense. Such acts

---

[1] The allegations herein are drawn from the May 11, 2017 Superseding Indictment, ECF No. 162 ("S1" or the "Indictment") and the September 20, 2016 Sealed Complaint, ECF No. 1 ("Compl." or the "Complaint"). *See United States v. Wolf*, No. 12 CR 968 JFK, 2013 WL 2359107, at *2 (S.D.N.Y. May 30, 2013) (considering both indictment and criminal complaint on a motion to dismiss indictment). By reciting these allegations, Percoco does not admit to them; they are treated as true merely for purposes of this motion to dismiss.

cannot be among "the essential facts constituting the offense charged" as a matter of law. Fed. R. Crim. P. 7(c)(1).

The allegations in Counts Nine and Ten, which charge Percoco with conspiracy to commit honest services fraud, are flawed for an additional reason: Percoco cannot have deprived the public of his honest services during the period that he was not a public employee. That is, Percoco owed no duties to the people of New York during those 7 ½ months in 2014. Accordingly, to the extent Counts Nine and Ten rely on alleged agreements to perform official acts during those 7 ½ months, they must be dismissed for failure to state a claim.

For a separate, albeit similar, reason, Counts Eleven and Twelve, which charge Percoco with violating the federal program bribery statute, 18 U.S.C. § 666, must be dismissed to the extent that they rely on purported actions, or alleged agreements to perform actions, during the same 7 ½ month period in 2014 after Percoco had left State employment. While § 666 does not contain an "official act" element, its express terms cover only government "agent[s]," meaning "person[s] authorized to act" on the government's behalf. 18 U.S.C. § 666(a)(1) & (d)(1). But Percoco did not have the authority to act on the State's behalf for 7 ½ months in 2014, and the Indictment does not allege otherwise. Nor does it allege that the campaign received any federal benefits. *Cf.* 18 U.S.C. ¶ 666(b). Accordingly, to the extent that the § 666 charges rely upon acts that Percoco performed between April 21 and December 8, 2014, those charges must be dismissed for failure to state a legally cognizable offense.

The flaws in the Indictment arising out of Percoco's official departure from government in April 2014 are only the beginning of the Indictment's deficiencies. The Supreme Court's landmark decision in *McDonnell v. United States*, 136 S.Ct. 2355 (2016), demands that the Indictment be dismissed in its entirety for reasons discussed in the Memorandum of Law in

Support of Defendant Peter Galbraith Kelly, Jr.'s Motion to Dismiss Based on *McDonnell v. United States* ("Kelly's Memorandum of Law"). We succinctly address those reasons here to make clear the connection to the charges against Percoco.

First, *McDonnell* requires that all of the charges against Percoco be dismissed because the Indictment does not allege that Percoco's purported official acts were actually performed *in exchange for* payments from the purported bribe payors. That is, the Indictment does not allege that Percoco had actually intended to perform official acts on a specific, focused matter at the time of the purported *quid pro quo*—the time when the alleged crime is supposed to be complete. Although the Indictment alleges a few examples of "official actions" that purportedly benefited the payors (*see* S1 ¶¶ 31, 35), it does not allege that Percoco intended or agreed to carry out those actions at the time of the alleged *quid pro quo* agreement. Thus, not one of the charges against Percoco adequately alleges the requisite specific intent or criminal agreement. For that reason, and for the reasons set forth in Point II of Kelly's Memorandum of Law, which Percoco hereby joins and incorporates, Counts Six, Seven, Eight, Nine, Ten, Eleven, and Twelve must be dismissed in their entirety.

Second, *McDonnell* requires that the charges against Percoco for accepting bribes in violation of 18 U.S.C. § 666(a)(1)(B) (Counts Eleven and Twelve) be dismissed in their entirety on separate constitutional grounds. *McDonnell* makes clear that § 666 is overbroad and vague in violation of the First and Fifth Amendments and that § 666 also violates principles of federalism embedded in the Constitution's framework. Although the Supreme Court was interpreting the language of the federal bribery statute, 18 U.S.C. § 201, its decision was explicitly premised on constitutional concerns implicated by all of the federal bribery statutes, § 666 included. The Court held that the Constitution requires that all federal bribery prosecutions be based on a

narrow definition of official act. Yet § 666 itself, unlike § 201, contains no "official act" element; Congress deliberately omitted the requirement when it passed § 666 in anticipation of the Supreme Court's impending decision in *Dixson v. United States*, a case regarding § 201. Recognizing that deficiency in § 666, the prosecutors in this case decided to include an "official action" element in the § 666 charges. (S1 ¶¶ 61, 63.) But only Congress can amend a statute; the Justice Department's attempt to save its § 666 charges here by adding an extra-statutory element amounts to an unconstitutional grab of legislative power by the executive branch. For that reason, and for the reasons set forth in Point I of Kelly's Memorandum of Law, which Percoco hereby joins and incorporates,[2] Counts Eleven and Twelve must be dismissed in their entirety.

Finally, to the extent that Counts Eleven and Twelve allege offenses premised on payment of gratuities rather than bribes, they must be dismissed. The Indictment does not charge Percoco under a gratuity theory, and to the extent that the government insists otherwise, its allegations lack the requisite specificity to do so under well-settled law. For these reasons, and for the reasons set forth in Point III of Kelly's Memorandum of Law, which Percoco hereby joins and incorporates, any counts purporting to charge Percoco for accepting gratuities must be dismissed.

---

[2] Kelly's Memorandum of Law challenges the constitutionality of 18 U.S.C. § 666(a)(2), which criminalizes the paying or offering of bribes. (*See* S1 ¶¶ 64-65.) Percoco challenges § 666(a)(1)(B), which criminalizes the accepting or soliciting of bribes. (*See* S1 ¶¶ 60-63.) But the two statutory provisions are mirror images of each other, and thus the arguments set forth in Point I of Kelly's Memorandum of Law apply equally to § 666(a)(1)(B) and, in turn, the charges against Percoco. *See United States v. Spano*, 401 F.3d 837, 840 n.2 (7th Cir. 2005).

# BACKGROUND

## A.    The allegations.

Percoco was appointed to be Governor Andrew Cuomo's Executive Deputy Secretary in or about January 2011.  (S1 ¶ 3.)  Percoco held this position until April 21, 2014, when he "officially left New York state employment to serve as campaign manager for the Governor's reelection campaign."  (*Id.* at ¶ 4.)  He returned to his former post in the administration on December 8, 2014, staying until the beginning of 2016.  (*Id.*)  The Indictment alleges that "during the time period that [Percoco] was the manager of the Governor's reelection campaign" —*i.e.*, after he had resigned from his position in the administration and before he had returned— Percoco nevertheless "continued to function in a senior advisory and supervisory role with regard to the Governor's Office, and continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities, and to travel with the Governor on official business, among other responsibilities."  (*Id.*)

The accusations against Percoco concern payments that he or his wife received from three of his seven co-defendants—Peter Galbraith Kelly, Jr. ("Kelly"), an executive of Competitive Power Ventures Holdings, LLC (the "Energy Company"), and Steven Aiello ("Aiello") and Joseph Gerardi ("Gerardi"), executives of COR Development Company, LLC (the "Syracuse Developer")—while Percoco was working for either the State or for Governor Cuomo's reelection campaign.  There are no allegations tying Percoco to the remaining four defendants, and he is not alleged to have had any involvement in the purported "Buffalo Billion Fraud and Bribery Scheme."  (*See id.* at ¶¶ 22-27;  *but see also id.* at ¶¶ 48, 50, 52, 54, 57, 60, 62 (each count against Percoco repeating, re-alleging, and incorporating by reference "[t]he allegations contained in paragraphs 1 through 15, 20 through 21, and 28 through 36").)

Regarding the Energy Company, the Indictment alleges that "[b]eginning in or about 2012," Percoco pressured Kelly into creating a "low-show" job at the Energy Company for Percoco's wife, for which she was paid $7,500 per month. (*Id.* at ¶ 30.) In exchange for these payments to his wife, Percoco allegedly "agreed to take, and in fact took, official actions … as the opportunity arose" and provided "official assistance … on an as-needed basis." (*Id.* at ¶¶ 29, 31.) However, the Indictment does not allege that when Kelly and Percoco entered into this alleged *quid pro quo* agreement in or about 2012, they agreed upon any specific official act that Percoco would perform, or that they agreed upon any specific matter in connection with Percoco would perform an official act. Percoco also is alleged to have "exerted pressure on and provided advice to certain other State officials" in order to secure agreements beneficial to the Energy Company in connection with two of its power plants. (*Id.* at ¶¶ 31a-b.)

Regarding the Syracuse Developer, the Indictment alleges that Percoco accepted $35,000 in "bribe payments" from the Syracuse Developer between August 2014 and October 2014 (*id.* at ¶ 33), while he was not employed by the State. (*Id.* at ¶ 4.) In exchange for these payments, Percoco allegedly "agreed to take, and in fact took, official actions for the benefit of the Syracuse Developer as the opportunity arose" (*id.* at ¶ 35) and provided "official assistance … on an as-needed basis." (*Id.* at ¶ 33.) However, the Indictment does not allege that when the Syracuse Developer and Percoco entered into the purported *quid pro quo* agreement, they actually agreed upon any specific official act that Percoco would perform, or upon any specific matter in connection with which Percoco would perform an official act.

Apart from an alleged *quid pro quo*, Percoco is alleged to have performed acts that benefited the Syracuse Developer. While he was working on the campaign and off the State payroll (*see* Compl. ¶ 26c), Percoco allegedly "exerted pressure on and provided advice to

certain other State officials, with the intent that those officials reverse an adverse decision by [the State's main economic development agency,] the Empire State Development Corporation [,]… [which] would have required the Syracuse Developer to enter into a costly agreement with labor unions." (S1 ¶¶ 26, 35a; *see also* Compl. ¶¶ 61-64 (placing events forming the basis of this allegation between early summer 2014 and December 4, 2014); S1 ¶ 4 (alleging that Percoco "officially left New York State employment to serve as a campaign manager to the Governor's reelection campaign" from April 21 through December 8, 2014).) In addition, after returning to State employment on December 8, 2014, Percoco allegedly pressured State actors to (i) secure the release of State funds owed to the Syracuse Developer, and (ii) secure a raise for Aiello's son, who worked in the Executive Chamber. (*Id.* at ¶¶ 35b-c.)

**B.     The charges.**

The Indictment charges Percoco with seven counts (Counts Six through Twelve, inclusive). They include conspiring to commit extortion under color of official right (Count Six) and extortion under color of official right (Counts Seven and Eight), in violation of 18 U.S.C. § 1951; conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Counts Nine and Ten); and solicitation of bribes and gratuities, in violation of 18 U.S.C. § 666 (Counts Eleven and Twelve). All of the charges allege that Percoco himself performed the "official actions" purportedly done in exchange for payment. (*See id.* at ¶¶ 49 (Count Six), 51 (Count Seven), 53 (Count Eight), 56 (Count Nine), 59 (Count Ten), 61 (Count Eleven), 63 (Count Twelve).) And all of the Counts allege that Percoco performed those official acts while serving "in the office of the Governor" or "as Executive Deputy Secretary to the Governor" (*Id.* at ¶¶ 49, 51, 53, 56, 59, 61, 63)—despite the fact that each count with which Percoco is charged includes the time period during which he had "officially left New York State employment." (*Id.* at ¶ 4.)

7

We assume, for purposes of this motion, that the Indictment's use of terms such as "official State action" (*id.* at ¶ 1), "official action" (*id*. at ¶¶ 31-32, 35, 47, 49, 51, 53, 56, 59, 61, 63, 65, 67), "official assistance" (*id*. ¶¶ 29-30, 33), and "official State favors" (*id.* at ¶ 28) are intended to be synonymous with "official act," as that term is defined in *McDonnell*. We attempted to confirm this understanding in our request for a bill of particulars and during our May 12, 2017 meet-and-confer, but the government refused to respond and merely referred counsel to its previous letters regarding requests for bills of particulars. If the government reveals that these terms mean something different than "official act," we reserve the right to move against the Indictment on that basis.

## LEGAL STANDARD

"The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Whether the indictment's allegations suffice to state the charged offenses is a question of law to be resolved on a pretrial motion to dismiss. Fed. R. Crim. P. 12(b)(3)(B). Dismissal is appropriate where an indictment fails to allege any or all of the essential elements of the charged offenses. *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). When an element is implicit in a statute, rather than explicit, the indictment must nonetheless allege that element explicitly. *See id.* at 93. A court may dismiss "a portion of a count" even if it does not dismiss the whole count or indictment. *Id.* at 88-89.

The Fifth and Sixth Amendments require "some amount of factual particularity" in the indictment "to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," and to ensure that the defendant is "informed of the nature and cause of the accusation against him." *Id.* at 92 (quotation marks omitted). And where the offense includes generic terms, the indictment cannot simply track the language of the

statute, but instead "must descend to particulars." *Id.* at 93 (quotation marks omitted). The Indictment "must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Id.*; *see also* Fed. R. Crim. P. 7(c)(1).

Further, in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), the Supreme Court specifically opined that judges should interpret the bribery statutes at issue in this case narrowly. The "intricate web of [statutes and] regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials," 526 U.S. at 409, has created "an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions." *Id.* at 412. "Given that reality," the Court opined, "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.*; *see also McDonnell*, 136 S. Ct. at 2373 (quoting the "scalpel vs. meat axe" passage approvingly).

The constitutionality of a federal criminal statute—like the question of whether an indictment sufficiently states an offense, or part of an offense—is also a "pure question of law," and is thus properly before the Court on a motion to dismiss. *United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002).

## DISCUSSION

### I. "Official Acts" Are Necessarily Acts by People Officially Working for Government Entities

#### A. The Supreme Court held in *McDonnell* that an official act is a formal decision or action on a specific and focused matter.

The federal bribery laws require a *quid pro quo*, and in *McDonnell v. United States*, 136 S.Ct. 2355 (2016), the Supreme Court clarified what the government must prove to establish the "*quo*." The Court held that federal bribery laws could *not* reach a state official who had taken bribes and in exchange had agreed to provide, and had in fact provided, only preferential access.

9

Even with a vivid *"quid"* —such as a Ferrari, a Rolex watch, or a ball gown, *id.* at 2375—there had to be a *quo*, and the Court held that an act such as arranging a meeting with a government official was not a sufficient *quo*. In fact, it was not enough even that the accused hosted an event "designed" to encourage another government official to decide a matter a certain way. *Id.* at 2365 (quotation marks omitted). Rather, the accused had to have provided (or agreed to provide) official government acts related to a "question, matter, suit, proceeding, or controversy" that was "specific and focused." *Id.* at 2372 (quoting 18 U.S.C. § 201(a)(3)). That narrow understanding of an official act was required, the Court held, to avoid a number of constitutional problems: the chilling of political activity protected by the First Amendment, arbitrary and discriminatory enforcement that denied public officials their due process rights, and interference by the federal government in matters rightly within the states' control. *See id.* at 2372-73; *see also* Section VI.A *infra*,.

The Court reached that conclusion in reviewing the case of Bob McDonnell, the former governor of Virginia. Governor McDonnell was convicted of honest services fraud and Hobbs Act extortion for accepting $175,000 in loans, luxury items, and other gifts from a businessman who wanted public universities to perform scientific studies on his company's dietary supplements. *Id.* at 2364-65. That Governor McDonnell had received benefits from the businessman and performed certain actions in exchange for them was not in real dispute. The parties essentially agreed that Governor McDonnell's actions included "arranging meetings … with Virginia government officials … to discuss and promote" the dietary supplements; "hosting[] and attending[] events at the Governor's Mansion designed to encourage Virginia university researchers to initiate studies"; and "contacting other government officials" in an "effort to encourage Virginia state research universities to initiate studies." *Id.* at 2365

(quotation marks omitted). The question was whether those actions performed by Governor McDonnell constituted "official acts."

At trial, the district court instructed the jury that "official acts" encompassed any "acts that a public official customarily performs." *Id.* at 2366 (quotation marks omitted). In so doing, the district court rejected the defense's request for an instruction that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts'" because they "are not decisions on matters pending before the government." *Id.* (quotation marks omitted). The jury convicted, and the Court of Appeals for the Fourth Circuit affirmed. *Id.* at 2367.

The Supreme Court reversed, vacating McDonnell's conviction and holding that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act.'" *Id.* at 2372. Nor does merely "expressing support for [an outcome] at a meeting, event or call," so long as the official does not "intend to exert pressure on another official or provide advice, knowing or intending such advice[3] to form the basis for an official act." *Id.* at 2371. Instead, an official takes an "official act" only when he or she exercises formal governmental power, or "advise[s]" or "pressure[s]" another to exercise such power. *See id.* at 2370-72.

More specifically, the Supreme Court clarified the scope of an "official act," defined by statute as "a[] decision or action on a[] question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, ***in***

---

[3] The Supreme Court did not use the word "advice" casually in *McDonnell*; it took the term from *United States v. Birdsall*, 233 U.S. 223, 227-31 (1914), which it explicitly cited and relied on in its holding. *See McDonnell*, 136 S. Ct. at 2370-71. In *Birdsall*, Justice Hughes, writing for the unanimous majority, found official action where a defense attorney bribed prosecutors for the Bureau of Indian Affairs so that the prosecutors would "advise" the Commissioner of the Bureau not to prosecute the attorney's client. Thus, the "advice" was a formal recommendation not to prosecute particular individuals. *Birdsall*, 233 U.S. at 228-29.

*such official's capacity*, or in such official's place of trust or profit." *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)) (emphasis added). The Court first explained that the terms "cause," "suit," "proceeding," and "controversy" "connote a *formal* exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* at 2368 (emphasis added). And although the terms "question" or "matter" are, on their face, broader, the Court applied the *noscitur a sociis* canon of statutory interpretation to conclude that "question" and "matter," like the words they are grouped with in § 201, also "refer to a formal exercise of governmental power." *Id.* at 2368-69.[4] The Court then went on to explain that a matter that is "pending" or "may by law be brought before any public official" is "something that is relatively circumscribed … something within the specific duties of an official's position—*the function conferred by the authority of his office*." *Id.* at 2369 (emphasis added).

Thus, federal bribery charges must identify, as the requisite *quo* for a bribe, a formal exercise of governmental power (or an agreement to exercise such power) on a "specific and focused" matter, *id.* at 2372, that is "within the specific duties of [the] official's position." *Id.* at 2369. That decision or action may include "*using his official position* to exert pressure on another official to perform an 'official act.'" *Id.* at 2372 (emphasis added); *see also Sun-Diamond*, 526 U.S. at 408 (implicitly stating that "official acts" can only be taken by those with an "official position" and explaining that the "official act" requirement ensures that "the giving of gifts by reason of the recipient's mere tenure in office" is not criminalized).

---

[4]    For brevity, going forward, we will use "matter" to refer to the "question, matter, cause, suit, proceeding, or controversy" element of the "official act" requirement.

**B.** *McDonnell* **and other precedent establishes that only people with official government responsibilities can perform official acts.**

Because a *formal* exercise of *official* power can only be made by a person who is authorized to exercise such power, the Supreme Court's logic in *McDonnell* demands that federal bribery charges may be brought only against individuals with the authority to act for or on behalf of the government. In other words, although it was undisputed that Governor McDonnell was a public official at all relevant times, the Court's definition of "official act" makes clear that such an act can only be performed by a person at a time when he or she has the authority to act for a governmental entity.

In addition, holding that a person *not* employed by or authorized to act for the government can perform an "official act" would not only contravene *McDonnell*, but would also run counter to an earlier Supreme Court decision construing the scope of the federal bribery statutes. In *Dixson v. United States*, 465 U.S. 482 (1984), the Court considered what circumstances could make non-government employees "public officials" subject to prosecution under 18 U.S.C. § 201.[5] The defendants in *Dixson* were officers of a private, nonprofit corporation that administered and expended federal development grants; they were charged with receiving kickbacks from contractors that sought grant funds. The Court held that "[t]o be a public official under section 201(a), an individual must possess some degree of *official responsibility* for carrying out a [government] program or policy … [and] *assume some duties of an official nature*." *Id.* at 499-500 (emphasis added); *see also id.* at 496 (relevant inquiry is "whether the person occupies a position of public trust with *official [governmental]*

---

[5]    Specifically, the Supreme Court in *Dixson* interpreted 18 U.S.C. § 201(a)(1), which defines a "public official" as "an officer or employee or person acting for or on behalf of the [government], or any department, agency, or branch … thereof …, in any official function, under or by authority of any such department, agency, or branch of government." 18 U.S.C. § 201(a)(1). The Court in *McDonnell* construed essentially the corollary provision of the same statute—the definition of "official act" set forth in § 201(a)(3).

*responsibilities*") (emphasis added).  Based on this reasoning, the Court upheld the convictions,

as the defendants in *Dixson* had been appointed to disburse funds that were directly issued by a

government agency pursuant to an act of Congress, and their salaries were paid entirely by the

grant money.  *Id.* at 487-88; *accord United States v. Kenney*, 185 F.3d 1217, 1221-22 (11th Cir.

1999) (management employee of government contractor, who assisted the Air Force in procuring

materials and equipment for a project, was a "public official" because he had been deputized

with official responsibility for carrying out government program).

Following *Dixson,* the Second Circuit has held that a bribery prosecution requires that at

the time of the purported *quo*, the defendant was either (i) a government employee; or (ii)

someone otherwise acting on the government's behalf and cloaked with some degree of official,

governmental authority.  *See United States v. Romano*, 879 F.2d 1056, 1059-60 (2d Cir. 1989);

*see also Laverpool v. N.Y. City Transit Auth.*, 835 F. Supp. 1440, 1462 (E.D.N.Y. 1993) (where

an arbitrator had been approached about a government job during a hearing and later accepted

that job, he was "neither a public official [n]or a public officer at the time" of the purported

bribes alleged as predicate RICO offense), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).[6]

Accordingly, when the government admits that "[o]n or about April 21, 2014" Percoco

"officially left New York State employment to serve as campaign manager for the Governor's

---

[6]    Moreover, the Supreme Court's later rulings concerning bribery and gratuities suggest that even the "official [governmental] responsibilities" requirement of *Dixson* is too broad and possibly too vague, and would be more narrowly drawn by the current Court so as to better mark the outer boundaries of official conduct.  *Dixson* did not invoke the rule of lenity, and instead looked to legislative history to interpret ambiguities in § 201(a), *Dixson*, 465 U.S. at 500 n.19—an approach that led four justices to dissent.  *See id.* at 501-02 (O'Connor, J., dissenting) ("I find the evidence of congressional intent too weak to meet the higher standard for resolving facial ambiguity against a defendant when interpreting a criminal statute."); *see also United States v. R.L.C.*, 503 U.S. 291, 310 (1992) (Scalia, J., concurring) ("The [*Dixson*] opinion [decided before Justice Scalia joined the Court] does not trouble to discuss fair warning … I think *Dixson* weak (indeed, utterly unreasoned) foundation for a rule of construction that permits legislative history to satisfy the ancient requirement that criminal statutes speak plainly and unmistakably.") (quotation marks and citations omitted).  Further, the Court's later unanimous decisions in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) and *McDonnell* adopted more narrow interpretations of the gratuity and bribery statutes.

reelection campaign, and [only] returned to State employment on or about December 8, 2014" (S1 ¶ 4), it admits that Percoco cannot have performed an official act between April 21 and December 8, 2014. Under Supreme Court precedent, he lacked any governmental authority during this time.

The Second Circuit's decision in *United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), cannot override the Supreme Court's later decisions in *Dixson* and *McDonnell*, of course, but in any event *Margiotta* does not require a contrary result here. The defendant in *Margiotta* was a Republican Party official who was not a government employee. He was convicted of honest services fraud relating to appointments of the insurance Brokers of Record for two municipalities: Nassau County and the Town of Hempstead. *Id.* at 113-14. The Second Circuit's opinion in *Margiotta* addressed whether a party official could, in certain extreme circumstances when he had near total *de facto* control of a government entity, owe a fiduciary duty to the general public; the case did *not* address the official act requirement. On its own terms, therefore, *Margiotta* is not directed at the issue in *McDonnell*. In addition, although the defendant in *Margiotta* was not himself a public official, the official acts in the case—the appointments of insurance brokers of record—were performed by public officials: the Nassau County Executive and the Presiding Supervisor of the Town of Hempstead. *Id.* at 132. So the court in *Margiotta* never considered whether a non-public official could perform an official act. In contrast, the Indictment here alleges that Percoco himself, who was not a public official from April 21 to December 8, 2014, performed the official acts during that time that form the basis for the charges against him. (*See* S1 ¶¶ 53, 58, 63 ("[f]rom at least in or about 2014, up to and including in or about 2015 … ").)

Further, in *Margiotta*, the Second Circuit did not conclude merely that the defendant had proximity to government officials, or influence with government officials, or even personal involvement with certain government functions. Rather, the Circuit went so far as to find that the defendant in *Margiotta* "had a ***stranglehold*** on the respective governments of Nassau County and the Town of Hempstead." *Margiotta*, 688 F.2d at 122 (emphasis added). "***[E]verything*** went through his hands … and he ***dominated*** governmental affairs as the de facto public ***leader***." *Id.* (emphasis added) (quotation marks omitted). Thus, the allegations in this case regarding Percoco's proximity, influence, or involvement in the Office of the Governor after he had resigned his government position do not remotely approach *Margiotta*.

In addition, *Margiotta* has been partially overruled and generally called into question. *See Ingber v. Enzor*, 841 F.2d 450, 453-54 (2d Cir. 1988) (recognizing partial overruling of *Margiotta*); *United States v. Murphy*, 323 F.3d 102, 109-18 (3d Cir. 2003) (Becker, J.) (expressly rejecting *Margiotta*'s holding and reasoning, and agreeing with Judge Winter's dissent in the case); *United States v. Adler*, 274 F. Supp. 2d 583, 586 (S.D.N.Y. 2003) (Brieant, J.) ("The *Margiotta* decision, which involved a patronage scheme widely practiced on a state and local level, has been widely criticized by practically everybody including the writer."); John C. Coffee, Jr., *Modern Mail Fraud: The Restoration of the Public/Private Distinction*, 35 AM. CRIM. L. REV. 427, 436 (1998) ("The overreach in [*Margiotta*'s] theory seems obvious and invades even the sphere of the First Amendment."). Even before *McDonnell*, there was good reason to confine the language of *Margiotta* to the extreme allegations at issue in that case. After *McDonnell*, the official act requirement places strict limits on how *Margiotta* can be applied.

**C.    Percoco cannot have performed any official acts between his resignation from state government in April 2014 and his return in December 2014.**

Counts Six through Twelve of the Indictment all charge that Percoco himself took, or agreed to take, the "official actions" that constitute the alleged *quo*.  (S1 ¶¶ 49 (Count Six), 51 (Count Seven), 53 (Count Eight), 56 (Count Nine), 59 (Count Ten), 61 (Count 11), and 63 (Count Twelve).)  Further, all of the Counts in which Percoco is charged explicitly state that he performed the alleged conduct while serving "in the office of the Governor."  (*Id.* at ¶¶ 49, 51; *see also id.* at ¶¶ 56, 59 (charging that Percoco agreed to take actions "while serving as Executive Deputy Secretary to the Governor").)  On their own terms,[7] therefore, the charges cannot be proven with "official acts" by Percoco at a time when he was not in government.

And yet, all of the charges against Percoco include the period from April 21, 2014 through December 8, 2014 (*see id.* at ¶¶ 49, 51, 61 ("[f]rom at least in or about 2012, up to and including in or about 2016 …"); *id.* at ¶¶ 53, 63 ("[f]rom at least in or about 2014, up to and including in or about 2015 …"); *id.* at ¶ 55 ("[f]rom at least in or about 2012, up to and including in or about 2014 …"); *id.* at ¶ 58 ("[f]rom at least in or about 2014, up to and including in or about 2015"))—a period during which Percoco was not working for the State.  (*See id.* at ¶ 4 ("On or about April 21, 2014, [Percoco] … officially left New York State employment to serve as campaign manager for the Governor's reelection campaign, and returned to State employment on or about December 8, 2014."); *see also* Compl. ¶ 26b (same); *id.* at ¶ 26c ("[Percoco] was not on the State payroll between at least on or about April 22, 2014 and December 7, 2014").)

Further, the Indictment alleges purported "official actions" by Percoco that, as demonstrated in the Complaint, occurred during that same time period when Percoco was *not* in

---

[7]    "[T]he indictment must be considered as it was actually drawn, not as it might have been drawn."  *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

government. (*See* S1 ¶ 35a (alleging Percoco "exerted pressure on and provided advice to certain other State officials, with the intent that those officials reverse an adverse decision by the Empire State Development Corporation [ESDC] that would have required the Syracuse Developer to enter into a costly agreement with labor unions") and Compl. ¶¶ 61-64 (alleging that the relevant interactions with ESDC occurred between early summer 2014 and December 4, 2014).)

Under *McDonnell* and *Dixson*, such acts by Percoco cannot be among "the essential facts constituting the offense charged." Fed R. Crim. P. 7(c)(1). Accordingly, the Indictment must be dismissed for failure to state an offense to the extent that it relies upon those acts.

The government attempts to blunt the effect of its admission that Percoco had resigned from the Executive Chamber in April 2014 by converting Percoco's job as campaign manager into the "functional" equivalent of a government job:

> However, during the time period that PERCOCO was the manager of the Governor's reelection campaign, he continued to ***function*** in a senior advisory and supervisory role with regard to the Governor's Office, and continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities, and to travel with the Governor on official business, among other responsibilities.

(S1 ¶ 4 (emphasis added).) But crucially, the government does not allege that Percoco, having resigned from his job with the State to become a campaign manager, had the authority to perform "a ***formal*** exercise of governmental power," *McDonnell*, 136 S. Ct. at 2372 (emphasis added), or that he "occupie[d] a position of public trust with ***official*** … responsibilities." *Dixson*, 465 U.S. at 496 (emphasis added). The "official events" and "official business" it alleges in this time period (assuming *arguendo* that they qualify as "official acts" under *McDonnell*), were official for the Governor, not for Percoco.

18

That a campaign manager often travels with a candidate and has input into a candidate's schedule does not clothe the campaign manager with official authority. Indeed, federal appellate courts around the country have held that campaign managers and even candidates running for office lack official government authority. *See, e.g., United States v. Manzo*, 636 F.3d 56, 62-65 (3d Cir. 2011) (affirming dismissal of Hobbs Act indictment of mayoral candidate and his brother and campaign manager for purported acceptance of bribes during campaign on the grounds that defendants lacked official authority); *United States v. Tomblin*, 46 F.3d 1369, 1382-83 (5th Cir. 1995) (conviction for extortion under color of official right reversed because defendant was not a public official nor in the process of becoming one, because defendant did not masquerade as a public official, and because defendant did not aid or abet a public official's receipt of money to which he was not entitled); *see also United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1380-82 (D.C. Cir. 1981) (recognizing distinction between "campaign work" and "official duties" in False Claims Act case against a Senator for using federal funds to pay his aide's salary while the aide was working on Senator's reelection campaign).

Further, holding that a person *not* authorized to act for the government could perform a formal exercise of governmental power would create tension with a wide ranging series of precedents. For example, cases determining the existence of governmental immunities place significant weight on whether a person has official authority. *See, e.g., United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1145 (9th Cir. 2004) (in False Claims Act case against private contractor, sovereign immunity did not apply because the employees that submitted false claims were "employed and paid by [the contractor]," and their mere working "under the supervision of [State] officials [did] not transform [them] into government officials"); *see also United States v. Cody*, 722 F.2d 1052, 1057-59 (2d Cir. 1983) (vacating

conviction in prosecution of union leader for receiving "personal profit as a result of his position," as criminal liability required a formal "employment relationship between the [briber] employer and members of the union, not the possibility of a future relationship[,] … [and] the connection between [briber] as an employer and [defendant] as an officer of [union] was too nebulous at the time the gift was made to be the basis for a criminal charge under [29 U.S.C.] § 186(b)(1)") (quotations omitted).

In sum, Percoco cannot have performed any official acts between his resignation from State government on April 21, 2014 and his return on December 8, 2014, and holding otherwise would not only distort federal bribery law but would also create tension with precedents in other areas.

## II.     Percoco Cannot Have Deprived the Public of His Services During the Period that He Was Not a Public Employee

Counts Nine and Ten of the Indictment charge Percoco with conspiracy to commit honest services wire fraud.  (*See* S1 ¶¶ 54-59.)  To the extent that the honest services wire fraud allegations against Percoco rely upon agreements that Percoco perform acts while he was off the State's payroll, there is an additional reason requiring dismissal:  during that time period, Percoco owed no services to the people of New York.  Percoco could not have "conspire[d]" or "agree[d]" to "deprive the public" of a right they did not have.  (*Id.* at ¶¶ 55-56, 58-59; *see also Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (conspiracy requires that defendants "reach an agreement with the specific intent that the underlying crime *be committed*") (quotation marks omitted) (emphasis in original).)

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court made clear that there can be no honest services fraud without a breach of fiduciary duty.  Jeffrey Skilling was a longtime executive of Enron Corp. who was prosecuted for, among other things, conspiracy to

commit honest services fraud in connection with Enron's collapse. Specifically, the government's theory was that Skilling was guilty of honest services fraud for making misrepresentations to his employer, Enron, and its auditors in order to falsely prop up Enron's stock price and, by virtue of his stock options, profit himself. *Id.* at 368-69. Skilling appealed his conviction to the Supreme Court, arguing that the honest services fraud statute was unconstitutionally vague. *Id.* at 376. The Supreme Court rejected this argument, but it held that the statute was unconstitutionally vague as applied to Skilling. In order to "preserve the statute without transgressing constitutional limitations," the Court held that the statute had to be read narrowly to cover only the "paradigmatic" kickback or bribery schemes that "spurred Congress to enact § 1346." *Id.* at 407-09.

In so holding, the Supreme Court also made clear that honest services fraud requires a breach of fiduciary duty. *See id.* at 407 (describing the "doctrine's solid core" as involving "offenders who, *in violation of a fiduciary duty*, participated in bribery or kickback schemes") (emphasis added); *see also id.* at 407 n.41 ("Justice SCALIA [in a concurring opinion] emphasizes divisions in the Courts of Appeals regarding the source and scope of fiduciary duties. But these debates were rare in [paradigmatic] bribe and kickback cases. The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute …") (citations omitted); *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012) (*en banc*) ("A close examination of the Supreme Court's opinion in *Skilling* reveals that embedded in the Court's holding … is the implication that a breach of fiduciary duty is an element of honest services fraud."), *cert. denied*, 133 S. Ct. 929 (2013).

Accordingly, to properly allege an honest services fraud conspiracy, the government is required to allege that the "official acts" that Percoco purportedly agreed to perform in exchange

for payment were ones he would take while owing fiduciary duties to the public—*i.e.*, while employed by the State. To the extent that the allegations against Percoco for conspiring to commit honest services fraud rely upon purported agreements that Percoco perform services while Percoco was not employed by the State, they must be dismissed for failure to state an offense.

## III. The § 666 Charges Cannot Be Proven by Acts that Percoco Performed During the Period that He Was Not a Government Agent.

Counts Eleven and Twelve charge Percoco with violations of the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B). (*See* S1 ¶¶ 61-64.) To the extent that these charges rely on acts that Percoco performed during the 7 ½ months in 2014 after he had left State employment— and even if *McDonnell*'s discussion of "official acts" did not apply to § 666 (*see supra* Sec. I)— dismissal is still required because Percoco was not an "agent" of the State for purposes of § 666 during that time.

### A. Under § 666, an "agent" must have actual legal authority to act on behalf of an organization or government.

Section 666 requires that the government prove that a defendant "solicit[ed]," "demand[ed]," "accept[ed,] or agree[d] to accept" payments in exchange for "influence" while "***being an agent*** of an organization, or of a State, local, or Indian tribal government, or any agency thereof," provided that "the organization, government, or agency receives[ annual] … benefits in excess of $10,000 under a Federal program." 18 U.S.C. § 666(a)(1)(B) & (b) (emphasis added); *see also United States v. Smith*, 394 F. App'x 742, 744 (2d Cir. 2010) ("it was essential for the indictment to charge and for the government to prove that Smith was a public official at the time he engaged in [§ 666] … bribery) (emphasis added); LEONARD B. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS § 27A-10 (2015) (hereinafter, "SAND") ("The first

element the government must prove beyond a reasonable doubt is that ***at the time alleged in the indictment***, [the defendant] was an agent of [the government].") (emphasis added).

Under the plain language of the statute, an agent is "a person ***authorized*** to act" on the government's behalf. 18 U.S.C. § 666(d)(1) (emphasis added); *see also* SAND at § 27A-10 ("An 'agent' is a person authorized to act on behalf of another person, organization or government."). As the Second Circuit has explained, the statute's definition of "agent" requires a showing that the defendant had *actual* authority to act on behalf of the government. *United States v. Mazer*, 631 F. App'x 57, 61 (2d Cir. 2015) (citing § 666(d)(1)), *cert. denied*, 137 S. Ct. 827 (2017). In other words, for criminal liability to attach, the defendant must have the "authority to act on behalf of and ***bind*** the [government entity] in connection with his work" forming the basis of the purported bribery scheme. *Id.* (emphasis added); *see also United States v. Toro*, No. 89 CR 0268 (RWS), 1989 WL 63118, at *1-2 (S.D.N.Y. June 8, 1989) (rejecting defendant's argument that the Restatement of Agency principles apply to § 666, and finding that under "Congress['s] … express definition of the term 'agent,'" defendant was an agent of an entity where she was specifically "enlisted … as its representative and authorized … to act on its behalf in [a particular] endeavor").

The other federal circuits that have considered the issue have adopted the same confined definition of "agent" when interpreting the statutory text. Indeed, in the seminal case addressing the issue, *United States v. Phillips*, the Fifth Circuit held that the relevant inquiry was whether the defendant, as a tax assessor for a parish—a local government entity that received federal funding—"was authorized to act on behalf of the parish with respect to its funds." *Phillips*, 219 F.3d 404, 411 (5th Cir. 2000); *accord United States v. Whitfield*, 590 F.3d 325, 344 (5th Cir. 2009) (same); *United States v. Beldini*, 443 F. App'x 709, 719 (3d Cir. 2011) (citing *Phillips* and

23

*Whitfield* approvingly for the same proposition); *United States v. Willis*, 844 F.3d 155,167 (3d Cir. 2016) (implicitly requiring proof of actual authority vested in the defendant by the relevant government or governmental agency); *United States v. Shoemaker*, 746 F.3d 614, 621 (5th Cir. 2014) (same); *United States v. Lupton*, 620 F.3d 790, 801 (7th Cir. 2010) (same); *United States v. Langston*, 590 F.3d 1226, 1234 (11th Cir. 2009) (same); *see also United States v. Sunia*, 643 F. Supp. 2d 51, 64 (D.D.C. 2009) (endorsing *Phillips* and applying its reasoning, noting that it was one of the "sole case[s] actually addressing the scope of the agency requirement of § 666").

Ultimately, the Fifth Circuit found in *Phillips* that the defendant was not authorized to act for the parish because (1) "although Phillips was the tax assessor for property in the parish, the parish ha[d] no power, authority, or control over the assessor's duties or job"; (2) "the assessor's salary [was] not set by the parish, the salary [was] not paid for by the parish, and the assessor receive[d] no employee benefits from the parish"; and (3) "[t]here [was] nothing in the record to indicate that Phillips had any ability to control or administer employees or programs or funds of the parish" or "***legal authority*** to bind the parish." *Phillips*, 219 F.3d at 412-13 (emphasis added). Similarly, in *United States v. Sunia*, the court dismissed the § 666 claims to the extent that those claims were based on acts that occurred before the defendants were first alleged to have held particular government positions. *Sunia*, 643 F. Supp. 2d at 58. The court found that dismissal was required because with respect to the earlier time period, the indictment alleged only that the defendants had "membership" in layers of government and "personal cachet appurtenant to [their] role[s]," but failed to allege that the defendants "actually used [any] authority conferred upon them ***by law*** to convert [federal] funds" to themselves in the alleged bribery scheme. *Id.* at 67 (emphasis added). Thus, in order for Percoco to be an agent of the State under § 666, he had to have had official legal authority to act for the State.

**B.    Percoco lacked the actual legal authority to act on behalf of the state government between April 21, 2014 and December 8, 2014.**

But Counts Eleven and Twelve of the Indictment charge Percoco for violating § 666 "[f]rom at least in or about 2012, up to and including in or about 2016" and "[f]rom at least in or about 2014, up to and including in or about 2015" (S1 ¶¶ 61, 63)—time periods that include the months after Percoco resigned from State employment to work for the Governor's reelection campaign.  (*See id.* at ¶ 4.)  And there is no allegation in the Indictment that, as the Governor's campaign manager, Percoco had any legal authority "to act on behalf" of the State.  18 U.S.C. § 666(d)(1).  Nor is there any hint that his salary or any employee benefits were paid by the State during that time—which indeed it could not, given that Percoco "*officially* left New York state employment" from April 21, 2014 through December 8, 2014.  (S1 ¶ 4 (emphasis added); *see also* Compl. ¶ 26c.)  Percoco therefore could not be considered an agent of the State at that time—much less a "senior official in the Office of the Governor."  (*See* S1 ¶¶ 61, 63).)

The government cannot cure this defect by alleging that Percoco, "during the time that [he] was the manager of the Governor's reelection campaign, … continued to *function* in a senior advisory and supervisory role with regard to the Governor's office" and  "continued to be *involved* in the hiring of staff and the coordination of the Governor's official events and priorities."  (*Id.* at ¶ 4 (emphasis added).)  Nor is it enough to allege that Percoco traveled with the Governor "on official business."  (*Id.*)  Those allegations are plainly insufficient; they contain no suggestion that Percoco had "legal authority," *Phillips*, 219 F.3d at 413, or the power to "bind the [State] in connection with his work" while employed by the campaign.  *Mazer*, 631 F. App'x at 61.

What is more, although the Indictment acknowledges that Percoco "officially left State employment" to serve as the Governor's campaign manager for a period of time covered in the

§ 666 charges (S1 ¶ 4), it contains no allegations that the Governor's reelection campaign received any federal funding, grant, or other form of benefit. In contrast, in charging other defendants, the government was careful to make such allegations. (*See* S1 ¶ 6 ("The SUNY System … receives federal funds in excess of $10,000 per year."); ¶ 7 ("During each year relevant to this Indictment, the Research Foundation received more than $10,000 in federal funding.").) The allegations against Percoco thus fail to satisfy the plain terms of § 666(b), unconstitutionally criminalizing conduct that in no way implicates "the reliability of those who use public money." *Sabri v. United States*, 541 U.S. 600, 608 (2004).

Thus, acts that Percoco performed between April 21 and December 8, 2014 cannot serve as the *quo* for § 666 bribery counts. To the extent that Counts Eleven and Twelve rely on acts taken during that time, they must be dismissed.

## IV. Counts Six, Eight, Ten, and Twelve Must Be Dismissed Because the Payments that Constitute the Alleged Bribes Were Made When Percoco Was Not an Official

The same logic that applies to the *quo* applies to the *quid*. If, at the time that a payee receives a payment, he does not have actual authority to act on behalf of and bind the government, and he has not taken legitimate steps toward becoming an official (*i.e.*, preparing to take office after having been appointed), he cannot be prosecuted for violating the federal bribery statutes. Not the Hobbs Act; not the honest services fraud statute; not § 666. The alleged "cash payments," "bribes," "cash," or "things of value," from the Syracuse Developer in Counts Six, Eight, Ten, and Twelve were all purportedly received by Percoco during the months that he was not a State official. (*See* S1 ¶¶ 48-49, 52-53, 57-59, 62-63; *see also id.* at ¶ 33 (alleging the payments from the Syracuse Developer were received between "in or about August 2014" and "in or about October 2014"). Accordingly, each of those Counts must be dismissed.

In *United States v. Manzo*, 636 F.3d 56 (3d Cir. 2011), the Third Circuit affirmed the dismissal of Hobbs Act conspiracy and attempt Hobbs charges against two brothers who were, respectively, an unsuccessful mayoral candidate and his campaign manager. The candidate had "previously held public office in other capacities," but was not in office at the time that he accepted payments in exchange for "expedit[ing] approvals of a particular … real estate development project." *Id.* at 59-60. In affirming the district court's dismissal for failure to state a claim, the Court of Appeals held that because neither the candidate nor the campaign manager "acted []or pretended to act in an official capacity, their conduct was not 'under color of official right.'" *Id.* at 64; *see also United States v. Tomblin*, 46 F.3d 1369, 1382-83 (5th Cir. 1995) (holding that a private person cannot be convicted of extortion under color of official right where the alleged extortion did not result in the receipt of money by any public official as the defendant was not a public official, nor in the process of becoming a public official, nor believed by his purported victims to be a public official).

Accordingly, charges under the Hobbs Act can only stand where "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," as "[i]n such situations, the official asserts that ***his official conduct will be controlled*** by the terms of the promise or undertaking." *Manzo*, 636 F.3d at 64 n.6 (emphasis added) (citing *McCormick v. United States*, 500 U.S. 257, 273 (257)). The same is true for charges under the honest services fraud statute, 18 U.S.C. § 1346; payments are not criminal unless accepted in exchange for a "formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2374.

The analysis under § 666 leads to the same result. To bring charges under § 666, the government must allege, and ultimately prove, that same purported *quid pro quo* agreement. *See United States v. Ford*, 435 F.3d 204, 210 (2d Cir. 2006). Indeed, the plain meaning of § 666's terms makes the status of the payee as a current "agent" a necessary element of the offense;

the statute covers payments only when the payee, while "***being an agent***" of the government or a government agency, agrees to take government action in return. 18 U.S.C. § 666(a) (emphasis added). Moreover, while § 201—the provision that the Supreme Court interpreted narrowly in *McDonnell* to avoid constitutional problems—expressly outlaws payments in exchange for official actions to "person[s] who ha[ve] been selected to be [] public official[s]," 18 U.S.C. § 201(b)(1), there is no analogous provision in § 666.

As argued previously, the government here does not allege that Percoco "acted []or pretended to act in an official capacity," *Manzo*, 636 F.3d at 64, during the months that he "officially left New York State employment." (S1 ¶ 4; *cf.* Compl. ¶ 62a (alleging, just prior to the first purported payment from the Syracuse Developer to Percoco, that Aiello asked, "is there any way Joe P can help us with this issue ***while he is off the 2nd floor working on the Campaign***") (emphasis added); *id.* at ¶ 59a (allegations that Percoco asked the Governor's then-assistant counsel about performing consulting services while working for the campaign)). The government merely alleges that, during the 7 ½ month period, Percoco had a close relationship with the Governor and "function[ed] in a senior advisory and supervisory role with regard to the Governor's Office." (S1 ¶ 4.) At most, this is an allegation that Percoco accepted payments while having mere "unofficial power over an official," which the Fifth Circuit found insufficient in *Tomblin*. *See* 46 F.3d at 1383.

In sum, all of the charges related to purported payments from the Syracuse Developer (Counts Six, Eight, Ten, and Twelve) are all premised on payments that Percoco received between "in or about August 2014 up through and including in or about October 2014" (S1 ¶ 33; *see also* Compl. ¶ 63), the period during which Percoco had "officially" resigned from State employment. (S1 ¶ 4.) As a matter of law, such payments cannot constitute the "*quid*" necessary to state the offenses alleged in any of those Counts. Therefore Counts Six, Eight, Ten, and Twelve must be dismissed.

## V.  The Indictment Must Be Dismissed Because It Does Not Allege that Percoco Agreed or Intended to Perform an Official Act on a Specific and Focused Matter

The Indictment alleges that Percoco eventually performed certain official acts before April 2014 and after December 2014, but it does not allege that Percoco received payments from the Energy Company or the Syracuse Developer with the intent to perform those purported official acts.  In other words, it does not allege that Percoco had actually intended to perform any particular official acts on any specific, focused matter at the time of the purported *quid pro quo*—the time when the alleged crime is supposed to be complete.  Thus, none of the conspiracy and substantive charges against Percoco adequately allege the required specific intent or criminal agreement.  For this reason, the reasons set forth below, and the reasons set forth in Point II of Kelly's Memorandum of Law, all the charges against Percoco must be dismissed.

To prove a federal bribery charge, the government must prove that there was a *quid pro quo* and that the defendant had the criminal intent to carry out that *quid pro quo*.  A public official must have received a thing of value (*quid*) with the specific intent to exchange that thing of value for an official act (*quo*).  And whether the thing of value was given and received with the requisite specific intent is determined at the time it is given and received or, in the case of a conspiracy charge, at the time of agreement.  *McDonnell*, 136 S. Ct. at 2371.  That is so because the "offense is completed at the time when the public official receives a payment in return for his agreement to perform **specific official acts**."  *Id*. at 2365 (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)) (emphasis added).  Further, the requisite official acts intended or agreed to be performed must be on a matter that is "specific and focused."  *McDonnell*, 136 S.Ct. at 2372; *see also id.* at 2369 ("the pertinent 'question, matter, cause, suit, proceeding or controversy' must be [] focused and concrete"— "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete").  Without the "quo" being "cabin[ed]" in this way,

*United States v. Silver*, 203 F. Supp. 3d 370, 378 n.8 (S.D.N.Y. 2016), the Supreme Court reasoned in *McDonnell*, the Governor could have been improperly convicted "on the theory that he accepted things of value that were given for ***future unspecified action***." *McDonnell*, 136 S. Ct. at 2367 (alterations omitted) (emphasis added). Accordingly, the Court vacated the judgment of McDonnell's conviction.

Permitting the government to bring bribery charges when the promised *quo* is merely a future unspecified act would implicate the "'significant constitutional concerns'" that dictated the Supreme Court's holding in *McDonnell* by criminalizing routine political activity. *Silver*, 203 F. Supp. 3d at 378 n.8 (quoting *McDonnell*, 136 S. Ct. at 2372). If a constituent has donated to a public official's campaign, or paid for the official's dinner, then the official would risk a bribery charge merely by providing legitimate constituent services to the donor. *See McDonnell*, 136 S.Ct. at 2372 (raising example of "the union official worried about a plant closing," and noting that "[t]he Government's position could cast a pall of potential prosecution over [that] relationship[] if the union had given a campaign contribution in the past").

Moreover, bribery charges based on unspecified future action would run afoul of the Supreme Court's decision in *United States v. Sun-Diamond Growers of California*, which specifically rejected the government's argument that criminal charges could be proved merely by showing that a thing of value was provided "because of [a person's] official position" or to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Sun-Diamond*, 526 U.S. at 405; *see also id.* at 407 (requiring payments to public officials be "linked to an[] identifiable act" because public officials always have before them issues concerning their constituents); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives money in the hope of future unspecified

assistance does not agree to exchange payments for actions. No bribe thus occurs if the elected official later does something that benefits the donor.").

But here, the Indictment attempts to criminalize the acceptance of things of value in exchange for unspecified official action. To be sure, the Indictment lists a few examples of "[o]fficial actions" allegedly taken "for the benefit of" the Energy Company and the Syracuse Developer (*see* S1 ¶¶ 31a-b, and 35a-c) regarding fairly "concrete" matters. *McDonnell*, 136 S. Ct. at 2369. However, even assuming that Percoco eventually carried out those acts—that is, even assuming that Percoco "in fact took" those acts, as the preambles to the lists in paragraphs 31 and 35 allege (S1 ¶¶ 31, 35)—that does not mean that he had intended to carry out those acts as part of the *quid pro quo*. And although the Indictment *does* allege that Percoco "**agreed** to take … official actions for the benefit of" the Energy Company and the Syracuse Developer "as the opportunity arose" (*id.* (emphasis added)), it does not allege that Percoco agreed to take the acts listed in the later paragraphs, or even that he agreed upon any specific matter on which he would perform an official act. Those omissions are material. As written, the Indictment would relieve the government of its burden of proving beyond a reasonable doubt that Percoco agreed or intended to perform those alleged official acts in exchange for payments from the Energy Company or the Syracuse Developer. *Cf. United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn.").

But the Supreme Court has made clear that for criminal liability to attach, the benefits have to be "connected to a particular official act," because public officials "*always* ha[ve] before [them] or in prospect matters that affect" their constituents and donors. *Sun-Diamond*, 526 U.S. at 407 (emphasis in original). There must be an alleged criminal intent "linked to an identifiable

act," and here there is none.  *Id.* at 406; *cf. Ganim*, 510 F.3d at 143 ("it was not enough for the

jury to have concluded that Garcia's acceptance of money was in connection with his official

duties or reasonably could have affected the performance of his official duties") (alterations

omitted) (quoting *United States v. Garcia*, 992 F.2d 409, 415 (2d Cir. 1993)).

Accordingly, the bribery allegations against Percoco are insufficient.  The only actions

that the government alleges Percoco agreed to perform in exchange for payments are either

unspecified "official actions" purportedly taken "as the opportunity arose" (S1 ¶¶ 31, 35) or,

worse still, generalized "official assistance" taken on an "as-needed" basis.  (*Id.* at ¶¶ 29,33.)

These allegations fail to "identify" *any* matter, let alone the "specific and focused" matter

required by *McDonnell*, 136 S. Ct. at 2372, and fall short of even the "nebulous" allegations that

Governor McDonnell was paid to make decisions "related to Virginia business development."

*Id.* at 2361, 2374.  Here, the charging language does not identify for Percoco what acts he is

actually accused of intending or agreeing to perform, and it gives the government the option of

prosecuting him for conduct that was not presented to the grand jury.  *Cf. Pirro*, 212 F.3d at 93.

For these reasons, and for the reasons set forth in Section II of Kelly's Memorandum of

Law, which Percoco hereby joins, the charges against Percoco in Counts Six, Seven, Eight, Nine,

Ten, Eleven, and Twelve must be dismissed.

## VI.     **After *McDonnell*, § 666 Is Unconstitutional**

### A.     ***McDonnell*'s narrow definition of "official action" was guided by constitutional principles and thus applies to all federal bribery statutes.**

Although the Supreme Court's decision in *McDonnell* interpreted the text of a statute (18

U.S.C. § 201), the Court's interpretation of the statute was informed by the "significant

constitutional concerns" implicated by an overly broad reading of the "*quo*" requirement." And

the constitutional requirement that the *quo* be an "official act" applies to all federal bribery

crimes, regardless of the statute charged. *McDonnell*, 136 S. Ct. at 2372. The Supreme Court's elaboration on the meaning of official act and the concepts that must be included in jury instructions are therefore also applicable in non-Section 201 cases.

The *McDonnell* Court had three basic concerns. First, the Court explained that an expansive view of what constituted a proper "*quo*" would risk criminalizing routine political activity. "[C]onscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time" as part of the "basic compact underlying representative government." *McDonnell*, 136 S. Ct. at 2372. Indeed, that compact "*assumes* that public officials will hear from their constituents and act appropriately on their concerns," which could include, for example, a "union official worried about a plant closing." *Id.* (emphasis in original). Accordingly, the Court discerned that an overly broad view of the "official act" requirement could chill public officials' interactions with the people they serve, and thus make it difficult for them to perform their duties. *Id.* ("[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance"). Similarly, such a view could "cast a pall of potential prosecution over … [normal] relationships" between public officers and their constituents or donors, causing "citizens with legitimate concerns" to "shrink from participating in democratic discourse." *Id.*

Second, the Court concluded that the government's expansive interpretation of "official act" raised a "serious" due process concern. *Id.* at 2373. Under that interpretation, "nearly anything a public official does … [would] count as a *quo*," *id.* at 2372, and public officials would be "subject to prosecution, without fair notice, for the most prosaic interactions." *Id.* at 2373. Such "overzealous prosecution" would not "comport with the Constitution's guarantee of due process." *Id.* (citations omitted). Similarly, such an expansive and indefinite reading of the term

could lead to "'arbitrary and discriminatory enforcement.'" *Id.* at 2373 (quoting *Skilling*, 561 U.S. at 402-03). The Court's narrower construction was thus necessary to avoid a finding of unconstitutional vagueness. *McDonnell*, 136 S. Ct. at 2373.

Third, the Supreme Court observed that as sovereigns, states have an interest in "regulat[ing] the permissible scope of interactions between state officials and their constituents" and preserving the integrity of their own governments. *Id.* Accordingly, it concluded that the government's theory "raise[d] significant federalism concerns," as its expansive reading of § 201 "left its outer boundaries ambiguous and [could] involve[] the Federal Government in setting standards of 'good government for local and state officials.'" *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

The Court therefore concluded that the Constitution requires that federal bribery prosecutions be based on a narrow understanding of what constitutes an official act.

**B.     The text of § 666 is unconstitutionally vague, overbroad, and contrary to principles of federalism because it does not contain an official act requirement.**

But § 666, unlike § 201, contains no "official act" element at all. Congress deliberately omitted the requirement when it passed § 666 in anticipation of the Supreme Court's impending decision in a case regarding § 201, *Dixson v. United States*, 465 U.S. 482 (1984) (discussed *supra*, Sec. I.B.). *See Salinas v. United States,* 522 U.S. 52, 58 (1997) (discussing the legislative history of § 666); *see also* S. Rep. No. 98-225, 370, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511. Accordingly, § 666's "outer boundaries [are] ambiguous" and its terms lack "sufficient definiteness," *McDonnell*, 136 S. Ct. at 2373, thereby violating the Constitution's principles of due process, fair notice, federalism, and freedom of political expression.

Recognizing § 666's constitutional infirmities in light of *McDonnell*, the government in this case included an "official action" element in the § 666 charges against Percoco. (S1 ¶¶ 61 (Count Eleven) and 63 (Count Twelve).) But only Congress can amend a statute, and federal prosecutors cannot write in an element where none exists. An attempt to do so amounts to an unconstitutional grab of legislative power by the executive branch. *See Skilling*, 561 U.S. at 415 (Scalia, J., concurring) ("A statute that is unconstitutionally vague cannot be saved by a more precise indictment.").

Moreover, the courts cannot "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly," *United States v. Stevens*, 559 U.S. 460, 480 (2010), and here, the government has not even done that. Rather, it has used § 666 to police "local criminal activity." *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014). And while § 666 contains no official act requirement, New York law does. *See* N.Y. Penal Law § 200.00-200.04 (criminalizing as bribery only payments in exchange for a public official's "vote, opinion, judgment, action, decision or exercise of discretion as a public servant"); *see also People v. Ginsberg*, 80 Misc. 2d 921, 925 (Cnty. Ct., Nassau Cnty. 1974) (state bribery law requires "that a bribe [] relate to the exercise of ***official*** powers or functions") (emphasis added). By charging Percoco under § 666, the government has ignored the Court's warning in *McDonnell* that it is not for federal prosecutors to "regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 136 S. Ct. at 2373; *see also Porcelli v. United States*, 404 F.3d 157, 159 n.3 (2d Cir. 2005) ("Caution is required when dealing with the federalization of state offenses.") (citing *Cleveland v. United States*, 531 U.S. 12, 24-25 (2000)).

For these reasons, and for the reasons set forth in Point I of Kelly's Memorandum of Law, the charges against Percoco in Counts Ten and Eleven must be dismissed.

**C.  If the Court finds that § 666 is constitutional, it must be because the text contains an implicit "official act" requirement.**

Like a conviction for honest services fraud or extortion, a conviction for federal program bribery under § 666 requires a *quid pro quo. See United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2006).  Interpreting the *quo* more broadly than the Court did in *McDonnell* for purposes of § 666 would risk "criminalizing virtually all official actions taken on behalf of constituents," *United States v. Silver*, 203 F. Supp. 3d 370, 378 n.8 (S.D.N.Y. 2016), and would thus cause the very same constitutional problems that drove the Court's reasoning in *McDonnell. See id.* ("The Supreme Court was clearly seeking to cabin the 'quo' in the quid pro quo pro element … in order to avoid … 'significant constitutional concerns.'") (quoting *McDonnell*, 136 S. Ct. at 2372).  In fact, it was only by "interpret[ing] the term 'official act' in § 201(a)(3)" in a narrow way and applying it to claims under the honest services fraud statute and the Hobbs Act that the Supreme Court was able to reject Governor McDonnell's challenge to those statutes as being unconstitutionally vague.  *See McDonnell*, 136 S. Ct. at 2375; *see also Skilling*, 561 U.S. at 266 (holding that honest services bribery would "draw content" from federal statutes such as § 201); *Evans v. United States*, 504 U.S. 255, 263-67 (1992) (treating the Hobbs Act, codified at 18 U.S.C. § 1951, as akin to bribery).

Accordingly, if § 666 did not run afoul of the Constitution, it would only be because it contained an official act requirement that satisfies *McDonnell.*  There is no other way to address the Supreme Court's concerns.  Indeed, in another recent case raising *McDonnell* issues, the government did not dispute that *McDonnell*'s definition of "official action" applies to both charges under § 666 as well as the Hobbs Act and honest services fraud statute.  *See* Mem. of Law of U.S. in Opp'n to Defs.' Motion for Bail Pending Appeal at 27, *United States v. Skelos*, No. 15 Cr. 317 (KMW) (S.D.N.Y. July 25, 2016), ECF No. 218 ("The Government agrees that

the Supreme Court's elaboration on the meaning of official act and the concepts that must be included in jury instructions will also be applicable in non-Section 201 cases.").

### D. No alleged conduct of Percoco between April and December of 2014 can constitute the "*quo*" required for criminal liabilty under § 666.

However, if this Court concludes that the text of § 666 does in fact contain an "official act" requirement that satisfies *McDonnell*, the § 666 charges (Counts Eleven and Twelve) would still have to be dismissed to the extent that they rely upon acts that Percoco took between April and December of 2014.[8]  For the reasons set forth previously, Percoco was not a public official during this time, and thus could not have taken any "official act" cognizable under the federal bribery statutes.  (*See generally supra* Sec. I; *see also United States v. Rooney*, 37 F.3d 847, 852 (2d Cir. 1994) (holding that "[a] fundamental component of a 'corrupt' act is a breach of some *official duty owed to the government or the public at large*," and thus reversing conviction under § 666 where there was no breach of official duty) (emphasis added).)

## VII. To the Extent that Counts Eleven and Twelve Charge a Gratuity Offense, Dismissal Is Required

The Indictment does not charge Percoco with a gratuity offense under § 666.  Quite the contrary.  The Indictment sets forth two separate "criminal schemes"  (S1 ¶ 1), alleging Percoco to have been involved in only one:  "[t]he Percoco *Bribery* Scheme."  (*id.* at ¶¶ 28-36 (emphasis added).)  In addition, while the Indictment describes Percoco's purported conduct as "bribery" in all of the allegations against him (*see id.* at ¶¶ 1, 2, 28-36 (paragraphs under the heading "The Percoco Bribery Scheme"), ¶¶ 54-63; *see also* Compl. ¶¶ 5-9, 18-20, 32-66), the factual allegations never once include any mention of gratuities.

---

[8]  This argument is made in the alternative to the argument in Point III.  If the Court dismisses Counts Eleven and Twelve to the extent they rely on acts taken while Percoco was not an agent of the State, it need not consider Point IV.D.

Nor do the paragraphs charging any of the counts against Percoco. Indeed, the word "gratuity" appears in the Indictment in only one place: in parentheticals under certain count headings, only two of which are counts against Percoco (Counts Eleven and Twelve, which charge Percoco with § 666 violations).

The Indictment's only arguable reference to a gratuity theory are the single, identical statements in those two counts that Percoco accepted payments "intending to be influenced *or rewarded*." (S1 ¶¶ 61, 63 (emphasis added).) Although the term "reward" has been interpreted by courts to connote a gratuity theory, *see United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011), here, it is merely included once in the charges—after appearing not once in the factual allegations—in a recitation of the statutory language. *See* 18 U.S.C. § 666(a)(1)(B) ("… intending to be influenced or rewarded in connection with any business …"). This does not suffice to state a gratuity offense. *See United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) ("the indictment cannot simply track the language of the statute … [but] must state some fact specific enough to describe a particular criminal act").

Thus, to the extent the Court interprets Counts Eleven and Twelve to charge gratuity offenses under § 666, those charges must be dismissed. As discussed previously (*see supra* Sec. V), these counts expressly reallege and rely upon allegations that Percoco accepted payments in exchange for taking official actions "as the opportunity arose." (S1 ¶¶ 60, 62 (incorporating paragraphs 31 and 35); *see also* ¶¶ 31, 35.) But the law is settled that to allege a gratuity offense, the government is required to allege and prove a specific "link" between alleged payments and "a *specific* 'official act' for or because of which it was given." *Sun-Diamond Growers of Cali.*,

526 U.S. 398, 414 (1999) (emphasis added). Gratuities cannot be alleged using the "as-needed" retainer theory.[9]

For these reasons, and for the reasons set forth in Point III of Kelly's Memorandum of Law, the charges against Percoco in Counts Ten and Eleven do not state a gratuity offense, and to the extent that they do, fail to do so with the requisite specificity and must be dismissed.

## CONCLUSION

For the reasons set forth above, Joseph Percoco respectfully requests that the Court:

a.      Dismiss Counts Six through Twelve of the Superseding Indictment in their entirety for failure to allege the required specific intent or criminal agreement, or, in the alternative, to the extent the Court finds that the Indictment adequately alleges specific official acts in paragraphs 31 and 35, to limit the government to that theory at trial and foreclose it from presenting evidence or argument on any other official acts purportedly taken by Percoco;

or, in the alternative, grant the following relief:

b.      Dismissal of Counts Eleven and Twelve on the basis that 18 U.S.C. § 666 is unconstitutionally vague, overbroad, and violates federalism principles;

c.      Dismissal of Counts Six Through Twelve to the extent that they rely upon acts taken by Percoco, or agreed to be taken by Percoco, between April 21, 2014 and December 8, 2014, while he was not employed by the State;

d.      Dismissal of Counts Eleven and Twelve to the extent that they rely upon acts taken by Percoco, or agreed to be taken by Percoco, between April 21, 2014 and December 8, 2014, or money received by him between those dates, while he was not an agent of the State or any other government entity receiving at least $10,000 in federal funds on an annual basis;

---

[9]     Additionally, while the Second Circuit has held that the statute's inclusion of the term "reward" refers to a gratuity offense, there is currently a circuit split on whether § 666 covers gratuities. *Compare United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011) *with United States v. Fernandez*, 722 F.3d 1, 20 (1st Cir. 2013) (confining § 666 to bribery offenses), *United States v. Jennings*, 160 F.3d 1006, 1015 n.13 (4th Cir. 1998) (same), and *United States v. Beldini*, 443 F. App'x 709, 718 (3d Cir. 2011) (recognizing absence of Third Circuit precedent). Given the different holdings by the circuits, Percoco raises the issue in order to preserve it.

e.      Dismissal of Counts Eleven and Twelve to the extent that they state a gratuity offense against Percoco; and

f.      Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       May 19, 2017

SCHULTE ROTH & ZABEL LLP

By:   /s/ Barry A. Bohrer
       Barry A. Bohrer
       Michael L. Yaeger
       Andrew D. Gladstein
       Abigail F. Coster

       919 Third Avenue
       New York, NY 10022
       Telephone: 212.756.2000

*Attorneys for Joseph Percoco*