UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

JOSEPH PERCOCO, a/k/a "Herb,"
ALAIN KALOYEROS, a/k/a "Dr. K.,"
PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

Defendants.

No. 16 Cr. 776 (VEC)

<u>Oral Argument Requested</u>

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
PETER GALBRAITH KELLY, JR.'S MOTION TO DISMISS**

LANKLER SIFFERT & WOHL LLP

Daniel M. Gitner
Jun Xiang
Samantha J. Reitz

500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Defendant
Peter Galbraith Kelly, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND

    A.    Factual Allegations ...........................................................................4

        1.    Todd Howe and Joseph Percoco ...............................................4

        2.    The Energy Company Hired Percoco's Wife .............................5

        3.    The Alleged Quid Pro Quo .........................................................6

        4.    The Alleged "Official Actions" ..................................................7

            a.    The Emissions Credits Agreement...................................7

            b.    The Power Purchase Agreement.....................................8

    B.    The Charges Against Mr. Kelly .........................................................9

ARGUMENT

POINT I

    THE OMISSION OF AN OFFICIAL ACT REQUIREMENT MAKES SECTION 666 UNCONSTITUTIONAL UNDER MCDONNELL ...................................................12

    A.    McDonnell cast doubt on the constitutionality of any federal bribery statute that lacks an official act requirement.........................................13

        1.    McDonnell v. United States.......................................................13

        2.    McDonnell narrowly defined "official act" ..............................15

        3.    McDonnell stressed the constitutional necessity of the official act requirement ............................................................................16

    B.    Section 666 lacks an official act requirement .......................................18

        1.    Section 666's plain text makes clear—and its statutory history confirms—that it contains no official act requirement .............18

        2.    An official act requirement cannot be inserted into section 666 ..............21

            a.    Section 666 must be distinguished from the Hobbs Act and honest services fraud statutes at issue in McDonnell ...............................22

    b.  The "corruptly" element of section 666 does not imply an official act requirement...........................................................................24

  3.  The Government cannot override Congress by modifying the elements of a section 666 offense ...............................................27

 C.  The statute charged in Count Thirteen, 18 U.S.C. § 666(a)(2), is unconstitutional....................................................................................28

  1.  Section 666 is substantially overbroad on its face .....................28

  2.  Section 666 is unconstitutionally vague as applied to the allegations against Mr. Kelly ....................................................33

    a.  Section 666 does not provide adequate notice of what is prohibited ........................................................................33

    b.  Section 666 is susceptible to arbitrary and discriminatory enforcement, as demonstrated by this case ....................36

    c.  Past court decisions that address vagueness challenges to section 666 are inapposite .........................................38

  3.  Section 666 undermines federalism ..........................................38

  4.  The word "corruptly" does not save section 666 from unconstitutionality.................................................................41

POINT II
  COUNTS NINE AND THIRTEEN MUST BE DISMISSED BECAUSE THEY REST ON THE GENERAL RETAINER THEORY OF BRIBERY ...............................43

 A.  Under McDonnell, an alleged briber must intend to influence official acts on a specific question or matter .........................................................44

  1.  The "official act" requirement is part of the specific intent of bribery............................................................................44

  2.  McDonnell defines "official act" to require a specific question or matter ......................................................................45

  3.  At the time of the alleged bribe, the payor must intend to influence action on a specific question or matter ......................................45

 B.  McDonnell extends the logic of Sun-Diamond ....................................46

 C.  The S1 Indictment fails to allege that Mr. Kelly provided a benefit to Percoco to influence Percoco's official action on a specific question or matter ........................................................................................49

      1.     The S1 Indictment alleges that Mr. Kelly and Percoco entered into a general retainer relationship, which does not satisfy <u>McDonnell</u> ..........49

      2.     The S1 Indictment does not allege that Mr. Kelly hired Percoco's wife to influence official action with respect to the ECA or the PPA ...................................................................................50

      3.     The allegations that Percoco agreed to assist the Energy Company are insufficient ..........................................................52

      4.     The allegation that Percoco's wife was paid monthly does not save the S1 Indictment ...............................................52

   D.     Rejecting the general retainer theory does not disturb all of the pre-<u>McDonnell</u> case law on "as opportunities arise" theories ....................................54

   E.     There are compelling constitutional and policy reasons to reject the general retainer theory ...........................................................57

POINT III
    COUNT THIRTEEN MUST BE DISMISSED TO THE EXTENT IT ALLEGES A GRATUITY OFFENSE ..............................................................61

POINT IV
    COUNTS NINE AND THIRTEEN MUST BE DISMISSED TO THE EXTENT THEY ALLEGE THAT MR. KELLY BRIBED PERCOCO WHEN PERCOCO WAS NOT A GOVERNMENT OFFICIAL ..................................................64

CONCLUSION ...........................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Almendarez-Torres v. United States,
    523 U.S. 224 (1998)......................................................................................10, 21

Arthur Andersen LLP v. United States,
    544 U.S. 696 (2005)......................................................................................25, 41

Barnhart v. Sigmon Coal Co., Inc.,
    534 U.S. 438 (2002)..............................................................................................19

Bond v. United States,
    134 S. Ct. 2077 (2014)..........................................................................................39

Broadrick v. Oklahoma,
    413 U.S. 601 (1973)......................................................................................28, 29

Buckley v. Valeo,
    424 U.S. 1 (1976) (per curiam)............................................................................30

Citizens United v. F.E.C.,
    558 U.S. 310 (2010)..............................................................................30, 36, 58

City of Houston, Tex. v. Hill,
    482 U.S. 451 (1987)..............................................................................................29

Dickerson v. Napolitano,
    604 F.3d 732 (2d Cir. 2010)....................................................................29, 33, 34, 37

Evans v. United States,
    504 U.S. 255 (1992)..............................................................................23, 44, 54

First Nat'l Bank of Boston v. Bellotti,
    435 U.S. 765 (1978).................................................................................. *passim*

Gesicki v. Oswald,
    336 F. Supp. 365 (S.D.N.Y. 1971)......................................................................28

Humanitarian L. Project v. Reno,
205 F.3d 1130 (9th Cir. 2000) .........................................................................10

Keene Corp. v. United States,
508 U.S. 200 (1993) .........................................................................................20

Kelly v. Robinson,
479 U.S. 36 (1986) ...........................................................................................39

Kolender v. Lawson,
461 U.S. 352 (1983) .........................................................................................33

Lamie v. U.S. Trustee,
540 U.S. 526 (2004) .........................................................................................18

Lanzetta v. State of New Jersey,
306 U.S. 451 (1939) .........................................................................................27

Mannix v. Phillips,
619 F.3d 187 (2d Cir. 2010) ......................................................................34, 36

McCormick v. United States,
500 U.S. 257 (1991) ...........................................................................30, 51, 58, 61

McCutcheon v. F.E.C.,
134 S. Ct. 1434 (2014) (plurality opinion) ...................................................30, 58

McDonnell v. United States,
136 S. Ct. 2355 (2016) ............................................................................. *passim*

McNally v. United States,
483 U.S. 350 (1987) .........................................................................................22

N.Y.S. Rifle and Pistol Ass'n, Inc. v. Cuomo,
804 F.3d 242 (2d Cir. 2015) ............................................................................33

NAACP v. Button,
371 U.S. 415 (1963) .......................................................................29, 31, 33, 41

New York v. Ferber,
458 U.S. 747 (1982) .........................................................................................29

Papachristou v. City of Jacksonville,
405 U.S. 156 (1972) .........................................................................................34

Regan v. Tax'n With Representation of Washington,
　461 U.S. 540 (1983)................................................................30

Ricks v. United States,
　414 F.2d 1111 (D.C. Cir. 1968)...........................................28

Russell v. United States,
　369 U.S. 749 (1962)..............................................................50

Russello v. United States,
　464 U.S. 16 (1983)................................................................20

Rust v. Sullivan,
　500 U.S. 173 (1991)........................................................10, 21

Sanabria v. United States,
　437 U.S. 54 (1978)................................................................54

Skilling v. United States,
　561 U.S. 358 (2010)......................................................*passim*

Smith v. United States,
　508 U.S. 223 (1993)..............................................................25

Swain v. Pressley,
　430 U.S. 372 (1977)........................................................10, 21

TRW Inc. v. Andrews,
　534 U.S. 19 (2001)................................................................24

United States v. Aleynikov,
　676 F.3d 71 (2d Cir. 2012)...................................................11

United States v. Alfisi,
　308 F.3d 144 (2d Cir. 2002)......................................24, 26, 27

United States v. Arshad,
　239 F.3d 276 (2d Cir. 2001)...........................................38, 56

United States v. Bahel,
　662 F.3d 610 (2d Cir. 2011)......................................25, 62, 63

United States v. Batchelder,
　442 U.S. 114 (1979)..............................................................33

United States v. Beldini,
    443 F. App'x 709 (3d Cir. 2011) (unpublished) ....................................................62

United States v. Bruno,
    661 F.3d 733 (2d Cir. 2011).............................................................................54

United States v. Brunshtein,
    344 F.3d 91 (2d Cir. 2003)..............................................................................38

United States v. Bryant,
    655 F.3d 232 (3d Cir. 2011)............................................................................55

United States v. Campbell,
    684 F.2d 141 (D.C. Cir. 1982).........................................................................56

United States v. Coyne,
    4 F.3d 100 (2d Cir. 1993) ...............................................................................54

United States v. Enmons,
    410 U.S. 396 (1973).......................................................................................22

United States v. Fernandez,
    722 F.3d 1 (1st Cir. 2013)...................................................................... *passim*

United States v. Ford,
    435 F.3d 204 (2d Cir. 2006).................................................................25, 26, 27

United States v. Ganim,
    510 F.3d 134 (2d Cir. 2007)...............................................................48, 54, 55, 57

United States v. Garcia,
    992 F.2d 409 (2d Cir. 1993)............................................................................30

United States v. Garrido,
    713 F.3d 985 (9th Cir. 2013) ...........................................................................20

United States v. Gonzalez,
    686 F.3d 122 (2d Cir. 2012)............................................................................11

United States v. Hawkins,
    777 F.3d 880 (7th Cir. 2015) ...........................................................................63

United States v. Jennings,
    160 F.3d 1006 (4th Cir. 1998) .....................................................................56, 62

United States v. McNair,
   605 F.3d 1152 (11th Cir. 2010) .......................................................................20

United States v. Morrison,
   529 U.S. 598 (2000).......................................................................................10

United States v. Pirro,
   212 F.3d 86 (2d Cir. 2000)..........................................................11, 50, 51, 56

United States v. Quinones,
   313 F.3d 49 (2d Cir. 2002).............................................................................10

United States v. Reese,
   92 U.S. 214 (1875).........................................................................................21

United States v. Ring,
   706 F.3d 460 (D.C. Cir. 2013) .......................................................................35

United States v. Rooney,
   37 F.3d 847 (2d Cir. 1994)..............................................................19, 23, 25

United States v. Rosen,
   716 F.3d 691 (2d Cir. 2013)......................................................................54, 55

United States v. Rybicki,
   354 F.3d 124 (2d Cir. 2003)...........................................................................34

United States v. Sattar,
   272 F. Supp. 2d 348 (S.D.N.Y. 2003) ............................................................10

United States v. Silver,
   203 F. Supp. 3d 370 (S.D.N.Y. 2016)............................................17, 20, 56, 58

United States v. Skelos,
   No. 15 CR 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015)...................20

United States v. Smith,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014)...............................................................4

United States v. Stevens,
   559 U.S. 460 (2010).........................................................................27, 29, 36

United States v. Sullivan,
   332 U.S. 689 (1948).......................................................................................21

United States v. Sun-Diamond Growers of California,
    526 U.S. 398 (1999)..................................................................*passim*

United States v. Tavares,
    844 F.3d 46 (1st Cir. 2016).....................................................39

United States v. Terry,
    707 F.3d 607 (6th Cir. 2013) .............................................51, 58

United States v. Urciuoli,
    513 F.3d 290 (1st Cir. 2008)...................................................36

United States v. Walsh,
    194 F.3d 37 (2d Cir. 1999)......................................................64

United States v. Whitfield,
    590 F.3d 325 (5th Cir. 2009) .................................................56

United States v. Williams,
    553 U.S. 285 (2008)..........................................................28, 32

United States v. Wolf,
    12 CR 968 JFK, 2013 WL 2359107 (S.D.N.Y. May 30, 2013) ..............................4

United States v. Zimmermann,
    509 F.3d 920 (8th Cir. 2007) .................................................63

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
    455 U.S. 489 (1982)................................................................33

Virginia v. Hicks,
    539 U.S. 113 (2003)..........................................................16, 28

Welch v. United States,
    136 S. Ct. 1257 (2016)............................................................33

**Statutes**

18 U.S.C. § 201 ...................................................................*passim*

18 U.S.C. § 666....................................................................*passim*

18 U.S.C. § 1346.............................................................14, 17, 22, 23

18 U.S.C. § 1349.........................................................................................................9

18 U.S.C. § 1951.....................................................................................14, 17, 22, 23

N.Y. Penal Law §§ 200.00–200.04............................................................................40

N.Y. Pub. Off. Law §§ 73, 73-a, 74....................................................................40, 60

**Other Authorities**

Albert W. Alschuler, Criminal Corruption: Why Broad Definitions of Bribery
    Make Things Worse, 84 Fordham L. Rev. 463, 481 (2015).......................51, 59, 61

Rule 12(b)(3) of the Federal Rules of Criminal Procedure.......................................1, 10

Joseph Hollow, Christopher Robertson–Remedies for Institutional Corruption:
    Disclosures, Blinding, and Criminal Prosecution, available at
    https://ethics.harvard.edu/christopher-robertson-remedies-institutional-
    corruption-disclosures-blinding-and.........................................................................41

S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182 ............................19

Defendant Peter Galbraith Kelly, Jr. respectfully moves this Court, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure: (I) to dismiss Count Thirteen of the Superseding ("S1") Indictment because the statutory subsection charged in that count, 18 U.S.C. § 666(a)(2), is unconstitutional in light of <u>McDonnell v. United States</u>, 136 S. Ct. 2355 (2016); (II) to dismiss Counts Nine and Thirteen because they rest on a general "as opportunities arise" or "retainer" theory of bribery; (III) to dismiss Count Thirteen to the extent it is based on the alleged payment of gratuities; and (IV) to dismiss Counts Nine and Thirteen to the extent they rest on the allegation that Mr. Kelly bribed Joseph Percoco to perform "official acts" during the period when Percoco was not a government official.

## <u>PRELIMINARY STATEMENT</u>

The Supreme Court's landmark decision in <u>McDonnell v. United States</u>, 136 S. Ct. 2355 (2016), rests on a fundamental principle: bribery statutes must be circumscribed by bright lines that distinguish clearly between <u>quid pro quo</u> bribery, on the one hand, and the ordinary interactions between public officials and their constituents, on the other. Statutes that lack such clarity jeopardize constitutional rights by threatening to criminalize—or chill—conduct that is essential to representative democracy. To prevent such a result and to ensure that public officials and their constituents have adequate notice of what the law proscribes, <u>McDonnell</u> delineates the outer reaches of what constitutes bribery under federal criminal law. Under <u>McDonnell</u>, bribery is limited to <u>quid pro quo</u> transactions in which a thing of value is given to a public official in exchange for the performance or promise of an "official act"—a formal exercise of governmental power on a specific question or matter.

While much of <u>McDonnell</u> is devoted to the importance of the requirement that the public official exercise *formal* power (as opposed to merely arranging meetings or calls), the decision

also emphasizes that every "official act" must be defined in relation to a *specific* question or matter. The importance of specificity is plain: the official act requirement would mean little if prosecutors could bring bribery cases even where there was no agreement as to a specific question or matter on which the public official would take action.

This case, brought in the wake of <u>McDonnell</u>, seeks to resurrect theories of bribery that have been foreclosed by that decision.

<u>First</u>, Count Thirteen charges Mr. Kelly with bribing a public official in violation of 18 U.S.C. § 666(a)(2) ("section 666"), a statute that contains no official act requirement and that purports to reach virtually all action that a public official might take in response to a constituent. The remarkable breadth of section 666—which prohibits any person from "corruptly" conferring any benefit on a state official with the intent to "influence" that official "in connection with" state business, 18 U.S.C. § 666(a)(2)—threatens to chill constitutionally-protected activity and provides no notice of what prosecutors will deem to be criminal. Without an official act requirement, section 666 is substantially overbroad and vague, in violation of the First Amendment and the Fifth Amendment Due Process Clause. The statute also undermines federalism by permitting federal prosecutors to impose their personal views of good government on states. Count Thirteen must be dismissed as unconstitutional.

<u>Second</u>, both Count Nine (honest services fraud conspiracy) and Count Thirteen (section 666) rest on the general retainer theory of bribery—the theory that Mr. Kelly paid Joseph Percoco, a public official, to take action "on an as-needed basis," without agreeing that Percoco would take official action on a particular question or matter. <u>McDonnell</u> now makes plain that there can be no "official act"—and therefore no bribery—unless the payor intended or agreed that the recipient would take action on a specific "question or matter." Counts Nine and Thirteen

2

must be dismissed because allegations of a general retainer relationship fail, as a matter of law, to satisfy the "official act" requirement necessary to state a bribery offense.[1]

Third, to the extent that Count Thirteen rests on the alleged payment of gratuities, it must be dismissed. The lengthy factual recitation in the S1 Indictment describes the alleged conduct as bribery, not the payment of illegal gratuities, and the word "gratuity" appears neither in the factual allegations nor in the statutory charging language of Count Thirteen. Furthermore, there is doubt—and a circuit split—as to whether section 666 actually proscribes gratuities. Finally, to the extent the Government may insist that Count Thirteen charges a gratuity theory, that charge rests on the same general retainer allegations as the bribery charges. It is settled law, however, that gratuities must be linked to specific official acts and cannot be premised on an "as opportunities arise" theory.

Fourth, Counts Nine and Thirteen allege that Mr. Kelly bribed Joseph Percoco from 2012 to 2016 and that Percoco performed "official acts" throughout that period. However, the Government acknowledges that from April 2014 to December 2014, Percoco held no government office and wielded no formal authority. Someone who is not a government official cannot perform "official acts," owes the public no duty of honest services, and is not an "agent" of the State. To the extent Counts Nine and Thirteen allege that Percoco performed "official acts" or received things of value from Mr. Kelly during the hiatus from government, they must be dismissed.

---

[1]    Count Thirteen, which charges a section 666 offense, does not have an "official act" requirement and, for that reason, must be dismissed as unconstitutional. See Point I, infra. As to that count, the argument in Point II is made in the alternative.

## BACKGROUND

In addition to the below, we respectfully refer the Court to the "Background" section of Mr. Kelly's separate Motion to Sever and Motion to Strike Prejudicial Surplusage.[2]

### A. Factual Allegations

Mr. Kelly is the former Senior Vice President of External Affairs of an energy company that develops power plants (the "Energy Company"). (S1 Ind. ¶¶ 20–21). In that capacity, he oversaw the Energy Company's public relations and government affairs. (Id.).

### 1. Todd Howe and Joseph Percoco

In 2010, the Energy Company hired Todd Howe—now the Government's cooperating witness—to provide consulting services in connection with a power plant being developed in New York (the "New York Power Plant"). (Compl. ¶ 35(a)). The Energy Company was seeking to enter into a "Power Purchase Agreement" ("PPA") with the New York Power Authority ("NYPA"), pursuant to which NYPA would purchase energy generated by the New York Power Plant. (S1 Ind. ¶ 31(b); Compl. ¶ 32). The Energy Company hired Howe to provide political consulting services for the PPA, and it paid him through a government relations firm and a limited liability company. (Compl. ¶¶ 35(a)–(b)). There is no allegation that any of the payments from the Energy Company to Howe were unlawful.

Later that year, Howe introduced Mr. Kelly to Joseph Percoco, who at the time worked on the gubernatorial campaign of Andrew Cuomo. (Id. ¶¶ 36(a), 37). The Complaint alleges that the Energy Company donated to the Cuomo campaign and that Kelly provided "personal

---

[2]    On a motion to dismiss an indictment, the Government's allegations are treated as true. United States v. Smith, 985 F. Supp. 2d 547, 551 n.2 (S.D.N.Y. 2014). Mr. Kelly disputes the allegations, which are drawn from the September 20, 2016 Sealed Complaint ("Compl."), Doc. No. 1, and the May 11, 2017 Superseding Indictment ("S1 Ind."), Doc. No. 162. See United States v. Wolf, 12 CR 968 JFK, 2013 WL 2359107, at *2 (S.D.N.Y. May 30, 2013) (considering both indictment and criminal complaint on a motion to dismiss indictment).

benefits" to Percoco in order to "ingratiate himself" and "cultivate access" with Percoco. These alleged benefits included a meal and a fishing trip. (Id. ¶¶ 32, 37(a)–(c)). There is no allegation that this conduct was unlawful. When Governor Cuomo took office in 2011, Percoco was named Executive Deputy Secretary to the Governor and served in the "Executive Chamber," which included Governor Cuomo's closest advisors. In that capacity, Percoco was "a primary 'gatekeeper' of opportunities to speak or meet with the Governor" and supervised "appointments and administrative matters for the Executive Chamber." (S1 Ind. ¶¶ 3–4; Compl. ¶¶ 19, 26(a)). Percoco held this position from January 2011 to April 21, 2014 and again from December 8, 2014 to January 2016. (S1 Ind. ¶¶ 3–4). From April 21 to December 8, 2014, Percoco resigned his government employment in order to work for Governor Cuomo's reelection campaign; during this period, he was not a government official. (Id.).

The Complaint alleges that beginning in May 2011, in response to Howe's advocacy, Percoco allegedly made efforts to set up a meeting between Mr. Kelly and another official, spoke to that official about the PPA, and personally met with Mr. Kelly. (Compl. ¶¶ 38(a)–(d)). There is no allegation that the conduct of Mr. Kelly or Percoco during this period was unlawful.

### 2.   The Energy Company Hired Percoco's Wife

In November 2012, on Mr. Kelly's recommendation, the Energy Company hired Percoco's wife, a teacher, to work as an education consultant for a public relations program (the "Education Program"). (Compl. ¶ 43). The Education Program reached elementary school students near where the Energy Company was developing a power plant in New Jersey (the "New Jersey Power Plant"). (S1 Ind. ¶¶ 29–30; Compl. ¶ 44(a)). The Complaint acknowledges that the Education Program was real, and that Percoco's wife performed real work for it, including designing a curriculum and going into classrooms to teach. (Compl. ¶¶ 44(a), (d)).

There is no allegation that Percoco's wife held a "no-show" job, although the Complaint alleges that her compensation exceeded what was "warranted by her limited work." (Id. ¶¶ 43, 44(d)). Percoco's wife was paid by one of the Energy Company's other consultants, and Percoco allegedly reported her income as coming from that consultant rather than from the Energy Company. (S1 Ind. ¶¶ 30(a), (d)). Percoco's wife continued working for the Energy Company through early 2016. (Compl. ¶ 56).

### 3. The Alleged <u>Quid Pro Quo</u>

The Government alleges that the Energy Company hired Percoco's wife as a way to bribe Percoco. (S1 Ind. ¶ 30; Compl. ¶ 32). According to the S1 Indictment, Mr. Kelly and Percoco agreed that, in exchange for the hiring of his wife, Percoco would take "official action" to benefit the Energy Company "on an as-needed basis" and "as the opportunity arose." (S1 Ind. ¶¶ 29, 31). There is no allegation that, when Mr. Kelly and Percoco entered into this alleged <u>quid pro quo</u> agreement in late 2012, they agreed upon any specific official act Percoco would perform or any specific question or matter on which Percoco would perform an official act. Notably, although the Energy Company had been pursuing a PPA, the S1 Indictment does not allege that Mr. Kelly and Percoco agreed in 2012 that the "<u>quo</u>" would be official action by Percoco on the PPA. Rather, the alleged "<u>quo</u>" was Percoco's open-ended commitment to take action favorable to the Energy Company whenever there was an opportunity to do so. (<u>Id.</u>).

### 4. The Alleged "Official Actions"

Following the alleged <u>quid pro quo</u> agreement in 2012, Percoco allegedly took "official action" first with respect to an "Emissions Credits Agreement" between New York and New Jersey (the "ECA"),[3] and later with respect to the PPA.[4]

### a. The Emissions Credits Agreement

With respect to the ECA, the S1 Indictment and Complaint allege that the Energy Company needed emissions reduction credits ("ERCs") acquired in New York to be available for use in New Jersey for the New Jersey Power Plant. (S1 Ind. ¶ 31(a); Compl. ¶ 32). For that to be possible, the two states needed to enter into the ECA, which would permit the transfer of ERCs. (S1 Ind. ¶ 31(a); Compl. ¶ 32). The New York agency responsible for negotiating the agreement was the Department of Environmental Conservation ("DEC"). (S1 Ind. ¶ 31(a); Compl. ¶ 47(a)).

In August 2013, Mr. Kelly allegedly told Howe that the "DEC Official" responsible for negotiations said that he (the DEC Official) needed a "push from above" in order to make the ECA "a priority." (Compl. ¶ 47(a)). Although there is no allegation that Mr. Kelly asked him to do so, Howe allegedly raised the issue with Percoco, who responded by directing Howe to two other officials, the "Former State Operations Director" and the "Operations Deputy." (<u>Id.</u> ¶ 47(b)). The Operations Deputy then allegedly instructed the "DEC Commissioner" to move forward with the ECA. (<u>Id.</u> ¶¶ 47(c)–(d)). There is no allegation that Percoco spoke with,

---

[3]     The Complaint and the original Indictment refer to the ECA as the "Reciprocity Agreement." (Compl. ¶ 32). We adopt the nomenclature used by the S1 Indictment.

[4]     The S1 Indictment implies that Percoco also took "official actions" on issues other than the ECA and the PPA, but does not identify them. (S1 Ind. ¶ 31 (alleging that "official actions" by Percoco were "not limited to" action on the ECA and the PPA)). We respectfully refer the Court to Mr. Kelly's separate Motion for a Bill of Particulars.

pressured, or advised the Former State Operations Director, the Operations Deputy, the DEC Commissioner, or the DEC Official to take any action on the ECA. Apart from the referral of Howe to the other officials, Percoco had no other alleged involvement in the ECA. New York and New Jersey did not enter into the ECA until late 2014, over a year later. (Id. ¶ 48).

### b. The Power Purchase Agreement

With respect to the PPA, the S1 Indictment alleges generally that, at some point after the alleged quid pro quo agreement with Mr. Kelly in 2012, Percoco "exerted pressure on and provided advice to certain other State officials, with the intent that those officials work to secure" the PPA for the Energy Company. (S1 Ind. ¶ 31(b)). There is no allegation that Percoco personally had the authority to make any decision on the PPA. The award of the PPA was channeled through a request for proposals ("RFP") issued by NYPA in April 2013, to which the Energy Company submitted a bid in May 2013. (Compl. ¶ 50). The agency responsible for reviewing the RFP bids was the Public Service Commission (the "PSC"). (Id. ¶ 51).

The Complaint alleges that Howe and Percoco exchanged emails in October 2013 in which Howe asked Percoco to ask another state official, the Former State Operations Director, to set up a meeting with the PSC and other agencies to "coordinate" and to prevent the PSC from going "off the reservation" with respect to the RFP. (Id. ¶ 51(b)). In November 2013, a few weeks after the email exchange, Percoco and Howe learned that the Energy Company would *not* be awarded the PPA; and, ultimately, no PPA was awarded to any company. (Id. ¶¶ 49, 52, 54).

The Government contends that Percoco and Howe concealed from Mr. Kelly their knowledge that the Energy Company would not receive the PPA. To "maintain the illusion" that the PPA was still possible, Percoco allegedly helped set up meetings, at Mr. Kelly's request, so that Mr. Kelly and other Energy Company representatives could meet with other state officials to inquire about the status of the RFP. (Id. ¶ 53).

B.     **The Charges Against Mr. Kelly**

Mr. Kelly is charged in only two counts: Count Nine and Count Thirteen.  Count Nine

charges Mr. Kelly with participating—together with Howe, Percoco, and other unnamed and

unindicted co-conspirators—in a conspiracy to commit honest services fraud, in violation of 18

U.S.C. § 1349.  (S1 Ind. ¶¶ 54–56).  Count Thirteen charges Mr. Kelly with bribing Percoco, in

violation of 18 U.S.C. § 666(a)(2).  (Id. ¶¶ 64–65).

Both counts incorporate by reference paragraphs 1 through 15, 20 through 21, and 28

through 36 of the S1 Indictment, even though not all of those paragraphs relate to the alleged

bribery of Percoco by Mr. Kelly and the Energy Company.[5]  As relevant to Mr. Kelly, the S1

Indictment alleges that:

> From at least in or about 2012 up through and including at least in or about 2016,
> [Howe] and [Mr. Kelly] arranged for the Energy Company to pay more than
> $287,000 in bribes to [Percoco] in exchange for Percoco's official assistance to
> benefit the Energy Company on an as-needed basis.

(Id. ¶ 29; see also id. ¶ 30 (alleging that bribes were in the form of "a 'low-show' job for

Percoco's wife that resulted in payment to the Percocos of $7,500 per month")).  The S1

Indictment further alleges that Percoco "agreed to take, and in fact took, official actions for the

benefit of the Energy Company as the opportunity arose" (id. ¶ 31), and that Percoco took action

on the ECA and the PPA (id. ¶¶ 31(a)–(b)).

The statutory charging language of Counts Nine and Thirteen alleges no additional facts.

The "to wit" clause of Count Nine alleges, in relevant part, that Mr. Kelly and Percoco "agreed

that Percoco would take official action in exchange for bribes paid at the direction of Kelly" and

transmitted wire communications in furtherance of the scheme.  (Id. ¶ 56).  Similarly, the

charging language of Count Thirteen alleges that Mr. Kelly directed things of value to Percoco

---

[5]     See Mr. Kelly's Motion to Strike Prejudicial Surplusage.

with the "intent to influence" Percoco and "in exchange for, to influence, and to reward the taking of official action to benefit the Energy Company, including official action to advance the development of the New York Power Plant and the New Jersey Power Plant." (Id. ¶ 65).

## LEGAL STANDARD

The arguments for dismissal urged in this motion present pure questions of law that the Court can—and should—resolve before trial. No argument implicates any dispute of fact or requires the Court to draw any inference about the truth of the Government's allegations or the Government's ability to prove them at trial.

Point I argues that section 666, charged in Count Thirteen, is unconstitutionally overbroad and vague, in violation of the First and Fifth Amendments. The constitutionality of a federal criminal statute is a question of law that is properly decided on a pretrial motion to dismiss. United States v. Quinones, 313 F.3d 49, 59 (2d Cir. 2002) ("A challenge to the facial constitutionality of a criminal statute is a pure question of law."); United States v. Sattar, 272 F. Supp. 2d 348, 359 (S.D.N.Y. 2003) (dismissing indictment where statute was unconstitutionally vague as applied); see also Fed. R. Crim. P. 12(b)(3)(B).

A validly enacted federal statute enjoys the presumption of constitutionality, United States v. Morrison, 529 U.S. 598, 607 (2000), and a court must "construe, not condemn, Congress' enactments" where fairly possible, Skilling v. United States, 561 U.S. 358, 403 (2010). At the same time, the presumption of constitutionality can be overcome if no reasonable interpretation of the statute renders it constitutional. Rust v. Sullivan, 500 U.S. 173, 191 (1991); see also Almendarez-Torres v. United States, 523 U.S. 224, 238 (1998). Statutory requirements cannot be ignored or altered "merely because . . . giving effect to the express language employed by Congress might require a court to face a constitutional question." Swain v. Pressley, 430 U.S. 372, 378 n.11 (1977); see also Humanitarian L. Project v. Reno, 205 F.3d 1130, 1137–38 (9th

Cir. 2000) ("While we construe a statute in such a way as to avoid constitutional questions, we are not authorized to rewrite the law so it will pass constitutional muster." (citation omitted)).

Points II and III argue that the allegations of a general retainer relationship between Mr. Kelly and Joseph Percoco, which form the basis of Counts Nine and Thirteen, fail as a matter of law to satisfy the "official act" element of honest services fraud conspiracy (Count Nine) and section 666 bribery (Count Thirteen) and therefore fail to state an offense under either statute.[6] Whether allegations in an indictment suffice to state the charged offense is a question of law to be resolved on a pretrial motion to dismiss. United States v. Aleynikov, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."). An indictment that fails to adequately allege "all of the essential elements of the offense charged is defective" and must be dismissed. United States v. Gonzalez, 686 F.3d 122, 127 (2d Cir. 2012).

An indictment does not pass muster simply because it parrots the language of the statute: "'where the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species [and] must descend to particulars.'" United States v. Pirro, 212 F.3d 86, 93 (2d Cir. 2000) (quoting Russell v. United States, 369 U.S. 749, 765 (1962)). In other words, the allegations in an indictment must "allow [a] court to evaluate whether [the] *facts alleged* could support conviction." Id. at 92 (emphasis added) (citing Russell).

---

[6]     Section 666 does not have an "official act" element for the reasons discussed, infra, at Point I. Point II is argued in the alternative as to section 666, in the event the Court rejects the interpretation of section 666 urged in Point I.

## ARGUMENT

## POINT I

### THE OMISSION OF AN OFFICIAL ACT REQUIREMENT MAKES SECTION 666 UNCONSTITUTIONAL UNDER <u>MCDONNELL</u>

In <u>McDonnell v. United States</u>, the Supreme Court held that federal bribery statutes must be "bounded" by the requirement that the alleged bribe be offered in exchange for an "official act," a term the Court narrowly defined.  136 S. Ct. 2355, 2368 (2016).  The Court warned that a bribery statute without a narrow official act requirement would present serious constitutional problems by casting "a pall of potential prosecution" over "democratic discourse" and by leaving "shapeless" the boundaries of criminal liability.  <u>Id.</u> at 2372–73 (quotation marks omitted).  In other words, such a statute would be unconstitutionally overbroad and vague.  The Court further cautioned that such a statute could undermine federalism by interfering with the ability of states to regulate the conduct of their own officials.  <u>Id.</u> at 2373.

Section 666, charged in Count Thirteen, criminalizes so-called "<u>quid pro quo</u>" arrangements between public officials and their constituents without requiring that the alleged "<u>quo</u>" be an official act.  Indeed, Congress *removed* the term "official act"—which was carefully defined in the statute that section 666 was modeled after, 18 U.S.C. § 201 ("section 201").  Section 666 is therefore purposefully unconstrained by any official act requirement, much less the narrow one demanded by <u>McDonnell</u>.

Section 666 is unconstitutional because it does not have an official act requirement.  For the reasons explained in <u>McDonnell</u>, section 666 (1) is facially overbroad, in violation of the First Amendment, (2) is vague as applied to the conduct alleged in this case, in violation of the Fifth Amendment Due Process Clause, and (3) undermines federalism by permitting federal prosecutors to impose their personal conceptions of good government on states.

## A. **McDonnell** cast doubt on the constitutionality of any federal bribery statute that lacks an official act requirement

### 1. **McDonnell v. United States**

McDonnell arose out of the relationship between the former Governor of Virginia, Robert McDonnell, and Jonnie Williams, a businessman who wanted to market a nutritional supplement called Anatabloc.[7] 136 S. Ct. at 2361–62. To get regulatory approval for Anatabloc, Williams needed to cite research showing its health benefits, and he hoped Virginia's public universities could perform such research. Id. At trial, the prosecution presented evidence that the Governor used his position to help Williams in a number of ways. Among other things, the Governor arranged for Williams to meet with other "government officials, who were subordinates of the Governor, to discuss and promote Anatabloc," personally contacted other officials "to encourage Virginia state research universities to initiate studies," and recommended that other officials meet with executives of Williams's company "to discuss ways that the company's products could lower healthcare costs." Id. at 2365–66. The Governor also hosted an event at the Governor's mansion, during which representatives of Williams's company distributed samples of Anatabloc as well as checks for researchers to use for grant proposals. Id. at 2363.

The prosecution argued that the Governor used his office to assist Williams not solely because he believed in Anatabloc's health effects, but also in exchange for a stream of extravagant gifts, payments, loans, and favors showered by Williams upon the Governor and his wife. Those benefits included a Rolex watch, a shopping trip for designer clothing, personal loans, use of a private jet and Ferrari, cash gifts, and several rounds of golf—the total value of which exceeded $175,000. Id. at 2362–64.

---

[7]    The facts and reasoning of McDonnell are undoubtedly familiar to the Court and are recited here only insofar as they bear on this motion.

The Governor and his wife were charged with, among other crimes, substantive and conspiracy offenses under the honest services fraud statute, 18 U.S.C. § 1346, and the Hobbs Act, 18 U.S.C. § 1951. Each of those charges rested on the theory that the Governor and his wife had accepted bribes from Williams. The parties agreed that, regardless of the statute at issue, a bribery offense requires a quid pro quo, in which the "quo" is the promise or performance of an "official act." 136 S. Ct. at 2365. The parties further agreed to use the definition of "official act" in section 201. Id. Section 201 provides, in relevant part:

> the term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).

The parties disagreed, however, as to the proper jury instructions for "official act" beyond the section 201 definition. The prosecution requested—and the district court delivered—an instruction that "official act" encompassed "'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" McDonnell, 136 S. Ct. at 2366 (quoting jury charge). Over a defense objection, the district court declined to give the instruction that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts.'" Id. at 2366 (quotation marks omitted). The Governor was convicted.

On appeal, Governor McDonnell argued that the jury instructions were erroneous, that there was insufficient evidence to convict, and that the honest services fraud and Hobbs Act statutes were unconstitutionally vague. Id. at 2367.

## 2. **McDonnell** narrowly defined "official act"

The Supreme Court vacated Governor McDonnell's conviction, holding that the jury instructions were erroneous because they failed to properly explain the concept of an "official act." McDonnell, 136 S. Ct. at 2370–72.

Like the parties, the Supreme Court looked to section 201 to supply the definition of "official act" applicable to each of the bribery-related offenses, regardless of the statute charged in a particular offense. Id. at 2367–68. The Court held that an "official act" consists of two elements. First, there must be a "specific," "focused[,] and concrete" question or matter requiring the "formal exercise of governmental power." Id. at 2370–72.[8] Second, there must be some "decision or action" by the public official on that specific question or matter. Id. at 2368–72. As to the second element, the Court explained that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'" Id. at 2372. Nor is it an "official act" to express support for an outcome favored by a constituent, refer a constituent to a different public official, or gather information on a constituent's behalf. Id. at 2371. In other words, even when there is an identifiable question or matter, not everything a public official does in relation to that question or matter constitutes official action. Id. ("[I]f every action somehow related to the research study were an 'official act,' the requirement . . . would be meaningless."). In narrowly defining what may constitute an "official act," the Court relied heavily on United States v. Sun-Diamond Growers of California, 526 U.S. 398, 408 (1999). McDonnell, 136 S. Ct. at 2370.

The Court did note, however, that the official act requirement can be satisfied if, in exchange for a payment, the public official agrees "to exert pressure on another official to

---

[8] This requirement—that every "official act" relate to a *specific* question or matter—is the basis of the argument in Point II, infra.

perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." Id. at 2372.

### 3. <u>McDonnell</u> stressed the constitutional necessity of the official act requirement

In arriving at a narrow definition of "official act," the Supreme Court did not rely solely on the statutory language of section 201. Equally critical was the Court's conclusion that, without a narrowly defined official act requirement, a federal bribery statute would "raise significant constitutional concerns." McDonnell, 136 S. Ct. at 2372. The Court identified three ways in which such a statute would be constitutionally suspect.

<u>First</u>, the absence of a narrow "official act" requirement would undermine the "basic compact underlying representative government," which "*assumes* that public officials will hear from their constituents and act appropriately on their concerns." Id. at 2372. The Court observed that "conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time." Id. The threat to "democratic discourse" would therefore be substantial if "nearly anything a public official accepts—from a campaign contribution to lunch—counts as a quid" and "nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a quo." Id. In other words, without a bright line to distinguish between quid pro quo bribery and ordinary "democratic discourse," the latter, which enjoys First Amendment protection, would be seriously threatened.[9]

_____

[9] The Supreme Court did not expressly cite the First Amendment or identify the overbreadth doctrine during this discussion. Nonetheless, the Court's analysis was plainly intended to invoke that doctrine, which bars the enforcement of any "overbroad law [that] may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." Virginia v. Hicks, 539 U.S. 113, 119 (2003). The Court's discussion repeatedly cited an amicus brief filed by former federal officers, which warned that an overbroad definition of "official act" would threaten the First Amendment. See Brief of Former Federal Officials as Amicus Curiae at 9, McDonnell, 136 S. Ct. 2355 (No. 15-474), 2016 WL 878849 at

Second, a narrow conception of official act is required so the crime of bribery is "defined with sufficient definiteness that ordinary people can understand what conduct is prohibited" and "in a manner that does not encourage arbitrary and discriminatory enforcement." Id. at 2373 (quotation marks omitted). Without a clear official act requirement, a public corruption statute could easily become the tool of "overzealous prosecutions" and fail to "comport with the Constitution's guarantee of due process." Id. (citations omitted).

Third, a federal bribery statute that lacks a robust official act requirement would raise "significant federalism concerns." Id. As sovereigns, states have "the prerogative to regulate the permissible scope of interactions between state officials and their constituents." Id. The absence of an official act requirement would leave a federal statute's "outer boundaries ambiguous and involve[] the Federal Government in setting standards of good government for local and state officials." Id. (citation omitted).

Because there was no dispute that the statutes charged in McDonnell—18 U.S.C. § 1346 and 18 U.S.C. § 1951—each required official acts, the Supreme Court did not need to find either statute unconstitutionally overbroad or vague. 136 S. Ct. at 2375. As to those statutes, the Court could "avoid the 'absurdities'" of overbreadth and vagueness simply "by adopting a more limited definition of 'official acts.'" Id. at 2370 (citing Sun-Diamond, 526 U.S. at 408). As constrained by the Court's definition of the "official act," the honest services fraud and Hobbs Act statutes were appropriately narrow and steered clear of the constitutional problems the Court identified. Id. at 2375; see also United States v. Silver, 203 F. Supp. 3d 370, 379 n.8 (S.D.N.Y. 2016)

---

*9 ("Sweeping such commonplace behavior into the definition of an official act under Section 201(a)(3) is not only contrary to precedent, it runs headlong into the First Amendment.").

(noting that <u>McDonnell</u> "avoid[ed] these constitutional concerns" because it was able to "cabin the 'quo' in the quid pro quo element of honest services fraud and extortion").

Section 666 cannot be cabined in the same way. For the reasons discussed below, section 666 does not require an official act and therefore cannot be limited through a *definition* of the term "official act." Without such a limitation, section 666 runs headlong into the constitutional problems <u>McDonnell</u> identified.

**B.     Section 666 lacks an official act requirement**

**1.     Section 666's plain text makes clear—and its statutory history confirms—that it contains no official act requirement**

The interpretation of a statute must begin with the statutory text and where the text is plain, it controls. <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534 (2004). Section 666, while remarkably broad and vague, is plain in one respect: no "official act" or "official action" is required. Instead, the statute subjects to criminal punishment anyone who:

> corruptly gives, offers, or agrees to give anything of value to any person, *with intent to influence* or reward an agent of an organization or of a State, local, or Indian tribal government, or any agency thereof, *in connection with any business, transaction, or series of transactions* of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2) (emphases added). The concept of an "official act" or "official action" is not included, defined, or otherwise alluded to. The term "corruptly" is likewise not defined.

By its plain terms, section 666 reaches conduct that does not involve an official act. It is entirely possible, and commonplace, to "influence" a public official "in connection with any business, transaction, or series of transactions" without intending that the public official perform an official act. For example, suppose a Developer, with regulatory issues before the State, agrees to take an Assemblyman to a baseball game if the Assemblyman will set up a call with the Chair of the relevant regulatory committee. Such a scenario might be prosecuted under the broad

18

scope of section 666: the baseball game is a "thing of value" and it was provided to the Assemblyman to "influence" him in exchange for a desired action by the Assemblyman "in connection with any business, transaction, or series of transactions" before the State. But, under McDonnell, the desired action by the Assemblyman—setting up a meeting with a different government official—would not be an official act, even if it was taken in exchange for tickets to the baseball game, and even if it related to pending business before the State. McDonnell, 136 S. Ct. at 2371; see also Sun-Diamond, 526 U.S. at 406–07. Section 666 therefore criminalizes interactions between public officials and constituents in which the public official does not promise or perform an "official act," as defined in McDonnell.

The statutory and legislative history confirms that Congress intentionally omitted section 201's "official act" element from section 666. Section 666 was enacted in 1984—when section 201 was already law—for the specific purpose of expanding the scope of criminal liability beyond what was encompassed by section 201. See S. Rep. No. 98-225, at 369 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3510; see also United States v. Rooney, 37 F.3d 847, 851 (2d Cir. 1994) (describing statutory history).[10] Congress was therefore fully aware of section 201 when it settled on the statutory language of section 666. Yet, unlike section 201, which not only includes the term "official act" but also specifically defines it, see 18 U.S.C. § 201(a)(3), section 666 includes neither the term nor a definition. The decision to omit the term "official act" from section 666 cannot be presumed to be an oversight. Section 201 shows that when Congress intended a bribery statute to include an official act requirement, it knew how to include one. Section 666 omits the term "official act" because it has no official act requirement. See Barnhart

---

[10]     As originally enacted, section 666 covered payments to a public official made "for or because of" the official's conduct; that language was amended to the present-day "with the intent to influence or reward" formulation in 1986. United States v. Fernandez, 722 F.3d 1, 21 (1st Cir. 2013) (describing statutory history).

v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)); Keene Corp. v. United States, 508 U.S. 200, 208 (1993); Russello v. United States, 464 U.S. 16, 23 (1983).

Courts in this circuit have interpreted the absence of the words "official act" from section 666 to mean that the statute lacks an official act requirement. See, e.g., United States v. Skelos, No. 15 CR 317 (KMW), 2015 WL 6159326, at *4 (S.D.N.Y. Oct. 20, 2015) ("Defendants are incorrect in their assertion that [to charge a section 666 offense] the Government must allege official action that involved a 'decision or action on any question, matter, cause, suit, proceeding or controversy.'"). Other circuits have likewise concluded that section 666 does not require an official act. See, e.g., United States v. Garrido, 713 F.3d 985, 1001 (9th Cir. 2013) ("Because the plain language of § 666 does not use the term 'official act,' we must not insert that term into our reading of the statute."); United States v. McNair, 605 F.3d 1152, 1191 (11th Cir. 2010) ("§ 666 sweeps more broadly than either § 201(b) or (c) . . . [because] Section 666 does not say 'official act' but says 'any business, transaction, or series of transactions.'"). The case law therefore confirms what is plain from the statutory text and history: section 666 does not contain an official act requirement.[11]

_____

[11]     In United States v. Silver, this Court raised the possibility that a definition of official act derived from state or local law could, in certain circumstances, satisfy McDonnell.  United States v. Silver, 203 F. Supp. 3d 370, 378 n.8 (S.D.N.Y. 2016).  The Court need not now decide whether McDonnell leaves open such a possibility.  Even assuming that it does, there is no language in section 666 that could be read to incorporate a non-section 201 definition of "official act" based on state or local law.  The problem with section 666 is that it purposefully omits *any* notion of an official act, whether derived from section 201 or otherwise.

## 2.    An official act requirement cannot be inserted into section 666

An official act requirement may not be inserted into section 666, even if such a requirement is needed to render the statute constitutional.  Under the constitutional avoidance canon, a statute may be *construed* to avoid constitutional concerns—but only if such a construction is fairly possible.  <u>Rust v. Sullivan</u>, 500 U.S. 173, 191 (1991); <u>see also</u> <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 238 (1998).  The constitutional avoidance canon does not permit courts to simply alter or ignore the unambiguous text of a statute.

In <u>United States v. Reese</u>, the Supreme Court addressed "whether a penal statute enacted by Congress, . . . which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish."  92 U.S. 214, 221 (1875).  The Court's answer was clear: to "introduce words of limitation into a penal statute so as to make it specific" would be to "make a new law, not to enforce an old one."  <u>Id.</u>  Congress is not permitted to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."  <u>Id.</u>   That principle has been reaffirmed time and again in the Supreme Court's jurisprudence.  <u>E.g.</u>, <u>Swain v. Pressley</u>, 430 U.S. 372, 378 (1977) ("Notwithstanding the desirability of adopting a construction of the statute which would avoid the constitutional issue raised by respondent, we are convinced that the language of [the statute] is sufficiently plain to require us simply to read it as it is written."); <u>United States v. Sullivan</u>, 332 U.S. 689, 693 (1948) ("When it is reasonably plain that Congress meant its Act to prohibit certain conduct, no [legal authority] justifies a distortion of the congressional purpose, not even if the clearly correct purpose . . . leads inevitably to a holding of constitutional invalidity."); <u>Skilling</u>, 561 U.S. at 415–16 (Scalia, <u>J.</u>, concurring in the judgment) ("A statute that is unconstitutionally vague

cannot be saved . . . by judicial construction that writes in specific criteria that its text does not contain." (citations omitted)).

Section 666 cannot fairly be construed to require an "official act." As discussed, its plain language allows the Government to prosecute conduct (such as the baseball-for-meeting hypothetical scenario discussed above) that involves no "official act" as that term is defined in McDonnell. Even if the statutory language were ambiguous—and it is not—the fact that the term "official act" was removed when section 666 was adapted from section 201 makes the congressional intent plain.

<blockquote>

a.   **Section 666 must be distinguished from the Hobbs Act and honest services fraud statutes at issue in <u>McDonnell</u>**
</blockquote>

The statutory history of section 666 distinguishes it from the Hobbs Act, 18 U.S.C. § 1951, and the honest services fraud statute, 18 U.S.C. § 1346, which were at issue in McDonnell. In McDonnell, the parties agreed that those statutes each contain an official act requirement, 136 S. Ct. at 2365, notwithstanding the absence of the words "official act" from the statutory text. Unlike section 666, however, neither of the statutes at issue in McDonnell was modeled after a predecessor that specifically included and defined the term "official act." See United States v. Enmons, 410 U.S. 396, 401 (1973) (explaining that Hobbs Act was adapted from the Anti-Racketeering Act of 1934); Skilling, 561 U.S. at 404 (explaining that 18 U.S.C. § 1346 was enacted to abrogate McNally v. United States, 483 U.S. 350 (1987)). Section 666's omission of the term "official act" is uniquely significant as to that statute because the term "official act"—and its accompanying definition—were *removed* when Congress adapted the language of section 201. See, supra, at Point II.B.1.

Furthermore, unlike section 666, the Hobbs Act and honest services fraud statutes can fairly be interpreted to imply an official act requirement.

The Hobbs Act prohibits "extortion," defined to mean "the obtaining of property from another, with his consent . . . under *color of official right*." 18 U.S.C. § 1951(b)(2) (emphasis added). That statutory language can readily be interpreted—and has been interpreted by the Supreme Court—to convey an official act requirement. Evans v. United States, 504 U.S. 255, 268 (1992) (interpreting "under color of official right" to mean that public official "obtained a payment to which he was not entitled, knowing that the payment was *made in return for official acts*" (emphasis added)).

The honest services fraud statute provides that "scheme or artifice to defraud," as used in the mail and wire fraud statutes, encompasses schemes "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. As the Supreme Court explained in Skilling, the statutory term "intangible right of honest services" refers to a body of case law which had long held that bribery and kickback schemes deprived the public of the right to honest services. Skilling, 561 U.S. at 408–12. In other words, Congress had traditional bribery in mind when it used that broad language in the statute. Id.

Precisely the opposite is true of section 666. Unlike the Hobbs Act, there is no ready textual hook in section 666 for an official act requirement; indeed, that hook (the defined term "official act") was removed when section 666 was adapted from section 201. And, unlike the honest services fraud statute, section 666 was not enacted by Congress with the intent to *incorporate* the elements of traditional bribery; to the contrary, Congress—with full knowledge of section 201—decided to *carve out* section 201's "official act" requirement. See Rooney, 37 F.3d at 851 (describing statutory history of section 666); United States v. Fernandez, 722 F.3d 1, 20 (1st Cir. 2013) (same).

To the extent the Government may argue that an official act requirement may be injected into section 666 through the statutory term "corruptly," that argument fails for a number of reasons.

<u>First</u>, the word "corruptly" appears in both section 666 and section 201, yet section 201 separately requires and defines "official act." <u>Compare</u> 18 U.S.C. § 666(a)(2), <u>with</u> 18 U.S.C. § 201(a)(3), (b)(1). To violate section 201, a defendant must act "corruptly" and intend to influence an "official act." Reading "corruptly" to imply an official act requirement would render section 201's express inclusion of the term "official act" and its definition of that term superfluous. <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation omitted)); <u>see also</u> <u>United States v. Alfisi</u>, 308 F.3d 144, 156 (2d Cir. 2002) (Sack, <u>J.</u>, dissenting) (noting that interpreting "corruptly" in section 201 to mean "with specific intent to influence official acts" would be "effectively reading 'corruptly' out of the statute" (emphasis omitted)).[12] Relatedly, interpreting the word "corruptly" to imply an official act requirement would leave unexplained why Congress included the term "official act" (as well as a definition) in section 201, but not in section 666. In that regard, it is notable that, in an effort to more closely track section 201, Congress amended section 666 to add the word "corruptly," yet *did not* take comparable action as to "official act." <u>See</u> <u>Fernandez</u>, 722 F.3d at 21–22 (explaining that

---

[12] The reasoning of Judge Sack's <u>Alfisi</u> dissent was essentially adopted by the Second Circuit a few years later, as discussed at footnote 14, <u>infra</u>.

"corruptly" was added to section 666 when the statute was amended in 1986). Congress clearly did not intend for section 666 to include an official act requirement.

Second, the ordinary meaning of "corruptly" or "corrupt" does not imply an official act. Smith v. United States, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). The ordinary meaning of "corruptly" or "corrupt" is "wrongful, immoral, depraved, or evil." Arthur Andersen LLP v. United States, 544 U.S. 696, 705 (2005) (citing dictionaries; see also United States v. Ford, 435 F.3d 204, 211 (2d Cir. 2006). Those concepts do not invoke a necessary link to the formal exercise of governmental power. For example, some may view trading personal benefits for access, meetings, cronyism, or favoritism as "corrupt."[13] But it does not follow that when a public official sets up a meeting in exchange for a personal benefit an official act has occurred. See McDonnell, 136 S. Ct. at 2372.

Third, the Second Circuit has already construed "corruptly," as used in section 666, to signify "the violation of some duty owed to the government or to the public in general." Rooney, 37 F.3d at 852–53; see also United States v. Bahel, 662 F.3d 610, 638 (2d Cir. 2011); Ford, 435 F.3d at 211. But a government official may breach the public trust without performing an official act under McDonnell. For example, it may be a breach of the public trust for an Assemblyman to arrange a meeting in exchange for tickets to a baseball game from a Developer, as discussed above. However unsavory or "corrupt" such conduct might seem, it would involve no official act. See McDonnell, 136 S. Ct. at 2375 (noting that "tawdry tales of Ferraris,

---

[13]     Indeed, that was the view of the amici who filed briefs supporting the Government's (losing) position in McDonnell. See, e.g., Brief of Citizens for Responsibility and Ethics in Washington as Amicus Curiae at 14, McDonnell, 136 S. Ct. 2355 (No. 15-474), 2016 WL 1445327 at *13 (arguing that sale of mere access would be "corrupt"); Brief of Public Citizen, Inc. and Democracy 21 as Amicus Curiae at 15–18, McDonnell, 136 S. Ct. 2355 (No. 15-474), 2016 WL 1445328 at *15–18 (same).

Rolexes, and ball gowns" do not alter "the broader legal implications of the Government's boundless interpretation of the federal bribery statute"). Likewise, it may be a breach of an official duty—not to mention a potential violation of a statute, regulation, or canon of ethics—for a government official to share with a constituent certain types of nonpublic information. But simply divulging nonpublic information is also not an "official act." Id. at 2371.

Fourth, section 666's "corruptly" element is separate and distinct from the statute's specific intent element that the thing of value be given with the "intent to influence or reward" the government official. See 18 U.S.C. § 666(a)(2) (". . . *corruptly* gives, offers, or agrees to give anything of value to any person, *with intent to influence or reward an agent . . .*" (emphases added)). The Second Circuit has made clear that the two elements of section 666 are legally distinct and must be proved separately. Ford, 435 F.3d at 211. In Ford, the jury was instructed that a "person acts corruptly when the person acts with the understanding that something of value is to be offered or given to influence her in connection with her organizational duties." Id. at 211. The Second Circuit observed that this instruction may have "confused the jury" because it "dealt with a subject that should have been adequately covered in the [separate] portion of the charge dealing with the statutory requirement that the recipient 'intend[ ] to be influenced.'" Id. In other words, the jury instruction improperly conflated the "corruptly" element with the specific intent element, which is what requires a quid pro quo. Id. at 213–14; cf. Alfisi, 308 F.3d at 156 (Sack, J., dissenting) ("[T]he words of [section 201] indicate that the quid pro quo element is established not by the term 'corruptly,' but rather by the other terms, i.e., a payment 'with intent . . . to influence any official act.'").[14] Because the official act in a bribery case is the

---

[14]    The Alfisi majority suggested that the term "corruptly," as used in section 201, "is in the nature of a quid pro quo requirement." 308 F.3d at 149 (citation omitted). To the extent this language suggests that the "corruptly" element is identical to the quid pro quo specific intent

"quo" of the quid pro quo, if section 666 did require an official act, that term would appear as part of the specific intent element. But Section 666 defines the specific intent without any reference to the concept of an official act. See 18 U.S.C. § 666 ("with intent to influence or reward . . . in connection with any business, transaction, or series of transactions"). By comparison, the specific intent element of section 201 requires an official act. See 18 U.S.C. § 201(b)(1)(A) ("with intent to influence any *official act*" (emphasis added)).

**3.    The Government cannot override Congress by modifying the elements of a section 666 offense**

The Government cannot amend statutory elements of section 666 through the S1 Indictment. The "to wit" clause of Count Thirteen alleges that the payments from the Energy Company to Percoco's wife were made "to influence, and to reward the taking of official action to benefit the Energy Company." (S1 Ind. ¶ 65). The Government apparently intended by this language to communicate that it intends to assume the burden of satisfying the McDonnell "official act" requirement with regard to section 666.

But the Government's intent and the language of the S1 Indictment cannot alter whether *Congress* intended section 666 to include an official act requirement. The Supreme Court has long recognized that the elements of a crime are established by the words of the statute, not by the formulations chosen by prosecutors in a charging instrument. Otherwise, the Government could modify the elements of a crime through artful pleading. Lanzetta v. State of New Jersey, 306 U.S. 451, 453 (1939) ("It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression."); United States v. Stevens, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government

---

element, it has been supplanted by Ford, which essentially adopts the reasoning of Judge Sack's dissent in Alfisi. See Ford, 435 F.3d at 211 (finding that jury instructions may have "confused the jury" by conflating the "corruptly" element with the quid pro quo specific intent element).

promised to use it responsibly."); Skilling, 561 U.S. at 415 (Scalia, J., concurring in the judgment) ("A statute that is unconstitutionally vague cannot be saved by a more precise indictment."); see also Ricks v. United States, 414 F.2d 1111, 1118 (D.C. Cir. 1968); Gesicki v. Oswald, 336 F. Supp. 365, 369 (S.D.N.Y. 1971) ("Where loss of personal liberty may be imposed, a citizen is entitled to know before he comes to court—not after—what is the standard of accepted behavior.").

### C. The statute charged in Count Thirteen, 18 U.S.C. § 666(a)(2), is unconstitutional

Without an "official act" element, section 666 is unconstitutional for the reasons identified in McDonnell.[15] The statute is substantially overbroad and vague. And, as applied to the alleged conduct here, it undermines federalism.

### 1. Section 666 is substantially overbroad on its face

Under the overbreadth doctrine, a statute violates the First Amendment if it "criminalizes a substantial amount of protected expressive activity." United States v. Williams, 553 U.S. 285, 297 (2008); see also Virginia v. Hicks, 539 U.S. 113, 119 (2003). A statute may be overbroad even if it does not restrict "spoken words" if it substantially restricts other "expressive or communicative conduct," including "rights of association." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973) (quotation marks omitted). Because invalidation of a statute is a strong remedy, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615. Where First Amendment rights are at stake, "[c]riminal statutes must be scrutinized with particular care" and "those [statutes] that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid

---

[15]    We challenge solely the subsection charged in Count Thirteen, 18 U.S.C. § 666(a)(2). As stated earlier, we use "section 666" as shorthand for that subsection.

even if they also have legitimate application." City of Houston, Tex. v. Hill, 482 U.S. 451, 459 (1987). Because an overbreadth challenge attacks the facial validity of the statute, a court can and should "take into account possible applications of the statute in other factual contexts besides that at bar." NAACP v. Button, 371 U.S. 415, 432 (1963); see also New York v. Ferber, 458 U.S. 747, 769 (1982) ("[W]e have allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity."); Dickerson v. Napolitano, 604 F.3d 732, 742 (2d Cir. 2010) ("[T]he plaintiff is allowed to challenge a law that may be legitimately applied to his or her own expressive conduct if the law has the potential to infringe unconstitutionally on the expressive conduct of others."). A statute that violates the First Amendment cannot be upheld based on Government assurances of prosecutorial restraint. Stevens, 559 U.S. at 480 ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*.").

Under these standards, section 666 is substantially overbroad. Although the statute reaches classic cases of quid pro quo bribery, it does not stop there. The absence of an official act requirement turns "nearly anything a public official accepts—from a campaign contribution to lunch—[into] a quid; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—[into] a quo." McDonnell, 136 S. Ct. at 2372. Such breadth threatens to criminalize the everyday interactions between public officials and constituents that make up the "basic compact underlying representative government." Id.

The unconstitutional applications of the statute are substantial. Among other things, section 666 criminalizes—or at the very least substantially chills—ordinary campaign contributions. Campaign contributions have long been recognized as expressing the First

Amendment-protected rights of free speech and association.  Buckley v. Valeo, 424 U.S. 1, 20

(1976) (per curiam); see also McCutcheon v. F.E.C., 134 S. Ct. 1434, 1448 (2014) (plurality

opinion).  At the same time, contributions are things of value that, in many instances, are given

in the hope that the recipient "will respond by producing those political outcomes the [donor]

favors."  Citizens United v. F.E.C., 558 U.S. 310, 359 (2010).  The Supreme Court has held that

contributions—even when given with the hope of producing some action in return—cannot be

criminalized as bribery unless there is "an explicit promise or undertaking by the official to

perform or not to perform an official act."  McCormick v. United States, 500 U.S. 257, 273

(1991); see also United States v. Garcia, 992 F.2d 409, 414 (2d Cir. 1993).  Put simply,

"government regulation may not target the general gratitude a candidate may feel toward those

who support him or his allies, or the political access such support may afford."  McCutcheon,

134 S. Ct. at 1441 (plurality opinion).  Yet section 666 purports to do just that—the statute

criminalizes political contributions so long as the intent of the donor is to "influence or reward"

the recipient "in connection with" any business before the state, even if all that is desired is that

the public official provide or facilitate political access.[16]

Section 666 also threatens to turn everyday acts of political advocacy—by private

citizens and, as relevant here, by advocates—into crimes.  Lobbying is a "type of speech

indispensable to decisionmaking in a democracy," First Nat'l Bank of Boston v. Bellotti, 435

U.S. 765, 776–77 (1978), and is protected by the First Amendment, Regan v. Tax'n With

Representation of Washington, 461 U.S. 540, 552 (1983) (Blackmun, J., concurring).  Integral to

---

[16]     In McDonnell, the Supreme Court considered the effect that an overbroad conception of
"official act" would have on campaign contributions, even though no contributions were at issue
in that case.  136 S. Ct. at 2372.  Here, the Government alleges that Mr. Kelly arranged for the
Energy Company to make political donations, not alleged to be unlawful, to the Cuomo
campaign "in an effort to ingratiate himself to Percoco."  (Compl. ¶¶ 37, 37(b)).  The Court can
and should consider the chilling effect section 666 has on campaign contributions.

lobbying, and to political advocacy generally, is the freedom to seek opportunities to speak with public officials. McDonnell, 136 S. Ct. at 2372; see also Button, 371 U.S. at 437 ("Free trade in ideas means free trade in the opportunity to persuade to action." (citation omitted)). The enforcement of a bribery statute that lacks a narrow official act requirement "'would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties.'" McDonnell, 136 S. Ct. at 2372 (quoting amicus brief). At the same time, "citizens with legitimate concerns might shrink from participating in democratic discourse." Id.

Indeed, this case demonstrates how section 666 casts an aura of impropriety over political advocacy. In addition to the charge that Mr. Kelly bribed Percoco by arranging for the Energy Company to hire Percoco's wife, the Complaint contains other uncharged allegations, laden with innuendo, that: (1) the Energy Company hired Todd Howe in 2010 as "a consultant . . . to help [the Energy Company] obtain official State favors," and (2) that in 2010 and 2011 (before Percoco's wife was hired), Mr. Kelly and Howe were "actively seeking the assistance of [Percoco] with obtaining State support for the development of the [New York] Power Plant." (Compl. ¶¶ 19, 38). Of course, *every* government relations consultant is, by definition, a consultant hired to obtain favorable government action. And, despite the implication of something sinister or illegal, the allegations as to Howe's efforts in 2010 and 2011 describe ordinary government relations work.

In fact, without the constraint of an "official act" requirement, the very scenarios discussed in McDonnell would be prosecutable under section 666. McDonnell explained that it would be constitutionally problematic if a "union official worried about a plant closing" could be prosecuted for reaching out to a public official on that issue simply because "the union had given

a campaign contribution in the past." 136 S. Ct. at 2372. But, as discussed, section 666 is capacious enough to criminalize campaign contributions that are given with the expectation that the recipient will be responsive to the donor's concerns in the future. Likewise, McDonnell warned that, absent an official act requirement, a bribery statute could be enforced against homeowners who ask for a local official's help in restoring electricity if, previously, "the homeowners invited the official to join them on their annual outing to the ballgame." Id. Again, section 666 could be invoked to prosecute such conduct: the ballgame was a "thing of value" and the homeowners invited the official in order to "influence" the official's future willingness to listen to their concerns "in connection with any business" before the local government. See 18 U.S.C. § 666(a)(2).

Such examples show that section 666's overbreadth is substantial both in "an absolute sense" and "relative to the statute's plainly legitimate sweep." Williams, 553 U.S. at 292. In McDonnell, the Supreme Court relied heavily on an amicus brief by former federal officials, which warned that, without a robust official act requirement, a bribery statute could be used to prosecute not only campaign contributions, but also many other ordinary practices, such as the reimbursement of travel expenses for members of Congress (and federal judges) to attend conferences and the giving of nominal gifts. Brief of Former Federal Officials as Amicus Curiae at 10–16, McDonnell, 136 S. Ct. 2355 (No. 15-474), 2016 WL 878849 at *9–16. It was precisely because such scenarios are so "commonplace" and the threat of casting a "pall of potential prosecution" over them so severe that the Supreme Court held that the official act requirement was constitutionally required. McDonnell, 136 S. Ct. at 2372.

Without an official act requirement, section 666 is substantially overbroad and violates the First Amendment.

### 2. Section 666 is unconstitutionally vague as applied to the allegations against Mr. Kelly

Count Thirteen must also be dismissed because section 666 is unconstitutionally vague as applied to the allegations against Mr. Kelly. The Due Process Clause of the Fifth Amendment ensures that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." United States v. Batchelder, 442 U.S. 114, 123 (1979) (citation omitted).[17] The harm of a vague statute is greatest when the statute "threatens to inhibit the exercise of constitutionally protected rights"; accordingly, statutes (like section 666) that burden First Amendment rights are subject to "a more stringent vagueness test." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982); see also Button, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."); N.Y.S. Rifle and Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265–66 (2d Cir. 2015).

Under the void-for-vagueness doctrine, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). A statute is unconstitutionally vague if it fails to provide adequate notice of what is criminal or if it is susceptible to arbitrary and discriminatory enforcement. Dickerson, 604 F.3d at 747. Section 666 is vague for both reasons.

### a. Section 666 does not provide adequate notice of what is prohibited

A criminal statute must give "the person of ordinary intelligence a reasonable opportunity to know" what is unlawful. United States v. Rybicki, 354 F.3d 124, 132 (2d Cir. 2003) (citation

---

[17] The vagueness doctrine does not differ insofar as it arises under the Due Process Clauses of the Fifth and Fourteenth Amendments. Welch v. United States, 136 S. Ct. 1257, 1261 (2016). We therefore cite cases discussing either Due Process Clause interchangeably.

omitted).  To provide adequate notice, a statute must make it "reasonably clear at the relevant time that the defendant's conduct was criminal."  <u>Mannix v. Phillips</u>, 619 F.3d 187, 197 (2d Cir. 2010) (citation omitted).

Section 666 provides no such notice.  As relevant here, the statute does not make it a crime simply to hire a consultant who happens to be the wife of a state official.  Nor does the statute make it a crime to pay such a person (what the Government perceives to be) above-market compensation for real work.[18]  So a person in Mr. Kelly's position would not be on notice that it was unlawful to hire Percoco's wife because her husband was a state official.[19]  <u>See Papachristou v. City of Jacksonville</u>, 405 U.S. 156, 163 (1972) (finding statute unconstitutionally vague because it reached "normally innocent" conduct).

What section 666 purports to make unlawful is to hire Percoco's wife "corruptly," with the intent to "influence" her husband "in connection with" business before the state.  18 U.S.C. § 666(a)(2).  However, the statute does not make clear what it is unlawful to "influence" the public official *to do*.  Put another way, assuming that the compensation to Percoco's wife counted as the "<u>quid</u>" of a <u>quid pro quo</u>, section 666 does not explain what sorts of "<u>quo</u>" are unlawful.  Does the unlawful "<u>quo</u>" have to be an official act by the public official, or does it also encompass something less?  For example, the Government alleges that Percoco was "a primary 'gatekeeper' of opportunities to speak or meet with the Governor."  (S1 Ind. ¶ 3).  Under section 666, would it have been unlawful if the Energy Company's hiring of Percoco's wife had been motivated, in part, by the hope that Percoco would give the Energy Company opportunities

---

[18]    Section 666 contains an express safe harbor for "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c).

[19]    The adequacy of notice is determined from the objective standpoint of a reasonable person in the defendant's position.  <u>Dickerson</u>, 604 F.3d at 745–46.

to speak with Percoco, the Governor, or any other state official regarding the PPA? The statute does not answer that question, and the ordinary person would have no reason to suspect that the statute could reach such conduct, particularly because such acts plainly are not "official acts" under McDonnell. See 136 S. Ct. at 2371.

The Government further alleges that Percoco spoke with the "Former Energy Assistant Secretary" to obtain allegedly "confidential information" about the status of the Energy Company's bid for a PPA—which Percoco allegedly did *not* share with Mr. Kelly. (Compl. ¶¶ 52–53). Again, nothing in section 666 alerts the ordinary person that it would be bribery if, in exchange for a thing of value, a government official gathered information relevant to a constituent, particularly in light of McDonnell's admonition that doing so is not an "official act." See 136 S. Ct. at 2371 (holding that "calling an official . . . to gather additional information" is not an official act); cf. United States v. Ring, 706 F.3d 460, 469 (D.C. Cir. 2013) (noting that section 201 does not target "purely informational inquiries").

As to the ECA, the Government alleges that, when approached by Howe, Percoco instructed Howe (a government relations consultant) to speak to a different government official about the issue. (Compl. ¶ 47(b)). But again, the language of section 666 gives no notice that it would be a crime for a constituent to give a thing of value to a public official in the hope that the official would direct the constituent to *other* public officials who could be helpful—particularly in light of McDonnell's holding that merely talking to another official is not an "official act." See 136 S. Ct. at 2371 (holding that it is not an official act "to refer a constituent to another official").

The lack of clarity takes on heightened significance because the conduct alleged by the Government is precisely the sort that McDonnell recognized is "commonplace"—and lawful—in

the context of "democratic discourse." See 136 S. Ct. at 2372 ("But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events *all the time*." (emphasis added)); see also Citizens United, 558 U.S. at 360 ("Ingratiation and access, in any event, are not corruption."); United States v. Urciuoli, 513 F.3d 290, 296 (1st Cir. 2008) (noting that it is not corruption to trade "on the reputation, network and influence that comes with political office"). An ordinary person in Mr. Kelly's position would have no reason to suspect that such "prosaic interactions" between a public official and a constituent could be swept in by section 666. McDonnell, 136 S. Ct. at 2373.

McDonnell holds that a bribery statute "avoids this vagueness shoal" only if it is limited by a bright-line rule: the "quo" must be an official act. Id. (citation omitted). The absence of an official act requirement from section 666 thus renders the statute unconstitutionally vague.

> **b.** **Section 666 is susceptible to arbitrary and discriminatory enforcement, as demonstrated by this case**

The extraordinary breadth of section 666 makes it ripe for arbitrary and discriminatory enforcement. While a penal statute "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth," it must provide "explicit standards" that provide "minimal guidelines to law enforcement authorities." Mannix, 619 F.3d at 197 (citations omitted). A "standardless" statute enables law enforcement officers to exercise unbridled discretion "to pursue their personal predilections." Id. (citation omitted). With due respect to the Government, the court "cannot construe a criminal statute on the assumption that the Government will use it responsibly." McDonnell, 136 S. Ct. at 2372–73; see also Stevens, 559 U.S. at 480. The risk of inconsistent enforcement is especially severe since section 666 can target purely political activities, such as lobbying, campaign donations, and the performance of constituent services.

Although section 666 provides explicit standards for some statutory elements—for example the $10,000 federal funding threshold, 18 U.S.C. § 666(b)—it provides no discernible standard, explicit or implicit, for a key concept: what the constituent must intend for the public official to *do* in exchange for the thing of value. The only language on that element—that the action must be "in connection with any business, transaction, or series of transactions" before the state, 18 U.S.C. § 666(a)(2)—is so capacious as to be meaningless. Because section 666 is not limited by an official act requirement, different prosecutors can take entirely different views of, among other things: the strength and nature of the "connection" between the public official's conduct and the business that is before the state, whether the public official's conduct must be an exercise of his formal authority, or whether the statute reaches arrangements in which the public official agrees to help arrange meetings between the constituent and other public officials.

As this case demonstrates, a prosecutor could take the view that section 666 criminalizes the very conduct that <u>McDonnell</u> held cannot be prosecuted under other federal statutes, 136 S. Ct. at 2371–72—namely, expressing support for a constituent's position, obtaining information for a constituent, setting up meetings, and referring a constituent to other officials. (<u>See</u> Compl. ¶¶ 46–53 (alleging that Percoco obtained information for the Energy Company, set up meetings between Energy Company executives and other officials, and referred the Energy Company to other officials)).

For this reason, the statute cannot be defended under the theory that, even if a statute is unclear, it is not vague as applied if "the conduct at issue falls within the core of the statute's prohibition." <u>Dickerson</u>, 604 F.3d at 748 (citation omitted). The conduct legitimately prohibited by section 666 is classic <u>quid pro quo</u> bribery, in which a public official with formal decisionmaking authority over a specific issue accepts payment in exchange for the exercise of

his authority on that issue.  E.g., United States v. Brunshtein, 344 F.3d 91, 94 (2d Cir. 2003) (tax officials bribed to delete tax records); United States v. Arshad, 239 F.3d 276, 278 (2d Cir. 2001) (housing inspectors bribed not to assess penalties).  Here, the Government does not allege that Mr. Kelly believed or expected Percoco would take—or had the authority to take—formal government action on the ECA or the PPA.  Instead, the Government alleges that Percoco exercised his influence on *other* government officials who did have decisionmaking authority. (See S1 Ind. ¶¶ 31(a)–(b); Compl. ¶¶ 38(a)–(d), 47(a)–(d)).  Those allegations—even if proved— do not fall within the "core" of section 666.

      **c.**      **Past court decisions that address vagueness challenges to section 666 are inapposite**

Whether the absence of an official act requirement makes section 666 unconstitutionally vague appears to be an issue of first impression in the Second Circuit.  That is not surprising since the basis for such a challenge was clarified only recently by the Supreme Court. McDonnell, 136 S. Ct. at 2373 ("Invoking so shapeless a provision to condemn someone to prison for up to 15 years raises the serious concern that the provision does not comport with the Constitution's guarantee of due process." (citation omitted)).

Past Second Circuit cases that have addressed vagueness challenges to section 666 are inapplicable because all of them predated McDonnell and none of them addressed the issue on which the present motion is based: whether the absence of an official act requirement from section 666 makes that statute unconstitutional.

      **3.**      **Section 666 undermines federalism**

The Government's use of section 666, which is unconstrained by an official act requirement, to prosecute the allegations in this case undermines federalism.  Although a due regard for federalism must inform many areas of the law, "[p]erhaps the clearest example of

traditional state authority is the punishment of local criminal activity." Bond v. United States, 134 S. Ct. 2077, 2089 (2014); see also Kelly v. Robinson, 479 U.S. 36, 47 (1986) ("The right to formulate and enforce penal sanctions is an important aspect of the sovereignty retained by the States."). A state's sovereign interest in retaining criminal jurisdiction is at its apex when the crime at issue relates to the functioning of state government. Because a "State defines itself as a sovereign through the structure of its government, and the character of those who exercise government authority," it is the "prerogative" of the state "to regulate the permissible scope of interactions between state officials and their constituents." McDonnell, 136 S. Ct. at 2373; see also United States v. Tavares, 844 F.3d 46, 54 (1st Cir. 2016).

Here, federal prosecutors utilize section 666 to prosecute a case that goes to the heart of how New York State regulates its officials and structures its government. The allegations center on the conduct of a New York State official in connection with contracts sought by a constituent, the Energy Company, pursuing business interests in New York. While some of the allegations pertain to the ECA between New York and New Jersey, the alleged conduct relating to the ECA occurred exclusively in New York and involved exclusively New York State officials. (See Compl. ¶¶ 47–48). Similarly, the allegations regarding the PPA concern a potential contract with a New York agency (NYPA) channeled through an RFP process overseen by another New York agency (PSC) to carry out an energy policy developed by the New York Governor's Office in order to overhaul New York's energy infrastructure. Whether one considers the nature of the crime charged or the circumstances under which it is alleged to have taken place, New York's interest is paramount. Federal prosecutors may have their own personal views as to how state

government ought to work,[20] but those views ought not displace the considered views of the people of New York, as enacted through New York law.  See McDonnell, 136 S. Ct. at 2373.

New York law takes a narrower view of bribery than section 666 and the Government. Consistent with McDonnell, New York limits bribery to transactions in which the thing of value is given in exchange for the public official's "vote, opinion, judgment, action, decision or exercise of discretion as a public servant"—that is, an official act.  N.Y. Penal Law §§ 200.00–200.04.[21]  Furthermore, New York law does not bar family members of state officials from receiving outside income if such income is appropriately reported.  N.Y. Pub. Off. Law §§ 73, 73-a.  The Government alleges that Percoco reported the income his wife received from the Energy Company, but that he did so improperly.  (Compl. ¶¶ 45(a)–(b)).  But whether the conduct alleged here, if proven, violates the applicable New York statutes is properly a question for New York regulators or prosecutors applying New York law.  By charging Mr. Kelly under section 666, the Government ignores McDonnell's admonition that it is not for federal prosecutors to set "standards of good government for local and state officials."  136 S. Ct. at 2373 (citations omitted).[22]

---

[20]    During the September 22, 2016 press conference announcing the charges in this case, the U.S. Attorney's Office remarked that it hoped that "all New Yorkers can see in gory detail what their state government has been up to."  It further commented that the allegations reflected "a systemic problem" that went "to the core of how . . . state government operates."  See USAOSDNY, Former Executive Deputy Secretary to the Governor and 9 others charged w/ federal corruption, fraud, YouTube (Sept. 28, 2016), https://www.youtube.com/watch?v=9eFr2qTEPes (video of press conference).

[21]    Similarly, the federalism concern in McDonnell was sharpened by the fact that the gifts accepted by the Governor were not illegal under Virginia state law.  See Petition for a Writ of Certiorari at 16, McDonnell, 136 S. Ct. 2355 (No. 15–474), 2015 WL 5996410 at *16 ("Here, Virginia law expressly permitted Virginia officials to accept unlimited gifts and loans; hence the jury was instructed that there was 'no suggestion' Gov. McDonnell violated Virginia law.").

[22]    The Government's prosecution of this case may also be contrary to Department of Justice policy.  The U.S. Attorneys' Manual instructs that "Federal prosecutors should be prepared to

### 4. The word "corruptly" does not save section 666 from unconstitutionality

The "corruptly" element does not save section 666 from unconstitutionality. For the reasons already discussed, the word "corruptly" does not imply an official act requirement. <u>See</u>, <u>supra</u>, Point I.B.2.b. Moreover, the ordinary definition of "corruptly"—"wrongful, immoral, depraved, or evil," <u>Arthur Andersen</u>, 544 U.S. at 705—does not address the First Amendment overbreadth problem, since many regard lobbying and the trading of financial benefits for political access to be wrong, even though such activities are protected by the First Amendment. Nor does "corruptly" offer meaningful guidance that would address the due process vagueness concern. When it comes to lobbying and other political activity, ordinary sentiment of what is "immoral" or "depraved" does not line up with what the law prohibits.[23] More importantly, the word "corruptly" does not provide notice of what a federal prosecutor will deem to be "immoral." The word "corruptly" is inherently ambiguous, and the Court "cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." <u>Button</u>, 371 U.S. at 438.

Furthermore, <u>McDonnell</u> makes plain that "corruptly" is not a silver bullet that solves the constitutional problems raised by the absence of an official act requirement. After all, the term

---

demonstrate that a violation of 18 U.S.C. § 666 affects *a substantial and identifiable Federal interest* before bringing charges," in order to ensure that "Federal prosecutions will occur only when *significant Federal interests* are involved." U.S. Attorneys' Manual 9-46.110 (Prosecution Policy on Program Fraud and Bribery—Identifiable and Substantial Federal Interest), <u>available at</u> https://www.justice.gov/usam/usam-9-46000-program-fraud-and-bribery (emphases added).

[23]    Researchers at Harvard University have conducted studies showing that volunteer "grand jurors" voted to indict *72% of the time* when presented with hypothetical facts designed to capture the commonplace (and lawful) interaction in which a politician accepts a donation from a donor and then, separately, takes action favorable to the donor. <u>See</u> Joseph Hollow, <u>Christopher Robertson–Remedies for Institutional Corruption: Disclosures, Blinding, and Criminal Prosecution</u>, <u>available at</u> https://ethics.harvard.edu/christopher-robertson-remedies-institutional-corruption-disclosures-blinding-and (describing studies).

"corruptly" *also* appears in the bribery provision of section 201. <u>See</u> 18 U.S.C. § 201(b)(1). Yet, in narrowing the section 201 conception of bribery, the Supreme Court did not even consider the word "corruptly," much less suggest that it was a constitutional panacea. If "corruptly" could serve that function, it is hard to imagine why the Supreme Court would have taken such pains to explicate the concept of an "official act" and its constitutional necessity. <u>McDonnell</u> stresses that bribery statutes must be defined by bright lines. Even if the "corruptly" requirement draws a line, it is hardly a bright one and the ordinary person cannot discern where it is drawn.

*　　*　　*

The statute charged in Count Thirteen,18 U.S.C. § 666(a)(2), presents the very constitutional problems feared by the Supreme Court in <u>McDonnell</u>. And because of the statute's clear language and statutory history, it cannot be constrained through the insertion of an official act requirement. While it is the duty of the Court to avoid finding statutes unconstitutional where possible, it is equally the duty of the Court to read a statute fairly, even if that reading leads to the inevitable result of unconstitutionality. Count Thirteen must be dismissed because the statute it charges is unconstitutional.

In the event that the Court declines to strike the statute as unconstitutional, we request that the Government be required to prove the promise or performance of an "official act"—as defined in <u>McDonnell</u>—as an element of Count Thirteen, and that the jury be instructed that <u>McDonnell</u>'s definition of what constitutes an official act applies fully to Count Thirteen. It would be a grave miscarriage of justice if, post-<u>McDonnell</u>, a jury were permitted to consider a theory of bribery that omits the constitutionally-mandated official act requirement.

## POINT II

**COUNTS NINE AND THIRTEEN MUST BE DISMISSED BECAUSE THEY REST ON THE GENERAL RETAINER THEORY OF BRIBERY**

Counts Nine and Thirteen must be dismissed for another reason. <u>McDonnell</u> defines "official act" to require a specific "question, matter, cause, suit, proceeding or controversy" in connection with which the public official will take formal action. 136 S. Ct. 2355, 2368–72 (2016). In light of that definition, an alleged briber must intend—or, in the case of a conspiracy, agree—that the public official will take action on a *specific* question or matter. But the S1 Indictment alleges that Mr. Kelly hired Percoco's wife in exchange for Percoco's open-ended commitment to provide unspecified "official acts" and "official assistance"[24] to the Energy Company "on an as-needed basis," rather than in exchange for Percoco's action on a *specific* question or matter. (S1 Ind. ¶¶ 29–31). In so doing, it fails to allege an "official act," as that term is defined by <u>McDonnell</u>.

The general retainer theory of bribery—that a public official can be bribed without any agreement as to the question or matter on which he will take action—may have been viewed as viable in the past, but <u>McDonnell</u> now makes clear that an "official act" can be performed or promised only in connection to a "specific" and "focused" question or matter before the government. 136 S. Ct. at 2372. Here, because the S1 Indictment alleges that Mr. Kelly provided the "<u>quid</u>" (the consulting position for Percoco's wife) without intending or agreeing

---

[24] We assume, for purposes of this motion, that the S1 Indictment's use of terms such as "official State action," (S1 Ind. ¶ 1), "official action," (<u>id.</u> ¶¶ 31–32, 35, 43, 47, 49, 51, 53, 56, 59, 61, 63, 65, 67), and "official assistance" (<u>id.</u> ¶¶ 29–30, 33), are intended to be synonymous with "official act," as that term is defined in <u>McDonnell</u>. We attempted to confirm this understanding in our request for a bill of particulars and during our May 12, 2017 meet-and-confer, but the Government refused to respond. In the event that the Government reveals that these terms mean something different than "official act," we reserve the right to move against the S1 Indictment on that basis.

43

that Percoco would take action on a *specific* question or matter, it necessarily also alleges that

Mr. Kelly and Percoco did not agree to exchange that "<u>quid</u>" for an "official act." And a "<u>quid</u>"

given for something other than an official act does not, as a matter of law, constitute a bribe.[25]

**A.     Under <u>McDonnell</u>, an alleged briber must intend to influence official acts on a specific question or matter**

**1.     The "official act" requirement is part of the specific intent of bribery**

A bribe is a thing of value that is given with the specific intent to exchange that thing of

value for an official act. <u>United States v. Sun-Diamond Growers of Cal.</u>, 526 U.S. 398, 404–05

(1999) ("[F]or bribery there must be a <u>quid pro quo</u>—a specific intent to give or receive

something of value *in exchange* for an official act."). The requirement of an "official act" is not

a requirement that an official act be *performed*, but a requirement about what *specific intent*

transforms a thing of value into a illegal bribe. <u>McDonnell</u>, 136 S. Ct. at 2370–71; <u>Evans v.

United States</u>, 504 U.S. 255, 268 (1992). Whether a thing of value is a bribe—that is, whether it

is given with the requisite specific intent—is determined at the time it is given or, in the case of a

conspiracy, at the time of the agreement. <u>McDonnell</u>, 136 S. Ct. at 2371 (observing that critical

question is "whether the public official agreed to perform an 'official act' at the time of the

alleged <u>quid pro quo</u>"); <u>Evans</u>, 504 U.S. at 268 ("[T]he offense is completed at the time when the

public official receives a payment in return for his agreement to perform specific official acts.").

<u>McDonnell</u>'s definition of "official act" therefore creates a requirement about the specific intent

an alleged briber must have when he provides a thing of value to a public official. For a payment

---

[25]     In the event Count Thirteen is dismissed as unconstitutional pursuant to the arguments made in Point I, <u>supra</u>, the Court need not consider Point II as to Count Thirteen. As to Count Thirteen, Point II is argued in the alternative in the event the Court concludes that section 666 does require an official act.

to be a bribe, the payor must provide the payment with the specific intent that the recipient will take an "official act" in exchange.

### 2. <u>McDonnell</u> defines "official act" to require a specific question or matter

<u>McDonnell</u> defines "official act" to mean "[1] a decision or action [2] on a question, matter, cause, suit, proceeding or controversy." 136 S. Ct. at 2371 (quotation marks omitted). The second element of that definition is a "question, matter, cause, suit, proceeding or controversy" in relation to which the public official promises to take action. <u>Id.</u> at 2368–72. The question or matter must be "specific," "relatively circumscribed," "focused," and "concrete"; and it must be either "pending before a public official" or "something that may be brought by law before him." <u>Id.</u> at 2369–70 (quotation marks omitted).

The question or matter must also be defined with particularity. <u>Id.</u> at 2369. Reviewing the record in <u>McDonnell</u>, the Supreme Court held that it was error for the district court to suggest that promised action by the Governor on "something as nebulous as 'Virginia's business and economic development'" could qualify as an official act. <u>Id.</u> at 2374. Instead, the Government was required to prove that the Governor accepted things of value in exchange for action on *specific* questions or matters, such as "'whether researchers at any of Virginia's state universities would initiate a study of Anatabloc'" or "'whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug.'" <u>Id.</u> at 2370.

### 3. At the time of the alleged bribe, the payor must intend to influence action on a specific question or matter

Because bribery is the provision of a benefit in exchange for an "official act" and because an "official act" requires action on a specific question or matter, bribery can be committed if, and only if, at the time the payor provides the alleged bribe, he intends to influence the recipient's action *with respect to a specific question or matter*. If a thing of value was given without regard

45

to a specific question or matter, it was given in exchange for something that, by definition, could not be an "official act" under <u>McDonnell</u>.  In such a case, the thing of value could not, as a matter of law, constitute a bribe.

Under <u>McDonnell</u>, it is not bribery for a person to give a thing of value intending that, in return, the public official be generally willing to act favorably toward that person in the future.  It is not enough even if the payor has a general subject matter in mind—for example, "economic development," "justice," or "national security"—as to which he hopes or expects the public official to take favorable action.  <u>McDonnell</u>, 136 S. Ct. at 2369.  <u>McDonnell</u> requires a very specific "<u>quo</u>"—the "<u>quo</u>" that, in exchange for the bribe, the recipient will exercise formal authority as to some *specific* and *concrete* question or matter.  Put simply, under <u>McDonnell</u>, if a payor does not provide a benefit intending to influence action on a specific question or matter, then that payor has not committed bribery.

**B.      <u>McDonnell</u> extends the logic of <u>Sun-Diamond</u>**

In requiring that a bribe be given in exchange for official acts on a specific question or matter, <u>McDonnell</u> extends the logic of <u>United States v. Sun-Diamond Growers of California</u>, which held, as to gratuities, that section 201 requires "a link between a thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given."  526 U.S. at 414 (emphasis added).

In <u>Sun-Diamond</u>, a trade association was charged under section 201 with paying illegal gratuities to the Secretary of Agriculture.  <u>Id.</u> at 400–02.  The indictment alleged that the association gave gifts to the Secretary during a period when the Secretary had before him two matters of interest to the association.  <u>Id.</u>  The association moved to dismiss the indictment on the ground that it did not allege a "specific connection" between the gifts and those pending matters.  <u>Id.</u>  The district court denied the motion, ruling that section 201 did not require that a specific

connection be alleged in the indictment.  Id.  At trial, the court instructed the jury that no

connection was needed, so long as the gifts were given because of the Secretary's official

position.  Id.  The defendant was convicted.  On appeal, the D.C. Circuit reversed the conviction,

concluding that the jury instruction was erroneous because the prosecution should have been

required to prove a connection between the gifts and official acts *in general*.  Id.  However, the

D.C. Circuit affirmed the denial of the motion to dismiss, reasoning that the prosecution was *not*

required to allege that "a gratuity was given 'for or because of' any *particular* act or acts."  Id. at

403 (emphasis added).

The Supreme Court not only affirmed the reversal of the conviction, but also strongly

suggested that the motion to dismiss the indictment should have been granted.  Id. at 414.

Interpreting section 201's definition of "official act"—the same definition at issue in

McDonnell—the Sun-Diamond Court considered whether "any official act" should be

understood to mean "official acts in *general*, without specification as to which one" or "some

*particular* official act of whatever identity."  Id. at 406 (emphases added).  The Court concluded

that the statute's "insistence upon an 'official act,' carefully defined, seems pregnant with the

requirement that *some particular official act be identified and proved*."  Id. at 406 (emphasis

added).  In reaching that result, the Court relied on the precept that, in the area of public

corruption, "a statute . . . that can linguistically be interpreted to be either a meat axe or a scalpel

should reasonably be taken to be the latter."  Id. at 412.  The Court observed that its analysis

"cast[] doubt upon the lower courts' resolution of respondent's challenge to the sufficiency of the

indictment."  Id. at 414.

McDonnell extends Sun-Diamond in several key respects.

First, notwithstanding lower court cases that have interpreted Sun-Diamond to apply *only* to charges brought under section 201, McDonnell makes clear that Sun-Diamond applies equally to charges brought under other statutes.  Compare United States v. Ganim, 510 F.3d 134, 146 (2d Cir. 2007) ("[T]here is good reason to limit Sun–Diamond's holding to the statute at issue in that case . . . ."), with McDonnell, 136 S. Ct. at 2370–71 (relying on Sun-Diamond to define "official act" for purposes of the honest services fraud and Hobbs Act statutes).

Second, again notwithstanding lower court precedent to the contrary, McDonnell holds that Sun-Diamond applies equally to bribery and gratuity offenses.  Compare Ganim, 510 F.3d at 146 ("Nor is there any principled reason to extend Sun–Diamond's holding beyond the illegal gratuity context."), with McDonnell, 136 S. Ct. at 2370–71 (relying on Sun-Diamond to define "official act" in context of bribery charges).  That makes sense because Sun-Diamond's analysis rested on the definition of "official act," a concept that has the same meaning in both the bribery and gratuity contexts.[26]

Third, McDonnell's holding that a thing of value is a bribe only if it is intended to influence an official act on a *specific* question or matter echoes Sun-Diamond's holding that, in the gratuity context, prosecutors must allege and prove "a link between a thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given."  Sun-Diamond, 526 U.S. at 414 (emphasis added).

---

[26]    Bribes and gratuities differ as to the intended relationship between the thing of value and the official act.  Bribes are intended to influence the official act, whereas gratuities are intended to reward the official act.  Sun-Diamond, 526 U.S. at 404–05.  What *constitutes* an "official act," however, does not differ.  For that reason, section 201 uses a single definition of "official act" that applies to both the bribery and gratuity subsections.  18 U.S.C. § 201(a)(3).

### C. The S1 Indictment fails to allege that Mr. Kelly provided a benefit to Percoco to influence Percoco's official action on a specific question or matter

#### 1. The S1 Indictment alleges that Mr. Kelly and Percoco entered into a general retainer relationship, which does not satisfy <u>McDonnell</u>

The S1 Indictment fails to allege, as required under <u>McDonnell</u> (and <u>Sun-Diamond</u>), that the "<u>quo</u>" of the alleged <u>quid pro quo</u> arrangement between Mr. Kelly and Joseph Percoco was an official act by Percoco on some specific question or matter. Indeed, Counts Nine and Thirteen allege the *opposite*, namely, that Mr. Kelly hired Percoco's wife "in exchange for Percoco's official assistance to benefit the Energy Company on *an as-needed basis*" and Percoco likewise "agreed to take, and in fact took, official actions for the benefit of the Energy Company *as the opportunity arose*." (S1 Ind. ¶¶ 29, 31 (emphases added); id. ¶¶ 54, 64 (incorporating paragraphs 29 through 31 into Counts Nine and Thirteen)). In so doing, the S1 Indictment does *not* allege that Mr. Kelly intended—or that Mr. Kelly and Percoco agreed—that Percoco would take action on any specific question or matter. The Government's theory is that "Percoco was effectively 'on call' for [Mr. Kelly] whenever Kelly required help for the Energy Company before the Executive Chamber or State agencies." (Compl. ¶ 46).

As a matter of law, the allegation of this general retainer relationship cannot satisfy <u>McDonnell</u>'s official act requirement. As discussed, <u>McDonnell</u> holds that a bribe must be given with the specific intent that the recipient perform an "official act," which must be defined in reference to a "specific" and "concrete" question or matter. If no particular question or matter was contemplated or agreed upon by Mr. Kelly and Percoco, then the official act element of the specific intent is not satisfied. Just as there is no "official act" if a public official promises to take action on something as "nebulous" as "economic development," "justice," or "national security," <u>McDonnell</u>, 136 S. Ct. at 2369, 2374, there can be no "official act" if the promise is to

take action on anything and everything the payor might need.  Under <u>McDonnell</u> (and <u>Sun-Diamond</u>), a thing of value given in exchange for such a promise is not a bribe.

In this regard, the S1 Indictment cannot satisfy <u>McDonnell</u>'s official act requirement simply by reciting the words "official action" in the charging language.  (S1 Ind. ¶¶ 56, 65).  "It is an elementary principle of criminal pleading, that where the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." <u>Russell v. United States</u>, 369 U.S. 749, 765 (1962) (citation omitted); <u>see also</u> <u>United States v. Pirro</u>, 212 F.3d 86, 93 (2d Cir. 2000).[27]  Although the Government has used the words "official act" in its Indictment, it has at the same time pleaded facts that, as a matter of law, fail to satisfy the "official act" requirement set forth in <u>McDonnell</u>.  <u>See</u> <u>Pirro</u>, 212 F.3d at 92 (explaining that court must "evaluate whether *facts alleged* could support conviction" (emphasis added)).

## 2. The S1 Indictment does not allege that Mr. Kelly hired Percoco's wife to influence official action with respect to the ECA or the PPA

The allegation that Percoco in fact took "official acts" with respect to the ECA and the PPA following his alleged open-ended agreement with Mr. Kelly cannot—and do not—save the S1 Indictment.

The S1 Indictment refers to two state contracts, the ECA and the PPA, on which Percoco allegedly took official action.  (S1 Ind. ¶¶ 31(a)–(b)).  But all that the S1 Indictment alleges is that Percoco's official actions took place *after* Mr. Kelly hired Percoco's wife in exchange for Percoco's promise to aid the Energy Company on an "as-needed basis."  (S1 Ind. ¶¶ 29–31).

---

[27]    The U.S. Attorneys' Manual instructs that a bribery charge under section 201 should include, in the charging language, a "description of [the] official act [the] defendant sought to . . . influence."  U.S. Attorneys' Manual 2047 (Sample Charging Language), <u>available at</u> https://www.justice.gov/usam/criminal-resource-manual-2047-sample-charging-language.

That is insufficient.  <u>Pirro</u>, 212 F.3d at 92 ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn.").  Bribery is giving a thing of value *in exchange* for an official act (on a specific question or matter), not giving a thing of value that *happens to be followed* by an official act (on a specific question or matter).  Whether a thing of value is given in exchange for an "official act" is determined at the time of the alleged bribe or agreement.  The subsequent performance (or nonperformance) of an official act may be relevant as evidence of the state of mind that accompanied the thing of value, but cannot retroactively determine that state of mind.  <u>McCormick v. United States</u>, 500 U.S. 257, 283 (1991) (Stevens, <u>J.</u>, dissenting) ("What [the public official] did thereafter might have evidentiary significance, but could neither undo a completed crime nor complete an uncommitted offense."); Albert W. Alschuler, <u>Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse</u>, 84 Fordham L. Rev. 463, 481 (2015) ("Every definition of bribery looks to the moment a benefit is received.  Bribery can be committed before this moment . . . but it cannot be committed after.  A payment cannot become a bribe retrospectively . . . .")[28]; <u>see also</u> <u>United States v. Terry</u>, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions.  No bribe thus occurs if the elected official later does something that benefits the donor.").  As charged, Percoco's open-ended commitment to aid the Energy Company "as the opportunity arose" was the alleged "<u>quo</u>" of the <u>quid pro quo</u>.  That general retainer theory is not permitted by <u>McDonnell</u>.

---

[28]     Albert Alschuler is the Julius Kreeger Professor Emeritus of Law and Criminology at Northwestern University Law School.

### 3. The allegations that Percoco agreed to assist the Energy Company are insufficient

McDonnell's requirement of a specific question or matter cannot be satisfied by the general allegation that Percoco agreed to take action "for the benefit of the Energy Company" (S1 Ind. ¶ 31), or by the allegation in the "to wit" clause of Count Thirteen that Percoco took action "to advance the development of the New York Power Plant and the New Jersey Power Plant." (S1 Ind. ¶ 65). Under McDonnell, "question or matter" means *governmental* "question or matter"—"a formal exercise of *governmental* power that is similar in nature to a lawsuit, administrative determination, or hearing." McDonnell, 136 S. Ct. at 2370 (emphasis added). A private business interest is not a governmental question or matter. Clearly, in McDonnell, the prosecutors could not have satisfied the specificity requirement simply by characterizing the gifts as being in exchange for the Governor's actions "for the benefit of the constituent's company" or "to promote Anatabloc." Here, the Government cannot satisfy McDonnell merely by alleging that Percoco's open-ended promise related to action that would benefit the Energy Company or the New York and New Jersey Power Plants.

### 4. The allegation that Percoco's wife was paid monthly does not save the S1 Indictment

The allegation that Percoco's wife was paid monthly—and that Percoco therefore received bribes on an on-going basis—does not satisfy McDonnell's requirement that the "quo" be official action on a specific "question or matter." (S1 Ind. ¶ 30). The objection here is to the "quo," not the "quid." Regardless of whether the "quid" is one lump sum or a continuous stream of payments, McDonnell requires that the "quo" be official action on a *specific* question or matter. 136 S. Ct. at 2362–64 (alleging stream of benefits conferred on Governor McDonnell). In a stream-of-payments case, McDonnell is satisfied only if the alleged briber intends that the stream (or some part of it) be in exchange for action on a specific question or matter.

According to the S1 Indictment, Mr. Kelly arranged for the Energy Company to hire Percoco's wife "in or about 2012" to obtain "Percoco's official assistance to benefit the Energy Company on an as-needed basis"—*not* so that Percoco would take action on any specific question or matter. (S1 Ind. ¶¶ 29–31). The fact that Percoco's wife was paid monthly does not change Mr. Kelly's intent at the time of the hiring. Whether a "<u>quid</u>" is paid all at once or in a stream, <u>McDonnell</u>'s requirement as to the "<u>quo</u>" is the same: the alleged briber must have the specific intent that, in exchange for the "<u>quid</u>," the public official will take action on a *specific* question or matter. 136 S. Ct. at 2362–64.

The S1 Indictment does not allege that the quid pro quo changed "mid-stream"—that, at some point *after* Percoco's wife was hired, Mr. Kelly and Percoco decided that her further compensation would influence Percoco's action on a specific question or matter. The allegation as to Mr. Kelly is that he hired Percoco's wife in exchange for Percoco's assistance on an open-ended basis. (S1 Ind. ¶¶ 29–30). Similarly, the allegation as to Percoco is that he "agreed to take, and in fact took, official actions for the benefit of the Energy Company as the opportunity arose." (<u>Id.</u> ¶ 31).[29]

The mere allegation that Percoco took official action at the same time that his wife was being paid by the Energy Company is not enough to save the S1 Indictment. (<u>Id.</u> ¶ 30). Bribery requires not just a "<u>quid</u>" and an official act, but that the "<u>quid</u>" be in exchange for the official act. <u>Sun-Diamond</u>, 526 U.S. at 404–05 ("[F]or bribery there must be a <u>quid pro quo</u>—a specific

---

[29] In any event, even if the S1 Indictment could be construed to allege that the <u>quid pro quo</u> changed "mid-stream"—and it cannot be—that change cannot retroactively turn past payments into bribes. At most, that change could bear on the legality of further payments. For example, if a Developer treats an Assemblymen to a baseball game each year in exchange for nothing specific, and then in the tenth year says "I'll take you to this game if you approve my upcoming zoning request," he may have attempted bribery in the tenth year, but he has not retroactively committed bribery for the preceding nine years.

intent to give or receive something of value *in exchange for* an official act.").  Thus, the

allegation that, months after Percoco's wife was hired (and during the period when she was being

paid), Percoco "in fact took" official action on the ECA and the PPA changes nothing, because

neither Mr. Kelly's intent nor the parties' agreement is alleged to have changed.  (S1 Ind. ¶ 31).[30]

**D.    Rejecting the general retainer theory does not disturb all of the pre-McDonnell case law on "as opportunities arise" theories**

As used in the S1 Indictment, the phrases "as-needed basis" and "as opportunities arose"

allege the general retainer theory, which is invalid in light of McDonnell.  However, the Court

need not revisit—and we do not challenge—every aspect of the pre-McDonnell cases approving

use of the phrase "as opportunities arise."  See United States v. Rosen, 716 F.3d 691, 700 (2d

Cir. 2013); United States v. Bruno, 661 F.3d 733, 744 (2d Cir. 2011); Ganim, 510 F.3d at 145;

United States v. Coyne, 4 F.3d 100, 114 (2d Cir. 1993).  As discussed below, that phrase has

been used in different contexts to express different propositions, some of which may well survive

McDonnell.

First, the phrase "as opportunities arise" has sometimes been used to mean that the "quo"

of a quid pro quo need not be explicitly stated.  Rosen, 716 F.3d at 701 ("Rosen argues that . . .

we should repudiate the Government's 'as opportunities arise' theory of prosecution and require

proof of an explicit promise."); Coyne, 4 F.3d at 114 (same).  We do not challenge the

proposition that, outside of the campaign donation context, the "quo" of a quid pro quo need not

be explicit.  Evans, 504 U.S. at 274 ("The official and the payor need not state the quid pro quo

in express terms . . . .").  The deficiency of the S1 Indictment is not a failure to allege that the

---

[30]    Indeed, the S1 Indictment conspicuously does not allege that, when the opportunities for
Percoco to take action arose, Mr. Kelly directed that any specific payments to Percoco's wife
preceding those actions—or any further payments to her—be *in exchange* for Percoco's action
on those contracts.  Sanabria v. United States, 437 U.S. 54, 65–66 (1978) ("The precise manner
in which an indictment is drawn cannot be ignored.").

54

"quo" was discussed explicitly; the deficiency is that the alleged "quo," implicit or explicit, cannot satisfy McDonnell.

Second, courts have sometimes construed "as opportunities arise" language to mean that "quids" and "quos" do not need to match up one-for-one. Ganim, 510 F.3d at 147 ("Neither the jury charge nor our decision, however, required a direct this-for-that relationship between each payment and benefit."); see also Rosen, 716 F.3d at 701. Relatedly, courts have held that a bribe need not come in one lump sum; it may consist of "payments at regular intervals." Ganim, 510 F.3d at 147; see also United States v. Bryant, 655 F.3d 232, 241 (3d Cir. 2011) ("[A] quid pro quo may come in the form of a 'stream of benefits.'"). We do not dispute these propositions either. It is perfectly possible to have a quid pro quo in which there is one "quid" for multiple "quos," or vice versa, or multiple "quids" for multiple "quos." What McDonnell requires is not a one-to-one correspondence between "quids" and "quos"; what it requires is that *each* "quo" be an official act as to a specific question or matter. The S1 Indictment does not allege multiple "quos"; it alleges a single "quo" that is legally deficient.

Third, McDonnell observes that the briber and public official need not agree on precisely how the public official will satisfy the "quo." 136 S. Ct. at 2371 ("[T]he public official need not specify the means that he will use to perform his end of the bargain."). We do not contend otherwise. Someone who pays a legislator in exchange for the legislator's official assistance to get a particular bill passed may have paid for an official act, even if he does not know the precise maneuvers the legislator will employ to accomplish that goal. The problem with the S1 Indictment is that it alleges that Mr. Kelly and Percoco had no agreement as to any specific question or matter on which Percoco would take action when Mr. Kelly hired Percoco's wife.

Fourth, "as opportunities arise" could be used to describe retainer agreements that are not general, but *limited*, in the sense that the briber pays the public official to perform official acts, as the opportunities arise, *on a specific question or matter*. An Indictment charging such a theory could allege, for example, that Mr. Kelly hired Percoco's wife so that Percoco would take official action, as the opportunities arose, *specifically* to help the Energy Company secure the ECA and/or the PPA (rather than to benefit the Energy Company *generally*). Such an allegation might well require a different analysis under McDonnell. That analysis is not needed here, however, since the S1 Indictment makes no such allegation. See Pirro, 212 F.3d at 92 ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn.").

Pre-McDonnell, courts have also permitted "as opportunities arise" allegations in cases where the payor and public official agree on the "specific *type* of action" that the public official agrees to perform. United States v. Whitfield, 590 F.3d 325, 350 (5th Cir. 2009); United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998). Examples include arrangements in which judges are bribed to fix tickets on an on-going basis, United States v. Campbell, 684 F.2d 141, 144 (D.C. Cir. 1982), or inspectors are bribed to ignore code violations, United States v. Arshad, 239 F.3d 276, 278 (2d Cir. 2001). However, the Court need not decide whether such arrangements satisfy McDonnell. Nor need the Court answer the hypothetical posed in United States v. Silver—whether the promise "If you pay me $10,000 per month, I will make sure that any legislation that affects your business is to your liking" promises an "official act." 203 F. Supp. 3d 370, 381 n.11 (S.D.N.Y. 2016). That promise at least specifies a *type* of question or matter—something the Government has not alleged here. Instead, the S1 Indictment alleges the equivalent of "If you hire my wife, I will do whatever your company needs." (See S1 Ind.

¶¶ 29–31).  Whatever else <u>McDonnell</u> might mean, it clearly means that "whatever your

company needs" is not a legally sufficient "<u>quo</u>."

To be clear, there is language in pre-<u>McDonnell</u> cases that could be interpreted to endorse

the general retainer theory.  <u>See</u> <u>Ganim</u>, 510 F.3d at 147 (implying that "an ongoing commitment

to perform acts to further the payor's interests" suffices as a "<u>quo</u>").  To the extent that <u>Ganim</u> or

other pre-<u>McDonnell</u> cases permit the prosecution of arrangements in which there is no

contemplation or agreement of a specific question or matter on which the public official will take

action, they have been abrogated by <u>McDonnell</u>.[31]  <u>McDonnell</u> holds that, absent a "specific"

and "focused" question or matter, there can be no "official act" and therefore no bribe.  136 S.

Ct. at 2372.

E.    **There are compelling constitutional and policy reasons to reject the general retainer theory**

There are compelling constitutional and policy reasons to reject the general retainer

theory of bribery alleged in the S1 Indictment.  As discussed in Point I, the purpose of

<u>McDonnell</u>'s "official act" requirement is to distinguish between lawful political activity and

<u>quid pro quo</u> bribery.  <u>McDonnell</u> draws that distinction—and avoids First Amendment and Due

Process concerns—by requiring that the "official act" constituting the "<u>quo</u>" of a <u>quid pro quo</u> be

tied to a specific and concrete question or matter.

Even before <u>McDonnell</u>, the Supreme Court made clear that bribery statutes cannot be

interpreted to criminalize the giving of gifts for goodwill or ingratiation, even if it is hoped that

the goodwill or ingratiation will translate into official action.  <u>Cf.</u> <u>Sun-Diamond</u>, 526 U.S. at 405

---

[31]    As discussed, <u>Ganim</u> took an unduly narrow view of <u>Sun-Diamond</u>: the <u>Ganim</u> court
thought that <u>Sun-Diamond</u>'s holding applied only gratuity offenses under section 201.  <u>Ganim</u>,
510 F.3d at 146–47.  <u>McDonnell</u> now makes clear that <u>Ganim</u> was wrong.  <u>Sun-Diamond</u>'s logic
applies equally to bribery and to statutes other than section 201.

(rejecting government's assertion that section 201 encompasses "'any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be *in a position to act* favorably to the giver's interests'"); McCutcheon v. F.E.C., 134 S. Ct. 1434, 1441 (2014) (plurality opinion) ("Ingratiation and access . . . are not corruption." (citation omitted)); Citizens United v. F.E.C., 558 U.S. 310, 359 (2010) ("Reliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." (citation omitted)); see also Terry, 707 F.3d at 613.[32]  That principle was incorporated in the jury instructions given by this Court in Silver.  See Jury Charge at 18, United States v. Silver, 15 Cr. 93 (VEC), (S.D.N.Y. Nov. 24, 2015), Doc. No. 135 ("If you find that Mr. Silver understood that the benefits were provided solely to cultivate goodwill or to nurture a relationship . . . and not in exchange for any official action, then this element will not have been proven.").  Put crudely, it is a crime to "buy" an official act; it is not a crime to "buy" goodwill with a public official who is in a position to perform official acts.

There is good reason for this.  If the Government were not required to allege and prove that action on a *specific* question or matter was agreed upon at the time a public official accepted a benefit from a constituent, then a public official who has received any benefit might thereafter be reluctant to take *any* official action that might benefit the constituent—regardless of how innocuous or tangential the action, regardless of how unconnected that action might be to the

---

[32]     The distinction between goodwill (that may translate to official acts) and specific official acts is especially relevant in the campaign finance context, where it is the norm that a public official will take official action that favors supporters.  McCormick v. United States, 500 U.S. 257, 272 (1991).  In some sense, every political donor at least hopes that, in exchange for the donation, the public official will be at least more responsive to the donor's concerns as the opportunities arise.  McCutcheon, 134 S. Ct. at 1441 (plurality opinion) ("[That is] a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.").

thing of value, and regardless of how independently meritorious that official action might be—because such action might be viewed by an overzealous prosecutor as the "quo" of an open-ended general retainer relationship. See Alschuler, Criminal Corruption, 84 Fordham L. Rev. at 486 ("If [an official] serves part-time as most state legislators do, who may patronize his law firm, insurance brokerage, or real estate agency? Who may give his spouse, adult child, or niece a job?").

Likewise, constituents might shy away from providing *any* benefits to their elected representatives for fear that by doing so, they essentially surrender their ability to obtain official action on their behalf in the future, regardless of whether such benefits are connected to the official action, and regardless of the merits of the requested official action. Or, having once provided something of value to a public official, a constituent might be reluctant to approach the official to express an opinion on a proposed bill or any other subject, however remote in time, for fear that he might then be subject to a bribery prosecution. These were the precise scenarios that the Supreme Court had in mind in McDonnell when it defined "official act" to require a specific question or matter. The Court observed that, under an overly expansive conception of "official act," homeowners who had previously treated a local official to an annual baseball game might be reluctant later to ask that local official for help in restoring electricity, for fear of a prosecutor drawing a connection between the benefit and the later request for help. 136 S. Ct. at 2372. If a benefit given for nothing in particular can be a bribe, then every constituent who treats a public official to an annual ballgame or concert (in the hope that the official will prove more responsive in the future) is guilty of bribery on an "as-needed" basis. That is absurd.

At bottom, the general retainer theory is little more than a repackaging of the government theory that the Supreme Court specifically rejected in Sun-Diamond—that it is unlawful to give a

public official things of value in order to build a "reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." 526 U.S. at 405. As the Supreme Court explained with respect to gratuities in Sun-Diamond, and now more recently with respect to bribes in McDonnell, that theory of bribery fundamentally misunderstands what a quid pro quo is. A quid pro quo is payment in exchange for official *acts*—not payment for goodwill that may translate to official acts, not payment for favoritism, and not payment for access for the donor. The thread underlying all of the Supreme Court's jurisprudence is the concern that if bribery statutes are stretched beyond this paradigmatic quid pro quo core—payment for official *act*—they will transform from a scalpel to a meat axe, with attendant harm to our democracy and the Constitution. McDonnell, 136 S. Ct. at 2373 ("'[A] statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.'" (quoting Sun-Diamond, 526 U.S. at 412)).

To be sure, the concept of a general retainer relationship between a public official and a constituent may present as offensive or unseemly.[33] But the mere fact that conduct feels "distasteful" and "tawdry" does not mean it is properly the subject of a federal bribery charge. McDonnell, 136 S. Ct. at 2375. The conduct of public officials can be—and is—regulated through other means, including through administrative rules and state ethics laws. See N.Y. Pub. Off. Law §§ 73–74 (imposing ethical obligations on New York public officials); Sun-Diamond, 526 U.S. at 409 (noting that federal bribery statute "is merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials").

---

[33]    Again, Mr. Kelly disputes that he entered into *any* kind of quid pro quo arrangement with Percoco, general retainer or otherwise.

By their nature, bribery laws must either be overinclusive or underinclusive: there is "no Goldilocks position" and a bribery statute that is narrowly drawn to avoid First Amendment or due process concerns may, as a consequence, not reach certain undesirable conduct.  Alschuler, Criminal Corruption, 84 Fordham L. Rev. at 484.  The answer is not to embrace an *overbroad* theory of bribery that prioritizes greater enforcement at the expense of making "public life intolerable" for public officials and their constituents.  Id. at 483.  Where First Amendment and due process interests are at stake, the Supreme Court has consistently opted for under- rather than overinclusiveness.  E.g., McDonnell, 136 S. Ct. at 2372 (limiting prosecution of bribery to cases in which the public official agrees to do more than set up meetings or make referrals); McCormick, 500 U.S. at 273 (limiting prosecution of bribery in campaign finance context to "explicit" quid pro quos).  The federal bribery statutes need not, and should not, be construed as a meat axe to cure all the ills of government.  Sun-Diamond, 526 U.S. at 412.

\*     \*     \*

The S1 Indictment alleges that Mr. Kelly provided a benefit to Joseph Percoco in exchange for Percoco's completely open-ended commitment to assist the Energy Company, without limitation as to any question or matter on which this assistance would be provided.  That allegation is fundamentally incompatible with McDonnell's requirement that the "quo" of quid pro quo be an official act on a *specific* question or matter.  For that reason, Counts Nine and Thirteen must be dismissed.

## POINT III

### COUNT THIRTEEN MUST BE DISMISSED TO THE EXTENT IT ALLEGES A GRATUITY OFFENSE

The S1 Indictment fails to charge Mr. Kelly with a gratuity offense under section 666. The word "gratuity" does not appear in the S1 Indictment at all, except in the captions under

61

some of the count headings.  Neither the general factual allegations nor the numbered paragraphs charging each count mention gratuities; and, at each juncture, the S1 Indictment describes the alleged conduct by Mr. Kelly as a "bribery" scheme.  (S1 Ind. ¶¶ 1, 28–32, 54–56, 64–65).  Furthermore, the statutory charging language of Count Thirteen alleges that Mr. Kelly acted with "intent to influence" Mr. Percoco (id. ¶ 65), and does not track section 666's "influence *or reward*" language.  See 18 U.S.C. § 666(a)(2) (emphasis added).  The Second Circuit has interpreted the word "reward" in section 666 to connote a gratuity theory.  See United States v. Bahel, 662 F.3d 610, 636 (2d Cir. 2011).

The only arguable reference to a gratuity offense is in the "to wit" clause for Count Thirteen, which alleges that Mr. Kelly gave Percoco a thing of value "in exchange for, to influence, and to reward the taking of official action."  (S1 Ind. ¶ 65).  Given the omission of the term "reward" from the statutory charging language of Count Thirteen, that stray reference in the "to wit" clause hardly suffices to charge a gratuity offense.

To the extent the Court interprets Count Thirteen to allege a gratuity offense under section 666, that count must nonetheless be dismissed.[34]

First, there is substantial doubt as to whether section 666 actually reaches gratuities. There is currently a circuit split on the issue.  The First Circuit has held that section 666 does not reach gratuities, and the Fourth Circuit has concluded the same, albeit in dicta.  United States v. Fernandez, 722 F.3d 1, 20 (1st Cir. 2013); United States v. Jennings, 160 F.3d 1006, 1015 n.4 (4th Cir. 1998); cf. United States v. Beldini, 443 F. App'x 709, 718 (3d Cir. 2011) (unpublished) (noting the absence of Third Circuit precedent).  Other courts of appeals—including the Second Circuit—have held that section 666's use of the term "reward" refers to a gratuity offense.

---

[34]     This argument is made in the alternative to the argument in Point I.  If the Court dismisses Count Thirteen because section 666 is unconstitutional, it need not consider Point III.

<u>Bahel</u>, 662 F.3d at 636; <u>see also</u> <u>United States v. Hawkins</u>, 777 F.3d 880, 881 (7th Cir. 2015); <u>United States v. Zimmermann</u>, 509 F.3d 920, 927 (8th Cir. 2007).  We adopt the arguments relied on by the First Circuit in its lengthy and well-reasoned <u>Fernandez</u> decision.  As the First Circuit observed, section 666's use of the term "corruptly" strongly implies that the statute reaches only bribes.  <u>Fernandez</u>, 722 F.3d at 20–26 (noting that "corruptly" appears in the bribery provision of section 201, but not in the gratuity provision).  Furthermore, section 666 prescribes a single penalty, whereas section 201 prescribes a far lighter penalty for gratuities than for bribery (a more serious crime).  <u>Id.</u>  Finally, section 666's use of the word "reward" need not refer to gratuities: in the context of 666, "reward" may refer to a bribery scheme in which payment is *promised* before the official act, but *delivered* after the act.  <u>Id.</u>

We appreciate that this Court may consider itself bound by Second Circuit precedent. We raise the issue in order to preserve it in the event that the Second Circuit reconsiders its view, <u>en banc</u> or otherwise, or the Supreme Court grants <u>certiorari</u> to resolve the circuit split.

<u>Second</u>, even if Count Thirteen charges a gratuity offense, and even if section 666 allows such a theory, Count Thirteen must be dismissed.  As discussed, Count Thirteen incorporates and relies upon the allegation that Mr. Kelly gave Percoco things of value so that Percoco would perform official acts as the opportunities arose.  (S1 Ind. ¶ 64 (incorporating paragraphs 29 through 31 into Count Thirteen)).  The Supreme Court has held, however, that gratuities cannot be paid on an "as opportunities arise" or retainer basis.  Rather, the Government must allege and prove, as to each alleged gratuity, "a link between [the] thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given."  <u>United States v. Sun-Diamond Growers of Cal.</u>, 526 U.S. 398, 414 (1999) (emphasis added).  Moreover, a general

retainer theory as to gratuities is nonsensical because, by definition, a gratuity rewards an official act that the public official has already performed or decided to perform.  Id. at 405.

The S1 Indictment does not identify any alleged gratuities, much less link any such gratuities to the specific official acts they were intended to reward.  Insofar as Count Thirteen purports to charge a section 666 gratuity offense, it must be dismissed.[35]

**POINT IV**

**COUNTS NINE AND THIRTEEN MUST BE DISMISSED TO THE EXTENT THEY ALLEGE THAT MR. KELLY BRIBED PERCOCO WHEN PERCOCO WAS NOT A GOVERNMENT OFFICIAL**

Counts Nine and Thirteen allege that Mr. Kelly bribed or conspired to bribe Joseph Percoco from "at least in or about 2012" up to "in or about 2015" (in the case of Count Nine) or "in or about 2016" (in the case of Count Thirteen).  (S1 Ind. ¶¶ 55, 65).  Each of those date ranges encompasses the period from April 21 to December 8, 2014, when Percoco was not a government official.  (Id. ¶ 4).  The Government apparently believes that actions allegedly taken by Percoco during his time away from government constituted "official acts" that furnished the "quo" of the alleged quid pro quo with Mr. Kelly.  (See id. ¶ 4 (alleging that Percoco "continued to function in a senior advisory and supervisory role with regard to the Governor's Office" during this period); Compl. ¶¶ 53(a)–(b) (alleging that Percoco arranged meetings for the Energy Company during this period)).

Mr. Kelly hereby adopts, incorporates by reference, and joins in full the arguments set forth in Points I through IV of Joseph Percoco's motion to dismiss (the "Percoco Motion")

---

[35] The insufficiency of the S1 Indictment cannot be remedied through a bill of particulars. United States v. Walsh, 194 F.3d 37, 45 (2d Cir. 1999) ("[A] bill of particulars or discovery cannot save a defective indictment." (quotation marks omitted)).  The failure to allege a link between an alleged gratuity and the "specific 'official act' for or because of which it was given" goes to the sufficiency of an indictment.  Sun-Diamond, 526 U.S. at 414.

explaining why any alleged action by Percoco during this period could not be the "quo" of a quid pro quo. As the Percoco Motion forcefully argues, someone who holds no government office and wields no formal authority is incapable of performing an "official act" under McDonnell. Nor does such a person owe a fiduciary duty of honest services to the public (for purposes of honest services fraud conspiracy) or act as an "agent" of the State (for purposes of section 666). And, relatedly, no section 666 charge can be predicated on a thing of value given or offered by Mr. Kelly to Percoco while Percoco was not an "agent" of the State. The arguments set forth in the Percoco Motion apply equally to the allegations against Mr. Kelly in Counts Nine and Thirteen.

## CONCLUSION

For the reasons stated above, the charges against Mr. Kelly, Counts Nine and Thirteen, must be dismissed.

Dated: May 19, 2017
      New York, NY

Respectfully submitted,

LANKLER SIFFERT & WOHL LLP

By:     /s/ Daniel M. Gitner
        Daniel M. Gitner
        Jun Xiang
        Samantha J. Reitz

        500 Fifth Avenue
        New York, NY 10110
        (212) 921-8399

        *Attorneys for Defendant*
        *Peter Galbraith Kelly, Jr.*