UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

     - v. -

JOSEPH PERCOCO, a/k/a "Herb,"
ALAIN KALOYEROS, a/k/a "Dr. K.,"
PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

               Defendants.

No. S1 16 Cr. 776 (VEC)
**Oral Argument Requested**

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PETER GALBRAITH KELLY, JR.'S
MOTION FOR A BILL OF PARTICULARS,
MOTION FOR BRADY MATERIAL, AND
JOINDER IN HIS CO-DEFENDANTS' APPLICATIONS**

LANKLER SIFFERT & WOHL LLP

Daniel M. Gitner
Jun Xiang
Samantha J. Reitz

500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Defendant*
*Peter Galbraith Kelly, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

FACTUAL ALLEGATIONS ..................................................................................3

POINT I  IF THE COURT DOES NOT DISMISS THE S1 INDICTMENT AS
AGAINST MR. KELLY, THE GOVERNMENT SHOULD BE ORDERED TO
PROVIDE A BILL OF PARTICULARS ...........................................................3

    A.    Background ...............................................................................3

        1.    The S1 Indictment is unclear regarding the most basic aspects of
the charges against Mr. Kelly ...............................................3

            a.    The S1 Indictment does not allege the specifics of the quid pro quo
at issue.......................................................................4

            b.    The S1 Indictment does not make clear whether Count Thirteen
charges a gratuity offense ...............................................6

            c.    The S1 Indictment does not provide sufficient detail on the
conspiracy charged against Mr. Kelly in Count Nine.....................8

            d.    The S1 Indictment provides no basis for the allegation that there is
any overlap between the Energy Company Bribery Scheme and the
other alleged schemes ...................................................8

        2.    The massive volume of discovery does not assist in refining the
allegations in the S1 Indictment................................................8

        3.    The Government denied Mr. Kelly's bill of particulars request...............10

    B.    Legal Standard ................................................................11

    C.    The Government Must Provide a Bill of Particulars ............................12

        1.    The Government must provide particulars as to the alleged "quid":
the "things of value" Mr. Kelly allegedly provided...................13

        2.    The Government must provide particulars as to the alleged
"official acts" performed to benefit the Energy Company ........................15

        3.    The Government should provide particulars with respect to any
gratuity offense that the Government claims is charged in Count
Thirteen ................................................................20

4. The Government should provide the names of the unindicted co-conspirators ............................................................................22

5. The Government should be required to provide the evidentiary basis for the allegation that the Energy Company Bribery Scheme "overlaps" with the other alleged schemes .................................................24

6. The Government should clarify Percoco's alleged role and duties ...........25

POINT II  THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH  THE COURT'S APRIL 6, 2017 BRADY ORDER ................................26

A. Legal Standard ...................................................................................28

B. Argument ...........................................................................................30

1. The Government must disclose materials tending to show that its cooperator altered documents and otherwise deceived his alleged co-conspirators ............................................................................30

2. The Government must disclose materials tending to show that Mr. Kelly was told or believed that there was an ethics opinion ..............35

3. The Government must disclose materials tending to show that Percoco did not pressure or advise other State officials to perform "official acts" to benefit the Energy Company .........................................36

POINT III  MR. KELLY JOINS CERTAIN MOTIONS FILED BY OTHER DEFENDANTS .........................................................................39

A. Joseph Percoco's Motion to Dismiss: Not a Government Official.......................39

B. Buffalo Defendants' Motion to Inspect Grand Jury Minutes ...............................40

CONCLUSION.............................................................................................41

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Brady v. Maryland,
    373 U.S. 83 (1963).................................................................................. *passim*

Giglio v. United States,
    405 U.S. 150, 154 (1972)...............................................................................32, 35

Kyles v. Whitley,
    514 U.S. 419 (1995)...................................................................................28, 29, 30

McDonnell v. United States,
    136 S. Ct. 2355 (2016)........................................................................... *passim*

Russell v. United States,
    369 U.S. 749 (1962)........................................................................................19

U.S. v. Rubin/Chambers, Dunhill Ins. Services,
    825 F. Supp. 2d 451 (S.D.N.Y. 2011)................................................................30

United States v. Agurs,
    427 U.S. 97 (1976)..........................................................................................28

United States v. Bagley,
    473 U.S. 667 (1985)....................................................................................28, 29

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011)...............................................................................6

United States v. Bin Laden,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000)................................................................13

United States v. Blankenship,
    5:14-CR-00244, 2015 WL 3687864 (S.D.W. Va. June 12, 2015)..................29, 30

United States v. Bortnovsky,
    820 F.2d 572 (2d Cir. 1987)................................................................... *passim*

United States v. Chen,
    378 F.3d 151 (2d Cir. 2004)...............................................................12

United States v. Davidoff,
    845 F.2d 1151 (2d Cir. 1988)........................................................12, 18

United States v. Espy,
    989 F. Supp. 17 (D.D.C. 1997)....................................................15, 18

United States v. Healey,
    860 F. Supp. 2d 262 (S.D.N.Y. 2012)...............................................29

United States v. Hsia,
    24 F. Supp. 2d 14 (D.D.C. 1998)................................................29, 30

United States v. Kahale,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...................................12, 23, 25

United States v. Lino,
    No. 00-CR-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ...............11, 15, 23

United States v. Mahaffy,
    693 F.3d 113 (2d Cir. 2012)...............................................................33

United States v. Maldonado-Rivera,
    922 F.2d 934 (2d Cir. 1990)...............................................................33

United States v. Marcus,
    628 F.3d 36, 41 (2d Cir. 2010)...........................................................11

United States v. McCarthy,
    292 F. Supp. 937 (S.D.N.Y. 1968)....................................................15

United States v. Meregildo,
    920 F. Supp. 2d 434 (S.D.N.Y. 2013)...............................................29

United States v. Nachamie,
    91 F.Supp.2d 565 (S.D.N.Y. 2000)..............................................22, 23

United States v. Ohle,
    S3 08-CR-1109, 2011 WL 651849 (S.D.N.Y. Feb. 7, 2011)................29

United States v. Praddy,
    725 F.3d 147 (2d Cir. 2013)...............................................................33

United States v. Rajaratnam,
    09-CR-1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ...........................................12, 25

United States v. Ramirez,
    609 F.3d 495 (2d Cir. 2010) .................................................................................................13

United States v. Rittweger,
    524 F.3d 171 (2d Cir. 2008) .................................................................................................35

United States v. Rodriguez,
    496 F.3d 221 (2d Cir. 2007) .................................................................................................35

United States v. Salameh,
    152 F.3d 88 (2d Cir. 1998) ...................................................................................................33

United States v. Salyer,
    CR. S-10-0061 LKK, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ...............................29, 30

United States v. Santiago,
    174 F.Supp.2d 16 (S.D.N.Y. 2001) ......................................................................................23

United States v. Siddiqi,
    No. 06-CR-377 (SWK), 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ............................14, 18

United States v. Skelos,
    15-CR-317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .......................................13

United States v. Sun-Diamond Growers,
    526 U.S. 398 (1999) ..................................................................................................... *passim*

United States v. Torres,
    901 F.2d 205 (2d Cir. 1990) .................................................................................................11

United States v. Trie,
    21 F. Supp. 2d 7 (D.D.C. 1998) ..........................................................................................19

**Statutes**

18 U.S.C. § 201 ............................................................................................................................17

18 U.S.C. § 666 ...................................................................................................................... *passim*

18 U.S.C. § 1346 ..........................................................................................................................39

18 U.S.C. § 1349 ........................................................................................1, 8

18 U.S.C. § 3500 ............................................................................................35

**Other Authorities**

Federal Rule of Criminal Procedure 7(f) ........................................... *passim*

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PETER GALBRAITH KELLY, JR.'S
MOTION FOR A BILL OF PARTICULARS,
MOTION FOR <u>BRADY</u> MATERIAL, AND
<u>JOINDER IN HIS CO-DEFENDANTS' APPLICATIONS</u>**

Defendant Peter Galbraith Kelly, Jr. respectfully submits this Memorandum of Law, together with the Declaration of Daniel M. Gitner ("Gitner Decl."), in support of his motion pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), for an Order directing the Government to provide him with a bill of particulars and with <u>Brady</u> material.  Mr. Kelly also joins in various motions filed by his co-defendants in this matter.

## <u>PRELIMINARY STATEMENT</u>

The Superseding Indictment ("S1 Indictment") charges Mr. Kelly with: (1) conspiracy to commit honest services fraud under 18 U.S.C. § 1349 (Count Nine); and (2) bribery of a State official under 18 U.S.C. § 666(a)(2) (Count Thirteen).[1]  Although this is a bribery case, the S1 Indictment fails to specify basic information needed for Mr. Kelly to prepare his defense and avoid surprise at trial.  The millions of pages of discovery materials, generic discovery index, and boilerplate responses from the Government to Mr. Kelly's bill of particulars requests do not begin to remedy the problem.  Mr. Kelly has not been provided with adequate notice of the charges against him, and, if the Court does not dismiss the case against him as requested in the motion to dismiss filed concurrently with this motion, the Government should be ordered to provide a bill of particulars pursuant to Rule 7(f).

---

[1]      Copies of the S1 Indictment ("S1 Ind."), filed on May 11, 2017, the original indictment, filed on November 22, 2016, and the Complaint ("Compl."), filed September 20, 2016, are attached as Exhibits B, C, and D to the Gitner Declaration, respectively.

Moreover, the Government has failed and refused to provide material that falls within its Brady disclosure obligations. Mr. Kelly has made four specific requests for Brady material: (1) information tending to show that the Government's cooperating witness, Todd Howe, altered documents and/or emails he forwarded Mr. Kelly or otherwise deceived Mr. Kelly; (2) information tending to show that Mr. Kelly was told about the existence of an "ethics opinion" that purported to authorize his employer (the "Energy Company") to hire defendant Joseph Percoco's wife; (3) information tending to undermine the Government's claim that Percoco advised or pressured State officials to take official action to benefit the Energy Company; and (4) as relevant to the honest services fraud conspiracy count in the *original* Indictment that charged Mr. Kelly together with defendants Steven Aiello and Joseph Gerardi (the "Syracuse Defendants"), information tending to undermine the Government's claim that Mr. Kelly entered into the single conspiracy charged.

While insisting throughout that it was unaware of any Brady material, the Government implicitly conceded that it had no evidence linking Mr. Kelly to the two Syracuse Defendants when it suddenly superseded the original Indictment to eliminate the single, impermissibly duplicitous conspiracy count which had charged Mr. Kelly together with the Syracuse Defendants. As to Mr. Kelly's other three Brady requests, however, even though each category of requested information clearly tends to undermine some aspect of the Government's theory that Mr. Kelly participated with Percoco and Howe in a conspiracy to commit bribery, the Government has refused to acknowledge that such information would be exculpatory. The Government should be ordered to produce the requested material to the extent it exists.

# FACTUAL ALLEGATIONS

Mr. Kelly respectfully refers the Court to the "Background" sections of the memoranda of law submitted in support of his motion to dismiss Counts Nine and Thirteen (the "Motion to Dismiss") and motion for severance (the "Severance Motion") for a description of the factual allegations.[2]

## POINT I

### IF THE COURT DOES NOT DISMISS THE S1 INDICTMENT AS AGAINST MR. KELLY, THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE A BILL OF PARTICULARS

**A.**     **Background**

      **1.**  **The S1 Indictment is unclear regarding the most basic aspects of the charges against Mr. Kelly**

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to provide a "plain, concise, and definite written statement of the essential facts constituting the offense charged." In addition, as relevant here, in connection with federal corruption prosecutions in particular, the Supreme Court has emphasized the need for specificity and clarity to avoid serious constitutional concerns. See McDonnell v. United States, 136 S. Ct. 2355 (2016); United States v. Sun-Diamond Growers, 526 U.S. 398, 414 (1999) (requiring the Government to prove, and suggesting that an indictment must allege, a link between a thing of value given and a specific official act by the recipient). If the Court concludes that the two counts charged against Mr. Kelly survive (which it should not do), then the most critical aspects of the charges against Mr. Kelly must be particularized, as discussed below.

---

[2]     Capitalized terms used herein have the same definition as they are given in those background sections.

Although the S1 Indictment and the Complaint in this case comprise more than one hundred pages of allegations, those allegations cover four separate schemes. Thus, only a portion of that material relates to the single scheme in which Mr. Kelly is alleged to have participated, a scheme referred to herein as the "Energy Company Bribery Scheme." (See S1 Ind. ¶¶ 29–32; Compl. ¶¶ 32–56). Although the S1 Indictment and the Complaint set forth with clarity certain aspects of the Government's theory, they do not provide "the essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c)(1). Indeed, in important respects they rely on generalities where specificity is required, and in other respects they use language that appears to have been chosen specifically to obfuscate rather than to elucidate the essential facts. Mr. Kelly is therefore unable to decipher critical aspects of the charges against him and cannot adequately prepare for trial.

### a. The S1 Indictment does not allege the specifics of the quid pro quo at issue

The S1 Indictment alleges that, sometime in 2012, Mr. Kelly arranged for his employer, the Energy Company, to hire the wife of Joseph Percoco, a New York State official who worked for Governor Cuomo, in exchange for Percoco's agreement to take "official actions for the benefit of the Energy Company as the opportunity arose." (S1 Ind. ¶¶ 30–31). It also alleges that, in 2012, Mr. Kelly arranged for the Energy Company to provide "more than" $287,000 in bribes to Percoco in exchange for Percoco's official "assistance" to benefit the Energy Company on an "as-needed basis." (Id. ¶ 29).

The S1 Indictment further alleges that after Mr. Kelly arranged for the Energy Company to hire Percoco's wife, Percoco "exerted pressure on and provided advice to 'certain other State officials,' with the intent that those officials" take action to benefit the Energy Company. (Id. ¶¶ 31(a)–(b)). However, it never identifies which officials Percoco allegedly pressured or

advised, or when or how he allegedly did so. Moreover, the S1 Indictment hints that Percoco took official acts that are not specifically charged. (Id. ¶ 31 ("Official actions taken by Percoco for the benefit of the Energy Company included, but were not limited to . . . ")).

To further confuse matters, the S1 Indictment not only alleges that Percoco performed "official acts," but also alleges variously that he agreed to perform unspecified "official State action" (id. ¶ 1), "official action" (id. ¶¶ 31–32), "official assistance" (id. ¶¶ 29–30), and "official State favors" (id. ¶ 28) to the Energy Company, without defining those terms. While "official act" is a term of art that was clearly defined by the Supreme Court in McDonnell, the S1 Indictment does not define these other terms, leaving entirely unclear whether they are intended to allude to official acts, or instead refer to other acts entirely. As a result, Mr. Kelly cannot know with any certainty what acts by Percoco the Government is alleging to constitute the alleged "quo" in this bribery case.

Adding to the confusion as to whether the term "official assistance" is equivalent to the term "official act" within the meaning of McDonnell, the S1 Indictment not only alleges that Mr. Kelly committed bribery by arranging for the Energy Company to hire Percoco's wife in 2012, but also leaves open the possibility that there are alleged bribe payments that flowed directly from Mr. Kelly to Percoco. (Id. ¶ 65).

Similarly, although the honest services fraud conspiracy charged against Mr. Kelly in Count Nine specifically covers a nine-month period during 2014 when Percoco was on leave from State employment to work on the Governor's reelection campaign, the S1 Indictment gives no indication of what duty or duties Percoco could possibly have violated during that period. (See id. ¶ 4 (alleging only that, during this period, Percoco continued to have certain

"responsibilities" with respect to the Governor's office, like "function[ing] in a senior advisory and supervisory role")).

### b. The S1 Indictment does not make clear whether Count Thirteen charges a gratuity offense

At every turn, the S1 Indictment characterizes Mr. Kelly's conduct as bribery. (See, e.g., S1 Ind. ¶¶ 1 (describing the charges as involving "bribery"), 28 and the preceding heading (defining the Count Nine conspiracy as part of the "Percoco Bribery Scheme" and stating that the conspiracy involved the payment of "bribes"), 29 (alleging that Mr. Kelly "arranged for the Energy Company to pay . . . bribes"), 56 (alleging that Mr. Percoco took "official action in exchange for bribes")). Similarly, the statutory charging language in Count Thirteen[3] alleges only that Mr. Kelly had the "intent to *influence* an agent of a State" (id. ¶ 65 (emphasis added)), omitting the statutory term "reward" that some courts have interpreted to allow a gratuity theory. See 18 U.S.C. § 666(a)(2) ("intent to influence or reward"); United States v. Bahel, 662 F.3d 610, 636 (2d Cir. 2011) (interpreting "reward" to refer to gratuity). As to Mr. Kelly, the term "gratuity" is used only in the caption of Count Thirteen, and the term "reward" appears only in the "to wit" clause. (S1 Ind. ¶ 65).

Moreover, the theory articulated in the S1 Indictment is that Mr. Kelly provided benefits to Percoco in exchange for official acts to the benefit of the Energy Company "on an as needed basis," not on a gratuity theory, which requires a specific link between the "thing of value" given as a gratuity and the particular "official act" it is intended to reward. Sun-Diamond, 526 U.S. at 414. In addition, Count Thirteen provides no particulars with respect to what payment (if any) is alleged to have constituted the gratuity itself.

---

[3]    Count Thirteen of the S1 Indictment was charged as Count Twelve of the original indictment. Accordingly, correspondence before May 11, 2016 (when the S1 Indictment was filed) will refer to Count Twelve.

The Government has informally advised that in its view, the language in the "to wit" clause of Count Thirteen is sufficient to charge Mr. Kelly with illegal gratuities. (See Ex. U to the Gitner Decl. at ¶ 7). However, the Government has refused to state as much in a bill of particulars—the proper procedure if the Government is to be bound by its informal representation—or otherwise to provide any particulars about the alleged gratuity or gratuities.

Because Count Thirteen does not comport with the specificity requirements of Sun-Diamond, it appears that the Grand Jury was never instructed with regard to gratuities in accord with that case. Thus, it is unknown whether the Grand Jury intended to charge Mr. Kelly with a gratuity offense under section 666, and, if so: (1) whether the Grand Jury was instructed on the difference between bribes and gratuities, (2) what evidence was presented that "things of value" were given to Percoco to reward him for specific "official acts"; (3) what specific "official acts" were linked to those things of value," (4) whether any of those "things of value" were alleged to be gratuities as opposed to bribes, and (5) whether any gratuities the Grand Jury intended to charge were forward-looking or backward-looking. See Sun-Diamond, 526 U.S. at 404 (explaining that an illegal gratuity can be "for or because of any official act *performed or to be performed* by such public official" (emphasis added)).

As discussed in Mr. Kelly's Motion to Dismiss, the charging deficiencies in Count Thirteen—whether it purports to be a bribery charge or a gratuity charge or both—are so significant that the count must be dismissed, regardless of whether the Government answers our bill of particulars requests.[4]

---

[4]     As mentioned above, pursuant to Sun-Diamond, "things of value" alleged to constitute illegal gratuities must be specifically linked to a particular "official act." 526 U.S. at 408. In addition, as discussed in Mr. Kelly's Motion to Dismiss, because the S1 Indictment fails to allege that anything of value was exchanged for Percoco's action on any specific question or matter, it

### c. The S1 Indictment does not provide sufficient detail on the conspiracy charged against Mr. Kelly in Count Nine

Count Nine charges Mr. Kelly and Percoco with conspiracy to commit honest services fraud through the use of interstate wires, in violation of 18 U.S.C. § 1349. However, the S1 Indictment does not name any of Mr. Kelly's alleged co-conspirators, other than Percoco and the Government's cooperating witness, Howe.[5]

### d. The S1 Indictment provides no basis for the allegation that there is any overlap between the Energy Company Bribery Scheme and the other alleged schemes

The S1 Indictment alleges that its charges "stem from two wide-ranging and overlapping criminal schemes": (1) the "Percoco Bribery Scheme," which supposedly covers the Energy Company Bribery Scheme and another separate and unrelated scheme to bribe Percoco (the "Syracuse Bribery Scheme"); and (2) the "Buffalo Billion Fraud and Bribery Scheme," which supposedly covers two separate bid-rigging schemes in Buffalo (the "Buffalo RFP Scheme") and Syracuse (the "Syracuse RFP Scheme"). (S1 Ind. ¶ 1). However, as discussed more fully in Point I of Mr. Kelly's Severance Motion, this conclusory claim of "overlap" is unsupported.

### 2. The massive volume of discovery does not assist in refining the allegations in the S1 Indictment

To date, the Government has produced over two million pages of Bates-stamped discovery materials, as well as forensic images and extracted files from 22 devices (containing

---

fails to allege an "official act" as that term was recently defined in <u>McDonnell</u>. (<u>See</u> Motion to Dismiss at Point II).

[5]     As discussed in Mr. Kelly's Severance Motion, another, much more serious flaw with the original indictment's version of Count Nine—that it duplicitously charged the Energy Company Bribery Scheme and another separate and unrelated scheme as part of a single hub-and-spoke conspiracy—was rectified by the Government in the recently-filed S1 Indictment. (<u>See</u> Part A of the Background section to the Severance Motion). That change eliminated the need for certain particulars with respect to Count Nine.

millions of additional pages of material). In its discovery updates, the Government has emphasized that these materials are "searchable" by their metadata and organized in a "detailed index." (See, e.g., Discovery Index, dated May 18, 2017, attached as Ex. T to Gitner Decl.). But, setting aside the technical issues with the Government's production, there are serious limitations to the defense's ability to rely on metadata searches and the Government's discovery "index" to focus the review in this case.

First, it is impossible to craft a successful search without knowing what to search for. The S1 Indictment does not apprise Mr. Kelly of, among other critical details: (1) the "things of value" alleged to have been unlawful, (2) the "official acts" allegedly promised or performed in exchange for bribes, (3) the officials that Percoco allegedly advised or pressured, (4) the "official acts" linked to the "things of value" alleged to be gratuities, (5) Mr. Kelly's alleged co-conspirators, (6) the basis for the alleged overlap between the Energy Company Bribery Scheme and the other alleged schemes, and (7) the duties Percoco allegedly violated during the period when he was not a government employee. Without this information, the defense lacks the detail needed to craft meaningful searches and is left in the position of trying to wade through tens or hundreds of thousands of potentially relevant files without a full understanding of the essential facts alleged.

Second, the Government's discovery "index" may be the only discovery index ever created that has single line items encompassing tens of thousands of pages. Indeed, the "detail" of the Government's discovery "index" stays general in every respect that truly matters. For example, while the discovery index contains ten pages of entries cataloguing materials obtained from hundreds of custodians, a good portion of the detail provided in the index—including entries for bank accounts, phone records, and emails of individuals and entities that are entirely

unrelated to the Energy Company Bribery Scheme—appears irrelevant.[6]  And the categories of materials that are *most* critical to Mr. Kelly's defense—such as materials obtained from Governor Cuomo's office or from the Energy Company—are lumped together under generic index entries covering tens of thousands of pages.  (See, e.g., id. at rows 9–11, 34, 37, 274, 277, 342, 353, and 361 (covering more than 75,000 Bates-stamped pages of material obtained from sources connected to Governor Cuomo); id. at rows 4, 40, 271, 297, 306, 308, and 330 (covering over 177,000 Bates-stamped pages of material obtained from the Energy Company)).

### 3.  The Government denied Mr. Kelly's bill of particulars request

On February 28, 2017, we submitted a three-page request to the Government, seeking a narrow bill of particulars on the details discussed above.[7]  (Ex. H to Gitner Decl.).  The Government waited six weeks to respond.[8]  (Ex. K to Gitner Decl.).  When it finally answered, the Government refused to provide any particulars, instead simply directing Mr. Kelly to paragraphs of the Indictment and the Complaint.  (Id. at 2–3).  The Government's response did include what it called a "roadmap" to "assist" Mr. Kelly with his review of the discovery materials concerning the alleged "things of value" and "official actions."  However, this so-called "roadmap" was more like a globe, in that it seemingly pointed to discovery materials obtained from all sources having some conceivable connection to the Energy Company Bribery

---

[6]    This is not to say counsel for Mr. Kelly can ignore those materials that relate only to other defendants.  To the contrary, as discussed in Point II of Mr. Kelly's Severance Motion, unless he is granted severance, we will have no choice but to familiarize ourselves with those materials.

[7]    On behalf of Mr. Kelly, we submitted an initial and supplemental request for a bill of particulars to the Government on February 28 and May 2, respectively.  Those letters are attached as Exhibits H and Q to the Gitner Declaration.

[8]    The Government responded by letter to our initial and supplemental request for a bill of particulars on April 10 and May 10, respectively.  Those letters are attached as Exhibits K and S to the Gitner Declaration.

Scheme—i.e., over 675,000 pages of Bates-stamped materials and twenty-one devices. (See id.; see also Ex. T to the Gitner Decl.). Thus, the Government's response provided no guidance regarding what the alleged "things of value" or "official actions" were, or how this undifferentiated mass of discovery materials was responsive to that specific inquiry.

As required by Local Criminal Rule 16.1—as well as section 4 of this Court's Individual Rules of Practice in Criminal Cases—defense counsel conferred with the Government about Mr. Kelly's bill of particulars (and Brady) requests on May 12, 2017 (the "May 12 Meet-and-Confer"). (See Affidavit of Daniel M. Gitner, attached as Ex. U to Gitner Decl.). At this conference, the Government conveyed that its position with respect to the bill of particulars request was essentially unchanged from the one taken in its response letters, other than to state that it believed Count Thirteen charges a gratuity offense. (See id.).

**B.    Legal Standard**

The Government must provide a bill of particulars where additional details of the charges are necessary to the preparation of the defense and to avoid prejudicial surprise at trial. United States v. Torres, 901 F.2d 205, 234–35 (2d Cir. 1990), abrogated on other grounds by United States v. Marcus, 628 F.3d 36, 41 (2d Cir. 2010); see also United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) ("Rule 7(f) . . . permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charges pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."). A bill of particulars is required "even if the effect is disclosure of the Government's evidence or theories." United States v. Lino, No. 00-CR-632 (WHP), 2001 WL 8356, at *3 (S.D.N.Y. Jan. 2, 2001) (citing United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998)).

Though a bill of particulars is "not necessary where the government has made sufficient disclosures . . . by other means," United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted), the Government does "not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided," Bortnovsky, 820 F.2d at 575. Moreover, "in complex conspiracy cases . . . , the potential for unfair surprise and the difficulty of preparing a defense are amplified," and a bill of particulars is even more necessary. United States v. Rajaratnam, 09-CR-1184, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010); see also United States v. Kahale, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009), aff'd sub nom. United States v. Graham, 477 F. App'x 818 (2d Cir. 2012) ("Certain charges, such as . . . fraud . . . , by their nature carry a greater potential for causing unfair surprise at trial due to their complexity.").

The decision whether to grant a bill of particulars is left to the sound discretion of the district court. United States v. Davidoff, 845 F.2d 1151, 1154–55 (2d Cir. 1988) (citation omitted).

C.    **The Government Must Provide a Bill of Particulars**

Mr. Kelly has not been provided with the "essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c). This fundamental reality is unchanged by the length of the S1 Indictment, the length of the Complaint, the volume of discovery, the number of entries in the discovery index, and the Bates-ranges cited in the Government's "roadmap." Quantity is no substitute for quality, and in this case quantity contributes to the problem. The scope of the discovery—which covers four alleged schemes, only one of which relates directly to Mr. Kelly—operates both to hide the materials crucial to Mr. Kelly's defense and to intensify the difficulty of his trial preparation. Bortnovsky, 820 F.2d at 574–75 (reversing because crucial

information was buried in a "mountain of documents"); <u>United States v. Ramirez</u>, 609 F.3d 495, 503 (2d Cir. 2010) ("The district court made clear that it ordered a bill of particulars because so much discovery was produced to the defendants, not too little."); <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (Sand, J.), <u>aff'd sub nom.</u> <u>In re Terrorist Bombings of U.S. Embassies in E. Africa</u>, 552 F.3d 93 (2d Cir. 2008) ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.").

Unlike cases in which requests for bills of particulars have been denied, this case features an indictment that is vague as to basic elements of the charges, discovery that is massive and without helpful form, and an index with entries encompassing so many documents and so many types of documents as to be nearly useless. <u>Cf.</u> <u>United States v. Skelos</u>, 15-CR-317 (KMW), 2015 WL 6159326, at *14 (S.D.N.Y. Oct. 20, 2015) (concluding that a bill of particulars was not necessary due to the "comprehensiveness and . . . methodical organization of the production"). The Government has skirted its duty to apprise Mr. Kelly of the most fundamental details of the charges against him; thus, Mr. Kelly lacks the information necessary to prepare his defense and avoid prejudicial surprise at trial. <u>See</u> <u>Bortnovsky</u>, 820 F.2d at 575. Accordingly, if the Court does not dismiss the charges against Mr. Kelly, as requested in his Motion to Dismiss, the Government should be ordered to provide a bill of particulars pursuant to Rule 7(f).

**1. The Government must provide particulars as to the alleged "<u>quid</u>": the "things of value" Mr. Kelly allegedly provided**

It is apparent that the bribery charges against Mr. Kelly are predicated, at least in substantial part, on the compensation that Percoco's wife received during her time as a consultant to the Energy Company. (<u>See</u> S1 Ind. ¶ 30; <u>see also</u> <u>id.</u> ¶¶ 54, 64 (incorporating ¶ 30 into Counts Nine and Thirteen)). However, Count Thirteen also alleges that Mr. Kelly "paid

Percoco," leaving open the possibility that there are alleged bribe payments that flowed directly from Mr. Kelly to Percoco (as opposed to compensation paid to Percoco's wife). (Id. ¶ 65).

Mr. Kelly asked the Government to identify each thing of value constituting a bribe to Percoco and to specify the date it was offered. (Ex. H to Gitner Decl. ¶¶ 3–4). To the extent the Government intends to rely solely on the payments made to Percoco's wife, it need only have said as much. The Government refused to do so, instead merely referring to the Complaint, the indictment, and tens of thousands of discovery records. (Ex. K to Gitner Decl. at 3). That response serves no purpose but to imply that there are additional bribe payments the S1 Indictment fails to particularize that might be buried somewhere in those materials.

In a bribery case such as this, where the Government is legally required to prove a specific quid pro quo, it should not be controversial that the Government must specify the quid (or quids) upon which it seeks to convict the defendant. This information forms the very core of the alleged crime; it is vital to Mr. Kelly's defense. If Mr. Kelly does not know the particulars of each alleged bribe payment, he obviously cannot prepare a defense or explanation for those payments, such as a lawful purpose for the payment. See, e.g., United States v. Siddiqi, No. 06-CR-377 (SWK), 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) (finding that defendant would be "unreasonably hampered in his ability to prepare a defense"—such as a "lawful purpose" for the alleged bribe payments—"[i]n the absence of more specific information" from the Government about some of the alleged "things of value").

Mr. Kelly cannot be expected to wade through the millions of pages of documents produced in discovery to divine what benefits the Government deems to have constituted bribes. Indeed, under similar circumstances, courts have compelled the Government to particularize information related to bribe payments. See id. at *2 (requiring production of "a bill of particulars

specifying the approximate dates and amounts of [certain] cash payments" alleged to be bribes) (citing cases); <u>Lino</u>, 2001 WL 8356, at *4 (requiring Government to provide bill of particulars specifying recipients and amounts of bribes) (citing cases); <u>United States v. McCarthy</u>, 292 F. Supp. 937, 941 (S.D.N.Y. 1968) (requiring bill of particulars setting forth the dates, times, and places of the charged bribery payments); <u>United States v. Espy</u>, 989 F. Supp. 17, 34 (D.D.C. 1997), <u>aff'd in part,</u> <u>rev'd in part on other grounds</u>, 145 F.3d 1369 (D.C. Cir. 1998) (requiring Government to particularize its allegations that defendant solicited and received things of value in exchange for official acts).

In complex cases with fact-intensive allegations, a clear understanding of the central allegations is not merely helpful but critical to a defendant's ability to prepare for trial and prevent surprise. This is particularly true in the case of bribery allegations, where under <u>McDonnell</u>, the very specificity of the parties' alleged <u>quid pro quo</u> determines whether or not a crime has even been committed.

As stated above, if the only alleged bribe at issue is the compensation paid to Percoco's wife, the Government should simply say so. And if the Government intends to assert that other "things of value" constituted bribe payments, the Government should set forth the particulars of each such item. (Ex. H to Gitner Decl. ¶¶ 3–4).

### 2. The Government must provide particulars as to the alleged "official acts" performed to benefit the Energy Company

Although the S1 Indictment alleges that Percoco took "official actions" for the benefit of the Energy Company relating to two contracts—the Emissions Credits Agreement ("ECA") and the Power Purchase Agreement ("PPA")—it provides no detail as to what Percoco allegedly did with respect to those contracts, other than to "exert[] pressure on and provide[] advice to other" unnamed "State officials" with the intent that they take official actions to benefit the Energy

Company.  (S1 Ind. ¶¶ 31(a)–(b)).  The S1 Indictment does not identify whom Percoco allegedly pressured or advised, even though Percoco's position in the Executive Chamber apparently necessitated that he be in constant contact with innumerable State officials.  (Id. ¶ 3).  Mr. Kelly cannot be expected to review each and every potentially relevant interaction, with an unknown number of individuals, for any communication that the Government might construe as pressure or advice relating to the Energy Company.  At the May 12 Meet-and-Confer, the Government stated that defense counsel should focus on the State officials named by title in the Complaint and the S1 Indictment; however, inexplicably, the Government refused to put this information in a bill of particulars or to confirm that there were no other State officials to which this allegation might apply.  (See Ex. U to Gitner Decl. at ¶ 6).  Because the Government is not bound by its informal response at trial, and because, in any event, its informal response did not actually restrict the number of individuals the S1 Indictment might be describing, this answer leaves the door open to prejudicial surprise at trial.  The Court should require the Government to shut that door by providing the requested particulars in a form on which Mr. Kelly can safely rely.

Further, the S1 Indictment leaves open the possibility that the Government could seek to introduce entire categories of unspecified official acts.  (See S1 Ind. ¶ 31 (alleging that the "[o]fficial actions taken by Percoco for the benefit of the Energy Company *included, but were not limited to* [actions on the ECA and the PPA]" (emphasis added)); see also Compl. ¶ 32 (using the qualifier "[a]mong other things" in regard to Percoco's alleged official actions)).  At the May 12 Meet-and-Confer, the Government advised that Mr. Kelly should focus on the ECA and the PPA, since those official acts were alleged in the S1 Indictment.  However, it refused to commit that it would not seek to prove other official acts at trial.  (See Ex. U to the Gitner Decl. ¶ 6).  The Government's position with respect to the request for particularization of "official acts" is

particularly egregious in light of <u>McDonnell</u> and <u>Sun-Diamond</u>. Indeed, the Department of Justice's own United States Attorneys' Manual recommends that the official acts involved in any bribery or gratuity case specifically be identified in the *indictment*. <u>See</u> U.S.A.M. CRM § 2047, <u>available at</u> https://www.justice.gov/usam/criminal-resource-manual-2047-sample-charging-language (setting forth sample charging language for bribery under 18 U.S.C. § 201, which includes a *"description of official act defendant sought to [] influence"*). Mr. Kelly cannot be expected to guess what official acts the Government might argue that he or Percoco sought to influence. Given the scope of the allegations—covering several years and involving interactions with multiple state agencies with shifting employees and responsibilities—it simply is not feasible to prepare a defense as to every potentially relevant communication.

As mentioned above, it also remains unclear whether the S1 Indictment refers to an "official act," as defined in <u>McDonnell</u>, when it uses other terms, such as "official State action" (S1 Ind. ¶ 1), "official action" (<u>id.</u> ¶¶ 31–32), "official assistance" (<u>id.</u> ¶¶ 29–30), and "official State favors" (<u>id.</u> ¶ 28). Certainly, "official action," "official acts," and "official State action" might reasonably be construed to mean the same thing, but given that "official act" is a term of art, it is difficult to understand why the Government would not use that term deliberately, carefully, and consistently. The Government's possibly purposeful use of "official assistance" and "official State favors" engenders even more confusion, as these phrases do not even incorporate the word "act" or "action." Thus, they would seem to mean something completely different. In spite of the obvious questions that arise in light of the Government's use of these various terms, the Government has refused to state whether they all mean the same thing, or whether they mean different things. (Ex. K to Gitner Decl. at 2–3). The Government's use of these vague and imprecise terms not only hinders Mr. Kelly in identifying the alleged conduct at

issue, but also prevents him from preparing a defense with respect to whether this alleged conduct meets the stringent test set forth in McDonnell. The Government's refusal to clarify its position is baffling and seemingly designed to cause surprise at trial.

As one court has stated, the "basis of the government's allegations that the defendant solicited and received things of value" in exchange for "official acts" is necessary to avoid surprise and is needed for the defendant to prepare a defense. Espy, 989 F. Supp. at 34. That court granted a motion for a bill of particulars that sought "the conduct, date, place, and substance of each official act referred to in the Indictment." Id.; see also Siddiqi, 2007 WL 549420, at *3 (requiring the Government to produce a bill of particulars in a bribery case with the date, beneficiaries, and substance of the alleged official acts, which were approvals of requests for payment and change orders) (citing cases).

A clear understanding of the central allegations in this case is vital to Mr. Kelly's ability to prepare for trial. Indeed, questions and matters before New York State can be complicated and nuanced. Energy policy and related regulations raise arcane and sophisticated issues. If an official act is asserted for the first time at trial, it will be impossible for the defense to be fully and adequately prepared to address it on the fly. See, e.g., Davidoff, 845 F.2d at 1152, 1154 (reversing where indictment had alleged extortion of a single air freight company, but, at trial, the Government introduced evidence of extortions directed at three other unrelated air freight companies, because "it [wa]s simply unrealistic to think" that the defendant "had a fair opportunity to defend" against these charges); see also Bortnovsky, 820 F.2d at 574–75 (noting that because of "the district court's failure to compel the Government to reveal crucial information" the "relevance of key events was shrouded in mystery at the commencement of and throughout the trial").

As it stands, the Government is attempting to preserve the unlimited ability to offer unidentified and impossible-to-predict "official acts" at trial—there is no clear notice of what official acts are at issue, or who Percoco allegedly pressured or advised, or what he pressured or advised others to do, let alone when, or how, or who was involved.  See, e.g., Russell v. United States, 369 U.S. 749, 768 (1962) (criticizing indictment that "left the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal").  Not only does this position presume that Mr. Kelly knows what official acts are at issue—"a premise inconsistent with the presumption of innocence"—it also "smacks of gamesmanship."  United States v. Trie, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) (holding that the Government must provide information to the defendant as to his alleged false statements, what about them was false, who made them, and how he caused those statements to be made).

McDonnell makes clear that federal corruption cases require specificity regarding alleged "official acts" at issue, but here, the Government refuses to provide that clarity.  136 S. Ct. 2355.  The Government should be required to identify the "official acts" at issue in this case, including those that Percoco allegedly undertook himself, the official acts Percoco allegedly advised or pressured other officials to take, the names of those other officials, the dates any such acts were allegedly sought by or on behalf of Mr. Kelly, agreed to by Percoco, and/or performed, the specific questions or matters any such acts concerned, and the conduct at issue.  (Ex. H to Gitner Decl. ¶¶ 6–7).  In addition, the Government should be ordered to state in a bill of particulars whether the S1 Indictment's use of imprecise and undefined terms—such as "official action," "official assistance," "official State action," and "official favors"—are equivalent to "official acts," as that term is defined in McDonnell.  (Id. ¶ 2).  And, if these terms differ from "official

act," the Government should identify both what they mean and each instance of such action allegedly provided by Mr. Percoco for the benefit of the Energy Company. (Id. ¶ 8).

### 3. The Government should provide particulars with respect to any gratuity offense that the Government claims is charged in Count Thirteen

Giving a bribe is different than giving a gratuity. A bribe is a thing of value that is given *in exchange for* or *to influence* an official act, whereas a gratuity is given to *reward* official action that the recipient has already performed or will perform. See 18 U.S.C. § 666; see also Sun-Diamond, 526 U.S. at 404–05.

During the May 12 Meet-and-Confer, the Government claimed that Count Thirteen charges a gratuity offense, (Ex. U to the Gitner Decl., ¶ 7), but this assertion is contradicted by the language of the S1 Indictment and its failure to comply with Sun-Diamond. (See Motion to Dismiss at Point III). If the Court concludes that the Government's inclusion of the word "reward" in Count Thirteen's "to wit" clause is sufficient to address gratuities, then, in any event, the S1 Indictment fails to link the "things of value" alleged to be gratuities with their corresponding "official act," as required by Sun-Diamond. 526 U.S. at 408–09. As discussed in the Motion to Dismiss, the S1 Indictment's failure to provide this direct link is a crucial flaw that necessitates dismissal of the gratuities allegations, regardless of whether this request for a bill of particulars is granted. (Id.).

In the alternative, however, if the Court interprets Count Thirteen to charge gratuities, and if the count survives Mr. Kelly's Motion to Dismiss, this direct link between the thing of value and the specific official act must be provided in a bill of particulars. Accordingly, Mr. Kelly asked the Government to clarify these matters in his bill of particulars request (Ex. H

to Gitner Decl. ¶¶ 3, 6) and at the May 12 Meet-and-Confer.  The Government refused.  (Ex. K to Gitner Decl. at 2; Ex. U to Gitner Decl. ¶ 7).

By claiming that Count Thirteen charges gratuities but hiding the ball on all critical issues surrounding those supposed gratuities, the Government prejudices Mr. Kelly in at least two ways.  First, because Count Thirteen does not make clear whether it charges bribery and gratuities or just bribery, it is not possible to decipher the specific intent alleged with regard to any particular benefit Mr. Kelly provided to Percoco.  Second, because gratuities can be either forward- or backward-looking, Mr. Kelly is not able to determine whether some or all of the benefits he supposedly provided are alleged to relate to future official acts or past official acts.

Mr. Kelly should not be forced to guess what crime he has been charged with under section 666, but that is the position he is in (and has been in for the past six months) due to the drafting choices in the original and the S1 Indictments, compounded by the Government's refusal to answer simple straightforward questions that go straight to the heart of the charged conduct.  Clarifying this issue would not divulge any Government theory, but would simply put Mr. Kelly in a position to know what crimes he is alleged to have committed, and how he is alleged to have committed them.  Indeed, due to the unique pleading and proof requirements in gratuity cases, Sun Diamond, 526 U.S. at 404–05, the defense will be fundamentally different if Count Thirteen charges gratuities (and survives the Motion to Dismiss).  If the Court agrees that Count Thirteen charges a gratuity offense (which it should not do, given the count's deficiencies), and if the count survives the Motion to Dismiss (which it should not, given those same deficiencies), then the Government should be ordered to identify in a bill of particulars each thing of value alleged to constitute a gratuity and, as to each such thing of value, specify the

date on which it was offered and the specific official act it was intended to reward.  (Ex. H to Gitner Decl. ¶¶ 3, 6).

### 4. The Government should provide the names of the unindicted co-conspirators

The S1 Indictment names two of Mr. Kelly's alleged co-conspirators in Count Nine but alleges that more existed.  Mr. Kelly cannot effectively prepare his defense and avoid unfair surprise at trial if he does not know who the Government believes he conspired with.  Mr. Kelly's request for this information was rejected by the Government.  (Ex. H to Gitner Decl. ¶ 9(a); Ex. K to Gitner Decl. at 3).

Courts consider the following factors when deciding whether to order the Government to provide the names of unindicted co-conspirators:

> (1) the number of co-conspirators;
> (2) the duration and breadth of the alleged conspiracy;
> (3) whether the Government otherwise has provided adequate notice of the particulars;
> (4) the volume of pretrial disclosure;
> (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and
> (6) the potential harm to the Government's investigation.

United States v. Nachamie, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).  Each of these factors militates in favor of disclosure.

First and second, as in Nachamie, there are "a large number of co-conspirators" (two defendants, Howe, and an unknown number of additional individuals) "and the alleged conspiracy . . . operated for a significant period of time" (three years).  Id. at 572–73.

Third and fourth, as discussed above, the S1 Indictment fails to provide "adequate notice of the particulars" as to the conspiracy charge, and the massive discovery production does not lessen the problem.  Id. at 572.  Mr. Kelly cannot reasonably be expected to search over two

million pages of discovery to identify all possible co-conspirators allegedly brought into the scheme by Percoco, by someone else in the Governor's Office, or by the Government's prolifically corrupt cooperating witness, Howe.  See, e.g., Lino, 2001 WL 8356 at *13 (noting that, in wide-ranging conspiracies, "a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met") (quoting Nachamie, 91 F. Supp. 2d at 572).  Moreover, in order to defend this case, Mr. Kelly must know who, if anyone, is alleged to have participated in the Energy Company Bribery Scheme, aside from those already named.  Put simply, Mr, Kelly must understand the scope of the conspiracy with which he is charged in order to defend against it.  He cannot do so if the Government insists on keeping his alleged co-conspirators a secret.

Fifth, none of the defendants in this action have been charged with any violent acts and the Government does not—and could not—contend that they pose a threat to witnesses.  See, e.g., United States v. Santiago, 174 F.Supp.2d 16, 35 (S.D.N.Y. 2001) (finding that "the identities of unindicted co-conspirators have been disclosed primarily in cases in which violence was not alleged") (citing cases); Kahale, 789 F. Supp. 2d at 373 (noting lack of "legitimate basis for concern" over safety of co-conspirators or risk of witness tampering in "white-collar fraud action involving no allegations of violence").

Sixth, given the high-profile nature of this case and its extensive publicity (much of which was solicited by the Government when it called a press conference), "there is no legitimate concern that disclosing the names of unindicted co-conspirators will . . . compromise the Government's investigation." Nachamie, 91 F. Supp. 2d at 573; see also Kahale, 789 F. Supp. 2d at 373 (noting that compromise of the Government's investigation is also not a risk of disclosure of unindicted co-conspirators in non-violent, white-collar fraud actions).

Accordingly, and for the reasons set forth in the motion for a bill of particulars filed by counsel to Percoco, all of which are incorporated by reference herein, the Government should be instructed to provide in a bill of particulars the names of all known unindicted co-conspirators mentioned in Count Nine. (Ex. H to Gitner Decl. ¶ 9(a)).

### 5. The Government should be required to provide the evidentiary basis for the allegation that the Energy Company Bribery Scheme "overlaps" with the other alleged schemes

The S1 Indictment alleges that its charges "stem from two wide-ranging and overlapping criminal schemes": (1) the "Percoco Bribery Scheme," covering the Energy Company Bribery and the Syracuse Bribery Scheme; and (2) the "Buffalo Billion Fraud and Bribery Scheme," covering the Buffalo RFP Scheme and the Syracuse RFP Scheme. (S1 Ind. ¶ 1). However, as discussed further in Part I of Mr. Kelly's Severance Motion, this conclusory claim of "overlap" is unsupported.

Mr. Kelly's request for the basis of this "overlap" was rejected by the Government. (Ex. H to Gitner Decl. ¶ 1; Ex. K to Gitner Decl. at 2). But this information is critical to Mr. Kelly's defense in a joint trial involving allegations that other defendants participated in schemes in which Mr. Kelly had no involvement. Here, Mr. Kelly, who is only alleged to have bribed Percoco for the benefit of the Energy Company, is inexplicably charged in the same indictment with six other defendants who are alleged to have carried out three other frauds entirely separate from Mr. Kelly's own, for the benefit of their unrelated companies, without Mr. Kelly's participation or knowledge. (See generally Severance Motion). Because the S1 Indictment provides no basis for this joinder, the Government is, in effect, asking Mr. Kelly to prepare a defense against accusations of overlap that have not actually been levied against him. See Bortnovsky, 820 F.2d at 574–75 (noting that because of "the district court's failure to compel the

Government to reveal crucial information" the "relevance of key events was shrouded in mystery at the commencement of and throughout the trial").  Moreover, it is not realistic to believe that Mr. Kelly could somehow sift through millions of documents produced in discovery to learn the basis on which these schemes could possibly be connected.  See Rajaratnam, 2010 WL 2788168, at *2 (noting that "in complex conspiracy cases . . . , the potential for unfair surprise and the difficulty of preparing a defense are amplified"); see also Kahale, 789 F. Supp. 2d at 373 (noting that "[c]ertain charges," such as the mail and wire fraud charges in that case, "carry a greater potential for causing unfair surprise at trial due to their complexity").

Accordingly, the Government should be ordered to state, in its bill of particulars, the evidentiary basis for its allegation that the Energy Company Bribery Scheme overlaps with the three other alleged schemes in the S1 Indictment.  (Ex. H to Gitner Decl. ¶ 1).

### 6.   The Government should clarify Percoco's alleged role and duties

Mr. Kelly adopts the arguments set forth at Point I(C) of the Motion for a Bill of Particulars filed by Percoco, which argue that the Government should be ordered to provide particulars regarding the alleged role and duties of Percoco (1) before Governor Cuomo was first elected, and (2) during April through December of 2014, when Percoco left State employment to work on Governor Cuomo's re-election campaign.  (Ex. H to Gitner Decl. ¶¶ 9(b), 10(a) and 10(b)).

*        *        *

In sum, the Government has both neglected and refused to apprise Mr. Kelly of the most critical aspects of the charges against him, including the very quid pro quo required to be specified under McDonnell, and Mr. Kelly lacks the information necessary to prepare his defense and avoid prejudicial surprise at trial.  See Bortnovsky, 820 F.2d at 574–75.  Accordingly, if the

Court does not dismiss the charges against Mr. Kelly, as requested in his Motion to Dismiss, the

Government should be ordered to provide a bill of particulars pursuant to Rule 7(f).[9]

## POINT II

### THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH
### THE COURT'S APRIL 6, 2017 BRADY ORDER

During the April 6, 2017 pretrial conference, the Government represented that it was not

aware of any Brady information, and the Court ordered the Government promptly to disclose any

materials falling within its obligations under Brady v. Maryland, 373 U.S. 83 (1963). (Transcript

of April 6, 2017 Status Conference at 7:18–19, attached as Ex. J to Gitner Decl. (COURT: "To

the extent you become aware of Brady information, provide it promptly.")). Mr. Kelly

respectfully requests that the Court direct the Government to comply with the Court's April 6

order with respect to three specific categories of Brady material that the Government has

indicated it does not deem exculpatory. Those categories are described below.

As mentioned above, we initially requested a fourth category of Brady material:

information tending to show that Mr. Kelly did not enter into a single conspiracy together with

the two Syracuse Defendants, with whom he was originally charged.[10] We sent a request for

particulars seeking the basis upon which Mr. Kelly could have been charged with those

---

[9]    In response to Mr. Kelly's supplemental request for a bill of particulars, the Government agreed to provide the specific wire transmissions on which it intends to rely in connection with Count Nine. (Ex. S to Gitner Decl. at 1). Under the circumstances, it is not necessary for the Court to issue an order with respect to this issue now. We will try to reach agreement with the Government on an appropriate schedule or make a further application if the parties cannot agree.

[10]    We sent letters on this topic to the Government on behalf of Mr. Kelly on February 28 (bill of particulars request), April 17 (Brady request), and April 28 (follow-up Brady request), which are attached as Exhibits H, M, and P to the Gitner Declaration. The Government sent response letters on April 10 (bill of particulars), April 26 (Brady), and May 5 (Brady), which are attached as Exhibits K, O, and R to the Gitner Declaration.

defendants in a single conspiracy count. (Ex. H to Gitner Decl. ¶ 9(c)). After that request was denied by the Government (Ex. K to Gitner Decl.), we followed up on that precise issue, sending two separate letters seeking disclosure pursuant to <u>Brady</u> of any information that would tend to undermine the Government's claim that these defendants were all members of the single charged conspiracy (Exs. M and P to Gitner Decl.). Without ever budging from its position that it was unaware of any <u>Brady</u> material, the Government ultimately responded that it was "considering seriously the issues raised" by Mr. Kelly's repeated requests, and that it would "provide a separate and further response." (Ex. R to Gitner Decl. at 2; <u>see also</u> Ex. O to Gitner Decl.). We received no such response. Instead, a week before motions were due and a full month after we stated in open court that we intended to address this duplicitous conspiracy count in our motions, the Government superseded its original indictment to remove the duplicitous count. The Government did so, presumably, because once it finally examined the issue carefully, it realized that there was no evidence to support the single conspiracy previously charged.

In addition to those <u>Brady</u> materials, which are no longer needed, we specifically requested the following categories of information in letters to the Government: (1) material tending to show that Howe altered the content of documents that were sent to Mr. Kelly and did so for the purpose of deceiving Mr. Kelly; (2) material tending to show that Mr. Kelly believed or was told that the Energy Company's hiring of Percoco's wife had been authorized by an ethics opinion; and (3) material tending to show that the State officials whom Percoco allegedly pressured or advised to take official action—including those identified by title in the Complaint—did not perceive Percoco to be pressuring or advising them at all.[11]

---

[11] We submitted these <u>Brady</u> letters on behalf of Mr. Kelly to the Government on January 25 (Howe lies and document alterations), February 16 (Howe lies and document alterations), April 11 (ethics opinion), April 25 (absence of pressure or advice), and April 28 (follow-up on

The Government continued to maintain that it had no <u>Brady</u> material.  It also indicated that, in its view, the materials requested would not be exculpatory.[12]

This reveals the problem Mr. Kelly and the other defendants face:  the Government appears not to appreciate the exceedingly broad range of information and evidence that tends to undermine the various inferences upon which the charges depend.[13]

## A.      <u>Legal Standard</u>

The Government's disclosure obligations under <u>Brady</u> are well-settled.  Due process requires the Government to disclose any evidence or information that is both material and favorable to the defendant.  <u>See generally</u> <u>United States v. Agurs</u>, 427 U.S. 97, 103–13 (1976); <u>United States v. Bagley</u>, 473 U.S. 667, 674–83 (1985); <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Bagley</u>, 473 U.S. at 682.

"When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."  <u>Agurs</u>, 427 U.S. at 106.  Although the standard of materiality does not differ depending on whether the defendant makes a specific request, <u>Kyles</u>, 514 U.S. at 433, where "the defense requests certain evidence, thus putting the prosecutor on

---

all <u>Brady</u> requests).  Those letters are attached as Exhibits E, G, L, N, and P to the Gitner Declaration.

[12]      The Government responded by letter to our relevant <u>Brady</u> requests on February 6 (Howe lies and document alterations), March 23 (Howe lies and document alterations), and May 5 (all <u>Brady</u> requests), which are attached as Exhibits F, I, and R to the Gitner Declaration.

[13]      We note that, unlike Mr. Kelly's motions to dismiss the indictment and his motion for a severance, this <u>Brady</u> motion in no way requires the Court to accept as true the allegations put forth by the Government in the S1 Indictment or the Complaint.  At trial, Mr. Kelly will vigorously dispute the charges, and he is entitled to support that position by offering evidence related to each of the below requests.

notice of its value," the failure by the Government to respond may lead "the defense to assume . . . that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption," Bagley, 473 U.S. at 682–83. For purposes of Brady, the Government includes not just prosecutors, but also any agents, investigators, or other individuals that form part of the prosecution team. Kyles, 514 U.S. at 437; see also United States v. Meregildo, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2013).

While the Government is not under an obligation to affirmatively seek out Brady information of which it is unaware, see United States v. Ohle, S3 08-CR-1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), courts have required the identification of Brady materials buried within a larger mass of discovery. See, e.g., United States v. Blankenship, 5:14-CR-00244, 2015 WL 3687864, at *6 (S.D.W. Va. June 12, 2015) ("[T]he United States does not comply with the requirement of Brady by merely including all known Brady material within the four million plus pages of discovery."); United States v. Salyer, CR. S-10-0061 LKK (GGH), 2010 WL 3036444, at *5 (E.D. Cal. Aug. 2, 2010) ("What the government is actually arguing, in effect and for practical purposes, is—that logistics in the 'big documents' case render Brady/Giglio a dead letter no matter who has the burden of ascertaining the information. There is no authority to support this evisceration of constitutional rights just because the case has voluminous documentation."); United States v. Hsia, 24 F. Supp. 2d 14, 29 (D.D.C. 1998) ("The government cannot meet its Brady obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.").[14]

---

[14]    There is case law in the Southern District suggesting that the Government can satisfy its Brady obligations simply by including Brady material within its broader discovery production, even if that production comprises millions of pages. See, e.g., United States v. Healey, 860 F.

### B. **Argument**

Mr. Kelly has requested that the Government disclose, pursuant to <u>Brady</u>, three categories of material critical to Mr. Kelly's defense, described below. Without disputing that it possesses materials responsive to these requests, the Government has refused to acknowledge that such materials fall within <u>Brady</u>. The Government misunderstands its <u>Brady</u> obligations, and we respectfully ask the Court to direct the Government to comply with the Court's April 6 Order by promptly disclosing any responsive materials.

> **1. The Government must disclose materials tending to show that its cooperator altered documents and otherwise deceived his alleged co-conspirators**

The Government should be required to disclose, pursuant to <u>Brady</u>, all evidence or information tending to show that Todd Howe altered or destroyed documents for the purpose of deceiving Mr. Kelly (or any other defendant). Howe is the Government's star cooperating witness and the only person alleged to have been involved in all the schemes alleged in the Indictment. Among other things, Howe is alleged to have participated in a conspiracy with Mr. Kelly and Percoco, the alleged purpose of which was to bribe Percoco to perform official acts in favor of the Energy Company. (<u>See</u> S1 Ind. ¶¶ 29–32, 55–56).

At the same time, the Complaint reveals that Howe repeatedly deceived Mr. Kelly by doctoring emails that he forwarded to Mr. Kelly. For example, on October 8, 2013, Howe allegedly sent an email to Percoco stating that a NYPA official wanted Percoco to help set up a

---

Supp. 2d 262, 269 (S.D.N.Y. 2012); <u>U.S. v. Rubin/Chambers, Dunhill Ins. Services</u>, 825 F. Supp. 2d 451, 455 (S.D.N.Y. 2011). But the Court should join <u>Blankenship</u>, <u>Hsia</u>, and <u>Salyer</u> in holding that burying <u>Brady</u> material in millions of documents comports with neither the spirit of <u>Brady</u> nor the requirements of due process. As the Supreme Court has warned, allowing the Government to play hide-and-seek with <u>Brady</u> would debase "the adversary system of prosecution" to "a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth." <u>Kyles</u>, 514 U.S. at 439.

meeting, which efforts Howe described as part of "operation fat man"—referring to Mr. Kelly. (Compl. ¶ 51(b)). In response, Percoco wrote "ok. Thanks." (Id.). When Howe then forwarded this email chain to Mr. Kelly, he removed the reference to "operation fat man" and altered Percoco's response to say "Ok. *on it now.* thanks." (Id. ¶ 51(b) & n.6 (Howe's alteration in italics)). One interpretation of these alterations is that Howe intended to deceive Mr. Kelly not only about Howe's view of his lobbying relationship with the Energy Company (referring to his work as "operation fat man" when communicating with Percoco), but also about the degree of involvement Percoco allegedly had in setting up meetings (suggesting that Percoco was "on it now").

Howe apparently routinely tampered with emails he forwarded to those for whom he worked. Apart from the examples disclosed in the Complaint (Id. ¶¶ 51(b), 51(d) & n.6, 7), the Government has pointed to over a half-dozen other emails that Howe doctored before forwarding to Mr. Kelly and the other defendants in this case. (See Ex. F to Gitner Decl. at 2; Ex. I to Gitner Decl. at 8–9). Accordingly, we have sent letters to the Government requesting prompt disclosure, under Brady, of: (a) evidence or information tending to show that Howe altered or destroyed documents sent to Mr. Kelly or other alleged co-conspirators, (b) Howe's false statements to Mr. Kelly or other alleged co-conspirators, and (c) any other evidence showing how or why Howe tampered with documents. (See Exs. E and G to Gitner Decl.).

In response, the Government has taken the position that Howe's "false statements to co-conspirators or altered communications regarding the nature and/or objectives of the conspiracy to co-conspirators during the pendency of the conspiracy" do *not* constitute Brady material and are instead merely impeachment material. (Ex. I to Gitner Decl. at 7; see also Ex. F to Gitner

Decl.).  The Government has offered two principal arguments for why these materials do not constitute Brady, neither of which holds up to scrutiny.

First, the Government has argued that evidence tending to suggest that Howe tampered with documents would only "constitute impeachment material" under Giglio v. United States, 405 U.S. 150, 154 (1972).  (Ex. F to Gitner Decl. at 1; see also Ex. I to Gitner Decl.).  It is true that Howe's practice of altering documents raises concerns about Howe's credibility and is for that reason impeachment material under Giglio.  But, as explained in our letters to the Government, whether material shedding light on Howe's document-tampering may constitute Giglio material *in addition* to having exculpatory significance is beside the point; the material is clearly material and exculpatory under Brady.  (Ex. G to Gitner Decl. at 1).  Treating such material as Giglio only and delaying its disclosure makes no sense, because it may prove useful to help exonerate Mr. Kelly even if Howe never testifies.  (Id.).

Second, the Government has argued—with regard to the tampered emails referenced in the Complaint—that Howe's alterations were *inculpatory* as to Mr. Kelly, rather than exculpatory, because (on the Government's interpretation) the alterations overstated the degree to which Percoco allegedly promised to help the Energy Company.  (See Ex. F to Gitner Decl. at 1 ("If anything, the emails at issue reflect efforts to advance the interests of the criminal conspiracy . . . .")).  As an initial matter, even if the Government's interpretation is plausible, the alterations suggest only that *Howe* was intent on lying to Mr. Kelly about what Percoco allegedly promised to do; they do not show that Mr. Kelly (or Percoco) shared Howe's depraved state of mind.  Regardless, and perhaps more importantly, it is irrelevant whether the Government can interpret the evidence in a manner consistent with its theories; evidence is often subject to differing interpretations, and it is the potentially exculpatory interpretation that matters for Brady

purposes.  United States v. Mahaffy, 693 F.3d 113, 130 (2d Cir. 2012) ("Where suppressed

evidence is inculpatory as well as exculpatory, and its exculpatory character harmonize[s] with

the theory of the defense case, a Brady violation has occurred." (internal quotation marks

omitted)).

In fact, the material regarding Howe's document-tampering and his deception of

Mr. Kelly is exculpatory under Brady.  Howe is alleged to have been a co-conspirator of

Mr. Kelly in the conspiracy charged in Count Nine of the S1 Indictment.  (S1 Ind. ¶¶ 55–56).  A

necessary element of any conspiracy charge is that the alleged co-conspirators agreed with each

other to further a common criminal objective.  See, e.g., United States v. Salameh, 152 F.3d 88,

145 (2d Cir. 1998) (describing essential elements of conspiracy).  Any evidence or information

tending to show that Howe deceived Mr. Kelly about a matter relevant to the alleged bribery

scheme—including the actions Percoco was taking or planned to take in furtherance of that

scheme—tends to undermine the Government's contention that Howe entered into and

maintained the agreement alleged by the Government with Mr. Kelly, sharing a common

objective throughout.  The exculpatory significance of Howe's deception is heightened here,

where the nature of that deception went directly to, as the Government put it, "the nature and/or

objectives of the conspiracy . . . during the pendency of the conspiracy."  (Ex. I to Gitner Decl. at

7).  If Howe and Mr. Kelly had different understandings of the "essential nature" of their

relationship with each other (and Percoco), or if their goals were at "cross purposes," they were

not co-conspirators.  United States v. Praddy, 725 F.3d 147, 153 (2d Cir. 2013) (citing cases);

United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (citing cases).

In its most recent letter on this issue, the Government volunteered to disclose

documentary evidence of Howe's document-tampering, but refused to acknowledge that such

disclosure—or disclosure of other evidence regarding Howe's deception of Mr. Kelly or other alleged co-conspirators—is required under <u>Brady</u>. (Ex. I to Gitner Decl. at 7 ("[W]e are providing the following information to you in an abundance of caution and to assist in your trial preparation.")). It is therefore unclear whether the Government is aware of other alterations that remain undisclosed. The Government's position that its disclosures are voluntary should be rejected. For the reasons discussed, the disclosures are required under <u>Brady</u> because Howe's deception of Mr. Kelly with respect to the Energy Company, Percoco, and/or the alleged objects of the conspiracy may well serve to undermine the Government's allegation that the three men formed and continued to participate together in the charged conspiracy.

To be clear, Mr. Kelly does not contend that simply because Howe lied to him or deceived him, that action would by law terminate the charged conspiracy. While in certain circumstances a deception could indeed have the effect of terminating a conspiracy, it is premature to suggest any such result here. However, unless the Government informs Mr. Kelly of the existence of those deceptions—deceptions about which the Government has undoubtedly debriefed Howe at length—Mr. Kelly may never be in a position to assert that those deceptions either prevented the formation of the charged conspiracy in the first instance, or resulted in its termination as a matter of law. Because Howe's lies and deceptions can readily undermine important inferences the Government will ask the jury to draw, including inferences about the nature, extent, scope, and particularly the duration of the charged conspiracy, a failure to disclose the relevant materials when specifically requested would constitute a violation of Mr. Kelly's

due process rights.  The Court should therefore order the Government to produce the requested

materials pursuant to <u>Brady</u>.[15]

### 2. The Government must disclose materials tending to show that Mr. Kelly was told or believed that there was an ethics opinion

The defense has requested evidence or information tending to show that Mr. Kelly was

told by Howe (or anyone else), or otherwise had reason to believe, that the hiring of Percoco's

wife by the Energy Company was supported by an "ethics opinion."  (Ex. L to Gitner Decl. at 1).

One of the allegations in the S1 Indictment is that Mr. Kelly falsely told other executives at the

Energy Company that he had obtained an ethics opinion from the Governor's Office approving

the Energy Company's hiring of Percoco's wife.  (S1 Ind. ¶ 30(c)).  The Government apparently

relies on this allegation to support an inference that Mr. Kelly knew hiring Percoco's wife was

improper.  (<u>Id.</u>).

The Government has refused to acknowledge that the requested information constitutes

<u>Brady</u> material, and, although it has shared some responsive information on what it says is a

---

[15]      In this regard, the Government's <u>Brady</u> obligations are not limited to written documents and extend to any statements, written or oral, from Howe about how or why he tampered with documents, or when, how, or why he deceived Mr. Kelly or the other alleged co-conspirators. Whether Howe deceived Mr. Kelly via email or orally is beside the point.  Moreover, the mere fact that the Government may have chosen not to memorialize relevant statements made by Howe does not alter whether they are <u>Brady</u> material.  <u>United States v. Rodriguez</u>, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the <u>Brady</u> and <u>Giglio</u> rules exists without regard to whether that information has been recorded in tangible form."). And the fact that the Government may have learned of <u>Brady</u> information in the course of witness interviews does not permit it to suppress such information until its Jencks Act production.  <u>United States v. Rittweger</u>, 524 F.3d 171, 181 (2d Cir. 2008) ("Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under <u>Brady</u>—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500.").

voluntary basis, it has not committed to provide all the information responsive to this request. (Ex. O to Gitner Decl. at 5; Ex. R to Gitner Decl. at 1–2).

The requested information falls under the Government's <u>Brady</u> obligations.  If Howe (or anyone else) communicated to Mr. Kelly that such an ethics opinion had in fact been sought, prepared, or obtained, then that communication would be material and exculpatory under <u>Brady</u>, *regardless of its truth*, because it would tend to show that Mr. Kelly *believed* or *had reason to believe* there was such an ethics opinion and therefore that he acted, or may have acted, with a more innocent state of mind.  To the extent such a communication from Howe was deliberately false or misleading, it would be exculpatory for the additional reason discussed earlier: it would tend to show that Howe did not share a common goal or purpose with Mr. Kelly and, to the contrary, acted to deceive Mr. Kelly.

For the reasons discussed in Section B.1 above, the Government's position that its disclosures are voluntary should be rejected.  The requested information is both material and exculpatory within the meaning of <u>Brady</u>, and its prompt disclosure is therefore required.

### 3.      The Government must disclose materials tending to show that Percoco did not pressure or advise other State officials to perform "official acts" to benefit the Energy Company

The defense has requested all specific materials tending to show that no "official act," as that term is defined in <u>McDonnell</u>, was actually contemplated, agreed to, or taken.  (Exs. N and P to Gitner Decl.).  In brief, under <u>McDonnell</u>, a public official performs an "official act" if that official personally makes a decision or takes an action on a specific question or matter, or if the official pressures or advises another official to do so.[16]  136 S. Ct. 2355, 2371–72.

---

[16]      <u>McDonnell</u> is described at length in Mr. Kelly's Motion to Dismiss.

Count Nine charges Mr. Kelly with conspiring with Percoco and others to commit honest services fraud, while Count Thirteen charges Mr. Kelly with bribery. The S1 Indictment alleges that, in exchange for bribes from Mr. Kelly, Percoco took official actions as the opportunity arose by "exert[ing] pressure on and provid[ing] advice to certain other State officials, with the intent that those officials" secure the ECA or the PPA for the benefit of the Energy Company. (S1 Ind. ¶¶ 31, 31(a)–(b)). The word "certain" in "certain other State officials" was added to the allegations when the Government superseded the indictment.

Mr. Kelly's <u>Brady</u> request encompasses, among other things, any evidence tending to show that when Percoco spoke with other officials (particularly those who had decision-making authority with respect to the ECA or the PPA) about the Energy Company, he did *not* pressure or advise them to take official action favorable to the Energy Company. (Exs. N and P to Gitner Decl.). For example, if the Government is aware that Percoco made an inquiry of another State official concerning the Energy Company's chance of obtaining a PPA, but did not pressure or advise that official to take an official act with respect to the PPA, that information would be <u>Brady</u> material. The S1 Indictment and the Complaint refer to a number of officials by title only. (<u>See</u> S1 Ind. ¶ 36 (the "Assistant Secretary"); Compl. ¶¶ 47(a) (the "DEC Official"), 47(b) (the "Operations Deputy" and the "Former State Operations Director"), 47(c) (the "DEC Commissioner"), 51(b) (the "NYPA President"), 52 (the "Former Energy Assistant Secretary"), 53(a) (the "Energy and Finance Chair"), 53(a)(vi) (the "Chief of Staff")). During the May 12 Meet-and-Confer, the Government stated that some or all of these officials were allegedly pressured or advised to take official action by Percoco, but it declined to provide further specificity, including whether it intended to prove that officials other than these were pressured or advised to take official action by Percoco. (Ex. U to Gitner Decl. at 6). If, in an interview

with the Government, any of these officials denied having been pressured or advised by Percoco to take official action with respect to any "official act" on which the Government intends to rely, or made any statement arguably inconsistent with having been being pressured or advised by Percoco, that information would fall under <u>Brady</u>.

Indeed, material of this sort was central to the trial defense in <u>McDonnell</u> itself. To counteract the prosecution's theory that Governor McDonnell took official action by instructing other State officials to help the alleged briber, the defense elicited testimony that those other State officials did not understand the Governor to be pressuring or instructing them to do anything substantive. <u>See, e.g.</u>, 136 S. Ct. at 2362 (describing testimony of Governor's aide that "she did not feel pressured by Governor or Mrs. McDonnell to do anything other than have the meeting") (internal quotation marks omitted). The information the defense seeks here is exculpatory for exactly the reason argued in <u>McDonnell</u>. Put simply, if, in exchange for payments from the Energy Company or other things of value, Percoco did not personally take an "official act" to benefit the Energy Company that would meet the stringent requirements set forth in <u>McDonnell</u>, and in addition, he neither pressured nor advised another state official to take an action that would meet those stringent requirements, then the Government's bribery theory fails.

The Government has refused to provide any materials responsive to this request on the ground that "specific instances where Mr. Percoco did not perform or cause others to perform an official act does not [sic] tend to negate Mr. Percoco's guilt, much less Mr. Kelly's guilt." (Ex. O to Gitner Decl. at 6; <u>see also</u> Ex. R to Gitner Decl. at 3). The Government mischaracterizes our request. The defense does not seek "specific instances" in which Percoco did not pressure or advise another official to take action; rather, it seeks any evidence tending to show that any of the State officials relevant to the issues in this case—particularly those State officials identified

by title in the Complaint as being the subjects of Percoco's pressure or advice—denied being pressured or advised by Percoco, or made statements inconsistent with the pressure or advice alleged.  The Government's refusal to provide this information serves only to prevent Mr. Kelly from learning the identity of potential exculpatory witnesses and the substance of their exculpatory testimony.  That is the antithesis of what <u>Brady</u> requires.

<p style="text-align:center">*     *     *</p>

In sum, Mr. Kelly has requested that the Government disclose, pursuant to <u>Brady</u>, three categories of material critical to his defense.  The Government's responses indicate that it misunderstands its <u>Brady</u> obligations, and we respectfully ask the Court to direct the Government to promptly disclose any responsive materials.

<p style="text-align:center"><b><u>POINT III</u></b></p>

<p style="text-align:center"><b><u>MR. KELLY JOINS CERTAIN MOTIONS FILED BY OTHER DEFENDANTS</u></b></p>

Mr. Kelly joins in several of the motions filed by his co-defendants, as set forth below.

**A.      <u>Joseph Percoco's Motion to Dismiss: Not a Government Official</u>**

Mr. Kelly adopts the arguments set forth at Points I through IV of the motion to dismiss filed by Percoco, which argue that Percoco could not have (1) performed "official acts," (2) deprived the public of honest services (within the meaning of 18 U.S.C. § 1346), or (3) acted as an "agent" of the State (within the meaning of 18 U.S.C. § 666(a)(2)) during the period when he was not a government official.  The arguments in Percoco's motion apply equally to the charges against Mr. Kelly, who is alleged in Count Nine to have engaged in an honest services fraud conspiracy with Percoco, and in Count Thirteen to have bribed Percoco over a period of time that encompassed Percoco's hiatus from government service.  Those portions of Percoco's motion to dismiss are incorporated by reference in Point IV of Mr. Kelly's own Motion to Dismiss.

<p style="text-align:center">39</p>

**B.    Buffalo Defendants' Motion to Inspect Grand Jury Minutes**

Mr. Kelly joins the motion filed by the Buffalo Defendants to inspect certain portions of the Grand Jury minutes, including the jury instructions.  As discussed above, as well as in Mr. Kelly's Motion To Dismiss, the S1 Indictment fails to make out the crime of bribery—with respect to either the honest services fraud conspiracy charged in Count Nine or the substantive bribery charged in Count Thirteen—because it alleges that Mr. Kelly arranged for the Energy Company to hire Percoco's wife in exchange for Percoco's open-ended commitment to assist the Energy Company, rather than in exchange for official action on a specific question or matter. That glaring deficiency creates an obvious and non-speculative basis to believe the Grand Jury was not properly instructed with respect to the law of bribery, pursuant to <u>McDonnell v. United States</u>, 136 S. Ct. 2355 (2016), <u>United States v. Sun-Diamond Growers</u>, 526 U.S. 398 (1999), and other relevant authorities.

In addition, the deficiencies cited above and in Point III of Mr. Kelly's Motion to Dismiss with respect to whether Count Thirteen charges gratuities likewise call into question whether the Grand Jury was properly instructed on the elements of an illegal gratuity and the difference between a gratuity and a bribe.

Finally, as discussed in Point III of Mr. Kelly's Severance Motion, the S1 Indictment is replete with baseless allegations suggesting that defendants *other than* Percoco participated together with Mr. Kelly in the alleged bribery scheme (the "Energy Company Bribery Scheme") and, even worse, that Mr. Kelly participated with other defendants in *their* alleged schemes. These references give rise to the serious and non-speculative concern that the Grand Jurors were misinformed about the legal requirements (including the limits) of conspiracy liability and aiding-and-abetting liability.

## CONCLUSION

Because neither the S1 Indictment nor any other disclosures by the Government apprise Mr. Kelly of the most critical aspects of the charges against him, if the Court does not dismiss the charges against Mr. Kelly as requested in his Motion to Dismiss, the Government should be ordered to provide a bill of particulars pursuant to Rule 7(f). Additionally, because the Government's responses to Mr. Kelly's <u>Brady</u> requests—regarding three categories of material critical to Mr. Kelly's defense—are inadequate, the Government should be ordered to promptly disclose any responsive materials. Mr. Kelly also joins in various motions filed by the other defendants in this matter.

Dated: May 19, 2017
      New York, NY

<div style="margin-left:40%">

Respectfully submitted,

LANKLER SIFFERT & WOHL LLP

By:    /s/ Daniel M. Gitner
        Daniel M. Gitner
        Jun Xiang
        Samantha J. Reitz

        500 Fifth Avenue
        New York, NY 10110
        (212) 921-8399

        *Attorneys for Defendant*
        *Peter Galbraith Kelly, Jr.*

</div>