UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - v. -

JOSEPH PERCOCO, a/k/a "Herb,"
ALAIN KALOYEROS, a/k/a "Dr. K.,"
PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

            Defendants.

No. S1 16 Cr. 776 (VEC)
**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PETER GALBRAITH KELLY, JR.'S
MOTION FOR SEVERANCE AND
TO STRIKE PREJUDICIAL SURPLUSAGE**

LANKLER SIFFERT & WOHL LLP

Daniel M. Gitner
Jun Xiang
Samantha J. Reitz

500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Defendant
Peter Galbraith Kelly, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

    A.     Procedural History ....................................................................................5

    B.     The Four Schemes Described In the S1 Indictment...................................8

            1.     The Energy Company Bribery Scheme ...........................................9

                  a.     Factual Allegations ..............................................................9

                         i.     The Energy Company hired Potomac Strategies ................9

                         ii.     Mr. Kelly ingratiated himself with Percoco......................10

                         iii.     The Energy Company hired Percoco's wife .....................10

                         iv.     Percoco allegedly took official actions to benefit the Energy Company ...............................................................11

                         v.     Mr. Kelly was falsely led to believe that New York State might issue a PPA to the Energy Company ......................12

                         vi.     Mr. Kelly realized that the Energy Company would not obtain a PPA ..................................................................13

                         vii.     The Energy Company stopped paying Potomac Strategies and Percoco's wife ............................................................13

                  b.     The Charges Related to the Energy Company Bribery Scheme....13

             2.     The Syracuse Bribery Scheme ................................................14

             3.     The Syracuse RFP Scheme ....................................................15

             4.     The Buffalo RFP Scheme ......................................................16

ARGUMENT.............................................................................................................17

POINT I  THE ENERGY COMPANY BRIBERY SCHEME COUNTS  (COUNTS SEVEN, NINE, ELEVEN AND THIRTEEN)  ARE IMPROPERLY JOINED WITH THE OTHER COUNTS UNDER RULE 8(B) AND SHOULD THEREFORE BE SEVERED .........................................................................17

    A.     Legal Standard ........................................................................................18

B.      The Energy Company Bribery Scheme and the other alleged schemes are not unified by a "substantial identity of facts or participants"...............................19

C.      There is no "common plan or scheme" between the Energy Company Scheme and the other three schemes alleged in the S1 Indictment ......................22

D.      Proof of the Energy Company Bribery Scheme will differ substantially from the proof of the other three schemes alleged.................................26

E.      Count Six, the only remaining count linking the Energy Company Bribery Scheme to the Syracuse Bribery Scheme, should be divided for trial.................32

POINT II  THE ENERGY COMPANY BRIBERY SCHEME COUNTS  (COUNTS SEVEN, NINE, ELEVEN, AND THIRTEEN)  SHOULD BE SEVERED UNDER RULE 14 .................................................................................................37

A.      Legal Standard ...........................................................................................37

B.      A joint trial of the four alleged schemes would unfairly prejudice Mr. Kelly....................................................................................................38

1.      The size, complexity, and length of a joint trial would unfairly prejudice Mr. Kelly.................................................................38

2.      Mr. Kelly is at risk of spillover prejudice and transference of guilt..........39

3.      The eight defendants may have conflicting defense theories, strategies, and evidentiary issues .............................................43

4.      A joint trial would unfairly burden Mr. Kelly's trial preparation..............44

5.      Other remedies will not suffice to cure the unfair prejudice of spillover and juror confusion ...................................................45

C.      A joint trial of the four alleged schemes would fail to serve the interests of judicial efficiency and economy ..........................................................46

POINT III  THE COURT SHOULD STRIKE, AS PREJUDICIAL SURPLUSAGE, PARAGRAPHS OF THE S1 INDICTMENT THAT IMPROPERLY INCORPORATE ALLEGATIONS UNRELATED TO MR. KELLY ...........................48

A.      The Baseless and Prejudicial Surplusage In Counts Nine and Thirteen Must Be Struck ........................................................................................50

1.      Counts Nine and Thirteen reallege irrelevant paragraphs.........................50

2.      The surplusage in Counts Nine And Thirteen is irrelevant and prejudicial and must therefore be struck...................................52

B.      Prejudicial Surplusage In The Other Thirteen Counts, None of Which
        Charge Mr. Kelly, Must Also Be Struck...............................................................54

        1.      The surplusage in the remaining thirteen counts .......................................54

        2.      The surplusage in the remaining thirteen counts is prejudicial and
                must be struck ............................................................................................56

C.      The Summary Paragraphs That Rhetorically Link The Allegations Against
        Mr. Kelly With Allegations Against Others Must Be Struck ...............................58

        1.      Paragraph 1 must be struck .......................................................................58

        2.      The heading above Paragraph 28, as well as language in both
                paragraphs 28 and 36, suggesting that Mr. Kelly's conduct was
                part of the "Percoco Bribery Scheme," must be struck ............................59

CONCLUSION....................................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Kotteakos v. United States,
 328 U.S. 750, 755 (1946).............................................................................6, 22, 39

McDonnell v. United States,
 136 S. Ct. 2355 (2016)...............................................................................11, 30, 41

United States v. Attanasio,
 870 F.2d 809 (2d Cir. 1989)..............................................................................18, 23

United States v. Berger,
 22 F. Supp. 2d 145 (S.D.N.Y. 1998).........................................................................31

United States v. Bertolotti,
 529 F.2d 149 (2d Cir. 1975).......................................................................................40

United States v. Branker,
 395 F.2d 881 (2d Cir. 1968).................................................................................45, 46

United States v. Cardascia,
 951 F.2d 474 (2d Cir. 1991).......................................................................................40

United States v. Catapano,
 05-CR-229 (SJ) (SMG), 2008 WL 2222013, at *15–16 (E.D.N.Y. May 22,
 2008) ..........................................................................................................................45

United States v. Cervone,
 907 F.2d 332 (2d Cir. 1990).......................................................................................41

United States v. Feyrer,
 333 F.3d 110 (2d Cir. 2003)............................................................................. passim

United States v. Gentile,
 60 F.R.D. 686 (E.D.N.Y.1973).............................................................................25, 36

United States v. Giraldo,
 859 F.Supp. 52 (E.D.N.Y.1994) ................................................................................25

United States v. Greenfield,
  01-CR-401 (AGS), 2001 WL 1230538 (S.D.N.Y. Oct. 16, 2001) ...................................19, 23

United States v. Guillen-Rivas,
  950 F. Supp. 2d 446 (E.D.N.Y. 2013) ....................................................................................38

United States v. Kassir,
  S2 04-CR-356, 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009) .................................................52

United States v. Kouzmine,
  921 F. Supp. 1131 (S.D.N.Y. 1996)........................................................................20, 21, 42

United States v. Lech,
  161 F.R.D. 255 (S.D.N.Y. 2001) (Sotomayor, J.) ......................................................19, 21, 25

United States v. McDermott,
  245 F.3d 133 (2d Cir. 2001).................................................................................................46

United States v. Menashe,
  741 F.Supp. 1135 (S.D.N.Y.1990).......................................................................................25

United States v. Mulder,
  273 F.3d 91 (2d Cir. 2001)............................................................................................49, 52

United States v. Ohle,
  678 F.Supp.2d 215 (S.D.N.Y. 2010).................................................................................23, 31

United States v. Rajaratnam,
  763 F. Supp. 2d 299 (S.D.N.Y. 2010)............................................................................ *passim*

United States v. Rittweger,
  524 F.3d 171 (2d. Cir. 2008).....................................................................18, 23, 37, 40, 41

United States v. Scarpa,
  913 F.2d 993, 1013 (2d Cir. 1990).................................................................................49, 52

United States v. Shkreli,
  15-CR-637 (KAM), slip op. (E.D.N.Y. Apr. 19, 2017).........................................................47

United States v. Sturdivant,
  244 F.3d 71 (2d Cir. 2001) (Sotomayor, J.)........................................................................35

United States v. Turoff,
  853 F.2d 1037 (2d Cir. 1988).........................................................................................18, 19

United States v. Urban,
    5-CR-229 (SJ) (SMG), Document No. 110 (filed June 26, 2008) .........................................45

United States v. Vanwort,
    887 F.2d 375 ...........................................................................................................................6

United States v. Wolf,
    12-CR-968 (JFK), 2013 WL 2359107 (S.D.N.Y. May 30, 2013) ...........................................8

United States v. Yaron,
    10-CR-363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011) ...................................19, 31

Zafiro v. United States,
    506 U.S. 534 (1993) ...............................................................................37, 39, 44, 45, 47

**Statutes**

18 U.S.C. § 666 ..........................................................................................................................2, 41

18 U.S.C. § 1343 ............................................................................................................................30

18 U.S.C. § 1349 ..............................................................................................................................1

U.S.S.G. §§ 3D1.1 and 3D1.2 ........................................................................................................36

**Other Authorities**

Fed.R.Evid. 401 .............................................................................................................................52

Federal Rule of Criminal Procedure 7 ...........................................................................................49

Federal Rule of Criminal Procedure 8(a) ........................................................................................6

Federal Rule of Criminal Procedure 8(b) .............................................................................. *passim*

Federal Rule of Criminal Procedure 14 ................................................................................ *passim*

Defendant Peter Galbraith Kelly, Jr. respectfully submits this Memorandum of Law,

together with the Declaration of Daniel M. Gitner ("Gitner Decl."), in support of his motion

pursuant to Rules 8(b) and 14 of the Federal Rules of Criminal Procedure, for an Order granting

him severance from six of his co-defendants and ten counts of the Superseding Indictment

("S1 Indictment"), and some or all of Count Six, on the grounds that the S1 Indictment alleges

no factual or legal basis to join them with Mr. Kelly and that their joinder for trial with Mr. Kelly

causes him significant unfair prejudice.[1]  Mr. Kelly also seeks an Order striking from the S1

Indictment all allegations suggesting or implying that he participated in a scheme with any co-

defendant other than Joseph Percoco, on the ground that such allegations are baseless, erroneous,

and constitute prejudicial surplusage.

## PRELIMINARY STATEMENT

In essence, the facts set forth in the S1 Indictment allege that Mr. Kelly hired the wife of

co-defendant Joseph Percoco, a New York State official, in exchange for Percoco's agreement to

perform official acts intended to benefit Mr. Kelly's employer, an energy company (the "Energy

Company") on as "as needed basis."  This scheme (referred to herein as "the Energy Company

Bribery Scheme"), was allegedly arranged with the assistance of the Government's cooperating

witness, Todd Howe, who worked at a government relations firm.

The S1 Indictment charges Mr. Kelly in two counts with: (1) conspiracy to commit

honest services wire fraud under 18 U.S.C. § 1349 (Count Nine); and (2) bribery of a State

---

[1]     The S1 Indictment is cited herein as "S1 Ind."  A copy of the S1 Indictment is attached as
Ex. B to the Gitner Declaration.

official under 18 U.S.C. § 666(a)(2) (Count Thirteen). Percoco, who is charged in the Count

Nine conspiracy together with Mr. Kelly, is also charged in three other counts. Those counts

relate to Percoco's alleged acceptance of bribes from Mr. Kelly, as well as his alleged extortion

of Mr. Kelly.

In addition to charging these five counts against Mr. Kelly and Percoco, the

S1 Indictment impermissibly stitches together six more defendants in other counts pertaining to

three schemes that are entirely separate and distinct from the Energy Company Bribery Scheme.

To assist the Court in visualizing the patchwork structure of the S1 Indictment, we have prepared

a chart, attached as Exhibit A to the Gitner Decl., showing which defendants are charged in

which counts and in relation to which schemes (the "Chart").[2] Each of the four schemes is

represented in a different color.

As the Chart makes clear, the S1 Indictment links unrelated charges and defendants.

Starting at the bottom left side of the Chart, the S1 Indictment includes, in green, the honest

services fraud conspiracy charge that appropriately joins Mr. Kelly with Percoco, as well as four

other charges, all in green, related to the Energy Company Bribery Scheme.

Moving up and to the right, the Chart depicts a second scheme, shaded in red, involving

five charges and two additional defendants, Steven Aiello and Joseph Gerardi ("the Syracuse

Defendants").[3] This scheme, identified herein as "the Syracuse Bribery Scheme," also allegedly

involved bribe payments made to Percoco. However, according to the S1 Indictment, the

---

[2]     The Chart differs from the version originally presented to the Court during the status
conference held on April 6, 2017, insofar as the original version depicted the charges contained
in the original indictment, while this version depicts the charges contained in the S1 Indictment.
The general format of the Chart remains the same: the left-hand column lists the fifteen counts in
the S1 Indictment, while the top row lists the eight defendants.

[3]     One of these five charges, an extortion conspiracy count charging only Percoco (Count
Six), covers Percoco's alleged extortion of both the Energy Company and the Syracuse
Developer and is therefore shaded both green and red. It is addressed below in Point I.E.

Syracuse Bribery Scheme was aimed at benefitting the Syracuse Defendant's real estate development company (the "Syracuse Developer") and had no connection to the Energy Company. Thus, other than the involvement of Percoco and Howe, the alleged Syracuse Bribery Scheme bears *no* relationship to the Energy Company Bribery Scheme.

Continuing up and across the Chart to the right, the two Syracuse Defendants are also charged with having participated in a bid-rigging scheme (the "Syracuse RFP Scheme"). That scheme, shaded in blue, allegedly involved submissions made by the Syracuse Developer to an entity in response to a request for proposals ("RFP") and involved yet another defendant, Alain Kaloyeros. Thus, the two Syracuse Defendants carry with them into the S1 Indictment another scheme and defendant, neither of which bears any connection whatsoever to Mr. Kelly or the Energy Company. The only commonality between this alleged scheme and the Energy Company Bribery Scheme is the presence of Howe.

Defendant Kaloyeros, in turn, is alleged to have engaged in yet another bid-rigging scheme that is also entirely unrelated to the Energy Company Bribery Scheme. That scheme, referred to herein as the "Buffalo RFP Scheme" and shaded in orange on the Chart, allegedly involved submissions made by a Buffalo real-estate developer (the "Buffalo Developer") to the same entity in response to a different RFP.[4] The Buffalo RFP Scheme allegedly involved three additional defendants, Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Buffalo Defendants"), all of whom were affiliated with the Buffalo Developer and none of whom have any alleged connection to Mr. Kelly or the Energy Company. The only commonality between this alleged scheme and the Energy Company Bribery Scheme is the presence of Howe.

---

[4] One of the charges in the S1 Indictment, a wire fraud conspiracy (Count One), covers alleged conduct related to both the Syracuse RFP Scheme and the Buffalo RFP Scheme and is therefore shaded both blue and orange. Neither Mr. Kelly nor Percoco are charged in this count.

By virtue of this strategic conglomeration of charges and defendants, Mr. Kelly—who should be facing a two-defendant trial on counts arising from the Energy Company Bribery Scheme—now finds himself facing an eight-defendant trial involving 15 counts arising from four distinct schemes, three of which he is not alleged to have any involvement in whatsoever. As discussed below in Point I, however, the S1 Indictment fails to allege the connection necessary to join Mr. Kelly with these unrelated defendants and counts.

Unlike the S1 Indictment, the original indictment filed in this matter charged Mr. Kelly in a single, duplicitous conspiracy count (then-Count Nine) along with not only Percoco, but also the Syracuse Defendants. Thus, the original indictment provided an ostensible basis for trying the Energy Company Bribery Scheme and the Syracuse Bribery Scheme together. However, in apparent recognition that the alleged Energy Company Bribery Scheme and Syracuse Bribery Scheme were entirely separate, the S1 Indictment split up the duplicitous honest services fraud conspiracy count to separately charge a conspiracy related to the Energy Company Bribery Scheme against Percoco and Mr. Kelly (Count Nine) and a conspiracy related to the Syracuse Bribery Scheme against Percoco and the Syracuse Defendants (Count Ten). As a result, there is no longer the same basis for joining Mr. Kelly in the same trial as the Syracuse Defendants, and Mr. Kelly's joinder for trial with the unrelated defendants and counts now presents an even more glaring violation of Rule 8(b).

As discussed below in Point II, a joint trial of these four schemes would result in a lengthy, unwieldy, and unfairly prejudicial trial for Mr. Kelly, in which the vast weight of the evidence would have nothing whatsoever to do with him or his alleged conduct. The Court should therefore grant a severance from the other schemes and defendants pursuant to Rule 14, even if the Court is not convinced—as it should be—that joinder is improper under Rule 8(b).

Finally, as set forth in Point III below, certain remnants of the original indictment, as well as certain additions to the S1 Indictment, improperly and unfairly suggest that there is some connection between the Energy Company Bribery Scheme and the other schemes. Those allegations should be stricken from the S1 Indictment as prejudicial surplusage.

\* \* \*

The Government's interest in publicizing its efforts to combat corruption in New York State government may well be served by a single trial on a sprawling, cleverly-engineered 15-count indictment charging eight defendants. Presumably, the Government is also interested in its own convenience. But such interests cannot be given precedence over the right of Mr. Kelly to a fair trial based on evidence relating to his alleged wrongdoing. In crafting both the original indictment and the new S1 Indictment, the Government plainly lost sight of that fundamental consideration, and also lost sight of the law.

For these reasons and as set forth below, Mr. Kelly's trial should be severed from that of the other defendants, except for Percoco, and from all counts charging conduct unrelated to the Energy Company Bribery Scheme, including some or all of Count Six. Allegations suggesting Mr. Kelly's involvement with the other alleged schemes should also be stricken.

## BACKGROUND

### A.    Procedural History

The original indictment in this case was returned on November 22, 2016 and charged eight defendants in 14 counts.[5] Like the S1 Indictment, the original indictment charged Mr. Kelly in two counts with honest services fraud conspiracy and bribery. The conspiracy count of that indictment (Count Nine) also charged Percoco. *Unlike* the S1 Indictment, Count

---

[5]    A copy of the original indictment, filed on November 22, 2016, is attached as Exhibit C to the Gitner Declaration.

Nine of the original indictment was considerably more crowded: it charged the two Syracuse Defendants with participating in the same conspiracy as Mr. Kelly and Percoco.

The apparent justification for the original conspiracy charge was that the Energy Company Bribery Scheme and the Syracuse Bribery Scheme were separate spokes of a wheel that had Percoco and Howe at the hub. The original indictment titled this purported hub-and-spoke conspiracy the "Percoco Bribery Scheme." (Ind. ¶ 27 caption).

Fatally, however, the original indictment alleged no "rim" for this single conspiracy. Nowhere in its 35 pages was there a single allegation of any "common aim or purpose" or any mutual dependency between the two alleged schemes. Nor was there any allegation to support an inference that Mr. Kelly was aware that he played a part in a conspiracy larger than just the Energy Company Bribery Scheme.

In late 2016, the Government began producing its voluminous discovery materials, which covered all four schemes alleged in the indictment. We searched these materials in vain for the slightest shred of evidence to support Mr. Kelly's joinder in a single conspiracy count with the Syracuse Defendants. Over time, it became more apparent that Count Nine was duplicitous as a matter of law, in violation of Federal Rule of Criminal Procedure 8(a), as well as Kotteakos v. United States and its progeny.[6] 328 U.S. 750, 755 (1946) (noting that "[t]hieves who dispose of their loot to a single receiver—a single 'fence'—do not by that fact alone become confederates" and requiring that hub-and-spoke conspiracies have a "rim" to enclose the spokes).[7] It also

---

[6]     Count Four of the Complaint, filed on September 20, 2016, likewise charged these two schemes together as a single conspiracy without alleging any factual basis. A copy of the Complaint is attached as Exhibit D to the Gitner Declaration.

[7]     See also United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989) (requiring mutual dependence, common aim or purpose, or awareness of part in larger organization to find a single conspiracy between separate schemes) (citing cases).

became apparent that the duplicitous Count Nine provided the Government with an ostensible—although impermissible—basis for joining Mr. Kelly in the same indictment as the charges and defendants related to the Syracuse Bribery Scheme, Syracuse RFP Scheme, and Buffalo RFP Scheme.

In recognition of the extraordinary prejudice caused by this impermissibly duplicitous conspiracy count, on February 28, 2017, we submitted to the Government a request for a bill of particulars, which included a demand that the Government "identify the basis for the allegation" in Count Nine that Mr. Kelly and the Syracuse Defendants "were members of a single conspiracy." (Ex. H to the Gitner Decl. ¶ 9(c)). At the April 6 status conference, having not yet received any response from the Government to this bill of particulars request, we indicated that Count Nine was impermissibly duplicitous because it encompassed two unrelated schemes. (Tr. of Apr. 6 Pretrial Conference at 16:1-7, attached as Ex. J to the Gitner Decl.). In responding, the Government maintained its position that the indictment was properly charged. (Id. at 19–20).[8] When the Government finally answered Mr. Kelly's bill of particulars request, it declined to provide any factual or legal basis for the single conspiracy charged in Count Nine, citing the boilerplate that a bill of particulars does not entitle a defendant to the "legal basis for an allegation" or a preview of the Government's case. (Ex. K to the Gitner Decl. at 2). So, on April 17, 2017, we sent the Government a request for Brady material specifically targeting any evidence that "tend[ed] to undermine the Government's contention that Mr. Kelly knowingly participated in a single agreement covering both the Energy Company Bribery Scheme and the Syracuse Bribery Scheme," and providing an example of such material. (Ex. M to the Gitner

---

[8]     The Government also made clear during the status conference that it was unaware of any Brady material with respect to any defendant. (Ex. J to Gitner Decl. at 6).

Decl. at 1).  The Government did not respond, other than to state that the particular example cited did not constitute <u>Brady</u> material.  (Ex. O to the Gitner Decl. at 6).

On April 28, 2017, we wrote to the Government again, reiterating more forcefully our <u>Brady</u> request for evidence tending to undermine the inference that Mr. Kelly conspired with the Syracuse Defendants.  (Ex. P to the Gitner Decl. at 2–4).  A week later, on May 5, 2017, the Government responded that it was "considering seriously the issues raised" by Mr. Kelly's repeated requests, and that it would "provide a separate and further response."  (Ex. R to the Gitner Decl. at 2).

We received our "separate and further response" on May 11, 2017, in the form of the S1 Indictment, which split the duplicitous conspiracy count into two: (1) Count Nine, charging Mr. Kelly and Percoco with the Energy Company Bribery Scheme, and (2) Count Ten, charging the Syracuse Defendants and Percoco with the Syracuse Bribery Scheme.  As a result, the conspiracy count that anchored the Government's original argument for joining Mr. Kelly in its sprawling indictment is now gone.

**B.**     **<u>The Four Schemes Described In the S1 Indictment</u>**[9]

Regardless of any labels attached by the Government to the conduct alleged in this case, the facts set forth in the S1 Indictment, as well as the facts set forth at length in the 79-page Complaint that preceded it, describe four distinct schemes:

- The Energy Company Bribery Scheme, allegedly involving bribes paid to Percoco for official action to benefit the Energy Company (S1 Ind. ¶¶ 29–32; Compl. ¶¶ 32–56);

---

[9]     The allegations in this section are drawn from the S1 Indictment and the Complaint ("Compl.").  <u>See</u> <u>United States v. Wolf</u>, 12-CR-968 (JFK), 2013 WL 2359107, at *2 (S.D.N.Y. May 30, 2013) (considering both indictment and criminal complaint on a motion to dismiss indictment).  By citing these allegations for purposes of this motion, Mr. Kelly by no means admits them.

- The Syracuse Bribery Scheme, allegedly involving bribes paid to Percoco for official action to benefit the Syracuse Developer (S1 Ind. ¶¶ 33–35; Compl. ¶¶ 27, 57–66);

- The Syracuse RFP Scheme, allegedly involving the rigging of an RFP to benefit the same Syracuse Developer (S1 Ind. ¶¶ 22–27; Compl. ¶¶ 67–71, 73–78, 85–87); and

- The Buffalo RFP Scheme, allegedly involving the rigging of an RFP to benefit the Buffalo Developer (S1 Ind. ¶¶ 22–27; Compl. ¶¶ 67–70, 72–77, 79–87).

Neither the S1 Indictment nor the Complaint alleges that Mr. Kelly participated in, benefited from, or was even remotely aware of, any scheme other than the Energy Company Bribery Scheme. The other three alleged schemes differed fundamentally from the Energy Company Bribery Scheme in their objectives, scope, character, means, and participants.

### 1. The Energy Company Bribery Scheme

As described in the S1 Indictment, the essence of the Energy Company Bribery Scheme (shaded in green on the Chart) is this: In late 2012, Mr. Kelly, who was then the Senior Vice President of External Affairs at the Energy Company, bribed Joseph Percoco, a high-level official in the New York State Governor's Office, in exchange for Percoco's agreement to take "official actions" on behalf of the Energy Company "as the opportunity arose." (S1 Ind. ¶ 31). The S1 Indictment claims that Mr. Kelly provided a benefit to Percoco by arranging for the Energy Company to hire Percoco's wife for a "low-show" job within its public relations arm. (Id. ¶¶ 29–30).

### a. Factual Allegations

### i. The Energy Company hired Potomac Strategies

Well before the Energy Company hired Percoco's wife, it utilized a government relations and lobbying firm (the "Government Relations Firm") where Todd Howe, the Government's cooperating witness, worked. (S1 Ind. ¶ 10; Compl. ¶¶ 28, 35). In or about mid-2010, Howe

formed another company, Potomac Strategies LLC ("Potomac Strategies"), which the Energy Company also hired. (Compl. ¶ 35(a)).[10]

### ii.       Mr. Kelly ingratiated himself with Percoco

The Government argues that, beginning in 2010—again, well before the Energy Company hired Percoco's wife—Mr. Kelly began offering and providing things of value to Percoco (who was then an advisor to Andrew Cuomo's gubernatorial campaign), to "ingratiate" himself with Percoco on behalf of the Energy Company. (Compl. ¶ 37; see also S1 Ind. ¶ 30). According to the Complaint, these "benefits" included: (1) taking Howe and Percoco on a fishing trip and inviting Percoco on a second trip; (2) arranging, at Percoco's request, for the Energy Company to donate the use of a private jet by the Governor's campaign; and (3) taking Howe and Percoco out to lunch. (Compl. ¶ 37).

In January 2011, Percoco was appointed Executive Deputy Secretary to the newly-elected Governor, Andrew Cuomo. (S1 Ind. ¶ 3; Compl. ¶ 26).

### iii.       The Energy Company hired Percoco's wife

The Complaint and the S1 Indictment allege that, starting some time in 2012, Percoco pressured Mr. Kelly to help Percoco's wife, a teacher, obtain an educational consulting position with the Energy Company. (S1 Ind. ¶ 30; Compl. ¶ 40). Towards the end of 2012, Mr. Kelly arranged for the Energy Company to hire Percoco's wife to work for a community education project focused on elementary school students (the "Education Program"); Percoco's wife helped develop the curriculum and taught at local schools. (S1 Ind. ¶ 30; Compl. ¶¶ 41, 43–44). The Government asserts, however, that this position was a "low-show" job and that the compensation received by Percoco's wife of $7,500 per month was inflated. (S1 Ind. ¶ 30; Compl. ¶¶ 43–44).

---

[10]       The Complaint defines Potomac Strategies as "Howe's LLC." (Compl. ¶ 35(a)).

### iv. Percoco allegedly took official actions to benefit the Energy Company

The Government claims that in exchange for benefits from Mr. Kelly, Percoco agreed to take "official actions for the benefit of the Energy Company as the opportunity arose." (S1 Ind. ¶ 31; see also Compl. ¶¶ 43, 46).[11] The Complaint and the S1 Indictment identify two contracts with respect to which Percoco allegedly took official action and hint at others. (See, e.g., S1 Ind. ¶ 31 ("Official actions taken by" Percoco "for the benefit of the Energy Company included, but were not limited to, the following . . .").

The Emissions Credits Agreement. The first contract for which Percoco allegedly undertook official action on behalf of the Energy Company was an agreement between New York and New Jersey, identified as the "Emissions Credits Agreement" (the "ECA"). (S1 Ind. ¶ 31(a); Compl. ¶¶ 36(e), 47).[12] The Energy Company had sought to purchase emissions reduction credits ("ERCs") in New York to use for a power plant in New Jersey, but it could not use those ERCs in New Jersey without an ECA between the two states. (Id.). The S1 Indictment claims that in or about August 2013, Percoco exerted pressure on and provided advice to other State officials to help secure the ECA for the Energy Company. (Id.). An agreement was eventually signed approximately one year later. (Compl. ¶ 48).

The Power Purchase Agreement. The second contract for which Percoco allegedly undertook official action on behalf of the Energy Company was a power purchase agreement (the "PPA") that the Energy Company sought to obtain from the State of New York. (S1 Ind. ¶¶ 20,

---

[11] In a separate motion, we move to dismiss the charges against Mr. Kelly on the ground that, after the Supreme Court's ruling in McDonnell v. United States, 136 S. Ct. 2355 (2016), the "as opportunities arose" theory of bribery liability—at least as alleged in this case—is no longer valid.

[12] In the Complaint and the original indictment, the ECA was referred to as the "Reciprocity Agreement."

31(b); Compl. ¶¶ 32, 34). The Energy Company was seeking to build a power plant in Wawayanda, New York (the "New York Power Plant"), and a PPA would have guaranteed a purchaser for the energy produced at that plant for a term of years. (Id.).

In the spring of 2013, as part of the Governor's initiative to identify new sources of energy in the State, the New York Power Authority ("NYPA") issued a request for proposals (the "Energy RFP") for the construction of new power plants. (Compl. ¶¶ 36(d), 50). The New York State Public Service Commission (the "PSC") was charged with making selections under the Energy RFP. (Id. ¶ 51). The Government claims that, in the fall of 2013, while the PSC was evaluating proposals submitted in response to the Energy RFP—including a proposal submitted by the Energy Company—Percoco "exerted pressure on and provided advice to certain other State officials, with the intent that those officials work to secure" a PPA for the Energy Company. (S1 Ind. ¶ 31(b); see also Compl. ¶ 51). No PPA was ever awarded. (S1 Ind. ¶ 32; Compl. ¶¶ 52, 55).

> **v.      Mr. Kelly was falsely led to believe that New York State might issue a PPA to the Energy Company**

The Government alleges that by October 2013, Howe and Percoco (but *not* Mr. Kelly) had gained confidential information about the Energy RFP from a State official. (S1 Ind. ¶ 32; Compl. ¶ 52). As a result, they knew that the PSC was unlikely to view the Energy Company's submission favorably, or award the Energy Company a PPA. (Id.). Nonetheless, Howe and Percoco falsely promised Mr. Kelly that Percoco "would continue to take official action to help the Energy Company to obtain the PPA." (S1 Ind. ¶ 32). Howe and Percoco allegedly maintained this "illusion" of continued official action by arranging meetings between Mr. Kelly and various State officials who, "in reality, had little or no involvement in the Energy RFP and PPA selection processes." (Compl. ¶ 53). Howe and Percoco allegedly took these actions to

ensure that the Energy Company would continue making payments to both Howe (under its consulting agreement with Potomac Strategies), and Percoco (through his wife's consulting work).  (S1 Ind. ¶ 32; Compl. ¶ 53).

### vi. Mr. Kelly realized that the Energy Company would not obtain a PPA

According to the Complaint, in or around the spring of 2015, Mr. Kelly finally realized what Howe and Percoco knew in 2013: New York State would not offer a PPA to the Energy Company.  (Compl. ¶ 55).  The Energy Company's need for the PPA had lessened by this time because it had obtained private funding for the New York Power Plant.  (Id.).

### vii. The Energy Company stopped paying Potomac Strategies and Percoco's wife

In June 2015, the Energy Company stopped paying a monthly retainer to Potomac Strategies, over Howe's objections.  (Id.).  In August 2015, Mr. Kelly informed an Energy Company employee that funding for Percoco's wife's salary was not included in the Energy Company's budget for 2016.  (Id.).  Percoco's wife continued working for the Energy Company through 2015 and into early 2016; her final payment for that work was made on or about January 28, 2016.  (Id. ¶ 56).

### b. The Charges Related to the Energy Company Bribery Scheme

As indicated above, the S1 Indictment charges Mr. Kelly with two counts—an honest services wire fraud conspiracy count (Count Nine) and a substantive bribery count (Count Thirteen)—based on his alleged participation in the Energy Company Bribery Scheme.

Defendant Percoco—the only other defendant charged with participating in the Energy Company Bribery Scheme—is charged, together with Mr. Kelly, in the Count Nine conspiracy.

He is also charged in Counts Six, Seven and Eleven, in relation to his alleged acceptance of bribes from, and extortion of, Mr. Kelly.

### 2.     The Syracuse Bribery Scheme

The S1 Indictment separately charges the two Syracuse Defendants (Aiello and Gerardi) and Percoco in the Syracuse Bribery Scheme (shaded in red on the Chart).

According to the S1 Indictment, in August 2014, almost two years after Mr. Kelly hired Percoco's wife to work for the Energy Company, the Syracuse Defendants provided $35,000 in bribe payments to Percoco in exchange for Percoco's "official assistance to the Syracuse Developer on an as-needed basis."  (S1 Ind. ¶ 33).  The Complaint alleges that the Syracuse Defendants made these payments via two checks payable to Potomac Strategies.  (Compl. ¶ 63(a)).  The funds were passed on to Percoco's wife by Howe and deposited into the Percocos' joint bank account.  (S1 Ind. ¶ 33; Compl. ¶¶ 63(c)–(d)).  According to invoices sent by Howe, these payments were for "NYS Consultation," "Labor Strategy-Relations," and "Labor Financing" work performed by him during the summer of 2014.  (Compl. ¶ 63(b)).  However, the Complaint alleges that Potomac Strategies actually functioned "as a pass through" entity "to "disguise the source" of bribe payments from the Syracuse Developer to Percoco.  (Compl. ¶ 63; see also S1 Ind. ¶ 34).

The S1 Indictment claims that, later in 2014, Percoco pressured State officials to take "official actions for the benefit of the Syracuse Developer."  (S1 Ind. ¶ 35; see also Compl. ¶ 57). None of these acts are alleged to have had had anything to do with the Energy Company.  (Id.). The alleged official acts include: (1) securing the release of more than $14 million in backlogged State funds that were owed to the Syracuse Developer; (2) reversing a State agency decision that would have required a union contract for one of the Syracuse Developer's projects; and

(3) arranging a raise for Aiello's son, who worked in the State's Executive Chamber. (S1 Ind. ¶ 35; Compl. ¶¶ 57, 64–66).

Based on their alleged participation in the Syracuse Bribery Scheme, the Indictment charges the Syracuse Defendants in two counts. The first is Count Ten, the honest services fraud conspiracy count in which Percoco is also charged. The second is Count Fourteen, which charges them with bribery. For his alleged participation in the Syracuse Bribery Scheme, Percoco is also charged in three other counts as well: Counts Six, Eight, and Twelve.

Mr. Kelly is not charged in connection with this scheme, nor is he alleged to have had any part in it.

### 3.    The Syracuse RFP Scheme

The S1 Indictment separately charges the two Syracuse Defendants in three counts relating to an alleged bid-rigging scheme, the Syracuse RFP Scheme (represented in blue on the Chart). Defendant Kaloyeros is also charged in relation to this scheme, which was allegedly orchestrated by Howe to favor the Syracuse Developer.

According to the S1 Indictment and Complaint, in 2012, Kaloyeros, who was then the head of SUNY Polytechnic Institute ("SUNY Poly"), caused SUNY Poly's funding arm to retain Howe as a consultant to help SUNY Poly undertake development projects through a real estate corporation called Fort Schuyler Management Corporation ("Fort Schuyler").[13]   (S1 Ind. ¶¶ 6–8; Compl. ¶¶ 25, 69–70). In October 2013, Fort Schuyler issued a request for proposals to identify a preferred developer for projects in Syracuse (the "Syracuse RFP"). (S1 Ind. ¶ 23; Compl. ¶ 77(c)). In December 2013, the Syracuse Developer won the bid and was ultimately awarded

---

[13]     Howe was technically retained as a consultant for the College of Nanoscale Science and Engineering ("CNSE"), which merged with the State University of New York Institute of Technology in 2014 and became SUNY Poly. (S1 Ind. ¶ 6; Compl. ¶ 25). For ease of reference, this brief refers to the relevant institution as "SUNY Poly."

$105 million worth of development contracts in Syracuse. (S1 Ind. ¶ 27; Compl. ¶ 86(a)). The Government claims that Howe and Kaloyeros had "preselected" the Syracuse Developer because the Syracuse Defendants had made large campaign contributions to the Governor and had paid hundreds of thousands of dollars in bribes to Howe, through both the Government Relations Firm and Potomac Strategies. (S1 Ind. ¶¶ 22–23; Compl. ¶¶ 68, 71, 74).

For their alleged participation in the Syracuse RFP Scheme, the S1 Indictment charges the Syracuse Defendants with three counts: a wire fraud conspiracy count (Count One); a substantive wire fraud count (Count Two); and a substantive bribery count (Count Three). The S1 Indictment charges Kaloyeros in the same wire fraud conspiracy count (Count One) and the substantive wire fraud count (Count Two).

Neither Mr. Kelly nor Percoco is charged in connection with this scheme, nor is either defendant alleged to have played a part in it.

### 4. The Buffalo RFP Scheme

The S1 Indictment separately charges the three Buffalo Defendants (Ciminelli, Laipple, and Schuler), together with Kaloyeros, in three counts alleging an entirely separate bid-rigging scheme. According to the S1 Indictment, this scheme—the Buffalo RFP scheme—was orchestrated by Howe to favor the Buffalo Developer. (S1 Ind. ¶¶ 12, 22, 24; Compl. ¶¶ 31, 68, 79).

In the late summer to early fall of 2013, Howe and Kaloyeros allegedly rigged Fort Schuyler's bidding process so that a request for proposals to find a "preferred developer" for Fort Schuyler development projects in Buffalo (the "Buffalo RFP") would be awarded to the Buffalo Developer. (Id.). In January 2014, the Buffalo Developer won the bid and was ultimately awarded a development contract worth approximately $750 million. (S1 Ind. ¶ 27; Compl. ¶¶

86(b), 87). The Government claims that Howe and Kaloyeros had "preselected" the Buffalo Developer, because the Buffalo Defendants had made sizeable campaign contributions to the Governor and had paid bribes to Howe through a consulting agreement with a law firm in Albany of which the Government Relations Firm was an affiliate (the "Law Firm"). (S1 Ind. ¶¶ 22–23; Compl. ¶¶ 28(b), 68, 72(a), 74).

For their alleged participation in the Buffalo RFP Scheme, the S1 Indictment charges the Buffalo Defendants in three counts: the same wire fraud conspiracy count in which the Syracuse Defendants and Kaloyeros are charged (Count One); a substantive wire fraud count (Count Four), and a substantive bribery count (Count Five). The S1 Indictment additionally charges Kaloyeros in the substantive wire fraud count (Count Four).

Neither Mr. Kelly nor Percoco is charged in connection with this scheme, nor is either defendant alleged to have played a part in it.

## ARGUMENT

## POINT I

### THE ENERGY COMPANY BRIBERY SCHEME COUNTS (COUNTS SEVEN, NINE, ELEVEN AND THIRTEEN) ARE IMPROPERLY JOINED WITH THE OTHER COUNTS UNDER RULE 8(b) AND SHOULD THEREFORE BE SEVERED

The S1 Indictment fails to demonstrate that the Energy Company Bribery Scheme and the three other schemes described above are unified by either a substantial identity of facts or purpose or a common plan or scheme. As set forth below, joinder of the defendants and counts relating to the Energy Company Bribery Scheme with the defendants and counts relating to the other three schemes is improper under Rule 8(b). Accordingly, Mr. Kelly seeks an Order (1) severing his trial from that of all defendants other than Percoco, (2) severing the counts relating solely to the Energy Company Bribery Scheme from all counts relating solely to the

three other schemes, and (3) requiring the Government to elect between trying Percoco on the relevant part of Count Six—the only remaining count that encompasses both the Energy Company Bribery Scheme and the Syracuse Bribery Scheme—either in the trial of the counts related to the Energy Company Bribery Scheme or in the trial of the counts related to the Syracuse Bribery Scheme.

### A. Legal Standard

Federal Rule of Criminal Procedure 8(b) governs joinder here.[14]  It provides:

> . . . The indictment or information may charge two or more defendants *if they are alleged to have participated in the same act or transaction*, or *in the same series of acts or transactions*, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

(emphasis added).  The Second Circuit has interpreted this language to permit joinder where defendants' alleged acts are "'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'"  United States v. Rittweger, 524 F.3d 171, 177 (2d. Cir. 2008) (Sotomayor, J.) (citation omitted).

In assessing whether there is a "substantial identity of facts or participants," a court must determine whether "a reasonable person would easily recognize the common factual elements that permit joinder."  United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (citation omitted).

A "common plan or scheme" exists where there is a "key link" between alleged conspiracies, as would exist when "one scheme stemmed from the other."  United States v. Turoff, 853 F.2d 1037, 1042, 1044 (2d Cir. 1988).  As then-Judge Sotomayor wrote more than

---

[14]     Where, as here, a defendant challenges the joinder of offenses allegedly committed by his co-defendants, Rule 8(b) clearly governs.  See United States v. Attanasio, 870 F.2d 809, 814-15 (2d Cir. 1989) ("Where . . . joinder involves both multiple offenses and multiple defendants, Rule 8(b) must be applied.").

fifteen years ago, "[i]t is well settled . . . that . . . separate transactions do not constitute a 'series' within the meaning of Rule 8(b) 'merely because they . . . involve one or more common participants.'" United States v. Lech, 161 F.R.D. 255, 256 (S.D.N.Y. 2001) (Sotomayor, J.) (quoting United States v. Bradford, 487 F. Supp. 1093, 1094 (D. Conn. 1980) (Cabranes, J.)); see also United States v. Greenfield, 01-CR-401 (AGS), 2001 WL 1230538, *4 (S.D.N.Y. Oct. 16, 2001) (noting that the mere fact that conspiracies alleged in multiple counts have *some* overlap, such as "common participants, generally similar objectives, and common confidential informants," is not enough to satisfy this test; rather, "multiple conspiracies must have a common goal or purpose to be joined under Rule 8(b)").

Under these standards, joinder is proper where the evidence of separate schemes is essentially the same, Feyrer, 333 F.3d at 114, or where the proof of one scheme "is indispensable for a full understanding of the other," Turoff, 853 F.2d at 1044. Conversely, joinder is improper where there is no substantial overlap of proof. See, e.g., United States v. Yaron, 10-CR-363 (GBD), 2011 WL 3279054, *8-9 (S.D.N.Y. July 28, 2011) (finding that, despite "some overlap of facts and participants" there was not sufficient connection between two fraud conspiracies to justify joinder under Rule 8(b)).

"Unless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice." Feyrer, 333 F.3d at 113 (citing United States v. Lane, 474 U.S. 438, 449 n.12 (1986)).

## B.  The Energy Company Bribery Scheme and the other alleged schemes are not unified by a "substantial identity of facts or participants"

There is no substantial overlap of facts or participants between the Energy Company Bribery Scheme and the other schemes alleged in the S1 Indictment. The four alleged schemes

vary in myriad ways.  While all four schemes involve illegal payments, among many other relevant distinctions, the payments:

- consisted of dramatically different amounts (from the low tens of thousands to hundreds of thousands),

- paid through varying entities (the Education Program, Potomac Strategies, the Government Relations Firm, and the Law Firm),

- to two different individuals (Howe and Percoco),

- for the benefit of three unrelated companies (the Energy Company, the Syracuse Developer, and the Buffalo Developer),

- operating in unique industries (energy, commercial real estate development, and construction),

- doing business in completely different geographical regions (Orange County / New Jersey, Syracuse, and Buffalo), and

- on entirely different projects (power plants and construction).

Moreover, the schemes were allegedly initiated at different times: 2012 (the Energy Company Bribery Scheme), 2013 (the Syracuse RFP Scheme and the Buffalo RFP Scheme), and 2014 (the Syracuse Bribery Scheme).

The only basis upon which the Government can possibly link these four alleged schemes is through a chain of defendants, which—as discussed above—is illustrated in the Chart attached as Exhibit A to the Gitner Declaration.  In short, (1) Mr. Kelly and Percoco are alleged to have participated in the Energy Company Bribery Scheme, (2) Percoco is connected to the Syracuse Defendants through the Syracuse Bribery Scheme, (3) the Syracuse Defendants are connected to Kaloyeros through the Syracuse RFP Scheme, and (4) Kaloyeros is connected to the Buffalo Defendants through the Buffalo RFP Scheme.  By means of this chain, Mr. Kelly—who is only alleged to have participated in the Energy Company Bribery Scheme—is tethered to six defendants he is not alleged to have met, or even heard of, and three schemes he had no reason

ever to imagine.   As Judge Kaplan observed in <u>United States v. Kouzmine</u>, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996), a defendant should not be exposed to "the risks inherent in joinder of [multiple] alleged conspiracies simply because he had the misfortune of being charged with another defendant who was subject also to other accusations."

In an attempt to justify this extraordinary conglomeration of charges and defendants, the Government has described for the Court the structure of the original indictment as a Venn Diagram with two overlapping circles—one covering the Energy Company Bribery Scheme and the Syracuse Bribery Scheme and the other covering the Syracuse RFP Scheme and the Buffalo RFP Scheme—with the Syracuse Defendants and the Government's cooperating witness, Howe, in the middle.  (<u>See</u> Ex. J to Gitner Decl. at 19–20).  But the Government's Venn Diagram was fundamentally flawed, because the *original* Count Nine—which charged Mr. Kelly in a single conspiracy with the Syracuse Defendants—has been dropped, a silent admission by the Government that this count was baseless and duplicitous.  **Accordingly, now that Mr. Kelly is no longer charged in a count with the Syracuse Defendants, the single most compelling justification to join Mr. Kelly for trial with any defendant other than Percoco no longer exists.**[15]

Also at the April 6 status conference, in an effort to justify a patchwork set of charges that Dr. Frankenstein would surely admire, the Government cited the presence of its cooperator in all four schemes as an appropriate basis for joinder.  (<u>Id.</u> at 20).  However, the law makes abundantly clear that a single common participant does not come close to justifying joinder under Rule 8(b).  <u>Lech</u>, 161 F.R.D. at 256; <u>Kouzmine</u>, 921 F. Supp. At 1133.  This is

---

[15]     Count Six, the only other count that in any way links the Energy Company Bribery Scheme with the Syracuse Bribery Scheme—charges only Percoco, and does not implicate Mr. Kelly.  It is addressed below in Point I.E.

particularly true where the only common participant is not even charged in the case.  In fact, were this not the case, then the number of separate schemes the Government could "string together" in a single indictment would be limited only by the inventiveness and industriousness of its cooperating witness.  See Kotteakos, 328 U.S. at 773 (noting that the Government may not "string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all").

C.     **There is no "common plan or scheme" between the Energy Company Scheme and the other three schemes alleged in the S1 Indictment**

The S1 Indictment makes clear that the four schemes alleged shared no "common plan or scheme."  As charged, the "plan" at the heart of the Energy Company Bribery Scheme's was to obtain unspecified official acts from Percoco to benefit the Energy Company "as the opportunity arose."  (See, e.g., S1 Ind. ¶ 29).  In contrast, the "plan" underlying the other three alleged schemes was to obtain benefits for two separate and distinct companies, the Syracuse Developer and the Buffalo Developer, neither of which had any relation to or dependence upon the Energy Company.  (See, e.g., id. ¶¶ 22 (Syracuse RFP Scheme and Buffalo RFP Scheme) and 33 (Syracuse Bribery Scheme).)

There is no allegation that the Energy Company Bribery Scheme depended on or benefitted from any of the other three alleged schemes, or vice versa.  Nor does the Government claim that proof of the Energy Company Bribery Scheme will hinge on evidence of any other scheme, or vice versa.  Nor could there be such a claim, given that the Energy Company is in a completely different industry than the Syracuse Developer and the Buffalo Developer and that the schemes were allegedly carried out for distinct purposes, at separate times, by different actors, who operated independently, and who used varying methods to meet the specialized

22

interests of their respective businesses.  See, e.g., Greenfield, 2001 WL 1230538, at *3 (finding

that insurance fraud conspiracy involving false water damage claims by three defendants was

improperly joined under Rule 8(b) with conspiracy involving false burglary claims made by two

of the same defendants at another property because the two conspiracies lacked a common goal)

(citing cases).

In addition, as noted above, neither the Complaint nor the S1 Indictment makes any

allegation that Mr. Kelly knew of the other schemes or had any reason to know of them.  As

courts in this District have ruled, knowledge of other alleged conspiracies, while not required, "is

an indicator of whether or not there is a common scheme or purpose."  United States v. Ohle,

678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010) (severing fraud conspiracy count charging two

defendants from counts charging other frauds allegedly carried out by one of those two

defendants without the other's knowledge).[16]

Moreover, the allegation that Howe participated in all of the schemes (and that Percoco

participated in the Syracuse Bribery Scheme) does not, by itself, create a "common plan,"

because neither the perspective of Howe, nor the perspective of any other defendant, affects the

perspective of Mr. Kelly.  See, e.g., United States v. Rajaratnam, 763 F. Supp. 2d 299, 309

(S.D.N.Y. 2010) (noting that allegation that defendant participated in two insider trading

schemes did not affect the "perspective" of defendant moving for severance, who was only

alleged to have participated in one of the two schemes, because a "plan cannot be called

---

[16]     Rittweger and Attanasio are not to the contrary, because, in both cases, there was a clear
"common purpose" shared between the schemes.  See Rittweger, 524 F.3d at 177 (finding
joinder of two investment fraud schemes proper under Rule 8(b)—even though two defendants
were alleged to have participated in only one of the schemes—because of a substantial overlap of
facts and participants and a clear common purpose of inducing investment in the same fraudulent
enterprise); Attanasio, 870 F.2d at 815 (concluding that various schemes all shared "common
purpose" of concealing and laundering central co-defendant's income).

common" where "only one defendant is alleged to be aware of it") (internal quotation marks, alteration, and citation omitted); <u>cf.</u> <u>Feyrer</u>, 333 F.3d at 114 (affirming district court's denial of motion to sever trial of conspiracies to inflate the stock price at two separate companies, on the grounds that, *inter alia*, defendants in both schemes "were aware of each other's participation" after attending a conspiratorial meeting with their common broker).

For example, in <u>United States v. Lech</u>, the indictment alleged three schemes with various participants: (1) two defendants (Russo and Fulton) were charged in three counts, with conspiracy, bribery, and mail fraud, in connection with a construction project on the Eastern Parkway, (2) three defendants (Russo, Fulton, and Lech) were charged in two counts with conspiracy and bribery in a scheme to obtain a contract to remove asbestos from a high school, and (3) one defendant (Russo) was charged in two counts, with conspiracy and bribery to obtain a lease and renovation agreement for a commercial property in Manhattan. 161 F.R.D. at 255–56 (Sotomayor, J.). The Government conceded that Lech did not participate in, or have specific knowledge of, the schemes involving the Eastern Parkway or the Manhattan property, and that the three schemes could not be charged in one overall conspiracy count. <u>Id.</u> at 256. Instead, the Government contended that Lech was "aware" that the corrupt official with whom he and Fulton had dealt "was somehow involved in a separate criminal relationship with Fulton." <u>Id.</u> Then-Judge Sotomayor noted that "two separate transactions do not constitute a series within the meaning of Rule 8(b) merely because they are of a similar character or involve one or more common participants," and found that "Lech had very little, if any, knowledge of the other schemes, and did not participate in them." <u>Id.</u> at 256–57 (internal quotation marks and citation omitted). Not surprisingly, the court severed Lech's case, pursuant to Rule 8(b). <u>Id.</u> at 258.

Lech relied on the reasoning in three cases, all of which provide further support for severance here. See United States v. Menashe, 741 F.Supp. 1135, 1138 (S.D.N.Y. 1990) (severing count charging conspiracy to sell anti-aircraft missiles, charged against one defendant, from count charging conspiracy to sell military planes, charged against that defendant and two other defendants, because of Government's failure to allege the other two defendants were "aware of or joined in" the plan to sell missiles); United States v. Giraldo, 859 F.Supp. 52, 54 (E.D.N.Y. 1994) (severing trial of drug distribution scheme carried out by one defendant from second scheme carried out by him and his co-defendants, even though "sales were made to a single cooperating witness," because there was no suggestion that the co-defendants "knew of or were involved in any overall scheme") (internal quotation marks and citation omitted); United States v. Gentile, 60 F.R.D. 686, 687, 689 (E.D.N.Y. 1973) (where the Government charged three separate bribery schemes with a single common defendant and a common bribee; severing each scheme into its own trial because there was nothing in the indictment which indicated the defendants had "acted in concert or . . . participated in a common scheme or plan").

Similarly, in this case, there is no indication that Mr. Kelly was aware of, or even suspected, that Howe and Percoco were involved in any other scheme, nor is there a common thread between the Energy Company Bribery Scheme and the other alleged schemes from which it could be fairly inferred that Mr. Kelly was associated with this unrelated alleged criminal conduct. See Gentile, 60 F.R.D. at 689 ("A defendant should not be held responsible for the conduct of others unless there is a showing that by his own affirmative acts he has in some way associated himself with the others' acts."). Here, the most that is shared between the Energy Company Bribery Scheme and three other alleged schemes is that Mr. Kelly, the Syracuse Defendants, and the Buffalo Defendants endeavored separately to achieve business goals for

25

their respective companies by making improper payments.  But that is not enough to find a "common plan or scheme."  <u>See</u> <u>Rajaratnam</u>, 753 F.Supp.2d at 311–12 (concluding that two counts charging separate defendants with insider trading did not allege a "common plan or scheme" to justify joinder under Rule 8(b) merely because they articulated the same type of offense).

**D.  Proof of the Energy Company Bribery Scheme will differ substantially from the proof of the other three schemes alleged**

The Court need not be concerned that granting the requested severance would lead to substantial duplication of evidence at trial.  Put simply, the proof of the Energy Company Bribery Scheme will differ almost completely from the proof of the other schemes alleged in the S1 Indictment.

Based on the S1 Indictment and the Complaint, the Government's proof of the alleged Energy Company Bribery Scheme will presumably consist of, among many other topics:

- Governor Cuomo's energy policy;

- the various individuals in the Governor's office responsible for carrying out that policy;

- the means of energy supply in New York State and the various sources and providers of that energy;

- the complex network of State agencies (including but certainly not limited to NYPA and the PSC) that perform energy regulatory functions in New York State;

- the various individuals who occupy significant roles in those agencies;

- the operations and personnel of the Energy Company, including Mr. Kelly's role;

- the Energy Company's New Jersey power plant and its need for ERCs;

- the Energy Company's New York Power Plant and its need for financing;

- the Energy Company's interest in a PPA and the Energy RFP required to obtain such an agreement;

- the Energy Company's interest in the ECA and the negotiations required to obtain such an agreement;

- the circumstances surrounding the Energy Company's decision to hire Howe;

- Howe's introduction of Mr. Kelly to Percoco;

- Mr. Kelly's alleged "ingratiation" of Percoco;

- the origin and development of a proposal for the Energy Company to hire Percoco's wife to participate in the Energy Company's Education Program;

- the agreed to compensation and job responsibilities of this position;

- the actual performance of Percoco's wife in this position;

- efforts allegedly made by the Energy Company to conceal its employment of Percoco's wife;

- efforts allegedly made by Percoco to conceal the source of his wife's salary;

- Percoco's and Howe's realization in 2013 that the Energy Company would not be awarded the PPA;

- the steps Percoco and Howe took to keep that information from Mr. Kelly;

- Mr. Kelly's ultimate realization that the Energy Company would not be awarded the PPA;

- the conditions under which the Energy Company ceased paying Potomac Strategies; and

- the circumstances surrounding the exit of Percoco's wife from the Energy Company's Education Program.

Much of this (perhaps dry) material is extremely specialized and technical. It will require great focus for the jury to comprehend and absorb. And the Government will presumably call a long list of witnesses and offer in evidence mounds of emails, and other documents to try to support its allegations on these topics. But none of this material would be repeated at any trial involving the other schemes because it bears no relevance whatsoever to those schemes.

Also needless to say, trial of the Energy Company Bribery Scheme will entail cross-examination of the Government's witnesses—and conceivably the offer of documents and defense witnesses—on each of these topics. That cross-examination, plus any documents and witnesses Mr. Kelly might offer, will be equally irrelevant to the other schemes.

Conversely, evidence about the other schemes charged in the S1 Indictment will necessarily involve weeks of testimony about entirely separate matters, including, among countless other topics:

- the economic revitalization of upstate New York;

- union work and funding channels in the construction industry;

- the Syracuse Developer and the roles of the two Syracuse Defendants;

- the relationship of the Syracuse Developer to Howe;

- the agreement allegedly formed between the Syracuse Defendants and Percoco to make payments to Percoco in exchange for official acts to benefit the Syracuse Developer;

- the bribes allegedly paid by the Syracuse Defendants to Percoco;

- the motivations for and process of obtaining the three official acts (release of funds, no union contract, and raise for Aiello's son) allegedly undertaken by Percoco for the Syracuse Developer;

- the structures and functions of SUNY Poly, CNSE, and Fort Schuyler, as well as the role of Kaloyeros at those entities;

- the relationship of SUNY Poly and Kaloyeros to Howe;

- the agreement allegedly formed between the Syracuse Defendants and Howe to make payments to Howe in exchange for Howe and Kaloyeros rigging the Syracuse RFP;

- the bribes allegedly paid by the Syracuse Defendants to Howe and the campaign contributions given to Governor Cuomo;

- the motivations for and process of obtaining the "preferred developer" status under the Syracuse RFP;

- the Buffalo Developer and the roles of the three Buffalo Defendants;

- the agreement allegedly formed between the Buffalo Defendants and Howe to make payments to Howe in exchange for Howe and Kaloyeros rigging the Buffalo RFP;

- the bribes allegedly paid by the Buffalo Defendants to Howe and the campaign contributions given to Governor Cuomo; and

- the motivations for and process of obtaining the "preferred developer" status under the Buffalo RFP.

As with the evidence relevant to the Energy Company Bribery Scheme, much of this evidence, as well as the accompanying defense cases, will also be extremely specialized and technical and require great focus for the jury to comprehend and absorb. None of this material would need to be repeated at any trial involving the Energy Company Bribery Scheme because none of it bears the slightest relevance to the Energy Company Bribery Scheme.

There are some aspects of the other alleged schemes that might appear, at first blush, to overlap with the Energy Company Bribery Scheme, but upon closer examination, they involve completely different proof. First, Howe's entity, Potomac Strategies, received payments in three of the four alleged schemes. In connection with the Syracuse Bribery Scheme, Potomac Strategies allegedly functioned as a pass-through entity for checks that represented bribes to Percoco. In connection with the Syracuse RFP Scheme, Potomac Strategies allegedly functioned as an entity through which Howe himself accepted bribes. By contrast, in the Energy Company Bribery Scheme, the Energy Company allegedly made consulting payments to Howe via Potomac Strategies, which are not alleged to have been bribes or otherwise illegal. Therefore, Potomac Strategies played a very different and lawful role in the Energy Company Bribery Scheme, as compared to the other two schemes.

Second, there are RFP processes in three of the four alleged schemes. In the Energy Company Bribery Scheme, the Energy RFP sought energy generation proposals for review by a State energy regulator. The Syracuse RFP and Buffalo RFP, in contrast, were separate requests for bids to become "preferred developers" for projects in Syracuse and Buffalo, respectively, issued by the real-estate development arm of a State university. Therefore, the proof of the Energy RFP will be entirely distinct from the Syracuse RFP and the Buffalo RFP.

Furthermore, because the two bid-rigging schemes (the Syracuse RFP Scheme and the Buffalo RFP Scheme) are frauds of an entirely different nature than the two bribery schemes (the Energy Company Bribery Scheme and the Syracuse Bribery Scheme), the types of defenses asserted at trial are likely to differ. Undoubtedly, a key defense focus in the trial of both bribery schemes will be whether the Government's proof has sufficiently satisfied the requirements set forth by the Supreme Court in <u>McDonnell</u>, 136 S. Ct. 2355.[17] Defense of the two bid-rigging schemes, on the other hand, is likely to challenge whether, in fact, there was a deprivation of money or property, as required under the wire fraud statute, 18 U.S.C. § 1343, or of information necessary to make discretionary economic decisions, in line with the Second Circuit's "right to control" theory.[18]

The Government claimed at the April 6 status conference that there is "significant overlap" between the four alleged schemes, primarily because of the single common participant, Howe. (Ex. J to Gitner Decl. at 20:9-13). However, rather than assert that Howe played a similar role in each scheme—which, as made clear by the S1 Indictment and the Complaint, he obviously did not—the Government merely indicated that Howe would testify about multiple

---

[17]     In a separate motion filed concurrently with this one, Mr. Kelly seeks dismissal of both counts of the S1 Indictment on the ground that they fail to meet the requirements set forth by the Supreme Court in <u>McDonnell</u>.

[18]     Pretrial motions asserted by some of the other defendants address this issue.

schemes and that the discovery material relating to Howe would be of interest to all the defendants. (Id. at 20:9-22). In light of the text of Rule 8(b), the fundamental fairness principles underlying it, and the cases construing it, Howe's differing presence in each scheme—and the resulting volume of impeachment he will no doubt generate—cannot possibly justify a joint trial of these defendants and these charges. As noted supra at Point I.B, if the ubiquitous presence of a cooperator were dispositive of a Rule 8(b) motion, then there would be virtually no limit to the number of charges and defendants that could be tried together.

The law makes clear that in circumstances such as these, there is no substantial overlap of proof. See, e.g., Ohle, 678 F. Supp. 2d at 226 (noting that the use of the same fraudulent tax shelter in two separate conspiracies would "not force the Government to prove 'essentially the same facts' more than once" because the conspiracies used the tax shelter "in different capacities"). Yaron is particularly instructive. 2011 WL 3279054. In that case, the indictment charged defendants in two separate conspiracies to defraud the New York Presbyterian Hospital by steering contracts to companies that had made illegal payments to the same two hospital employees. Id. at *8. The defendants charged only in the first conspiracy (involving asbestos removal contracts) argued that they were improperly joined with the defendants and counts related to the second conspiracy (involving HVAC unit purchases), because the two schemes were "separate and distinct" from each other. Id. at *6. The district court agreed and ordered severance, noting, *inter alia*, that the "the two conspiracies operated very differently." Id. at *8; see also United States v. Berger, 22 F. Supp. 2d 145, 154–55 (S.D.N.Y. 1998) (finding that several schemes to defraud federal programs were properly joined under Rule 8(b) because, *inter alia*, "each of the schemes, regardless of which defendants participated, employed means and

methods that perfectly mirrored the means and methods used by other defendants in furtherance of the other schemes").

### E. Count Six, the only remaining count linking the Energy Company Bribery Scheme to the Syracuse Bribery Scheme, should be divided for trial

Count Six charges Percoco, alone, with conspiring to extort both the Energy Company and the Syracuse Developer. This count should be divided for trial pursuant to both Rules 8(b) and 14.

For all the many and varied reasons discussed above, the Energy Company Bribery Scheme should not be tried together with *any* other scheme described in the S1 Indictment. That includes the Syracuse Bribery Scheme, which—although it shares defendant Percoco with the Energy Company Bribery Scheme—is otherwise completely unrelated. Indeed, as set forth above in the Procedural History discussion, it is precisely because the Energy Company Bribery Scheme and the Syracuse Bribery Scheme are unrelated that the Government was ultimately forced to supersede the single conspiracy count that originally (and impermissibly) joined Mr. Kelly with the Syracuse Defendants.

As it now stands, the S1 Indictment charges a *separate* honest services fraud conspiracy count, bribe payment count, and bribe solicitation count in connection with *each* of these two distinct schemes. (See S1 Ind. Counts Nine, Eleven, and Thirteen (the Energy Company Bribery Scheme) and Counts Ten, Twelve, and Fourteen (the Syracuse Bribery Scheme)). In addition, the S1 Indictment charges, in connection with each of these two distinct schemes, a count charging that Percoco extorted the Energy Company *only* (Count Seven) and a count charging that Percoco extorted the Syracuse Developer *only* (Count Eight). The four Energy Company Bribery Scheme charges therefore can readily be tried separately from the four Syracuse Bribery Scheme charges, and should be tried separately.

There remains a single count—conspiracy to commit extortion (Count Six)—that charges *only* Percoco but straddles the Energy Company Bribery Scheme and the Syracuse Bribery Scheme.  (See the single red and green cell in the Chart attached as Ex. A to the Gitner Decl.).  Because Percoco alone is charged in this count, the Government has done in Count Six what it had to *undo* in the original, duplicitous Count Nine: charge a single conspiracy that collapses these two entirely distinct schemes into one count.

Unlike Mr. Kelly, who loudly and frequently raised his objection to his inclusion in a single conspiracy count covering both of these schemes, Percoco obviously has no incentive to seek a division of Count Six into two separate conspiracy counts.  As a result, despite the Government's implicit concession that the Energy Company Bribery Scheme and the Syracuse Bribery Scheme are entirely distinct, the Government will almost certainly attempt to rely on Count Six as a justification to import the *entire* Syracuse Bribery Scheme—and, with it, *all the rest* of the defendants and the charges contained in the S1 Indictment—into what should properly be a relatively short and straightforward trial of the Energy Company Bribery Scheme, alone.  In other words, it appears that the Government will seek to reconstitute the entire chain of charges and defendants based on this single most tenuous of links.

The Court should not permit it, as that would be an unconscionable result under Rules 8(b) and 14, and under the basic principles of fairness in these rules that protect Mr. Kelly.  Even putting aside the two bid-rigging schemes, if the Syracuse Bribery Scheme were joined for trial with the Energy Company Bribery Scheme, it would import into Mr. Kelly's trial evidence of an unrelated scheme in which he did not participate.  As discussed above, the proof would be vastly different, as the two alleged bribery schemes not only involved different defendants but also involved completely different industries, projects, purposes, processes, procedures, State

agencies, and "official acts."  Thus, Mr. Kelly would once again be facing a trial that is far longer and more complex than warranted by his alleged conduct, a trial replete with witnesses, facts, theories, evidence, objections, evidentiary rulings, defenses, limiting instructions, and jury charges that are all totally irrelevant to his alleged conduct—exactly the result that Rules 8(b) and 14 are meant to prevent.

Fortunately, there is a relatively straightforward and practical way for the Court to deal with Count Six—as permitted under Rule 14(a) of the Federal Rules of Criminal Procedure, which allows the Court to fashion any relief that justice requires to avoid prejudice to a defendant caused by joinder—that would neither violate the principles of Rule 8(b) nor prejudice the Government or Percoco:[19]

- The Court should order separate trials with respect to the Energy Company Bribery Scheme and the Syracuse Bribery Scheme.

- The Court should then require the Government to elect in which trial it wishes to prove the extortion conspiracy to the jury.  In that trial, the Government would be allowed to prove the half of the extortion conspiracy count related to the scheme being tried: either the extortion of the Energy Company or the extortion of the Syracuse Developer.  Regardless of the election, the proof presented by the Government would not be affected.

- For example, if the Government were to elect to try Count Six in the trial of the counts related to the Energy Company Bribery Scheme, it would try Percoco on that conspiracy together with the other Energy Company Bribery Scheme counts. Because Howe will be testifying at that trial to establish Percoco's guilt on the *substantive* Energy Company extortion count (the proof of which will be essentially coextensive with the proof on the extortion conspiracy), the Energy Company aspect of the extortion conspiracy would be tried in full, and Count Six would be presented to the jury based on the Energy Company extortion conspiracy evidence.

- Then, in the trial of the counts related to the Syracuse Bribery Scheme, Percoco would be tried on the *substantive* Syracuse Developer extortion count (the proof of

---

[19]    Of course, the Government could also resolve this issue on its own by splitting Count Six into two separate counts, one charging the alleged conspiracy to extort the Energy Company and one charging the alleged conspiracy to extort the Syracuse Developer.

which will be essentially coextensive with the proof on the extortion conspiracy). However, Count Six—which would have been passed upon by the jury in the trial of the counts related to the Energy Company Bribery Scheme—would not be presented again for consideration by the second jury.

Under this procedure, Percoco would not be tried twice on the same count, but between the two trials, all of the same evidence on Count Six would be introduced. If Percoco were convicted of the extortion conspiracy in the trial in which it is tried, then the Court, having presided over the other trial as well, could determine in connection with his sentencing whether the conspiracy had been sufficiently proven at the other trial for the Court to take that evidence into account at sentencing.

Requiring the Government to elect the theory on which to proceed is not without precedent. For example, in the context of duplicitous counts—which Count Six clearly would be, were additional defendants joined in it—courts have frequently protected against unfair prejudice by requiring the Government to elect the theory on which it wants to proceed and precluded the Government from pursuing the other theory at the same trial. See, e.g., United States v. Sturdivant, 244 F.3d 71, 79 (2d Cir. 2001) (Sotomayor, J.) ("[P]rior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes included within a duplicitous count.") (citing cases). Obviously then, the Court has the authority to limit the Government's proof in Mr. Kelly's trial in pursuit of fairness to him.

And here, the case for doing so is even stronger than in the duplicity context. First, each aspect of the extortion conspiracy is essentially coextensive with the corresponding substantive extortion count. As a result, the Government will not be prejudiced by electing to proceed with half of Count Six in a single, severed trial, because it will be able to present its case in full against Percoco. Moreover, Percoco would not be prejudiced, because even if he were to be

convicted of the two substantive extortion counts at the separate trials, the presence or absence of the additional conspiracy count would likely make little or no difference in his Sentencing Guidelines range.  See U.S.S.G. §§ 3D1.1 and 3D1.2, particularly Application Note 4, Example 1 (noting that if "[t]he defendant is convicted of one count of conspiracy to commit extortion and one count of extortion for the offense he conspired to commit," then "[t]he counts are to be grouped together").[20]  To the extent it did make any difference, the Court could take that into account.

Mr. Kelly respectfully submits that only by trying him in a case without Count Six (or with Count Six but without the Syracuse Developer aspects of it) can he be given the fair trial he deserves, unburdened by defendants, schemes, and counts with which he had no connection.[21]

\*       \*       \*

In sum, a "reasonable person" would not "easily recognize the common factual elements that permit joinder" of the Energy Company Bribery Scheme with the other three schemes alleged in S1 Indictment.  Feyrer, 333 F.3d at 114 (citation omitted).  There is neither a substantial overlap of facts or participants between the Energy Company Bribery Scheme and the

---

[20]     This does require that Percoco be tried twice.  However, it is more appropriate that Percoco, who allegedly participated in two different bribery schemes, have two trials than it is for Mr. Kelly, who allegedly participated in only one bribery scheme, to face a prolonged trial full of damaging spillover prejudice relating to alleged criminal acts entirely disconnected from his own.  See Gentile, 60 F.R.D. at 689.

[21]     The Court could also order that Count Six be tried separately from both (a) the Energy Company Bribery Scheme specific counts and (b) the Syracuse Bribery Scheme specific counts.  The district court selected a similar route in Gentile.  60 F.R.D. at 689.  In that case, two defendants, LaPonzina and Lucadana, were charged with two separate schemes to defraud the Internal Revenue Service by bribing one of its employees to influence their outstanding tax liabilities.  Id. at 687.  A co-defendant who assisted both LaPonzina and Lucadana in those frauds, Gentile, separately bribed the same Internal Revenue Service employee in connection with his own tax liability.  Id.  The district court severed the case into three trials: (1) a trial of LaPonzina and Gentile on the counts relating to the LaPonzina fraud, (2) a trial of Lucadana and Gentile on the counts relating to the Lucadana fraud, and (3) a trial of Gentile on the counts relating to the Gentile fraud.  Id.  at 689.

36

other three schemes, nor a key link, such as a common purpose.  <u>Rittweger</u>, 524 F.3d at 177.

Moreover, because the Energy Company Bribery Scheme will entail different proof than the

other schemes, this is not a case where severance would lead to "the evidence at one trial . . .

essentially duplicat[ing] the evidence at" another.  <u>Feyrer</u>, 333 F.3d at 114.  The Indictment's

joinder of the counts and defendants charged in Energy Company Bribery Scheme to those

charged in the other three alleged schemes is therefore improper under Rule 8(b) and should be

severed.

<b><u>POINT II</u></b>

<b>THE ENERGY COMPANY BRIBERY SCHEME COUNTS<br>(COUNTS SEVEN, NINE, ELEVEN, AND THIRTEEN)<br><u>SHOULD BE SEVERED UNDER RULE 14</u></b>

Even if joinder of the counts and defendants charged in these four alleged schemes could

somehow be viewed as proper under Rule 8(b), which it cannot, severance should nonetheless be

granted under Rule 14 because a joint trial would be unfairly prejudicial to Mr. Kelly and would

disserve the interests of judicial efficiency and economy.

**A.  <u>Legal Standard</u>**

Rule 14(a) of the Federal Rules of Criminal Procedure provides:

> If the joinder of offenses or defendants in an indictment . . . appears to prejudice a
> defendant or the government, the court may order separate trials of counts, sever
> the defendants' trials, or provide any other relief that justice requires.

Although there is a preference for trying jointly defendants who are indicted together, a

district court should grant severance for prejudice pursuant to Rule 14 when "there is a serious

risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent

the jury from making a reliable judgment about guilt or innocence," and when other measures do

not suffice to cure the prejudice.  <u>United States v. Feyrer</u>, 333 F.3d 110, 114 (2d Cir. 2003)

(quoting <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993)).

Courts in this Circuit have articulated several factors to consider when determining whether sufficient prejudice exists to justify severance under Rule 14, including:

> (i) the number of defendants and counts; (ii) the complexity of the indictment; (iii) the estimated length of trial; (iv) disparities in the amount or type of proof offered against the defendants; (v) disparities in the degrees of involvement by defendants in the overall scheme; (vi) possible conflict between defense theories or strategies; (vii) potential prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant; and (viii) potential prejudice if exculpatory evidence were unavailable in a joint trial, but would have been available to a defendant tried alone.

United States v. Guillen-Rivas, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013) (citing cases).  No one factor is dispositive, and the decision whether to grant severance rests with the discretion of the trial court.  Feyrer, 333 F.3d at 114.

### B.  A joint trial of the four alleged schemes would unfairly prejudice Mr. Kelly

#### 1.  The size, complexity, and length of a joint trial would unfairly prejudice Mr. Kelly

As an initial matter, the number of counts and defendants and the complexity of the S1 Indictment both strongly favor severance.  As discussed above, the S1 Indictment charges eight defendants in 15 counts relating to four alleged schemes.  These schemes take place in separate arenas of State government, and they involve at least two totally different industries with unique projects and procedures, all of which will require detailed explanation by the Government to give the jury footing to assess the charges.  Indeed, because there are four different schemes alleged, rather than one, consideration of prejudice caused by disparities in the relative involvement of the various defendants "in the overall scheme," Guillen-Rivas, 950 F. Supp. 2d at 457, reinforces how completely inappropriate it would be for Mr. Kelly to be tried with six of his co-defendants and their related counts, where he had no role in the other alleged schemes.

Additionally, as the monumental volume of discovery has made clear, the scope of this case, as charged, is massive. At this time, more than twenty attorneys have filed notices of appearance on behalf of the defendants. The Government has estimated that a joint trial of the four alleged schemes could take up to two months; factoring in the *eight* potential defense cases, it could take much longer.

Obviously, the stress of such a long trial, alone, is substantial. In addition, however, Mr. Kelly does not live in commuting distance of the courthouse and will have to live in a hotel during trial. A trial on the Energy Company Bribery Scheme allegations alone could easily be completed in less than two weeks. The extra six plus weeks of court necessitated by a joint trial will therefore place an additional emotional and financial burden on Mr. Kelly, who lost his job after this case was initiated.

### 2. Mr. Kelly is at risk of spillover prejudice and transference of guilt

Because of the S1 Indictment's concatenated joinder, Mr. Kelly is needlessly exposed to the obvious dangers of spillover prejudice and transference of guilt.

A defendant's rights are compromised when "evidence that the jury should not consider against [him] and that would not be admissible if [he] were tried alone is admitted against a codefendant." Zafiro, 506 U.S. at 539. As the Supreme Court recognized over seventy years ago, "[n]umbers are vitally important in trial, especially in criminal matters." Kotteakos v. United States, 328 U.S. 750, 772 (1946). The unfairly prejudicial effect of this joinder is manifest, because it multiplies the spillover against Mr. Kelly exponentially. Based on the charges against him, Mr. Kelly should be facing a short two-defendant trial on the Energy Company Bribery Scheme allegations, alone. Because of the S1 Indictment's strategic joinder, Mr. Kelly instead faces an eight-defendant, 15-count, two-month trial, covering the proof of three unrelated schemes which he is not alleged to have participated in, known of, or even

suspected, as well as potential 404(b) evidence against six defendants with no alleged connection to Mr. Kelly or his conduct. In such circumstances, it is likely that the jury could transfer guilt from evidence regarding these unrelated allegations to Mr. Kelly. A joint trial therefore threatens to take away Mr. Kelly's right to individual consideration by the jury. United States v. Bertolotti, 529 F.2d 149, 157 (2d Cir. 1975) (noting that "[t]he possibilities of spill-over effect . . . are patent when the number of conspiracies, the number of defendants and the volume of evidence are weighed against the ability of the jury to give each defendant the individual consideration our system requires.")

Moreover, the risk of spillover prejudice and transference of guilt is compounded significantly where, as here, a defendant's trial is joined with an unrelated conspiracy in which he is alleged to have played no part. See United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) (noting that "[t]he joinder of an unrelated conspiracy . . . is an aggravated variation of the scenario presented when minor players in a conspiracy trial are joined with co-conspirators who played more significant roles"). In United States v. Rittweger, the indictment charged two schemes that, although they had different participants and methods, shared key players and the common purpose of inducing investment into the same fraudulent enterprise. 524 F.3d 171, 177 (2d. Cir. 2008) (Sotomayor, J.). Two defendants, each of whom was only alleged to have participated in one of the two schemes, argued that the district court's failure to try the schemes separately pursuant to Rule 14 caused them undue prejudice. Id. at 176–77. While the Second Circuit found no abuse of discretion, it also voiced concern that no connection existed between the moving defendants and that "the connection between the two charged conspiracies was tenuous," overtly questioned the Government's decision to try the two conspiracies together, and emphasized that Rule 8(b) does not provide the Government "limitless discretion" to join

defendants, nor does it "absolve" the Government of its independent obligation to consider the unfairness that may result from joinder.  Id. at 180.

Here, in contrast, the unfairness to Mr. Kelly of joining the Energy Company Bribery Scheme with three unrelated schemes in trial is far more compelling, for the connection between these schemes is not just "tenuous," it is non-existent.  Unlike in Rittweger, where the two schemes, though separate, lured investors into the same fraudulent enterprise, the Energy Company Bribery Scheme is not alleged to have shared any common purpose with, or received any benefit from, the Syracuse Bribery Scheme, the Syracuse RFP Scheme, or the Buffalo RFP Scheme.  Rather, the joinder of these schemes is based only on the common participation of Howe (in four schemes) and Percoco (in two).  As discussed above, this flimsy affiliation is legally insufficient even for joinder under Rule 8(b); it certainly cannot be used under Rule 14 to justify a joint trial.

The resultant prejudice is extreme.  First, the jury's ability to focus upon, retain, and ultimately fairly assess central issues in Mr. Kelly's case—including whether Mr. Kelly entered in any agreement with Percoco to exchange payments for "official acts," within the meaning of McDonnell, and whether the compensation Percoco's wife earned was *bona fide* or a bribe[22]— will be severely weakened by weeks of testimony involving the alleged bribes and official acts at issue in the Syracuse Bribery Scheme, the Syracuse RFP Scheme and the Buffalo RFP Scheme. See, e.g., United States v. Cervone, 907 F.2d 332, 342 (2d Cir. 1990) (noting that severance may be warranted in cases where "spillover might influence a jury to attribute criminal intent to ambiguous conduct associating a particular defendant with a conspiracy").

---

[22]     See 18 U.S.C. § 666(c) (discussing safe harbor for bona fide compensation).

Second, as discussed above in Part I, there are aspects of the alleged schemes that appear to superficially overlap, despite critical differences, and the jury could improperly conflate these concepts, to Mr. Kelly's detriment.  For example, the jury might confuse the alleged bribes paid through and to Potomac Strategies in the Syracuse Bribery Scheme and the Syracuse RFP Scheme with the Energy Company's lawful payments to Howe.  Similarly, the jury might import undue meaning to the Energy Company's lawful, and ultimately unsuccessful, interaction with State agencies regarding the Energy RFP, because the Syracuse RFP and Buffalo RFP were allegedly successfully rigged.

Third, faced with four separate schemes allegedly orchestrated by the Government's cooperating witness, Howe, the jury could unfairly conclude that Howe succeeded in corrupting everything and everyone that he represented.  See United States v. Kouzmine, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996) (noting that a defendant should not be exposed to "the risks inherent in joinder of [multiple] alleged conspiracies simply because he had the misfortune of being charged with another defendant who was subject also to other accusations").  Similarly, the jury could unfairly associate Mr. Kelly with the conduct of his co-defendants (which may be introduced not only through proof of their alleged schemes, but also through 404(b) evidence), even though he enjoyed no such association with them and their alleged schemes were unrelated to his own.

In such circumstances, the risk of spillover prejudice and guilt by association could be insurmountable.  See, e.g., United States v. Rajaratnam, 753 F.Supp.2d 299, 316 (S.D.N.Y. 2010) (noting that trying certain insider trading charges together could lead to "weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve [one of the two

defendants] in any way, such that mounting proof of the guilt of one is likely to affect another")
(internal quotation marks and citation omitted).

### 3. The eight defendants may have conflicting defense theories, strategies, and evidentiary issues

The large number of defendants charged in the S1 Indictment raises the specter of conflicting defense theories, strategies, and evidentiary issues.

Indeed, as evidenced by correspondence to the Court, the problem of inconsistent strategies already presented itself when some defendants sought a quick decision with regard to a venue transfer motion, while other defendants sought a unified motion schedule. (See, e.g., Doc Nos. 101 and 102 (discussing the Buffalo Defendants' transfer motion)). Similarly, strategic differences and dueling evidentiary issues will almost certainly arise among the defense teams regarding cross-examination of Howe.

Additionally, any one of the other defendants could put on their own defense case, which would not only lengthen Mr. Kelly's trial for reasons unrelated to him, further confusing the jury, but also could raise issues that unfairly prejudice him. For example, it is possible that defendants charged in different schemes will attempt to minimize the allegations against themselves in comparison to the allegations against others. Moreover, because of the dramatically different mechanisms of the alleged frauds in the two bid-rigging schemes as compared to the two bribery schemes, the jury will be continuously inundated with complicated legal arguments, such as "right to control" or "official acts," that apply to one defendant but not another. (See Part I.D supra). This will further extend the length of the trial and the difficulty of the jury's task in evaluating Mr. Kelly's defense.

In addition, the jury will necessarily be deluged with limiting instructions which—in a two-month trial of 15 counts—will be impossible to absorb, remember, and apply.

### 4. A joint trial would unfairly burden Mr. Kelly's trial preparation

Joinder of these four unrelated schemes puts undue financial and time burdens on all of the defendants, including Mr. Kelly, at both the pretrial and trial stage. The Government produced millions of pages of discovery materials, covering all of the alleged schemes, while at the same time seeking and obtaining a trial date less than a year from the original indictment. As the Court is aware from our correspondence on this matter, merely processing and hosting this data is an expensive commitment. Actually reviewing the massive amount of material in the detail required to prepare for trial is impossible.

Furthermore, because Mr. Kelly is charged in the same indictment with three schemes unrelated to his own, we must review a huge volume of material with no bearing on Mr. Kelly's alleged conduct. This is essential because counsel must be sufficiently familiar with all the evidence to formulate objections and request limiting instructions when evidence might confuse the jury or otherwise cause serious prejudice to Mr. Kelly. This burden has already unfairly prejudiced Mr. Kelly to a significant degree, because it has forced the expenditure of time and resources reviewing evidence related to these three other complex schemes that should be deemed irrelevant and inadmissible as to him.[23] This problem will only worsen as trial approaches, because this irrelevant data acts both to bury the materials crucial to Mr. Kelly's defense and ratchet up the cost and time required for his trial preparation.[24]

---

[23]     Until the Government filed its S1 Indictment, Mr. Kelly's counsel was also forced to scour the discovery material for any evidence supporting Mr. Kelly's improper joinder with the Syracuse Defendants in a single conspiracy count, which—given the Government's recent decision to split up the count and charge the conspiracies separately—evidently does not exist.

[24]     The Government expressed "surprise" at the status conference that the defendants would not want to review the entire discovery, noting that they should be interested in all of Howe's conduct. (See Ex. J to the Gitner Decl. at 20:17–19.) But even a cursory review of the discovery index reveals large swaths of data unrelated to Howe.

### 5. Other remedies will not suffice to cure the unfair prejudice of spillover and juror confusion

Although measures such as limiting instructions will sometimes suffice to cure the unfair prejudice of joinder, <u>Zafiro</u>, 506 U.S. at 539, here, even a committed juror could not possibly avoid the prejudicial spillover from each of the four alleged schemes.

The Second Circuit has long recognized it as "obvious" that "as the number of counts is increased, the record becomes more complex and it is more difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind." <u>United States v. Branker</u>, 395 F.2d 881, 887–88 (2d Cir. 1968) (reversing the convictions of four taxpayer defendants, who were joined in trial with Internal Revenue Service employees charged in dozens of other counts, in which they played no part). And this kind of prejudice is "particularly injurious to defendants," like Mr. Kelly, "who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants." <u>Id.</u> at 888.

In <u>United States v. Catapano</u>, Magistrate Judge Gold concluded that a hub-and-spoke bribery conspiracy count was impermissibly duplicitous and should be dismissed, as against a defendant, Urban, who was alleged to have participated in only one of the two spokes. 05-CR-229 (SJ) (SMG), 2008 WL 2222013, at *15–16 (E.D.N.Y. May 22, 2008) (Report & Recommendation).[25] Magistrate Judge Gold also concluded that it would be too difficult for jurors fairly to assess Urban's portion of the alleged conduct along with the larger conspiracy charged against his co-defendants, who were alleged to have participated in both spokes, and

---

[25] Ultimately, the district court did not have to adopt Magistrate Judge Gold's well-reasoned Report & Recommendation, because the Government informed the court that it would try defendant Urban separately. <u>See</u> Minute Entry for June 26, 2008 Status Conference, <u>United States v. Urban</u>, 5-CR-229 (SJ) (SMG), Document No. 110 (filed June 26, 2008).

recommended severance of Urban's case.  <u>Id.</u> at *17.  Here, a joint trial would encompass not one but three additional schemes in which Mr. Kelly did not participate.  The risk of transference of guilt and jury confusion is therefore far more severe.  After weeks of being subjected to misconduct completely unrelated to Mr. Kelly, "'the mounting proof of the guilt of one is likely to affect another.'"  <u>Branker</u>, 395 F.2d at 888.  The jury would thus be unable to make "a reliable judgment about guilt or innocence."  <u>Zafiro</u>, 506 U.S. at 539; <u>see</u> <u>also</u> <u>Rajaratnam</u>, 753 F. Supp. 2d. at 316–17 (concluding that defendant could not be tried in the same case as conspiracy counts against her co-defendant covering dozens of incidents of alleged insider trading, not involving her in any way, because this would create a risk of transference of guilt).

Furthermore, as mentioned above, a joint trial would necessitate frequent, if not constant, limiting instructions, in an effort to make clear that evidence relevant to certain defendants is not admissible against the remainder.  While it may be true in some situations that a jury can reasonably be expected to keep track of such instructions and follow them, in circumstances like this, where the "prejudicial spillover" is "overwhelming," jurors cannot reasonably expected to follow even the most well-crafted of limiting instructions.  <u>United States v. McDermott</u>, 245 F.3d 133, 139–40 (2d Cir. 2001) (noting that the presumption that jurors follow limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity") (citation omitted).

**C.** **A joint trial of the four alleged schemes would fail to serve the interests of judicial efficiency and economy**

Courts in this Circuit recognize that "the coexistence of Rule 8 and Rule 14 assumes an 'inevitable tolerance of some *slight* prejudice to codefendants'" when that prejudice is "'outweighed by the judicial economies resulting from the avoidance of duplicative trials.'"  <u>Rajaratnam</u>, 753 F. Supp. 2d at 305 (quoting <u>Cardascia</u>, 951 F.2d at 482–83) (emphasis added).

In this case, however, the two counts with which Mr. Kelly is charged—conspiring to bribe and actually bribing Percoco in exchange for future official acts to benefit the Energy Company—are wholly disconnected to the other three alleged schemes. The Government tries to mask this distinction by emphasizing the common participants between the schemes, but the reality is that, in order to undertake a joint trial, the Government will have to present four separate cases in one. (See, supra, Section I.D (discussing the different proof for the Energy Company Bribery Scheme versus the other alleged schemes)). And given the crowded courtroom, voluminous evidence, and frequent limiting instructions that will be required to conduct such a joint trial, the whole could easily be longer and more cumbersome than the sum of its parts. See, e.g., Zafiro, 506 U.S. at 545 (Stevens, J., concurring) (noting that there will "almost certainly be multidefendant cases in which a series of separate trials would not only be more reliable, but also more efficient and manageable than some of the mammoth conspiracy cases which the Government often elects to prosecute"). Even if a joint trial were shorter (a risky assumption), that marginal benefit would be far outweighed by the prejudice to Mr. Kelly discussed above. See, e.g., United States v. Shkreli, 15-CR-637 (KAM), slip op. at 22 (E.D.N.Y. Apr. 19, 2017) ("[W]here judicial economy is butting up against a defendant's right to a fair trial, judicial economy must give way to fairness.") (citing Zafiro, 506 U.S. at 539).

*　　*　　*

In sum, the Government asks Mr. Kelly to sit through many weeks of prejudicial evidence unrelated to the Energy Company Bribery Scheme. Even if the patchwork charging structure of the S1 Indictment were sufficient to justify joinder under Rule 8(b)—which it is not—it is clear under Rule 14 that the resultant prejudice to Mr. Kelly outweighs any claims of judicial economy. Accordingly, Mr. Kelly's trial should be severed from that of the other

defendants, except for Percoco, and from all counts charging conduct unrelated to the Energy Company Bribery Scheme, including some or all of Count Six.

**POINT III**

**THE COURT SHOULD STRIKE, AS PREJUDICIAL SURPLUSAGE, PARAGRAPHS OF THE S1 INDICTMENT THAT IMPROPERLY INCORPORATE ALLEGATIONS UNRELATED TO MR. KELLY**

According to the S1 Indictment, the Energy Company Bribery Scheme operated independently of and separately from any other scheme; no count charges all defendants, and no defendant is charged with participating in all the alleged schemes. Nevertheless, each of the S1 Indictment's 15 counts contains a paragraph repeating and realleging conduct relevant to other counts, schemes, and defendants not charged in, or relevant to, that particular count. By way of example, Counts Nine and Thirteen charge Mr. Kelly with conspiracy to commit honest services fraud and bribery. But each of these two counts incorporates by reference paragraphs that appear earlier in the S1 Indictment and that have nothing to do with either charge. Moreover, the S1 Indictment contains "summary paragraphs" that, while rhetorically linking the allegations against Mr. Kelly with separate allegations against other defendants, are inadmissible against him because no such link actually exists.

This cunning charging tactic——which was apparently not the result of an oversight, as the Government specifically amended its "repeat and reallege" paragraphs when it superseded—has the unfair and prejudicial effect of tying Mr. Kelly to alleged criminal conduct with which he is not charged and in which he was not involved. As a result, to the extent Counts Nine and Thirteen incorporate allegations about the conduct of other defendants, those allegations prejudice Mr. Kelly by unfairly suggesting a link between Mr. Kelly and those defendants.

The reverse is also true. To the extent the remaining counts—which charge defendants other than Mr. Kelly with conduct not involving Mr. Kelly—baselessly incorporate allegations about Mr. Kelly, those other allegations also prejudice Mr. Kelly.

The Government easily could have incorporated, for each count, only those allegations relevant to the defendant(s) and conduct charged *in that count*. Instead, it opted for a scattershot approach, essentially incorporating by reference allegations against every defendant in every count. This approach can serve only to create a misimpression in the minds of the jurors that the defendants and the four alleged schemes were somehow all related. But as Points I and II show, an analysis of the S1 Indictment and the Complaint shatters that illusion: the allegations with respect to the Buffalo Defendants and the Syracuse Defendants have nothing to do with Mr. Kelly and the Energy Company, and vice versa.

Rule 7 does not allow for the indiscriminate approach taken in the S1 Indictment. Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts *constituting the offense charged*." (emphasis added)). Rule 7(d) also provides that a court may strike surplusage from an indictment. The Advisory Committee Notes to subdivision (d) state that the rule "introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment . . . which may, however, be prejudicial." An allegation must be struck as surplusage if it is "'not relevant to the crime charged and [is] inflammatory and prejudicial.'" United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (quoting United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990)). Pursuant to these standards, the prejudicial surplusage suggesting unfair and irrelevant connections between Mr. Kelly and the conduct of others must be struck.

## A. **The Baseless and Prejudicial Surplusage In Counts Nine and Thirteen Must Be Struck**

### 1. **Counts Nine and Thirteen reallege irrelevant paragraphs**

Mr. Kelly is charged in only two counts, Count Nine and Count Thirteen. In Count Nine, Mr. Kelly is charged with conspiring with Percoco and no other co-defendant. In Count Thirteen, Mr. Kelly is the sole defendant. The other defendants in the S1 Indictment are all charged with conduct in which Mr. Kelly did not participate. Yet both counts include paragraphs that incorporate by reference allegations against those other defendants that have *nothing* to do with Mr. Kelly or the charges against him, including allegations relating *solely* to Kaloyeros, the Buffalo Defendants, and the Syracuse Defendants. (S1 Ind. ¶¶ 54, 64).

Specifically, Counts Nine and Thirteen incorporate by reference, among others, paragraphs 1, 6–8, 11–15, 28, and 33–36. (Id. ¶¶ 54 (Count Nine) and 64 (Count Thirteen)).

Paragraph 1 purports to summarize *all* the charges against *all* the defendants. It introduces this case as involving "two wide-ranging and overlapping schemes." It then describes a massive and secret bid rigging scheme involving "the payment of hundreds of thousands of dollars as directed by" the Syracuse Defendants and the Buffalo Defendants to Howe, in connection with Howe's work for SUNY Poly and Kaloyeros. In an apparent remnant from the original indictment that charged Mr. Kelly with participating in the same conspiracy as the Syracuse Defendants, paragraph 1 next describes, in a single sentence, the alleged payment of bribes by the Syracuse Defendants to Percoco and the bribes Mr. Kelly allegedly paid to Percoco, even though the Syracuse Defendants are no longer charged in any count with Mr. Kelly.

Paragraphs 6 and 7 are entitled "CNSE, SUNY Poly, and Fort Schuyler." They concern those entities—none of which has anything to do with Mr. Kelly or the charges against him, but

which are relevant only to the alleged bid-rigging schemes in which Mr. Kelly played no part. Similarly, paragraph 8 identifies defendant Kaloyeros, who is charged with the same unrelated bid-rigging conduct. Mr. Kelly is not alleged to have participated with, known, met, or even been aware of Kaloyeros or these entities.

Paragraph 11 discusses the Government's cooperating witness, Howe, and his relationship with Kaloyeros and SUNY Poly. As indicated above, these allegations are irrelevant to Mr. Kelly.

Paragraph 12 further concerns Howe's conduct, stating that Howe was retained by the Syracuse Developer, the Buffalo Developer, and the Energy Company. But whether Howe had clients other than the Energy Company is irrelevant to the charges against Mr. Kelly, who had no alleged dealings with, or knowledge of, these other clients.

Paragraphs 13 through 15 are entitled "Steven Aiello, Joseph Gerardi, and the Syracuse Developer." Not surprisingly, they solely concern the Syracuse Defendants and their company, the Syracuse Developer. These allegations therefore bear absolutely no relevance to Mr. Kelly.

The heading above paragraph 28, rather than any allegation of fact, purports to introduce something called the "Percoco Bribery Scheme." This is an obvious remnant from the original indictment's Count Nine, which—unlike the S1 Indictment—actually charged such a scheme, in that it alleged that Mr. Kelly and the Syracuse Defendants conspired together to bribe Percoco. The S1 Indictment makes clear that no such conspiracy existed, as it charges Mr. Kelly with conspiring only with Percoco (in Count Nine). It separately charges the Syracuse Defendants with conspiring only with Percoco (in Count Ten).

Paragraphs 33 through 35 further describe allegations against the Syracuse Defendants alone, none of which involve Mr. Kelly or the Energy Company. Mr. Kelly is not alleged to have participated in, benefitted from, or known about their conduct.

Paragraph 36 alleges that Mr. Kelly exchanged interstate emails and telephone calls that support the Count Nine honest services fraud conspiracy charge. However, like Paragraph 28, this paragraph also discusses the Syracuse Defendants, even though the Syracuse Defendants are no longer charged in any counts with Mr. Kelly.

### 2. The surplusage in Counts Nine And Thirteen is irrelevant and prejudicial and must therefore be struck

Insofar as they relate to defendants and conduct not involved in the Energy Company Bribery Scheme, the allegations contained in the "incorporation paragraphs" of Counts Nine and Thirteen are plainly irrelevant to the charges against Mr. Kelly. (See, e.g., S1 Ind. ¶¶ 1, 11–15, 28, 33–36).

The identities, roles and conduct of Kaloyeros, the Buffalo Defendants, and the Syracuse Defendants are entirely irrelevant to the charges against Mr. Kelly. None of the charged conduct against any defendant outside the alleged Energy Company Bribery Scheme has any probative value with respect to Mr. Kelly. Nothing the others did with respect to any other alleged scheme makes it any more or less likely that Mr. Kelly committed the crimes charged against him. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Nor do the allegations against the other defendants provide relevant background to the charges against Mr. Kelly, or present any other basis upon which they could be admissible against him. Cf. Mulder, 273 F.3d at 100 (noting that allegations discussing "background

evidence that was properly admissible and relevant" should not be struck as surplusage); Scarpa, 913 F.2d at 1012; United States v. Kassir, S2 04-CR-356 (JFK), 2009 WL 995139, at *2 (S.D.N.Y. Apr. 9, 2009). As the S1 Indictment makes clear, those other schemes all began *after* Mr. Kelly allegedly agreed to bribe Percoco. Indeed, the S1 Indictment states that Mr. Kelly hired Percoco's wife in exchange for Percoco's promise of official action in *2012* (S1 Ind. ¶ 30), but that the Buffalo RFP Scheme and Syracuse RFP Scheme began in *2013* (Compl. ¶ 67), while the Syracuse Bribery Scheme began in *2014* (S1 Ind. ¶ 33).

The Government's calculated inclusion of these irrelevant allegations in Counts Nine and Thirteen is plainly prejudicial to Mr. Kelly. As discussed more fully in Point III.B below, Mr. Kelly will be unfairly harmed by the insinuation that the allegations of bid-rigging against Kaloyeros, the Syracuse Defendants, and the Buffalo Defendants are somehow linked to him. (See, e.g., id. ¶¶ 1, 12, 28, 36). Allowing the jury to hear about—or worse, to read about—this unrelated conduct in relation to a charge against Mr. Kelly will unmistakably convey that this conduct is relevant to his conduct, when in fact it is not. Indeed, the paragraphs that reallege the conduct of others in Counts Nine and Thirteen strongly (and wrongly) imply that there is just such a connection between the Energy RFP and the wholly unrelated Syracuse RFP and Buffalo RFP (as to which there are allegations of bid-rigging).

Similarly, Mr. Kelly will be harmed by the incorporation into the counts against him of allegations that Potomac Strategies, the company founded by Howe, functioned as a pass-through entity for checks that represented bribes to Percoco in connection with the Syracuse Bribery Scheme (id. ¶ 33–34). These allegations will unfairly taint the jury's perception of the Energy Company's payments to Potomac Strategies, which are not alleged to have been criminal.

For these reasons, the allegations in Counts Nine and Thirteen that concern (either in whole or in part) defendants other than Mr. Kelly and Percoco, and/or conduct having nothing to do with the Energy Company Bribery Scheme, must be struck as irrelevant and prejudicial.

## B. Prejudicial Surplusage In The Other Thirteen Counts, None of Which Charge Mr. Kelly, Must Also Be Struck

### 1. The surplusage in the remaining thirteen counts

The thirteen counts charging other defendants with conduct and schemes that have nothing to do with Mr. Kelly also unfairly and unlawfully incorporate allegations against him.

Counts One through Five allege bid rigging schemes involving Kaloyeros, the Syracuse Defendants, and the Buffalo Defendants. Yet, these counts repeat and reallege allegations regarding the Energy Company Bribery Scheme and Percoco. (Id. at ¶¶ 37, 40, 42, 44, 46 (realleging, among others, paragraphs 1, 3–5, and 12)).

Count Six charges Percoco with conspiracy to commit extortion of the Energy Company and the Syracuse Developer, but incorporates paragraphs concerning the Buffalo RFP Scheme and the Syracuse RFP Scheme, none of which have any relevance to that alleged conspiracy. (Id. ¶ 48 (realleging, among others, paragraphs 1, 6–8, and 11–12)).

Inexplicably, Count Seven charges Percoco with extorting Mr. Kelly *only*, but realleges paragraphs concerning the Syracuse Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme (id. ¶ 50 (realleging, among others, paragraphs 1, 6–8, 11–15, 28, and 33–36)), while Count Eight charges Percoco with extorting the Syracuse Defendants *only,* but realleges allegations concerning the Energy Company Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme, (id. ¶ 52 (realleging, among others, paragraphs 1, 12, 20–21, and 28–32)).

Count Ten charges Percoco and the Syracuse Defendants with conspiring to commit honest services fraud. It has nothing to do with Mr. Kelly or the Energy Company, yet it

realleges paragraphs that describe the Energy Company Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme. (Id. ¶ 57 (realleging, among others, paragraphs 1, 11–12, 20–21, and 28–32)).

Count Eleven charges Percoco with soliciting bribes from the Energy Company *only*, but it realleges paragraphs concerning the Syracuse Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme. (Id. ¶ 60 (realleging, among others, paragraphs 1, 6–8, 11–15, 28, and 33–36)).

Count Twelve, meanwhile, charges Percoco with soliciting bribes from the Syracuse Developer *only*, but it realleges paragraphs concerning the Energy Company Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme. (Id. ¶ 62 (realleging, among others, paragraphs 1 6–8, 11–12, 20–21, and 28–32)).

Count Fourteen charges the Syracuse Defendants with paying bribes to Percoco for the benefit of the Syracuse Developer, but it realleges paragraphs concerning the Energy Company Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme. (Id. ¶ 66 (realleging, among others, paragraphs 1, 11–12, 20–21, and 28–32)).

Count Fifteen charges the Syracuse Defendants with providing false statements to the Government during the course of a proffer in June 2016. The alleged false statements concerned the Syracuse Bribery Scheme and the Syracuse RFP Scheme *only*, yet, most amazingly and impermissibly of all, Count Fifteen repeats nearly *every* allegation against *every* defendant in the S1 Indictment, including those concerning the Energy Company Bribery Scheme and the Buffalo RFP Scheme. (Id. ¶ 68 (realleging, among others, paragraphs 1, 16–21, and 28–32)).

## 2. The surplusage in the remaining thirteen counts is prejudicial and must be struck

The allegations in the remaining thirteen counts that suggest a link between Mr. Kelly and alleged conduct having nothing to do with him, like the surplusage in Counts Nine and Thirteen, must be struck as irrelevant and prejudicial.

**Counts One Through Five, Eight, Ten, Twelve, Fourteen and Fifteen.** The Court should strike those paragraphs incorporated into Counts One, Two, Three, Four, Five, Eight, Ten, Twelve, Fourteen, and Fifteen (Id. ¶¶ 37, 40, 42, 44, 46, 52, 57, 62, 66, and 68), to the extent they incorporate allegations about Mr. Kelly and the Energy Company, because those counts have nothing to do with Mr. Kelly or the Energy Company Bribery Scheme. Mr. Kelly is not charged in those counts, and his alleged conduct is not relevant to those alleged crimes. The inclusion of the allegations against Mr. Kelly in those counts prejudices him because it suggests, incorrectly, that his alleged conduct forms the basis of, or is otherwise connected to, the crimes alleged against these other defendants.

Furthermore, the Court should strike these paragraphs to the extent they incorporate allegations about any defendants or schemes that have nothing to do with the specific crimes charged in those counts. For example, as mentioned above, Count Eight charges Percoco with extorting the Syracuse Developer *only*, while Count Twelve charges Percoco with soliciting a bribe from the Syracuse Developer *only*, yet each count incorporates allegations regarding the Energy Company Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme. These allegations impermissibly suggest a link between Percoco's conduct with respect to the Syracuse Bribery Scheme and the other alleged schemes, including the Energy Company Bribery Scheme. But the S1 Indictment makes clear what the original indictment did not: Percoco's conduct with respect to the alleged solicitation of bribes from the Syracuse Defendants was

separate and apart not only from the bid-rigging schemes, but also from his alleged solicitation of bribes from Mr. Kelly.  (See id. at Count Nine (charging that Mr. Kelly participated in a conspiracy with Percoco to commit honest services fraud, but not including the Syracuse Defendants in this charge)).  These incorporated references prejudice Mr. Kelly because, if he is tried in the same case as Percoco and these offending allegations are allowed to remain, a juror may mistakenly assume a link that nowhere exists between the Energy Company Bribery Scheme and the Syracuse Bribery Scheme.

**Count Six.**  As described above, Count Six charges Percoco with conspiracy to commit extortion of the Energy Company and the Syracuse Developer but incorporates paragraphs concerning the Buffalo RFP Scheme and the Syracuse RFP Scheme.  These paragraphs suggest links between the alleged Percoco extortion conspiracy and the two bid-rigging schemes, and, by extension, a link between Mr. Kelly and those schemes, when, in fact, there is none.  Neither Percoco nor Mr. Kelly is charged with any conduct remotely connected to the Buffalo RFP Scheme or the Syracuse RFP Scheme.  This prejudices Mr. Kelly because, if he is tried in the same case as Percoco and these offending allegations are allowed to remain, a juror would erroneously conclude that evidence of these other schemes is relevant to, and admissible against, Mr. Kelly.

**Counts Seven and Eleven.**  As indicated, Counts Seven and Eleven charge Percoco with extorting and soliciting a bribe from the Energy Company *only*.  Because each count incorporates allegations regarding the Syracuse Bribery Scheme, the Syracuse RFP Scheme, and the Buffalo RFP Scheme, they suggest a link between (a) the conduct alleged against Percoco in these counts with respect to the Energy Company, and (b) defendants other than Mr. Kelly.  But

these counts do not charge Percoco with any conduct remotely connected to the defendants other than Mr. Kelly or a link to their alleged schemes.

### C. The Summary Paragraphs That Rhetorically Link The Allegations Against Mr. Kelly With Allegations Against Others Must Be Struck

#### 1. Paragraph 1 must be struck

Paragraph 1 states that the S1 Indictment involves "two overlapping schemes" and describes as one "scheme" the alleged bid-rigging conduct and as another scheme the alleged bribery of Percoco. It never explains how any of these "schemes" overlap, other than to suggest that the common defendants provide a connection among them.

As an initial matter, despite paragraph 1's description of this case as involving "two" schemes—one an RFP bid-rigging scheme and the other a bribery scheme—the S1 Indictment makes clear that it describes four separate schemes. Paragraph 1's claim that there are only two schemes alleged in the S1 Indictment prejudices Mr. Kelly by suggesting that his alleged conduct—the bribery of Percoco—was part and parcel of a single scheme in which he and the Syracuse Defendants together sought to bribe Percoco. Because the Syracuse Defendants are no longer charged in any count with Mr. Kelly, evidence to prove the case against them is not admissible to prove the case against Mr. Kelly. Put simply, and as discussed above, Mr. Kelly is alleged to have bribed Percoco, and the Syracuse Defendants are separately alleged to have bribed Percoco. There is no connection between them. Any suggestion that the Syracuse Defendants' conduct was somehow linked to that of Mr. Kelly causes him prejudice. Reference to there being "two" schemes must therefore be struck.

The allegation that the "two" schemes are "overlapping" is likewise prejudicial and must be struck. Despite the paragraph's rhetoric, as discussed at length above in Points I and II, the allegations against Mr. Kelly do not "overlap" with any other "scheme," but rather, stand on their

58

own.  The Government's allegation that Mr. Kelly's conduct is "overlapping" with that of others unconnected to the Energy Company Bribery Scheme therefore unfairly and harshly prejudices Mr. Kelly.  It, too, must be struck.

**2.  The heading above Paragraph 28, as well as language in both paragraphs 28 and 36, suggesting that Mr. Kelly's conduct was part of the "Percoco Bribery Scheme," must be struck**

The heading above paragraph 28 purports to introduce something called the "Percoco Bribery Scheme," and paragraph 28 suggests that Mr. Kelly's conduct was part of a single scheme that included the participation of the Syracuse Defendants.  Similarly, paragraph 36 suggests that the wires at issue in the Syracuse Bribery Scheme conspiracy (Count Ten) are somehow relevant to the Energy Company Bribery Scheme conspiracy (Count Nine).  Because the S1 Indictment makes clear that no single conspiracy existed among Mr. Kelly and the Syracuse Defendants, this language should be struck as prejudicial surplusage for the same reasons the Court should strike paragraph 1's suggestion that Mr. Kelly's alleged bribery of Percoco was part of a single scheme with the Syracuse Defendants' alleged bribery of Percoco.

\*       \*       \*

The S1 Indictment charges Mr. Kelly in two discrete counts related to his alleged participation in the Energy Company Bribery Scheme, along with Percoco.  The Government's sly effort to link the cabined allegations against Mr. Kelly with the separate and independent allegations against his co-defendants appears to be part and parcel of its calculated yet unlawful and prejudicial attempt to join Mr. Kelly in a massive trial when, in fact, he should be tried alone with Percoco.

## CONCLUSION

The S1 Indictment artificially joins Mr. Kelly for trial with other counts charging six other defendants with participating in three additional schemes, all of which were separate from and unrelated to Mr. Kelly. This patchwork of charges and defendants is both improper and unfairly prejudicial to Mr. Kelly. For these reasons, and those set forth above, the Court should sever Mr. Kelly's trial from that of the other defendants, except for Percoco, and from all counts charging conduct unrelated to the Energy Company Bribery Scheme, including some or all of Count Six. The Court should also strike all those allegations in the S1 Indictment that improperly suggest Mr. Kelly's involvement with any alleged scheme other than the Energy Company Bribery Scheme.

Dated: May 19, 2017
　　　　New York, NY

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　LANKLER SIFFERT & WOHL LLP

　　　　　　　　　　　　By:　　/s/ Daniel M. Gitner
　　　　　　　　　　　　　　　Daniel M. Gitner
　　　　　　　　　　　　　　　Jun Xiang
　　　　　　　　　　　　　　　Samantha J. Reitz

　　　　　　　　　　　　　　　500 Fifth Avenue
　　　　　　　　　　　　　　　New York, NY 10110
　　　　　　　　　　　　　　　(212) 921-8399

　　　　　　　　　　　　　　　*Attorneys for Defendant*
　　　　　　　　　　　　　　　*Peter Galbraith Kelly, Jr.*