

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 27, 2017

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States* v. *Joseph Percoco, et al.*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

    The Government respectfully moves *in limine* to preclude the proffered expert testimony of two experts noticed by defendant Peter Galbraith Kelly, Jr., specifically Nicholas Allard and Dubravka Tosic, and one expert noticed by defendant Joseph Percoco, Michael Kunkel. For the reasons set forth below, the testimony of the respective experts is both irrelevant and unreliable, and should therefore be precluded under Federal Rule of Evidence 702. In the alternative, the Government requests a *Daubert* hearing to determine the relevance and reliability of the experts' opinions.[1]

    **A. Relevant Facts**

    *1. Kelly's Proposed Expert Testimony Regarding Lobbying*

    Kelly seeks to qualify an expert to provide background testimony about lobbying. Nicholas Allard, a law professor, would testify that, although the public is often "suspicious" of lobbyists and views them as "engaged in unseemly conduct," lobbying activity in fact "plays a vital role in promoting effective representative government." (Ex. A ("Kelly Expert Ltr. 1") at 2 (excluding the résumés of the experts).) Allard would further testify that the "most basic function" of a lobbyist is to provide information to government officials, but that the "primary function" of some lobbyists is to "provide access to government officials." (*Id.*) In addition, Allard would purportedly explain that people "expect" the lobbyists they hire "to know and follow rules and regulations governing lobbying and to inform the clients of such rules," and "to inform them of potential or actual conflicts of interest." (*Id.*)

---

[1] The Government notified defense counsel in advance of filing this motion. The Government believes that the relevant parties will likely have a proposed motion schedule by the time of the final pretrial conference tomorrow.

Kelly proposes this expert testimony notwithstanding the fact that Howe did not register as a lobbyist in New York State during his time as a consultant to the Energy Company for which Kelly worked. Publicly available documents filed with the State's Joint Commission on Public Ethics ("JCOPE") by the Energy Company and Howe's law firm (the "Law Firm") show that Howe was not listed as a lobbyist even though other lawyers at the Law Firm who worked with the Energy Company were registered as such. Furthermore, Kelly's expert notice fails to specify whether Allard is knowledgeable about the particular State lobbying rules contained in the Lobbying Act, Public Integrity Reform Act, and other applicable State statutes and regulations. In response to the Government's request that Kelly produce the underlying data reviewed and relied on by Allard, Kelly indicated only that Allard's "proposed testimony is based on his education and experience in government relations and lobbying." (Ex. B ("Kelly Expert Ltr. 2") at 1.)

### 2. *Kelly's Proposed Expert Testimony Regarding Percoco's Wife's Job at the Energy Company*

Kelly is charged with bribing Percoco by creating a "low show" job for Percoco's wife at the Energy Company. The Government expects that the evidence at trial will demonstrate that in or about late 2012, Percoco, who was struggling financially, asked Kelly to find a teaching job for his out-of-work wife. In response, Kelly initiated a program to provide short lectures about energy and power generation to fourth graders at certain schools near Woodbridge, New Jersey that were close to the site of an Energy Company power plant. The Energy Company paid Percoco's wife, a former schoolteacher, a monthly consulting fee of approximately $7,500, or $90,000 per year. The Government expects to prove that this amount, dictated by Percoco, was almost precisely the amount of money the Percocos needed to meet their monthly expenses. That this consulting arrangement between Kelly and Percoco was in fact a bribe will be proven in multiple ways, including that (i) it was agreed at the same time that Percoco would provide official assistance on matters pending before New York State, as reflected in, among other things, contemporaneous email communications; (ii) the payments to Percoco's wife were accomplished via secret means, from the Energy Company to a third party consultant, and then from that consultant to Percoco's wife; and (iii) Percoco's wife's name was purposefully withheld from certain literature relating to the program.

The Government expects the evidence will also show that Percoco's wife performed limited work in exchange for the masked $90,000 annual payments to Percoco. For example, Percoco's wife worked part-time; taught little more than a handful of lessons to fourth graders per year; had limited additional responsibilities beyond helping develop curriculum for these sessions; and was paid more than double the amount that was paid both to her primary colleague in the program (who worked considerably more hours) and to others who performed similar work for the program after Percoco's wife was terminated around the end of 2015.

Regardless of what the evidence shows with respect to the work performed by Percoco's wife for the education program, the Government will have established the requisite quid pro quo if it proves, beyond a reasonable doubt, that a job was given to Percoco's wife in exchange for the promise of official action. Consistent with the Government's expectation that it will do so, the evidence will show that the termination of Percoco's wife around the end of 2015 occurred at the point at which Kelly decided that Percoco, who had left State service, could no longer take official action to benefit the Energy Company.

December 27, 2017
Page 3

Nonetheless, Kelly proposes to qualify labor economist Dr. Dubravka Tosic as an expert to testify that the fees paid to Percoco's wife were "within reasonable parameters" compared to "the level of earnings for individuals with similar responsibilities and experience, in the New York metropolitan area, during the relevant time period." (Kelly Expert Ltr. 1 at 3.) As described further below, Tosic's calculations are based on data related to jobs that bear no resemblance to the part-time consulting position held by Percoco's wife. *First*, Tosic collected from the United States Bureau of Labor Statistics ("BLS") the average salaries and values of fringe benefits for three categories of public relations positions and four types of teaching jobs from the "New York-Jersey City-White Plains, NY-NJ Metropolitan" area. *Second*, Tosic collected from the Economic Research Institute ("ERI") the average salaries and values of fringe benefits for three categories of public relations positions and two types of teaching jobs from within a "50 mile radius around Woodbridge, NJ." Much of Tosic's analysis of this data showed that the average total compensation for the public relations and teaching positions exceeded six figures.[2]

### 3. *Percoco's Proposed Expert Testimony Regarding "Blank" Emails*

Percoco claims that certain emails extracted from certain seized electronic devices contain to/from headers and subject lines, but are otherwise blank. He proposes to call an expert to testify that the blank bodies of those emails "likely contained content at the time they were sent or received." (Ex. C ("Percoco Expert Ltr.") at 2.) In addition, he anticipates that the expert, Michael Kunkel of Setec Investigations, would testify about the operation of web-based email accounts and email applications installed on electronic devices. (*Id.* at 1-2.)

On November 28, 2017, the Government requested that Percoco identify the emails and devices to which Kunkel's proposed testimony would apply so that the Government could assess the reliability of any such testimony and decide whether to notice a rebuttal expert witness. On December 11, 2017, Percoco stated that no reports existed at that point and that he had not identified the universe of emails with blank bodies. On December 14, 2017, Percoco provided five "examples" of such emails, but did not identify the device from which those emails were extracted. Based on the to/from and subject lines of the emails, the Government strongly believes that the emails have no relevance whatsoever to any of the issues or charges in the January trial.[3] To date, Percoco has produced no additional information about his expert.

---

[2] Kelly also produced articles, Internet reports, and other information that Tosic relied on in reaching her conclusions. Certain articles discussed the differences between employees of a company and independent contractors, including the lack of job security as well as fringe benefits such as health insurance and retirement savings for contractors. Other articles described the responsibilities and duties of school teachers, who are free to pursue other opportunities during the summers and have the benefit of a tenure system. Finally, Kelly produced certain handwritten notes of Tosic that reflected, among other things, her understanding of the work performed and time spent by Percoco's wife on her job.

[3] None of the five emails were either sent to or received from any of the four defendants in the January trial. Three of the five emails were exchanges between Howe and employees of the State University of New York Polytechnic Institute ("SUNY Poly"), and one of those emails bears

B.  **Legal Standard**

Expert testimony is admissible pursuant to Federal Rule of Evidence 702 if it is "both relevant and reliable." *Tiffany (NJ) Inc.* v. *eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (quotation marks omitted).  The Court is the "gatekeeper" of such evidence.  *See United States* v. *Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364, at *1 (S.D.N.Y. Nov. 14, 2014).  In that role, the Court "must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact."  *Tiffany*, 576 F. Supp. 2d at 458 (citing *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).  Furthermore, even if all these requirements are met, the Court may nonetheless exclude the expert testimony under Federal Rule of Evidence 403 if its prejudicial effect substantially outweighs its relevance.  *United States* v. *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001).

Expert testimony is relevant when it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Although "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely*, 414 F.3d at 395-96, such testimony "should be limited to situations in which the subject matter is beyond the ken of the average juror," *United States* v. *Lombardozzi*, No. 02 Cr. 273 (PKL), 2003 WL 1907965, at *2 (S.D.N.Y. Apr. 17, 2003).  Accordingly, expert testimony is not proper with respect to "matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews* v. *Metro–North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

Furthermore, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony" and thus are not relevant testimony.  *In re Rezulin Prods. Liab. Litig.* ("*Rezulin*"), 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also Linde* v. *Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) (precluding testimony of "[e]xpert opinions regarding the motivations of suicide bombers and the charitable intentions of the Saudi Committee In Support of the Intifada Al Quds").  Indeed, "the question of intent is a classic jury question and not one for the experts."  *Rezulin*, 309 F. Supp. 2d at 547 (quotation marks and alteration omitted).  Speculative expert testimony about intent "cannot be saved by couching [the expert's] opinion as 'industry custom and practice.'"  *Highland Capital Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008).

The reliability inquiry is flexible and "must be tied to the facts of a particular case."  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 150 (1999).  The Second Circuit has emphasized that "it is

---

the subject line "Re: SUNY Nikon rls – pls review."  While one of the official actions taken by Percoco was to pressure the State Division of Budget to release funds to the film hub project awarded by a SUNY Poly affiliate, email interactions between Howe and employees of SUNY Poly are most likely to be relevant, if at all, to the charges in the June trial.  Moreover, none of the June charges relate to a SUNY Poly project with Nikon.  Of the two remaining emails, one bears the subject line "Fwd: Glenmont Heating and Air Conditioning [SS-LEGAL.FID900612]" and the other bears the subject line "Re: Lockheed Update."  Neither Glenmont nor Lockheed has any relevance to the charges in the January trial.

December 27, 2017
Page 5

critical that an expert's analysis be reliable at every step." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.*; *see also id.* at 265 ("[T]he district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" (quoting Fed. R. Evid. 702)). Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267 (quotation marks omitted).

At the motion *in limine* stage, the Court should make a preliminary determination under Federal Rule of Evidence 104(a) as to the admissibility of the defendants' proffered expert testimony. *United States* v. *Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1469487, at *1 (S.D.N.Y. June 30, 2004). The defendants have "'the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.'" *Id.* (quoting Fed. R. Evid. 702 advisory comm. note). The Court may, in its broad discretion, order a factual hearing pursuant to Rule 104 to determine whether expert testimony is reliable under *Daubert* v. *Merrell Dow Pharma.*, 509 U.S. 579 (1993). However, "[t]he law requires only that the parties have an opportunity to be heard before the district court makes its decision, and an evidentiary hearing is unnecessary when the evidentiary record pertinent to the expert opinions is already well-developed." *Atl. Specialty Ins.* v. *AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 285 (S.D.N.Y. 2013) (internal citations and quotation marks omitted).

### C. Discussion

The Government moves *in limine* to preclude the three defense experts from testifying. Their proffered opinions are neither relevant nor reliable. We discuss each in turn.

#### 1. *Allard's Testimony Is Not Relevant Background and Improperly Discusses Intent*

Kelly proposes that Allard would provide background information about lobbying. This proffered testimony is not relevant, and thus should be precluded. As an initial matter, lobbying is a subject matter "which a jury is capable of understanding and deciding without the expert's help." *Andrews*, 882 F.2d at 708. The average juror will either know what lobbying is or will easily grasp, through lay witnesses, the basic tenet that lobbyists represent clients and seek to promote their clients' interests to public officials. Further, a detailed background on lobbying is unnecessary and irrelevant to this case because Todd Howe was not registered as a New York State lobbyist when Percoco took the charged official actions in exchange for bribes from Kelly and the Syracuse Defendants, respectively. Indeed, Howe did not register even though other lawyers from the Law Firm, who worked with Howe on behalf of the Energy Company, did file annual

registrations with the State. Consequently, testimony about the rules applicable to lobbyists will not be helpful to the jury because Howe did not purport to follow those rules.[4]

Kelly also proffers that Allard would testify that people who hire lobbyists generally "expect" their lobbyists to "know and follow" the relevant rules. Put another way, Allard would testify as to the collective intent or state of mind of an undefined group of people who employ lobbyists. Such testimony from an expert is improper because "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Rezulin*, 309 F. Supp. 2d at 547. Furthermore, speculative expert testimony about intent "cannot be saved by couching [the expert's] opinion as 'industry custom and practice.'" *Highland Capital Mgmt., L.P.*, 551 F. Supp. 2d at 183. The same is true of any proposed testimony that lobbyists are generally expected to act within legal limits. *Cf. Rezulin*, 309 F. Supp. 2d at 543 ("At their core, however, the witnesses' opinions regarding ethical standards for reporting or analyzing clinical trial data or conducting clinical trials articulate nothing save for the principle that research sponsors should be honest. Even if charitably viewed as a 'standard,' the testimony nevertheless is so vague as to be unhelpful to a fact-finder." (quotation marks omitted)); *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 529, *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001) (excluding as overly vague proposed industry standard testimony that "broker dealers are expected to act with the highest integrity").

Furthermore, even if Allard's testimony did not substantially consist of improper opinion regarding intent, it would still be improper for lack of reliability. Allard is prepared to opine both that the public is often "suspicious" of lobbyists and views them as "engaged in unseemly conduct," and that people "expect" the lobbyists they hired "to know and follow rules and regulations governing lobbying and to inform the clients of such rules," and "to inform them of potential or actual conflicts of interest." (Kelly Expert Ltr. 1 at 2.) Kelly has offered no study, methodology, data, or anything that could plausibly provide a reliable basis for these opinions. To the contrary, Kelly offers that Allard is qualified to set forth for the jury what the public thinks of lobbyists and what those who hire lobbyists expect "based on [Allard's] education and experience in government relations and lobbying." (Kelly Expert Ltr. 2 at 1.) Allard's opinions are not "grounded on sufficient facts or data," are not "the product of reliable principles and methods," and do not reflect the application of "the principles and methods reliably to the facts of the case," and therefore Allard's testimony lacks reliability. *Amorgianos*, 303 F.3d at 265.

---

[4] Even assuming for the sake of argument that information about New York State lobbying rules is relevant, Kelly has failed to demonstrate that Allard's testimony is reliable. Kelly has proffered that Allard would testify "based on his education and experience in government relations and lobbying." (Kelly Expert Ltr. 2 at 1.) But Kelly has not proffered that Allard has any knowledge about New York State's specific lobbying rules, including those set forth in the Lobbying Act, Public Integrity Reform Act, Public Officers Law, JCOPE regulations, and other applicable State statutes and regulations. *See, e.g.*, JCOPE, Law & Regulations, http://www.jcope.ny.gov/about/laws_regulations.html. Because the charged official actions occurred in New York State, and the bribed public official was a State officer, the relevant rules would be those of the State. To be reliable, expert testimony must, among other things, be "grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265. There is no indication that Allard's testimony is based on relevant data regarding New York State lobbying.

### 2. *Tosic's Testimony Is Not Relevant or Reliable*

The Government has charged that Percoco's wife's consulting position with the Energy Company was a "low show" job given in exchange for the promise of official action by Percoco. To counter that allegation, Kelly seeks to have Tosic testify as an expert that the fees paid to Percoco's wife were commensurate to the compensation paid to others in similar positions in the New York City area. The Court should preclude Tosic's testimony because it is irrelevant, not beyond the ken of the ordinary juror, and unreliable.

As an initial matter, and as detailed above, the Government has alleged that the job for Percoco's wife was the quid in a quid pro quo arrangement between Percoco and Kelly, providing Percoco with a $7,500 monthly fee that his family needed to live on. Although the fact that Percoco's wife performed limited work is relevant and consistent with the notion that the job in fact furthered a bribery scheme, the question of whether Percoco's wife's job was worth $7,500 a month is irrelevant. Indeed, even if it were, the salary would still constitute a bribe payment if agreed to in exchange for official action. *See, e.g.*, *United States* v. *Bryant*, 655 F.3d 232, 243 (3d Cir. 2011) ("[T]he evidence allowed a jury to conclude that [the bribed state official's university] salary and benefits—nominally for his public relations work—were in fact provided in exchange for his abuse of office."); *United States* v. *Urciuoli*, 613 F.3d 11, 14–15 (1st Cir. 2010) ("That [the bribed state official] performed some marketing services did not prevent the jury from regarding the payments as primarily intended by [the bribor] to secure [the bribed official's] legislative help."); *United States* v. *Bryant*, 556 F. Supp. 2d 378, 427 (D.N.J. 2008) ("Since the payments at issue were allegedly compensation for [the bribed state official's] undisclosed, 'primary role' as a legislator on the take, rather than simply for work pursuant to [the bribed official's] publicly disclosed job description [for a university position], it cannot be argued with a straight face that the payments were 'bona fide' salary paid in the 'usual course of business,' for purposes of this motion to dismiss."). The nuances of other people's teaching or public relations salaries will thus not "assist the trier of fact" in determining whether the salary payments here in reality facilitated a bribery scheme. Fed. R. Evid. 702.

Tosic's testimony is irrelevant for the additional reason that the jury does not need the help of an expert to determine whether the job was "low show." That concept has a common sense meaning that does not require the application of any specialized knowledge to understand. Furthermore, as set forth above, the Government expects to call fact witnesses who will describe the amount of work performed by Percoco's wife, as well as the work and salaries of her colleagues and her replacements in the same program. From these facts, the jury will be able to reach its own conclusions about the nature and character of the job. Because expert testimony "should be limited to situations in which the subject matter is beyond the ken of the average juror," Tosic's testimony should be precluded as irrelevant. *See Lombardozzi*, 2003 WL 1907965, at *2.

What is more, Tosic's conclusions are based on compensation data for positions that bear no resemblance to Percoco's wife's job at the Energy Company. The Government expects that the jury will learn that the Energy Company's education program was unique in its goals and activities. Percoco's wife was not an elementary or secondary school teacher, nor was she a public relations consultant—she worked from home assisting a number of individuals with the collection and

development of curriculum and other materials related to the work of an energy company, and delivered a small number of guest lectures on energy topics to fourth graders in the Woodbridge, New Jersey area. The work performed by Percoco's wife was specific to this particular program of the Energy Company, a program created in significant measure to provide her with a job.

Even if Tosic's testimony were relevant, and even if it could theoretically assist the jury in understanding matters beyond their ken, the testimony is unreliable because it is based on data that has little application here. For example, even though the clear focus of Percoco's wife's job was lecturing young children about the merits of an energy company's program, Tosic included several categories of high-paying public relations jobs and management positions in her analysis. Tosic also pulled data from a wide geography beyond Woodbridge that includes the high-paying New York City area—in particular, the ERI data covered a 50-mile radius from Woodbridge, which includes New York City, and the BLS data expressly covered the New York-New Jersey metropolitan area. This sweeping geographic scope inflates the compensation values for both the public relations jobs as well as the teaching positions. In fact, publicly available data shows that the highest teaching salaries in New York State are found in school districts located in Westchester County and certain counties on Long Island. *See* Steve Billmyer, "NYS teacher salaries by district, county, region," Syracuse.com, http://www.syracuse.com/news/index.ssf/2015/02/nys_teacher_salaries_by_district_county_region_look_up_compare_any_district.html (last updated Feb. 8, 2016).

By adding compensation totals for public relations jobs, and likely including teaching positions from counties around New York City, Tosic's compensation averages are misleadingly skewed upward. The BLS data, for example, includes compensation figures for "Public Relations and Fundraising Managers," who, according to BLS, typically "[w]rite press releases . . . for the media," "[h]elp clients communicate effectively with the public," "[d]evelop their . . . client's corporate image and identity," and "[a]ssign, supervise, and review the activities of staff," among other things.[5] That position, which had an estimated mean total compensation of more than $220,000 in 2016, is not a proper comparison point for Percoco's wife's job. Although one of the purported goals of the education program was to improve the image of the Energy Company and its power plant with young children, who, it was hoped, would then influence their parents, Percoco's wife's responsibilities were limited to preparing lectures and related materials for the children and therefore do not resemble those of a highly-paid public relations manager in New York City. In addition, Percoco's wife did not liaise with the media or develop outreach with community leaders.[6] What is more, Tosic added the higher total compensation for secondary

---

[5] *See* https://www.bls.gov/ooh/management/public-relations-managers.htm#tab-2. The other positions in Tosic's BLS data were (1) "Public Relations Specialists," (2) "Social and Community Service Managers," (3) "Instructional Coordinators," (4) "Elementary School Teachers, Except Special Education," (5) "Middle School Teachers, Except Special and Career/Technical Education," and (6) "Secondary School Teachers, Except Special and Career/Technical Education."

[6] Similarly, Percoco's wife's role did not include the usual work of "Social and Community Service Managers," who had earned mean total compensation of approximately $120,000 in 2016 for "[w]ork with community members and other stakeholders to identify necessary programs and

school teachers, in spite of the fact that Percoco's wife only delivered lectures to elementary school students. These same problems also apply to the ERI data collected by Tosic.[7]

Expert testimony is not reliable when the expert's analysis "utilizes 'cherry-picked' data to distort results or produce misleading results." *In re Lyondell Chem. Co.*, 567 B.R. 55, 113 (Bankr. S.D.N.Y. 2017); *see also Barber* v. *United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (district court precluded expert who "did not adequately explain why he ignored certain facts and data, while accepting others"). Here, Tosic's analysis is based on data from positions that bear little resemblance to Percoco's wife's job and hail from higher paying geographic areas. The inclusion of that data leads to the misleading conclusion that Percoco's wife's compensation "was within reasonable parameters" of the compensation paid to similarly situated professionals. (Kelly Expert Ltr. 1 at 3.); *cf. Cooper* v. *Southern Co.*, 260 F. Supp. 2d 1258, 1270 (N.D. Ga. 2003) (finding problems with plaintiff's statistical analysis in a race discrimination case because the "statistics generally fail to compare similarly situated individuals, significantly diminishing the probative value of any disparity. For example, Plaintiff's statistics do not account for differences in the type or level of the employees' applied skills, both of which are highly related to hiring decisions."); *Donaldson* v. *Microsoft Corp.*, 205 F.R.D. 558, 566-67 (W.D. Wash. 2001) (doubting plaintiffs' expert in part because he "compared the salary data on jobs which bore similar titles, but which required greatly varying skills"). Because most of Tosic's comparison points appear to be unrelated to Percoco's wife's job, her expert testimony would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *cf. Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (affirming decision of district court to preclude plaintiffs' expert testimony in a civil securities fraud case where the expert "cherry-picked unusually volatile days and made them the focus of the [event] study" even though those volatile days "were often unrelated to the shareholders' allegations" (quotation marks omitted)).

As a result, Tosic's testimony should be precluded as irrelevant and unreliable.

---

services," "[o]versee administrative aspects of programs to meet the objectives of the stakeholders," "[a]nalyze data to determine the effectiveness of programs," and "[w]rite proposals for social services funding," among other things. *See* https://www.bls.gov/ooh/management /social-and-community-service-managers. htm#tab-2.

[7] With respect to the ERI data, Tosic included the job categories "Curriculum and Instructional Director," "Community Development Manager," "Public Relations Representative," "Elementary School Teacher," and "Secondary School Teacher," which are not appropriate comparison points for the reasons stated above. Tosic performed a few calculations using compensation numbers for public relations jobs with one year of experience and teaching jobs with five years of experience. The addition of that variable does not make the calculated averages more accurate because, at bottom, the duties and responsibilities of a first-year public relations employee or a fifth-year schoolteacher are not comparable to those of Percoco's wife. As a result, the numbers calculated by Tosic remain misleadingly skewed.

### 3. *Kunkel's Testimony Is Not Relevant or Reliable*

Percoco's proposed expert testimony should be precluded because it is both irrelevant and unreliable. *First*, Kunkel's testimony that certain blank emails "likely" contained messages at some point would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). His testimony would not help the jury determine what the content of the emails used to be, or whether that content was relevant to this case. The mere fact that a now-blank email previously contained content of some kind is not probative at all and therefore is not relevant evidence. *See id.*; *see also* Fed. R. Evid. 401(a) ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence."). The irrelevance of Kunkel's proposed testimony is underscored by Percoco's failure to identify any blank emails with even a colorable connection to the charges in this case. As described in footnote 3 above, Percoco has only produced five blank emails, each with a subject line and/or distribution list that is completely unrelated to any facts relevant to this trial. Expert testimony about irrelevant emails with no content would not help the jury understand the evidence.

Rather, Kunkel's testimony would likely confuse the jury and suggest the improper inference that Howe or others purposefully deleted the content of the now-blank emails. Percoco wrote in his expert notice that Kunkel would testify about how computer-based email applications work and that "the likely reason certain emails produced to the defendants appear to be blank is based on the settings of the computer from which those emails were extracted." (Percoco Expert Ltr. at 2.) If Kunkel testifies about blank emails extracted from Howe's devices (which remains uncertain given Percoco's failure to disclose any additional information reviewed or produced by Kunkel), then the jury may improperly infer from this testimony that Howe somehow changed the settings of the email applications to deliberately erase the contents of the emails.

*Second*, Kunkel's testimony is also unreliable. Percoco only produced five irrelevant blank emails, and he was unable to identify the device(s) from which those emails had been extracted. Notwithstanding the Court's order to provide his expert's underlying data by December 18, 2017, Percoco has not produced any additional material. As a result, Percoco has not identified the universe of blank emails about which Kunkel would testify, or the principles or methods that Kunkel used to analyze those emails. There is no basis to believe that Kunkel's testimony would be based on (1) sufficient facts or data, or (2) reliable principles or methods, or (3) the application of reliable principles or methods to the facts of this case. *See Amorgianos*, 303 F.3d at 265; Fed. R. Evid. 702. Accordingly, Kunkel's expert testimony should be precluded.[8]

---

[8] On December 22, 2017, defendants Steven Aiello and Joseph Gerardi produced to the Court and the Government a defense exhibit list and corresponding documents that included thousands of emails with header information and subject lines but no body text (referred to collectively as the "Syracuse Defendants Emails"). (Dkt. No. 411.) A spreadsheet provided by Aiello and Gerardi stated that many of the Syracuse Defendants Emails were extracted from various seized devices. However, neither Aiello nor Gerardi (nor Percoco) have provided any indication to the Government that any of them intends to call Percoco's expert witness and have Kunkel opine on whether the Syracuse Defendants Emails contained content at some past time. If that is in fact their intent, then they failed to produce the Syracuse Defendants Emails on December 18, 2017 as ordered by the Court. (The Government reached out late this evening to Aiello and

December 27, 2017
Page 11
December 27, 2017
Page 11

\* \* \*

In sum, the Government respectfully requests that the Court preclude the proffered expert testimony of Allard, Tosic, and Kunkel, or, in the alternative, that the Court order a *Daubert* hearing to assess the relevance and reliability of their respective testimonies.

    Respectfully submitted,

    JOON H. KIM
    Acting United States Attorney

By: /s/
    Janis Echenberg/Robert Boone/
    David Zhou/Matthew Podolsky
    Assistant United States Attorneys
    (212) 637-2597/2208/2438/1947

cc: Counsel for all defendants (via ECF)

---

Gerardi to inquire about their intentions with respect to the Syracuse Defendants Emails and will seek to confer tomorrow.)

    Assuming for the sake of argument that Aiello or Gerardi (or Percoco) does plan to have Kunkel testify about the Syracuse Defendants Emails, that testimony should also be precluded for lack of relevance and reliability. *First*, as explained above, Kunkel's testimony that an email may have once contained content, but that Kunkel has no idea what that content might have been, would not help the jury understand the emails (with content) that will be properly admitted as evidence at trial. Instead, such testimony would only serve to confuse the jury and prompt improper and baseless speculation about the purported former contents of the supposedly blank emails. Furthermore, as with the irrelevant emails identified by Percoco, it is obvious from the header information and subject lines that many of the Syracuse Defendants Emails have nothing to do with the facts or charges in the January trial. *See, e.g.*, SYR-2 (subject line "FW: [Howe's son] / Summer School"); SYR-1231 (subject line "Fwd: Your First SoulCycle Class"). Quite surprisingly, large numbers of emails identified by Aiello and Gerardi were sent to defendants in the June trial, the facts of which Aiello and Gerardi successfully moved to preclude from this trial. *See, e.g.*, SYR-114, 563, 1103, 1523, 2069, 2520, 3034, 3503 (sent to Alain Kaloyeros); SYR-66, 193, 670, 1121, 1734, 2002, 2542, 3017, 3536 (sent to executives of the Buffalo Developer). In short, these defense exhibits are plainly not relevant and, *a fortiori*, any expert testimony about them is irrelevant.

    *Second*, any testimony by Kunkel about the Syracuse Defendants Emails is unreliable. Neither Aiello nor Gerardi has proffered that Kunkel has reviewed the Syracuse Defendants Emails, or that Kunkel has applied reliable principles or methods to analyze those emails. *See Amorgianos*, 303 F.3d at 265; Fed. R. Evid. 702. Accordingly, any testimony by Kunkel regarding the Syracuse Defendants Emails should be precluded on that basis as well.