# LANKLER SIFFERT & WOHL LLP
ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, N.Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX    (212) 764-3701

January 5, 2018

**BY ECF:**

Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

    Re: <u>United States v. Percoco, et al.</u>, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

    We represent Peter Galbraith Kelly, Jr. in the above-referenced matter. We write on behalf of Mr. Kelly and Mr. Percoco in response to the Government's December 27, 2017 motion *in limine*, which seeks to preclude the proffered testimony of two experts noticed by Mr. Kelly – Dr. Dubravka Tosic and Brooklyn Law School Dean Nicholas Allard. The Government apparently concedes that both Dr. Tosic and Dean Allard are experts in their respective fields but challenges their proposed testimony as irrelevant and unreliable.[1] (Doc. No. 418 ("Gov't MIL")). The Government's application is baseless and should be denied.

    I.    **Applicable Legal Standard**

    "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," <u>Nimely v. City of New York</u>, 414 F.3d 381, 395 (2d Cir. 2005) (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 588 (1993)) and "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm. Notes. Indeed, Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education," to provide expert testimony, so long as the testimony is reliable and will assist the jury in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702; <u>see also</u> <u>Daubert</u>, 509 U.S. at 597.

    "In assessing the relevance of proffered expert testimony, the Court looks to whether the testimony has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>Tiffany (NJ) Inc. v. eBay, Inc.</u>, 576 F. Supp. 2d 457, 459 (S.D.N.Y. 2007); <u>see also</u> Fed. R. Evid. 401.

---

[1]     The Government does not argue that the proposed expert testimony is unduly prejudicial under Rule 403.

1

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 2

Moreover, "it is proper for an expert to testify as to the customs and standards of an industry," Primavera familienstiftung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), abrogated on other grounds by Casey v. Merck & Co., Inc., 653 F.3d 95, 100 (2d Cir. 2011), especially in complex cases or cases involving topics that are not commonly understood. See, e.g., United States v. Mulder, 273 F.3d 91, 101–02 (2d Cir. 2001) (concluding that the district court did not err by finding that testimony on labor coalitions, their goals, history and tactics required specialized or expert knowledge).

In assessing the reliability of potential expert testimony, a court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (citing Daubert, 509 U.S. at 595). Generally, so long as an expert is not speculating or basing her opinion on an assumption that is in "bad faith" and has not undertaken an "apples and oranges comparison," then "other contentions that the [expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony." Tiffany, 576 F. Supp. 2d. at 459 (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted)); see also Amorgianos, 303 F.3d at 267 ("The judge should only exclude the evidence if" a flaw in reasoning "is large enough that the expert lacks 'good grounds' for his or her conclusions." (internal quotation marks and citation omitted)).

## II. Dr. Dubravka Tosic's Testimony is Admissible.

### A. Relevant Background

Mr. Kelly was the Senior Vice President for Public Relations and Government Relations ("PR/GR") at Competitive Power Ventures ("CPV"), a large energy company that developed power plants across the United States and in Canada. The PR/GR group was responsible for cultivating support for CPV's plants in the surrounding communities.

The evidence will show that one way the PR/GR group sought to gain local support for CPV's plants was through an award-winning education program it developed to teach students at elementary schools about energy and electricity (the "Education Program"). The Education Program, which supplements the schools' existing science curriculum, demystifies the fuel sources and generation processes of CPV's plants, increasing understanding of the plant in the local community and reducing opposition to it.[2]

---

[2] Several corporations have education outreach programs. For example, Lockheed Martin launched the "Generation Beyond" program in April 2016, to "bring the science of space into thousands of homes and classrooms across America." Lockheed Martin, "Ready for Blast-Off: Lockheed Martin Launches Educational Program to Prepare America's Students for Deep Space Exploration," available at https://www.lockheedmartin.com/us/news/press-releases/2016/april/041516-generation-beyond-STEM-education.html (April 15, 2016).

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 3

In late 2012, Mr. Kelly arranged to have CPV retain Lisa Percoco – a school teacher and the wife of co-defendant Joseph Percoco, who was a senior aide to the Governor of the State of New York – as a consultant to the Education Program. Ms. Percoco worked as a consultant for the Education Program from late 2012 until approximately January 2016. During this time, Ms. Percoco (among other things) helped develop the curriculum for the Education Program, assisted with getting the program off the ground, and taught lessons at elementary schools near the CPV's plant in Woodbridge, New Jersey. The evidence will show that Ms. Percoco performed real work – researching, writing, and editing the curriculum, participating in calls and meetings with multiple personnel and consultants for CPV, helping to create promotional materials for the Education Program, creating activities and handouts for the lessons, and travelling long distances to teach. Ms. Percoco was paid $7,500 per month for her consultant work but, as she was not an employee, she received no fringe benefits.

The Education Program has been indisputably successful. Woodbridge schools have welcomed CPV into their classroom every semester since the program began and teachers, education officials, and even the Mayor's office have expressed their appreciation of CPV's education outreach. Management at CPV also supported the Education Program, and, even though Ms. Percoco left her position in early 2016, CPV continues to operate the program today using her curriculum.

The Government alleges that the reason Mr. Kelly arranged for CPV to retain Ms. Percoco as a consultant for the Education Program was so that he could pay a bribe to her husband, Mr. Percoco, in exchange for official acts by Mr. Percoco to benefit CPV as the opportunity arose. (S2 Ind. ¶ 31; Compl. ¶ 43). That is, the Indictment alleges that the compensation paid to Ms. Percoco was in fact a bribe to Mr. Percoco.

While the Government alleges and apparently will try to prove that Ms. Percoco's consulting position was a "low-show" job and that the compensation she received ($7,500 per month, but with no fringe benefits) was "a much higher salary than warranted by her limited work," (S2 Ind. ¶ 30; Compl. ¶¶ 43–44) the defense will show that Ms. Percoco's compensation was reasonable and given in exchange for real work.

**B.     Dr. Tosic's Proposed Testimony Regarding Ms. Percoco's Compensation**

To show that Ms. Percoco's compensation was reasonable, the defense will call Dr. Dubravka Tosic, an expert in labor economics and statistical analysis. Dr. Tosic will testify that, in her expert opinion, the compensation Ms. Percoco received from CPV was within reasonable parameters.

Dr. Tosic will testify that her opinion – that Ms. Percoco received reasonable compensation – is based on her review of earnings data for individuals who have experience similar to Ms. Percoco and who worked in positions with similar responsibilities, in the New

# LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 4

York metropolitan area, during the relevant time period. Dr. Tosic obtained this earnings data from two databases that are respected and commonly used (including by the government): (i) the Salary Assessor from the Economic Research Institute ("ERI") and (ii) the Occupational Employment Statistics data from the U.S. Bureau of Labor Statistics ("BLS"). These databases compile earnings data for various positions over time in various geographical regions.

Dr. Tosic will explain that no single occupation on the ERI and BLS databases covered every aspect of the role that she understood Ms. Percoco to serve for the Education Program – a role that required curriculum drafting and teaching but also complementing the public relations work of the PR/GR group and cultivating support for the company in the local community. As such, Dr. Tosic collected earnings data for several different positions on both the ERI and BLS databases, each of which overlapped in some way with Ms. Percoco's responsibilities.

Dr. Tosic will also explain that she used earnings data from relevant geographical locations available through the ERI and BLS databases, taking into account that Ms. Percoco lived in Westchester, New York, was teaching in Woodbridge, New Jersey, and had previously taught in the New York City public school system.

Using the relevant earnings data from the ERI and BLS databases as a base, Dr. Tosic will testify that she added estimated fringe benefits to calculate estimated total compensation for each of the selected positions. We provided the Government with tables laying out Dr. Tosic's calculations, as well as articles explaining the basis for her fringe benefits estimates. In order to show a range of results, Dr. Tosic ran several iterations of the estimated total compensation calculation, using mean, median, lower percentile, and lower experience earnings data for each position.

Dr. Tosic will testify that she reviewed the estimated total compensation values for these comparable positions to help her reach her conclusion that Ms. Percoco's compensation was within reasonable parameters. She will also testify that any assessment of the reasonableness of Ms. Percoco's compensation must consider, among other things, that Ms. Percoco (1) was a retained consultant, not a salaried employee, and therefore did not receive fringe benefits (such as health insurance, pension plan or 401(k) benefits, and the like), (2) was paid the same compensation every month, no matter whether she had a busy month or a light month, (3) contributed to the curriculum and development of an education program that still functions today, and (4) helped to generate goodwill and positive public relations for CPV.

Dr. Tosic's analysis led her to conclude that Ms. Percoco was compensated within reasonable parameters – an issue which the Government has squarely put in issue in this case. The bribery statute charged provides that *bona fide* compensation cannot be a bribe, see 18 U.S.C. § 666(c), but even if it did not, the question of whether Ms. Percoco was reasonably compensated would still be contested in this case. The Government will argue that Ms. Percoco was overcompensated for the work she performed and that this is a reason to infer that her compensation was actually a bribe payment to her husband. The defense must be allowed to

# LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 5

counter this argument, and present proof that her work was real and that she was fairly compensated and that these are reasons to infer that her compensation was not a bribe.

Not only is the data that Dr. Tosic relied upon unassailable, there can be no question that Dr. Tosic is qualified to present her opinion. She has a PhD in economics, with an area of concentration in labor economics. She has worked on economic and statistical analysis in the area of labor economics for almost twenty years and has written and presented on topics such as employment litigation and employee compensation. The Government does not even try to question her expertise.

Moreover, the Government has more than enough information to prepare its own questions for Dr. Tosic. The defense provided to the Government a description of the information given to Dr. Tosic about Ms. Percoco's position, a copy of Dr. Tosic's notes, and copies of the studies and articles relevant to her proposed testimony. The Government was also provided a list of factors that Dr. Tosic considered in reaching her opinion, as well as the detailed tables that she prepared, showing her calculation of estimated total compensation for positions comparable to Ms. Percoco's. The earnings data that went into those calculations is available through the ERI and BLS databases, which also provide descriptions for each of the relevant positions.

### C. Dr. Tosic's Proposed Testimony is Relevant and Reliable

#### 1. Ms. Percoco's Compensation is Relevant

Dr. Tosic's testimony is clearly relevant. The Government claims that Ms. Percoco's job was a "low-show" position and that the jury should infer that her compensation was a bribe to Mr. Percoco. The defense disputes this allegation, and will argue that because Ms. Percoco did real work and was fairly compensated, there is reason for the jury to infer that her compensation was not a bribe.

In the first instance, the Government claims that Dr. Tosic's testimony is irrelevant because, according to the Government's theory, regardless of how much Ms. Percoco was paid, "the salary would still constitute a bribe payment if agreed to in exchange for official action." (Gov't MIL at 7). But the Government has injected the issue into the case by charging that the bribe was payments received through a "low-show" job. (S2 Ind. ¶ 30; Compl. ¶¶ 43–44 (alleging that Ms. Percoco was provided "a much higher salary than warranted by her limited work")). A "low-show" job is not simply a job that does not require long hours – that is a part time job; a low-show job is a job that pays more than the hours merit.

Indeed, the Government itself seeks to put in evidence regarding the reasonableness of Ms. Percoco's compensation. The 3500 material makes clear that the Government will argue that the job was "low-show" by comparing the work Ms. Percoco did with the compensation she was given. The Government's letter flatly states that "the evidence will . . . show that

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 6

[Ms. Percoco] performed limited work in exchange for" her compensation and claims that she "was paid more than double the amount that was paid both to her primary colleague in the program (who worked considerably more hours) and to others who performed similar work for the program" after she left. (Gov't MIL at 2).

If the Government is entitled make this argument – that Ms. Percoco was overpaid for the work she performed – and to elicit Ms. Percoco's compensation, then the defense is entitled to present evidence that, in fact, Ms. Percoco's work merited the compensation provided. We must be allowed to do so, as that is our defense to this charge by the Government.

Moreover, the cases the Government cites support the conclusion that Dr. Tosic's testimony *is* relevant. In those cases, the courts recognized that the issue of whether compensation was instead a bribe is a fact question for the jury and that the defendants should be free to argue that the work merited the compensation provided. For example, in United States v. Bryant, a § 666 bribery case involving a university job for a State Senator, the Third Circuit recognized that the jury had been given information about the official's hours and compensation and that this and other evidence provided "indirect proof of [the briber]'s intent. 655 F.3d 232, 242–43 (3d Cir. 2011) (noting that the record evidence showed that the official's "approved" salary of $35,000 was "commensurate with the work of a .6 employee" on the university's pay scale, whereas the amount of work actually expected of him "should have qualified him only as a .2 employee").[3] Similarly, in United States v. Urciuoli, the First Circuit stated that the defendant – accused of honest services fraud by soliciting a bribe – was "free to make" arguments that he did not commit bribery but instead actually "performed some marketing services" and earned his salary. 613 F.3d 11, 14–15 (1st Cir. 2010).

The Government next argues that Dr. Tosic's proposed testimony is irrelevant because the concept of a "low-show" job has a "common sense meaning that does not require the application of any specialized knowledge to understand." (Gov't MIL at 7). But Dr. Tosic's proposed testimony is not proposed to define "low-show" job. Rather, it will address whether Ms. Percoco's compensation was reasonable under her circumstances and given her responsibilities. That concept is not one with a "common sense meaning," but instead requires an understanding of how the market compensated similar individuals during the relevant time frame for similar work. It cannot be said that the average juror will have an innate understanding of what reasonable compensation would be for helping to create and execute an education outreach program for a major energy company.

In fact, assessment of the reasonableness of Ms. Percoco's compensation – which provides the jury with information helpful to its determination as to whether Ms. Percoco's job

---

[3] To that end, the fact that the district court in United States v. Bryant had rejected defendants' motion to dismiss based on whether the university position was *bona fide* is irrelevant. 556 F. Supp. 2d 378 (D. N.J. 2008). Evidence about the hours and compensation for the university position were *in fact* admitted at trial, and should be permitted here, as well.

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 7

was actually "low-show" – requires specialized and expert knowledge regarding earnings data for a range of comparable positions. Dr. Tosic, a labor economics expert who frequently uses ERI and BLS data in her work, is equipped to provide the jury with earnings data analysis for positions with responsibilities similar to Ms. Percoco's work for the Education Program. Furthermore, Dr. Tosic's testimony regarding the other factors informing her opinion, such as the distinctions between employees and consultants, will provide the jury with an informed and useful framework for determining the true nature of Ms. Percoco's job and the reasonableness of her compensation.

### 2. Dr. Tosic's Analysis of Earnings Data is Relevant and Reliable

The Government spends over two pages arguing that Dr. Tosic's proposed testimony is neither relevant nor reliable because it uses "cherry-picked" data from higher-paying positions "that bear no resemblance" to Ms. Percoco's job and positions located in higher paying regions of the New York City metropolitan area. (Govt. MIL at 7–9). This claim is simply incorrect, and in any event, only goes to weight of Dr. Tosic's testimony, not its admissibility.

As an initial matter, databases like BLS and ERI are commonly used by experts in cases regarding employment and compensation. See, e.g., Higgins v. Kinnebrew Motors, Inc., 547 F.2d 1223, 1226 (5th Cir. 1977) (noting that the Fifth Circuit had "previously upheld an expert witness' use of figures taken from the United States Department of Labor, Bureau of Labor Statistics tables" and stating that the admission of an expert opinion in a wrongful death suit that was "formed by reliance on figures from the [BLS], [did] not provide a basis for reversal"); Evans v. Quintiles Transnat'l Corp., 13-CIV-00987 (RBH), 2015 WL 9455580, *6–7 (D. SC Dec. 23, 2015) (denying motion to preclude expert opinion regarding the type and value of future employment that plaintiff would be able to obtain in wrongful termination action, which was based on expert's experience in the vocational field, BLS data, research, and professional literature). The Government itself has proffered expert testimony based on data from these databases. See, e.g., United States v. Wilhite, 2017 WL 4572321, *3–5 (D. Co. Oct. 13, 2017) (concluding that the calculation of defendant's uncompensated services performed by the Government's expert in a fraud case, which was based on data obtained from the "nationally-reliable database from the Economic Research Institute," was "reasonable and accurate").

Furthermore, Dr. Tosic's use of the data is actually designed to avoid the "cherry picking" claim. First, because Ms. Percoco's job was an amalgam of several positions with multiple aims – curriculum drafting, teaching, public relations, corporate branding, etc. – Dr. Tosic used the earnings data from multiple positions in her analysis, each of which contains aspects that overlap with Ms. Percoco's responsibilities. Second, Dr. Tosic used data from geographical locations that account for the spread-out nature of this case – in which Ms. Percoco, who lived in Westchester and had worked as a teacher in the New York City public school

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 8

system, taught lessons for the Education Program in Woodbridge, New Jersey.[4]  Third, Dr. Tosic's methodology is laid bare in the tables collecting her analysis of the earnings data, and she ran her calculations of estimated total calculation several times, using variations on the earnings data to show a range of results.

The Government cites no case stating that a party's disagreement with an expert's conclusion should lead to preclusion of her testimony.  Rather, the Government weakly argues that in its opinion, Dr. Tosic chose the wrong data to arrive at her conclusion.  (Gov't MIL at 8).  In doing so, it cites a series of contested facts and conclusions, and ignores other facts that support Dr. Tosic's analysis.

The Government cannot reasonably argue that Dr. Tosic's assumptions are in "bad faith" or that she has undertaken an "apples and oranges comparison" so flawed as to lack good grounds for her conclusion.  Tiffany, 576 F. Supp. 2d at 459 (quoting Boucher, 73 F.3d at 21 (internal quotation marks omitted)).[5]

Regardless, to the extent the Government claims that the data or assumptions Dr. Tosic used leads to an inflated conclusion, it is welcome to cross-examine her.  Indeed, the case law is overwhelmingly clear that "contentions that the [expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony."  Id.; see also Bazemore v. Friday, 478 U.S. 385, 400 (1986) (noting, in a racial discrimination case, that "[n]ormally, failure to include variables" in a regression analysis "will affect the analysis' probativeness, not its admissibility") (Brennan, J., concurring); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992) ("All of [defendant's] arguments" regarding damages calculation in age discrimination case "go to the weight, not the admissibility, of the testimony.").

In this regard, the Government was free to notice a rebuttal expert who could provide compensation calculations using different positions, geographical locations, or assumptions.  It did not.  Accordingly, as this Court acknowledged in United States v. Rosario, the proper course for the Government to resolve its issues with the "purported flaws" in Dr. Tosic's data selection

---

[4] Notably, although the Government claims that Dr. Tosic's broader geographical parameters inflated the earnings data (Gov't MIL, at 8), the New York metropolitan area includes regions that earn, on average, less than Westchester, where Ms. Percoco lived at the time, or Staten Island, where Ms. Percoco taught prior to her work for the Education Program.

[5] The majority of the cases cited by the Government contain extreme examples of flawed analysis not analogous here.  See Amorgianos, 303 F.3d at 268 (expert did not use the variables he chose as relevant in his own analysis in determining a chemical evaporation rate); In re Lyondell Chemical Co., 567 B.R. 55, 113 (S.D.N.Y. 2017) (the "cherry-picked data" resulted in a projection that was billions off from other contemporaneous ones); Barber v. United Airlines, Inc., 17 F. App'x 433, 437 (7th Cir. 2001) (expert rejected weather data that contradicted his opinion on turbulence conditions without adequate explanation).  The remaining cases are out of Circuit rulings on a summary judgment and class certification motion, respectively, that provide little insight into the issue at hand.  See Cooper v. Southern Co., 260 F. Supp. 2d 1258 (N.D. Ga. 2003); Donaldson v. Microsoft Corp., 205 F.R.D. 558 (W.D. Wash. 2001).

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 9

is cross-examination, not exclusion.  09-CR-415 (VEC), 2014 WL 6076364, *3 (S.D.N.Y. Nov. 14, 2014) ("Insofar as Rosario is concerned that the jury will accord undue weight to Agent Hauger's estimations of Rosario's locations given alleged flaws in Agent Hauger's methodologies, the remedy is simple: Rosario should cross-examine Agent Hauger about these purported flaws and may call his own expert to testify to what, if anything he believes the records actually establish.").

    III.        **Mr. Allard's Testimony is Admissible.**

        A.  **Relevant Background**

The evidence at trial will show that, as the Senior Vice President of CPV's PR/GR group, Mr. Kelly frequently worked with lobbyists to help CPV navigate the intricacies of federal, state, and local government and regulations.  CPV engaged lobbyists in nearly every state in which it worked.

In 2010, Mr. Kelly participated in CPV's decision to engage the Government's co-operating witness, Todd Howe – who was then a well-respected lobbyist, heading a Washington, D.C. lobbying firm – to assist CPV with its interactions with New York State officials regarding a power plant it was developing in New York.  The defense intends to elicit that CPV entered into this agreement with Mr. Howe after Mr. Howe touted his long-standing personal and professional connections to the then-favored gubernatorial candidate, his senior aides (including Mr. Percoco), and State officials who were already in power.  Based on those relationships, Mr. Howe persuaded Mr. Kelly and CPV that he could not only assist the company in its efforts to obtain financing for its power plant, but could also bring CPV to the attention of the Governor's office, thereby giving CPV a voice in helping the new administration develop its energy policy.

Mr. Howe held himself out as a lobbyist to CPV.  CPV's agreement with Mr. Howe appeared to contemplate that he would engage in lobbying in New York State on CPV's behalf.  Moreover, representatives of CPV understood Mr. Howe to be a lobbyist for the company.

After CPV hired Mr. Howe, Mr. Howe did – as promised – use his personal and professional relationships to gain access to individuals within the prior administration and the current administration who held decision-making authority in areas that related to energy.  With that access, Mr. Kelly sought repeatedly to persuade those officials – who did not include Mr. Percoco – that CPV's proposed power plant would be beneficial to New York State and that the State should therefore award CPV a contract that would assist CPV in obtaining the necessary financing to build its plant.

The Government apparently intends to elicit at trial that Mr. Kelly used Mr. Howe's relationships – with Mr. Percoco and others – to gain access to public officials, as well as to obtain favors, for a period of more than two years before the alleged bribe even took place, in late 2012, as well as during the period covered by the bribery allegations.  The Government

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 10

alleges in the Complaint that, having been introduced by Mr. Howe to Mr. Percoco in 2010, Mr. Kelly sought to "ingratiate" himself with Mr. Percoco in various ways during the two years preceding the alleged bribery agreement. (Compl. ¶ 37). The Government thus plays upon the widely-held popular perception that the use of lobbyists to obtain access to government officials is at best unseemly, and at worst illegal. As the Court has no doubt observed, such perceptions are reflected frequently in the press, with regular reporting that one person or another sought to "buy access" to a political official.

Mr. Kelly seeks to neutralize the impact of such perceptions, and to place his own actions in proper perspective, by establishing several basic propositions concerning the use of lobbyists. He also seeks to provide the jury with an understanding of why he deferred to Mr. Howe when Mr. Howe described to him the various steps he (Howe) intended to take and was taking on CPV's behalf.

### B. Mr. Allard's Proposed Testimony Regarding Lobbying

Mr. Kelly plans to call Nicholas Allard, the Dean of Brooklyn Law School and a nationally recognized expert in lobbying and government relations, for these limited purposes. Mr. Allard has held several public service roles over his distinguished career and has published academic papers on the topic of lobbying. He was a partner at Patton Boggs & Squire for over a decade, where he chaired the firm's Government Relations group, and he was recognized as one of Washington D.C.'s "Top Lobbyists" by The Hill from 2008 to 2013. He is currently a Senior Counsel in the Public Policy and Regulation practice at Dentons. Among other publications, Mr. Allard authored an article entitled "Lobbying is an Honorable Profession," in which he discusses the fact that public perception of lobbyists is quite negative, but ought not be. See Nicholas Allard, "Lobbying is an Honorable Profession: The Right to Petition and the Competition to be Right," 19 Stan. L. & Pol'y Rev. 23, 25 (noting that "approximately eighty percent of Americans believe that lobbyists exercise undue influence on public policy" (citing a CNN exit poll and a Harris interactive survey)).

Mr. Allard would inform the jury that using a lobbyist to obtain "access" to public officials is quite common, and that despite popular perception, there is nothing unseemly, dishonorable or improper about doing so. He would explain that some lobbyists – sometimes called "contract lobbyists" or "access lobbyists" – provide access to public officials as their business model. Furthermore, to counter any implication that a company's use of a lobbyist to obtain access to public officials is itself a corruption of the democratic process, Mr. Allard would testify that, whether members of the public realize it or not, *they all* have lobbyists representing their interests. He would also explain that lobbyists aid the democratic process by bringing to the attention of public officials the different perspectives of different constituencies and thus help to ensure that diverse interests are considered and understood in the policy-making process.

Contrary to the unsupported statement in the Government's motion that "the average juror will either know what lobbying is or will easily grasp [it]," (Gov't MIL at 5), Mr. Allard is

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 11

expected to testify that the average citizen does *not* have a clear understanding of what lobbying is, that the very definition of lobbying varies from one jurisdiction to another, that lobbying is regulated to different degrees and in different ways in different jurisdictions, and that it is a lobbyist's responsibility to know the requirements of the those jurisdiction(s) in which he or she practices.[6]  He will also testify that, in fact, it is prudent for a lay person or corporate executive to hire a professional lobbyist when interacting with the government, precisely because professional lobbyists do know the local rules and restrictions, which are not intuitively obvious and vary widely from jurisdiction to jurisdiction.  Such testimony will inform the jury's understanding of why Mr. Kelly necessarily and appropriately relied upon Mr. Howe's experience and expertise as a lobbyist when he delivered himself and CPV's interests into Mr. Howe's hands.

### C. Mr. Allard's Proposed Testimony is Relevant and Reliable

#### 1. The Proposed Lobbying Testimony is Relevant

The Government suggests that Mr. Allard's expert testimony is unnecessary because the average juror understands "the basic tenet that lobbyists represent clients and seek to promote their clients' interests to public officials." (Gov't MIL at 5).  As the Government's own 3500 material reveals, however, at least one of the witnesses the Government plans to call at trial (a lobbyist) has told prosecutors that, although he represented CPV and promoted CPV's interests to public officials, he *did not* engage in lobbying for CPV.  In addition, Mr. Howe's 3500 material reveals that Mr. Howe is confused about what conduct constitutes lobbying.  Mr. Howe has been asked by the Government on at least three separate occasions whether what he did on behalf of CPV in New York constituted lobbying.  The first time he was asked, Mr. Howe told the Government that he had "crossed the line" and had in fact been lobbying.  (3512-14, at 6 ("Howe agreed that his interactions with [State official] and Percoco constituted lobbying")). The second time he was asked, Mr. Howe told the Government he had gotten "close or over line." (3512-58, at 1 ("NY State lobby – in retrospect close or over line re: registering")).  Most recently, after further reflection, Mr. Howe told the Government that his conduct did not constitute lobbying.  (3512-97, at 1 ("as relates to CPV, COR, not lobbyist")).  If Mr. Howe cannot determine whether his conduct constituted lobbying, twelve jurors cannot reasonably be expected to intuit what lobbying is.

In fact, the question of what activity constitutes lobbying is a far cry from the situation presented in Andrews v. Metro-North Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989), the Government's only citation for its proposition that Mr. Allard's testimony is not needed.  There, the proposed expert testimony addressed the dirtiness of a train platform and the reasonableness of an intoxicated man walking on the tracks after having fallen off of it – both areas for which

---

[6] The Government apparently does not dispute those principles, as one of its objections to Mr. Allard's testimony is that the defense has made no showing that he is familiar with the particular rules governing lobbying in New York State. (Gov't MIL, at 2 and 6 n.4).

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 12

the Second Circuit correctly noted that "the jury was not in need of expert assistance." 882 F.2d at 708. There is plainly a vast distance between a juror's ability to understand drunken stumbling, on the one hand, and the level of intricacy involved in lobbying, on the other.

Lobbying is clearly an area that is not as intuitively obvious as the Government suggests. Brief testimony from an expert will help jurors understand that obtaining access through the use of a lobbyist is neither unseemly nor corrupt, and will also help them understand why Mr. Kelly might have deferred to Mr. Howe when Mr. Howe described for him various contacts with public officials on CPV's behalf.

Courts in the Second Circuit have long recognized that "it is proper for an expert to testify as to the customs and standards of an industry." Primavera, 130 F. Supp. 2d at 529. This is especially true in complex cases or in cases involving topics that are not commonly understood, such as lobbying. See, e.g., Mulder, 273 F.3d at 101 (concluding that the district court did not err by finding that testimony on labor coalitions, including their goals, history, and tactics required specialized or expert knowledge). Moreover, to exclude such testimony can be reversible error. In United States v. Litvak, the Court of Appeals reviewed the trial court's order excluding, on relevance grounds, expert testimony about the process by which investment managers evaluate certain securities. 808 F.3d 160, 182–84 (2d Cir. 2015). Finding that such expert testimony would have been helpful to the jury in assessing the materiality of the specific statements at issue and their impact on a "reasonable investor," the Second Circuit concluded that the district court had "exceeded its allowable discretion" in excluding the testimony, that the error was not harmless, and that the conviction should be reversed and the case remanded for a new trial. Id. at 183–84. Similarly, here, the proposed expert testimony would provide the jury with information that could help them to assess the defendants' motivations, expectations, and actions at issue.

A critical danger here is that jurors – due to common misperceptions of lobbying as a suspicious and unsavory activity – will *think* that they understand the lobbying industry and its activities, when, in fact, they do not. See, e.g., United States v. Hall, 93 F.3d 1337, 1345 (7th Cir. 1996) ("The court indicated that it saw no potential usefulness in the evidence, because it was within the jury's knowledge. This ruling overlooked the utility of valid social science. Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct."). These misperceptions go right to the heart of this case and will prejudice Mr. Kelly and Mr. Percoco if left uncorrected by Mr. Allard. See Empress Casino Joliet Corp. v. Johnston, 09-CIV-3585 (MFK), 2014 WL 6735529, *11 (N.D. Ill. Nov. 28, 2014) (permitting expert testimony on lobbying from expert who noted that "members of the general public often have misconceptions regarding the usual activities of lobbyists" and acknowledging that "[o]ne appropriate function of an expert witness may be to debunk commonly held views") (citing Hall, 93 F.3d at 1345).

In fact, a District Court has permitted essentially the same testimony we seek to offer. In Empress Casino, a group of casinos brought a civil suit based on the bribery conviction obtained

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 13

against former Illinois Governor Rod Blagojevich regarding a bill that benefitted certain racetracks at the expense of the casinos. 2014 WL 6735529. The defendant racetracks sought to call an expert witness to provide testimony regarding, inter alia, "what lobbying involves and the general public's misconceptions about it," the "different types of lobbyists" (including contract lobbyists), and how these various types of lobbyists "were involved in lobbying in connection with" the legislation at issue. Id. at *8–9; see also Exhibit B to Defendants' Response in Opposition to Plaintiffs' Motion in Limine, Empress Casino Joliet Corp. v. Johnston, 09-CIV-3585 (MFK) (N.D. Ill. Nov. 28, 2014); Doc No. 310-2 at 4–5 (detailing the proposed testimony regarding contract lobbyists). The plaintiffs moved to bar such testimony as irrelevant and unreliable. Empress Casino, 2014 WL 6735529 at *8. Though the district court did exclude some of the expert's proposed testimony on topics irrelevant to this case – critically, the court permitted testimony "regarding interest groups and how they advocate their interests, and testimony regarding what lobbyists do," noting that such testimony was relevant to the defendants' understanding of what their lobbyist was doing, which was "at the core of the claims and defenses in [the] case." 2014 WL 6735529 at *10–11.

Empress Casino is not alone. Similar testimony has been permitted in other criminal cases – which the Government ignores in its letter motion. See, e.g., United States v. McDade, 92-CR-249, 1995 WL 476230, *3 (E.D. Pa. Aug. 7, 1995) (concluding, in a case charging a U.S. Congressman with accepting illegal gratuities, that expert "[t]estimony concerning the general contents of ethics and disclosure rules, and the extent to which the average congressman is aware of the content of those rules, [would] assist the jury in assessing [his] defense that he was not aware that his acceptance of the gifts at issue was impermissible."); United States v. Chapman, et al., 16-CR-199 (CMR), Doc. No. 58 (E.D. Pa Jan. 19, 2017) (summarily denying Government motion to exclude expert witness regarding campaign finance regime).[7]

Additionally, the Government's further argument that expert testimony about lobbying is irrelevant because Mr. Howe never registered as a lobbyist in New York (Gov't MIL at 5–6) is simply illogical. Mr. Howe failed to do many things he should have done; whether he registered as a lobbyist does not determine whether he was engaged in lobbying. More importantly, Mr. Howe held himself out as a lobbyist and was understood to be a lobbyist.

Lastly, we note that even while arguing that Mr. Allard's expert's testimony would be irrelevant, the Government suggests that the defense can use one of the Government's fact witnesses to elicit the testimony it needs concerning lobbying. (Gov't MIL at 5). There is no requirement that the defense utilize any Government fact witness to assert its defense, see Litvak, 808 F.3d at 183–84, and such a proposition is particularly inappropriate here, where the

---

[7]   For a description of the defendants' argument as to why the expert testimony was admissible, in Chapman, see their response brief. Defendant's Response in Opposition to Motion to Exclude Defense Expert, United States v. Chapman, et al., 16-CR-199 (CMR), 2017 WL 464485 (arguing that the defense should not be precluded from putting on an expert witness regarding campaign finance regime and the custom and practice of persons subject to it, given that such testimony was "essential for the jury to understand the extent to which the average public officials are aware of those rules").

# LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 14

overwhelming bulk of the Government's witnesses (including the witness to whom the Government alludes) have declined to speak with the defense in advance of trial. Moreover, because Mr. Allard is not a fact witness but is instead an expert, his testimony about lobbying in general is likely to be viewed by the jury as unbiased, and therefore potentially more reliable, than that of the Government's fact witness.

### 2. The Proposed Lobbying Testimony is Reliable

The Government also objects that Mr. Allard's proposed testimony about the public's misperceptions of lobbying as suspicious and unseemly is unreliable because it is based on his education and experience, rather than studies, methodology, or data. (Gov't MIL at 6). But as an initial matter, the distaste that many American citizens have for lobbying – and their view of lobbying behavior as illicit or unseemly – is a phenomenon commonly observed by political scientists and policy specialists, in both academic literature and polling data. Mr. Allard himself cited some of these studies in a law review article. Nicholas Allard, "Lobbying is an Honorable Profession: The Right to Petition and he Competition to be Right," 19 Stan. L. & Pol'y Rev. 23, 25 (noting that "approximately eighty percent of Americans believe that lobbyists exercise undue influence on public policy" (citing a CNN exit poll and a Harris interactive survey)).

Moreover, even absent the academic literature and polling data on this topic, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience," and that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes to Fed. R. Evid. 702 (citations omitted); see also Kumho, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); In re Blech Securities Litigation, 94-CIV-7696 (RWS), 2003 WL 1610775, *20–21 (S.D.N.Y. Mar. 26, 2003) (holding that expert with forty years of experience in the stock brokerage industry could testify "as to what ordinary broker activity entails and as to the customs and practice of the industry" (citing Primavera, 130 F. Supp. 2d at 523)).

Additionally, as discussed in further detail above, the District Court in Empress Casino permitted similar expert testimony, finding that the expert, a political scientist who relied on his own experience and academic research, had "sufficient specialized knowledge and expertise in the field in question and that he ha[d] employed reliable methods in reaching his conclusions." Empress Casino, 2014 WL 6735529 at **11-12.

### 3. The Scope of the Proposed Lobbying Testimony

It is worth noting what the defense will not ask Mr. Allard to testify to. Despite the suggestion in the Government's motion (Gov't MIL at 6 & n.4), the defense has no intention to seek from Mr. Allard an explanation of the specific lobbying rules set forth in New York's statutes and regulations. We do not offer him as an expert on the intricacies of the New York

LANKLER SIFFERT & WOHL LLP

January 5, 2018
Page 15

lobbying rules. Given that this is not a case about violation of lobbying rules, we will not ask Mr. Allard to opine on whether Mr. Howe's representation of CPV, or any other client, followed New York State lobbying rules.

Moreover, given the Government's objections, we will not ask Mr. Allard to testify that people who hire lobbyists generally "expect" their lobbyists to know and follow the relevant rules. (See Gov't MIL at 6). Mr. Allard will limit his testimony to the roles of lobbyists and the activities in which they typically engage on behalf of their clients, under lobbying industry customs and practice. See Empress Casino, 2014 WL 6735529 at *11 (noting that "testimony regarding interest groups and how they advocate their interests, and testimony regarding what lobbyists do [wa]s relevant" to a civil suit regarding an alleged bribery scheme); see also Primavera, 130 F. Supp. 2d at 529 (noting that "it is proper for an expert to testify as to the customs and standards of an industry" where those customs and standards are articulated for the jury and not expressed broadly as a statement that participants in the industry are "expected to act with the highest integrity").

Nor does the defense intend to elicit "a detailed background on lobbying." (Gov't Motion at 5). We expect Mr. Allard's direct testimony will provide specialized and expert testimony that will be relatively brief.

\* \* \*

In sum, Mr. Kelly respectfully requests that the Court deny the Government's motion *in limine* to preclude the relevant – indeed necessary – and reliable proposed expert testimony of Dr. Tosic and Mr. Allard.

Respectfully submitted,

LANKLER SIFFERT & WOHL LLP

By: /s/ Daniel M. Gitner

Daniel M. Gitner
Samantha J. Reitz

**CC:**

All Counsel (Via ECF)