U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 12, 2018

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States v. Joseph Percoco, et al.*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

  The Government respectfully writes in reply to the letters submitted by Joseph Percoco (Dkt No. 432 ("Percoco Opp.")) and Peter Galbraith Kelly Jr. (Dkt. No. 434 ("Kelly Opp.")), which opposed the Government's *in limine* motion (Dkt. No. 418 ("Gov't MIL")) seeking to preclude the testimony of their noticed experts. For the reasons set forth below, the defendants' arguments are not persuasive and should be rejected.

  **A. Percoco's Proposed Expert Testimony About Certain Extracted Emails**

  Percoco seeks to admit expert testimony about purportedly blank emails so that he can ask the jury to speculate about what the content might have been. This expert testimony should be precluded as both irrelevant and unreliable. In his opposition, Percoco explains that Michael Kunkel would testify about certain emails (extracted from seized electronic devices) that have no body text but do contain to/from lines, dates, and subject lines. Kunkel would claim that those emails are now blank because of a common configuration in the settings of Microsoft Outlook and "not because those emails actually lacked content when they were sent or received." (Percoco Opp. 2.) Percoco is particularly interested in blank emails exchanged between his wife and her co-workers because those emails might have "otherwise reflected work that Ms. Percoco was doing," which would, according to him, support his defense that his wife's job was legitimate and not a bribe in disguise. (Percoco Opp. 3.)

  This explanation lays bare the inadmissibility and irrelevance of Kunkel's proposed testimony. Percoco apparently plans to ask the jury to draw the inference that, based on Kunkel's opinion that the blank emails once contained content, some of those emails previously contained work product produced by his wife. But Percoco does not proffer that his wife or any other recipient would testify that she remembers those particular emails and can recall the now-missing content, and Kunkel plainly cannot opine on that issue. (Percoco Opp. 3.) As such, any inference that the blank emails reflected his wife's work would be based on pure speculation. It is axiomatic that evidence inviting the jury to speculate is properly excluded pursuant to Federal Rule of

Evidence 403. Under that rule, "a trial court may refuse to admit evidence the probative value of which 'is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury.'" *United States v. Zayac*, 765 F.3d 112, 118 (2d Cir. 2014) (quoting Fed. R. Evid. 403). The risk of unfair prejudice outweighs the probative value of evidence when there is a "high risk that the jury would engage in speculation" in assessing that evidence "rather than reasoned deduction from the evidence." *Id.*; *see also United States v. McAllister*, 104 F.3d 357, 1996 WL 730502, at *1 (2d Cir. Dec. 19, 1996) (unpublished) (noting that it is "clear that a district court has discretion to exclude evidence that would require the jury to speculate" (citing *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 854 (2d Cir. 1984) and *Berry v. Deloney*, 28 F.3d 604, 609 (7th Cir. 1994)).

In *Zayac*, for example, the Second Circuit affirmed the district court's exclusion under Rule 403 of a holster and magazine recovered from an accomplice's house. 765 F.3d at 118. The district court justifiably concluded that "this evidence, if introduced, risked leading the jury to conclude that [the accomplice] owned a gun and that this gun was the murder weapon" even though "[t]his chain of inferences . . . would have been based on speculation rather than reasoned deduction from the evidence, since the holster was empty when it was recovered, the murder weapon was not found, and forensic testing had failed to establish with precision what kind of firearm was used to kill [the victim]." *Id.* The same concerns exist here. Kunkel's expert testimony would risk misleading the jury to conclude that Percoco's wife sent numerous substantive emails, when, even if the expert testimony is credited, there is no factual basis to infer that the emails contained work product.

Counsel has also not established that Kunkel's proposed testimony would be reliable. Percoco has not made any additional disclosures regarding his expert since the Government submitted its motion to preclude. Because Percoco appears to concede that the five "example" emails he previously produced are not relevant to this case (*see* Percoco Opp. 3), the Government still has no understanding of which blank emails, from which seized devices, will be the subject of Kunkel's testimony.[1] Percoco's focus on emails involving his wife provides limited clarity because numerous seized devices might contain such emails. Indeed, the Government seized, among other things, several computers and a hard drive from Percoco's residence and one computer from the Energy Company consultant who acted as the pass-through for payments to Percoco's wife.

Percoco counters that Kunkel would testify that the same Outlook configuration affected all the blank emails extracted from the seized devices. (Percoco Opp. 3.) Thus, he reasons, the Government does not need to conduct an "independent review of every single individual blank

---

[1] Percoco cryptically notes that the Government "knows which emails have been included in the defendants' exhibit lists and from which devices those emails came." (Percoco Opp. 3.) Percoco himself did not mark any blank emails in his exhibit list. The Syracuse Defendants, meanwhile, marked over 3,600 emails with no content as exhibits (*see* Gov't MIL 10 n.8; Dkt. No. 411), but Joseph Gerardi's counsel confirmed at the final pretrial conference that he will not call Kunkel (*see* Dec. 28, 2017 Conf. Tr. at 19). Furthermore, the marked emails included numerous exchanges with people who are not relevant to this trial.

January 12, 2018
Page 3

email."[2]  (Percoco Opp. 3.)  However, "expert opinions that are 'conclusory' must be excluded." *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)).  Percoco has not explained the precise details of the Outlook configuration, and he has provided no indication that Kunkel's assessment of that configuration, the blank emails, or the seized devices "is grounded on sufficient facts or data."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Furthermore, it is unclear whether Kunkel considered other factors that may have affected the content of those extracted emails.  In the absence of any reports, studies, or similar documents, Percoco also has not carried his burden to prove by a preponderance that Kunkel's testimony "is the product of reliable principles and methods," or that Kunkel "has reliably applied the principles and methods to the facts of the case."[3]  Fed. R. Evid. 702(c)-(d).  "[I]t is critical that an expert's analysis be reliable at every step," *Amorgianos*, 303 F.3d at 267, but Kunkel's proposed testimony fails each one.

Consequently, the Court should preclude Kunkel's testimony on the grounds both that it is irrelevant and that Percoco has not established its reliability.

### B. Kelly's Proposed Expert Testimony on Job Compensation

#### a. Tosic's Testimony Is Not Relevant

Kelly asserts that Dr. Dubravka Tosic's testimony is relevant because it will support his defense argument that "in fact, Ms. Percoco's work merited the compensation provided."  (Kelly Opp. 6-7.)  In particular, Tosic's proposed testimony would help the jury understand "what reasonable compensation would be for helping to create and execute an education outreach program for a major energy company" by providing it with evidence of "how the market compensated similar individuals during the relevant time frame for similar work."  (Kelly Opp. 6.)  Kelly contends that this expert "assessment of the reasonableness of Ms. Percoco's compensation" would "provide the jury with information helpful to its determination as to whether Ms. Percoco's job was actually 'low-show.'"  (Kelly Opp. 6-7.)

This argument, however, confuses two distinct questions: (1) whether Percoco's wife provided only minimal or nominal services in return for $90,000 per year, and (2) whether $90,000 per year is reasonable compensation generally for a position as a consultant to a company's education program.  Question One is relevant to the Government's allegations that Percoco's wife

---

[2] The Government collected emails from numerous sources, including web-based email accounts, seized devices, and third-party subpoena respondents.  As a result, it is certainly possible that a particular blank email extracted from a device exists with content elsewhere in the discovery.  For example, the Syracuse Defendants marked as exhibits SYR-15, which is a blank email, and SYR-3859, which is an email chain with content that includes a substantive version of SYR-15.  (*See* Dkt. No. 411.)  Because Percoco has failed to identify the relevant blank emails analyzed by his expert, the Government has not been able to assess whether there are versions with content.  (*Cf.* Percoco Opp. 2 n.2.)

[3] In fact, Percoco notes in his opposition that Kunkel gave his opinion about the cause of the blank extractions after "counsel described those observations" to him. (Percoco Opp. 2.)  Thus, it is unclear whether Kunkel has personally analyzed either the blank emails or the seized devices.

January 12, 2018
Page 4

was given a low-show job as a bribe to Percoco, but Question Two is not. That is because a low-show job is one where the position holder "provided only minimal or nominal services." *United States v. DeMizio*, 741 F.3d 373, 383 (2d Cir. 2014) (quoting *United States v. Bryant*, 655 F.3d 232, 237 (3d Cir. 2011)); *see also id.* (A private-sector "scheme qualifies as a kickback scheme where the recipient receives inordinate amounts of money for doing minimal work."); *United States v. McDonough*, 56 F.3d 381, 389 (2d Cir. 1995) (affirming conviction where the scheme involved kickbacks to the appellant totaling "nearly $100,000, for which [he] performed almost no work").

Thus, the Government expects to call fact witnesses who will testify that, among other things, over the course of three years, when she was paid more than $270,000, Percoco's wife gave guest lectures to fourth graders in the Woodbridge, New Jersey area approximately six to seven times per school year, on average, with each class typically lasting less than two hours. The Government also expects to show, among other things, that, although Percoco's wife assisted with the creation of the curriculum and related presentations, it was a colleague who typed the presentations and gathered the majority of the content, much of which came from other education resources. This evidence will prove that Percoco's wife provided only minimal services to the Energy Company and thus worked a low-show job.[4] *See DeMizio*, 741 F.3d at 383. Meanwhile, Kelly will be free to challenge this evidence through cross-examination, or to offer factual evidence of his own, if any, that refutes the evidence or inferences introduced by the Government.

Tosic's proposed testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue" and thus is irrelevant. Fed. R. Evid. 702(a). By Kelly's own description, Tosic would present compensation data to show "what reasonable compensation would be for helping to create and execute an education outreach program for a major energy company." (Kelly Opp. 6.) Tosic's data and analysis purport to show that the average compensation for jobs Tosic identifies as similar to the teaching position with the Energy Company, including among other things, public relations professionals and full-time teachers (of which Percoco's wife was decidedly not) in a geographic area far wider than the relevant New Jersey school district, falls at or around $90,000 per year.[5] As a result, this expert testimony would address Question Two. But

---

[4] Average jurors will have no trouble applying their common sense and deciding whether the few hours Percoco's wife spent working on curriculum, meeting with her co-workers, and giving lectures at elementary schools constituted "minimal or nominal services." *DeMizio*, 741 F.3d at 383. "Expert testimony is properly excludable where persons of 'common understanding' are 'capable of comprehending the primary facts and of drawing correct conclusions from them.'" *United States v. Dupre*, 339 F. Supp. 2d 534, 541 (S.D.N.Y. 2004), *aff'd*, 462 F.3d 131 (2d Cir. 2006) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)). In any event, Tosic cannot, and does not propose to, testify about the amount of work performed by Percoco's wife because Tosic has no first-hand knowledge of that work.

[5] At present, Kelly has provided the Government only the Bureau of Labor Statistics and Economic Research Institute tables prepared by Tosic, as well as a collection of articles she apparently reviewed in connection with her proposed testimony. Kelly represented in his letter dated December 18, 2017 that, when meeting with Tosic, he provided various information to her, including Energy Company compensation information and documents related to the education program, and further represented that they "may provide her more material." (*See* Gov't MIL Ex.

the answer to Question Two is not a "fact of consequence in determining the action" because it is untethered to how much work Percoco's wife was actually expected to do or actually performed in her job. *See* Fed. R. Evid. 401(b) (defining relevant evidence). As explained in prior letters, Kelly's creation of a job for Percoco's wife, irrespective of her salary, constituted the quid of his corrupt agreement with Percoco. (*See* Gov't MIL 7; Dkt. No. 430.) Of course, the fact that Percoco's wife was not required, nor did she perform, substantial work is relevant and consistent with the inference that the job in fact furthered a bribery scheme. In contrast, it is irrelevant whether $90,000 per year is a fair or reasonable salary for a public relations/teaching consultant who is expected to and does perform substantial work on an energy company's education program.

The Government's allegation is that Percoco's wife's consulting gig was a low-show job because she "provided only minimal or nominal services" in exchange for her annual salary. *DeMizio*, 741 F.3d at 383. (*See* S2 Indictment ¶ 30 ("KELLY agreed to and arranged for the Energy Company to create a 'low-show' job for PERCOCO's wife . . . ."); Compl. ¶ 43 ("KELLY . . . paid PERCOCO's wife a much higher salary than warranted by her limited work . . . .").) Assuming for the sake of argument that Tosic's data is reliable (which it is not), evidence that other comparable jobs had similar or higher compensation relative to that of the Energy Company teaching position would not make it more or less probable that Percoco's wife did minimal work, or that the job itself was a bribe, as alleged. Indeed, as an expert without first-hand knowledge of the facts, Tosic cannot testify about the amount of work that Percoco's wife performed between December 2012 and January 2016. Accordingly, Tosic's expert testimony is not relevant. *See* Fed. R. Evid. 401.

To the contrary, Tosic's testimony would likely mislead the jury into conflating Question One and Question Two. Tosic's data and analysis, which would have an aura of statistical rigor, could easily divert the jury's attention from the evidence related to the actual amount of work performed by Percoco's wife, which was minimal. *Cf. Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) ("What little value [the proposed expert's conclusions] have is far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a medical professional."). For example, the jury may mistakenly conclude that Percoco's wife's job could not have been low show because her annual salary was lower than the average compensation of other supposedly similar positions. Thus, Tosic's testimony should be precluded.

      b.    **Tosic's Testimony Is Not Reliable**

Kelly's arguments in support of the reliability of Tosic's analysis are similarly unpersuasive.

---

B at 2.) The Government requested a copy of this material on January 11, 2018, but has not yet received anything. On January 10, 2018, the Government also requested a copy of all materials reflecting Kelly's compensation arrangement with Tosic, as well as any Federal Rule of Criminal Procedure 26.2 material. Kelly has agreed to produce these materials, but has not indicated when he will provide them to the Government. The Government may seek relief from the Court if Kelly has not produced these materials on or before January 16, 2018.

*First*, Kelly defends Tosic's collection of compensation data for high-paying public relations jobs and actual full-time schoolteacher positions on the ground that Percoco's wife's job was an "amalgam of several positions with multiple aims – curriculum drafting, teaching, public relations, corporate branding, etc." (Kelly Opp. 7.) This justification defies common sense. The fact that Percoco's wife's job may have enhanced the company's public relations goals[6] does not make it appropriate to compare her salary to that of a full-time public relations professional. By the same token, the fact that she taught two-hour guest lectures approximately six or seven times a school year does not mean that her job is somehow equivalent or comparable to that of a schoolteacher who typically teaches a full day, every week day during the school year. Furthermore, the "position descriptions" provided in the last tab of Tosic's "BLS Table" are filled with duties that go well beyond those performed by Percoco's wife, including writing press releases, responding to media requests, managing the company's corporate image and communications with the public, drafting speeches for the company's top executives, evaluating advertising programs and public opinion through social media, supervising staff, overseeing administrative aspects of programs, analyzing data to determine the effectiveness of the program, and writing proposals for funding. (*See also* Gov't MIL 8 & n.6.) All of these public relations and social outreach duties were handled either by Kelly's full-time staff or other outside consultants, but certainly not by Percoco's wife. That she gave limited input on a promotional brochure and participated in some team calls with actual public relations professionals (*see* Kelly Opp. 3) does not make her one. Kelly's explanation is particularly unconvincing because the "multiple aims" of "teaching, public relations, [and] corporate branding" all refer to the same work product—namely, the guest lectures given by Percoco's wife at Woodbridge, New Jersey elementary schools. (Kelly Opp. 7.) In other words, Percoco's wife was not both teaching classes and separately creating public relations materials; instead, she did some work in furtherance of the company's public relations goals by teaching those classes and playing a small role in creating related teaching materials. As a result, treating Percoco's wife's guest lectures as both public relations and teaching work for the purpose of finding supposedly comparable compensation data is tantamount to double counting.

*Second*, Kelly contends that it is appropriate for Tosic to include compensation data for positions throughout the greater New York metropolitan area because Percoco's wife "lived in Westchester and had worked as a teacher in the New York City public school system." (Kelly Opp. 7-8.) However, in her role as a teaching consultant for the Energy Company's education program, Percoco's wife only taught fourth graders in the Woodbridge area. Kelly offers no further explanation as to why it is appropriate to compare Percoco's wife's salary to compensation data that includes positions close to where she lived or previously worked but far from where she

---

[6] Kelly refers to the education program as "award-winning." (Kelly Opp. 2.) Moreover, Kelly references various constituencies who have thanked the Energy Company for the program at various points in his opposition, his expert notice letters, and the expert's notes of what he conveyed to her about Percoco's wife's job. The value of the program to the community is similarly irrelevant, both to the expert's testimony and to the issues in dispute at trial. Whether schoolchildren enjoyed the program and whether the mayor expressed appreciation has no bearing on the amount of work conducted by Percoco's wife and whether her pay outpaced that amount of work. To the extent the defendants intend to admit this type of evidence, the Government may seek the opportunity to further brief or argue the issue. (*See, e.g.*, Dkt. No. 349 at 9-10.)

actually performed her work.  As the Government previously noted, this unjustifiable inclusion of higher salaries in Westchester County and New York City misleadingly inflates the averages calculated by Tosic.[7]  (Gov't MIL 8-9.)  Kelly's observation that the New York metropolitan area also includes certain lower-earning regions does not explain why salaries from Westchester County and Staten Island are proper comparison points for a Woodbridge job.  (Kelly Opp. 8 n.4.)

*Third*, Kelly argues that the Government's objections to the reliability of Tosic's expert testimony can be explored on cross examination and do not warrant preclusion.  (Kelly Opp. 8.)  The cases cited in his letter do not support his position.

- Kelly relies on *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457 (S.D.N.Y. 2007), in which the district court declined to preclude expert testimony notwithstanding the defendant's reliability concerns because the defendant would have the opportunity to cross examine the expert.  *Id.* at 459.  That case is inapposite because it involved "a bench trial where there [was] not a concern for juror confusion or potential prejudice."  *Id.* at 457 n.1.  In stark contrast, in this case, the admission of Tosic's unreliable and misleading testimony on direct examination would create juror confusion and prejudice that cannot be sufficiently mitigated or corrected through cross examination.

- Kelly also cites *Bazemore v. Friday*, 478 U.S. 385, 392 (1986) (Brennan, J., concurring).  There, the Supreme Court faulted the appellate court for rejecting a regression analysis showing racial disparities in salary that included control variables "account[ing] for the major factors" but did not "include *all* measurable variables thought to have an effect on salary level."  *Id.* at 399-400 (quotation marks omitted and emphasis in original).  The Supreme Court explained that the failure to include "all" the variables in the analysis went to the weight of the evidence, rather than its admissibility.  *Id.* at 400.  That ruling is not instructive.  Tosic collected the wrong data on jobs that bear almost no resemblance to Percoco's wife's position.  Accordingly, this is not a situation where Tosic "account[ed] for the major factors" but failed to include certain additional potentially relevant data.  *Id.*  Rather, Tosic's analysis is fundamentally flawed because it is based on misleading and inapposite data.

- Next, Kelly cites *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir. 1992), in which the Second Circuit rejected the defendant-employer's challenges to the expert estimate of the future earnings of the plaintiff, a former employee terminated because of his age.  *Id.* at 1188.  To calculate the plaintiff's hypothetical wage increases over the next 17 years, the expert determined that the plaintiff had

---

[7] Kelly asserts that Tosic has not engaged in an "apples and oranges comparison so flawed as to lack good grounds for her conclusions."  (Kelly Opp. 8.)  But that is precisely the problem with her data collection and resulting analysis.  As explained above and in the Government's motion *in limine*, Tosic calculated averages based on data for positions that bear almost no resemblance to Percoco's wife's job and are located in higher-paying geographic areas.  (Gov't MIL 7-9.)

- received an average increase of 8.3% in the past 17 years and then applied that percentage moving forward. *Id.* In other words, the expert grounded his analysis, in large part, on that specific plaintiff's past wages. *Tyler* is thus factually inapposite. As explained above, Tosic compares Percoco's wife's salary to other jobs that have different responsibilities and work requirements, in different geographical areas, and therefore cannot demonstrate that her analysis "is grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265.

- Finally, Kelly's reliance on this Court's opinion in *United States v. Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364 (S.D.N.Y. Nov. 14, 2014) is misplaced. There, the defendant sought to preclude the expert testimony of a federal agent about the location of certain cellphones based on historical cell tower data. *Id.* at *2. The defendant objected on reliability grounds even though numerous courts had approved of the methods used by the agent. *Id.* (collecting cases). In view of the vast factual differences from the instant case, *Rosario* provides no guidance.

In fact, Kelly's assertion that cross examination is the proper remedy for the Government's reliability objections ignores the Court's role, as the gatekeeper of expert testimony, to determine whether the proposed testimony is admissible at all because it is based upon reliable data and methodology. *See Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005); Fed. R. Evid. 702. Where, as here, the flaws in the expert evidence are "large enough that the expert lacks 'good grounds' for his or her conclusions," the Court should preclude that testimony. *Amorgianos*, 303 F.3d at 267 (quotation marks omitted).

In sum, the Court should preclude Tosic's proposed testimony because it is both irrelevant and unreliable.

### C. Kelly's Proposed Expert Testimony about Lobbying

Kelly continues to press for the admission of irrelevant testimony about lobbying. He argues for the admission of expert testimony about the norms and activities of the lobbying industry, and the legality of those practices. Specifically, Nicholas Allard, his proposed expert, would testify that "using a lobbyist to obtain 'access' to public officials is quite common, and that despite popular perception, there is nothing unseemly, dishonorable or improper about doing so." (Kelly Opp. 10.) Furthermore, in spite of his concession that Allard should not testify about other people's expectations when they hire lobbyists (*see* Kelly Opp. 15), Kelly repackages that improper testimony as an expert opinion that it is "prudent" for individuals and companies to hire lobbyists who know the applicable rules of each jurisdiction (Kelly Opp. 11).

Kelly contends that this testimony is relevant to teach the jurors about the practices and customs of the lobbying industry, and to provide them with the necessary context to understand his defense argument that he "might have deferred to Mr. Howe when Mr. Howe described for him various contacts with public officials on [the Energy Company's] behalf." (Kelly Opp. 12.) He is wrong. As an initial matter, this testimony is not relevant because it is not probative as to any "fact . . . of consequence in determining the action." Fed. R. Evid. 401(b). As explained in the preceding section, the issue at trial is not whether Kelly engaged in lobbying or hired a lobbyist,

but whether the job he created for Percoco's wife was intended as a bribe for Percoco's official action. Expert testimony about legitimate lobbying activities will not make it more or less probable that the teaching job was intended as a corrupt quid.

Kelly counters that Allard's testimony is relevant to the jury's understanding of the legitimate lobbying activities of Kelly and Howe between in or about 2010 and the first half of 2012. Kelly asserts that, because the Government will introduce evidence of Kelly's attempts in those years to ingratiate himself with Percoco through, among other things, a fishing trip and a campaign donation from the Energy Company, he is entitled to have Allard explain that lobbyists engage in actions that may seem unsavory but are legitimate. (Kelly Opp. 9-10.) This argument misses the mark. That earlier conduct is not the basis of any of the charges against Kelly, Percoco, or Howe. The S2 Indictment clearly alleges that Kelly and Percoco committed federal crimes because they conspired to hire Percoco's wife in or about late 2012 as a consultant of the Energy Company in exchange for beneficial official action as opportunities arose. (S2 Indictment ¶¶ 28-31.) The Government has not, and will not, argue that Kelly and Howe's efforts in or about 2010 through early 2012 to befriend Percoco were illicit or illegal.[8] Instead, the Government will offer that evidence to explain the background of the conspiracy and the relationships between the co-conspirators, as well as to prove the importance that Kelly placed on State action and Percoco's knowledge of that fact. As a result, the legality of Kelly's earlier interactions with Percoco is not a "fact of consequence in determining the action." Fed. R. Evid. 401(b). It follows that Kelly's proposed expert testimony about the legitimacy of lobbying activities, which is intended to provide context for those earlier interactions between the two defendants, is not relevant evidence and should be precluded. *Id.*

In any event, Allard does not propose to testify about any practices or standards that fall outside the ken of the average juror. The jury will understand, or easily learn through other evidence, that the primary duties of a lobbyist are to interface with public officials on behalf of clients and to represent certain interests or points of view. *Cf. Gray v. St. Martin's Press, Inc.*, No. 95 Civ. 285, 1999 WL 813909, at *3 (D.N.H. May 19, 1999) (noting that "the influence of, and access provided to political figures by, powerful Washington, D.C., lobbyists" are "familiar and often discussed public issues"). Allard's proposed testimony does not offer much beyond those basic facts. Although he would note that lobbying rules vary across jurisdictions, he does not propose to testify about any specific laws or regulations that might be beyond the knowledge of the average juror. (Kelly Opp. 11, 15.)

Thus, the instant case is distinguishable from *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015) (cited in Kelly Opp. 12), in which the Second Circuit found that the district court abused its discretion in precluding expert testimony "about the highly-specialized field of [residential mortgage-backed securities or RMBS] trading." *Id.*; *see also United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("Labor coalitions and their goals are not well known or commonly understood.") (cited in Kelly Opp. 12).[9] The lobbying industry is not as obscure or complicated

---

[8] Either Kelly or Percoco is certainly free to request a jury instruction regarding the legitimacy of lobbying activities.

[9] The "labor coalition" in *Mulder* was a group that purported to "use[] time-honored tactics of the labor movement to obtain jobs for members of minority groups on construction projects,"

as the RMBS trading world.  Moreover, the precluded expert testimony in *Litvak* would have been particularly helpful to the jury because RMBS trading differed in important ways from the standard stock market trading that is more familiar to jurors.  *See Litvak*, 808 F.3d at 183.  The *Litvak* expert would have explained to the jury that traders of esoteric RMBS securities often rely on their "own sophisticated valuation methods and computer model" rather than on the "market price"; that evidence, in turn, would have undermined the materiality of certain misrepresentations made by a seller about the price of such securities.  *Id.*  Unlike in *Litvak*, here, Allard's testimony about lobbying would consist only of "lay matters which a jury is capable of understanding and deciding without the expert's help." *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (quotation marks omitted).

What is more, expert testimony about industry standards and customs is generally relevant only when the conduct of the defendants is undisputed and "the opinion testimony was received to assist the trier of the facts in evaluating the effect or propriety of that undisputed conduct." *R.B. Ventures, Ltd. v. Shane*, No. 91 Civ. 5678 (CSH), 2000 WL 520615, at *3 (S.D.N.Y. May 1, 2000).  Such testimony is not helpful to the jury and is thus not relevant when "the core issue with respect to the conduct of the parties at bar is hotly disputed."  *Id.*  This is particularly true in the criminal context, where industry acceptance of a particular practice says nothing about its legality.  Even assuming *arguendo* that it is normal practice for lobbyists to give jobs to State officials and their relatives in exchange for official action, that fact would not legalize such conduct.  In the instant case, Kelly strenuously denies that he offered that job to Percoco's wife in order to bribe Percoco for official action.  Allard's background testimony that it is common for lobbyists to provide access to public officials would not assist the jury because it would not provide a basis for the jury to infer that the job did not constitute a bribe offer.  Instead, the "only apparent purpose" for the expert testimony "is to lay a foundation for an inference counsel . . . would ask the jury to draw" that Kelly's interactions with Percoco were innocent efforts to gain access to a State official "consistent with the practice" of the lobbying industry.  *Id.* at *4.  This is supported by Kelly's opposition, which explains that Allard would testify that "there is nothing . . . improper" with a person hiring a lobbyist to obtain such access. (Kelly Opp. 10.)  For the reasons set forth herein, such testimony would likely be confusing, misleading, and unduly prejudicial.

In addition, Kelly seeks to have Allard implicitly opine on the state of mind or intent of an undefined group of people who hire lobbyists.  Kelly expressly concedes that his expert would not testify that people expect their lobbyists to follow the law. (Kelly Opp. 15.)  However, he appears to offer the same substantive testimony in a somewhat reworded form.  In particular, he explains that Allard would testify that "it is prudent for a lay person or corporate executive to hire a professional lobbyist . . . precisely because professional lobbyists do know the local rules and restrictions . . . ." (Kelly Opp. 11.)  The relevance of this testimony is unclear.  Prudence is a civil tort standard that has no application to the criminal law and would therefore be confusing and misleading to the jury.  Allard's opinion that people who hire lobbyists are acting "prudent" could easily be misinterpreted or misunderstood to suggest that those people necessarily have an innocent or pure state of mind.  Similarly, Allard's testimony that lobbyists "know the local rules and restrictions" implies that the "prudent" people who hired the lobbyists wanted to stay within the

---

but instead committed extortion to obtain money and jobs from construction sites in New York City.  273 F.3d at 98.

boundaries of the law. As the Government previously explained, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony" and thus are not relevant testimony. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). (*See* Gov't MIL 4, 6.) Accordingly, his testimony should be precluded due to the risk of unfair prejudice and confusion under Rule 403.

Kelly counters that similar testimony was admitted in *Empress Casino Joliet Corp. v. Johnston*, No. 09 Civ. 3585, 2014 WL 6735529 (N.D. Ill. Nov. 28, 2014), in which the district court permitted limited expert testimony about "interest groups and how they advocate their interests, and testimony regarding what lobbyists do . . . at least as a general matter" in a civil case related to bribery of the governor of Illionis. *Id.* at *10. That decision, however, is neither instructive nor persuasive because the quid in that case was a campaign contribution. The plaintiffs alleged that the defendant violated the Racketeer Influenced Corrupt Organizations ("RICO") Act by working with lobbyists to bribe the governor with a $100,000 campaign contribution. *See id.* at *1; *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 821 (7th Cir. 2016). "A *quid pro quo* agreement to trade a campaign contribution for the governor's signature [was] the foundation of the [plaintiffs'] claim for a RICO conspiracy," as well as for their other claims. *Id.* at 824. Expert testimony about lobbying may be relevant in a campaign-contribution case because, as the Supreme Court has observed, "campaigns must be run and financed" and thus "[m]oney is constantly being solicited on behalf of candidates" who sometimes "act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries." *McCormick v. United States*, 500 U.S. 257, 272 (1991). "Given this political reality, distinguishing an illicit bribe from a genuine [campaign] donation is sometimes no easy task." *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012).

Unlike a bribe in the form of a campaign contribution, a low-show job for the wife of a public official much more clearly constitutes an illicit payment.[10] It is simply not the case that jobs for relatives are "constantly being solicited on behalf of candidates." *McCormick*, 500 U.S. at 272. The case law acknowledges this sharp difference between a campaign-contribution bribe and a classic bribe: when the latter is the quid, "the government does not have to prove an explicit promise to perform a particular act made at the time of payment,'" and that, "[i]nstead, 'it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—*i.e.*, on behalf of the payor—as specific opportunities arose.'" *United States v. Ganim*, 510 F.3d 134, 144 (2d Cir. 2007) (quoting *United States* v. *Coyne*, 4 F.3d 100, 114 (2d Cir. 1993)); *cf. McCormick*, 500 U.S. at 273 (requiring an explicit promise by the official to perform an official act in exchange for the illicit contribution).

---

[10] Any confusion by Howe as to whether certain of his work activities constituted lobbying under New York State rules and regulations, and therefore required registration with the State (*see* Kelly Opp. 11), has no bearing on the issue of whether Percoco's wife's job constituted a bribe. In fact, Howe has been clear that Kelly offered that job in exchange for Percoco's official actions. Howe has pleaded guilty to committing federal crimes in connection with his role in facilitating this bribery scheme involving Kelly and Percoco. (*See* 3512-41 (Sept. 20, 2016 Plea Tr.), at 41-43.)

January 12, 2018
Page 12

      Accordingly, Allard's testimony should be precluded as irrelevant and unduly prejudicial.

\*    \*    \*

      In sum, the Government respectfully submits that the Court should preclude the proffered expert testimony of Kunkel, Tosic, and Allard.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/
    Janis Echenberg/Robert Boone/
    David Zhou/Matthew Podolsky
    Assistant United States Attorneys
    (212) 637-2597/2208/2438/1947

cc: Counsel for all defendants (via ECF)