UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,

        -against-

JOSEPH PERCOCO,
     a/k/a "Herb,"
ALAIN KALOYEROS,
     a/k/a "Dr. K,"
PETER GALBRAITH KELLY, JR.,
     a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

                         Defendants.

------------------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:___2/13/2018___

16-CR-776 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

On December 27, 2017, the Government moved *in limine* to preclude the expert

testimony of Dubravka Tosic. *See* Ltr. (Dec. 27, 2017), Dkt. 418 ("Gov. Mot."). On January 19,

2018, the Court held a *Daubert* hearing and orally GRANTED the Government's motion. This

order explains the reasons for the Court's ruling.

## BACKGROUND

Defendants Percoco, Kelly, Aiello, and Gerardi (the "January Defendants") are currently

being tried on bribery and corruption charges. The Court assumes familiarity with the

allegations in this case. *See generally* Order and Opinion (Dec. 11, 2017), Dkt. 390, 2017 WL

6314146; Second Superseding Indictment (Sept. 19, 2017), Dkt. 321 ("S2 Indictment");

Complaint (Sept. 20, 2016), Dkt. 1 ("Compl.").

On December 27, 2017, the Government moved *in limine* to preclude the testimony of three expert witnesses:  Dubravka Tosic, whom Kelly offered to testify about the reasonableness of the compensation paid to Percoco's wife by Competitive Power Ventures ("CPV"); Nicholas Allard, whom Kelly offered to testify about lobbying practices; and Michael Kunkel, whom Percoco offered to testify about "blank" emails on the exhibit lists of some of the January Defendants.  *See* Gov. Mot.  On December 28, 2017, Kelly moved *in limine* to preclude some testimony from two of the Government's fact witnesses, teachers who worked in the same education program as Percoco's wife.  *See* Ltr. (Dec. 28, 2017), Dkt. 420.

On January 19, 2018, the Court held a *Daubert* hearing on Tosic's proposed testimony.  *See* Transcript (Jan. 19, 2018), Dkt. 481 ("Tr.").  The Court also held argument on the Government's other motions and on Kelly's motion.  At the conference, the Court orally granted the Government's motion to preclude Tosic and stated that a written opinion would follow.  The Court reserved decision on the Government's motion to preclude Allard until the close of the Government's case-in-chief.  The Court also reserved decision on the Government's motion to preclude Kunkel, pending an admissibility determination of the "blank" emails and a possible stipulation to Kunkel's testimony.  Finally, the Court granted Kelly's motion in part and denied it in part.

Trial for the January Defendants began on January 22, 2018.  The Government's case-in-chief is ongoing.

## DISCUSSION

### I. Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony.[1] "When parties seek to introduce expert testimony in accordance with Rule 702, a district court must serve as a gatekeeper." *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). "The Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993)).

The threshold question for a district court is whether the "proffered expert testimony is relevant." *Amorgianos*, 303 F.3d at 265. "Next, the district court must determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" *Id.* (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)). Among other things, a district court should consider whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. *See id.* "[I]t is critical that an expert's analysis be reliable at every step." *Id.* at 267.

"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison . . . ." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d

---

[1]      Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

457, 459 (S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. 'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)); *see also United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir.), *cert. denied*, 138 S. Ct. 176 (2017).

## II.    The Government's Motion to Preclude Dubravka Tosic's Testimony Is Granted

### A.    Tosic's Proposed Testimony

The Government charges Kelly with paying bribes or gratuities to Percoco by providing his wife an allegedly "low-show" job. *See* Gov Mot. at 2; S2 Indictment ¶ 30; Compl. ¶¶ 32, 39–43. Ms. Percoco had been a public school teacher in New York City. Compl. ¶ 39. Kelly allegedly caused his employer, CPV, to hire Ms. Percoco as part of a newly-created education program, called CPV Educates. *Id.* ¶ 44(a). The program brought Ms. Percoco and others into elementary school classrooms in Woodbridge, New Jersey, allegedly in order to build support for a nearby development project. *See id.*; Gov. Mot. at 2. CPV paid Ms. Percoco $7,500 per month, or $90,000 per year, for her work. Compl. ¶¶ 44(b).

Kelly offered Tosic to testify that Ms. Percoco's compensation was "within reasonable parameters." Ltr. (Nov. 28, 2017), Dkt. 418, Ex. A, at 3; *see also* Tr. 54:11–55:18. To reach this conclusion, Tosic compared Ms. Percoco's salary to the compensation of other jobs that allegedly had "similar responsibilities and experience," in a similar geographic area, during the "relevant time period." Ltr. (Nov. 28, 2017), Dkt. 418, Ex. A, at 2–3.

Tosic relied primarily on two labor databases, the Occupational Employment Statistics ("OES") dataset, provided by the U.S. Bureau of Labor Statistics ("BLS"), and the Salary Assessor dataset, provided by the Economic Research Institute ("ERI"). *See* Ltr. (Dec. 18, 2017), Dkt. 418, Ex. B, at 2. These databases collect compensation information for various jobs across different geographic areas. *See* Tr. 60:17–61:9. From each database, Tosic found five to seven jobs with responsibilities that she deemed to be "similar" to Ms. Percoco's position and collected data on their annual mean and median salaries. Exs. BKX-524, BKX-525. Tosic added 30 percent to each of these salaries to account for the value of fringe benefits that Ms. Percoco, as an independent contractor, did not receive.[2] Exs. BKX-524, BKX-525; Tr. 63:16–64:8. Tosic then calculated the arithmetic average of those salaries (with the 30 percent premium). Exs. BKX-524, BKX-525. That figure—an average of salaries for numerous purportedly "similar" jobs, enlarged by the value of fringe benefits—served as a reference point from which Tosic assessed the "reasonableness" of Ms. Percoco's compensation. Tr. 74:8–23.

Tosic performed a few alternative calculations to generate additional reference points. In one iteration, she reduced the annual mean/median salary for each comparator job by 50 percent, before adding the value of fringe benefits. Exs. BKX-524, BKX-525; Tr. 70:23–71:6. She then performed the same calculation with a 75 percent reduction of the annual mean/median salary. Exs. BKX-524, BKX-525; Tr. 70:23–71:6. Tosic also performed calculations in which she weighed some comparator jobs more heavily than others in her analysis, purportedly to account for variations in Ms. Percoco's role. Exs. BKX-524 (labeled as "weighted average"), BKX-525

---

[2]     Tosic testified that the value of an employee's fringe benefits is typically around 30 percent of the employee's base salary. Tr. 63:16–64:8, 81:4–20. She drew this data from the Employer Cost for Employee Compensation survey, which is provided by the U.S. Bureau of Labor Statistics. *Id.* 63:16–64:8.

(same).  Finally, Tosic drew data from lower percentiles, to account for Ms. Percoco's lack of experience in some areas, and performed the same calculations on those lower salaries. Exs. BKX-524 (data drawn from 25th percentiles), BKX-525 (data divided by years of experience).  Tosic used these calculations as alternative benchmarks for the "reasonableness" of Ms. Percoco's salary.  Tr. 70:23–71:6, 187:4–9.

### B.    Tosic's Testimony Is Not Reliable[3]

Tosic's opinion about Ms. Percoco's salary is inherently comparative.  Her testimony, then, is reliable only if her comparisons are reasonable and grounded in a sound methodology, reliably applied.  The Court will focus on three steps in Tosic's analysis: (a) identifying jobs with responsibilities "similar" to those of Ms. Percoco, (b) determining the relevant geographic area, and (c) accounting for other variables in compensation data, such as fringe benefits.

### 1.    Job Categories

To assess the reasonableness of Ms. Percoco's salary, Tosic first needed to identify similar jobs to serve as comparison points.  In Tosic's view, Ms. Percoco's position was an "amalgam" of several different jobs.  Ltr. (Jan. 6, 2018), Dkt. 434 ("Kelly Resp."), at 7; *see also* Tr. 174:16–175:5.  The position involved teaching and curriculum development.  Kelly Resp. at 3.  But, as part of a private company's efforts to build community support, it also involved public relations and corporate branding.  *Id.* at 3, 7; Tr. 57:2–19.  Thus, Tosic considered compensation data for public relations, community development, and teaching positions.  Kelly Resp. at 7; Tr. 57:2–19, 59:20–60:5.  In the BLS dataset, for example, Tosic collected salary information for "Public Relations and Fundraising Managers" and "Social and Community Service Managers," along with "Elementary School Teachers" and four other positions.

---

[3]    The Court assumes for purposes of this motion that Tosic's testimony is relevant.  The parties also do not dispute that Tosic's specialized knowledge in the field of labor economics qualifies her as an expert witness.

Ex. BKX-524.  Tosic collected the mean and median annual compensation data for each of those positions and averaged them together, before adjusting for fringe benefits and performing the alternative calculations that the Court has described.  *Id.*

Tosic had no clear methodology for choosing these positions.  After learning about Ms. Percoco's responsibilities, Tosic simply scrolled through the hundreds of jobs in the BLS and ERI databases and chose the ones that she "felt" were most appropriate comparators.  Tr. 90:9–21.  Tosic offered no explanation as to *how* she reviewed and decided among possible comparator jobs.

Kelly argues that Tosic chose comparator jobs whose duties "contain[] aspects that overlap with Ms. Percoco's responsibilities."  Kelly Resp. at 7; *see also* Tr. 75:16–76:6, 158:17–159:19.  But *other* jobs in the BLS and ERI databases also overlapped with Ms. Percoco's responsibilities.  Tosic offered no method for choosing one comparator job over the other.  For example, why did she include "Public Relations and Fundraising Managers" but not "Marketing Managers" or "Advertising and Promotions Managers"?  *See* Ex. GXD-22 at 2; May 2013 Occupation Profiles, Bureau of Labor Statistics (Apr. 1, 2014), https://www.bls.gov/oes/2013/may/oes_stru.htm.  Absent some reliable or replicable system for choosing among comparator jobs, and a basis for that system in studies or data, Tosic's analysis is predicated on arbitrarily chosen data.

Further illustrating the arbitrariness of Tosic's selection of data, the jobs she selected contain numerous aspects that clearly do not overlap with Ms. Percoco's role and, in fact, go well beyond the scope of her responsibilities.  According to a BLS handbook, for example, "Public Relations and Fundraising Managers" write press releases and "prepare information for the media."  Ex. GXD-1.  Tosic stated that she had no reason to believe that Ms. Percoco

performed those functions. *See* Tr. 128:16–129:15. Similarly, Tosic included "Public Relations Specialists" as a comparator position in her analysis. Ex. BKX-524. The BLS handbook describes that position as involving "draft[ing] speeches and arrang[ing] interviews for an organization's top executives." Ex. GXD-2. Tosic admitted that she had seen no evidence that Ms. Percoco performed these duties. *See* Tr. 130:3–131:10.[4]

Tosic failed—entirely—to account for these discrepancies. Her baseline calculations simply averaged the annual mean/median salary of each comparator job that she selected—that is, she assigned each comparator job an equal weight. *See* Exs. BKX-524, BKX-525; Tr. 74:13–15, 89:23–90:1 ("So the average is a very simple average, where every single occupation is weighed the same way."). Tosic offered no explanation why it was appropriate to weigh each job equally, when some jobs clearly had more overlap with Ms. Percoco's responsibilities than others.

Tosic also calculated "weighted averages," in which she weighed the public-relations-type comparator jobs at 75 percent and the teaching-type comparator jobs at 25 percent. *See* Exs. BKX-524, BKX-525; Tr. 89:18–91:12. Tosic explained that when Ms. Percoco's salary was initially set, her duties "were more in line with" public relations than with teaching. Tr. 90:3–8. Even if this were true, Tosic's "weighted averages" failed to account for the areas of public relations that Ms. Percoco undisputedly did *not* perform, such as drafting press releases and

---

[4]     Regardless of the BLS handbook, Tosic's choices of comparator jobs were plainly inappropriate when read with some basic common sense. Ms. Percoco, who developed curriculum and taught lessons to fourth graders, was clearly not a "Public Relations and Fundraising Manager." Kelly alleges that Ms. Percoco had some involvement in creating promotional materials and participated in some calls with public relations professionals. *See* Kelly Resp. at 3. Those limited tasks do not make her a public relations manager, in the sense that any reasonable person would use the term—and certainly not in the sense that BLS used the term. Kelly also argues that the goal of CPV Educates was to generate goodwill and positive public relations. *See id.* at 4. That argument conflates the ultimate *goal* of the program with the day-to-day *duties* of a person working within that program. Neither Kelly nor Tosic explained why that leap was appropriate.

executive speeches. Tosic's "weighted averages," then, fail to address the Court's concerns on this point.[5]

In sum, nothing in Tosic's analysis accounts for the stark differences between her comparator jobs and Ms. Percoco's responsibilities. Nor did Tosic offer any objective methodology to support her selection or weighting of those jobs. What we are left with, then, is a series of arbitrary, inappropriate, and unreasonable comparisons.[6]

### 2. Geographic Areas

Tosic's next step was to define the geographic area relevant to her analysis. Compensation varies geographically, so Tosic needed to define a reasonable area from which to select comparative compensation data.

### i. The BLS Data

Tosic testified that the "relevant labor market" for her analysis was the area where Ms. Percoco performed her work for CPV Educates. Tr. 76:6–15; *see also id.* 78:13–21, 152:21–153:1. Tosic explained that Ms. Percoco performed most of her work from her home in Westchester County, New York. *Id.* 76:7–22, 152:19–153:1. Particularly during the first few years of her tenure, Ms. Percoco worked from home developing curriculum and promotional materials. *Id.* 152:19–153:1. Ms. Percoco also performed some work in the township of

---

[5]       Tosic also admitted that her choices of 75 percent and 25 percent were "just a judgment call," that is, they were chosen arbitrarily. Tr. 91:3–12. The arbitrariness of Tosic's "weighted averages" makes it impossible to draw any reliable conclusions at all, let alone to address the concerns that the Court has expressed.

[6]       At the *Daubert* hearing, Tosic testified that her conclusion about the "reasonableness" of Ms. Percoco's compensation would not change even if she removed the higher-paying public relations positions from her analysis. Tr. 101:23–102:8. Accordingly, Kelly argues that these positions did not "[drive] her analysis" and should not cause the Court to preclude Tosic's testimony. *Id.* 186:24–187:24. Kelly misses the point. The problem is not the particular positions that Tosic included but, rather, the methods that she employed. Even without the public relations jobs, Tosic still cherry-picked *other* jobs from the BLS and ERI databases without any reliable methodology. And she still failed to account for the differences between those jobs and Ms. Percoco's actual responsibilities. Her opinions remain unreliable and inadmissible.

Woodbridge, which is in Middlesex County, New Jersey. *Id.* 77:5–13. Once the CPV Educates program was up and running, Ms. Percoco taught the curriculum to students there. *Id.* 77:5–13, 137:18–20. Thus, Tosic said, it was important to include both Westchester and Middlesex compensation data in her analysis. *Id.* 76:7–77:13.

Tosic selected two regions from the BLS database: the "New York-White Plains-Wayne, NY-NJ Metropolitan Division" and the "New York-Jersey City-White Plains, NY-NJ Metropolitan Division." Ex. BKX-524. Because these regions included both Westchester and Middlesex, Tosic said, they fully captured the labor markets in which Ms. Percoco worked. Tr. 77:5–13.

Tosic was wrong in her description of these regions. Middlesex County was not part of BLS's "New York-White Plains-Wayne, NY-NJ Metropolitan Division" in 2013 or 2014. *See* Exs. GXD-17 at 112, GXD-18 at 101; Tr. 138:8–15. Thus, at least two years of Tosic's analysis did *not* fully capture the markets in which Ms. Percoco worked. Tosic apparently did not realize this when she developed her analysis. *See* Tr. 77:5–13 (Tosic stating on direct examination that her BLS regions included Middlesex County). When confronted on cross examination with this information, Tosic admitted that her BLS chart was "incorrect." *Id.* 138:8–139:2. By Tosic's own assumptions, then, her analysis was based on faulty data.[7]

---

[7]  To rehabilitate his expert, Kelly argued that salaries in Westchester are no higher than salaries in Woodbridge, essentially rendering harmless Tosic's failure to include Woodbridge in the BLS regions. *See* Tr. 88:23–89:16, 178:21–179:2. The Court disagrees. The mean salary in 2013 for a "Public Relations Representative" was $67,128 in Woodbridge but $73,277 in South Salem (the town in Westchester in which Ms. Percoco lived). Ex. BKX-525. That is an almost 10 percent difference. Tosic herself admitted that teachers' salaries are lower in Woodbridge than in Westchester. *See* Tr. 140:19–141:16 ("The Court: So the salaries in Woodbridge are lower. The Witness: Yes, they are. The Court: So you were incorrect before when you said they were all about the same. The Witness: Well, I was thinking about the totality of the occupations that I looked at, not just the elementary school teachers or the teachers."). In any event, Kelly's argument misses the larger point. Regardless of whether the salaries are the same between the two areas, Tosic had no reliable method for choosing one area over the other.

More importantly, Tosic's assumptions lack any foundation. Tosic assumed that the relevant market for a comparative compensation analysis was the physical location where a person worked, even if that person was an independent contractor who worked from home. Tosic repeatedly stated that she based her analysis on this assumption, but she provided no studies, facts, or data to support that assumption. *Id.* 76:6–25, 154:15–158:13. When asked how often employers set salaries based on an independent contractor's residence (if that contractor works from home), Tosic could reply only that "[s]ometimes they do" and "[i]t's hard to say." *Id.* 76:21–25; *see also id.* 154:15–158:13. Tosic's reasoning fell dramatically short of testimony that is "grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 268.

Once again, a small amount of common sense shows how absurd Tosic's assumptions are. In Tosic's view, if an independent contractor worked from home, the employer would set the contractor's salary based on the location of the contractor's residence, however remote that might be. Ms. Percoco could have lived in Boston, upstate New York, or Alaska—Tosic still would have taken those labor markets into account when identifying appropriate comparative compensation data.[8]

## ii.    The ERI Data

Tosic selected ERI compensation data from a "50 mile radius around Woodbridge, NJ." Ex. BKX-525. Tosic explained that she "wanted to get a similar geographic region to the region that was used" in the BLS data chart. Tr. 85:8–14. Tosic's description of her geographic area was again wrong. The ERI "geographic region" was not "similar" to the BLS regions; the ERI

---

[8]      *See* Tr. 79:16–79:21 ("The Witness: Well, if [Ms. Percoco] performed the work from Boston, then I would have considered Boston as well. The Court: You absolutely would? The Witness: Yes."), 156:9–20 ("The Witness: Well, what matters is where the work is done. The Court: Why? As you have said, it doesn't matter where the work is done. The person could be sitting in an igloo in Alaska. They're communicating via email. . . . The Witness: Well, that's one of the elements. The Court: What's one of the elements? The Witness: Where the work is performed.").

area centered around Woodbridge, and the BLS areas did not include Woodbridge in 2013 and 2014. *See* Exs. GXD-17 at 112, GXD-18 at 101; Tr. 138:8–15. Furthermore, as the Court has explained, the choice of BLS areas had no basis in common sense, facts, or data. If the ERI region was based on the BLS regions, then the ERI region was equally unfounded. Finally, Tosic offered no basis for her choice of a 50-mile radius (as opposed to a 40-mile or a 10-mile radius), further undercutting the appropriateness of the data on which she relied.

Put simply, Tosic's choice of geographic regions was arbitrary and unfounded. She based these regions on assumptions that had no support in data or common sense. And she contradicted herself and admitted errors in her analysis. *See, e.g.*, Tr. 138:8–139:2. In short, her opinion is unreliable in every sense of the word.[9]

### 3. Accounting for Fringe Benefits

After identifying compensation data associated with purportedly "comparable" jobs, Tosic increased all comparator salaries by 30 percent. *See* Exs. BKX-524, BKX-525; Tr. 63:16–64:8, 74:21–24. In the BLS data, for example, Tosic took the median and mean annual salaries for "Public Relations and Fundraising Managers" and increased those amounts by 30 percent. Ex. BKX-524. She then did the same for all other comparator jobs, before averaging those inflated numbers together to arrive at a reference point for Ms. Percoco's compensation. *See* Tr. 74:21–24.

---

[9] As a last-ditch maneuver, Kelly's attorney argued that Ms. Percoco "lived practically smack in the middle of three different developments by CPV," making her residence in Westchester the relevant geographic area for Tosic's analysis. Tr. 176:14–177:7; *see also id.* 168:21–169:6. Kelly failed to lay an adequate foundation for this assertion. Tosic mentioned only briefly that Ms. Percoco's proximity to CPV developments might have been "an important factor" in CPV's compensation decision. *Id.* 168:21–169:6. She failed to cite any evidence on which she could have based that inference. Tosic also did not demonstrate that the geographic regions she considered matched the area "in the middle of" CPV's three developments. *Id.* 176:14–177:7. That area includes parts of Connecticut, for example, which Tosic did not include in her analysis. It seems much more likely that Tosic selected geographic regions based on the location from which Ms. Percoco performed her duties (as Tosic testified repeatedly), rather than on Ms. Percoco's proximity to CPV developments.

Tosic explained that 30 percent represents the average value of employees' fringe benefits (such as health insurance). *Id.* 63:16–64:8. Ms. Percoco did not receive fringe benefits as an independent contractor. *Id.* 58:7–22. In Tosic's view, an assessment of the reasonableness of Ms. Percoco's compensation needed to take into account the fact that employees doing similar work to Ms. Percoco received fringe benefits, while Ms. Percoco did not. *See id.*; Kelly Resp. at 4.

Tosic failed to provide any foundation for this approach. At the *Daubert* hearing, she and Kelly argued that an assessment of the "reasonableness" of a salary should take place from the contractor's point of view (*i.e.*, whether an independent contractor might "reasonably" have demanded the salary that Ms. Percoco received). *See* Tr. 122:4–13, 169:12–170:4, 188:6–24, 196:22–197:16. According to Kelly, an independent contractor in Ms. Percoco's situation would demand a higher salary to compensate for the lack of fringe benefits. *See id.* 169:12–170:4, 188:6–24, 196:22–197:16. But Kelly and Tosic failed to support this assertion with any studies or data. Their assumption about what an independent contractor "might" do in this situation is pure conjecture.[10] *Id.* 169:12–19. The next step in their argument—that employers actually agree to such demands and increase contractors' compensation to account for the absence of fringe benefits—is even more conjectural.

Tosic also failed to apply this principle reliably to her data. She testified that the BLS dataset included salaries for both full-time and part-time workers. *Id.* 63:5–11, 144:23–145:4. Tosic acknowledged that part-time workers do not usually receive fringe benefits. *Id.* 69:21–24. Yet Tosic indiscriminately increased *all* BLS salaries by 30 percent, without taking into account

---

[10]     It seems equally plausible that an independent contractor might *not* demand a higher salary, knowing that the employer wishes to save money by hiring an independent contractor for whom fringe benefits will not be provided. Without studies, data, or other foundation, the Court has no way of knowing one way or the other.

that the data included part-time workers.[11]   *Id.* 69:21–70:1.  Tosic had no explanation for this

gap in her logic.  When asked whether she had any reason to believe that the part-time workers

in the BLS data received fringe benefits, Tosic could reply only that "[t]hey may in some cases"

and that she "would have to look at data" to answer the question.  *Id.* 119:13–121:4.  In Tosic's

own words, she simply "assumed"—without foundation—"that everybody that is included in the

averages and the occupations that [she] looked at" received "a value [in] benefits that equals 30

percent."  *Id.* 120:14–18.[12]

In short, Tosic had no reasonable basis for adding the value of fringe benefits to her

analysis.

### C.    Tosic's Opinions Warrant Preclusion

Kelly urges this Court to allow him to present Tosic's opinions to the jury, arguing that

any flaws in Tosic's reasoning go to weight, not admissibility.  *See* Kelly Resp. at 8; Tr. 190:13–

191:14.  The Court disagrees.  Tosic injected numerous assumptions into her analysis that lack

support in data or common sense.  At the *Daubert* hearing, Tosic was unable to answer basic

questions about those assumptions, let alone explain why they are reasonable.  She contradicted

herself and admitted errors in her analysis.  *See, e.g.*, Tr. 138:8–139:2.  When an expert's

---

[11]     If Tosic's theory on compensation practices were correct, the salaries of these part-time workers would already be inflated.  In Tosic's view, the employers of part-time workers (who are presumably independent contractors without fringe benefits) would already have increased their salaries to account for their lack of fringe benefits.

[12]     Tosic later stated that the effect of including part-time workers in the data was to bring the salary levels down, meaning that her error did not inflate her comparisons.  Tr. 150:1–12.  The Court's concern is not merely the inclusion of part-time salaries but, rather, the enlargement of those salaries by adding the value of fringe benefits.  The effect of that calculation is, of course, to skew the numbers upward.

Tosic also ran alternative calculations in which she reduced the average salary data by 50 percent or 75 percent before adding the value of fringe benefits.  *See* Exs. BKX-524, BKX-525.  These numbers are meaningless.  Tosic admitted that she could have chosen any value other than 50 or 75 percent; she "just wanted to see what the numbers would look like."  *Id.* 71:9–16.  In other words, Tosic's choice of percentages here was random and arbitrary.

testimony is "speculative or conjectural," and when the expert's assumptions "are so unrealistic and contradictory as to suggest bad faith," a court properly excludes that expert from testifying. *Tiffany*, 576 F. Supp. 2d at 459. Admitting any portion of Tosic's testimony would be misleading and irresponsible. It would mean abandoning this Court's role as a gatekeeper.[13]

Kelly also asks the Court to reserve decision on the admissibility of Tosic's testimony. *See* Tr. 186:6–12, 191:3–10. He argues that further relevant evidence may be adduced at trial and that Tosic can adjust her analysis accordingly. *See id.* 91:23–92:14, 186:6–12, 191:3–10. The Court declines to reserve decision. No amount of evidence about Ms. Percoco's role could rectify Tosic's methodological problems. Even if, for example, Kelly could show that Ms. Percoco performed some of the duties of a high-level public relations professional, he could not change the fact that Tosic cherry-picked jobs from the databases and averaged them together without accounting for their differences or for the relative amount of time that Ms. Percoco spent on different tasks. Nor could any amount of evidence about CPV Educates provide a basis for Tosic's assumption that employers set independent contractors' compensation higher than that of employees to account for the absence of fringe benefits. The Court has based its ruling on Tosic's methods and assumptions, not on the evidence available about Ms. Percoco and CPV.

---

[13] For these reasons, the cases that Kelly cites in his response letter are distinguishable. *See* Kelly Resp. at 8–9 (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992); *United States v. Rosario*, No. 09-CR-415, 2014 WL 6076364, at *3 (S.D.N.Y. Nov. 14, 2014)). In each of these cases, a proposed expert witness provided a reasonable basis for the assumptions in his or her analysis. For example, in *Bethlehem Steel*, a case involving a discriminatory job termination, an expert projected that the plaintiff would have received annual salary increases of 8.3 percent had he continued working for the defendant. 958 F.2d at 1188. The expert explained that the plaintiff's wages had increased by 8.3 percent in each of the past seventeen years. *Id.* The defendant argued that the 8.3 percent assumption was unrealistic, because the company lacked a budget for such increases and because no other employee earned such a high salary. *Id.* But because the expert had proffered a reasonable basis for his assumptions, the defendant's arguments went to weight, not admissibility. *Id.* In the instant case, Tosic has failed to provide any basis for her assumptions beyond conjecture. Her opinion is, therefore, properly excluded.

**CONCLUSION**

For the foregoing reasons, the Government's motion to preclude the expert testimony of

Dubravka Tosic is GRANTED.

**SO ORDERED.**

**Dated: February 13, 2018**
     **New York, NY**                                                                                **VALERIE CAPRONI**
                                                                            **United States District Judge**