UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/10/2018

-------------------------------------------------------------- X

UNITED STATES OF AMERICA, :
 :
        -against- :
 :
JOSEPH PERCOCO, :
        a/k/a "Herb," :
ALAIN KALOYEROS, :                          16-CR-776 (VEC)
        a/k/a "Dr. K," :
PETER GALBRAITH KELLY, JR., :               MEMORANDUM OPINION
        a/k/a "Braith," :                      AND ORDER
STEVEN AIELLO, :
JOSEPH GERARDI, :
LOUIS CIMINELLI, :
MICHAEL LAIPPLE, and :
KEVIN SCHULER, :
 :
                        Defendants. :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

On March 13, 2018, a jury returned a verdict in the trial of Defendants Joseph Percoco,

Peter Galbraith Kelly, Jr., Steven Aiello, and Joseph Gerardi (the "January Defendants").[1] Prior

to charging the jury, the Court dismissed one count of extortion under color of official right as to

Percoco, pursuant to Federal Rule of Criminal Procedure 29(a). *See* Order (Feb. 28, 2015),

Dkt. 515. This opinion explains the reasons for the Court's ruling.

---

[1]        Prior to trial, the Court divided the Defendants into a group that would be tried in January (Defendants Percoco, Kelly, Aiello, and Gerardi) and a group that would be tried in June (Defendants Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler). *See* Order (July 18, 2017), Dkt. 279; Order (Aug. 3, 2017), Dkt. 307.

# BACKGROUND

I.     Facts[2]

The Government charged Percoco with engaging in two extortion schemes: one related to an energy company, Competitive Power Ventures ("CPV"), and the other related to a real estate company, COR Development Company LLC ("COR Development" or "COR"). *See* Complaint, Dkt. 1; Second Superseding Indictment (Sept. 19, 2017) ("S2 Indictment"), Dkt. 321. Only the scheme involving COR is relevant to this decision.

Until 2016, Percoco was a top aide to the Governor of New York, Andrew Cuomo. *See* Tr. 441–43. Percoco was a longtime friend of Cuomo, having served on Cuomo's staff when Cuomo was New York State's Attorney General and the U.S. Secretary of Housing and Urban Development. Tr. 459, 496–97, 2130–32, 3185, 3646.[3] Under Andrew Cuomo, Percoco served as Executive Deputy Secretary in the Governor's office, also known as the Executive Chamber. *See* Tr. 443, 1103–05. In that position, Percoco oversaw numerous divisions within the Executive Chamber, including the divisions responsible for operations, appointments, and labor relations. Tr. 441–42, 457–58, 1103–05, 1119–20, 1248–49. By virtue of his position and his relationship to Cuomo, Percoco was known to be one of the most powerful members of the Cuomo administration. *See* Tr. 1119–20, 1183–85, 1231–32, 2092, 2098, 2197, 3185.

---

[2]     The Court assumes familiarity with the facts of the case and discusses only those facts relevant to the Court's decision to dismiss one of the extortion counts. The Court refers to the January Trial transcript as "Tr." and to exhibits by the numbers that they were given at the January Trial.

[3]     Percoco also worked for Cuomo's father, Mario, when Mario Cuomo was New York State Governor. *See* Tr. 497, 2116–18, 3185.

In April 2014, Percoco left state employment to work full time on Cuomo's reelection campaign. *See* GX-1206; SYR-3832; Tr. 444, 573–75, 912–14, 1016, 1185.[4] Although he no longer held an official position, Percoco continued to use his office and telephone in the Executive Chamber, and he continued to exercise influence over numerous state projects, operations, and personnel. *See, e.g.*, GX-571, GX-669, GX-676, GX-1507, GX-1701, GX-1702; Tr. 1127–28, 1231–35, 1249–52, 2379–80, 2410–17, 2535–37, 4964–68. According to cooperating witness Todd Howe, "regardless of whether [Percoco] was [on] the campaign . . . he had the ability to pick up the phone and get things done." Tr. 2098.

In the summer of 2014, Empire State Development ("ESD"), a state agency, told COR that the company would need to enter into a "labor peace agreement" ("LPA") in order to receive a state grant to help finance a project that COR was developing in the Syracuse Inner Harbor area. *See* GX-513, GX-551; Tr. 643–46, 660–61, 2533–34. Because COR believed that having an LPA would make the project more costly, Aiello and Gerardi, two executives at COR, sought assistance from Percoco to reverse ESD's decision to require the LPA. *See* GX-551, GX-556A, GX-1706. In late July 2014, Aiello emailed Howe, who was a consultant for COR, asking, "[I]s there any way [Percoco] can help us with this issue while he is off the 2nd floor [*i.e.*, not employed by the Governor's office] working on the Campaign[?]" GX-550. Less than two weeks later, COR paid Percoco $15,000, routed through Howe. GX-1401I, GX1420H, GX-1606A; Tr. 2098–99, 2479–80.[5] Howe, Aiello, Gerardi, and Percoco exchanged a number of emails about the LPA throughout the summer and fall of 2014. *See, e.g.*, GX-1707 (collecting

---

[4]     Inexplicably, although Percoco resigned from state employment, he was allowed to retain his swipe card, which gave him access to the Executive Chamber offices, and he was allowed continued use of his former office and telephone in the Executive Chamber. *See* GX-1172B, GX-1701, GX-1702; Tr. 1127–28.

[5]     Although not relevant to the issue at hand, Aiello and Gerardi disputed at trial that the funds that were transferred from COR to Howe ultimately went to Percoco.

emails).  In October 2014, COR paid Percoco another $20,000, again routed through Howe.  GX-1401J, GX-1420L, GX-1606B; Tr. 2098–99, 2483–84.

In early December 2014, Gerardi reached out to Percoco through Howe because ESD was continuing to press COR to enter into an LPA.  *See* GX-583, GX-586, GX-588, GX-1706.  Approximately one hour later, Percoco called Andrew Kennedy, an employee in the Governor's office, and told Kennedy to stop ESD from requiring COR to enter into the LPA.  *See* GX-1706; Tr. 475–76, 1272–76.  Kennedy subsequently contacted an official at ESD, causing a flurry of calls and emails among the agency's staff.  *See* GX-1706; Tr. 682–85, 1274–76.  The next day, ESD told COR that it would no longer require an LPA for the project.  *See* GX-590, GX-1706; Tr. 685–86.

A few days later, Percoco returned to state employment.  *See* GX-1206; Tr. 444, 1016.  Subsequently, in mid-2015, Percoco pressured state officials to release funds that had been allocated to one of COR's projects, *see* GX-1703, and, later that year, he secured a raise for Aiello's son, who worked in the Executive Chamber, *see* GX-1704.

## II.    Procedural History

Before the case was submitted to the jury, the Court asked the parties to address whether Count Eight,[6] which charged Percoco with extortion under color of official right, 18 U.S.C. § 1951, in relation to the COR Development scheme, must be dismissed because Percoco did not hold any official position at the time that he received payments from COR Development.  Tr. 3689–90.  The Court entertained numerous arguments on this question in the following days.

---

[6]     For purposes of Percoco's trial, the Government prepared a redacted indictment including only the charges against the four January Defendants.  *See* Trial Indictment, Dkt. 397.  In that redacted indictment, the extortion charge at issue was Count Three (which was numbered Count Eight in the S2 Indictment, *see* Dkt. 321, and is referred to as Count Eight in this opinion).  After the Court dismissed this count, the Government again renumbered the counts for the jury, as reflected in the final verdict form and jury instructions.  *See* Verdict Form, Dkt. 527; Jury Instructions, Dkt. 516.

*See* Tr. 3985–90, 4228–46, 5489–5502, 5740–61; Percoco Ltr. (Feb. 19, 2018), Dkt. 490; Gov.

Ltr. (Feb. 20, 2018), Dkt. 494.  At the close of all of the evidence, the Court dismissed Count

Eight pursuant to Rule 29(a) and indicated that a written opinion would follow.  *See* Order (Feb.

28, 2018), Dkt. 515; Tr. 5757.[7]

## DISCUSSION

### I.  Legal Standard

Under Rule 29(a), a court must "enter a judgment of acquittal of any offense for which

the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "[T]he relevant

question is whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  *United States v. Taylor*, 475 F. App'x 780, 781 (2d Cir. 2012) (quoting

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "'A judgment of acquittal' is warranted 'only if

the evidence that the defendant committed the crime alleged is nonexistent or so meager that no

reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v. Jiau*, 734 F.3d

147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

### II.  Percoco Was Entitled to a Judgment of Acquittal on Count Eight

This case presents the question whether a private individual can be guilty of extortion

under color of official right and, if so, under what circumstances.  The Court will address this

question in three parts.  First, does the offense require that a defendant be a "public official," that

is, a person who holds an official position within government, or does the offense also apply to

private citizens if they wield "unofficial" influence and control within the government?  Second,

---

[7]    After the Government rested, each of the January Defendants moved for a judgment of acquittal, pursuant to Rule 29(a).  Tr. 5104–41.  The Court reserved decision.  Tr. 5141.  No Defendant renewed his motion after the jury's verdict under Rule 29(c) or submitted any briefing in support of his motion.  The Court hereby denies the January Defendants' motions for judgments of acquittal.

if an official position is required, at what point in time during the commission of the offense must the defendant be a public official?  And third, did the facts of this case warrant sending Count Eight to the jury on the theory that, pursuant to 18 U.S.C. § 2(b), Percoco "willfully caused" others to commit extortion under color of official right?

**A.  Extortion Under Color of Official Right Generally**

The Hobbs Act, 18 U.S.C. § 1951, provides, "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).  "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

The "official right" theory of extortion imposes liability on "a public official [who] has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S. 255, 268 (1992); *see also United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007).  Both extortion under color of official right and extortion by force, violence, or fear involve coercing another person to make a payment. *See United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (quoting *United States v. Margiotta*, 688 F.2d 108, 130–31 (2d Cir. 1982)).  In "official act" extortion, the defendant's public office "supplies the necessary element of coercion."  *Id.*; *see also Evans*, 504 U.S. at 266; *United States v. Manzo*, 636 F.3d 56, 65 (3d Cir. 2011); *United States v. McClain*, 934 F.2d 822, 824, 830 (7th Cir. 1991).  Under this theory, a public office gives a defendant the power to convey the threat (explicitly or implicitly) that "failure to make a payment will result in the victimization of the prospective payor or the withholding of more favorable treatment" in the form of official action.  *Evans*, 504 U.S. at 274–75 (Kennedy, J., concurring).  That threat, if

properly understood, *see Ganim*, 510 F.3d at 144 (describing "the applicable quid pro quo standard"), coerces the victim to give over property not legitimately owed to the person holding public office, thus completing the offense. *Evans*, 504 U.S. at 268.

> **B.** **Extortion Under Color of Official Right Applies Only to Public Officials**

The first question for this Court is whether the Hobbs Act contemplates that only persons with *official* governmental positions can exercise the coercive effect necessary for extortion, or whether the statute extends to private citizens who, through their unofficial influence, wield power equal to that wielded by an official.

> **1.** **Out-of-Circuit Authority**

Every circuit that has squarely considered this issue has held that, as general matter, extortion under color of official right requires that the defendant be a "public official," that is, a person who holds an official position within the government. *See Manzo*, 636 F.3d at 64–65; *United States v. McFall*, 558 F.3d 951, 955, 959–60 (9th Cir. 2009); *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995); *McClain*, 934 F.2d at 830–31; *cf. United States v. Abbas*, 560 F.3d 660, 665–66 (7th Cir. 2009); *United States v. Boggi*, 74 F.3d 470, 476 (3d Cir. 1996). These courts have held that the defendant "need not actually have the powers he threatens to use," but he must in some sense be on the government payroll or otherwise hold an official position. *Tomblin*, 46 F.3d at 1382; *see also McFall*, 558 F.3d at 958 n.8.[8]

Some courts, however, have left open the possibility that private citizens could commit extortion under color of official right in some circumstances. At least two courts have stated, in

---

[8] Parts II.A–C of this opinion pertain only to defendants who are charged as principals with the substantive offense of extortion under color of official right. The Court will address a "willfully causing" theory of the offense in Part II.D *infra*.

dicta, that a defendant who is "in the process of becoming a public official" could be capable of committing the offense. *Saadey*, 393 F.3d at 675; *Tomblin*, 46 F.3d at 1382. Presumably this exception could apply to political candidates or others who coerce payments while "in the process" of being elected or becoming employed by a governmental entity. Additionally, at least two circuits have stated, in dicta, that a person "masquerading" as or "pretending" to be a public official could commit the offense. *Manzo*, 636 F.3d at 64; *Tomblin*, 46 F.3d at 1382.[9] Few, if any, circuit courts have actually affirmed convictions for extortion under color of official right against defendants who were only pretending to be public officials. *See Abbas*, 560 F.3d at 665 (stating that no court has "successfully convicted or sentenced" a person for extortion under color of official right based on his "masquerading" as a public official).[10]

Most relevant here, at least three circuits have considered whether a private citizen can commit the offense if, through his influence, he wields such extensive control over public officials that, *de facto*, he exercises governmental power. *See McFall*, 558 F.3d at 959–60; *Tomblin*, 46 F.3d at 1383; *McClain*, 934 F.2d at 831. Each court held that "proceeding against private citizens on an 'official right' theory is inappropriate under the literal and historical meaning of the Hobbs Act, irrespective of the actual 'control' that citizen purports to maintain

---

[9]   *McClain*, a Seventh Circuit case, also includes this dicta, *see* 934 F.2d at 830, but a subsequent decision by the same court made clear "that private citizens generally cannot be considered to act 'under color official right,'" and expressly disagreed with the *McClain* dicta "that masqueraders are the exception to this general rule." *Abbas*, 560 F.3d at 663.

[10]   The only appellate decision this Court could find that affirmed a conviction under a "masquerading" theory against a non-public official for extortion under color of official right was *United States v. Rubio*, 321 F.3d 517, 527 (5th Cir. 2003). In *Rubio*, the Fifth Circuit affirmed an extortion conviction in part on the theory that the defendant "held himself out as a public official" by flashing a badge. Even if *Rubio* were correctly decided, it would not change this Court's conclusion, as there was no evidence that Percoco held himself out to be a public official when he was working on the campaign.

over governmental activity." *McFall*, 558 F.3d at 958; *Tomblin*, 46 F.3d at 1383; *McClain*, 934 F.2d at 831.[11]

In *McClain*, the defendant accepted payments in exchange for assisting the payer to win a lucrative city contract. 934 F.2d at 824. The defendant was a former aide to the mayor of Chicago; although the defendant held no official position, he "boasted colorfully of the power he wielded over city contract awards," *id.*, and generally had a "vise-like grip on power" within city government, *id.* at 831. In exchange for payments from a private collection agency, the defendant lobbied and bribed city officials to award the collection agency a contract to collect the city's parking tickets. *Id.* at 824. The Seventh Circuit held that it was "improper to have charged [the defendant] under the official right prong of the Hobbs Act," *id.* at 831, because he was "at all relevant times a private citizen" for purposes of the statute, *id.* at 829.

Similarly, in *McFall,* the defendant wielded extensive control within state and local government as a private lobbyist and was convicted of attempted extortion under color of official right. *See* 558 F.3d at 954. State officials told bribe payers that the defendant "spoke for" them and that state contracts "would not materialize without [his] help." *Id.* at 954–55. The Ninth Circuit reversed the defendant's conviction because he "made no claim of official right," but rather claimed only "to have outsized political influence." *Id.* at 959.

Finally, in *Tomblin*, a private citizen, who was a close friend of a United States Senator, was convicted of extortion under color of official right based on proof that he solicited payments in exchange for influencing the Senator to expedite legislation. 46 F.3d at 1374–75. The Fifth Circuit reversed his conviction. *Id.* at 1383. Because the defendant's influence was not "official

---

[11]     *Saadey*, a Sixth Circuit case, also contains this language, although it is not clear whether this theory of liability was at issue in the facts of that case. *See* 393 F.3d at 674.

power," but rather was "unofficial power over an official," the Hobbs Act did not reach his conduct. *Id.*

### 2. Second Circuit Authority

The issue decided in *McFall*, *McClain*, and *Tomblin* has not been squarely decided in the Second Circuit. The most on-point case is *Tillem*, 906 F.2d at 822. In that case, several restaurants paid Astley Campbell, a private citizen, consulting fees to help them pass city health inspections. *Id.* at 819. Campbell, in turn, accomplished his mission by paying bribes to health inspectors to guarantee that his clients would pass. *Id.* The Second Circuit reversed Campbell's conviction, holding that he "was not an official in the City Department of Health; thus, he cannot be convicted of extortion under color of official right." *Id.* at 822; *see also id.* at 821 ("Extortion under color of official right occurs when *an official* uses the authority of his office to obtain unearned money." (emphasis added)).

*Tillem* states in plain terms that extortion under color of official right applies only to "public officials" (that is, people who hold official positions within government). *See id.* at 821–22. But because there is no indication that Campbell wielded influence or control within the city Department of Health—unlike the defendants in *McFall*, *McClain*, and *Tomblin*—*Tillem* did not address whether a person's *de facto* authority, uncoupled from an official, *de jure* position, is sufficient to support a conviction for extortion under color of official right.[12]

---

[12] The Government's theory in *Tillem* was that Campbell's restaurant clients (*i.e.*, the "victims" of his alleged extortionate scheme) paid him in exchange for his influence over official health inspections. *See Tillem*, 906 F.2d at 820. Leaving aside the question of whether Campbell *had* any influence, there did not appear to be proof that the victims *understood* when paying him that he would use his influence to rig inspections. *See Tillem*, 906 F.2d at 819, 823. Even if Campbell were a public official, he could not be guilty of extortion under color of official right without proof that his victims were "motivated to make payments as a result of [his] control or influence." *United States v. McDonough*, 56 F.3d 381, 388 (2d Cir. 1995). All of this is to say that Campbell's charge was in more ways than one poor fit for his conduct, and—if the Second Circuit were to reconsider the issue—*Tillem*'s language about the "official right" theory may be less controlling than it appears at first blush.

The Government pointed the Court to *United States v. Middlemiss*, 217 F.3d 112 (2d Cir. 2000), and *United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995), but neither case is directly on point. *See* Gov. Ltr. at 1, Dkt. 494; Gov.'s Request to Charge, Dkt. 379, at 16, 19, 22–23. The Government argued that, in both cases, the Second Circuit stated that a defendant's "control or influence over public officials" can support liability for extortion under color of official right. *See* Gov. Ltr. at 1; *Middlemiss*, 217 F.3d at 117; *McDonough*, 56 F.3d at 388. But the Second Circuit used that language in the context of the *victim's belief* about the defendant's power. *See Middlemiss*, 217 F.3d at 117 ("[T]he government must prove beyond a reasonable doubt that the victims *were motivated* to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware *of this motivation*." (emphasis added)); *McDonough*, 56 F.3d at 388 (same); *id.* (stating that the defendant's appeal focused on "the element of the extortion victim's state of mind"). Neither *McDonough* nor *Middlemiss* addressed the element at issue here, which is whether the defendant must, *in fact*, hold an official position within the government, regardless of the victim's belief about his influence or control. The preponderance of authority assumes that the victim's subjective belief and the defendant's objective position are separate elements of the offense.[13] *See Manzo*, 636 F.3d at 67 (calling the requirement that the defendant be a public official "the central status element" of the offense); *Abbas*, 560 F.3d at 664; *McFall*, 558 F.3d at 959 (holding that the offense "reaches only the

---

[13] It is questionable whether the defendant in *McDonough*, a chair of a local political party, was a "public official," because he arguably held no official position within the government. *McDonough*, 906 F.2d at 384; *see also Margiotta*, 688 F.2d at 114, 131 (district court declined to allow the jury to find the defendant guilty as a principal of extortion under color of official right because the defendant was a political party chair, not a public official); *cf. United States v. Halloran*, 821 F.3d 321, 339 (2d Cir. 2016) (raising the possibility that political party officials do not exercise "de jure power[s]" under New York's election laws), *cert. denied*, 137 S. Ct. 1118 (2017). Nevertheless, the *McDonough* decision centered not on the defendant's status as a public official *vel non*, but solely on "the element of the extortion victim's state of mind." *See McDonough*, 56 F.3d at 388. The opinion did not address the definition of "public official" in the objective sense.

conduct of government officials that 'actually exercise[] official powers'" (alteration in original) (quoting *United States v. Freeman*, 6 F.3d 586, 593 (9th Cir. 1993))); 3-50 *Modern Federal Jury Instructions: Criminal* ¶ 50.03 (2017) (treating the defendant's status as a public official and the victim's state of mind as separate elements).[14]

The Government also pointed to *Margiotta*, 688 F.2d at 108, but that case, again, addressed a different question. *See* Gov. Ltr. at 1; Gov.'s Request to Charge at 16, 19, 23; Tr. 4230–31. In *Margiotta*, because the defendant "was not a public official," the district court expressly declined to allow the jury to find him guilty of extortion under color of official right as a principal. 688 F.2d at 131. The district court charged the jury that it could find the defendant guilty only on a theory that he "willfully caused" public officials to commit the offense, pursuant to 18 U.S.C. § 2(b). *Id.* at 115, 131. As the Court will discuss *infra*, *Margiotta* is instructive as to the applicability of § 2(b) to extortion cases. But because the Second Circuit's opinion in *Margiotta* takes as a given that the defendant was a private citizen, and therefore could be liable only on a § 2(b) theory, the case sheds no light on whether the ability to wield public power without actually holding a public position is sufficient under the Hobbs Act.[15]

Finally, the Government relied on a district court case, *United States v. Rudi*, 902 F. Supp. 452 (S.D.N.Y. 1995). *See* Gov. Ltr. at 1; Tr. 4229–30. In *Rudi*, the defendant was a

---

[14]    *Abbas* is instructive on this point, although that case wrestled with the applicability of § 2C1.1 of the U.S. Sentencing Guidelines to a defendant acquitted of Hobbs Act charges, and not with the elements of the Hobbs Act itself. *See* 560 F.3d at 664. In *Abbas*, the defendant, a private citizen, obtained payments from victims by impersonating an FBI agent. *See id.* at 661. The Seventh Circuit held that § 2C1.1, the Sentencing Guideline for extortion under color of official right, should not have been applied to the defendant's conduct because he was not a public official. *Id.* at 665–66. Even though "it made no difference" in the minds of the victims whether the defendant was actually a public official, the fact that he objectively did not hold any official position meant that he could not be sentenced pursuant to § 2C1.1, as that Guideline punishes "those involved in government dishonesty." *Id.* at 665. *Abbas*, therefore, drew a clear distinction between the victims' state of mind and the defendant's official position, albeit in a slightly different context.

[15]    That said, *Margiotta* would have been the perfect vehicle for the Second Circuit to have said, if this were its position, that *de facto* power is a sufficient basis for Hobbs Act liability, as there is no doubt that Margiotta wielded tremendous *de facto* power through his influence. *See* 688 F.2d at 113.

private citizen acting as an independent financial advisor to a local government authority. *See* 902 F. Supp. at 454. In that capacity, he was heavily involved in selecting underwriters for the authority's municipal bonds. *Id.* He solicited side payments from prospective underwriters, telling them that he had the power to select them for a bond offering because "he *was* the Authority." *Id.* (emphasis added). Relying on *Tillem*, the defendant moved to dismiss the indictment on the ground that he was not a public official and therefore could not be guilty of "official right" extortion. *Id.* at 459. The district court denied the motion, holding that *McDonough*'s discussion of the victim's belief in the defendant's "control or influence over public officials" had narrowed *Tillem*'s holding. *Id.* at 459–60. Cases subsequent to *Rudi*, however, have made clear that the defendant's objective status as a public official is a separate question from the victim's belief about the defendant's authority. *See Manzo*, 636 F.3d at 67; *Abbas*, 560 F.3d at 664; *McFall*, 558 F.3d at 959. For that reason, the Court does not find *Rudi* persuasive.[16]

In sum, the Second Circuit has not squarely decided whether a private citizen can be convicted of extortion under color of official right based on his *de facto* control over state actors.

### 3. Application to the Extortion Charge Against Percoco

In light of the language in *Tillem* and the overwhelming out-of-circuit authority, this Court holds that only public officials—that is, persons who hold official positions within the government—are capable of committing the substantive offense of extortion under color of official right as principals.[17]

---

[16]     A jury acquitted the defendant of extortion, so the Second Circuit had no opportunity to review *Rudi*'s reasoning on appeal. *See* No. 95-CR-166, Dkt. 25, (S.D.N.Y. June 4, 1996).

[17]     The Court recognizes that drawing a distinction between a person who officially occupies a government position and a person who, in every real sense, effectively exercises the powers of that position may appear overly formalistic. But for better or worse, Congress has not chosen to criminalize bribery and corruption in all of its contexts. In this case, because extortion under color of official right is, fundamentally, "a crime against the public

Applying these standards, Percoco was clearly not a "public official" at the time that he worked on Governor Cuomo's campaign. Before joining the campaign, Percoco signed a resignation letter and left the state payroll; while employed by the campaign, Percoco no longer held any position in an official capacity. *See* GX-1206; SYR-3832; Tr. 444, 573–75, 912–14, 1016, 1185. That Percoco exercised extensive influence, or even *de facto* control, over state government during this time is irrelevant. He was not a "public official" as the vast majority of courts have defined that term.

During oral arguments, the Government urged the Court to adopt the out-of-circuit dicta that suggests that private citizens "in the process of becoming" public officials can be liable for extortion under color of official right. *See* Tr. 5751–53; *Saadey*, 393 F.3d at 675; *Tomblin*, 46 F.3d at 1382. The Court declined to do so. As an initial matter, the Government offered no substantive extortion case in which this theory has actually been applied, as opposed to being discussed in dicta, and the Court's research has found none. Moreover, this was not the theory of liability on which the Government tried this case. In the ordinary case, the power of a defendant's current official position supplies the coercive element of the extortion scheme. The premise of the "in the process of becoming" theory is that the possibility of a defendant's *future* official position can supply that coercion. Under this theory, if a person who is in the process of becoming a public official demands payments in exchange for the promise to take official acts after he assumes an official position, that person would, in effect, be using the power of his

---

trust," Congress has "singled out" public officeholders for "a special brand of criminal liability." *Abbas*, 560 F.3d at 664 ("[W]hat makes extortion under color of official right so pernicious is that the state (generally for good purposes; not evil) has given the offender the power to harm his victims."); *see also Evans*, 504 U.S. at 273–74 (Kennedy, J., concurring) ("The term 'under color of' is used . . . to sweep within the statute those corrupt exercises of authority that the law forbids but that nevertheless cause damage because the exercise is by a governmental official."); *Manzo*, 636 F.3d at 62 ("The 'essence of the offense was the abuse of public trust that inhered in the office.'" (quoting *United States v. Mazzei*, 521 F.2d 639, 650 (3d Cir. 1975) (en banc) (Gibbons, J., dissenting))).

future public office to extort money. The Court expresses no opinion whether that is a legally viable theory, but even if it were, the evidence at trial showed that Percoco received payments from COR based on the expectation that he would assist COR while he was on the campaign (that is, while he was not a public official). One email, for example, expressly asked whether Percoco could help COR with state business while Percoco was "off the 2nd floor," that is, out of state employment. GX-550. Percoco, then, was not using the power of his potential *future* official position to extort money from COR; he was using his *then-existing unofficial* influence and control to obtain money from COR. The coercive element of the scheme arose out of Percoco's unofficial power, which, under this Court's ruling, is not sufficient to support a charge of extortion under color of official right. Under the facts of this case, viewing all evidence in the light most favorable to the Government, no reasonable jury could conclude that Percoco committed extortion while "in the process" of becoming a public official, even assuming that were a viable theory.

C. **Percoco Was Not a "Public Official" During Any Time Relevant to Count Eight**

1. **The Hobbs Act Requires that a Defendant Be a "Public Official" At or Before the Time that He Obtains Payments**

Although Percoco was not a public official while he was on the campaign (*i.e.*, at the time that he obtained payments from COR), he was a public official at the time that he performed two official acts for COR's benefit. The next question for the Court, therefore, is *when* during the course of an extortion scheme must a defendant hold the requisite official position.

Generally, all elements of an offense must occur by the time the offense is "complete." *See United States v. Rivlin*, No. 07-CR-524 (SHS), 2007 WL 4276712, at *2 (S.D.N.Y. Dec. 5, 2007) ("In general, an offense is committed when the offense is complete, that is, when every element of the offense has occurred." (citations omitted) (citing *Toussie v. United States*, 397

U.S. 112, 115 (1970); *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987)). In *Evans*, the Supreme Court held that extortion under color of official right "is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts." 504 U.S. at 268. The Court further stated that "fulfillment of the *quid pro quo*," *i.e.*, the defendant's performance of the official acts in return for which the payment was made, "is not an element of the offense." *Id.*; *see also Ganim*, 510 F.3d at 145 ("[T]he crime of extortion occurs without regard to whether the promised official act is carried out . . . .").

Because the act of holding an official position is a necessary element of extortion under color of official right, *see supra* Parts II.A–B, that act must occur by the time the offense is "completed," *i.e.*, by the time that the defendant obtains a coerced payment, *see Evans*, 504 U.S. at 268. This Court holds, therefore, that in order to commit extortion under color of official right, a defendant must hold an official position either (a) at the time that an extortionate payment is made or (b) at some relevant time before the payment, such as at the time that the defendant enters into a *quid pro quo* arrangement or otherwise makes a demand for payment.[18]

The theory behind the offense compels this conclusion. If the defendant's official position is the source of the coercive force that pries open a victim's wallet and extorts a payment, then, logically, that coercive force must be in place at or before the time that the payment is made. And the Supreme Court's statement that "fulfillment of the *quid pro quo* is not an element of the offense" makes clear that all elements of the offense must occur by the time the

---

[18] The Court recognizes that an explicit agreement, demand, or other form of inducement is not an element of extortion under color of official right outside of the campaign contribution context. *See Evans*, 504 U.S. at 266; *Ganim*, 510 F.3d at 142–44 (citing *United States v. Coyne*, 4 F.3d 100, 113–14 (2d Cir. 1993); *United States v. Garcia*, 992 F.2d 409, 413–15 (2d Cir. 1993)). The Court includes clause (b) to leave open the possibility that a conviction could be sustained if a defendant demanded a payment while a public official and, after he ceased to be a public official, actually obtained the demanded payment.

extortion payment is made, regardless of when, if ever, the *quid pro quo* is fulfilled.  *See Evans*, 504 U.S. at 268.

### 2.    Application to the Instant Case

Count Eight fails under the Court's rule.  Viewing the evidence in the light most favorable to the Government, the evidence showed that a *quid pro quo* arrangement between Percoco, on the one hand, and Aiello and Gerardi, on the other, began to materialize sometime in the early summer of 2014 (signaling the earliest possible time that the offense could have begun).  *See* Tr. 2093–97; GX-1707 (collecting emails).  COR Development then made payments to Percoco in August and October 2014 (signaling the completion of the offense).  *See Evans*, 504 U.S. at 268; *see also* GX-1401I, GX-1401J, GX1420H, GX-1420L, GX-1606A, GX-1606B; Tr. 2098–99, 2479–80.  Percoco was employed by Cuomo's campaign—not New York State— between April and December 2014.  *See* GX-1206; SYR-3832; Tr. 444, 1016.  Thus, at no time during the commission of this offense—either at the time of payment or during some relevant time before—was Percoco a public official.[19]

The Government asked the Court to charge the jury that it could find that Percoco satisfied the "public official" element "at some later time" after he received payments from COR, such as in 2015, after he returned to state employment and performed official acts on behalf of COR.  Gov.'s Request to Charge at 21; *see also id.* at 16.  Essentially, the Government sought to define the time period of this offense as continuing past the time of the allegedly extortionate payments.  *See id.* at 21.  To support this theory, the Government cited numerous cases holding that extortion can be a "continuing offense."  *See id.* at 16, 23.  But every case that

---

[19]     Although Percoco was a public official during Governor Cuomo's first term, *i.e.*, between January 2011 and April 2014, there was no evidence presented that the extortion of Aiello, Gerardi, and COR Development began that early.

the Government cited for this point—and many other cases applying the continuing offense doctrine to extortion under color of official right—involve a stream of multiple payments made periodically.[20]  In contrast, the COR Development scheme involved only two payments, and neither occurred when Percoco was employed by the state.  Taking this fact together with *Evans*'s admonition that the offense is complete at the time of the payment, the Court is unable to hold that this offense continued past the time of the last purportedly-extortionate payment.

In sum, because the Government failed to prove that Percoco was a public official at the time that he accepted payments from COR Development or at the time that payment was demanded, the Government failed to prove a necessary element of Count Eight.  Under these circumstances, no reasonable juror could have found Percoco guilty of Count Eight as a principal.

### D.    No Reasonable Juror Could Have Found Percoco Guilty of Count Eight Under a "Willfully Causing" Theory

The Government also urged this Court to submit the COR extortion count to the jury using 18 U.S.C. § 2(b).  That statute provides: "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  Under a § 2(b) theory, a defendant who possesses the requisite mental state for an offense, and who willfully causes a third party to commit the act criminalized

---

[20]      *See, e.g.*, *United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) ("Several courts have held that Hobbs Act and extortion crimes involving *multiple payments* are continuing offenses for purposes of statutes of limitations." (emphasis added)); *United States v. Forszt*, 655 F.2d 101, 104 (7th Cir. 1981) ("Hobbs Act extortion is also a continuing offense so that no statute of limitations problem exists where, as here, there is a single continuous plan of extortion embracing *multiple payments* over a period of years." (emphasis added)); *United States v. Rumore*, No. 07-CR-1167 (LTS), 2008 WL 2755827, at *3 (S.D.N.Y. July 14, 2008) (distinguishing *Smith* on the ground that it involved "a single, continuous plan of extortion with multiple payments."); *United States v. Aliperti*, 867 F. Supp. 142, 147 (E.D.N.Y. 1994) ("[T]his Court finds that in prosecutions under Section 1951, such as the one at bar, where the Indictment alleges that the defendants engaged in a single, continuous plan of extortion envisioning *multiple payments* over several years . . . Congress would have intended that the offense be treated as a continuing one." (emphasis added)).

by that offense, is punishable as if he were a principal. *See United States v. Gabriel*, 125 F.3d 89, 99 (2d Cir. 1997); *United States v. Concepcion*, 983 F.2d 369, 383–84 (2d Cir. 1992); *United States v. Blackmon*, 839 F.2d 900, 905 (2d Cir. 1988); *Margiotta*, 688 F.2d at 130–33. The third party "who actually performed the act need not have had any criminal purpose or intent," as long as the defendant had that intent and willfully caused the third party to commit the act. *Concepcion*, 983 F.2d at 384; *see also United States v. McGee*, 291 F.3d 1224, 1226–27 (10th Cir. 2002) (collecting cases).

Put more academically, § 2(b) allows the Government to split an offense's *mens rea* and *actus reus* between two different individuals. The defendant must possess the requisite *mens rea*, and the third party must commit the offense's *actus reus*. *See United States v. Gumbs*, 283 F.3d 128, 134 (3d Cir. 2002) (stating that § 2(b) is an exception to the general principle that "the essential element of criminal intent must always reside in the person who does the forbidden act"); *Gabriel*, 125 F.3d at 99 ("[T]he government must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant 'willfully caused' another to commit the necessary act."); *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994) ("Section 2(b) imposes criminal liability on those who possess the *mens rea* to commit an offense and cause others to violate a criminal statute."). The two elements must be connected by a third element, causation: the defendant must willfully cause the third party to commit the criminal act. *See United States v. Ferguson*, 676 F.3d 260, 276 (2d Cir. 2011); *Gabriel*, 125 F.3d at 101–02; *Concepcion*, 983 F.2d at 383–84.

Section 2(b) requires that the third party commit the *actus reus* in its entirety. The third party must commit an act which, if coupled with the offense's *mens rea*, would be a completed offense. *See Blackmon*, 839 F.2d at 905 (reversing a conviction under § 2(b) because the third

party's act did not "constitute conduct proscribed by law"); *see also United States v. Dodd*, 43 F.3d 759, 763 (1st Cir. 1995) (§ 2(b) imposes liability "even though [the defendant] intentionally refrained from the direct act *constituting the completed offense*." (emphasis added) (quoting 18 U.S.C. § 2(b) reviser's note)); *Concepcion*, 983 F.2d at 384 (§ 2(b) imposes liability "if the defendant willfully caused an act that, had he performed it directly, would be an offense"); *United States v. Jordan*, 927 F.2d 53, 55 (2d Cir. 1991) (same).

In *Blackmon*, for example, the Government charged the defendants with bank fraud on a § 2(b) theory. *See* 839 F.2d at 904–05. The applicable statute, 18 U.S.C. § 1344, in substance, makes it a crime to knowingly obtain property under the custody of a federal bank by means of false or fraudulent representations. *Id.* at 904. The defendants allegedly used false representations to trick wealthy victims into withdrawing cash from their bank accounts and providing the money to the defendants. *Id.* at 902–03. The Second Circuit reversed the bank fraud convictions. *Id.* at 907. Although the defendants had "willfully caused" their victims to commit *part* of the criminal act (*i.e.*, withdrawing money from the custody of a federal bank), the third-party victims had not committed the *complete* criminal act (*i.e.*, withdrawing money from the custody of a federal bank, using false or fraudulent pretenses). *See id.* at 905. The acts of the third parties, even if coupled with the requisite scienter, were "perfectly legal" because they were withdrawing their own money. *Id.* Because the defendants had not caused the third parties to commit acts "proscribed by law," the defendants' convictions could not stand under § 2(b). *Id.*

In this case, the applicable *actus reus* has two parts: (1) obtaining property, to which the defendant is not otherwise entitled, (2) while holding an official position within the government. *See supra* Parts II.A–C. When combined with the requisite scienter, *i.e.*, knowledge "that the

payment was made in return for official acts," this conduct constitutes a completed offense. *Evans*, 504 U.S. at 268; *see also Ganim*, 510 F.3d at 144.[21]

Under the Government's § 2(b) theory, Percoco received payments from COR while he was not a public official, and, in exchange, "willfully caused" public officials, such as Andrew Kennedy, to take official action favoring COR Development. *See* Gov. Ltr. at 2 n.1; Tr. 4231–34. However unseemly these facts, taking official action is not an element of extortion under color of official right; what the Hobbs Act criminalizes is *obtaining payments* under color of official right. *See Evans*, 504 U.S. at 268 ("[F]ulfillment of the *quid pro quo* is not an element of the offense."). While Kennedy was a public official, the acts that he committed were not criminal under the applicable statute. And although Percoco committed part of the statute's criminal act (*i.e.*, he obtained purportedly extortionate payments), he was not a public official at any relevant time. Even under a § 2(b) theory, therefore, no single person committed the offense's *actus reus* (*i.e.*, obtaining payments while holding an official position within the government).

In short, the Government's theory sought to split extortion's *actus reus* between two individuals. Kennedy committed part of the criminal act (he held an official position), while Percoco committed another part of it (obtaining payments). That theory failed in *Blackmon*, when the Government proved that the defendants had committed part of the *actus reus* (making false representations) and the third-party victims had committed another part (withdrawing money from the custody of a federal bank). *See* 839 F.2d at 905. It must also fail here.[22]

---

[21] Extortion under the Hobbs Act also requires that the defendant's conduct "obstructs, delays, or affects" interstate commerce. 18 U.S.C. § 1951(a). While this requirement is perhaps part of the offense's *actus reus*, it is not at issue here.

[22] Once he rejoined state employment, Percoco also pressured other state officials to release funds for a COR project and to grant a raise to Aiello's son. These acts do not change the Court's analysis because, like Percoco's

The Government's argument relied largely on *Margiotta*, a case in which the district court did submit an extortion charge to the jury on a § 2(b) theory. 688 F.2d at 130–33. While aspects of *Margiotta* are similar to the facts in this case, in crucial ways the facts differ. In *Margiotta*, the defendant, Joseph Margiotta, was a powerful person in Nassau County but not a public official. *Id.* at 113. Margiotta entered into an agreement with insurance brokers, pursuant to which Margiotta would cause local officials to appoint the brokers as "brokers of record" for the county, and the brokers would kick back some of the county's insurance commissions to him. *Id.* Because the kickbacks could not materialize until the local officials had appointed the brokers, the payments were contingent on the third-party officials' actions. *See id.* Thus, the third-party officials committed the offense's complete *actus reus*: while holding public office, they caused the brokers to make payments to Margiotta (albeit unknowingly).[23] *See id.* at 131–32. When combined with Margiotta's *mens rea*, the third parties' *actus reus* constituted a completed offense. *See id.* ("If the public officials were aware that the [broker] was making the kickbacks . . . the public officials could have been found guilty of extortion as principals, for unlawfully obtaining the consent to the payments under color of official right."). *Margiotta* is distinguishable because, in the present case, no one in public office caused COR to make payments to Percoco. Thus, no one person committed a complete criminal act. *Blackmon* distinguished *Margiotta* on precisely these grounds. *See Blackmon*, 839 F.2d at 905.

For all these reasons, no reasonable juror could have found Percoco guilty of Count Eight under a § 2(b) theory.

---

assistance on the labor peace agreement, those actions, although evidence of a corrupt relationship, did not constitute criminal acts under the Hobbs Act.

[23]     That the public officials unknowingly obtained these payments for Margiotta, and not for themselves, makes no difference under the Hobbs Act. *See Margiotta*, 688 F.2d at 133 ("A Hobbs Act prosecution may lie where the extorted payments are transferred to third parties . . . .").

## CONCLUSION

The Court is mindful that, if this decision is not correct, and assuming that the jury had accepted the Government's theory that Percoco wielded *de facto* power, the Government has been deprived of an opportunity to appeal. That appeal could have given the Second Circuit an opportunity to clarify an important issue affecting the prosecution of public corruption. But when the overwhelming authority holds that the conduct charged is, quite simply, not a crime, the defendant cannot be put in jeopardy and is entitled to a judgment of acquittal.

For all the foregoing reasons, the Court entered a judgment of acquittal as to Count Eight of the Second Superseding Indictment. *See* Order (Feb. 28, 2018), Dkt. 515; Tr. 5757.

In addition, as discussed in note 7, *supra*, whereas the Court reserved decision on the Rule 29(a) motions that the January Defendants made at the close of the Government's case, Tr. 5141, those motions are now DENIED. There was more than sufficient evidence presented as to every count that was sent to the jury.

**SO ORDERED.**

**Dated:** **May 10, 2018**
     **New York, NY**                                        **VALERIE CAPRONI**
                                                              **United States District Judge**