Michael C. Miller
212 506 3955
mmiller@steptoe.com
1114 Avenue of the Americas
New York, NY 10036
212 506 3900 main
www.steptoe.com



May 18, 2018

Via ECF

Hon. Valerie E. Caproni
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: *United States v. Percoco, et al.* (Case No. 16-cr-776)**

Dear Judge Caproni:

On behalf of defendant Alain Kaloyeros, we respectfully submit this letter in response to Sections II and III of the Government's letter motion *in limine* (Dkt. No. 635) ("Government Letter"). With respect to Section II, the Government should not be permitted to introduce evidence of lawful campaign contributions by other defendants because such evidence is entirely irrelevant to the charges against Dr. Kaloyeros and would be unfairly prejudicial to him. In particular, such evidence will likely stoke resentment among jurors and invite them to convict Dr. Kaloyeros based on these feelings rather than the evidence. With respect to Section III, the defendants should be permitted to introduce categories of evidence concerning the quality of the work performed and the developer's qualifications. This evidence is highly relevant to, among other things, whether the Government can prevail under its "right to control" theory of wire fraud.

## I. THE CAMPAIGN CONTRIBUTION EVIDENCE IS IRRELEVANT AND UNFAIRLY PREJUDICIAL.

The Government has not (because it cannot) alleged that Dr. Kaloyeros made or received *any* campaign contributions that would be relevant to charges against him.[1] Rather, the

[1] Indeed, Dr. Kaloyeros has not contributed to a New York state-level campaign since 2002 and has never contributed to a campaign relevant to this case.




Government intends to offer evidence of campaign contributions made by his co-defendants. This evidence has no bearing on the charges against Dr. Kaloyeros and will only pray on juror bias on a controversial topic—inviting the jurors to convict Dr. Kaloyeros based on the lawful acts of others.

While the Court previously admitted campaign contribution evidence against Mr. Gerardi and Mr. Aiello (along with Mr. Ciminelli, "the Donor Defendants") during the January trial, the Court must consider whether "the evidence creates a significant risk of prejudice" in light of the charges against Dr. Kaloyeros and the facts and circumstances of the June trial. *See United States v. Figueroa*, 618 F.2d 934, 945 (2d Cir. 1980) ("Evidence that might be admissible under Rule 403 in a trial of one defendant is not inevitably admissible in a joint trial."). As discussed below, evidence of lawful and proper campaign contributions by any of Dr. Kaloyeros' co-defendants (and/or their families) should be excluded because the proposed evidence is irrelevant and would unfairly prejudice Dr. Kaloyeros.

**A. The Court Should Exclude the Campaign Contributions Under Rules 402 and 403.**

1. <u>The Campaign Contribution Evidence Is Not Relevant</u>.

During the January trial—where each defendant was involved in the campaign contributions admitted into evidence—the Court admitted these contributions as "relevant to Percoco's state of mind," showing that the developers wanted to be "in good favor with the New York State governor," and as "background evidence of the relationship[s] among the contributors." 12/13/2017 Tr. at 110, Dkt. No. 400. The Government Letter suggests that such evidence would similarly be relevant to the motivations of Dr. Kaloyeros. Government Letter at 7. The Government asserts that this evidence is not just relevant but "critical" to understanding Dr. Kaloyeros' motivations. But the Government's argument misses the mark for several reasons.

*First*, the Government's suggestion that the Donor Defendants were seeking "state action" in the form of "obtaining state contracts" is simply inaccurate. The Government cannot dispute that: (1) Fort Schuyler Management Corporation ("FSMC") was a private 501(c)(3) organization, not a state agency; (2) the selection of specific developers was a decision made by FSMC and not the state, and thus did not involve state action; and (3) the allegedly rigged RFPs explicitly *did not* provide the winners a contract of any kind—only the opportunity to negotiate for contracts in the future. Furthermore, the fact that the Donor Defendants and other developers later received contracts that were funded by a public benefit corporation does not transform the RFP awards into state action. *See Bordeleau v. New York*, 960 N.E.2d 917, 921–22 (N.Y. 2011) (rejecting the argument that public benefit corporations are state agencies because the "prime purpose for creating such [public benefit] corporations was to separate their administrative and fiscal functions from the State and its subdivisions").



*Second*, the campaign contribution evidence is not probative of Dr. Kaloyeros' intent absent a foundation that Dr. Kaloyeros knew about those campaign contributions. Here, the Government relies on the fact that its cooperating witness, Todd Howe, was aware of the contributions and the tenuous logic that "friends" means "friends of the Governor," which, in turn, meant "major contributors." Government Letter at 7. The Government's proffered speculation says nothing of *Dr. Kaloyeros'* understanding and is thus insufficient to lay a foundation thereof. *See United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002) (holding that a discussion participant's own understanding of a conversation is not, by itself, a sufficient foundation for that participant to testify to another participant's understanding of the conversation). Moreover, the Government's theory would at best justify admission of evidence referring to "friends of the Governor." Precise donation figures—*which the Government does not claim were ever seen by Dr. Kaloyeros*—would not be probative of Dr. Kaloyeros' intent. *See Austin v. Cnty. of Northampton*, 630 F. App'x 163, 165 (3d Cir. 2015) (affirming exclusion of evidence because there was "no direct evidence that the [relevant actors] were aware of the [evidence], and only speculation suggesting otherwise").

*Third,* the Government's connection between the contributions and the action is tenuous at best. *United States v. Castrejon-Esteban*, 617 F. App'x 340, 344 (5th Cir. 2015) ("Given the tenuous links between and among these 'logical' steps, we find no abuse of discretion in the district court's conclusion that the probative value of the [disputed] evidence is lacking."); *see also United States v. Bailey*, 840 F.3d 99, 119 (3d Cir. 2016) ("When the probative value of evidence is tenuous, a relatively minor risk of substantial undue prejudice should counsel against admitting it."). The Government suggests that the Donor Defendants and their respective family members made campaign contributions based on the generalized notion that they could receive benefits down the road or would "catch the eye" of the administration. Government Letter at 6–7. But this generalized, hindsight view of the donors' motives could be imputed to anyone that makes campaign contributions. The connection between unknown campaign contributions, the importance of state action, and the non-state action at issue in this case are far too tenuous to justify admission of campaign contributions.

2. <u>The Campaign Contribution Evidence Would Unfairly Prejudice Dr. Kaloyeros</u>.

Reasonable, intelligent people can disagree about whether large campaign contributions should be part of the American electoral system. *Compare Citizens United v. FEC*, 558 U.S. 310, 359 (2010) ("The fact that [contributors] may have influence over or access to elected officials does not mean that these officials are corrupt: Favoritism and influence are not avoidable in representative politics." (internal quotation marks and citation omitted)), *with id.* at 450, 479 (Stevens, Ginsburg, Breyer, Sotomayor, J.J., dissenting) (stating that large contributions to gain influence or access "depart so thoroughly from what is pure or correct in the conduct of Government that it amounts to a subversion of the electoral process" and poses a threat to the "legitimacy and quality of Government" (internal quotation marks and citation omitted)).



Regardless of the merits, popular opinions about wealthy individuals and organizations exerting undue influence on American government cannot be ignored. Following *Citizens United*, President Obama's State of the Union address decried that the wealthy would "bankroll" American elections preventing the American people from deciding their results.[2] An overwhelming majority (84%) of the public believe that "money has too much influence" in American political campaigns.[3] Wealthy donors are seen as perverting democracy, stealing the voice of ordinary Americans.[4]

Because of this popular backlash, campaign contribution evidence can have "a strong tendency to prejudice, confuse, and mislead the jury." *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2011); *see* Mem. Order at 2, 3, *United States v. Silver*, No. 15-cr-93, Dkt. No. 88 (S.D.N.Y. Oct. 20, 2015) (relying on *Ring*); 12/13/2017 Tr. at 110, Dkt. No. 400 (relying on *Ring* and *Silver*); *see also In re Air Crash Disaster*, No. 89-cv-8082, 1991 WL 279279, at *2 (N.D. Ill. Dec. 26, 1991) (holding that even if campaign contributions had remote relevance, they were unfairly prejudicial under Fed. R. Evid. 403). "[E]specially in light of the heated debate about the proper role of money in politics," campaign contribution evidence can "pose[] a significant risk of evoking precisely the kind of negative emotional response that might 'lure the jury into declaring guilt on a ground different from proof specific to the offense charged.'" *Ring*, 706

[2] Barack Obama, State of the Union Address (Jan. 27, 2010), http://stateoftheunionaddress.org/2010-barack-obama.

[3] *Americans' Views on Money in Politics*, N.Y. Times, June 2, 2015, https://www.nytimes.com/interactive/2015/06/02/us/politics/money-in-politics-poll.html.

[4] *See, e.g.*, Marlow Stern, *Meet the Billionaires Manipulating the U.S. Presidential Election*, The Daily Beast, Aug. 2, 2016, https://www.thedailybeast.com/meet-the-billionaires-manipulating-the-us-presidential-election ("America is no longer a country 'by the people, for the people,' but a plutocracy."); *id.* ("I think there's the belief that somehow the whole system in Washington is not on the level—that it's tilted against the ordinary citizen. And the reason people have that view is because they're right: it is tilted against the ordinary citizen and it does favor the rich." (quoting former U.S. Congressman Tom Downey); Russell Berman, *How Can the U.S. Shrink the Influence of Money in Politics?*, The Atlantic, Mar. 16, 2016, https://www.theatlantic.com/politics/archive/2016/03/fix-money-in-politics/473214/ ("The problem of money in politics is so universally recognized that even Donald Trump, the ultimate capitalist, and Bernie Sanders, a self-described Democratic socialist, agree on it. Sanders has spent his career railing against the corrupting influence of wealthy and corporate donors, while Trump has unmasked the game by admitting that he gave money to politicians to curry favor with them. The success of both of these politicians suggests the degree to which Americans are fed up with the influence of money on politics.").



F.3d at 472 (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).[5] In what it called a "close" case, the D.C. Circuit ultimately permitted campaign contribution evidence because it was "so inexorably intertwined with the charged offense," that the sizeable prejudice did not require—*though it may have merited*—exclusion. *Id.* at 473 (affirming under an abuse of discretion standard based on a repeated and aggressive limiting instruction, but noting it may not have reached the same decision in the district court's place).[6] As described above, here, the probative value of the campaign contribution evidence does not even rise to the "close case" presented in *Ring*.

* * *

This lack of relevance renders the proposed campaign contribution evidence inadmissible under both Rule 401 and Rule 403. *See United States v. Ferrouillet*, No. 96-cr-198, 1996 WL696489, at *3 (E.D. La. Dec. 4, 1996) (excluding evidence of irrelevant conduit contributions under Fed. R. Evid. 401); *Air Crash Disaster*, 1991 WL 279279, at *2 (holding that even if campaign contributions had remote relevance, they were unfairly prejudicial under Fed. R. Evid. 403). The campaign contribution evidence is not relevant. It is only unfairly prejudicial and should be excluded.

---

[5] The D.C. Circuit also highlighted that permitting antagonistic evidentiary use of campaign contributions could create concerns of chilling the exercise of First Amendment liberties, "concerns that are especially powerful where political speech is involved." *Id.* (citing *Brown v. Hartlage*, 456 U.S. 45, 61 (1982)); *see* Syracuse Defs.' Resp. to Gov't's Mot. in Limine at 4–5, Dkt. No. 371 (Nov. 30, 2017); Def. Kelly's Resp. to Gov't Mot. in Limine at 10–11, Dkt. No. 373 (Nov. 30, 2017) (briefing these concerns for the Court).

[6] The probative value was substantially higher in *Ring* because the evidence indicated that the contributions were, in fact, part of a quid pro quo scheme. *See id.* at 471 (noting that Ring asked Abramoff to ensure that a congressman who had acted as "a good soldier" received "his fair share of contributions" and that Ring repeatedly made jokes about the contributions being a quid pro quo). Unlike *Ring*, the Government, here, does not allege the same type of quid pro quo where the Donor Defendants made campaign contributions for the specific purpose of being awarded the strategic partnerships described in the RFPs. The connection is even more tenuous for Dr. Kaloyeros who: (1) did not himself make contributions to a campaign relevant to this case; (2) did not solicit—let alone receive—campaign contributions from anyone; and (3) is not alleged to have known about the campaign contributions that the Government intends to offer.



**B. If the Court Admits the Campaign Contribution Evidence, Then the Court Should Issue a Forceful Limiting Instruction to the Jury.**

In *United States v. Silver*, this Court relied extensively on *United States v. Ring* to reach the conclusion that campaign contributions were admissible and that a limiting instruction would cure the unfair prejudice. Mem. Order at 2–3, *Silver*, Dkt. No. 88. If the Court decides to admit the campaign contributions in this case, then, as in *Ring*, the Court should consistently and forcefully use limiting instructions to protect the defendants' First and Fifth Amendment rights. In *Ring*, the jury was given a limiting instruction "[e]ach time that evidence or testimony touched on a campaign fundraiser or campaign contribution" and again in the final jury instructions. *United States v. Ring*, 768 F. Supp. 2d 302, 305 (D.D.C. 2011). Specifically, the jury was repeatedly instructed that:

> Campaign contributions and fundraising are an important, unavoidable and completely legitimate part of the American system of privately-financed elections. The law recognizes that virtually every campaign contribution is given to an elected public official because the given supports the acts done or to be done by the elected official.
>
> The Supreme Court of the United States has recognized that legitimate honest campaign contributions are given to reward public officials with whom the donor agrees, and in the generalized hope that the official will continue to take similar official actions in the future.
>
> Lobbyists often donate to the political campaigns of public officials and there is nothing illegal about this practice. Official acts that advance the interest of a lobbyist's clients, taken shortly before or after campaign contributions are solicited or received from the lobbyist, can, depending on the circumstances, be perfectly legal and appropriate.
>
> In this case, the propriety or legality of campaign contributions or fundraisers is not before you, and you are, therefore, instructed not to consider campaign contributions or fundraisers as part of the illegal stream of benefits that Mr. Ring is charged with providing to certain public officials.

*Id.*; *see also United States v. McGregor*, 879 F. Supp. 2d 1308, 1310–11 (M.D. Ala. 2012) (adapting the *Ring* instruction to a case charging campaign contribution bribery). In concluding that admission, while perhaps ill advised, was not an abuse of discretion, the D.C. Circuit said that it was "significant that the district court repeatedly instructed the jury that the campaign contributions were not illegal." *Ring*, 706 F.3d at 473. "Although 'curative instructions are no panacea,' the fact that *the instruction was repeated every time contribution evidence arose*—as opposed to being given only a single time at the end of a trial throughout which jurors may have failed to distinguish contribution evidence from other evidence—did much to mitigate the potential for confusion and First Amendment chilling, even if it could not have entirely



eliminated the potential for prejudice." *Id.* (emphasis added) (quoting *Dallago v. United States*, 427 F.2d 546, 552 n.13 (D.C. Cir. 1969)).

Given the significant and unfair prejudice that Dr. Kaloyeros will face if this evidence is admitted, Dr. Kaloyeros respectfully requests that the Court give a similar limiting instruction and insert a question in the juror questionnaire verifying the juror's ability to follow such a *Ring* instruction. Dr. Kaloyeros proposes the following abbreviated version of the *Ring* instruction in light of the Court's final jury instructions during the January trial:

> You also heard some testimony about campaign contributions and fundraising. Campaign contributions and fundraising are an important, unavoidable and completely legitimate part of the American system of privately financed elections. A person, including a company, has the constitutional right to make campaign contributions to a political candidate and political associations. Contributors have the right to make contributions with the hope that the candidate will support legislation or produce political outcomes that benefit the contributor. The government does not allege that any of the campaign contributions described in this case were unlawful. To the extent you find that a defendant made campaign contributions or was actually aware that others were making these campaign contributions, you may, however, consider the contributions as evidence that state policy was important to that donor.

While such an instruction "could not . . . entirely eliminate[] the potential for prejudice,"[7] it would be necessary to mitigate the harm.

## II. <u>THE COURT SHOULD ADMIT EVIDENCE OF COR AND LPCIMINELLI'S PERFORMANCE BECAUSE IT DEMONSTRATES THAT ANY DECEPTION DID NOT REGARD A MATERIAL FACT AND WAS NOT INTENDED TO DEPRIVE FSMC OF AN ESSENTIAL ELEMENT OF ITS BARGAIN</u>.

The Court denied without prejudice the Government's request to preclude evidence of the merits or public benefit of the completed projects at issue in the January bribery trial. 12/13/2017 Tr. at 111, Dkt. No. 400. The Government, relying on the same five bribery cases, now asks the Court to preclude that evidence from the June trial because such evidence is irrelevant to bribery. Government Letter at 9. Dr. Kaloyeros, however, is charged with wire

---

[7] *Ring*, 706 F.3d at 473.



fraud, not bribery. And evidence that LPCiminelli and COR delivered precisely what FSMC paid for is relevant to wire fraud.[8]

"The essential elements of mail and wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). "The gravamen of the offense is the scheme to defraud." *Id.* "In order to prove the existence of a scheme to defraud, the government must . . . prove 'that the misrepresentations were material,' and that the defendant acted with fraudulent intent." *Id.* (quoting *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (citations omitted)). The requirements of material misrepresentations and fraudulent intent make bribery caselaw wholly inapposite in determining admissibility in a wire fraud case.

Evidence that COR and LPCiminelli successfully constructed high-quality buildings at a reasonable price is circumstantial evidence of their qualifications, and therefore relevant to Dr. Kaloyeros' defense that COR and LPCiminelli were selected because they were qualified. As explained below, the successful construction of high-quality projects is relevant to proving that any alleged deception: (A) was immaterial because COR and LPCiminelli were, in fact, qualified and fit; and (B) was not intended to injure FSMC but rather to secure qualified contractors for important projects. Evidence that COR and LPCiminelli delivered FSMC the promised quality construction[9] is relevant and should be admitted.

### A. Evidence of the Construction's Quality Is Probative of the Developers' Qualifications and Therefore Relevant to Whether the Alleged Misrepresentation Was Material.

"A statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct. In other words, a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation

[8] As noted above, Dr. Kaloyeros agrees that merits evidence involving the projects' post-construction effect on economic development is not relevant and should be excluded. The bright line of relevance, however, is when COR and LPCiminelli concluded their construction.

[9] To be clear, Dr. Kaloyeros does not contend that any party should have carte blanche to offer evidence of public benefit or harm untethered from the charges in this case. The Government, for example, relies on an article about the state's inability to lease office space and bring filmmakers to New York. Government Letter at 9. Dr. Kaloyeros agrees that such evidence of the projects' post-investigation difficulties has no relevance to his intent that FSMC secure a qualified preferred developer.



of a proposal." *Weaver*, 860 F.3d at 94 (citation omitted). The Supreme Court has clarified that while courts often recite "natural tendency to influence or be capable of influencing," "the central object of the inquiry is "whether the misrepresentation or concealment was *predictably* capable of affecting . . . the official decision." *Kungys v. United States*, 485 U.S. 759, 771 (1988) (emphasis added and citation omitted).

Setting aside the Government's conflicting allegations that the RFPs were both "vague"[10] and "specifically tailored,"[11] any tailoring would not have been material to deciding to select COR, LPCiminelli, and a third developer as preferred developers or the subsequent decisions to offer these companies specific construction projects. The evidence at trial will show that COR, LPCiminelli, and the third developer—three large, reputable developers in their regions—were selected as preferred developers because they were the most qualified companies for the contemplated work.

To show that the three preferred developers were selected based on their qualifications, the defense must introduce evidence that the developers were qualified. The defense will introduce evidence of the developers' performance, their positive reputations in the industry, and their general capabilities.[12] The developers' exemplary performance on the projects on which the RFP was premised will show that, consistent with their other work, the developers were qualified and fit to deliver the high-quality construction that FSMC demanded. The evidence is therefore critical to demonstrating that any alleged deception was immaterial.

**B. Evidence of the Construction's Quality Is Probative of Dr. Kaloyeros' Lack of Fraudulent Intent.**

Proving fraudulent intent requires that the Government show that Dr. Kaloyeros acted with intent to harm FSMC's property interests. *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006). Evidence of the construction's quality is probative of a lack of intent to harm in two key respects: (1) it demonstrates Dr. Kaloyeros' lack of intent to deceive FSMC with respect to

---

[10] Sealed Complaint ¶ 84, Dkt. No. 1 (Sept. 20, 2016).

[11] *Id.* ¶ 79(e).

[12] The Government has not sought to preclude evidence of COR and LPCiminelli's qualifications, contemporaneous reputations, performance history, or abilities. The Government's motion only seeks to preclude "evidence or arguments seeking to establish that any of these three *projects* had merit or were beneficial to New York or the public . . . ." Government Letter at 9 (emphasis added). Evidence of those qualifications, reputations, and similar considerations would be the most relevant evidence of materiality and intent to harm.



the essential elements of its bargain and (2) it demonstrates that an actual benefit was received by FSMC. We discuss each in turn.

1. Evidence of the Construction's Quality Shows a Lack of Intent to Deceive Regarding an Essential Element of FSMC's Bargain.

The Second Circuit has made clear that the right to control does not extend to the right to decide who to contract with or whether to contract at all. "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *Novak*, 443 F.3d at 159 ("[T]he harm contemplated in a scheme to defraud must affect the very nature of the bargain itself."); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (same); *United States v. Regent Office Supply*, 421 F.2d 1174, 1182 (2d Cir. 1970) (same). Central to this analysis is whether the charged misrepresentations "can or do result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017); *Starr*, 816 F.2d at 99 (inferring a lack of intent to defraud because "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received"). The misrepresentations must concern a fact that "bear[s] on the ultimate value of the transaction." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000); *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

In the real estate development context, the quality of the construction work performed is an essential element of the bargain. *See, e.g.*, *Mittelstaedt*, 31 F.3d at 1217–18 (holding that although misrepresentation deceived government into purchasing land, it was not intended to harm absent proof the government agency "could have negotiated a better deal for itself if it had not been deceived" and vacating convictions based on sales for fair market value). In *United States v. Davis*, for example, the district court relied on the *successful* completion of the construction to conclude that the purported victim received the full benefit of its bargain and therefore was not deprived of an essential element of the contract. No. 13-cr-923, 2017 WL 3328240, at *15 & n.12 (S.D.N.Y. Aug. 3, 2017), *appeal withdrawn*, (2d Cir. Dec. 7, 2017).

Here, as in *Davis,* LPCiminelli and COR's qualifications as strategic partners are evidenced by their ability to undertake the development activities described in the RFP. This evidence is central to rebutting the Government's required proof that FSMC could have negotiated a better deal but for the alleged deception.

2. Actual Benefit is Probative of a Lack of Intent to Harm.

Actual benefit or harm to the victim is not an element of wire fraud. It can, however, be probative of the element of intent to harm. An alleged victim's actual harm tends to prove that the defendant intended to harm that alleged victim. Similarly, an alleged victim's lack of actual harm tends to prove that the defendant did not intend to harm the alleged victim. *United States v. Ethridge*, 948 F.2d 1215, 1217–18 (11th Cir. 1991) (per curiam) ("If Hanover had lost money,



the government would likely have introduced that fact as evidence of intent to defraud. In our opinion, the Ethridges are equally entitled to argue that the fact that Hanover did not suffer a loss related to their intent, and present evidence to support that argument."); *United States v. Thomas*, 32 F.3d 418, 421 (9th Cir. 1994) (holding that benefits to purported victims were relevant to show lack of intent to defraud); *United States v. Foshee*, 578 F.2d 629, 634 (5th Cir. 1978) (holding that a defendant must be permitted to argue that a lack of actual harm is circumstantial evidence of a lack of intent to defraud); *see also United States v. Cleary*, 565 F.2d 43, 48 (2d Cir. 1977) ("In determining what the 'natural' effect of a defendant's conduct may be [to evaluate the defendant's intent], the 'actual' effect can seldom be without relevance."). The Second Circuit has noted that because intent and good faith "may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh" its relevance. *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) (quoted with approval in *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (citation omitted)). The merits of COR's and LPCiminelli's constructed buildings cannot conclusively prove that Dr. Kaloyeros lacked intent to defraud, but they certainly make that intent "less probable than it would be without the evidence." Fed. R. Evid. 401(a). The merits of those constructed buildings should therefore be admitted.

## III. <u>CONCLUSION</u>

For the reasons stated above, Dr. Kaloyeros respectfully requests that the Court preclude evidence of campaign contributions and admit categories of evidence that reflect the qualifications of COR and LPCiminelli.

Respectfully submitted,

Michael C. Miller

cc: All Counsel (via ECF)