UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                                       :          S2 16 Cr. 776 (VEC)

JOSEPH PERCOCO,                                          :

                Defendant.          :

----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

 

                                GEOFFREY S. BERMAN
                                United States Attorney
                                Southern District of New York

Janis Echenberg
Matthew Podolsky
Robert Boone
David Zhou
Assistant United States Attorneys

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................... 3

   I.   The Defendant's Offense Conduct.................................................................... 3

      A.  The CPV Scheme ........................................................................................ 3

          1.   Percoco's Agreement to Influence the Power Purchase Agreement Decision ....... 4

          2.   Percoco's Influence over the State's Position on the Reciprocity Agreement ....... 8

      B.  The COR Scheme ....................................................................................... 8

          1.   Percoco's Influence Over the ESD's Reversal of the LPA Decision ................... 9

          2.   Percoco's Influence Over the Release of COR Funds ......................... 11

          3.   Percoco's Influence Over Steven Aiello's Jr.'s Raise ......................... 11

   II.   The Advisory Guidelines Range ..................................................................... 112

      A.  The Probation Office's Calculation ............................................................ 12

      B.  The Defendant's Challenges to the Guidelines Calculation .......................... 14

      C.  The Defendant's Denial of Responsibility.................................................... 18

DISCUSSION ................................................................................................................. 22

   I.   A Term of Imprisonment—Meaningfully Exceeding the 60 Months Recommended by the Probation Office—Is Warranted .............................................................. 22

   II.   Comparable Sentences for Corruption Offenses............................................... 25

   III.   The Court Should Order Forfeiture................................................................. 26

CONCLUSION................................................................................................................ 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                                              :          S2 16 Cr. 776 (VEC)

JOSEPH PERCOCO,                                          :

                  Defendant.               :

------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the
sentencing of defendant Joseph Percoco.

## PRELIMINARY STATEMENT

By 2012, after a long career in the administrations of both former Governor Mario
Cuomo and his son, current Governor Andrew Cuomo, Joseph Percoco had become one of the
highest-ranking officials in New York State's executive department.  As the Governor's
Executive Deputy Secretary, he wielded significant power and exerted vast influence throughout
state government.  He swore an oath to serve the people of New York – the people whose taxes
paid his salary – and outwardly purported to do so.  But for years, he did just the opposite.  He
monetized his power and influence, demanding payments for action, and betraying the people of
New York.

As proven in considerable detail during a more than seven-week trial before the Court,
Joseph Percoco sought and accepted payments from two clients of his longtime friend, lobbyist
Todd Howe.  In exchange for payments from those clients – Competitive Power Ventures

("CPV") and COR Development ("COR") – Percoco agreed to and did take action to benefit not the public good, but those clients' private business interests pending before state agencies.

For CPV, an energy company based *outside* of New York, Percoco agreed to use his influence to persuade various state officials, including Howard Glaser ("Glaser"), the then-State Operations Director, to award CPV a power purchase agreement ("PPA"), valued at $100 million, for a power plant CPV was building in New York.  Percoco also agreed to and did direct Glaser and John Regan, Glaser's deputy, to support, on behalf of the Governor's Office, a reciprocity agreement CPV needed to purchase energy credits from New York for a power plant it was building in New Jersey.  In exchange, CPV paid Percoco's wife, through a third party, more than $287,000 for a low-show job at CPV.

For COR, Percoco intervened on COR's behalf with multiple state officials, in the Division of Budget ("DOB"), Empire State Development Corporation ("ESD"), and the Governor's Office itself to: (i) ensure COR would not be subject to a costly Labor Peace Agreement ("LPA") in connection with a state development project; (ii) speed the release of certain state funds to COR; and (iii) obtain a raise for COR executive and co-defendant Steven Aiello's son.  In exchange, COR paid Percoco $35,000.  The payments flowed through Howe's shell company, and were then paid by check to Percoco's wife, who had no connection whatsoever to COR.

As the Court is aware, and all too sadly, Percoco's trial exposed wrongdoing at high levels of state government that is hardly aberrant.  Recent prosecutions and trials in this district have laid bare the ugly truth that, too often, political power and responsibility in New York leads to political corruption.

This Court is well positioned to and should send a strong message to those who might consider following in this disgraceful tradition. In short, a significant prison term for Percoco is warranted both in light of the extent of his corruption and to promote general deterrence.

For his crimes, Percoco faces an advisory Guidelines range of 188 to 235 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"). The Probation Office recommends a sentence of 60 months' imprisonment. Although the Probation Office and the Government agree that a substantial prison term is required and also agree that a sentence of 15 years or more is unwarranted in light of all of the facts and circumstances of this case, the Government submits that, to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, in particular in Albany, Percoco's prison term should meaningfully exceed 60 months.

## BACKGROUND

### I.      The Defendant's Offense Conduct

The Court is well aware of the trial record in this case, which established the defendant's guilt in connection with both schemes. For more than three years, while holding one of the most senior positions in New York State government, Percoco purposefully and actively engaged in schemes to obtain bribes from executives at COR and CPV in exchange for agreeing to influence, and influencing, state employees at multiple agencies to make decisions favorable to those companies.

### A.      The CPV Scheme

As proven at trial, in exchange for a low-show job given to his wife, Percoco agreed to take action to benefit CPV as the opportunities arose. Ultimately, Percoco agreed to take action

with respect to the CPV scheme in two areas.  First, Percoco agreed to work to persuade state officials to select CPV in an ongoing state competition for a PPA, which would provide needed funding for CPV to build a new power plant in New York, and through which CPV stood to receive a benefit of at least $100 million.  (PSR ¶ 40.)  Second, Percoco agreed to and did direct state officials to enter into a reciprocity agreement with New Jersey, which allowed CPV to purchase needed energy credits in New York, ultimately saving the company more than $1.5 million.  (PSR at 56, 58.)  The participants in the CPV scheme were (i) Percoco; (ii) Braith Kelly ("Kelly"), a senior CPV executive responsible for government relations, who has pleaded guilty to defrauding CPV to hire Percoco's wife for a low-show job; and (iii) Howe, who has also pleaded guilty to his role in the scheme, and who served as a go-between arranging the payments and requesting action from Percoco.

### 1.  Percoco's Agreement to Influence the Power Purchase Agreement Decision

The CPV scheme began in mid-2012, when Kelly learned, through Howe, that Percoco's wife needed a job.  (PSR ¶ 42.)  At that time, CPV was attempting to build a power plant in Orange County, New York and seeking New York State financing for the project through a PPA. (PSR ¶¶ 39-40, 63.)   CPV had been attempting to build the Orange County plant for nearly five years by then, had spent hundreds of thousands of dollars on the project, and had been unable to secure financing to finish the project.  (*Id*.)  Kelly, CPV's Government Relations Vice President, was leading the effort to secure New York State financing.  (PSR ¶ 38.)

The bribery scheme was hatched at a time when Percoco wanted additional income and Kelly wanted an inside track in the Governor's Office.  By 2012, Kelly understood Percoco to be an influential member of the Governor's senior staff.  They had met on several occasions and Kelly had described Percoco in emails as "Cuomo's #1 guy."  (GX 43.)  Kelly even stated he

would "sleep in the streets"waiting to meet Percoco.  (PSR ¶ 55; GX 20.)  Howe, who was

working as a lobbyist for CPV in connection with securing a PPA, had facilitated meetings for

Kelly with Percoco and others at the Governor's office regarding the PPA.  (GX 18 (Howe

arranges a meeting for CPV with Glaser and Percoco), GX 21 (Howe asks Percoco to "do the

right thing with Braith"), GX 32 (March 2012 meeting for CPV with Percoco and Glaser); Tr.

2141.)

       In the spring and summer of 2012, Percoco was growing increasingly desperate to find a

job for his wife to meet financial obligations incurred by, among other things, his purchase of a

new, larger home in Westchester.  (GX 207, 260, 1601, 1605; JPX 90.)  Howe, who knew that

Percoco could be useful to CPV as a government insider, sought Kelly's help in securing a job

for Percoco's wife.   Specifically, Howe conveyed Percoco's financial situation to Kelly both

orally and by email, indicating, for example, that they "need to hammer something out for

[Percoco]" and Percoco wanted to "stay removed" from the process.  (GX 47.)

       Kelly, aware that Percoco would use his official influence to help CPV in business before

New York State, agreed to help find Percoco's wife, Lisa Percoco, a job at CPV.  The bribery

agreement was finalized in September 2012 when Kelly, Percoco and Howe met for dinner at a

restaurant in Connecticut.  Kelly billed the dinner to CPV, under a billing code for the Orange

County project, but did not list Percoco as being present at the dinner, intentionally leaving a

blank line for the third person at dinner, demonstrating both that the dinner was about the Orange

County project (and Percoco's promise to assist with it) and the wrongfulness of the *quid pro

quo* agreement they arranged at that dinner.   (GX 431, 1091 at 3.)  At trial, Kelly's assistant

confirmed Kelly's efforts to cover up the fact that CPV paid for a dinner with Percoco about the

Orange County project. (Tr. 4103-04.)

5

Shortly after the dinner, Kelly confirmed that he would be able to arrange a job for Percoco's wife.  (GX 52, 198.)  Percoco himself set his wife's salary of $7,500 per month, falsely claiming that $7,500 was her previous salary.  (GX 61, 1214.)  While Kelly did meet Lisa Percoco before she was hired – at a dinner, cooked by her, at the Percocos' house – there was no formal interview.  (*Id.*)   The day after the dinner, Kelly confirmed that he was setting up the first payment for Percoco's wife.  (GX 206.)  Then, when Percoco's wife received her first monthly payment, prior to having done any work, Percoco complained that it was not for two months.  (GX 65, 220.)

As the evidence at trial made clear, Percoco's wife's work for CPV was extremely limited, and her pay far exceeded her contributions, if any, to the company.  She was paid $90,000 per year for a few hours of work a week, at most, to develop and then teach two one-hour lessons to fourth graders in New Jersey a handful of times per year.  (GX 1072R.)  The lessons were one-part basic science about energy creation and one-part positive public relations for CPV.  (*E.g.*, GX 1071, 1033, 1037A.)  When Kelly's assistant complained to Kelly that Percoco's wife showed little motivation and refused to do certain tasks, Kelly did nothing to reprimand her or ensure that she did the work she was assigned, and he kept her on.  (Tr. 4176-78.)

Percoco's wife's income from CPV was concealed from many at CPV and from the public.  For example, Percoco's wife was paid not by CPV, but by personal check from Chris Pitts, a friend of Kelly's who was a consultant for CPV and served as a pass through for Percoco's wife's salary.  (GX 1420N, 1602, 1603-N.)  This concealment effort was known to Percoco, as demonstrated (i) in emails; (ii) his financial disclosures in which he failed to disclose CPV as the source of his wife's income, instead listing "Chris Pitts LLC" despite training to the

contrary; and (iii) his statement to Counselor to the Governor Linda Lacewell immediately following law enforcement's search of his home.  (PSR ¶¶ 51-54; 3535-01 (letter from Pitts to Percoco noting Pitts is *not* an incorporated business and that he "subcontract[s Percoco's wife's] education services"); Tr. 488 ("Braith had a money guy, Chris Pitts, who paid Lisa."), 1113-15; GX 1218, 1219.)  Multiple members of Kelly's team at CPV, in consultation with Kelly, also made efforts to conceal Percoco's wife's identity, keeping her name and picture out of the education program brochure, and out of social media.  (GX 408; Tr. 4139, 4752-53.)

Although CPV did not ultimately get the PPA, Howe repeatedly asked Percoco to intervene with state officials on CPV's behalf, and Percoco agreed to do so. (*See* GX 82, 85; Tr. 2139-41, 2340-41.)  Percoco explicitly agreed to "push on" Glaser for him to support a PPA for CPV.  (GX 85.)   Shortly thereafter, Glaser told Raj Addeppali, a state employee whose agency was evaluating PPA applications, that Glaser was concerned about the state supporting a certain power plant that would compete with CPV's Orange County project (thereby making it less likely that CPV would receive a PPA).  (Tr. 5179-5183.)

When it became clear to Howe and Percoco that, notwithstanding their efforts, CPV would not get a PPA, they chose not to tell Kelly, in order to continue the payments to Percoco's wife.  (*See* Tr. 2404.)  Howe and Percoco attempted to convince Kelly they were still working to get CPV the PPA by continuing to set him up to meet with high-level state officials.  (GX 123, 131, 134, 250.)  In doing so, Howe told Percoco he had "been trying to keep this alive," referring to the bribe payments.  (GX 113.)   These efforts and communications underscore the extent to which Percoco abused his power to keep the bribes, or as he called them, "ziti," flowing.

### 2.   Percoco's Influence over the State's Position on the Reciprocity Agreement

In approximately mid-2013, CPV needed New York State to participate in an interstate reciprocity agreement with New Jersey in order for CPV to complete construction on another power plant project in New Jersey.  When Kelly asked Howe for a "push from above" to get New York to enter in to a reciprocity agreement with New Jersey, Howe reached out to Percoco, who, in turn, instructed Glaser and Regan to get it done, and they did.  (PSR ¶¶ 58-61; GX 75A, 75, 416, 1041, 1708).)

As a result of the reciprocity agreement, CPV was able to purchase needed energy credits from sellers in New York at a substantial discount.  As set forth in more detail below, CPV saved more than $1.5 million by buying the credits in New York rather than in New Jersey.  (PSR ¶ 62.)

### B.   The COR Scheme

Hundreds of thousands of dollars from CPV was not enough for Percoco.  (GX 117, 123, 244, 511 (demanding more "ziti").)  Approximately two years after the CPV scheme began, Percoco sought additional bribes from COR, another client of Howe.  In exchange for tens of thousands of dollars of bribes, Percoco agreed to and successfully obtained state agency decisions favorable to COR.   Specifically, COR made corrupt payments totaling approximately $35,000 to Percoco, who accepted the bribes with the intention of taking official actions on behalf of COR in relation to the LPA, and as other opportunities arose.

The COR scheme had three components.  First, Percoco agreed to and did influence ESD to reverse its view that COR needed to sign an LPA with local labor organizations in order to receive $1.5 million in ESD funds for an ongoing COR development project.  Second, Percoco agreed to and did influence several DOB employees to prioritize the release of millions of dollars

of payments to COR for ongoing development projects.  And, third, Percoco agreed to and did influence several Governor's Office human resources staff to provide a raise to co-defendant and COR executive Steven Aiello's son, who was then working in the Governor's Office.  The participants in this scheme were (i) Percoco; (ii) Howe; and (iii) COR executives Aiello and Joseph Gerardi.[1]

### 1.   Percoco's Influence Over the ESD's Reversal of the LPA Decision

In 2014, COR faced a significant obstacle to completing one of its construction projects. Although ESD had awarded COR a $1.5 million grant in connection with the project, ESD had also determined that COR was required to sign an LPA and negotiate with a union in order to use the funding to build a planned parking lot near a hotel within the development.  In COR's view, the LPA would significantly increase the cost of the project, and COR had been unable to reverse ESD's decision requiring the LPA.  (PSR ¶¶ 77-79.)

As with CPV, Howe knew that Percoco, who had asked Howe to find him additional income, could help COR reverse the unfavorable ESD decision.  (*Id.*)  Through Howe, Aiello and Gerardi agreed to pay Percoco in exchange for Percoco's advocacy to reverse ESD's decision, and as other opportunities arose.  (*See* Tr. 2093-2101.)  In mid-August 2014, when Percoco was soon to return to the Governor's office from his role as campaign manager for Governor Cuomo, COR made its first payment, facilitated by Howe, of approximately $15,000 to Percoco.  (GX 555, 1606A.)  COR sent the money through Howe's shell company, and Percoco directed Howe to write a check to Percoco's wife, rather than paying Percoco directly.

---

[1] Although Gerardi was acquitted of all charges related to this scheme, the Court may still consider evidence of his conduct presented at trial.  *See United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

(*Id.*)  The payment to Percoco came shortly after Aiello told Howe he needed "Joe P." to "help on [the LPA]."  (GX 551.)  Despite months of effort, COR had been unable to convince ESD the parking lot project did not trigger the LPA law.  (GX 550, 692.)  Less than two weeks after the first payment, Aiello and Gerardi again requested Percoco's intervention to reverse the costly ruling by ESD.  (GX 556A (requesting that their "labor consultant…try to resolve this matter").)  Howe then emailed specific requests of Percoco, copying Aiello, to assist with the LPA issue. (GX 557, 558.)

In late October, Gerardi and Aiello made another corrupt payment of approximately $20,000 to Percoco, again using Howe as a pass-through.  (GX 1606B.)  On or about December 3, 2014, just days before Percoco officially resumed his role as Cuomo's Executive Deputy Secretary, Gerardi again pressed for Percoco's help in resolving the LPA issue.  (GX 583, 590.) Percoco successfully pressured ESD, through Andrew Kennedy, the Assistant Secretary for Economic Development and later Deputy Director for State Operations, to reverse its position, eliminating the need for COR to negotiate an LPA.  (Tr. 1274-76.)  Specifically, in response to pressure from Percoco, Kennedy reached out to ESD and directed the agency to reverse its decision.  (GX 587, 1509.)  After the decision was reversed, Aiello thanked Howe and Percoco for their efforts.  (GX 590.)

Ultimately, COR did not use the $1.5 million of ESD funds even after they were released from the LPA requirement.  But the trial evidence showed that had COR decided to use the ESD funds and been held to the LPA requirement, COR's costs would have increased significantly, possibly enough to prevent the project from going forward.  (GX 556A "[construction] will not be able to proceed if an LPA is required"); Tr. 1266, 5337 (LPAs make projects more expensive).)  In addition, at least one COR company email produced in discovery, which was

written just before the COR executives requested Percoco's assistance with the LPA, reflects a concern that costs could increase as much as 40% when unionized labor was required. *See* Exhibit A (attached).

       **2.**     **Percoco's Influence Over the Release of COR Funds**

Percoco again used his official influence and position of power to benefit COR in September 2015, well after he had returned to the Governor's Office as Executive Deputy Secretary.  COR had previously been named the preferred developer for SUNY Poly in Syracuse after Aiello, Gerardi, Howe, Alain Kaloyeros, and others worked together to rig the bidding process.[2]  (PSR ¶¶ 2, 3.)  Pursuant to that fraudulent bidding process, COR was awarded a contract worth approximately $15 million to construct a film studio (the "Film Hub"), as well as a separate contract worth approximately $90 million to build a manufacturing plant.  (PSR ¶ 89.) By the summer of 2015, however, the state had not yet released a significant portion of the funding allocated to the two projects. (*Id.*)  In response to requests for help from Aiello and Gerardi, which were conveyed to Percoco by Howe, Percoco exerted influence over at least two supervisors at DOB – Michael Novakowski and David Lara – to grant their approval for the release of funds for the Film Hub and the manufacturing plant projects.  (GX 615; Tr. 766, 844.) In response to pressure from Percoco, DOB approved the projects, and the funds were released. (GX 1224.)

       **3.**     **Percoco's Influence Over Steven Aiello's Jr.'s Raise**

Around the same time, Percoco used his official position and influence to benefit Aiello in yet another way: he secured a salary increase of approximately $5,600 for Aiello's son, who

---

[2] Aiello, Gerardi and Kaloyeros were found guilty on July 12, 2018 for their roles in this scheme and Howe previously pleaded guilty.

worked in the Executive Chamber of the Governor's Office.  In September 2015, Aiello, dissatisfied with a $2,000 raise for his son, sent a text message to Howe, pressing for a further raise and stating, "I have been loyal as the day is long."  (PSR ¶¶ 97-99; GX 631.)  Howe forwarded that text message directly to Percoco, with some additional facts, indicating that Aiello wanted Percoco to know the full chronology.  In response, Percoco instructed and caused multiple Executive Chamber employees involved in human resources – Theresa Brennan, Nancy Nemeth, and Joanne Fryer – to authorize an additional raise for Aiello's son.  (GX 628, 652.)

Further demonstrating Percoco's abuse of power and willingness to make work-related decisions in favor of those paying him bribes, Percoco also forced Andrew Ball, a low-level employee who had a difficult relationship with Aiello's son, to move to a less desirable floor at Aiello's request.  (GX 571; Tr. 1453, 4966-67.)

## II.     The Advisory Guidelines Range

### A.     The Probation Office's Calculation

The Government agrees with the Probation Office's calculation of the defendant's advisory Guidelines range, which is:

- Pursuant to U.S.S.G. § 3D1.2(d), all counts are grouped because the offense level is determined largely on the basis of the total amount of harm or loss.

- Pursuant to U.S.S.G. § 2C1.1(a)(1), because the defendant was a public official, as defined by Application Note 1, the base offense level is 14.[3]

- Pursuant to U.S.S.G. § 2C1.1(b)(1), the base offense level is increased by 2 levels, because the offenses involved more than one bribe.

---

[3] Notably, the Sentencing Commission has stated: "The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes."  *See* U.S.S.G. Manual app. C (Amendment 666).

- Pursuant to U.S.S.G. § 2C1.1(b)(2), this base offense level is increased by the number of levels from the table in § 2B1.1, because the value of the payments, the benefit received or to be received in return for the payments, and/or the value of anything obtained or to be obtained by the public official or others acting with the public official exceeded $6,500.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the value of the payments exceeded $1,500,000, but did not exceed $3,500,000, the base offense level is increased by 16 levels.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), the base offense level is increased by 4 levels, because the offenses involved a public official in a high-level decision-making or sensitive position.

(PSR ¶¶ 116-122.)

In accordance with the above, the total offense level is 36.  (PSR ¶ 126.)  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶¶ 130-131, 186.) Based upon these calculations, the defendant's advisory Guidelines range is 188 to 235 months' imprisonment.  (PSR ¶ 186.)  As the Court is aware, the Guidelines range is the "starting point and the initial benchmark" for a sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence).

While the Government agrees with the Probation Office that a substantial sentence of incarceration is appropriate, the Government submits that a Guidelines sentence, with a floor of more than 15 years, is unwarranted, most notably because it would exceed most other sentences in major public corruption cases, including this Court's sentence of 12 years' imprisonment after the first conviction of Sheldon Silver, the former Speaker of the New York State Assembly, who engaged in a longer and more personally lucrative bribery scheme.  To serve the legitimate purposes of sentencing, however, including promotion of respect for the law and general deterrence, in particular in New York State where several recent prosecutions demonstrate that

13

corruption continues, virtually unchecked, even after several years of high-profile corruption prosecutions, Percoco's prison term should meaningfully exceed the five years recommended by the Probation Office.

### B.        The Defendant's Challenges to the Guidelines Calculation

Based on the defendant's objections to the PSR, the Government expects the defendant's primary challenge to the Probation Office's Guidelines calculation to be to the 16-point enhancement for the value of the bribes.  (PSR at 54.)  This challenge should be rejected.  As set forth below, the Government's calculation, which the Probation Office has adopted (PSR at 56), is based on CPV's own records and calculation, and is a reasonable estimate of what CPV saved by purchasing energy credits for their New Jersey plant in New York, an ability they obtained through bribes to Percoco.  Having presided over trial, the Court is in the best position to evaluate the calculation presented by the Government, Probation and CPV and should find that $1,554,293.50 is a reasonable estimate of the benefit to CPV of the reciprocity agreement. *See, e.g.*, *United States v. Guang*, 511 F.3d 110, 122 (2d Cir. 2007) (affirming Guidelines findings where district court had presided over trial); *cf., e.g.*, *United States v. Ware*, No. 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009) (rejecting objection to the loss amount, and explaining that the "Court presided over a lengthy trial involving the facts [the defendant] now disputes").

Pursuant to U.S.S.G. § 2C1.1(b)(2), the value of a bribe is the *greatest* of the value of the payment, the benefit received or to be received from the payment, the value of anything obtained or to be obtained by a public official or others acting with the public official, or the loss to the

government from the offense.  CPV's own documents plainly demonstrate that the benefit received by CPV is in excess of $1.5 million.  CPV agrees this estimate is reliable.

The bribe benefit calculation compares the best price for credits CPV received from a *New Jersey* seller prior to seeking a reciprocity agreement ($3,221,079.50) to the price CPV actually paid for credits purchased in *New York* using the reciprocity agreement CPV obtained through bribes ($666,786) and subtracting the $1 million CPV donated to New York State in connection with obtaining the reciprocity agreement.  The result is a total benefit of $1,554,293.50.  The New Jersey and New York price totals are calculated as follows:

- The $3,221,079.50 New Jersey price is based on a July 3, 2013 email to Mark Turner, the then-developer of CPV's New Jersey plant (attached as Exhibit B), reflecting the best price CPV received from a New Jersey seller for the energy credits CPV needed.  CPV, through counsel, concurs that this email reflects the best offer CPV received, from Phillips 66, the only New Jersey seller with sufficient credits to sell, and the Government has found no subsequent emails reflecting any better offers from New Jersey sellers.  The price offered by Phillips 66 was $20,725 per ton, and CPV ultimately needed 155.42 credits, resulting in a total price if they had purchased the credits in New Jersey of **$3,221,079.50**.

- The $666,786 CPV actually paid to purchase 155.42 tons of credits from New York sellers is based on a CPV business record (attached as Exhibit C) reflecting actual CPV transactions, conducted pursuant to the reciprocity agreement, in 2014 and 2015.  Those purchases (highlighted in purple and reflected in the "NOX upfront costs" row under "Actual Purchases") were from Shell,

Eastchester Heights and PUR Energy.  Accordingly, the total of each of those purchases – $390,817, $62,013, $159,016 and $54,940[4] – is **$666,786**.

There is no dispute between the parties that CPV paid $1 million to New York in connection with obtaining the reciprocity agreement, and that the $1 million cost should be deducted from any net benefit calculation.

In sum, the net benefit calculation agreed upon by Probation, the Government and CPV is as follows:

$3,221,079.50  (expected cost if CPV was required to buy credits in New Jersey)

-$666,786 (actual cost to CPV to purchase credits in New York)

-$1,000,000 (donation to NYSERDA in connection with reciprocity agreement)

_____

**TOTAL NET BENEFIT $1,554,293.50**

Percoco argues that the value of the reciprocity agreement is not readily quantifiable, in large part because he challenges the comparison of the price offered by a New Jersey seller in 2013 with the price actually paid by CPV in 2014 and 2015.  (PSR at 54.)  But those are exactly the right time frames to compare.  The New Jersey price is in an email CPV received just a few weeks before Kelly sought Percoco's intervention so that CPV could purchase energy credits in New York.  (*Compare* Exhibit C *with* GX 75A).  And the New York price is the actual price paid by CPV after successfully obtaining the reciprocity agreement through bribes.

Strangely, Percoco claims that the New Jersey price is "randomly selected."  (*Id.*)  The only random selection is by Percoco, who points to a historic price in *New York* as the price that should be used to calculate the expected *New Jersey* price had CPV not obtained the reciprocity

_____

[4] For the second PUR purchase, only 10.72 tons of the 13.66 purchased were transferred to NJ (as reflected in the "NY to NJ transfers" row), so the total NOX upfront cost for those credits is $54,940 ($5,000/ton plus $1,340 brokerage fee of 2.5%) and not $70,007.

agreement.  (PSR ¶ 112.)  This calculation is nonsensical, and certainly is not a "reasonable estimation," as is required by the Guidelines.  USSG § 2B1.1 app. n.3(C).

Percoco further, and with any support in the record, claims that negotiations for a New Jersey price were "ongoing" beyond July 2013.  They were not.  Nothing in the voluminous discovery demonstrates any ongoing negations.  CPV, through counsel, has affirmatively represented that $20,725 per ton was the best price CPV received in New Jersey.  And CPV has further represented that the NJ company offering the $20,725 per ton price later optioned the same credits to another entity in 2016 for $25,000/ton, further supporting that the price would not have gone below $20,725 per ton.

As demonstrated at trial, Kelly turned to Percoco, in August 2012, for help getting access to New York energy credits just after learning of the $20,725 per ton price.  And because of their bribery scheme, Percoco jumped in to action, agreeing first to reach out to the Commission of the New York Department of Environmental Conservation ("DEC") himself to urge the DEC Commissioner to agree, on New York's behalf, to the reciprocity agreement.  Then, when personal issues prevented Percoco from doing so, he tasked Glaser and Regan, the Governor's Director and Deputy Director of Operations to take care of it, which they did.  As of August 27, 2013, Regan reported to Howe and Percoco that he "spoke to [the Commissioner of DEC]. They are moving forward and will get it done ASAP."  (GX 75A.)  After that, there would have been

17

no point for CPV to continue to negotiate with New Jersey sellers because CPV then had access

to much lower prices in New York, where they ultimately purchased the needed energy credits.[5]

    In sum, the bribe valuation of more than $1.5 million is amply supported by the record.

If anything, the 16-point enhancement is conservative.  The calculation above does not include

the "benefit to be received" from the PPA, which company documents estimated at $100 million.

Nor does the calculation account for any of the benefit received by COR, even though, as a result

of the bribes, millions of dollars of funds were cleared to be released to COR and COR was

relieved of the obligation to enter an LPA, which COR's own internal correspondence shows

could save COR significant costs.  While the Government agrees that the value of these

additional benefits is difficult to calculate, they certainly did carry value sufficient enough to

erase any doubt that the total bribe value exceeds $1.5 million.  While the Government is not

arguing for a bribe-amount enhancement of more than 16 points, a lesser enhancement would be

unjust given all of the other benefits and potential benefits obtained by COR and CPV as a result

of the bribes.

        **C.**        **The Defendant's Denial of Responsibility**

    The defendant also attempts, in his voluminous objections to the PSR, to reframe certain

aspects of the trial testimony as though the jury's verdict were something other than to convict

the defendant for his participation in both bribery schemes.[6]  In sum, these objections amount to

an almost total denial of the crimes for which he was convicted.  Not only should the Court reject

---

[5] Due to ongoing litigation at CPV and other bureaucratic delays, the reciprocity agreement was
not signed by New York and New Jersey until late 2014.  (GX 1017.)

[6] The Probation Office summarizes most of the defendant's objections at the end of the PSR,
beginning at page 41.  For the Court's convenience, the Government will provide, as Exhibits D,
E and F, the defendant's objections, the Government's response, and the defendant's reply.
Because these documents relate to the PSR, they will not be publicly filed.

these objections, but Percoco's complete lack of acceptance of responsibility counsels in favor of a significant sentence of incarceration. *See, e.g.*, *United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)); *see generally United States v. Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform . . .).'" (citation omitted)).

In his objections, the defendant astonishingly continues to minimize his role in New York government, despite there being ample evidence at trial (and in the public record) of his outsized role, for years, in Andrew Cuomo's administration.  Years before he was charged in this case, Percoco himself described his role as being the "hammer" for Cuomo.  (Tr. 3185.)  Despite that and ample other evidence to the contrary, the defendant persists in arguing that he did not speak for the Governor.  (PSR at 42.)  Multiple witnesses testified to the contrary, explaining that Mr. Percoco spoke for the Governor on multiple substantive matters, including labor issues and legislation.  (Tr. 1103-04 (Governor's Counsel Seth Agata describing Percoco's extensive role in the Executive Chamber and noting "[w]hen it went into those subject matter areas [including labor issues, legislation], Joe was a person I would go to, to speak to, to get his view and also assume that he'd reflected the Governor's view"), 1118 ("I knew Joe was very close to the governor and was considered a very senior and important member of the governor's staff"), Tr. 1120 (list of substantive matters Percoco handled), 1185  (Q: "You testified on direct that Mr. Percoco in some areas, you thought, spoke for the governor? A: Yes"), 1231-32, 2092 (Todd

19

Howe: "Joe is very close with the governor and in many instances spoke on behalf of the governor.").

Percoco also contends he did not have any substantive role in government while working on the Governor's 2014 reelection campaign.  (PSR at 42.)  As established at trial, Agata and Chief of Staff to the Governor's Chairman of Energy and Finance Kate Burson both testified about directions they took from Percoco while he was on the campaign.  (Tr. 5217-5219, 5224.)  Todd Howe reiterated that he overheard Percoco directing state business from the campaign office.  (Tr. 2203-04.)  Multiple witnesses also testified regarding, and trial exhibits showed, Percoco at a state-related meeting and using his State office while on the campaign.  (GX 1328, 1701, 1702, 1706; Tr. 478, 4965.)

Percoco also appears to deny that he intended to return to the Governor's Office when he received payments from COR (PSR at 42), despite (1) Todd Howe's testimony to the contrary, (2) the fact that Percoco received the COR payments after listing his job at the Governor's office on a mortgage application, and (3) the fact that Percoco returned to state service just days after receiving the second payment from COR.  (PSR ¶ 32; GX 1410D; Tr. 2204.)  Percoco's claim that he did not intend, or allow others to believe he intended, to return to the Governor's office after the campaign at the time he accepted the COR payments is not credible and belied by the record.

With regard to CPV, Percoco downplays virtually all aspects of that scheme.  He (i) minimizes the PPA's value (PSR at 43); (ii) refuses to concede that his wife had a low-show job and that her pay was purposefully concealed (PSR at 44-45, 47-48); (iii) denies that Kelly and Howe sought his assistance or that he agreed to assist with the PPA (PSR at 45-46);  and (iv) continues to downplay his role in helping CPV obtain the reciprocity agreement (PSR at 46).

20

Percoco also asks the Court to ignore Howe and Kelly's interactions that did not involve him (PSR at 43), despite those facts being relevant to the Court's analysis of the scheme and of the relative culpabilities of the co-conspirators.

With regard to COR, Percoco (i) denies that the LPA would have had a negative financial impact on COR (PSR at 49); (ii) denies that he influenced Andrew Kennedy (PSR at 50); (iii) persists in arguing that Maria Cassidy ("Cassidy"), the lawyer at ESD who had insisted on the LPA, independently changed her mind (PSR at 50-51); (iv) denies that DOB employees were pressured by him (PSR at 51-52); and (v) claims that Aiello's son's raise was "standard" and not the result of his influence (PSR at 53).

Percoco's objections are, without exception, inconsistent with the evidence presented at trial, as summarized in the Offense Conduct section above. The jury has already rejected them. For the reasons stated by Probation and as set forth herein, the Court should also reject them. Notably, the defendant's continued reliance on Cassidy's testimony is particularly outrageous. As the Court likely recalls, the purported chronology of when Cassidy "decided" an LPA was not required was inconsistent with documents she said she needed in order to make that decision but had not yet received at the time she claimed to have made the decision, making her testimony illogical and not credible. (Tr. 5340-61.) In any case, even if it were true that Cassidy independently arrived at the same view directed by Percoco (a conclusion entirely inconsistent with the evidence adduced at trial), such circumstances would still, as both a legal and factual matter, have no bearing on Percoco's culpability.

Percoco's continued lack of acceptance of responsibility is a factor the Court should consider seriously when determining a punishment significant enough to deter any future wrongdoing.

## DISCUSSION

I.    **A Term of Imprisonment—Meaningfully Exceeding the 60 Months Recommended by the Probation Office—Is Warranted**

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Office recommends a sentence of 60 months' imprisonment.  (PSR at 57.)  Every one of the factors set forth in 18 U.S.C. § 3553(a) weighs in favor of a substantial term of imprisonment, which the Government submits should exceed 60 months.

*First*, the nature and seriousness of the offenses warrants such a sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).   While serving as one of the most senior officials in New York government and someone with unfettered access to the Governor, Percoco sold his office, not once, but twice, to benefit private companies with business before the state.  He disregarded the oath he took to serve in the public's interest, and worked instead for his own personal financial gain, to the tune of more than $300,000, substantially increasing his income while the scheme persisted.  (GX 1601, 1605.)  As noted by the Probation Office, "Percoco is a prime example of why it appears the public has lost faith in their public officials."  (PSR at 59.)  His crime, particularly at this time, is among the most serious this Court is called upon to consider.

*Second*, the history and characteristics of the defendant, the circumstances of the offenses, and the need for the sentence imposed to promote respect for the law warrant a substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant's schemes were not the result of a single, aberrant lapse in judgment.  While he has dedicated much of his life to public service, it was when he was at the height of his power and influence that he chose to take advantage of his position and engage in two significant bribery schemes.  He also arranged his

22

bribes through a powerful New York lobbyist, and intentionally failed to disclose the payments in his required public filings, thumbing his nose at the transparency and conflict of interest rules he knew were designed to prevent such schemes.  And he did so after many New York officials had been convicted of or were being investigated for serious corruption offenses.

While the defense may argue that Percoco's prior good works warrant a sentence reduction, those good works were what he was expected to do in exchange for his public salary, and not a reason to reward him when he corruptly used that same position for his own private gain.  *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a legislator "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants"); *United States v. Morgan*, 635 F. App'x 423, 449-50 (10th Cir. 2015) (finding that sentencing judge erred in sentencing the former President Pro Tem of the Oklahoma State Senate to probation for accepting a $12,000 bribe, in part, by giving undue weight to letters of support:  "The number of letters was certainly impressive but not surprising.  As the Government aptly points out: 'One does not become President Pro Tem without the confidence of many supporters, some quite influential.'  The letters must be viewed in that light.").

*Finally*, the need for general deterrence strongly weighs in favor of a substantial sentence.  *See* 18 U.S.C. § 3553(a)(2)(B).  Public corruption has plagued the citizens of New York for some time, as vividly demonstrated by the spate of recent trials in this district against several of the state's highest ranking officials.  Given the harm caused by these crimes, and the pervasiveness of corruption in New York, Percoco's sentence must communicate that these types of violations of the public trust, in particular when committed by a high-level official, will be

met with significant sentences.  Indeed, the Second Circuit has specifically endorsed the sentencing court taking into account local deterrence under Section 3553(a).  *See United States v. Cavera*, 550 F.3d 180, 195 (2d Cir. 2008) (en banc) (affirming sentence based, in part, on need for local deterrence of crime); *see also United States v. George Pabey*, No. 10 Cr. 17, 2011 WL 3163523 (N.D. Ind. May 5, 2011 Sentencing Order) (recounting recent public corruption convictions in the region and stating that the sentence for the former Mayor of East Chicago should send the "necessary message that corruption by elected public officials will not be tolerated and the epidemic of political corruption that has existed in this region of our state for at least the past three decades has got to stop").  A significant sentence is necessary to demonstrate that no one, not even one of the most influential advisors to New York's Governor – his "right hand man," and "enforcer" – is above the law.

In addition, the defendant's crimes were difficult to investigate and were uncovered as the result of a more than year-long investigation requiring significant Government resources, including interviews of more than 100 people and dozens of court orders to access the defendant's and his co-conspirators' communications, most of which were conducted through personal, rather than government email.  A significant sentence that serves as general deterrence of crimes that are complex and difficult to investigate is also warranted here.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."

24

(internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

## II.      Comparable Sentences for Corruption Offenses

There are numerous corruption cases in this district and elsewhere in New York in which defendants were sentenced to below-Guidelines but still significant sentences of imprisonment. In each of these cases, the sentencing court stressed the compelling need to deter public corruption.  While the examples provided below include primarily elected officials, Percoco's extremely influential role within the Governor's Office renders him comparable to the defendants in those cases.  In addition, the Guidelines apply the same enhancement for an "elected public official" as for "any official in a high-level decision making or sensitive position," such as Percoco, further enforcing that those cases are analogous.  U.S.S.G. § 2C1.1(b)(3).

- In *United States v. William Boyland, Jr.*, 11 Cr. 850 (E.D.N.Y.), a former New York State Assemblyman convicted of four separate corrupt schemes was sentenced to 168 months' imprisonment, following conviction at trial.  The applicable Guidelines range was 235 to 293 months' imprisonment.

- In *United States v. Malcom Smith*, 13 Cr. 397 (KMK), a former New York State Senator and briefly the majority leader was sentenced after trial to a term of imprisonment of 84 months, only slightly below the Guidelines range of 97 to 121 months' imprisonment. Smith was convicted at trial of various corruption offenses that arose principally from his scheme to bribe Republican Party officials to be placed on the Republican ballot for the 2013 New York City mayoral race.  Smith received his seven year sentence even though he obtained no personal financial gain from the offense.

- In *United States v. Carl Kruger*, 11 Cr. 300 (JSR), a former State Senator who served briefly as Chairman of the Senate Finance Committee pleaded guilty to corruption charges resulting from his participation in two separate bribery conspiracies involving approximately $500,000 in bribes that occurred over a four-year period of time. Kruger faced a Guidelines range of 108 to 135 months' imprisonment and received a sentence of 84 months' imprisonment.

- In *United States v. Anthony Seminerio*, 08 Cr. 1239 (NRB), a former State Assemblyman pleaded guilty to corruption charges relating to his receipt of approximately $1 million

worth of bribes from hospitals through a consulting firm.  The applicable Guidelines range was 135 to 168 months' imprisonment, and Seminerio was sentenced to 72 months' imprisonment.

- In *United States v. Efrain Gonzalez*, 06 Cr. 726 (WHP), a former New York State Senator pleaded guilty to corruption charges involving the embezzlement of more than half a million dollars from nonprofit groups to cover his personal expenses.  The applicable Guidelines range was 108 to 135 months' imprisonment, and the defendant received 84 months' imprisonment.

- In *United States v. Mahmoud Thiam*, the Republic of Guinea Minister of Mines who was convicted at trial of receiving and laundering bribes, faced a Guidelines range of 151-188 month's imprisonment and was sentenced to 84 months' imprisonment.

- In *United States v. Bahel*, 06 Cr. 918, a former Chief United Nations procurement officer was convicted of fraud charges relating to his diversion of United Nations contracts to his friend in exchange for gifts. The applicable Guidelines range was 97 to 121 months' imprisonment, and Bahel was sentenced to 97 months' imprisonment.

- In *United States v. Dean and Adam Skelos*, 15 Cr. 317 (KMW), the defendants were convicted at trial, sentenced before their convictions were overturned and retried and convicted again recently.  During their first sentencing, Dean Skelos, the former Senate Majority Leader, faced a Guidelines range of 155-188 months and was sentenced to 60 months' imprisonment.  Adam Skelos, his son and co-conspirator, faced a Guidelines range of 121-151 months and was sentenced to 78 months' imprisonment.

- In *United States v. Sheldon Silver*, 15 Cr. 093 (VEC), during the first sentencing, this Court sentenced Silver to 144 months' imprisonment after determining that he faced a Guidelines range of 262-327 months' imprisonment.

### III.    The Court Should Order Forfeiture

As a result of the two bribery schemes, Percoco received $321,596 in bribe payments.

The Government will submit a proposed forfeiture order in advance of sentencing seeking

forfeiture of Percoco's ill-gotten gains.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court

impose a substantial term of imprisonment exceeding 60 months, a sentence that is sufficient but

not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
       July 18, 2018

                                          Respectfully submitted,

                                          GEOFFREY S. BERMAN
                                          United States Attorney

                       By:    s/ Janis Echenberg
                              Janis Echenberg/Matthew Podolsky
                              Robert Boone /David Zhou
                              Assistant United States Attorneys