UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                    No.  S2 16 CR 776 (VEC)

JOSEPH PERCOCO,

Defendant.

---

**SENTENCING MEMORANDUM ON BEHALF OF JOSEPH PERCOCO**

SCHULTE ROTH & ZABEL LLP

Barry A. Bohrer
Michael L. Yaeger
Andrew D. Gladstein
Nicole P. Geoglis
Abigail F. Coster

919 Third Avenue
New York, NY 10022
Telephone: 212.756.2000

*Attorneys for Joseph Percoco*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD ............................................................................................................2

DISCUSSION .........................................................................................................................4

I.     The 18 U.S.C. § 3553(a)(1) Factors Call for a Substantial Variance ..................................4

     A.     Joe's history and characteristics support a sentence well below the Guidelines range..........................................................................................................................4

           1.     "The Glue That Held the Percoco Family Together" ...................................5

           2.     "The Pillar of Strength His Whole Family Relies On"............................10

           3.     "The Person You Can Call On" .................................................................14

           4.     A Man Who "Lean[s] On His Faith" .......................................................15

           5.     A "Loyal" and "Dedicated Public Servant".............................................16

     B.     The nature and circumstances of the offense warrant a sentence well below the Guidelines ......................................................................................................22

           1.     CPV.........................................................................................................23

           2.     COR .........................................................................................................25

II.     There Is No Need for an Extended Period of Incarceration Under § 3553(A)(2) ............29

     A.     A sentence of two years' imprisonment would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.................................................................................................................29

     B.     A sentence of two years would afford more than "adequate deterrence to criminal conduct"....................................................................................................30

     C.     A sentence of two years is greater than necessary "to protect the public from further crimes of the defendant" .........................................................................31

III.     The Appropriate Guidelines Range Is Based on Gain and Is 121-151 Months.................33

     A.     The government has not proved by a preponderance of the evidence a loss attributable to Mr. Percoco ...................................................................................34

i

B.    The value of the benefit received from the reciprocity agreement cannot reasonably be determined ....................................................................................36

IV.    A Sentence Below the Guidelines Range Is Needed To Avoid Unwarranted Disparities under § 3553(A)(6) ...................................................................................39

A.    Sentences of elected officials convicted of similar or more egregious conduct ....39

B.    Sentences of unelected officials and political aides.............................................41

C.    Joe's co-defendant Braith Kelly......................................................................43

V.    The Guidelines Are Not an Appropriate Guide for Actual Sentencing Practice in Bribery Cases ............................................................................................................43

A.    The Guidelines grossly exaggerate the length of pre-Guidelines sentences..........44

B.    The Guidelines also do not accurately reflect current bribery sentencing practice.................................................................................................................46

CONCLUSION.....................................................................................................................48

# TABLE OF AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Gall v. United States*,
   552 U.S. 38 (2007)..................................................................................2, 3

*Kimbrough v. United States*,
   552 U.S. 85 (2007)..............................................................................3, 4, 47

*Nelson v. United States*,
   555 U.S. 350 (2009)...................................................................................3

*Pepper v. United States*,
   562 U.S. 476 (2011)...................................................................................2

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*,
   301 F. App'x 93 (2d Cir. 2008) .................................................................2, 30, 32

*United States v. Bruno*,
   No. 1:09-cr-0029-GLS (N.D.N.Y. 2010)..........................................................39-40

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008).......................................................................3, 4

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012)........................................................................33

*United States v. Cuti*,
   No. 08 Cr. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ...................................34

*United States v. Foggo*,
   No. 1:08-cr-0079 (E.D. Va. 2009) ................................................................42-43

*United States v. Margiotta*,
   688 F.2d 108 (2d Cir. 1982)........................................................................41-42

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010)..........................................................................3

*United States v. Ring*,
   811 F. Supp. 2d 359 (D.D.C. 2011) ..............................................................34, 36

*United States v. Robert F. McDonnell*,
   No. 3:14-cr-12 (E.D. Va. 2015) ....................................................................41

*United States v. Sixto*,
   No. 1:08-cr-00345 (D.D.C. 2009)....................................................................42

*United States v. Skelos*,
   1:15-cr-00317-KMW, (S.D.N.Y. 2016).......................................................40-41

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)...........................................................................30

*United States v. Tutty*,
   612 F.3d 128 (2d Cir. 2010)............................................................................4

*United States v. Whitfield*,
   590 F.3d 325 (5th Cir. 2009) .......................................................................36

*Williams v. New York*,
   337 U.S. 241 (1949)........................................................................................2

**Statutes**

18 U.S.C. § 3553(a)(2)(C) ...................................................................................31

28 U.S.C. § 991(b)(1)(A) .....................................................................................43

**Sentencing Guidelines**

U.S.S.G., Ch. 1, pt. A(4)(d) (1987).....................................................................45

U.S.S.G., Ch. 1 pt. A(3) (1987) ..........................................................................43

U.S.S.G. § 2B1.1, cmt. n. 3(B) (2016).................................................................33

U.S.S.G. § 2B1.1(b)(1)(G) (2016) .......................................................................34

U.S.S.G. § 2C1.1 (2016) ................................................................................33, 46

U.S.S.G. §2C1.1(b)(2) (2016)........................................................................33, 34

U.S.S.G. §2C1.1(b)(2)(A) (2016) ........................................................................34

**Other Authorities**

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key
   Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988) ...............43, 45

Andrew Cuomo, *All Things Possible: Setbacks and Success in Politics and Life*
   (2014)............................................................................................................19

Richard Frase, *Punishment Purposes*, 58 Standford L. Rev. 67 (2005) .......................30

Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ........................................................31

Raymond Paternoster*, How Much Do We Really Know about Criminal Deterrence*, 100 J. Crim. L. & Criminology 765 (2010) ...........................................31

Norman Redlich, *Foreward to* Seymour P. Lachman and Robert Polner, *Three Men in a Room: The Inside Story of Power and Betrayal in an American Statehouse* (2006)........................................................................................22

Kate Stith and Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998) ...............................................................44, 45

Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L. J. 485 (1998) ..................................................................................................30

Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006) ...........................................................31

U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) ................................................32

U.S.S.C., *Sentencing Guidelines – Revised Draft* (January 1987) ...............................44

U.S.S.C., Interactive Sourcebook, https://isb.ussc.gov/Login .......................................46

CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl ...................................46

# INTRODUCTION

Joseph Percoco served as a political aide in New York for more than twenty years—first for Governor Mario Cuomo, and later for Andrew Cuomo when he was Attorney General and Governor.  A few decisions Joe made during his tenure as the Governor's Executive Deputy Secretary have tarnished his years of loyal and dedicated public service.  In 2012, Joe sought help finding his wife a teaching job in their new community.  After she was hired by CPV—an energy company seeking business before the State—Joe arranged several meetings between CPV and other New York State officials.  He did not attend any of those meetings.  Then, in 2014, following his resignation from State government, Joe received payments for consulting work done for Todd Howe's clients, including COR.  Joe sought and received a formal ethics opinion from counsel before taking on this engagement, and he disclosed the payments when he ultimately returned to State government, but he failed to wall himself off entirely from issues involving COR and the State.

We seek to put into context Joe's conduct and to show that these mistakes do not define the man that Joe is:  a hard worker who has otherwise lived a life of honesty and loyalty, both as a family man and as a caring mentor to his colleagues in government.  He is also a man whose punishment has already begun.  The trial—which played out on the pages of virtually every newspaper and media outlet in New York—has all but destroyed Joe's life.  Joe faces impending bankruptcy and a substantial term of incarceration.  He has two teenage daughters preparing for college and no realistic way to support them, leaving his wife Lisa with the impossible burden of caring for and trying to keep their family together.

Even outside this context, the advisory Guidelines range is Draconian.  Properly calculated, the advisory Guidelines range is 121-151 months, not 188-235 months, but a 10-year sentence is still far longer than necessary, as courts across the country have consistently

recognized in similar circumstances.  In fact, courts in this district, this circuit, and throughout the country routinely impose variant sentences significantly below the advisory Guidelines range in political corruption cases.  Between 2006 and 2016 there were 2,034 defendants with a criminal history category of I who were sentenced under U.S.S.G. § 2C1.1; the average sentence in that group was 32 months, and the median sentence was 24 months.  Moreover, a clear-eyed assessment of Joe's conduct shows it to be far less offensive than that of public officials in New York who were both elected and more powerful than Joe.  Those officials were recently convicted of pay-to-play schemes that were <u>far</u> more lucrative than Joe's conduct, and yet those elected officials received sentences that were <u>far</u> below the guidelines—and sometimes as low as 24 months.

In Joe's case, we respectfully submit that a sentence of imprisonment no greater than 24 months is both significant and sufficient punishment under an individualized assessment of the 18 U.S.C. § 3553(a) sentencing factors.  A longer sentence is not necessary to achieve the statutory goals of sentencing.

## LEGAL STANDARD

The Court must "impose a sentence sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing.  18 U.S.C. § 3553(a).  As the Supreme Court has recognized, "the principle" underlying sentencing is that "'the punishment should fit the offender and not merely the crime.'"  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (defendant should receive credit for good deeds "not performed to gain status or enhance his image").  Therefore, in rendering "an individualized assessment based on the facts presented," the Court must consider the seven factors identified in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50

2

(2007).  For that reason a sentencing court has a very different task to perform than a jury does.

Ultimately, a jury makes a binary decision: guilty or not guilty.  A sentencing court, in contrast,

must go further.  It must consider not merely whether a particular defendant's conduct steps over

a legal line, but also how that defendant and his conduct should be judged in relation to other

defendants.  *See* 18 U.S.C. § 3553(a)(1) and (6) (listing, among other factors, the nature and

circumstances of the offense, the history and characteristics of the defendant, and the need to

avoid unwarranted disparities in sentencing).

One of the seven factors is, of course, the applicable Guidelines range.  *Gall*, 552 U.S. at

49.  The Guidelines, however, are "truly advisory."  *United States v. Preacely*, 628 F.3d 72, 79

(2d Cir. 2010).  Indeed, the Supreme Court has made clear that a sentencing court should not

even presume a sentence within the advisory Guidelines range will comply with the statutory

purposes of sentencing.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  To the

contrary, a district court "must instead conduct its own independent review of the sentencing

factors, aided by the arguments of the prosecution and defense."  *United States v. Cavera*, 550

F.3d 180, 189 (2d Cir. 2008).

In doing so, the sentencing court may even reject the Guidelines on policy grounds.  That

is, "[a] district court may vary from the Guidelines range based solely on a policy disagreement

with the Guidelines, even where that [policy] disagreement applies to a wide class of offenders

or offenses."  *Id*. at 191.  For instance, a policy disagreement may arise, where, as here (*see infra*

at Section V), an applicable provision was not based on empirical data of past sentences and

national experience, such that it "do[es] not exemplify the Commission's exercise of its

characteristic institutional role."  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).  In these

instances, it is well within the sentencing court's discretion to determine that the Guidelines

would "yield[] a sentence 'greater than necessary' to achieve § 3553(a)'s purposes." *Id.* at 109-110.  In fact, the Second Circuit has held that a district court commits procedural error when it concludes "that it could not consider a broad, policy-based challenge to the [applicable] Guidelines." *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010).

More generally, the justification for rejecting a Guidelines sentence need only be "sufficiently compelling" in light of the individualized assessment under § 3553(a).  *Gall*, 552 U.S. at 50.  A sentence outside the Guidelines range does not require the sentencing court to find "extraordinary" circumstances, because such a requirement would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at 47.  "District judges are, as a result, generally free to impose sentences outside the recommended range." *Cavera*, 550 F.3d at 189.

## DISCUSSION

### I.     The 18 U.S.C. § 3553(a)(1) Factors Call for a Substantial Variance

The letters submitted on Joe's behalf, prepared by those closest to him and those whose lives he has touched in his years of public service, paint a vivid picture of a fiercely loyal, self-reliant, and fundamentally decent man.  These characteristics, combined with Joe's complete lack of any criminal history, justify a downward variance and a sentence far below the applicable Guidelines range.

### A.     Joe's history and characteristics support a sentence well below the Guidelines range

Joe Percoco was born in New York on April 15, 1969.  His parents, Domenico and Angela, both immigrated to the United States from Italy.  They raised Joe and his two sisters in the Bronx before relocating to Rockland County when Joe was six years old.  Domenico and Angela wanted the best for their children, but saw to it that nothing was just handed to them—

4

Joe and his sisters learned that you had to work for what you wanted, just as his parents had. *Frances Campo.* Domenico was a machinist for Con Edison, often working long hours to provide for his three children, and Angela worked in the meat department of a local supermarket to help supplement Domenico's salary. *Frances Campo.*

Joe learned quickly the value of hard work and discipline. By the age of 16, he had started his own landscaping business, which he balanced with his academic and athletic responsibilities at Clarkstown High School North. Joe kept the business going when he left for college by managing it remotely. He then used his earnings, as well as personal loans, to pay half of his tuition—the half remaining after the scholarship he had received from Wagner college to play football. *Lisa Percoco.*

It was also during his years at Wagner that Joe met Lisa, his wife of more than 20 years. As Lisa writes in her letter: "I knew right from the start that he was a family-oriented man" and a "hard worker" who "took care of his mother and two sisters." *Lisa Percoco.* The letters from Lisa and other family members reflect that Joe is the same man today.

### 1.   "The Glue That Held the Percoco Family Together"[1]

By the time Joe was in college, his parents had divorced, and Joe's father moved away, largely falling out of touch with the family. The responsibility fell on Joe to care for his mother and sisters. Joe became like a "second father" to his younger sister, Vita (though he was already her "idol" from the time she was a little girl). *Vita Percoco.* He would "come home every other weekend to visit" and "always called on Thursday nights to speak to [their] mother, but he never hung up the phone before asking to speak to [Vita] too." *Vita Percoco.*

---

[1]   *Patrick Halpin.*

Joe had "stepped right into the role of 'man of the household," and he stood firm in that role when his father unexpectedly passed away only a few years later. *Frances Campo*. This required performing ceremonial and minor tasks, such as walking his older sister down the aisle and taking care of things around the house for his mother, as well as more onerous undertakings, such as taking out a loan to cover the cost of his father's funeral and making sure everyone else in the family was emotionally cared for. *Frances Campo*.

After "[l]osing his dad at an early age Joe had to grow up quickly and become the man of the house. He was a father to his two sisters and the stability his mom needed and demanded." *Joe Solicito*. Joe was only 24 years old when his father died, and his younger sister was still in high school, but Joe "was the one to get [Vita] back into routines and sent [her] off to school that next Monday" after the funeral. *Vita Percoco*. Joe also got "a couple of jobs to help keep the family on the right track" because he wanted "to ensure that his mom never had the stress of falling behind with the bills during this trying time." *Maria Birrittieri*. Later, Joe helped Vita apply to college and even became her legal guardian to ensure she had access to health insurance after their father's death. *Vita Percoco*.

Joe carefully balanced the development of his own new family with Lisa with the emotional, financial, and practical support he was committed to providing for his mother and sisters. When Joe and Lisa purchased a home in Staten Island, Joe's younger sister was attending Joe's alma mater, Wagner College, in Staten Island. *Frances Campo*. Not wanting his mother to be alone in Rockland County with an empty nest, "Joe found an available store in Staten Island to open a bagel store for his mother and make her dream a reality while keeping her close." *Joe Solicito*. He presented his mother with a fully developed plan that, as Joe's sister Fran explains in her letter, would "allow [Joe] to be closer to work at the Mayor's office, allow

6

[their] younger sister to be close to [their] mother while at school, and give [their] mother the opportunity to work on her own terms." *Frances Campo*.

But Joe did not simply present his mother with a plan and provide moral support, he took an active role in getting the bakery off the ground by "risk[ing] his own money to open her a store," chauffeuring the store's baker from Hackensack, New Jersey to Staten Island at 3:00 a.m. each day so his mother would not be inconvenienced or have to wake up early, and making sure "the bakery [was already] running successfully so his mom could move to Staten Island with him after his wedding." *Joe Solicito*.  Even after his mother moved to Staten Island and the bakery was up and running, "Joe would get up early in the morning to get all the equipment started and beg[i]n making the dough so everything would be ready to open in time for the morning." *Joseph F. Muggeo*.  After Joe finished his work at the bakery in the morning, he "would run out to his job in the mayor's office." *Frances Campo*.  "While most people were working 9-to-5 jobs, Joe had already put in five hours of work before heading to his 'day job.'" *Frances Campo*.  And when the bakery went out of business, Joe "once again absorbed the financial loss without hesitation." *Vita Percoco*.  For Joe, these are just the things you do for family.

In 2012, when Joe and Lisa decided to leave Staten Island and purchase a home in Westchester, they bought a home "with a guest room because Joe felt that it was important that [their] moms, both widows, had a place to stay when they came to visit." *Lisa Percoco*.  They even took Joe's mother with them when they were house-hunting. *Frances Campo*.  By that time, Joe's mother had been diagnosed with ████████████████████████████. As a result, Joe "wanted to make sure that he would be able to host holidays and special occasions" – something his mother "took pride in doing as the matriarch of her family." *Frances Campo*.

7

When his mother was diagnosed with ▆▆▆▆▆▆▆, "Joe did everything that he could to get the best care possible for his mother, taking her to doctors and hospitals all over the states of New York and New Jersey." *Frank Errico*.  He would call his younger sister, who lived with and cared for their mother as her health deteriorated, "from the road in between events and meetings with the Governor every day to check on her." *Vita Percoco*.  Joe's older sister attributes "his research and persistence" for the additional time they were able to enjoy with their mother. *Frances Campo*.

But medicine has its limits, and eventually the unspeakable became inevitable.  After being told the different treatment options available and their probability of success, "Joe asked the doctor in a very straight-forward manner, 'if this was your mother, what would you do?'" *Frances Campo*.  The doctor told him that he would make his mother comfortable, so Joe went with the doctor to talk to his mother to see what *she* wanted.  *Frances Campo*.  And when his mother "courageously told [him] that she wanted to be made comfortable," Joe honored that wish – despite his own desire (and that of his sisters) to extend for as long as possible the time they would have with their mother.  *Frances Campo*.

But, just as he did when it came to treating his mother's condition, Joe "went out on a mission to find [their] mother the best Hospice facility that would accept her insurance and [be] easily accessible for" the family.  *Vita Percoco*.  When Joe's mother arrived at the facility and took a tour of the grounds, she "cried tears of joy" and "said it was the most beautiful place she had ever seen, and [that] she felt very much at peace." *Vita Percoco*.  During the last days of his mother's life, Joe was "by her side day and night." *Maria Birrittieri*.  His younger cousin can "still picture Joseph pacing in the hallways and consistently being there for his mom and for all of [the family]." *Daniella Birrittieri*.

Even after his mother's passing, Joe continued to be the "glue that [holds] the Percoco family together." *Patrick Halpin*. "[H]e has always been a reliable brother to his two sisters, and has been there for them whenever they have needed him." *Frank Errico*. When his younger sister struggled ███████████████ after their mother's death, Joe and his older sister ████████████████████████████████████████████████████████████" and even "sat with [his younger sister] █████████████████████████████████████████ █████████" *Vita Percoco*. Even in the small moments, like when his older sister gets "frustrated with work, [her] brother reminds [her] of the success story that [she is] having started from the bottom and working to the top. He always reminds [her] to take pride in what [she has] accomplished." *Frances Campo*.

Joe's extended family looks up to, relies on, and cherishes him too. As one of the oldest of more than 20 first cousins, "Joe has always served as a role model and exemplar for the rest of" the family. *Giorgio Errico*. He taught them the values of hard work, service, and determination. Joe's cousin Vito, fifteen years younger than Joe, recalls how Joe routinely took him along to "landscaping jobs because [Joe] enjoyed the big-brother role he could play" and how, at the age of 12 (when Joe was 27 years old), he served as "Joe's little assistant in selling Christmas trees outside [the] neighborhood Costco." *Major Vito J. Errico*. Joe "worked to lease the lot, rent a truck, drive down to North Carolina to buy the trees, and then ultimately run the lot while simultaneously working his day job." *Major Vito J. Errico*. He helped his younger cousins find jobs so they would be "working in high school and college." *John Errico*. And even when he was in school and working two jobs, he would babysit his four cousins "whenever [his aunt and uncle] were in a need of a sitter who could handle [the] four kids." *Ellen Mitchell*.

9

"Joe values family and on many occasions [has] been the facilitator behind activities that [the family] can all do together.  From barbeques to sporting events, Joe continues to find ways to create time in his busy schedule to spend time with his large extended family."  *John Errico*. He is "the infectiously warm figure at the heart of every major holiday."  *Major Vito J. Errico*. For his cousin Giorgio Errico, Joe was the reason he "looked forward to every holiday growing up because [he] knew [he'd] get to hang out and play video games or touch-football with Joe." *Giorgio Errico*.  Joe "has always had the uncanny ability to make anyone laugh, even in serious moments," which is but one of "his ways of bringing the family together."  *Frances Campo*. Simply put, "Joe is a wonderful asset to [his] family."  *Daniella Birrittieri*.

## 2.     "The Pillar of Strength His Whole Family Relies On"[2]

Joe and Lisa Percoco have been happily married for 21 years and have been blessed with two daughters – V█████ (16 years old) and J█████ (12 years old).  As they are both very family-oriented, they quickly became enmeshed in each other's families, and began building their own family together in Staten Island, where they met and where Lisa grew up.  *Lisa Percoco*.  By 2000, Joe and Lisa had saved enough money to buy their first home.  At the time, Joe was working full time and attending law school four nights a week, so Lisa "would make him lunch and dinner so that he could eat in the car while on the way."  *Lisa Percoco*.  As he often reminded her, "'[e]ating lunches and dinners out could be quite costly."  *Lisa Percoco*. This frugality carried through to his time at Madison Square Garden ("MSG"), where, despite having the title of "Senior Vice President of External and Governmental Affairs," Joe was "still brown bagging it."  *Lisa Percoco*.

---

[2]     *Lisa Percoco.*

Around this same time, Lisa's step-father, Frank Coppola, was diagnosed with ███ and Joe, who had formed a close bond with Frank from the first time they met, "was extremely invested in his care." *Maria Rotondo Callas.* When Frank needed to go to the hospital, "Joe came during the night and physically carried him into the car." *Mary Ann Coppola.* Joe wasn't only there for Frank ██████████████, Joe was "there for everyone and everyone depended on him for support." *Peter Rotondo.* To this day, Joe makes sure that Frank's memory lives on, hosting Thanksgiving where he "recounts . . . Frank's greatest moments and makes [everyone] laugh (and cry sometimes) as he retells some amazing stories in only the way Joe can deliver." *Peter Rotondo.*

As Lisa acknowledges in her letter, the demands of Joe's job "created some stress" in their marriage. *Lisa Percoco.* Joe "has always been a wonderful provider for [his] family," but his "job, dedication and loyalty to the Governor often kept him away from home and family events." *Lisa Percoco.*

But in 2006, when a ████████████████ meant that Lisa had to have ████████ ███████ in the midst of Andrew Cuomo's campaign for Attorney General, "Joe was there for every doctor's visit despite his horrible schedule." *Lisa Percoco.* "He was always aware that his family came first." *Lisa Percoco.* Joe would go into work, "then drive back from Manhattan to Staten Island to pick [Lisa] up and then drive back to Washington Heights, where [her] doctors were located at ████████████████." *Lisa Percoco.*

When Lisa was in the hospital, "Joe took time off from work . . . in the midst of a statewide campaign and spent his days in the hospital and then went home to take care of the girls." *Lisa Percoco.* Although Joe returned to work the day after his wife returned from the hospital, he "created a schedule for family and friends to ensure Lisa had round the clock help

with their 2 small children, cooking, cleaning, etc. [while] Joe himself handled most of the laundry and food shopping." *Sherry and Michael Toscano*. Indeed, Joe still handles the grocery shopping each week, clipping coupons and taking pride in "how much he save[s] because of the flyer that was sent to him in his email." *Jerome Campo*.

Joe's colleagues at work were well aware of his dedication to his wife and daughters. Despite being "the hardest working, most loyal and dedicated colleague," Joe "was also just as available and dedicated to his immediate and extended family[.]" *Ashley C. Cotton.* They "joked that Joe could be rough at work sometimes because he was such a softy at home." *Joseph Rossi*. His two daughters "ha[ve] him wrapped around their fingers." *Joan Morgan-Baird*. When he was in North Carolina for the Democratic National Convention and "very busy with the New York State delegates," he even "flew back to New York for one day to be with his children who were beginning school." *Steven Cohn*.

Joe would include his daughters at events and "has always gone out of his way to make them comfortable, able to have fun and introduce them proudly to anyone and everyone." *June O'Neill*. When a fish hook got caught in his hand while fishing with his daughters, niece and nephew, he "proceeded to take himself and the kids to the ER for stitches," and, not wanting to disappoint them, "when he was done, he took them, as promised, back to fish." *Michele DePasquale*. "Joe is teaching his own daughters the importance of independence and believing they can do anything they dream." *Frances Campo*. Joe's older daughter, V██████, "strives to be like dad" and Lisa's father and step-mother "watch in amusement when the 2 of them debate an issue." *Sherry and Michael Toscano*.

Joe is a "devoted father who loves spending time with his girls whatever way he can, whether it is watching a movie cuddling on the couch, taking V█████ out driving to practice for

12

her road test," or managing to "sit through fashion shows every time [his] youngest comes back from a shopping trip." *Lisa Percoco*. Despite his demanding work schedule, when Joe was still working in state government, he would "travel two hours to Albany and stay over when he had to be there early the next morning," but, if "the girls had a school function or concert, Joe would leave Albany late at night to drive home and work out of the Manhattan office the next day, so he could be there for his daughters." *Lisa Percoco*. In early 2016, when Joe began working at MSG, he was finally "around at night and after many years [he, Lisa and the girls] were able to have family dinners together." *Lisa Percoco*.

In fact, Joe's "biggest motivation for leaving state government was to spend more time with [his younger daughter,] J███████," who ████████████████████████████████████████ ████████████████████████████████." *Lisa Percoco*. J██████'s own letter is a testament to the strength Joe has instilled and continues to inspire in his younger daughter. When J██████ was in second grade, Joe did not just encourage her to face her ████████ by saying good morning to her teacher, he made it a challenge, by giving her a goal to work towards (a sleepover with her friends) if she faced her fear each day. J██████ *Percoco*.

Joe's relationship with his older daughter, V██████, is no less critical to her development. V██████ herself put it best – "It is my father that I think of whenever I face a challenge that gives me pause. I hear his words that he encouraged me with all throughout my childhood: 'conquer your fear. You want something? You work hard to go earn it.'" V██████ *Percoco*. Joe accompanies V██████ to her lacrosse games and comforts her if they lose; he taught her to drive; he "encourages [her] to strive fearlessly in pursuit of the goals [she] wish[es] to accomplish, although he himself might wish for a different path." V██████ *Percoco*.

13

Joe's daughters are in the midst of their formative years, the younger J█████ entering high school in a year's time and the older V████ one year away from leaving for college. V████ and J██████ "need him for everything from the small stuff (lacrosse games, parent teacher conferences…) to life's big milestones (prom, high school graduation, college move-in day…) . . . [and they] need his 'sweet strong' personality to toughen [them] up yet remind [them] of [their] own morality and obligations."  *V████ Percoco*.  Lisa and Joe "are shaping [their] girls to be strong women", but they are "not done and together have so much more to teach them."  *Lisa Percoco*.

### 3.    "The Person You Can Call On"[3]

Unsurprisingly, Joe's generous spirit is not limited to his interactions with his family.  Joe "has an old school sense of what a neighbor should be, no questions asked, nothing in return, how can I help."  *Kevin O'Reilly*.  He is "the kind of person you call when you [are] lost driving through New York State . . . [h]e always picks up the phone and helps you find an answer, no matter the time or topic."  *Ashley C. Cotton*.  "He is the person you can call on, whether you just talked to him yesterday or haven't talked to him in months."  *Bridget Siegel*.  Joe "is a person who does a favor for you and then thanks you for letting him do it."  *Jerri-Lynn Capobianco*.

"Sometimes Joe can seem hard but inside he is really a soft and caring person that would give the shirt off his back to help someone."  *Joseph F. Muggeo.*  He is always "one of the first to pitch in with contributions for life events, both good and bad."  *June O'Neill*.  Sometimes that help can take the form of supporting a friend who chose to pursue nursing after losing friends and colleagues on September 11, 2001; sometimes it is words of comfort, support and encouragement to a friend ███████████.  *Grace Ann Magro*; *Joan Morgan-Baird*.

---

[3]    *Bridget Siegel.*

When his pregnant colleague was ████████████████████ and merely mentioned having a hard time getting around, Joe sent someone to her office that same day with a parking permit to make it possible for her to drive to work.  *Rachel Demarest Gold*.  When the daughter of his long-time friends, John and Donna Marino, suddenly became very ill, "Joe not only was there to listen to [their] concerns, he was prepared to take time off to drive [them] down to Manhattan and help in numerous ways."  *John and Donna Marino*.

Joe is also someone who "everyone goes to for advice."  *Vitino Errico*.  His law school classmate, and long-time friend, Christopher R. Bryant, credits Joe's "advice and friendship" as having helped "steer [his] law school and career paths."  His former colleague, Ashley C. Cotton, "would go to Joe to support [her] in all sorts of professional issues."  When Joseph Muggeo was "████████████████████████████████████████ Joe would sit with him and try to get him to understand that these things ████████████████ and could affect his future."  Joe "guided [Jon-Michael Giannuzzi] through the law school application process and even choosing the right internships" once he was in law school so that he "could learn as much as possible."  *Jon-Michael Giannuzzi*.  He was "a good sounding board, running ideas back and forth before making proposals."  *June O'Neill*.

### 4.  A Man Who "Lean[s] On His Faith"[4]

Joe's loyalty, unrelenting work ethic, and generosity not only reflect the qualities he was raised to espouse, they are evidence of Joe's efforts to live according to the tenets of his faith. Joe was raised as a devout Caothlic and attended church with his family every Sunday.  Since moving to Westchester, Joe "has been a regular worshipper" in Saint Mary Parish in Ridgefield, Connecticut, and is active in the Parish Men's Ministry, which meets weekly on Saturday

---

[4]    *Joe Rossi.*

mornings. *Monsignor Laurence R. Bronkiewicz*. The Men's Ministry meets to "discuss experiences and challenges that are intended to help with personal spiritual awareness and improvement in family and parental relationships." *Joseph W. Bellacosa*. Through those discussions, and the Spiritual Direction he has sought over the course of the last four years from Father Michael Carnevale, Joe is growing and "living a better Christian life." *Father Michael Carnevale, OFM.*

Joe "has been able to keep his chin up during this trial because he dug his heels in and leaned on his Christian faith." *Joe Rossi*. As he struggled through the trial, Joe would attend Church services with a friend and exchange devotionals and prayers to help keep from going to a "dark place or a depressed place." *Joe Rossi*. He has also encouraged his wife to do the same. *John and Donna Marino*. As his youngest daughter wrote, she and Joe "both believe as Catholics that everything happens for a reason and that through the suffering [their] family has endured, especially [her] dad, that there is a reason for it all." *J█████ Percoco*. Joe is "leaning in" to his faith and by doing so, he is learning from his mistakes.

### 5. A "Loyal" and "Dedicated Public Servant"[5]

Despite the media's portrayal of Joe as an "enforcer" – Governor Andrew Cuomo's "most pugnacious aide" – those closest to Joe, and those he served, know Joe to be accessible, responsive, and forthright. As Governor Mario Cuomo told Joe's daughter V█████, Joe "is a sweet strong. He's strong, but he's got that different side too." *V█████ Percoco*. Joe is "tough yet courteous, caring, concerned and willing to be in the background while always learning from and listening to others." *Steven Cohn.*

---

[5]   *Abraham Wieder.*

Though this case has certainly thrust Joe into the spotlight, the vast majority of Joe's years as a public servant were carried on in the background.  Joe never ran for office and never sought credit or recognition for any of the work he did while working in state government. When his brother-in-law would ask why he was not seen in more pictures with the Governor, Joe would simply tell him – "I am not the governor.  I have a job to do and being in the media isn't part of it, there's no need for that." *Jerome Campo.*  Joe "never tried to puff up his reputation and constantly ignored interviews[.]" *Joe Rossi.*  Rather, Joe worked tirelessly "and no task was too big or too small for him." *Richard Ostroff.*

(a)      Early Years

With the help of a dedicated professor at Wagner College, Joe found his calling in politics and public service.  Recognizing Joe's "real interest in helping others," Professor Jeffrey Kraus "helped [Joe] get involved in local political campaigns and introduced him to political operatives who brought him into major campaigns they were working on." *Jeffrey Kraus.*  Joe's first volunteer opportunity came with the 1988 Dukakis presidential campaign, and he began on the ground floor: sweeping the parking lot, carrying party literature to clubs and unions, canvasing neighborhoods, and spending hours at phone banks.  Joe's passion for public service only grew after his first political internship.

After volunteering for David Dinkins' mayoral campaign in 1989, Joe spent a full semester working for State Senator Surfin Malties in Albany.  During that internship, Joe was introduced to the central nervous system of the Mario Cuomo administration.  As a former Counsel to the Lieutenant Governor, David Weinraub, wrote in his letter, Joe "demonstrated a strong desire to help the team" and "showed an early understanding of what [David Weinraub] call[s] Mario Cuomo's mission." *David Weinraub.*  It was also at this time that Howard Glaser was Governor Mario Cuomo's scheduler, and Todd Howe was Glaser's deputy director.  Howe

17

was impressed with Joe's talent and reliability and quickly took Joe under his wing.  He often invited Joe to political and social events for Governor Mario Cuomo, giving Joe the opportunity to assist with administrative duties, including nametags and event setup, but also to gain critical exposure to the Governor and his senior staff.

Joe stayed connected to the Cuomo administration following his internship, and, about a year after he graduated from Wagner, Joe joined the Cuomo administration as Mario Cuomo's "downstate advance man," working directly for Howe.  Joe's responsibilities included traveling to events in advance of the Governor to make sure those events were organized and prepared according to the Governor's needs.  As Mary Griffin writes in her letter on Joe's behalf, "Those of us who worked for Mario Cuomo felt that our role in government was to help people, to accomplish things that were going to improve lives and we were dedicated, working 15 hours a day for very little money.  Joe epitomized this ethic." *Mary Griffin*.

Because the downstate job included the New York City region, the position required moxie, strength, and finesse.  Joe dealt with strong personalities on a daily basis, placing a premium on his people skills.  Yet, as Governor Mario Cuomo recognized, Joe was a "sweet strong."  So, for instance, when delays resulted in Governor Mario Cuomo having to miss visiting a local family farm on a trip to Malone, New York, "Joe made arrangements . . . to have the Bean family meet and greet the Governor before he went out to start the forum." *June O'Neill*.  "It was a real highlight for the whole family." *June O'Neill*.

Joe's dedication and loyalty to the Governor did not go unnoticed.  As former Secretary to the Governor Larry Schwartz recalls:

> I first met Joe in 1994.  We were both working to help re-elect Mario Cuomo to a fourth term.  Joe was just a young kid, doing everything and anything to help the Governor and his campaign. . . . What impressed me at that time were Joe's sense of loyalty and

> his strong work ethic.  He never complained about any task that he
> was given.  He was committed to seeing Mario Cuomo win and his
> passion for Mario Cuomo became a lifelong relationship of love
> and respect for one another.

*Larry Schwartz.*  But when the 1994 campaign ended Mario Cuomo lost and Joe had to find a

new job.

For nearly the next decade, Todd Howe acted as a mentor to Joe, helping Joe get a

number of political jobs.  Todd Howe helped Joe find interviews at places like the New York

Public Advocate's Office and hired Joe to work under him in the New York regional office at the

U.S. Department of Housing and Urban Development ("HUD"), where Howe was working for

then deputy secretary Andrew Cuomo.  It was during his time at HUD (in both the New York

regional office and the Washington, D.C. office) that Joe developed a close professional

relationship with Andrew Cuomo.  As Cuomo wrote in his memoir:

> [Joe] had the guts, brains, and stick-to-itiveness necessary to attack
> any project—hard.  Joe had another trait that served us well: during
> the worst of times he could make us laugh.

Andrew Cuomo, *All Things Possible: Setbacks and Success in Politics and Life* (2014).

With the election of President George W. Bush came a change in power at HUD, and

Secretary Cuomo left his position.  Shortly thereafter, in 2002, Andrew Cuomo contemplated

running for Governor of New York, and he turned to Joe to help run his fledgling campaign.  The

two spent countless hours in the car together, driving across the State to save money on flights.

And when that campaign failed, prompting many in the State to criticize Cuomo, it was Joe who

stood by his side, not just in a professional capacity, but in a personal one as well.  Governor

Cuomo described Joe in 2003 as both "my divorce counselor" and "my fishing buddy."

*(b)      The Attorney General's Office and the Governor's Office*

After Andrew Cuomo's 2002 gubernatorial campaign failed, Joe took some time off to take the bar exam and then joined KPMG, working in the firm's Forensic and Litigation Department.  *Lisa Percoco*.  But that foray into the private sector was short-lived.  Less than three years later, Joe left his private sector job to help manage Andrew Cuomo's campaign for Attorney General for the State of New York.  This time around Cuomo won; he was elected Attorney General in 2006.  Joe went to work on the transition, working closely with Steven Cohen and helping Cohen to "navigate the people and personalities critical to putting together a team that would best serve the Administration."  *Steven Cohen*.  Though he had played a "critical role in the election," Joe was, again, happy to work behind the scenes.  He "was interested in the success of the enterprise and willing to put his own personal interests aside for the greater good." *Steven Cohen.*

After four years in the Attorney General's Office, Joe once again helped Andrew Cuomo on a campaign – this time a successful run for Governor.  After the election, Joe served as Executive Deputy Secretary to Governor Andrew Cuomo and "was involved in overseeing Legislative outreach and administrative operations, as well as working with the regional ombudsmen, organized labor and community groups throughout the state."  *Larry Schwartz.*

In both his position in the Attorney General's office and the Executive Chamber, Joe worked in the background where he "showed himself to be deft in his dealing with an array of legislators and interest groups."  *Steven Cohen.*  One example concerns the passage of Marriage Equality in New York; Joe took an active role on the issue, as Steven Cohen makes clear:

> Joe and I met personally with representatives of certain Orthodox Jewish groups who were opposed on religious grounds to the passage of same sex marriage.  It was Joe who took the lead in explaining that he fully understood the group's objections and that he respected their right to have a view different from the

20

> Administration. . . . He pressed the notion that no one was seeking to impinge on their rights or their religious observances. . . . When the meeting ended, the group's leader said he respected our viewpoint, appreciated our friendship and was going home.  In other words, the group would let the issue play out and cease lobbying in opposition.

*Steven Cohen*.  Joe was "a role model in how to communicate, tackle projects and keep up with a constant flow of work."  *Joe Rossi.*

"Although Joe was a tough manager, he never gave [his] team assignments he wasn't willing to do himself."  *Mayra Linares-Garcia*.  He "took every step he could to ensure that [the] entire team gave [their] very best performance at every parade, gubernatorial announcement or bill signing event."  *Melissa Magro*.  But Joe also "cared for the well-being of every one of his colleagues."  *Melissa Magro*.  As Melissa explains in her letter, "After working late night shifts at gubernatorial events, [Joe] always made sure that we all made it back to the train safely, that we made it home in time to see our families, or even that we ate."  *Melissa Magro*.  "After major events, Joe would take a few moments to send everyone a note congratulating and thanking them on a job well done."  *Mark Streb*.

Constituents with whom Joe interacted also describe Joe as "easy to talk to, a man of his word, and [someone who] would always get back to [them] even if he didn't give [them] good news."  *Leon Goldenberg*.  He was "honest, fair minded and accessible" and "always able to cut to the heart of the matter and make things happen."  *George Weinberger*.  Joe was always "receptive to issues of concern to the Jewish community, a fierce warrior on the battlefield against anti-Semitism and a staunch advocate of religious freedom."  *Sol Werdiger*.  For example, when the Attorney General's Office "received a referral from the Health Department to close down a summer camp," he contacted a friend on a Friday afternoon to "drive over to the camp and check out the issue."  *Abe Eisner*.  Joe was "sensitive enough to the [Jewish]

21

community's needs" to make sure that, unless it was necessary, a Jewish institution would not be

closed "on a Friday afternoon, right before the Sabbath," because he knew "it would create

tremendous hardship for everyone involved."  *Abe Eisner.*  Due to his insistence that his friend

look into the matter, Joe was able to gather sufficient information to determine that there was not

an immediate need to close down the camp and to allow for the resolution of the complaint to

wait until Monday.  *Abe Eisner.*

There is no doubt that responsiveness is expected from someone in Joe's position –

responding to constituent concerns was a responsibility inherent to Joe's job as a public servant.

What was unique about Joe, and what is overlooked by the law's broad definition of "public

official," is that Joe was not, and never wanted to be, an elected official.  Nor has he sought to

take credit for good deeds to further himself professionally.  Rather, those whom he has served,

supported, and touched over the years are petitioning on his behalf now and asking that the

Court, in evaluating Joe as a person, recognize the impact that Joe has had on their lives.

**B.**     **The nature and circumstances of the offense warrant a sentence well below the Guidelines**

Unlike other officials who have been convicted under federal bribery laws, Joe, while a

close confidant of Governor Cuomo with significant responsibilities, was not an elected official,

much less one of Albany's "three men in a room."[6]  Joe did not hold himself out to the public in

the way that a candidate running for office does.  His role was largely confined to the inner

workings and operations of the Cuomo administration.  His duties included "scheduling,"

"planning" and "executing."  (Tr. 510:9-10.)

---

[6]     *See* Norman Redlich, *Foreward* to Seymour P. Lachman and Robert Polner, *Three Men in a Room: The Inside Story of Power and Betrayal in an American Statehouse*, ix (2006) ("The 'Three Men in a Room,' are, of course, the Governor of New York State, the Speaker of the Assembly (usually a Democrat), and the Majority Leader of the State Senate (usually a Republican).")

The jury's task was to make a binary decision: guilty or not guilty.  But the Court has a different task.  The Court must consider the "nature and circumstances of the offense," and therefore must consider where Joe's conduct falls on a continuum of culpability.  We hope that in considering the relative level of Joe's culpability the Court will appreciate, as the jury told us, that this was a close case.  Not because of the language and the desperation Todd Howe often employed in emails while pursuing and pushing the interests of his clients, but because of what Joe actually did.  And that was, respectfully, very little.

Finally, the government spends much of its sentencing submission focused on Joe's "denial of responsibility."  *See* Gov't Sentencing Submission at 18-21.  This argument is based on objections Joe's counsel made to the initial draft of the PSR.  According to the government, these objections reflect Joe's "complete lack of acceptance of responsibility," which the government wrongly equates with a "lack of remorse" in arguing for a significant sentence of incarceration.  *Id.* at 19.  This argument should be rejected.

We are not arguing for a downward adjustment based on acceptance of responsibility, as none would be appropriate under the circumstances here.  Nor should a lack of acceptance of responsibility of every factual assertion viewed in the light most favorable to the government serve as a basis for an upward adjustment, as the government clearly and repeatedly suggests.  Our objections to the draft PSR, many of which were accepted by the Probation Department, sought to replace assumptions based on allegations in the charging document with facts that were actually proven at trial.   The Court should not view any of these objections as evidence of Joe's lack of remorse.  They are not.

### 1.    CPV

With respect to the CPV scheme, the *quid* did not involve briefcases of cash or secret transfers; it was a job for Joe's wife.  In the spring of 2012, the Percocos moved out of New

York City and into Westchester County.  The move meant that it was no longer possible for Lisa to commute to her old school in Staten Island.  Joe turned to his network to inquire about open positions at schools in the local community, and asked his colleagues and friends, including Todd Howe, for help.  It was in this context that Todd Howe thought Braith Kelly—Howe's client and a man who had many contacts in neighboring Connecticut—could help.  When Howe initially reached out to Kelly, he didn't ask whether Kelly could hire Lisa Percoco at CPV but whether Kelly knew anyone in the Ridgefield, or New Canaan, Connecticut school districts— districts in which Lisa might find employment as a school teacher.  (GX 415.)  Joe never made any demands on Kelly or pressured him in any way to hire Lisa.

Joe made significant mistakes when the possibility arose, months later, that CPV might be able to hire Lisa for its own education program.  Joe should have sought and received a formal opinion from counsel.  Thereafter, he should have been walled off from CPV matters. Joe accepts responsibility for those mistakes.

But Joe's conduct—on the *quo* side—was also atypical:  it mainly involved providing routine access to relevant State officials.  Joe had no role in energy policy.  He had no understanding of the issues that concerned CPV.  And he never once pressured or directed any of the State officials that did. [7]  Indeed, the government's sole witness from the senior ranks of the Cuomo administration, Linda Lacewell, testified that Joe never once raised an energy issue in any of the senior staff's weekly meetings on the Second Floor.  (Tr. 632-33.)

Rather, Joe was a man who connected people, and that is what he did for Braith.  Joe arranged a handful of meetings for Braith, both well before and after Lisa was hired by CPV.

---

[7]     The government argues that Percoco "agreed to 'push on' [Howard] Glaser for him to support a PPA for CPV," citing GX 85—an email between Howe and Percoco.  Gov't Sentencing Mem. at 7.  Not even Howe agreed with the government's current characterization of this email, which was sent after the PSC had already decided not to award a PPA.  When asked what he was requesting of Percoco by asking him to "push on" Glaser, Howe testified that he wanted Joe "to push on Howard to hold that meeting that both [Gil] Quinones and I were discussing."  (Tr. 2361.)

Joe did not attend a single one of those meetings.  Nor was there testimony that Joe ever pressured anyone to take one of those meetings or that he ever raised an agenda or topic for a meeting in making a request.  We make this point not to reargue the counts of conviction, but to show that Joe's culpability is vastly different from that of other convicted officials who promised legislation or contracts in exchange for payments.  By all accounts, Joe abided by the adage that so many have ascribed to him in letters to the court:  "if you can be helpful, be helpful, if you can't, you can't."

There is perhaps no better example of the disparity between Joe's conduct and the contemplated Guidelines punishment than with respect to the Reciprocity Agreement entered into by the states of New York and New Jersey.  The PSR attributes a $1.5 million loss to Joe because Joe replied to an email from Todd Howe by telling Howe to ask someone else for help: "Pls ask howard to help or regan on this.  Things with momma not good.  Thx."  (GX 74A.)  Joe sent that email from the hospice where he was tending to his dying mother.  And he sent it directly to Howe, without copying or forwarding it to anyone else.  To Joe, that was the end of the matter.  When *Howe* forwarded the same email to Howard Glaser, who, unlike Joe, oversaw the agency responsible for negotiating the Reciprocity Agreement, Glaser responded to Howe's request: "not a problem."  (GX 75A.)  When John Regan, on behalf of the Governor's Office reached out to the agency representatives, he explicitly noted that he was doing so at the request of *Howard Glaser*.  (GX 416.)  Moreover, the agreement itself was only executed after an additional year of negotiations (none of which involved Joe) and a commitment by CPV to contribute $1 million to another New York state agency.  (GX 1017.)

### 2.    COR

By early 2014, Joe was ready to leave State government and transition into the private sector, as so many Cuomo alumni had done.  First, however, he planned to fulfill his

commitment to the Governor to run the Governor's second gubernatorial campaign.  Unlike

others who took leaves of absence to work on the campaign, Joe resigned in anticipation of

entering the private sector after the election.  He disclosed to the Governor that he was going to

take on consulting work while he ran the campaign.  (3565-07 at 7.)  He then sought a counsel's

opinion allowing him to do the work he had contemplated: consulting clients on permissible

local and labor issues.  As the Court heard, this was something Joe discussed with Howe from as

early as January 2014, long before any issue arose between COR and ESD.  (Tr. 2093:11-19.)

There is no testimony—Howe's included—that Joe agreed to accept payments for COR

in exchange for official action.  Rather, after months of promising Joe consulting work, Howe

asked Joe in August 2014 to speak directly with a labor union official in the Syracuse area about

labor's demands on the Inner Harbor project.  This was precisely the type of work that Joe

understood he was able to perform:   Negotiations between the labor union and COR that did not

involve the State.  (Tr. 5314:17-19.)  There was no evidence and no allegation that Joe had any

contact with any State officials on matters relating to COR during this time period.  Further, at

the time that Joe received the payment from COR in August, he had no intention of ever

returning to his position as Executive Deputy Secretary (or to any other position in State

government).

Joe did not make the decision to return to government until after the November election

when Governor Cuomo asked him to return to the administration for a period of time.  As

Governor Cuomo told the government, the decision to return was made at the Governor's

request, at a point in time when the Governor found himself in a difficult situation and needed

Percoco's help to ensure a smooth transition into the next legislative session. (*See* 3565-07 at 8.)

When Joe did return, he immediately disclosed his receipt of money from COR on his appointment questionnaire and his financial disclosure forms.  (JPX 1014; GX 1219.)

We respectfully submit that these are not the actions of a man who set out to sell State action for money or to conceal a corrupt financial arrangement; they reflect that Joe was trying to stay on the right side of the line.

Joe's actions for COR after he returned to State government amounted to the following: (i) speaking for fewer than two minutes in a phone call to Andrew Kennedy in December 2014 in which Joe asked about issues holding up the resolution of the LPA; (ii) conveying a few communications in September 2015 in which Joe asked about funding long-owed to COR under a state grant that Joe had nothing to do with awarding; and (iii) facilitating a $6,000 raise for Steve Aiello, Jr., a staffer who had served under Joe while on the campaign and had been previously overlooked for a standard raise.

With respect to the LPA, it is undisputed that Joe contacted Andrew Kennedy on December 3, 2014 and that they spoke for less than two minutes.  Making this call was a mistake; Joe should have known that any contact with State officials on matters relating to COR following his receipt of payments from COR was prohibited.  But what Joe did was consistent with what he was always willing to do:  get to the bottom of a problem.  During that call, Joe asked Kennedy why the project was being held up.  Kennedy did not respond that ESD had made the determination to require an LPA.  He said the opposite:  that he was under the impression that the decision to drop the LPA requirement had been resolved six weeks earlier.  (Tr. 1346.) It was this appearance of miscommunication that prompted Joe to ask Kennedy to get to the bottom of problem.  That is a far cry from placing a phone call to demand that a State official reverse a particular decision; Joe did not do that.  (Tr. 1348.)  Rather, as Maria Cassidy testified,

the decision not to require an LPA was made on the merits, because the Inner Harbor project was much larger than simply the hotel she had originally been presented with.  (Tr. 5325; 5377.)

Nearly a year later, Joe received an email from Todd Howe informing him that workers were threatening to walk off one of the Governor's priority projects in Syracuse because the State had failed to make timely payments on grants connected to two projects:  Film Hub and SORAA.  Again, Joe was willing, as he always was, to find out what the problem was.  A phone call to Mary Beth Labate—the director of the Division of Budget—revealed that the Division of Budget had already approved a small allocation of funds for the Film Hub.  (Tr. 5687; JPX 742-R.)  Ms. Labate informed Joe that her deputy, David Lara, was in charge of the allocations and had the relevant details; Joe followed up.  When Lara informed Joe that the Film Hub funds were in process and should be disbursed within a week,[8] he also asked whether Joe wanted him to process the SORAA grant—which was almost three times the amount of the Film Hub funds that had already been allocated.  In other words, Lara gave Joe the opportunity to approve the allocation of many millions of dollars more for COR.  Joe refused this request.  (JPX 652; GX 620.)  He told Mr. Lara to instead wait for Andrew Kennedy to return from vacation the following week.  And Kennedy's own testimony makes still more clear how relatively limited Joe's involvement was.  Kennedy stated that he (Kennedy) authorized the allocation of the Film Hub funds on behalf of the Governor's office (Tr. 1377), that he had allocated the funds prior to Joe's involvement because the funds were owed long before September 2015 (Tr. 1380-81), that he approved the allocation on his own accord, and that he did so without any pressure or direction from Joe.  (Tr. 1386; 1389-90.)

---

[8]    The funds had been allocated but remained subject to further diligence by DASNY—the agency that actually responsible for grant disbursements.

Finally, Joe approved a raise for Steve Aiello Jr., also in September 2015.  We urge that, when the Court assesses Joe's intent, the Court should recall that the raise was owed and that Joe was under the misimpression that it had already been paid.  Testimony established that a 10% raise was typical for State employees when they switched "lines" within the Second Floor.  (Tr. 907-08.)  Steve Aiello, Jr. had previously switched lines, but no raise was ever processed.  When Joe learned of this, he genuinely believed that there had been a mistake, and the raise for Steve Aiello Jr. had been overlooked.  He fixed that mistake for a mentee whom he had seen loyally serve the campaign on a volunteer basis.

## II.      There Is No Need for an Extended Period of Incarceration Under § 3553(A)(2)

### A.      A sentence of two years' imprisonment would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense

We acknowledge that the offenses of conviction suggest a prison sentence.  Although Joe's generous nature and tireless work ethic make him well-suited for a sentence of community service, we understand that, in light of the seriousness of the offenses and the Court's interest in promoting respect for the law, a term of incarceration is deemed appropriate.  What is not appropriate, however, and what would constitute *un*just punishment, is the Draconian sentence called for by the Guidelines (even a sentence at the lower end of the correctly calculated Guidelines range).

A term of imprisonment not to exceed two years will serve as a reminder to those who hold public office and those who serve elected officials that corruption in any form will not be tolerated and will sufficiently punish Joe as an individual.  With a sentence of two years' imprisonment, Joe will not see his older daughter graduate from high school, nor will he help her move in to her college dorm.  He will not have the opportunity to support and guide his younger

29

daughter through high school.  He will be unable to contribute financially to his family, leaving

his wife with one daughter in college and another approaching college, yet only one income.

Moreover, while any term of incarceration will certainly be devastating to Joe, the most

severe punishment has already been meted out in the court of public opinion.  Since the day of

his arrest, both he and his family have been subjected to seemingly limitless public scrutiny.

Such scrutiny will only increase as the gubernatorial election approaches.  Joe's own work

history, and the letters written on his behalf, show, if nothing else, that he has spent

overwhelming majority of his professional career supporting and advocating on behalf of the

Cuomo family and enhancing its reputation.  That his name, his picture, and this case will be

used in an attempt to sully that reputation is itself stiff punishment.  And, when Joe finally

completes his sentence, he will have no job to return to (for he has already lost his job with

MSG, a job he worked towards for years), no prospect of ever again working in public service or

governmental relations, and will be saddled with millions in debt with no prospect of recovery.

These realities are appropriate for the Court to consider when assessing whether a sentence will

serve as "just punishment" for an offense.  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir.

2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not

consider the collateral effects of a particular sentence.").

### B.     A sentence of two years would afford more than "adequate deterrence to criminal conduct"

There is considerable evidence that white collar offenders are strongly deterred by even

relatively short sentences.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y.

2006) (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) and Elizabeth

Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)).  Conversely,

there is no evidence that increases in sentence length reduce crime through deterrence.  Current

empirical research on general deterrence shows that while *certainty* of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects.  Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28-29 (2006) (citations omitted).

Typical of the findings on general deterrence are those in a report published by the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  It examined the effects of changes to both the c*ertainty* and the *severity* of punishment.  Although significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance."  *Id.* at 2.  The report concludes that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."  *Id.* at 1.  "[W]hile there may be disagreement about the magnitude, there does seem to be a modest inverse relationship between the perceived *certainty* of punishment and crime, but no real evidence of a deterrent effect for *severity*[.]"  Raymond Paternoster, *How Much Do We Really Know about Criminal Deterrence, 100 J. Crim. L. & Criminology* 765, 818 (2010) (emphasis added).

C.     **A sentence of two years is greater than necessary "to protect the public from further crimes of the defendant"**

Among the factors the Court is to consider is the need to "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Joe poses no risk to society and there is no risk of recidivism.  Joe's political career was already over at the time of his arrest; he had moved

on to the private sector.  He will never again be in a position to commit the sort of crimes for which he stands convicted.

Apart from the mistakes that brought him here, and as the many letters submitted on his behalf make clear, Joe has led a remarkable and extraordinary life, both professionally and personally.  He put himself through college and rose through the ranks with grit and determination.  He went from being an intern passing out flyers and setting up chairs at events to being the close aide and confidant of a governor.  And all the while, he stood as the rock to his large extended family, spending whatever rare moments he could get away from his work with them.  He has never before been in any kind of trouble with the law.  Plainly, the public need not be protected from further crimes by Joe.

Empirical data also supports the argument that the public need not be protected from further crimes by defendants like Joe.  According to a report on recidivism by the United States Sentencing Commission, offenders with similar criminal histories and demographic characteristics as Joe are highly unlikely to commit another crime.  The report states that only 6.9% of defendants who—like Joe—are over 40 and in Criminal History Category I, are even arrested again, let alone convicted.  *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 28 (May 2004).  Offenders sentenced under the fraud guidelines are the least likely to recidivate, and recidivism rates are also lower where the defendant has a college education.  *Id.* at 29-30.  In light of these factors, it is extremely unlikely that Joe will ever come before this or any other Court again, and this factor, too, weighs in favor of a sentence far below the advisory Guidelines range.  *See Adelson*, 441 F. Supp. 2d at 514.

### III.   The Appropriate Guidelines Range Is Based on Gain and Is 121-151 Months

The PSR calculates a total offense level of 36.  The parties do not dispute the base level the Probation Office assigned (14 points) or the propriety of two of the three enhancements applied (2 points because the offense involved more than one bribe and 4 points because the offense involved a public official in a high-level decision-making or sensitive position).  The remaining 16 points—which we do dispute—applied by the Probation Office are derived from an enhancement assigned according to Section 2C1.1(b)(2) of the Guidelines, which looks to the greatest of:  (1) the value of the payment; (2) the benefit received or to be received in return for the payment; or (3) the loss to the government from the offense to determine the appropriate number of points to add to an offense level.

A loss calculation must be made with particularity and supported by evidence.  *See United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings must be grounded in the evidence and not derive from mere speculation.").  Here, the Probation Office values the benefit received by CPV in obtaining the reciprocity agreement at in excess of $1.5 million— a figure carrying a 16-point enhancement.  In accepting the government's view arriving at that figure, the Probation Office relies purely on speculation.  It cannot establish a sufficient causal connection between Joe's conduct and the energy credits purchased by CPV, and it cannot establish what the specific value of certain energy credits might have been at a certain point in time.  This loss calculation is unreasonable and should be rejected.

Consequently, under section 2C1.1, the Court should use the only amount that can reasonably be quantified—the gain that resulted from the offense—as an alternative measure of loss.  U.S.S.G. § 2B1.1, cmt. n. 3(B).  Because Joe received a total of $322,000 from the two

schemes that form the basis of his conviction, the Court should apply a corresponding 12-point enhancement under Section 2C1.1(b)(2) and 2B1.1(b)(1)(G).[9]

### A.   The government has not proved by a preponderance of the evidence a loss attributable to Mr. Percoco

In seeking a loss enhancement, "the Government bears the burden to prove both the existence and amount of the loss attributable to the offenses of conviction." *United States v. Cuti*, No. 08 cr 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011).  While the Court is advised to take the "greatest" of (i) the value of the payment, (ii) the benefit received or to be received in return for the payment, or (iii) the gain to the public official, it should not simply accept the Government's assertions at face value.  Here, the Government and the PSR attribute to Joe a benefit received by CPV in excess of $1.5 million based on a single email exchange between Joe and Howe in August 2013.  In order to enhance a sentence because of such a benefit – "the benefit received or to be received *in return for the payment*" – the government must establish not only receipt but causation; the benefit must have been received *in return for* the payment.  U.S.S.G. §2C1.1(b)(2)(A).  There must be a sufficient "causal link" between Joe's conduct and the Reciprocity Agreement.  *United States v. Ring*, 811 F. Supp. 2d 359, 377 (D.D.C. 2011).

The government cannot simply use the jury's verdict to prove that causal link; the verdict does not establish that the Reciprocity Agreement was executed "in return for" bribe payments to Joe or that any benefit to CPV was foreseeable to him.  The jury was not asked to distinguish between the PPA and Reciprocity Agreement schemes.  Accordingly, the verdict does not resolve the matter in question, and the Court must examine the facts.

---

[9]    With respect to Joe's conduct in connection with COR, the parties agree the only benefit received by COR (or loss suffered by the government) that can be reasonably valued is the $6,000 raise received by Steven Aiello, Jr. The payment Joe received from COR ($35,000) exceeds that amount, thereby making it appropriate, under Section 2C1.1(b)(2), to rely on the value of the payment.

The government's version of Joe's conduct with respect to the reciprocity agreement is as follows:  "When Kelly asked Howe for a 'push from above' to get New York to enter in to a reciprocity agreement with New Jersey, Howe reached out to Percoco, who, in turn, instructed Glaser and Regan to get it done, and they did."  Gov't Sentencing Submission at 8.  This characterization has *no* basis in fact.

The relevant events occurred in August 2013.  On August 12, 2013, Howe informed Joe that CPV was in negotiations with the New York Department of Environmental Conservation ("DEC") for New York and New Jersey to enter into a Reciprocity Agreement whereby New York emission reduction credits ("ERCs") could be used for a plant in New Jersey.  Howe forwarded an email from Kelly to Joe, and Joe responded that he would "check" with the DEC commissioner as to what else was needed for the agreement.  However, Joe never reached out to the DEC commissioner, and when Howe followed up, Joe responded, without copying or forwarding the email to anyone else:  "Pls ask howard to help or regan on this.  Things with momma not good.  Thx."  Howe and Howard Glaser—who was Deputy Secretary and senior to Joe on the organization chart—were friends of 30 years, and John Regan had worked for Howe at the Mortgage Bankers Association and WOH Government Solutions.  Moreover, unlike Joe, Glaser oversaw the agency in question, and was Regan's direct supervisor.  When Howe forwarded the exchange to Glaser, Glaser responded almost immediately, and without any intervening contact from Percoco:  "not a problem."

That email traffic is not sufficient to establish the requisite causal link between payments to Joe and the execution of the Reciprocity Agreement.  Joe did not take a position on the Reciprocity Agreement or even forward Howe's email.  Moreover, even if one were to assume (incorrectly) that there was a sufficient causal link between payments to Joe and CPV's receipt

of a benefit because of the Reciprocity Agreement, the logic of *United States v. Ring* counsels that the relevant comparison is ***not*** between what CPV paid to purchase ERCs because the Agreement was executed and what it would have been required to pay had the Agreement not been executed.  Rather, the Court must evaluate what benefit CPV received as a result of Howe first emailing Joe as compared to what CPV might have received if Howe had emailed Glaser (or Regan) first.  That is because "in determining the value of the benefits 'received or to be received in return for the payment,' the Court must take care to take into account benefits that would have been received in any event."  *Ring*, 811 F. Supp. 2d at 378 (citing *United States v. Whitfield*, 590 F.3d 325, 368 (5th Cir. 2009)).  Thus, as the court in *Ring* explained, benefits that CPV received "from [ ] corrupt lobbying must be compared with what might have happened had there been no *corrupt* lobbying, not, as the government would have it, by looking to what would have happened had there been no lobbying at all."  *Id.*  On this record, there is no reason to presume that Glaser would have had a different response had Howe contacted him without first emailing Joe.  Wholly legitimate lobbying would have obtained the same benefit.

### B.     The value of the benefit received from the reciprocity agreement cannot reasonably be determined

Assuming arguendo that CPV received a benefit from the Reciprocity Agreement as a result of the payments to Joe, the value of that benefit cannot be reasonably calculated.  The PSR attempts to value the benefit that CPV received from the Reciprocity Agreement by engaging in a largely arbitrary process.  The PSR first picks an amount that CPV would have had to pay if, in July 2013, it had bought New Jersey ERCs in order to build an energy plant in Woodridge, New Jersey (the "Shore plant").  Then, from that July 2013 figure the government subtracts the amount that CPV actually paid in March 2014 to purchase the needed ERCs in New York.  And finally the PSR subtracts the one million dollars CPV contributed to the New York State Energy

36

Research and Development Authority ("NYSERDA") pursuant to the Contribution Agreement between CPV and NYSERDA. These calculations result in a purported net benefit to CPV of $1,554,293.50. But only the last step – subtracting CPV's contribution – makes sense.

The valuation analysis is fundamentally flawed for several reasons. First, it depends entirely on speculation—what CPV would have paid for ERCs in July 2013. Because there is no real market for ERCs and thus no way to trace a market price, the government attempts to price what ERCs would have cost in the absence of the Reciprocity Agreement, and does so by seizing on a single offer made to CPV that never even materialized. Specifically, on July 3, 2013, a broker working on CPV's behalf sent an email to Mark Turner, the CPV employee managing the development of the Shore plant. The broker informed Mr. Turner that Phillips 66, a company holding New Jersey ERCs, had an offer to sell 200 ERCs to CPV for $20,725/ton.[10] (*See* CPV-SDNYGJ-00039639-640 (marked pre-trial as GX 72)). The government argues that this offer was the best price CPV could possibly have obtained for New Jersey ERCs; however, its proof that no better offer was available in 2013 is actually a transaction from *three years later* in 2016, when Phillips 66 optioned those ERCs for $25,000/ton. And the very email on which the government relies – the July 3, 2013 email – shows that negotiations were still ongoing, and that Phillips 66 had already lowered its initial price per ton offer by nearly 20%. At that time, even CPV's own broker contemplated further negotiations; he sent an email to Mr. Turner asking whether he should "respond to Phillips 66's counteroffer."

Second, a spreadsheet cited by the government as evidence of the price that CPV ultimately paid to purchase New York ERCs in March 2014 reflects a price per ton of only $10,000 for the ERCs held by Phillips 66 – less than half the price in the July 3, 2013 email.

---

[10]   ERCs are priced per ton such that the price per ton is equivalent to the price per credit – *e.g.*, for ERCs priced at $20,725/ton, one ERC would cost $20,725.

(*See* Gov't Sentencing Submission, Exh. C, ECF 788-3.)[11]  Indeed, the historical prices as of June 2013—the only numbers that have a factual basis of support—were in reality much lower in New York and New Jersey than the $20,725 per ton figure cited in the PSR.  A June 2013 email exchange admitted into evidence at trial demonstrates that the highest price ERCs in New Jersey had historically been sold for was only $5,000/ton and, in New York, $12,000/ton.  (GX 79.)

Third, CPV's own emails indicate that the figures relied upon by the government were not grounded in reality and not indicative of prevailing market prices.  Mr. Turner noted in his June 12, 2013 email to Steve Remillard and Braith Kelly that the "offers" CPV had received from New Jersey companies were the "same thing as saying '[w]e're not ready to sell'" because the prices quoted by the companies were "5 to 7 times the market value" of the ERCs.  (GX 79.)  In other words, the basis for CPV seeking the Reciprocity Agreement was not its desire to save money on the cost of purchasing ERCs, but simply that ERCs were unavailable in sufficient quantity from New Jersey companies.

Finally, the comparison in prices reflected in the PSR is apples-to-oranges.  The PSR relies on a randomly selected July 2013 offer from a New Jersey seller as compared to the actual price CPV paid in March 2014, eight months later, to purchase credits in New York.  By comparing the prices at disparate times, the government's calculation fails to account for changes in the market price of ERCs that are *not* attributable to the Reciprocity Agreement.  That is, the government assumes that *any* savings CPV obtained by purchasing ERCs in New York eight months later can be attributed *solely* to the fact that New York and New Jersey had entered into a Reciprocity Agreement.  That assumption completely ignores any other factors that may have influenced the price per ton for ERCs during that eight-month period.

---

[11]    That this price appears in a column bearing the title "unlikely" is irrelevant, as that shows only that it was "unlikely" that CPV would purchase those ERCs given the better offers it had received from other companies.

Given the difficulties in valuing the Reciprocity Agreement, the more reasonable approach to determining the proper value on which to rely for purposes of Section 2C1.1(b)(2) would be to look to the payments Joe actually received.  The value of Joe's gain in this case is readily quantifiable:  it was more than $250,000, but less than $550,000.  Accordingly, the appropriate enhancement to his offense level is 12 points, resulting in a total offense level of 32.

## IV. A Sentence Below the Guidelines Range Is Needed To Avoid Unwarranted Disparities under § 3553(A)(6)

The Guidelines range in this case dwarfs the sentences recently handed down to *elected* officials for conduct far more egregious than was present here:  conduct that involved the extortion of those with business before the State, pressure and threats of others for corrupt payments, and the sale of public legislation or public contracts.  This was not one of those cases.  The Guidelines range also far exceeds the sentences that have been imposed upon *unelected* political aides who have been convicted of political corruption.  A review of these cases makes clear that a sentence of even half the Guidelines range in Joe's case would be one of the harshest ever imposed.  Notably, the government offered to Joe's co-defendant, Braith Kelly, a plea in which the Guidelines range is *ten times* lower than the range for Mr. Percoco.

### A. Sentences of elected officials convicted of similar or more egregious conduct

#### *United States v. Bruno* (Two-Year Sentence)

Joseph Bruno was New York State Senate Majority Leader and one of the three most powerful men in New York State.  He was convicted in 2009 of two counts of honest services mail fraud, after entering into consulting relationships with individuals and entities with business before the New York State Senate.  Specifically, Bruno accepted payments worth $280,000 for consulting work and other goods he never performed or delivered by exploiting his official position for personal gain, including by directing certain State grants to entities in which Bruno's

bribers had an interest.  Bruno further concealed the nature of those relationships and the existence of the payments on his disclosure forms.  The court calculated an offense level of 30 and a Guidelines Range of 97-121 months.  In delivering its judgment, the sentencing court noted that Bruno had "trampled on the integrity of the State Legislature and people who put their trust in you and others, and there has to be a penalty for that."  Sentencing Transcript, *United States v. Bruno*, No. 1:09-cr-0029-GLS (N.D.N.Y. May 6, 2010), Dkt. 306 at 94.  In reaching the appropriate balance with the severe Guidelines recommendation the court imposed a sentence of 24 months.

### *United States v. Skelos* (Five-Year Sentence)

Like Joseph Bruno before him, Dean Skelos was the New York Senate Majority Leader and one of the three most powerful elected officials in New York State.  In 2015, Skelos was convicted of pressuring and threatening companies with substantial business before the New York Senate into providing his son with no-show jobs worth hundreds of thousands of dollars.  Notably, it was Skelos who first approached the bribe payors seeking payments for his son, leaving these companies with the impression that he would withdraw his critical legislative support if they did not comply.  Gov't Sentencing Mem., *United States v. Skelos,* 1:15-cr-00317-KMW (S.D.N.Y. Apr. 4, 2016), Dkt. 173 at 24 (it was a "significant aggravating factor that the companies did not first approach Dean Skelos or otherwise instigate the violation of his oath to honestly serve the public.").  In stark contrast, Joe left no such impressions upon Kelly; he never once pressured Kelly into hiring Lisa, and he never once insinuated that CPV would gain or lose support from New York State depending on whether Lisa was hired.  (*See* Tr. 2137-2138.)

Skelos ultimately took official actions to benefit the companies paying his son, including by supporting legislation and steering contracts worth millions of dollars to them, and his son

then held those companies "hostage" for a commission on the value of those contracts.  All told, Skelos and his son sought more than $760,000 in extortion payments, bribes and gratuities. Skelos' conduct was far more egregious and far more detrimental to the democratic process, the duration of that conduct was far more extended, and the scheme was far more lucrative than here. The Guidelines recommendation for Skelos was 151 to 188 months.  He was sentenced to a term of imprisonment of just 60 months.

### *United States v. McDonnell* (Two-Year Sentence)

Virginia Governor Robert McDonnell was convicted of 11 counts of public corruption-related allegations including extortion and theft of honest services.  *United States v. Robert F. McDonnell*, No. 3:14-cr-12 (E.D.Va. 2015).  Unlike the payments here, Governor McDonnell and his wife accepted lavish shopping sprees and gifts, including luxury sports cars.  In return, Governor McDonnell made critical introductions between his alleged briber and other high-ranking Virginia State officials—similar to what Joe did for CPV.  McDonnell's Guidelines range was 121-151 months.  He, like Joe Bruno, was sentenced to 24 months.

### B.     Sentences of unelected officials and political aides

A review of convictions of unelected officials and political aides likewise reveals that lengthy sentences of incarceration are exceedingly rare.  Even in cases involving sales of government contracts and legislation in exchange for bribes and kickbacks, the sentences imposed have never substantially exceeded four years.  In other words, a sentence here of even half the Guidelines recommendation (or the sentence recommended by the Probation Office) would be one of the most severe ever handed down to an unelected political aide.

### *United States v. Joseph Margiotta* (Two-Year Sentence)

The Court has previously compared Joe's position after his resignation from office to the defendant's position in *United States v. Margiotta*, as Joseph Margiotta was not a public official.

However, there was nothing similar about Margiotta's conduct.  Margiotta, the chairman of the Nassau County Republican Party, was convicted of a scheme that lasted more than a decade and which involved extorting more than $600,000 in insurance kickbacks for his supporters. Specifically, Margiotta arranged for an insurance agency to be appointed as the county's official insurance broker in return for the agency's secret agreement to give half of the commissions to persons selected by Margiotta.  *United States v. Margiotta,* 688 F.2d 108, 113-14 (2d Cir. 1982). Margiotta received a two-year sentence.

### *United States v. Felipe Sixto* (**30-Month Sentence**)

Felipe Sixto was special assistant to President George W. Bush for intergovernmental affairs, responsible for liaising with state legislators on issues involving Cuba, Puerto Rico, health and labor.  He was charged with stealing nearly $600,000 from a nonprofit group promoting democracy in Cuba, for whom he had previously worked.  The government described Sixto as a "man who over the course of years engaged in an intricate scheme to defraud an organization chartered to help people who were of his own heritage."  Gov't Mem. in Aid of Sentencing, *United States v. Sixto*, 1:08-cr-00345-RBW (D.D.C. March 11, 2009), Dkt. 13 at 4. Sixto was sentenced to 30 months of incarceration.

### *United States v. Foggo* (**37-Month Sentence**)

Kyle "Dusty" Foggo was one of the most powerful executives at the Central Intelligence Agency.  He was convicted of honest services fraud for a years-long scheme in which Foggo steered millions in CIA and CIA-related contracts during the height of the war on terror in exchange for a lucrative private sector opportunity when he left the CIA.  He was treated to lavish vacations on private jets and expensive meals, and used his power to force his subordinates to hire his mistress.  Gov't Sentencing Mem., *United States v. Foggo,* No. 1:08-cr-

00079 (E.D. Va Mar. 23, 2009), Dkt. 139 at 2.  The government submitted evidence that Foggo had abused his position for virtually the entirety of the 20 years he had served.  Foggo was sentenced to a term of incarceration of 37 months.

### C.  Joe's co-defendant Braith Kelly

As the Court is aware, Braith Kelly was allowed to plead guilty to one count of wire fraud.  The terms of Kelly's plea include a loss amount of less than $250,000, and a recommended Guidelines range of 12-18 months.  While we accept the differences in posture between Joe and Kelly's respective cases, the inequity of these two Guidelines recommendations should be patently obvious:  Joe's recommended Guidelines range is more than *ten times* Kelly's Guidelines range.  This despite the fact that: (1) Joe had no involvement or insight into the creation of CPV Educates, the way in which it was structured, or how CPV Educates marketed Lisa's involvement; (2) when asked, Joe responded that any income earned by Lisa would have to be disclosed; and (3) Joe was not a part of any meeting between Braith Kelly and any State official.

## V.  The Guidelines Are Not an Appropriate Guide for Actual Sentencing Practice in Bribery Cases

When Congress enacted the Sentencing Reform Act of 1984, it directed the Sentencing Commission to issue guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), but the Sentencing Commission couldn't agree on which purposes should predominate — for example, whether principles of just deserts should be given greater weight than incapacitation.  Instead, the Commission decided to take its cue from past practice; it issued guidelines that it claimed were based on an empirical study of past sentences.  *See* U.S.S.G., Ch. 1 pt. A(3) (1987); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).  In effect, the purposes that

judges had previously relied on — the purposes implicit in actual past sentences — would be their guide.  But in fact the guidelines that the Commission set (the sentences they recommended) did not, and to this day do not, accurately reflect past practice.

### A.      The Guidelines grossly exaggerate the length of pre-Guidelines sentences

The Sentencing Commission sought to replicate past sentencing practice by "drawing on a detailed analysis of 10,500 cases sentenced in the federal courts and on consideration of a less-detailed compilation of nearly one hundred thousand additional cases."  Kate Stith and Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 59 (1998).

The Commission used past sentences for two purposes.  First, "to determine the overall severity level of Guidelines sentences"; meaning to determine what sentences to recommend for particular categories of crimes.  *Id.* (citing U.S.S.C., *Sentencing Guidelines – Revised Draft*, January 1987, 16-18).  Second, to determine what factors should be used to distinguish between different instances of the same crime; for example, what should make one bribery sentence lower than another.  *Id.*  But in fact the Commission's study was fatally flawed in its efforts to accomplish both purposes because it grossly exaggerated the length of past sentences and failed to determine the facts that judges actually relied upon in arriving at those past sentences.

The Commission's study grossly exaggerated the length of pre-Guidelines sentences by ignoring the effect of the abolition of parole.  Sentences handed down in the pre-Guidelines era, before the enactment of the Sentencing Reform Act, were imposed in a system that included parole.  And under that system federal prisoners "served only 47 percent of their nominal sentences on average."  *Id.* at 63.  In other words, their actual prison time served was reduced by 53% from the sentence imposed.  But the Sentencing Reform Act abolished parole, and the maximum "good time" allowance a prisoner can receive is a 15% reduction of his sentence.

44

Thus, by ignoring the effect of this change, Guidelines sentences raised the time that the average offender actually spent in prison by 38%.[12]

The Commission's study also suffered from a basic flaw in the sources it used to collect data.  It did not examine court records of actual judgments entered by judges, or transcripts, to see what facts judges actually relied on in imposing a sentence.  Instead, "[t]he Commission simply correlated the mention of particular facts in the presentence report (such as whether the defendant used a weapon, the nature of his role in the offense, the amount of harm caused, etc.) with the sentence ultimately imposed."  *Id.* at 61 (footnote omitted).  For that reason, one cannot assume that the Guidelines' weighting of particular factors accurately reflects past sentencing practice.

Moreover, the fraud guideline — which drives a substantial portion of Joe's Guidelines score in this case — does not even purport to be based on empirical data of past practice.  When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses.  Breyer, *supra*, 17 Hofstra L. Rev. at 22-23.  Before the Guidelines were issued, probation was the norm for white collar offenses, but the Commission's then-mandatory rules required prison for all but the most minor cases. U.S.S.G., Ch. 1, pt. A(4)(d) (1987).  And in the years since the Guidelines were adopted, the Commission has made the loss tables even more punitive.  In 1987 a loss figure of 1.5 million — the loss that the government calculates here — corresponded to an 11-level increase, in 1989 it yielded a 14-level increase, and in 2001 it was 16 levels. At the same time, the actual harm from a $1.5 million loss has dropped because of inflation; the U.S. Labor Department's Consumer

---

[12]    Defendants convicted of fraud faired only a little worse than prisoners overall; they served approximately 54% of their sentences on average, meaning that their actual prison time was reduced by 46% from the sentence imposed. Thus, by ignoring the effect of the elimination of parole on fraud sentences the Guidelines raised the time that the average offender actually spent in prison by 31%.  *Id.* at 63.

Price Index estimates that $1.5 million in January 2018 dollars would have been only $733,000 in January 1989 dollars.  *See* CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl.[13] In other words, the same loss figure causes less than half the economic damage that it did when the Guidelines were issued, but now yields a significantly longer prison term.

Taken together, these flaws completely undermine the Commission's claim that the Guidelines derive from past experience, and thus undermine the central justification for the Guidelines methods and recommendations.

**B.    The Guidelines also do not accurately reflect current bribery sentencing practice**

Even now, after judges have been applying the Guidelines for almost three decades, a sentence based on the bribery Guideline does not accurately reflect actual sentences in bribery cases.

The average and median sentences under 2C1.1 are a tiny fraction of the recommended Guidelines sentence here.  For example, between 2006 and 2016, the average sentence for defendants with a criminal history category of I under § 2C1.1 in the Second Circuit was 26 months and the median 24 months out of a total population of 170 defendants sentenced to a term of incarceration.  *See* U.S.S.C., Interactive Sourcebook, https://isb.ussc.gov/Login.  If we expand that to all circuits, between 2006 and 2016, the average sentence for criminal history category I under § 2C1.1 was 32 months and the median sentence was 24 months out of a population of 2,034 defendants sentenced to a term of incarceration.

In other words, there is no reason whatsoever to presume that the Guidelines provide useful guidance in bribery cases.  When the Commission formulated guidelines for white collar offenses, it departed from "empirical data and national experience," and in so doing it departed

---

[13]    Conversely, $1.5 million in January 1989 dollars would be worth more than $3 million in January 2018.

from its "characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). In the years since 1987, the Loss Table has only become more distorted by the effects of inflation; the recommended punishment for many loss amounts has effectively doubled.  And finally, the Commission's own data shows that the bribery guidelines in particular continue to recommend sentences far above the sentences that are actually imposed in most cases.  In this context, to impose a Guidelines sentence—or one substantially influenced by the Guidelines— would be to create a serious sentencing disparity and an unjust result.

**CONCLUSION**

In these circumstances, the Guidelines are too blunt an instrument – the Guidelines range does not appropriately calculate the need for the sentence imposed.  For crimes such as Joe's, the Guidelines have become unmoored from what is sufficient but not greater than necessary to achieve the purposes of 3553(a).  Our recommended sentence would reflect the seriousness of the offense, provide adequate general and specific deterrence, reflect public safety concerns, and recognize that Joe has already paid an incredibly high price for the mistakes that he has made. Given the unique circumstances of this case, a sentence of two years is a reasonable variance. For the foregoing reasons, we respectfully request that the Court impose a sentence of not greater than two years imprisonment here.

Dated:  July 18, 2018
New York, New York

Respectfully submitted,

/s/ Barry A. Bohrer_____

Barry A. Bohrer
Michael L. Yaeger
Andrew D. Gladstein
Nicole P. Geoglis
Abigail F. Coster

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022

*Attorneys for Joseph Percoco*

48