UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                    :        S2 16 Cr. 776 (VEC)

JOSEPH PERCOCO                               :

                       Defendant.                     :

-------------------------------------------------------------x

## GOVERNMENT BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR BAIL PENDING APPEAL

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Janis Echenberg
Robert Boone
David Zhou
Matthew Podolsky
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

PRELMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

    I.   The CPV Scheme ......................................................................................... 2

    II.  The COR Scheme ........................................................................................ 4

APPLICABLE LAW ................................................................................................. 6

ARGUMENT ........................................................................................................... 7

    I.   The Court's Bribery Instruction was Correct .................................................. 7

    II.  The Government Properly Proved "Official Actions" Occurred ..................... 11

    III. The COR Scheme Was Properly Charged .................................................. 16

    IV. There Is No Question that Percoco's Convictions Were Supported by Sufficient ........... 16

    Evidence ..................................................................................................... 21

        a.   Applicable Law ...................................................................................... 22

        b.   Discussion .............................................................................................. 23

CONCLUSION ..................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Evans v. United States*, 504 U.S. 255 (1992) ........................................................................ 23

*McDonnell v. United States*, 136 S. Ct. 2335 (2016) ............................................... 1, 7-12, 14, 15, 17, 24

*McNally v. United States*, 483 U.S. 350 (1987) ......................................................... 14, 19

*Miserendino v. United States*, 307 F. Supp. 3d 480 (E.D. Va. 2018) ......................... 10

*Ocasio v. United States*, 136 S.Ct. 1423 (2016) ...................................................... 17-21

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ............................................. 7

*United States v. Bala*, 236 F.3d 87 (2d Cir. 2000) ..................................................... 23

*United States v. Clemente*, 22 F.3d 477 (2d Cir. 1994) ............................................... 17

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) .................................................. 22

*United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993) ..................................................... 8

*United States v. Fattah*, 223 F. Supp. 3d 336 (E.D. Pa. 2016) .................................. 10

*United States v. Forszt*, 655 F.2d 101 (7th Cir. 1981) ................................................ 13

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) .............................................. 8, 11

*United States v. Giordano*, 693 F.2d 245 (2d Cir. 1982) ............................................ 17

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) ................................................... 23

*United States v. Gordon*, 2018 WL 3067739, at *5-*6 (N.D. Ga. June 21, 2018) ................... 10

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) ............................................... 17

*United States v. Lasher*, 2015 WL 7769528 (S.D.N.Y. Nov. 30, 2015) ...................... 22

*United States v. Lena*, 497 F. Supp. 1352 (W.D. Pa. 1980) ....................................... 13

*United States v. Mangano*, 2018 WL 851860 (E.D.N.Y. Feb. 9, 2018) ...................... 10

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982) ...................................... 14, 19, 21

*United States v. Menendez*, 2018 WL 526746 (D.N.J. Jan. 24, 2018) ........................ 10

*United States v. Meyers*, 529 F.2d 1033 (7th Cir. 1976) ............................................ 13

*United States v. Miller*, 753 F.2d 19 (3d Cir. 1985) .................................................... 7

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ................................................. 22

*United States v. Rabinowich*, 238 U.S. 78 (1915) ...................................................... 17

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ............................................................. 22

*United States v. Randell*, 761 F.2d 122 (2d Cir. 1985) ................................................. 7, 22, 27

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017) .............................................................. 11

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ...................................................... 9, 23, 25

*United States v. Silver*, 2018 WL 1406617 (S.D.N.Y. Mar. 20, 2018) ..................................... 10

*United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016) ................................................... 7

*United States v. Skelos*, 2018 WL 2849712 (S.D.N.Y. June 8, 2018) ..................................... 10

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) ...................................................... 11

*United States v. Sotomayor-Vasquez*, 249 F.3d 1 (1st Cir. 2001) ............................................ 16

*United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018) ............................................................ 11

*United States v. Sun-Diamond Growers of California,* 526 U.S. 398 (1999) ............................ 11

*United States v. Trapilo*, 130 F.3d 547 & n.9 (2d Cir. 1997) .................................................. 17

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ......................................................... 17

*Woodward v. United States*, 2018 WL 4611122 (1st Cir. Sept. 26, 2018) ............................... 10

## PRELIMINARY STATEMENT

On March 13, 2018, Defendant Joseph Percoco was convicted at trial of two counts of conspiracy to commit honest services wire fraud in violation of Title 18, United States Code, Section, 1349, and, one count of solicitation of bribes and gratuities in violation of Title 18, United States Code, Sections 666(a)(1)(B).  Subsequently, on September 20, 2018, Percoco was sentenced to six years in prison.  Percoco now seeks bail pending appeal on several grounds.  He claims substantial questions exist as to the following issues:  (1) whether the "as opportunities arise" theory is inconsistent with *McDonnell*; (2) whether the Government's reliance on supposed "official acts" that occurred when Percoco was not a state official requires a new trial; (3) whether the COR-related charge can be proven because at the time of the alleged agreement Percoco could not perform "official acts"; and (4) whether the convictions are supported by sufficient evidence.  At the heart of all of Percoco's claims is his continued misunderstanding of the Supreme Court's holding in *McDonnell* v. *United States*, 136 S. Ct. 2335 (2016).  As is clear from Percoco's brief, he believes that *McDonnell* stands for far more than just the proper interpretation of the phrase "official act" in Title 18, United States Code, Section 201(a)(3).  As explained in detail below, he is wrong.  But even if he were right, he has not even attempted to show how his interpretation of *McDonnell* would call into question his conviction of solicitation of bribes and gratuities.  Accordingly, as his interpretation of *McDonnell* is incorrect, and he has not even attempted to show how his interpretation would result in the reversal of *all* counts, his request must be denied.

## STATEMENT OF FACTS

As the Court is well aware, the Government's evidence at trial conclusively demonstrated that Joseph Percoco carried out two criminal schemes to use his official position as the Executive Deputy Secretary for the State of New York to engage in official acts in exchange for hundreds of thousands of dollars in bribe payments. The schemes involved two companies – Competitive Power Ventures ("CPV") and COR Development ("COR") – both of which were clients of Percoco's longtime friend, lobbyist Todd Howe. After a seven-week trial, the jury found that the Government proved the *quid pro quo* for both corrupt schemes beyond a reasonable doubt. Percoco was convicted of one count of conspiracy to commit honest services wire fraud in relation to the COR scheme, one count of conspiracy to commit honest services wire fraud in relation to the CPV scheme, and one count of solicitation of bribes and gratuities in relation to the CPV scheme. He was subsequently sentenced to 6 years' imprisonment.

### I.     The CPV Scheme

In the CPV Scheme, Joseph Percoco agreed to take action to benefit CPV as the opportunities arose in exchange for a low-show job given to his wife. The scheme began in mid-2012 when co-defendant and CPV executive, Peter Galbraith Kelly, Jr., learned through Todd Howe that Percoco's wife needed a job. At that time, CPV was attempting to build a power plant in Orange County, New York and seeking New York State financing for the project through what is known as a Power Purchase Agreement ("PPA"). (Tr. 2089-2090, 2135-2138.) Kelly was CPV's Government Relations Vice President and was leading the effort to secure New York State financing. Howe was working as a lobbyist for CPV in connection with securing a PPA. The bribery agreement was finalized in September 2012 when Kelly, Percoco and Howe met for dinner at a restaurant in Connecticut. (Tr. 2138-2141; GX 49.) Shortly after the dinner, Kelly

arranged a job at CPV for Percoco's wife.  She was paid $90,000 a year for a few hours of work a week, at most, to develop and then teach two one-hour lessons to fourth graders in New Jersey a handful of times per year.  (GX 1072R.)  The lessons were one-part basic science about energy creation and one-part positive public relations for CPV.  (*E.g.*, GX 1071, 1033, 1037A.) Percoco's wife's income was concealed from many at CPV and from the public.  She was paid not paid directly by CPV, but by personal check from Chris Pitts, a friend of Kelly's who was a consultant for CPV and served as a pass through for Percoco's wife's salary.  (GX 1420N, 1602, 1603-N.)

        In exchange for the low-show job given to Percoco's wife, Percoco ultimately performed two official acts: (1) In October 2013, Percoco pressured Howard Glaser, the head of all of New York's state agencies, to discourage the Public Service Commission ("PSC") from awarding a Power Purchase Agreement ("PPA") to a competitor of CPV's; and (2) In August 2013, Percoco directed New York state officials to approve a reciprocity agreement for CPV so that CPV could build a power plant in New Jersey. With respect to the PPA, the evidence at trial showed that Percoco explicitly agreed to pressure Glaser to support a PPA for CPV.  (GX 85.)  Shortly thereafter, Glaser told Raj Addeppali, a state employee whose agency was evaluating the PPA applications, that Glaser was concerned about the state supporting a certain power plant that would compete with CPV's Orange County project (thereby making it less likely that CPV would receive a PPA).  (Tr. 5179-5183.)  In regards to the reciprocity agreement, the evidence at trial showed that CPV needed New York State to participate in an interstate reciprocity agreement with New Jersey in order for CPV to complete construction on another power plant in New Jersey.  (Tr. 1579-1581, 1583.)  When Kelly asked Howe for a "push from above" to get New York to enter into a reciprocity agreement with New Jersey, Howe reached out to Percoco,

who, in turn, instructed Glaser and another state employee to get it done, which they did.  (GX 75A, 75, 416, 1041, 1708.)  As a result of the reciprocity agreement, CPV was able to purchase needed energy credits from sellers in New York at a substantial discount.

## II.    The COR Scheme

In the COR Scheme, Percoco agreed to take action to benefit COR specifically in relation to helping reverse a decision by a state agency, but also as opportunities arose, in exchange for $35,000 in bribes.  The scheme began in 2014 while Percoco was working for the Governor's re-election campaign.  (Tr. 2093-2097.)  Percoco worked for the campaign beginning on April 21, 2014 and returned to work in the Governor's office on December 8, 2014.  (Tr. 1016; GX 1206.) In 2014, COR faced a significant obstacle to completing one of its construction projects that involved state money.  The Empire State Development Corporation ("ESD") had awarded COR a $1.5 million grant in connection with its project, but had also determined that COR was required to sign a Labor Peace Agreement ("LPA") and negotiate with a union in order to use the funding to build a planned parking lot near a hotel within the development.  (Tr. 1445-1446; GX 574.)  In COR's view, the LPA would significantly increase the cost of the project, and COR had been unsuccessful in convincing ESD to reverse its decision.  (Tr. 725-726, 1476-1477.)

At the time, COR was a client of Todd Howe.  Howe who had been asked by Percoco for help finding additional income, knew that Percoco could help COR reverse the unfavorable ESD decision.  Subsequently, co-defendants Steven Aiello and Joseph Gerardi, founding executives of COR, agreed to pay Percoco in exchange for Percoco's help in reversing ESD's decision, and as other opportunities arose.  (Tr. 2093-2101.)  On approximately August 11, 2014, COR made its first payment, facilitated by Howe, of approximately $15,000 to Percoco.  (GX 555, 1606A.) COR sent the money through a shell company controlled by Howe, and Precoco directed Howe

to write a check to Percoco's wife, rather than paying Percoco directly. (Tr. 2476-2477; GX 555.) Just days before, on August 7, 2014, Percoco wrote a letter to his mortgage company in which he announced that he was guaranteed a job with the Governor after the election, indicating that was intending to return to the Governor's office. (GX 1410D.) In late October, Gerardi and Aiello made another corrupt payment of approximately $20,000 to Percoco, again using Howe as a pass-through. (GX 1606B.)

On or about December 3, 2014, just days before Percoco officially returned to the Governor's office on December 8, 2014, Percoco successfully pressured ESD, through Andrew Kennedy, the Assistant Secretary for Economic Development and later Deputy Director for State Operations, to reverse its position, eliminating the need for COR to negotiate an LPA. (Tr. 1274-76.) Specifically, in response to pressure from Percoco, Kennedy reached out to ESD and directed the agency to reverse its decision. (GX 587, 1509.) Percoco went on to perform two additional official acts: (1) In September 2015, Percoco directed employees in the state budget office to approve state funds for COR; and (2) Also in September 2015, Percoco directed state human resource administrators to approve a raise for the son of COR's owner, Steven Aiello, who worked in state government at the time.

With respect to the release of funds, evidence at trial showed that COR was awarded a contract worth approximately $15 million to construct a film studio (the "Film Hub"), as well as a separate contract worth approximately $90 million to build a manufacturing plant. By the summer of 2015, however, the state had not yet released a significant portion of the funding allocated to the two projects. (Tr. 1279-82.) In response to requests for help from Aiello and Gerardi, which were conveyed to Percoco by Howe, Percoco exerted influence over at least two supervisors at the state Department of Budget ("DOB") – Michael Novakowski and David Lara –

to grant their approval for the release of funds from the Film Hub and manufacturing plant.  (GX 615; Tr. 766, 844.)  In response to pressure from Percoco, DOB approved the projects, and the funds were released.  (Tr. 766.)

In regards to the raise for Steven Aiello's son, Aiello's son worked in 2015 in the Executive Chamber of the Governor's Office.  Evidence at trial showed that in September 2014, Aiello was dissatisfied with a $2,000 raise for his son and sent a text message to Howe, pressing for a further raise and stating, "I have been loyal as the day is long."  (GX 631.)  Howe forwarded that text message directly to Percoco, with some additional facts, indicating that Aiello wanted Percoco to know the full chronology.  In response, Percoco instructed and caused multiple Executive Chamber employees involved in human resources – Theresa Brennan, Nancy Nemeth, and Joanne Fryer – to authorize an additional raise for Aiello's son.  (GX 628, 652.)

## APPLICABLE LAW

Title 18, United States Code, Section 3143(b), provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial."  18 U.S.C. § 3143(b)(1)-(2).

That provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  Following

a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). It is the defendant's burden to "rebut this presumption with clear and convincing evidence." *Id.*

A "substantial question" is "a 'close' question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v. *Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Id.* (quoting *Miller*, 753 F.2d at 23). As this Court has explained, "the appeal must raise a substantial question that, if decided in defendant's favor, will likely result in a reversal or order for a new trial as to *all counts* for which a defendant has been sentenced to prison." *United States v. Silver*, 203 F. Supp. 3d 370, 377 (S.D.N.Y. 2016) (emphasis added). With respect to all of these issues, "the burden of persuasion rests on the defendant." *Randell*, 761 F.2d at 125-26.

## ARGUMENT

### I.    The Court's Bribery Instruction was Correct

The defendant argues that there is a substantial question as to whether the "as opportunities arise" theory of bribery is valid given the Supreme Court's ruling in *McDonnell* v. *United States*, 136 S. Ct. 2335 (2016). Specifically, Percoco claims that, in light of *McDonnell*, a public official can no longer be convicted for agreeing to provide unspecified future benefits. (Def. Br. 5.) Indeed, he contends that *McDonnell* made clear that "federal bribery charges must identify, as the requisite 'quo' for a bribe, a formal exercise of governmental power (or an agreement to exercise such power) on a 'specific and focused' matter." (Def. Br. 4.)

Accordingly, Percoco claims, the Court's instruction to the jury that "it could find a *quid pro quo* and convict if there was an exchange to perform acts 'as opportunities arose'" may have conflicted with *McDonnell*.  (Def. Br. 5-6.)  As explained in more detail below, Percoco misunderstands *McDonnell*.  *McDonnell* did not come close to invalidating the "as opportunities arise" theory, and Percoco's arguments are flatly contradicted by Second Circuit law.

Indeed, this Court has already ruled as much.  In an opinion dated December 11, 2017, Docket Entry No. 390 (the "December 11th Opinion"), Your Honor rejected arguments made by the defendants that are nearly identical to those made here.  Your Honor found, among other things, that the defendants had clearly "misread" *McDonnell*, as it would be "incomprehensible that Congress would not have intended for bribes paid as 'retainers' to be made unlawful."  (Dec. Opp'n 9.)  Curiously, Percoco does not acknowledge this Court's prior ruling, much less engage with the Court's reasoning.  In any event, Your Honor's ruling, which is the law of the case, was manifestly correct, and its reasoning should be applied again to reject the defendant's claims.

As this Court has recognized, the Second Circuit has held that, with regards to federal bribery-related crimes, "the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise."  *United States* v. *Ganim*, 510 F.3d 134, 142 (2d Cir. 2007).  (Dec. Opp'n 8.)  *See also*, *United States* v. *Coyne*, 4 F.3d 100, 114 (2d Cir. 1993) (observing in a Hobbs Act extortion case that "it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arose.").  The Circuit's position on the viability of this theory is unambiguous:

> We have made it crystal clear that the federal bribery and honest services fraud statutes [the defendant] was convicted of violating criminalize schemes involving

> payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, . . . and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence.

*United States* v. *Rosen*, 71 F.3d 691, 700 (2d Cir. 2013) (internal quotation marks, citations, and brackets omitted).

McDonnell did not dismantle the "as opportunities arise" theory. In fact, *McDonnell* did not even address it. As this Court recognized, *McDonnell* concerns the proper interpretation of the phrase "official act" in Title 18, United States Code, section 201(a)(3). (Dec. Opp'n 8-9.) In *McDonnell*, the Supreme Court found that, under Title 18 United States Code, Section 201(a)(3), "an 'official at' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy' [that] must involve a formal exercise of governmental power . . . [and] must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official." 136 S. Ct. at 2371-72. More specifically, the Supreme Court found that an official action must relate to something "more specific and focused than a broad policy objective," and contrasted "Virginia business and economic development" with a properly-focused question on the initiation of research studies for a specific chemical compound. *Id*. at 2374.

As this Court made plain the December 11th Opinion, *McDonnell* says nothing about whether the government official or agent must agree to take a specific action on any particular matter – it holds only that the actions the bribe-recipient ultimately takes relate to a matter that is "specific" and "focused." *Id*. at 2370, 2372. Your Honor stated:

> Defendants again misread *McDonnell* in arguing that the Supreme Court found the "retainer theory" of bribery impermissible and that the acts to be performed must be specified at the time of the quid prop quo agreement. The Court did no such thing. *McDonnell* held only that the matter on which official action is *ultimately* taken must be specific and focused, as evidenced by the contrast the Court drew between acts taken to further "Virginia business and economic

9

development" (too diffuse to be an "official act") and the decision to initiate
research studies (sufficiently focused to be an "official act") . . . In describing the
background of the case, the Court noted that Governor McDonnell had been
"indicted for accepting payments, loans, gifts, and other things of value . . . in
exchange for performing official actions on an as-needed basis, as opportunities
arose . . ." 136 S. Ct. at 2364-65.  The Court made no other mention of the fact
that *McDonnell* had been charged on a retainer theory, and it is apparent that the
retainer theory was of no import to the Court's decision relative to the proper
definition of "official act" under Section 201.

(Dec. Opp'n 9.)

Indeed, every court to have considered whether the "as opportunities arise" theory is still

valid post-*McDonnell*, has rejected Percoco's contention.  *See, e.g.*, *Woodward v. United States*,

No. 17-2114, 2018 WL 4611122, at *5 (1st Cir. Sept. 26, 2018);  *United States v. Gordon*, 17-

CR-354-MHC-LTW, 2018 WL 3067739, at *5-*6 (N.D. Ga. June 21, 2018); *United States v.*

*Skelos*, 15 Cr. 317 (KMW), 2018 WL 2849712, at *3 (S.D.N.Y. June 8, 2018); *Miserendino v.*

*United States*, 307 F. Supp. 3d 480, 493-94 (E.D. Va. 2018); *United States v. Silver*, 15 Cr. 93

(VEC), 2018 WL 1406617, at *4 (S.D.N.Y. Mar. 20, 2018); *United States v. Mangano*, No. 16-

CR-540, 2018 WL 851860, at *4 (E.D.N.Y. Feb. 9, 2018); *United States v. Menendez*, No. Cr.

15-155, 2018 WL 526746, at *3-5 (D.N.J. Jan. 24, 2018); *United States v. Fattah*, 223 F. Supp.

3d 336, 363 (E.D. Pa. 2016), *rev'd in part on other grounds* 902 F.3d 197 (3d Cir. 2018).  In

fact, the First Circuit specifically rejected the conclusion that *McDonnell* implicitly overruled the

retainer theory, holding that "we remain confident that a 'stream of benefits' theory of bribery

remains valid today."  *Woodward v. United States*, No. 17-2114, 2018 WL 4611122, at *5 (1st

Cir. Sept. 26, 2018).  And although not expressly considering the question, this Circuit and

several others have continued to apply the "as opportunities arise" theory after *McDonnell*.

*United States v. Skelos*, 707 F. App'x 733, 738 (2d Cir. 2017) (citing retainer theory in rejecting

sufficiency challenge); *United States v. Suhl*, 885 F.3d 1106, 1115 (8th Cir. 2018); *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017).

As set forth above, *McDonnell* has done nothing to alter the longstanding rule that a government official commits bribery when the "government official receive[s] a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *Ganim*, 510 F.3d at 142.[1]  Accordingly, this Court's instruction to the jury that Percoco's guilt could be based on an "as opportunities arise" theory of bribery did not create a substantial question.[2]

## II.    The Government Properly Proved "Official Actions" Occurred

Percoco claims that there is a substantial question as to whether the "official acts" relied on by the Government at trial to prove the defendant's guilt were, in fact, "official acts" in light of *McDonnell*.  Because the *McDonnell Court* "found that an official act must be an act '*within the specific duties of the officials' position*,'" Percoco argues, it can be inferred that, "at a minimum, official acts must be performed by officials: people officially working for, or vested with official authority by, government entities."  (Def. Br. 7-8.)  At trial, Percoco contends, "all

---

[1] To the extent that Percoco relies on *United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398 (1999), to support his argument that the "as opportunities arise theory" is invalid, his reliance is misplaced.  Although the Court in *McDonnell* references *Sun-Diamond* in a discussion about what qualifies as an "official act," it says nothing about *Sun-Diamond* eviscerating the "as opportunities arise" theory. *See McDonnell*, 136 S.Ct. at 2370-71.

[2] Although Percoco states in the introduction section of his brief that "[t]he Second Circuit has already recognized in *United States* v. *Silver*" that the "as opportunities arise" theory of bribery is inconsistent with *McDonnell*, "making it likely that Mr. Percoco's convictions will be overturned on appeal," (Def. Br. 5), Percoco does not actually discuss the Second Circuit's decision regarding Sheldon Silver's request for bail pending appeal in any detail in any section of his brief.  (Def. Br. 5.)  This is likely because it is not at all clear from the record what the Second Circuit's basis was for granting Silver's request.  As this Court is likely aware, Silver's appeal from this Court's denial of his initial request for bail pending appeal raised two arguments: (1) that the District Court failed to instruct the jury it had to find that Silver had an "agreement" with those paying him; and (2) that the "as opportunities arise" theory of bribery was rejected in *McDonnell*.  However, in granting Silver's request for bail, the Second Circuit did not say which of Silver's arguments it found raised a substantial question.  Accordingly, it cannot be said with any certainty that the Second Circuit found Silver's argument regarding the "as opportunities arise" theory persuasive.

of the counts turned, in part, on purported 'official acts' by Mr. Percoco," that occurred between April 21, 2014 and December 8, 2014, when the defendant was working on the Governor's re-election campaign and was not working in State government.  (Def. Br. 10.)  Given the defendant's lack of Government employment, the defendant argues, those acts could not have been "official acts" as defined by *McDonnell*, and thus the Government's reliance on those acts "raises a substantial question likely to result in reversal or a new trial."  (Def. Br. 10.)  As explained in more detail below, the defendant has woefully mischaracterized the evidence at trial and again has misread *McDonnell*.

Contrary to Percoco's claim, the Government did not improperly or exclusively rely on "official acts" that occurred when Percoco was not working in State government to prove his guilt.  As the Court is aware, Percoco was convicted of one count of conspiracy to commit honest services wire fraud in relation to the COR scheme, one count of conspiracy to commit honest services wire fraud in relation to the CPV scheme, and one count of solicitation of bribes and gratuities in relation to the CPV scheme.  With respect to the COR scheme, the Government proved at trial that Percoco took three official actions in exchange for $35,000 in bribes from the COR defendants: (1) On December 3, 2014, Percoco pressured a government employee, Andrew Kennedy, to reverse a decision by the Empire State Development Board ("ESD") regarding a requirement that COR enter into a labor peace agreement ("LPA"); (2) In September 2015, Percoco directed employees in the state budget office to approve state funds for COR; and (3) also in September 2015, Percoco directed state human resource administrators to approve a raise for the son of COR's owner, Steven Aiello, who worked in state government at the time.

Conveniently, Percoco does not acknowledge the official acts that clearly occurred while Percoco was working in the Governor's office – the directing of state employees to approve state

funds for COR and the raise for Steven Aiello's son.  Instead, Percoco focuses solely on the

Percoco's actions to help eliminate the LPA requirement for COR, including the pressure he

placed on Andrew Kennedy at a time when Percoco was not a state employee.  (Def. Br. 9-10.)

However, as this Court has recognized, "case law suggests that when the Government pursues

bribery charges based on a retainer theory, it can rely on conduct occurring when the defendant

is temporarily out of office if the scheme includes actions taken or to be taken when the

defendant returns to government."  (Dec. Opp'n 18.)  *See United States* v. *Meyers*, 529 F.2d

1033, 1035-36 (7th Cir. 1976).

For example, in *United States* v. *Meyers*, the Seventh Circuit expressly approved an

indictment charging an extortion conspiracy that began before a co-conspirator ascended to

public office and ended after that person took an official action.  529 F.2d 1033, 1035-36 (7th Cir.

1976).  Two candidates for local elected positions accepted bribes in consideration for their

future official acts; they were subsequently elected and took office.  *Id*. at 1035.  The Seventh

Circuit explained that the defendants could be charged with a Hobbs Act extortion conspiracy

that spanned both the pre- and post-election time period because "a criminal conspiracy is a

continuing crime in that the conspiracy continues until the goal for which it was formed has been

attained" – which occurred after the defendants became public officials.  *Id*. at 1036.[3]

Here, the trial evidence clearly showed that Percoco had already decided to return to

work in the Governor's office before accepting bribe money from COR in exchange for

performing official acts "as opportunities arose."  Indeed, days before accepting the first COR

---

[3] The converse is also true.  Courts have affirmed the extortion conspiracy convictions of former public officials
who accept payments *after* they took official actions and then relinquished their public positions.  *See United States*
v. *Forszt*, 655 F.2d 101, 104 (7th Cir. 1981) ("[W]e now hold that it is unlawful for a public official to sell his public
trust while in office even though the last installment for the services rendered is to come after he leaves office.");
*United States* v. *Lena*, 497 F. Supp. 1352, 1359 (W.D. Pa. 1980), *aff'd*, 649 F.2d 861 (3d Cir. 1981).

bribe payment, and months before pressuring Andrew Kennedy regarding the LPA, Percoco wrote a letter to his mortgage company, dated August 7, 2014, stating that he was guaranteed a job with the Governor after the election.[4]  (GX 1410D.)  Moreover, while Percoco was working on the Governor's re-election campaign, he continued to use his physical office in state government, kept his nick-knacks and photos in his state office, made over 100 phone calls from his desk phone in his state office, gave the phone number of his former government assistant to other people, and  maintained control over employment decisions in the Governor's office, further clarifying that he intended to return to the Governor's office.  (*See* Tr 6012-6013; GX 676, 683.)  Accordingly, Percoco's pressuring of Andrew Kennedy was indeed an "official act," irrespective of the fact that it occurred while Percoco was technically not a State employee.

In addition, contrary to Percoco's claim, *McDonnell* did not hold that an "official act" must be performed "by a person officially working for a government entity."  (Def. Br. 11.)  The *McDonnell* opinion concerns the proper interpretation of the phrase "official act;" nowhere in the opinion did the Supreme Court opine on who can and cannot perform an "official act," and the defendant has been unable to cite to a single case saying otherwise.  Indeed, with respect to honest services fraud in particular, the case law is clear that "an individual without formal office may be held to be a public fiduciary," making it possible for a non-public official to commit an "official act."  *United States* v. *Margiotta*, 688 F.2d 108, 121-122 (2d Cir. 1982); *see also McNally* v. *United States*, 483 U.S. 350, 355-56 (1987) (acknowledging the ruling in *Margiotta*).

Turning to the CPV scheme, the Government proved at trial that Percoco performed two "official actions" in exchange for more than $280,000 in bribes from the CPV defendant, Peter

---

[4] In an email dated October 15, 2014, Percoco again indicates his intention to return to the Governor's office after the election.  *See* GX 831.  Also, on or about November 25, 2014, Percoco begins filling out forms in preparation for his return to the Governor's office.  (*See* JPX 1014, Tr. 605-606).

Galbraith Kelly, Jr:  (1) In October 2013, Percoco pressured Howard Glaser, the head of all of New York's state agencies, to discourage the Public Service Commission ("PSC") from awarding a Power Purchase Agreement ("PPA") to a competitor of CPV's; and (2) In August 2013, Percoco directed New York state officials to approve a reciprocity agreement for CPV so that CPV could build a power plant in New Jersey.

In his brief, Percoco again chose to ignore these official acts that clearly occurred while Percoco was working in the Governor's office.  Instead, Percoco falsely claims that the Government relied on "official actions" that it clearly did not rely on.  Specifically, Percoco claims that the Government argued that "in July 2014, Mr. Percoco arranged a meeting for co-defendant, Peter Galbraith Kelly, with New York State's energy 'czar,' Richard Kauffman . . . and, in October 2014, a meeting for Mr. Kelly with Deputy State Operations Director Jim Malatras."  (Def. Br. 10.)  It is true that the Government argued that those actions occurred, but the Government never argued that those actions were "official actions" under *McDonnell*.  (*See* Tr. 5976.)  The only official acts the Government alleged were performed by Percoco were the pressure Percoco placed on Glaser and the direction to state officials to approve the reciprocity agreement, both of which undisputedly occurred while Percoco worked in the Governor's office.  *Id*.  Accordingly, Percoco's claim that the Government improperly relied on official acts that occurred when Percoco was not working in State government is blatantly false.

Moreover, whatever the merits of *McDonnell*, they do not reach the federal funds bribery statute.  As stated earlier, in addition to being convicted of conspiracy to commit honest services wire fraud, Percoco was also convicted of soliciting bribes and gratuities in violation of Title 18, United States Code, Section, 666(a)(1)(B).  The language of that statute makes clear that there is no requirement that the bribe recipient be a government employee.

The statute prohibits the solicitation of bribes by an "agent of . . . a State, local, or Indian triable government or any agency thereof." 18 U.S.C. § 666(a)(1), (a)(1)(B), (a)(2). For the purposes of this statute, an agent is someone "authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). *See, e.g.*, *United States* v. *Sotomayor-Vasquez*, 249 F.3d 1, 8 (1st Cir. 2001) (finding that an "agent" includes individuals acting as directors, managers, or representatives of an organization covered by the statute, even if they are not employed by the organization).

As the jury properly found, Percoco clearly qualified as an agent of the State of New York under Section 666, irrespective of his employment status between April 21, 2014 and December 8, 2014. While working on the Governor's re-election campaign, Percoco continued to function in a senior advisory and supervisory role with regard to the Governor's office, including by working out of his government office and maintaining involvement in employment decisions in the Governor's office, among other things.   (*See* Tr 6012-6013; Gx. 676; Gx. 683.) As such, Percoco's lack of government employment during a portion of the charged conspiracy did not – and could not have – disqualified him from committing federal funds bribery.

## III.   There Is No Question that Percoco Engaged in an Honest Services Fraud Conspiracy with Respect to COR

Percoco contends that there is a substantial question as to whether his honest services fraud conspiracy conviction related to the COR scheme will be overturned. Specifically, he argues that to prove a conspiracy, the Government must show that at the time the conspiracy was formed, "some member of the conspiracy was capable of committing the substantive offense." (Def. Br. 10). Because *McDonnell* requires that an official act be performed "by a person officially working for a government entity" (Def. Br. 11), and because Percoco was not working

16

in government at the time the honest services fraud conspiracy related to COR was formed, Percoco argues, he was incapable of performing an "official act" and committing the substantive offense of honest services fraud. As explained below, the defendant's argument fails for several reasons.

*First*, at its core, the defendant's argument is an impossibility defense, and it is well established that "'impossibility of success is not a defense'" to the crime of conspiracy, which is an agreement to commit a crime. *United States* v. *Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (quoting *United States* v. *Jiminez Reo*, 537 U.S. 270, 276 (2003)); *United States* v. *Trapilo*, 130 F.3d 547, 552-53 & n.9 (2d Cir. 1997) (legal impossibility is no defense to conspiracy to commit wire fraud); *United States* v. *Clemente*, 22 F.3d 477, 480-81 (2d Cir. 1994) ("'Factual impossibility' is no defense to the inchoate offense of conspiracy under Hobbs Act."); *United States* v. *Wallach*, 935 F.2d 445, 470 (2d Cir. 1991). Percoco and the COR defendants' conspiratorial agreement to engage in a scheme to defraud the public of its right to Percoco's honest services, an agreement proved beyond a reasonable doubt, is sufficient for criminal liability. The government need not also prove that the defendants could accomplish their criminal objective. *See United States* v. *Giordano*, 693 F.2d 245, 249 (2d Cir. 1982) ("[I]t does not matter that the ends of the conspiracy were from the beginning unattainable."); *see also United States* v. *Rabinowich*, 238 U.S. 78, 86 (1915) ("A person may be guilty of conspiring, although incapable of committing the objective offense.").

The defendant attempts to skirt this age-old principle of conspiracy law by clinging to a single sentence in the Supreme Court's opinion in *Ocasio* v. *United States*, 136 S. Ct. 1423 (2016). In *Ocasio*, the Supreme Court affirmed the Hobbs Act conspiracy conviction of a former police officer who had participated in a kickback scheme in which he and other officers routed

damaged vehicles from accident scenes to an auto repair shop in exchange for payments from the shop owners. *Ocasio*, 135 S. Ct. at 1427-29. The defendant in *Ocasio* argued that because his supposed co-conspirators, the shop owners, were the extorted party, they did not share the same criminal objective and "were incapable of being members of the conspiracy charged in this case." *Id*. at 1433.

The Supreme Court disagreed. The Court found that the police officer defendant and the shop owners did have a common criminal objective – not that each conspirator would obtain money from "another," but rather that the police officers would do so. *Id*. at 1434. The Court found that under basic principles of conspiracy law, "the Government has no obligation to demonstrate that each conspirator agreed personally to commit – or was even capable of committing – the substantive offense of Hobbs Act extortion." *Id*. at 1432. The Court went on to say that "[i]t is sufficient to prove that the conspirators agreed that the underlying crime be committed by a member of the conspiracy who was capable of committing it." *Id*. It is from this single statement that Percoco argues that, to prove a conspiracy, the Government must prove that at least one person in the conspiracy was capable of committing the underlying offense.

The Supreme Court clearly did not intend for this one sentence to eviscerate the long standing principle that a "conspiracy is just an agreement." (Tr. 6441). Indeed, the defendant has failed to cite to a single case that cites to *Ocasio* for the proposition that "at least one member of a conspiracy must be capable of committing the substantive offense." (Def. Br. 10). The Court in *Ocasio* was just trying to make it clear that, in an extortion under the color of official right conspiracy, the bribe payors do not get a pass merely because they are not the public officials and therefore could not have committed the substantive crime of extortion under the color of official right. There is no language in *Ocasio* suggesting that the Court's holding

18

was intended to add an additional requirement to proving a conspiracy, while simultaneously

lifting the ban on impossibility defenses.

*Second*, even if the defendant's interpretation of *Ocasio* were correct, *Ocasio's* purported

holding is irrelevant to Percoco's conviction because he was capable of committing the offense

at the formation of the conspiracy.  Here, a member of the charged conspiracy was capable of

committing the underlying offense: that member was Percoco.  As stated earlier, with respect to

honest services fraud, the case law is clear that "an individual without formal office may be held

to be a public fiduciary," making it possible for a non-public official to commit an "official act."

*United States* v. *Margiotta*, 688 F.2d 108, 121-22 (2d Cir. 1982); *see also McNally* v. *United

States*, 483 U.S. 350, 355-56 (1987) (acknowledging the ruling in *Margiotta*).  Indeed, this Court

stated as much in its jury charge:

> A person does not need to have a formal employment relationship with the state in
> order to owe . . . a duty of honest services to the public, however.  You may find
> that Mr. Percoco owed the public a duty of honest services when he was not a
> state employee if you find that at the time he owed the public a fiduciary duty.  To
> determine whether Mr. Percoco owed the public a fiduciary duty when he was not
> employed by the state, you must determine, first, whether he dominated and
> controlled any governmental business and, second, whether people working in the
> government actually relied on him because of a special relationship he had with
> the government.

(Tr. 6446).  As explained in further detail below, *see infra* Part IV, the Government

adduced far more than sufficient evidence at trial to support the jury's verdict that

Percoco owed the public a fiduciary duty.

But even if Percoco were correct that, in order to participate in an honest services fraud

conspiracy, he had to be an employee of New York State at the time (which he is not), his

argument would still fail, because he *was* an employee of New York State during the charged

conspiracy and his unsupported assertion that Percoco had to be a State employee at the

formation of the conspiracy is incorrect.  Indeed, *Ocasio* has nothing whatsoever to say regarding the timing of when any member of the conspiracy must be able to commit the substantive offense; indeed, it explicitly says that that "[a] defendant must merely reach an agreement with the specific intent that the underlying crime *be committed* by some member of the conspiracy." *Ocasio*, 136 S. Ct. at 1429 (internal quotation marks omitted; emphasis in *Ocasio*); *see also, e.g.*, *United States* v. *Scott*, 681 F. App'x 89, 94 n.6 (2d Cir. 2017) (conspiracy is a continuing offense); *United States* v. *Rutigliano*, 790 F.3d 389, 395 (2d Cir. 2015) (same).  And there is no doubt whatsoever that Percoco was an employee—indeed a very high ranking employee—of New York State during the period of the charged conspiracy and at the time when he took official action.

In fact, Percoco made this precise argument at the Rule 29 stage, and the Court had no trouble rejecting it.  Ironically, Percoco relies on this Court's Opinion and Order dated May 10, 2018 (Dkt. No. 648) ("May 10th Opinion") to support his claim, when that very opinion and the Court's prior decision explained by that opinion rejected it.  Although the Court did dismiss the substantive Hobbs Act extortion count because Percoco was not a public official at the formation of extortionate agreement, the Court did *not* dismiss either the Hobbs Act or honest services fraud conspiracy counts because Percoco *was* a State employee during the course of the conspiracy.  In short, Percoco's bald assertion that he must be a public official at the time of the *formation* of the conspiracy finds no support in *Ocasio* or any other authority and is simply incorrect.

Percoco's reliance on the Court's May 10th Opinion is misplaced for an additional reason.  The Court's May 10th Opinion concerned only whether a reasonable jury could have found Percoco guilty of one count of extortion under the color of official right in relation to the

COR scheme.  Ultimately, the Court found that a reasonable juror could not have convicted Percoco under that specific count.  In reaching its decision, the Court determined that, "in order to commit extortion under color of official right, a defendant must hold an official position either (a) at the time that an extortionate payment is made or (b) at some relevant time before the payment, such as the time that the defendant enters into a quid pro arrangement or otherwise makes a demand for payment."  (May Opp'n 16).  The Court found that the Government had failed to prove that Percoco was a public official at the time he accepted payments from COR Development or at the time that payment was demanded.  (*Id.* at 18).  Accordingly, the Court entered a judgment of acquittal as to the count of extortion under color of official right relating to COR.

The Court's ruling, however, does not save Percoco from being convicted under a completely different statute – the honest services fraud statute.  Obviously, the elements of extortion under the color of official right are different from those of conspiracy to commit honest services fraud.  For the reasons articulated above, the central element in the Court's analysis of the extortion under color of official right charge – that the defendant hold an official position at the time that an extortionate payment is made or at some relevant time before the payment – is not present in the honest services fraud statute. *Cf. Margiotta*, 688 F.2d at 121-22 (2d Cir. 1982). ("an individual without formal office may be held to be a public fiduciary").  Accordingly, the Court's May 10th Opinion is of no moment in assessing Percoco's honest services fraud conspiracy conviction related to COR.

## IV.   There Is No Question that Percoco's Convictions Were Supported by Sufficient Evidence

Finally, Percoco argues, much as he did at the Rule 29 stage and in closing argument, that the evidence adduced at trial was not sufficient to prove that he (1) performed or agreed to

perform official acts for CPV or (2) "dominated or controlled governmental business at the time of the alleged COR agreement." (Def. Br. 13, 18.) Both the Court and a rational jury have already rejected these arguments, and they fare no better here, where "the evidence must be viewed in the light most favorable to the Government." *United States v. Lasher*, No. 12 Cr. 868 (NRB), 2015 WL 7769528, at *3 (S.D.N.Y. Nov. 30, 2015) (relying on *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)). Indeed, as explained below, far more than sufficient evidence was admitted at trial to prove each of the facts still contested by Percoco, and his argument must fail if there is no substantial question as to even one of these facts. *United States v. Randell*, 761 F.2d 122, 125-26 (2d Cir. 1985) (noting that, in order to carry his or her burden, a defendant must show that the appeal raises a substantial question likely to result in a reversal or new trial as to all counts for which he or she received a prison sentence).

### a. Applicable Law

"[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)). Indeed, "[t]he conviction must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). Courts "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Coplan*, 703 F.3d at 62 (internal quotation marks omitted). The Court "must consider the evidence as a whole, and not as individual pieces, and remember that the jury is entitled to base its decision on reasonable inferences from circumstantial evidence." *United*

*States v. Rahman*, 189 F.3d 88, 122-23 (2d Cir. 1999).

    **b. Discussion**

    *First*, Percoco contends that, with respect to the power purchase agreement, the evidence was insufficient to prove that he agreed to do anything more than arrange meetings for CPV.[5] As an initial matter, the question is not whether Percoco did take official action with respect to the power purchase agreement or any other issue—the question is whether the evidence demonstrates that Percoco agreed to take official action as the need arose.  *See United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("We have made it crystal clear that the federal bribery and honest services fraud statutes that Rosen was convicted of violating criminalize schemes involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen . . . ." (internal quotation marks and brackets omitted)); *cf. Evans v. United States*, 504 U.S. 255, 268 (1992) (explaining in the Hobbs Act extortion context that "fulfillment of the *quid pro quo* is not an element of the offense").  The government presented overwhelming evidence of such an agreement, including evidence demonstrating Percoco's willingness and intent to take official action regarding the power purchase agreement.

    For example, Todd Howe testified extensively and explicitly regarding Percoco's efforts to use his official position and to take official action to assist CPV in obtaining the power purchase agreement.  *See United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000) (Courts "must . . . defer to the jury's assessment of witness credibility and the jury's resolution of conflicting

---

[5] Percoco also continues to assert that "he could not have done much to help CPV" (Def. Br. 14), notwithstanding the extensive evidence adduced at trial to the contrary, including evidence regarding Percoco's broad power in state government.  In any case, it is not a defense to a charge that Percoco agreed to take official action that "could not have done much."

testimony."); *see also United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (deferring to Government witnesses on sufficiency of the evidence review where the witnesses "testified pursuant to cooperation agreements with the Government and even though their testimony was pock-marked with inconsistencies"). Howe explained that Braith Kelly paid Percoco's wife because Kelly "wanted Joe to be an advocate and his eyes and ears in the governor's office and to push for the . . . power purchase agreement." (Tr. 2091:25-92:3.) Howe further noted that, as early as 2011, Percoco understood that what Howe—and Kelly—wanted was for Percoco to use his position to advocate for CPV and to influence and push Howard Glaser to remove hurdles facing CPV in obtaining a power purchase agreement. (Tr. 2212:4-16, 2216:21-17:5.) From this testimony alone, the jury could infer that when Percoco later agreed to receive payments from Kelly in exchange for his assistance, he understood that that assistance included taking official action as previously requested through Howe. And Howe testified that Percoco continued to work toward obtaining the power purchase agreement for CPV. (*See, e.g.*, Tr. 2313:7-10, 2314:3-11, 2348:23-49:14, 2354:9-55:3, 2356:5-14, 2362:24-63:2.)

Furthermore, Howe's testimony is corroborated by Percoco's own words in emails that he sent in the course of his bribery scheme. (*See, e.g.*, GX 77 (responding to Howe's request regarding the use of old power plants), GX 85 (agreeing to "push on HG").) And the numerous meetings that Percoco himself cites in his brief (*see* Def. Br. 14-16) and that he pushed to set up with the goal of causing official action to advance CPV's cause are themselves evidence of the unlawful agreement to take official action. *See McDonnell*, 136 S. Ct. at 2371 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or

advise another official on a pending matter.").  In short, there was ample evidence from which a rational jury could and did conclude that Percoco agreed to take official action, including with respect to the power purchase agreement.

*Second*, Percoco argues that "[t]he record is barren of any evidence that Mr. Percoco either agreed to do anything—or did anything—with respect to CPV's obtaining the reciprocity agreement to obtain emission credits for its power plant in New Jersey."[6]  (Def. Br. 16.)  The evidence cited by Percoco, however, is itself more than ample to support the jury's finding.  (*See* Def. Br. 17.)  Indeed, Percoco's action was captured and preserved in an email chain.  (*See* GX 75A.)  Kelly requested a "push from above," and Howe forwarded that request directly to Percoco, who instructed Howe to have Howard Glaser or John Regan provide the "push."  (*Id.*)  Howe then forwarded Percoco's instruction, copying Percoco, to Glaser and Regan so that Glaser and Regan would know that Percoco had told them to assist.  (*Id.*)  Once Regan reported that he had provided the "push" and that New York State would move forward with the reciprocity agreement, Howe confirmed to Kelly that it was "[d]one."  (GX 75.)  Although a reasonable jury could easily conclude based on this exchange alone that Percoco had taken official action with respect to the reciprocity agreement, the plain meaning of this email exchange was further corroborated by Todd Howe's testimony.  (Tr. 2092:18-93:4 (stating that

---

[6] Percoco also argues that there was no evidence that the reciprocity agreement was contemplated at the time of the initial agreement between Kelly and Percoco in 2012.  (Def. Br. 16-17.)  This contention is simply irrelevant.  As discussed at length above, the Government proved at trial that Percoco agreed to take official action as the opportunity arose, and it is therefore of no moment that any particular official act was not conceived of at the beginning of the arrangement.  *Rosen*, 716 F.3d at 700.  Additionally, Kelly continued paying Percoco through his wife during and after the time at which Kelly requested Percoco's assistance with the reciprocity agreement, and a rational jury could have concluded that Percoco understood and intended that his agreement to act on the reciprocity agreement was in exchange for the continued payments.

Percoco "asked two folks in the governor's office to take control of [the reciprocity agreement] and move it along, if possible"), 2329:20-30:4 (explaining that Howe forwarded Percoco's email to Glaser and Regan "[s]o they knew that Joe wanted to get this done and they could move forward").)  The evidence on this issue clearly demonstrates that Percoco both agreed to take official action in exchange for payment from Kelly and then took official action by instructing Glaser and Regan to ensure that the reciprocity agreement moved forward.

*Third*, Percoco argues that "no sufficient evidence—much less proof beyond reasonable doubt—was offered to satisfy the requirement of domination, control, and reliance based on a special relationship" to give rise to a finding that Percoco owed a fiduciary duty when not technically employed by New York State.  (Def. Br. 19.)  To the contrary, the record is replete with such evidence, in the form of testimony from multiple witnesses, contemporaneous emails, and telephone and swipe records.  Witnesses testified clearly that Percoco was immensely powerful in New York State government, both because of his official position and his relationship to the Governor, and that Percoco continued to wield that power and to be involved in official New York State business even while working on Governor Cuomo's campaign.  (*See, e.g.*, Tr. 457:23-59:20 (testimony of Linda Lacewell describing Percoco's position in State government and relationship with the Governor), 478:11-79:2 (testimony of Linda Lacewell that Percoco was present in his New York State office even while working on the campaign), 1323:2-5 (testimony of Seth Agata stating that he understood Percoco to speak for the Governor on legislation issues even while Percoco was on the campaign), 1252:10-55:12 (testimony of Andrew Kennedy recounting Percoco's presence at a private State agency briefing).)  And numerous emails documented Percoco making decisions on behalf of New York State, including employment decisions, and directing the actions of New York State employees even while not

26

technically employed by the State.  (*See, e.g.*, GX 670, 675, 676, 679, 681, 682, 683, 687, 688, 825.)  Finally, the Government introduced extensive evidence documenting Percoco's use of his New York State office—including to take official action for COR—while not technically employed by the State.  (*See, e.g.*, GX 1701 and GX 1702 (summarizing Percoco's use of his New York State office phone), GX 840 (instructing others to call him at his New York State office).)  In other words, ample evidence supports the jury's verdict as to the COR conduct.

As noted above, Percoco must demonstrate a substantial question as to the sufficiency of the evidence as to each count of conviction in order to justify bail pending appeal.  *Randell*, 761 F.2d at 125-26.  Because he cannot do so as to even a single count, Percoco's application on this ground must be denied.

## **CONCLUSION**

For the reasons set forth above, the defendant's motion for bail pending appeal should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Janis Echenberg/Robert Boone/
David Zhou/Matthew Podolsky
Assistant United States Attorneys
(212) 637-2597/2208/2438/1947