UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2/8/2019

----------------------------------------------------------- X

UNITED STATES OF AMERICA,                    :
                                             :
              - v. -                         :          16-CR-776 (VEC)
                                             :
JOSEPH PERCOCO and                           :          OPINION AND ORDER
STEVEN AIELLO,                               :
                                             :
                          Defendants.        :
----------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Defendants Joseph Percoco and Steven Aiello were convicted at trial of bribery and

related corruption offenses.  They have moved for bail pending appeal, pursuant to 18 U.S.C.

§ 3143(b).  For the following reasons, the motions are DENIED.  Percoco and Aiello must

surrender to begin serving their sentences of imprisonment no later than **March 1, 2019 at**

**2:00 p.m.**  *See* Order (Jan. 7, 2019), Dkt. 974; Aiello Judgment (Dec. 11, 2018), Dkt. 946;

Percoco Judgment (Sept. 25, 2018), Dkt. 867.

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 4

    I.     Overview ........................................................................................................... 4

    II.    The January Trial .............................................................................................. 5

        A.     Factual Background ............................................................................... 5

        B.     Procedural Background .......................................................................... 7

    III.   The June Trial ................................................................................................... 8

DISCUSSION ................................................................................................................... 9

    I.     The Applicable Law .......................................................................................... 9

        A.     Standard for Bail Pending Appeal ........................................................ 9

        B.     The Relevant Elements of Federal-Program Bribery and Honest Services Wire Fraud Conspiracy ........................................................ 11

        C.     *McDonnell v. United States* .............................................................. 12

    II.    The Question Whether *McDonnell* Overruled the So-Called "Retainer Theory" of Bribery Does Not Warrant Bail Pending Appeal .............................. 13

        A.     Introduction ......................................................................................... 13

        B.     The Court's Jury Instructions .............................................................. 14

        C.     Defendants' Argument Does Not Raise a Substantial Question of Law or Fact ................................................................................................. 15

    III.   Defendants' Arguments Relating to the "Duty of Honest Services" Element of Count Ten Do Not Warrant Bail Pending Appeal ........................................... 17

        A.     The Court Correctly Instructed the Jury on the Duty of Honest Services ............................................................................................... 17

            1.     The Court's Jury Instruction ..................................................... 17

            2.     The Defendants' Argument ....................................................... 18

            3.     A Person May Owe a Duty of Honest Services to the Public if He Exercises "*De Facto* Control" over the Government .............. 20

        B.     There Was Sufficient Evidence that Percoco Owed a Duty of Honest Services to the Public While He Worked on the Campaign .................... 23

    IV.   The Question Whether Official Acts Can Be Performed Only by State Officials Does Not Warrant Bail Pending Appeal ................................................. 28

        A.     Introduction ......................................................................................... 28

        B.     The Defense's *McDonnell* Argument Does Not Raise a Substantial Question of Law or Fact ....................................................................... 29

1. The Federal Bribery Statutes, Not *McDonnell*, Determine Who Can Be Prosecuted for Corruption Offenses ................................. 29

2. *McDonnell*'s Definition of "Official Action" Does Not Limit the Class of Persons to Whom the Bribery Laws Apply .............. 33

3. The Court's May 10 Opinion Does Not Compel a Different Conclusion .................................................................................. 39

C. Any Error in Defining the Class of Persons Capable of Performing Official Actions Would Be Harmless as to Counts Nine and Eleven, Percoco's Convictions Relating to the CPV Scheme .............................. 41

V. The Question Whether There Was Sufficient Evidence on Counts Nine and Eleven Does Not Warrant Bail Pending Appeal .................................... 44

A. The Applicable Law ................................................................................ 44

B. Background ............................................................................................. 45

1. The Origins of the CPV Scheme ..................................................... 45

2. The PPA ........................................................................................... 47

3. The Reciprocity Agreement ............................................................. 49

C. There Was Sufficient Evidence that Percoco Agreed to Perform Official Acts as Part of the CPV Scheme .................................................. 50

VI. Concluding Note ......................................................................................... 53

CONCLUSION ............................................................................................................. 54

# BACKGROUND[1]

## I.      Overview

This case involves three corrupt schemes:  one involving Competitive Power Ventures, Inc. ("CPV"), a national energy company (the "CPV Scheme"); one involving COR Development Company, LLC ("COR Development" or "COR"), a real estate development company based in Syracuse, New York (the "COR Development Scheme"); and one involving Fort Schuyler Management Corporation ("Fort Schuyler"), a nonprofit affiliate of the State University of New York Polytechnic Institute (the "Fort Schuyler Scheme").  *See generally* Second Superseding Indictment ("S2 Indictment"), Dkt. 321; Compl., Dkt. 1.  The CPV Scheme and the COR Development Scheme were the subject of a trial that began on January 22, 2018 (the "January Trial"), and the Fort Schuyler Scheme was the subject of a trial that began on June 18, 2018 (the "June Trial").  Percoco was a defendant only in the January Trial.  Aiello was a defendant in both trials, but his convictions relating to the June Trial are not at issue in the present motion, as this Court has already ruled that bail pending appeal is appropriate for all convictions arising out of the June Trial.  *See* Order (Jan. 4, 2019), Dkt. 973; Kaloyeros Sentencing Tr. (Dec. 11, 2018), Dkt. 961, at 48–50; Aiello Sentencing Tr. (Dec. 7, 2018), Dkt. 959, at 37–42; Ciminelli Sentencing Tr. (Dec. 3, 2018), Dkt. 948, at 43–45, 47.[2]

---

[1]      Because Percoco and Aiello have been convicted at trial, the Court "view[s] the evidence in the light most favorable to the Government."  *United States v. Vilar*, 729 F.3d 62, 91 (2d Cir. 2013).

[2]      All citations in this opinion to transcript pages and exhibits refer to the January Trial.  Additionally, the Court will refer to all counts as they were numbered in the S2 Indictment.  The Court renumbered these counts in the jury instructions and verdict forms that were used in each trial.  *See* Verdict Form (June Trial), Dkt. 785; Jury Instructions (June Trial), Dkt. 784; Verdict Form (January Trial), Dkt. 527; Jury Instructions (January Trial), Dkt. 516.

## II.    The January Trial

### A.    Factual Background

Percoco, Aiello, Joseph Gerardi, and Peter Galbraith Kelly, Jr. were tried in the January Trial.  Percoco was a high-level official in the office of New York Governor Andrew Cuomo.  *See* Mem. Opinion and Order (the "May 10 Opinion"), Dkt. 648, at 2–3, *available at* 317 F. Supp. 3d 822, 825 (S.D.N.Y. May 10, 2018).[3]  As a longtime friend of Cuomo, Percoco was one of the most powerful members of the Governor's administration.  *See id.*; *see also* Tr. 459–64, 519–21, 1104, 1118–35, 2092, 2131–32, 2197–2201, 2414–15.  Between January 2011 and April 2014, Percoco served as Executive Deputy Secretary to the Governor.  *See* May 10 Opinion, 317 F. Supp. 3d at 825 (slip op. at 2–3).  In April 2014, he resigned from the Governor's office to serve as Cuomo's campaign manager.  *See id.*  Although Percoco was not a government employee while he worked on the campaign, he continued to wield tremendous influence over state government during that time.  *See id.*; *see also* Tr. 582, 1199–1200, 1232–35, 2098, 2379–80, 2414–15, 3736–37.  In December 2014, after Cuomo was re-elected, Percoco returned to his prior position in the Governor's office.  *See* May 10 Opinion, 317 F. Supp. 3d at 826 (slip op. at 4).  Percoco remained in that position until early 2016, when he resigned to take a job in the private sector.  *See id.* at 825 (slip op. at 2); *see also* Tr. 441–44, 610–11, 2202–03, 2406.

In both the CPV and the COR Development Schemes, Percoco agreed with executives of those companies to accept bribe payments in exchange for the promise of official action as the opportunity arose.  *See* Tr. 2089–2102.  Todd Howe, a corrupt lobbyist and a longtime friend of Percoco and other officials in the Governor's office, was a co-conspirator in both schemes;

---

[3]    Many of the facts relating to the January Trial have been discussed in a prior opinion, entered by this Court on May 10, 2018.  *See* May 10 Opinion, 317 F. Supp. 3d at 825–26 (slip op. at 2–5).

Howe testified as a cooperating witness in the January Trial. *See id.* at 1259–60, 1317–18, 1424–28, 2089–2102, 2116–21, 2127–32.

The CPV Scheme centered around an illicit agreement between Percoco and Kelly, who was an executive at CPV. *See id.* at 2089–92, 2135–40, 2242–52. Between 2012 and 2016, Percoco accepted approximately $285,000 in payments from CPV, funneled through a "low-show" job for his wife. *See id.* at 2135–40, 2242–52; GX-1602, GX-1603-N, GX-1604D. In exchange, Percoco pressured state officials to approve two agreements in order to benefit CPV: a Power Purchase Agreement ("PPA"), which would have facilitated financing for a power plant CPV wanted to build by locking in the state as a customer of the plant; and a Reciprocity Agreement, an interstate compact between New York and New Jersey that allowed CPV to purchase low-cost emissions credits across state lines. *See* Tr. 1531–55, 1579–98, 1880–83; 2138–39, 2320–70, 2243; GX-77, GX-81, GX-82, GX-85, GX-284, GX-1708. Although Percoco was not successful in ensuring that CPV obtained the PPA, he was successful in securing the Reciprocity Agreement. *See* Tr. 1882–83, 2337–39, 2353, 2369–70, 2404–07; GX-284, GX-425, GX-1017. Percoco's actions relating to both the PPA and the Reciprocity Agreement took place primarily in 2012 and 2013, when Percoco was a state employee. *See* Tr. 2320–70; GX-77, GX-81, GX-82, GX-85, GX-1708.

The COR Development Scheme involved a corrupt agreement between Percoco and Aiello, who was COR's president.[4] *See* Tr. 2093–2101, 2407–11. At the direction of Aiello, COR paid $35,000 to Percoco in the summer and fall of 2014. *See id.*; *see also* GX-1606A, GX-1606B. In exchange, Percoco pressured state officials to take action on three matters that were

---

[4] The Indictment charged Gerardi, another executive at COR, as an additional co-conspirator in the COR Development Scheme, *see* S2 Indictment ¶ 35, but Gerardi was acquitted of all charges relating to this scheme, *see* Gerardi Judgment (Dec. 11, 2018), Dkt. 945.

important to COR: first, Percoco pressured a state agency, Empire State Development ("ESD"), to reverse its decision to require COR to enter into a labor peace agreement ("LPA") for one of COR's development projects; second, Percoco pressured the state's Division of the Budget ("DOB") to authorize the release of public funds that had been designated for another of COR's development projects; and, third, Percoco directed staff in the Governor's office to give Aiello's son, who was a state employee, a raise. *See* May 10 Opinion, 317 F. Supp. 3d at 825–26 (slip op. at 3–4); *see also* Tr. 666–87, 751–66, 958–66, 1262–87, 2462–2504, 2522–41; GX-1703, GX-1704, GX-1706, GX-1707. Percoco's actions relating to the LPA took place in 2014 (while he was working on the Governor's campaign and not employed by the state). *See* May 10 Opinion, 317 F. Supp. 3d at 825–26 (slip op. at 3–4); *see also* GX-1706, GX-1707. Percoco's actions relating to the release of funds and the raise for Aiello's son took place in 2015 (after Percoco had returned to the Governor's office). *See* GX-1703, GX-1704.

### B.     Procedural Background

In the January Trial, Percoco and Aiello were convicted of conspiracy to commit honest services wire fraud in connection with the COR Development Scheme, in violation of 18 U.S.C. §§ 1343, 1346, and 1349 (Count Ten). In connection with the CPV Scheme, Percoco was convicted of conspiracy to commit honest services wire fraud (Count Nine), and federal-program bribery, in violation of 18 U.S.C. § 666(a)(1)(B) (Count Eleven). The jury deadlocked on charges against Kelly, who subsequently pleaded guilty. Gerardi was acquitted of all charges in the January Trial.[5]

---

[5]      *See* Verdict Form (January Trial); Aiello Judgment; Gerardi Judgment; Kelly Judgment (Oct. 17, 2018), Dkt. 890; Percoco Judgment; Kelly Plea Tr. (May 11, 2018), Dkt. 769; S3 Superseding Information (May 11, 2018), Dkt. 652.

The Court sentenced Percoco principally to a term of imprisonment of 72 months and Aiello principally to a term of 36 months.[6]  Both Defendants moved for bail pending appeal, with Aiello adopting all of Percoco's arguments to the extent relevant to him.[7]

## III.  The June Trial

Aiello, Gerardi, Alain Kaloyeros, and Louis Ciminelli were tried in the June Trial.  The subject of that trial, the Fort Schuyler Scheme, involved an agreement to rig the competitive bidding processes of Fort Schuyler, an entity that manages state-funded construction projects of the State University of New York Polytechnic Institute ("SUNY Poly").[8]

In 2013, Fort Schuyler issued two requests for proposals ("RFPs"), which were designed to allow Fort Schuyler to select private construction companies to be its local "preferred developers."  Preferred developer status, in turn, would give the selected companies an advantage in obtaining Fort Schuyler's future development contracts.  Although preferred developer status was supposed to be awarded through a competitive selection process, Kaloyeros used his position as president of SUNY Poly to provide confidential advance drafts of the RFPs

---

[6]     Specifically, as to Percoco, the Court imposed a sentence of 72 months' imprisonment on Counts Nine, Ten, and Eleven, to run concurrently.  The Court entered a general order of forfeiture against Percoco but did not impose a fine because of his inability to pay.  As to Aiello, the Court imposed a sentence of 36 months' imprisonment on Count Ten, to run concurrent to the same sentence on Counts One and Two, Aiello's convictions arising out of the June Trial.  The Court imposed a fine of $250,000 on Counts One and Two (to run concurrent to each other) and $250,000 on Count Ten (to run consecutive to the fine imposed on Counts One and Two), for a total fine of $500,000.  The Court also entered a general order of forfeiture against Aiello.  *See* Aiello Judgment; Aiello Sentencing Tr.; Percoco Judgment; Percoco Sentencing Tr. (Sept. 20, 2018), Dkt. 876.  The parties dispute the amount of forfeiture that should be entered against Percoco and Aiello; the Court will resolve those disputes at a later date.

[7]     *See* Defs.' Mem. of Law (Oct. 11, 2018), Dkt. 884; Gov.'s Resp. Mem. of Law (Nov. 2, 2018), Dkt. 897; Defs.' Reply Mem. of Law (Nov. 8, 2018), Dkt. 898; Aiello Sentencing Tr. at 38–41; Gov. Ltr. (Dec. 14, 2018), Dkt. 958, at 4–5; Aiello Ltr. (Dec. 20, 2018), Dkt. 966.

[8]     The Indictment charged Defendants Michael Laipple and Kevin Schuler as additional co-conspirators in the Fort Schuyler Scheme.  *See* S2 Indictment ¶¶ 22–27.  Prior to the June Trial, Schuler pleaded guilty to two counts relating to the Fort Schuyler Scheme, *see* Schuler Plea Tr. (May 18, 2018), Dkt. 683, and the Court entered an order of *nolle prosequi* as to Laipple, *see* Order (June 1, 2018), Dkt. 696.  Schuler testified as a cooperating witness in the June Trial.

to COR Development, through Aiello and Gerardi, and to another construction company, LPCiminelli, Inc. ("LPCiminelli"), through Ciminelli, who was LPCiminelli's CEO.  Working with Howe, these men made secret edits to the RFPs in order to favor their companies in the preferred-developer selection process.  By stacking the process in their favor, they ensured that COR Development and LPCiminelli became Fort Schuyler's "preferred developers," and, ultimately, that those companies received multimillion-dollar, state-funded contracts without the threat of competition.

In the June Trial, Aiello, Ciminelli, Gerardi, and Kaloyeros were convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Count One), and of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two and Four).  Gerardi was also convicted in the June Trial of making false statements to federal officers, in violation of 18 U.S.C. § 1001 (Count Sixteen).[9]

## DISCUSSION

## I.      The Applicable Law

### A.       Standard for Bail Pending Appeal

Pursuant to 18 U.S.C. § 3143(b), a defendant who has been sentenced to a term of imprisonment must be detained pending appeal unless a court finds by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community, that the appeal is not for the purpose of delay, and that the appeal "raises a substantial question of law or fact likely to result in reversal, an order for a new trial," or a reduced sentence.  18 U.S.C. § 3143(b)(1)(A)–(B).  There is no dispute that Percoco and Aiello are unlikely to flee, that they

---

[9]      *See* Kaloyeros Judgment (Dec. 12, 2018), Dkt. 953; Aiello Judgment; Gerardi Judgment; Ciminelli Judgment (Dec. 4, 2018), Dkt. 939.

pose no danger to the community, and that their appeals are not for the purpose of delay. There is a dispute over whether these Defendants' appeals present substantial questions of law or fact and, if so, whether those questions would be likely to result in reversal or a new trial.

This Court must employ a two-step analysis to determine whether bail pending appeal is warranted. *See United States v. Randell*, 761 F.2d 122, 124–25 (2d Cir. 1985). First, the Court must determine whether Percoco's or Aiello's appeal raises a "substantial question of law or fact." *Id.* at 124. A "substantial" question is "a 'close' question or one that very well could be decided the other way," that is, a question "of more substance than would be necessary to a finding that it [is] not frivolous." *Id.* at 125 (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).[10] Second, the Court must determine whether the "substantial question" is "so integral to the merits of the conviction on which [the] defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.* (quoting *United States v. Miller*, 753 F.2d 19, 23–24 (3d Cir. 1985)). As to this second step, the defendant must show that the question, if resolved in his favor, would result in reversal "on all of the counts" for which he has been sentenced to a term of imprisonment. *Id.* at 126. As to both steps, "the burden of persuasion rests on the defendant." *Id.* at 125.

---

[10] Percoco and Aiello argue that a "substantial question" is one that is "fairly debatable," one that is "novel," or one which "has not been decided by controlling precedent." Defs.' Mem. of Law at 2; Aiello Sentencing Tr. at 38–39; Aiello Ltr. at 1–2. The Court disagrees. In *Randell*, the Second Circuit noted that other courts had defined a "substantial question" using these terms, but the Second Circuit expressed a preference for the standard that a "substantial question" is one that is a "'close' question or one that very well could be decided the other way." 761 F.2d at 125. Most other circuits have also adopted this "more demanding" standard because it "appears better to accord" with the "presumption of [a] valid conviction" that Congress intended to impose in enacting § 3143(b). *United States v. Perholtz*, 836 F.2d 554, 555–56 & n.2 (D.C. Cir. 1987) (collecting cases); *see also, e.g., United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (per curiam); *Giancola*, 754 F.2d 900–01 ("The 1984 Act was intended to change the presumption so that the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption."); *cf. United States v. Abuhamra*, 389 F.3d 309, 318–19 (2d Cir. 2004).

## B.     The Relevant Elements of Federal-Program Bribery and Honest Services Wire Fraud Conspiracy

The federal-program bribery statute, 18 U.S.C. § 666, makes it unlawful for an "agent" of a state government to "corruptly solicit[] or demand[] . . . or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the state government.  *See* 18 U.S.C. § 666(a)(1)(B); *United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007).  An "agent" of a state government is a person "authorized to act on behalf of" the government and includes "a servant or employee, and a partner, director, officer, manager, and representative."  18 U.S.C. § 666(d)(1).

The wire fraud statute, 18 U.S.C. § 1343, makes it unlawful for any person, "having devised or intending to devise any scheme or artifice to defraud," to use interstate wires "for the purpose of executing such scheme or artifice."  18 U.S.C. § 1343; *see also United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (hereinafter *Halloran I*).  Federal law defines the term "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346; *see also Halloran I*, 821 F.3d at 337.  Thus, for honest services fraud in the public-sector context, the Government must prove, among other things, that a person owed a duty of honest services to the public and that the defendant participated in a scheme to defraud the public of that person's honest services.  *See Halloran I*, 821 F.3d at 337–38; *United States v. Rosen*, 716 F.3d 691, 698 n.3 (2d Cir. 2013); *United States v. Napout*, 332 F. Supp. 3d 533, 549 (E.D.N.Y. 2018).

When charging federal-program bribery and honest services fraud under a bribery theory,[11] the Government is required to prove the existence of a *quid pro quo* arrangement, meaning that the defendant intended to give or receive something of value in exchange for the promise or performance of official action. *See United States v. Silver*, 864 F.3d 102, 111 & n.24 (2d Cir. 2017); *see also Rosen*, 716 F.3d at 700; *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013); *United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011); *Ganim*, 510 F.3d at 148–49. Put differently, "[a] *quid pro quo* is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the course of the exercise of his official authority." *United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011).

## C.    *McDonnell v. United States*

In *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Supreme Court defined the term "official action" (or "official act"), which, as charged in this case, is a component of the *quid pro quo* element of honest services fraud and federal-program bribery.[12] The parties in *McDonnell* agreed to define the term "official act" by reference to the federal-officer bribery statute, 18 U.S.C. § 201 *et seq.*, which provides that an "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official

---

[11]     Federal-program bribery may be charged under either a bribery theory or a gratuity theory. *See Ganim*, 510 F.3d at 150 (distinguishing between the two theories). Count Eleven charged Percoco under both theories, but the motions for bail pending appeal focus primarily on the bribery theory. The Court, therefore, will continue to refer to this offense simply as "federal-program bribery."

[12]     *McDonnell* did not specifically state that the "official act" requirement applies to honest services wire fraud or to federal-program bribery, but the parties here agreed to charge the jury that it does. *See* Tr. 5888; Gov.'s Requests to Charge (Dec. 8, 2017), Dkt. 379, at 13, 29, 42, 52; Defs.' Requests to Charge (Dec. 8, 2017), Dkt. 382, ¶¶ 63, 84–85; *see also United States v. Skelos*, 707 F. App'x 733, 737–38 (2d Cir. 2017) (although federal-program bribery does not necessarily contain an "official act" requirement, if the Government chooses to charge federal-program bribery under an "official act" theory, the definition set forth in *McDonnell* applies).

capacity," 18 U.S.C. § 201(a)(3).  *See McDonnell*, 136 S. Ct. at 2365.  Interpreting this

provision, the Supreme Court stated:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy."  The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  It must also be something specific and focused that is "pending" or "may by law be brought" before a public official.  To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so.  That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.  Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell*, 136 S. Ct. at 2371–72.

## II.      The Question Whether *McDonnell* Overruled the So-Called "Retainer Theory" of Bribery Does Not Warrant Bail Pending Appeal

### A.      Introduction

Percoco and Aiello argue that there is a substantial question whether the "retainer" theory

of bribery remains good law following *McDonnell*.  *See* Defs.' Mem. of Law at 3–7; Defs.'

Reply Mem. of Law at 1–3.  Each argues that he is entitled to bail pending appeal because the

Court allowed the jury to rely on the retainer theory to find him guilty on each of his counts of

conviction.  *See* Defs.' Mem. of Law at 5–6; Aiello Ltr. at 1–2.

Under the retainer theory, otherwise known as the "stream of benefits" theory, the *quid*

*pro quo* element of honest services fraud, federal-program bribery, and other bribery offenses

may be satisfied if a defendant agrees to receive payments in exchange for his commitment to

perform official acts "as the opportunities to commit those acts arise."  *Rosen*, 716 F.3d at 700

(quoting *Ganim*, 510 F.3d at 147); *see also, e.g.*, *Bruno*, 661 F.3d at 744; *United States v.*

*Coyne*, 4 F.3d 100, 114 (2d Cir. 1993).  In other words, the specific official acts that the

defendant will corruptly perform do not need to be identified at the time that the *quid pro quo* arrangement first comes into existence, nor does the Government need to prove that the defendant intended to link a particular official act to a particular payment. *See Rosen*, 716 F.3d at 700; *Ganim*, 510 F.3d at 145. Rather, an unlawful *quid pro quo* exists if a defendant intends to perform official actions *generally* in exchange for payments, as the opportunities for those corrupt actions arise through time. *See Rosen*, 716 F.3d at 700.

### B. The Court's Jury Instructions

Percoco and Aiello are correct that the Court allowed the jury to rely on the retainer theory to find them guilty of each of their counts of conviction. Specifically, when instructing the jury, the Court included the retainer theory in its definition of a "*quid pro quo.*" *See* Jury Instructions (January Trial), Dkt. 516, at 18 (Tr. 6436–37) ("To prove a *quid pro quo*, the Government must prove that Mr. Percoco obtained the property to which he was not entitled by his public office, knowing that it was given in exchange for official acts as the opportunities arose."). The Court incorporated this definition into its instructions for conspiracy to commit honest services fraud (Counts Nine and Ten) and, in part, for federal-program bribery (Count Eleven). *See id.* at 27–28, 32–33 (Tr. 6448–49, 6454–55).[13]

---

[13]    As to Count Eleven, the Court allowed the jury to find Percoco guilty based on either the bribery theory or the gratuity theory of the offense. *See* Jury Instructions at 32–34 (Tr. 6455–57); *Ganim*, 510 F.3d at 150 (distinguishing between the two theories). The Court, however, allowed the jury to apply the retainer theory only when considering the bribery theory, not the gratuity theory. *See* Jury Instructions at 33 (Tr. 6456–57) (gratuity theory required the Government to prove "a link between the thing of value that was paid or received and a specific official act for which or because of which the thing of value was paid or received"); *see also Ganim*, 510 F.3d at 145–46 (setting forth a similar instruction, based on *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 414 (1999)). The jury, however, returned a general verdict on Count Eleven, without specifying whether it relied on the bribery theory or the gratuity theory. *See* Verdict Form (January Trial), Dkt. 527.

### C.       Defendants' Argument Does Not Raise a Substantial Question of Law or Fact

Prior to *McDonnell*, the retainer theory was well-established in the Second Circuit and in nearly every other circuit in the country.  *See Rosen*, 716 F.3d at 700 ("We have made it crystal clear that the federal bribery and honest services fraud statutes . . . criminalize 'scheme[s] involving payments at regular intervals in exchange for specific official[] acts as the opportunities to commit those acts arise' . . . ." (alterations in original) (quoting *Ganim*, 510 F.3d at 147)); *Bruno*, 661 F.3d at 744; *Coyne*, 4 F.3d at 114.[14]

*McDonnell* did not change this settled principle of law.  Although *McDonnell* defined the term "official act," it said nothing about *when* the parties to an illicit agreement must identify the specific official acts that the defendant will perform.  *See McDonnell*, 136 S. Ct. at 2371–72. Nor did *McDonnell* hold that the parties must mentally link each payment (*i.e.*, the "*quid*") to a specific official action (*i.e.*, the "*quo*").  *See id.*; *see also Woodward v. United States*, 905 F.3d 40, 48 (1st Cir. 2018); *United States v. Menendez*, 291 F. Supp. 3d 606, 616 (D.N.J. 2018) (stating that *McDonnell* defined "the *quo*, not the *pro*" in a *quid pro quo*).  *McDonnell*, therefore, did not address the question whether a defendant could agree to perform official actions generally in exchange for payments, without specifying at the time of the agreement which particular official actions he will corruptly perform.  *See Woodward*, 905 F.3d at 48; *Menendez*, 291 F. Supp. 3d at 616.

---

[14]        *See also, e.g.*, *United States v. Solomon*, 892 F.3d 273, 277 (7th Cir. 2018) (citing *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012)); *United States v. Morgan*, 635 F. App'x 423, 454 (10th Cir. 2015) (collecting cases); *United States v. McDonough*, 727 F.3d 143, 153 (1st Cir. 2013); *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013); *United States v. Jefferson*, 674 F.3d 332, 359 (4th Cir. 2012) (quoting *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004)); *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011); *United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2010); *United States v. McNair*, 605 F.3d 1152, 1188–89 (11th Cir. 2010); *United States v. Whitfield*, 590 F.3d 325, 351 (5th Cir. 2009); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 n.15, 945–46 (9th Cir. 2009); *United States v. Ring*, 628 F. Supp. 2d 195, 209 (D.D.C. 2009).

To this Court's knowledge, every court that has considered this issue has held that *McDonnell* did not overrule the retainer theory[15]—an unsurprising result, given the clear distinction between the definition of an "official act" and the timing with which the act must be identified. This Court reached the same conclusion when considering the Defendants' pretrial motions. *See* Order and Opinion, Dkt. 390, at 8–10, *available at* 2017 WL 6314146, at *4–5 (S.D.N.Y. Dec. 11, 2017). The reasons for this holding have been set forth at length in prior opinions, and the Court will not repeat them here. *See, e.g.*, *id.*; *Woodward*, 905 F.3d at 46; *Menendez*, 291 F. Supp. 3d at 616.

In short, the retainer theory has long been settled law, every court that has considered the issue has held that *McDonnell* did not overrule the theory, and nothing in *McDonnell* compels a different conclusion. Accordingly, Percoco and Aiello's argument does not present the sort of close question that warrants bail pending appeal.[16]

---

[15]    *See, e.g.*, *Woodward*, 905 F.3d at 48; *United States v. Malkus*, 696 F. App'x 251, 252–53 (9th Cir. 2017); *United States v. Gordon*, No. 17-CR-354, 2018 WL 3067739, at *5–6 (N.D. Ga. June 21, 2018); *United States v. Skelos*, No. 15-CR-317, 2018 WL 2849712, at *3 (S.D.N.Y. June 8, 2018); *Miserendino v. United States*, 307 F. Supp. 3d 480, 493–94 (E.D. Va. 2018); *United States v. Silver*, No. 15-CR-93, 2018 WL 1406617, at *4 (S.D.N.Y. Mar. 20, 2018); *United States v. Mangano*, No. 16-CR-540, 2018 WL 851860, at *4 (E.D.N.Y. Feb. 9, 2018); *Menendez*, 291 F. Supp. 3d at 616.

[16]    Percoco and Aiello also argue that the Second Circuit's grant of bail pending appeal in *United States v. Silver* means that the Second Circuit has already determined that this question is "substantial." *See* Defs.' Mem. of Law at 1; Defs.' Reply Mem. of Law at 1–2 (citing *United States v. Silver*, No. 18-2380-CR, Dkt. 51 (2d Cir. Oct. 3, 2018)). In *Silver*, the defendant's motion for bail pending appeal raised two separate arguments: first, that *McDonnell* overruled the retainer theory, and, second, that the district court erred by declining to instruct the jury that a *quid pro quo* requires a mutual agreement between the payor and the payee. *See* Defs.' Emergency Mot. at 13–22, *United States v. Silver*, No. 18-2380-CR, Dkt. 30 (2d Cir. Sept. 23, 2018). The Second Circuit granted bail pending appeal without specifying which question it found to be substantial. *See* Order, *United States v. Silver*, No. 18-2380-CR, Dkt. 51. The Second Circuit has not yet rendered a decision on the full appeal. Because the Second Circuit did not specify the grounds for its decision on *Silver*'s motion for bail pending appeal, the decision does not lend support to Defendants' argument.

Percoco and Aiello also point to the oral argument on *Silver*'s motion for bail pending appeal as evidence that the Second Circuit granted the motion based on the question implicating the retainer theory. *See* Defs.' Reply Mem. of Law at 2–3. Reading the tea leaves of oral argument is an act of pure speculation. The Second Circuit did not specify the basis for its decision on *Silver*'s motion, and this Court does not find it appropriate to look past that decision.

**III. Defendants' Arguments Relating to the "Duty of Honest Services" Element of Count Ten Do Not Warrant Bail Pending Appeal**

Percoco and Aiello challenge their convictions on Count Ten, conspiracy to commit honest services fraud in connection with the COR Development Scheme, arguing, first, that the Court incorrectly instructed the jury on the duty of honest services and, second, that the evidence on this element was insufficient to support a finding of guilt. *See* Defs.' Mem. of Law at 18–21; Defs.' Reply Mem. of Law at 4, 14–15.

**A. The Court Correctly Instructed the Jury on the Duty of Honest Services**

**1. The Court's Jury Instruction**

The Court instructed the jury that the object of the conspiracy charged in Count Ten, honest services fraud, required the jury to find "first, that Mr. Percoco owed the public a right to his honest services, and, second, the existence of a scheme to defraud the public of those honest services." Jury Instructions at 25 (Tr. 6445). As to whether Percoco "owed the public a right to his honest services," the Court instructed the jury as follows:

> "[H]onest services" are the duties that a person owes to the public because of a special trust that the public has reposed in the person. When a person obtains a payment in exchange for official action, that person has breached his duty of honest service. This is because, although the person is outwardly purporting to be exercising independent judgment on behalf of the public, in fact, the person's actions have been paid for. Thus, the public is not receiving what it expects and what it is entitled to, namely, its right to the person's honest and faithful services.

> While Mr. Percoco was employed by the state, he owed the public a duty of honest services by virtue of his official position. A person does not need to have a formal employment relationship with the state in order to owe a duty of honest services to the public, however. You may find that Mr. Percoco owed the public a duty of honest services when he was not a state employee, if you find that during that time he owed the public a fiduciary duty. To determine whether Mr. Percoco owed the public a fiduciary duty when he was not employed by the state, you must determine, first, whether he dominated and controlled any governmental business and, second, whether people working in the government actually relied upon him because of a special relationship that he had with the government. Both factors must be present for you to find that he owed the public a fiduciary duty. Mere influence and participation in the processes of government, standing alone,

are not enough to impose a fiduciary duty. Whether Mr. Percoco owed the public
a fiduciary duty and, thus, a duty of honest services, when he was not a public
employee is a question of fact for you to determine. As noted before, however, as
a matter of law, he owed the public a duty of honest services while he was
employed by the state.

*Id.* at 25–26 (Tr. 6445–46).

### 2. The Defendants' Argument

Percoco and Aiello take issue with the Court's instruction that "[a] person does not need

to have a formal employment relationship with the state in order to owe a duty of honest services

to the public," so long as the person "owe[s] the public a fiduciary duty." Jury Instructions at 25

(Tr. 6446); *see also* Defs.' Mem. of Law at 18–20. Percoco and Aiello argue that private citizens

cannot, as a matter of law, owe a duty of honest services to the public. *See* Defs.' Mem. of Law

at 19. They argue that the "sole exception" to this principle is *United States v. Margiotta*, 688

F.2d 108, 125 (2d Cir. 1982), a case in which the Second Circuit held that the chair of a local

political party owed a duty of honest services to a municipal government because he stood in a

relationship of "reliance, and *de facto* control and dominance" with respect to the government.

Percoco and Aiello argue that *Margiotta* is an outlier to the general principle that "private

citizens are not fiduciaries" and, more generally, that *Margiotta* has been "called into question"

and is no longer good law. Defs.' Mem. of Law at 19.[17]

In Percoco and Aiello's view, their convictions on Count Ten required the jury to find

that Percoco owed a fiduciary duty to the public during the time that he was working on the

Governor's campaign, that is, while he was a private citizen not employed by the state. *See id.*

---

[17] A different part of *Margiotta*, relating to the charge of extortion under color of official right, was discussed
at length in the Court's May 10 Opinion. *See* May 10 Opinion, 317 F. Supp. 3d at 831, 837 (slip op. at 12, 22).
Percoco and Aiello's argument here refers to the mail fraud charge in *Margiotta*, a portion of *Margiotta* not
addressed in the May 10 Opinion.

They argue that because Percoco could not, as a matter of law, owe the state a duty of honest services during this time, their convictions on Count Ten must be reversed.[18]

As an initial matter, although Percoco was also convicted of conspiracy to commit honest services fraud in Count Nine, he does not challenge his conviction for Count Nine on this ground. *See id.* at 18–20. That is likely because Count Nine relates to the CPV Scheme, which occurred primarily during the time that Percoco was employed by the state and, thus, when he indisputably owed the public a duty of honest services. Nor does Percoco challenge his conviction on Count Eleven on this ground, because that count charged federal-program bribery, which did not require the jury to find that Percoco owed the state a duty of honest services. Thus, even if this argument were meritorious, it would not warrant bail pending appeal for Percoco because it would not result in a reversal "on *all* of the counts" for which he was convicted. *Randell*, 761 F.2d at 126 (emphasis added).

Additionally, the Second Circuit would likely find that this argument has been waived. At the charge conference, Percoco proposed the very jury instruction that the Court adopted, and he defended that instruction on the ground that it was consistent with *Margiotta*.[19] Aiello joined in Percoco's request for this instruction.[20] "[W]here a defendant has invited the instruction he

---

[18]   Although Percoco and Aiello couch their argument as a challenge to the sufficiency of the evidence, *see* Defs.' Mem. of Law at 18–20, their argument relates to the scope of the duty of honest services as a matter of law and, thus, may also be viewed as a challenge to the Court's jury instructions.

[19]   *See* Tr. 5838 ("I would propose that [the Court's draft instruction] be struck and I have some sentences based on *Margiotta*."); *id.* (stating that *Margiotta* is not "a model of clarity" but that it is "pretty good" on the elements of a fiduciary duty); *id.* at 5841 (defending proposed jury instructions on the ground that they are "close to an exact quote from *Margiotta*"); *id.* at 5844–45 (accepting the Court's final draft of the instructions, including the instruction that "[a] person does not need to have a formal employment relationship with the state in order to owe a duty of honest services to the public"); *id.* at 6169 (objecting to the Government's proposed modification of the instruction on the ground that "[i]t does not seem in line with *Margiotta*"); *id.* at 6223 (offering another modification to the instruction because it better "captures what is going on in *Margiotta*").

[20]   *See* Tr. 5843 (Aiello argues for an instruction on the fiduciary duty element that requires a finding of "*de facto* control and dominance," which he argues is supported by *Margiotta*).

seeks to challenge, he has waived any right to appellate review of the charge." *United States v. Binday*, 804 F.3d 558, 581 (2d Cir. 2015) (internal quotation marks omitted) (quoting *United States v. Giovanelli*, 464 F.3d 346, 351 (2d Cir. 2006)); *see also United States v. O'Garro*, 700 F. App'x 52, 53 (2d Cir. 2017) (collecting cases). Thus, to the extent that Percoco or Aiello now objects to the Court's instruction or argues that *Margiotta* is not good law, the Second Circuit would likely find that these arguments are not subject to appellate review, even for plain error. *See United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009) ("[Defendant] not only failed to object to the challenged charge—an omission that would normally limit our review to plain error, *see* Fed. R. Crim. P. 30(d), 52(b)—his counsel specifically 'endorse[d]' it. . . . Such endorsement might well be deemed a true waiver, negating even plain error review."); *see also O'Garro*, 700 F. App'x at 53 ("'A finding of true waiver' is particularly appropriate 'when . . . defendants not only failed to object to what they now describe as error, but they actively solicited it.'" (quoting *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007))).[21]

### 3. A Person May Owe a Duty of Honest Services to the Public if He Exercises "*De Facto* Control" over the Government

Even if Defendants' argument had not been waived, it is meritless. Numerous cases, other than *Margiotta*, have held that a person may owe a fiduciary duty to an entity if that person has a relationship of "reliance, *de facto* control and dominance" with the entity, even if he is not employed by it and even if it has not vested him with "formal authority." *Halloran I*, 821 F.3d at 338–39. In *Halloran I*, for example—another case cited by Percoco in proposing the jury instruction that the Court adopted, *see* Tr. 5840, 5842, 6169—the Second Circuit affirmed a

---

[21] Percoco made several objections to the Court's jury instructions during and after the charge conference. *See, e.g.*, Tr. 5779, 5824–25, 5833–36, 5846–47, 6474–75. Because Percoco and Aiello's argument ultimately lacks merit, the Court need not discuss whether any of those objections were specific enough to preclude a finding of waiver.

conviction for honest services wire fraud where the defendant had participated in a scheme to deprive a political party of the party chairs' duty of honest services. *See Halloran I*, 821 F.3d at 339. The *Halloran I* defendant argued that party chairs could not, as a matter of law, owe the party a fiduciary duty because they had no "authority to act on behalf of the party." *Id.* The Second Circuit rejected that argument, holding that "the existence of a fiduciary duty depends not on formal authority but on *de facto* control." *Id.* While the chairs "may not have had *de jure* power . . . to make final decisions, . . . as long as the party committees *in fact* followed the chairs' lead with respect to those decisions," a rational jury could find that the chairs owed the party a duty of honest services. *Id.* at 339–40 (emphasis added). The Second Circuit later reaffirmed this holding in an unreported opinion in the same case. *See United States v. Halloran*, 664 F. App'x 23, 27 (2d Cir. Oct. 20, 2016) (hereinafter *Halloran II*) ("The [e]ssential elements of a fiduciary relation are reliance, *de facto* control and dominance.").[22]

The "*de facto* control" test has its origins in common law and is longstanding precedent under New York law.[23] Under New York law, fiduciary relationships are not limited to employment relationships or formal grants of authority but include any "informal relations which exist whenever one man trusts in, and relies upon, another." *Galvstar Holdings, LLC v. Harvard*

---

[22]     The opinion in *Halloran II* was published after *McDonnell* was decided. Although *Halloran II* did not expressly address the issue, nothing in that opinion indicates that *McDonnell* had any impact on the "*de facto* control" standard. *See Halloran II*, 664 F. App'x at 27; *see also Halloran I*, 821 F.3d at 340 n.13.

[23]     *See Rienzi & Sons, Inc. v. Puglisi*, 638 F. App'x 87, 90–91 (2d Cir. 2016) ("[U]nder New York law, the two essential elements of a fiduciary relation are . . . *de facto* control and dominance." (quoting *Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15, 21 (2008))); *Petrello v. White*, 344 F. App'x 651, 653–54 (2d Cir. 2009) (one party did not owe a fiduciary duty to the other because the record contained no evidence "that would permit a reasonable fact-finder to conclude that [the party] exercised '*de facto* control' or 'dominance' over [the other], both '[e]ssential elements' of a fiduciary duty claim." (quoting *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 158 (2008))); *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 173 (1993) ("The essential elements of a fiduciary relation are the concepts of reliance, and *de facto* control and dominance." (internal quotation marks omitted)).

*Steel Sales, LLC*, 722 F. App'x 12, 15 (2d Cir. 2018) (citing *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005)).[24]

The "*de facto* control" test is well-established in the Second Circuit's honest services fraud jurisprudence. The applicable line of cases began with *Margiotta*, 688 F.2d at 125 (collecting state cases applying the "time-tested . . . *de facto* control test"), but has continued through insider trading cases such as *United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir. 1991) (en banc) ("[A]t the heart of the fiduciary relationship lies reliance, and *de facto* control and dominance."), and other cases holding that brokers owe fiduciary duties to their clients, *see, e.g.*, *United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002). In *United States v. Rybicki*, the Second Circuit expressly recognized that this line of cases applies to honest services fraud. *See* 354 F.3d 124, 141–42 n.17 (2d Cir. 2003) (en banc) ("Although the bulk of the pre-*McNally* honest-services cases involved employees, we see no reason the principle they establish would not apply to other persons who assume a legal duty of loyalty *comparable to* that owed by an officer or employee to a private entity." (emphasis added) (citing *Szur*, 289 F.3d at 208–12, and collecting other cases)). These principles remained the law of this Circuit following the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010). *See Bahel*, 662 F.3d at 632 ("*Rybicki*, like *Skilling*, stands for the proposition that fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases . . . not the identity of the actors involved in those cases."); *United States v. Wolfson*, 642 F.3d 293, 295–96 (2d Cir. 2011) (affirming a jury instruction which stated that "[a]t the heart of the fiduciary relationship

---

[24]     *See also, e.g.*, *Marini v. Adamo*, 995 F. Supp. 2d 155, 201–02 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016); *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 166 (E.D.N.Y. 2010); *cf. Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 223 (2d Cir. 2018) ("The definition of 'fiduciary' under ERISA focuses on the exercise, as well as the possession, of authority or control over a pension plan's assets, without regard to the title of the person exercising such control." (internal quotation marks omitted)).

lies reliance and *de facto* control and dominance," on the ground that the instruction was

"identical in all material respects to the charge given in *Szur*"); *see also Halloran I*, 821 F.3d at

339–40.[25]  And they remain the law today, following *McDonnell*.  *See supra* n.22; *Halloran II*,

664 F. App'x at 27.

In short, it is black-letter law in this Circuit that a person owes a duty of honest services

to an entity if he stands in a relationship of reliance, *de facto* control, and dominance with that

entity, regardless of whether he is employed or vested with official authority by it.  Because the

Court's jury instruction captured these elements, the Court did not err in instructing the jury that

Percoco could owe the public a duty of honest services during the time that he was not employed

by the state.  Percoco and Aiello's arguments to the contrary do not raise a substantial question

of law or fact.

### B.     There Was Sufficient Evidence that Percoco Owed a Duty of Honest Services to the Public While He Worked on the Campaign

Apart from their challenge to the jury instructions, Percoco and Aiello argue that the

evidence was insufficient to support a finding that Percoco owed the state a duty of honest

services while he was working on the Governor's campaign.  *See* Defs.' Mem. of Law at 20–21;

Defs.' Reply Mem. of Law at 14–15.

"The existence of a fiduciary duty is a question of fact for the jury, and as such . . . [the

jury's finding] is subject to an 'exceedingly deferential' standard of review."  *Halloran I*, 821

F.3d at 340 (quoting *Binday*, 804 F.3d at 572; citing *Milovanovic*, 678 F.3d at 723).  "'[A]

---

[25]       *See also, e.g.*, *United States v. Harper*, No. 13-CR-601, 2015 WL 6029530, at *3 (E.D.N.Y. Oct. 15, 2015); *United States v. Kerik*, 615 F. Supp. 2d 256, 264 (S.D.N.Y. 2009); *accord United States v. Milovanovic*, 678 F.3d 713, 724–25 (9th Cir. 2012) (en banc) (state's independent contractors could be prosecuted for honest services fraud; "There is no question that were [the defendants] employees of the State of Washington, they would be subject to prosecution for theft of honest services.  We see no reason why [they] should be treated differently simply because the terms of their contracts label them independent contractors." (citation omitted)).

defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden' because [the court] must uphold the judgment of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vilar*, 729 F.3d at 91 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)).  The court must "view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *Id.* (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)).

Percoco was one of the "most senior" officials in the Governor's office, also known as the Executive Chamber.  Tr. 459.  He oversaw the Executive Chamber's Administrative Division, which was responsible for hiring and personnel matters within the Chamber; its Operations team, which organized the Governor's schedule and coordinated large-scale state events; and the Appointments Office, which conducted hiring across state agencies.  *See id.* at 442, 457–62, 502–03, 510–11, 627, 888–89, 920–21, 1180–81, 1248–49.  He also oversaw the Executive Chamber's relationship with organized labor, local governments, and members of the state legislature.  *See id.* at 442, 1103, 1180–81.  Over 100 members of the Governor's staff reported directly to Percoco.  *See id.* at 461.

Apart from his formal responsibilities, Percoco's "primary role" was to serve as the "Governor's right-hand person" and to "enforc[e] what the Governor wanted." *Id.* at 2414–15; *see also id.* at 519–21.  Staff in the Executive Chamber, for example, were required to obtain Percoco's "clearance" before leaving to seek private-sector employment.  *Id.* at 1137–44; *see also id.* at 1207–09, 1220–21, 2215.  More generally, due to Percoco's longstanding friendship

with the Governor, *see id.* at 2131–32, state officials believed that Percoco "had the Governor's ear," *id.* at 2198, and could "speak for the Governor" on many issues, *id.* at 1120; *see also, e.g.*, *id.* at 1120 (the former acting counsel to the Governor testified that when he spoke with Percoco, "it was as good as having the Governor sitting there with me").[26]  Accordingly, Percoco's words carried tremendous weight among state employees.  *See, e.g.*, *id.* at 752–66, 1226–27, 1244, 1248–49, 1273–76; *id.* at 2098 (Howe testified that "[w]hen [Percoco] picked up the phone, everybody respected [Percoco], and everybody interpreted that as something that needed to be done"); *id.* at 2197–98.

By way of example, Andrew Kennedy, a senior economic development official, tried for months to get DOB to authorize the state to release funds that had been designated for one of COR's development projects.  *See id.* at 752–55, 800–01, 807, 1278–87, 1324–25, 3010–11; GX-692; JPX-582-R2.  When Kennedy's efforts were unsuccessful, Percoco contacted an official at DOB and requested that the funds be authorized for release.  *See* Tr. 752–53, 844–45, 2537–41; GX-1703, GX-609, GX-620.  Upon receiving a request from "senior staff" such as Percoco, DOB employees knew that they needed to "attend to those matters in an expedited way and generally make [them] a top priority."  Tr. 752; *see also id.* at 755, 3810; GX-612 (state deputy director of the budget wrote in an email, "I'll let you know once I have more detail but because Percoco is involved we'll have to get a status update and move things along quickly").  Accordingly, after Percoco's inquiry, DOB moved the funding request "to the top of the list"

---

[26]    *See also, e.g.*, Tr. 459; *id.* at 464 (according to the Governor's chief of staff, no other official in the Executive Chamber spent as much time with the Governor as Percoco did); *id.* at 1104, 1118, 1226–35, 2092; *id.* at 2201 (according to Howe, Percoco was "the most important person in many ways in the Governor's office").

and, within a matter of days, authorized the release of the funds. Tr. 763–66; *see also id.* at 764–66, 840–41, 854–57, 1281–87; GX-1703, GX-655, GX-1174.[27]

When Percoco resigned from state government to work on the Governor's campaign, he relinquished the duties of his official position, *see, e.g.*, Tr. 579, 913, 1201; viewing the evidence in the light most favorable to the Government, however, Percoco's influence and control over state government continued uninterrupted during his time on the campaign. According to Howe, "regardless of whether [Percoco] was in the campaign or . . . the Governor's office physically, he had the ability to pick up the phone and get things done." Tr. 2098; *see also id.* at 582, 1199–1200; *id.* at 1232–35 (the former acting counsel to the Governor believed that Percoco continued to speak for the Governor on many matters while working on the campaign and, therefore, the former acting counsel continued to consult Percoco regarding state business during that time); *id.* at 1294 (according to Kennedy, it did not make "any difference" whether Percoco worked for the campaign or for the Executive Chamber; "he was still present in my mind" while he worked on the campaign because "[h]e was coming back"); *id.* at 2379–80, 2414–15, 3736–37.

While working on the campaign, for example, Percoco pressured Kennedy and two other senior state officials to prevent them from resigning from state government and accepting jobs in the private sector. *See id.* at 1143–44, 1277, 2413–17; GX-669, GX-670, GX-675, GX-676, GX-688.[28] Howe testified that these actions were "an example of [Percoco] being in the campaign

---

[27]     To be precise, DOB approved the "allocation" of these funds, which was "the main green light" for the state agency administering the project to release the funds. Tr. 750; *see also id.* at 763–65, 778, 849–53.

        The Government alleged that Percoco's act of pressuring DOB officials to authorize the release of these funds was one of the official acts that he performed in exchange for the bribe payments from COR Development. *See* S2 Indictment ¶ 35; Tr. 39–42, 5953, 6000–01.

[28]     *See also* Tr. 2413 (while Percoco was working on the campaign, he told Kennedy that Kennedy "wasn't going to be leaving, and that whatever job opportunity [Kennedy] had he should forego because he wasn't going to be leaving the Governor's office"); *id.* at 2414 (during the campaign, Percoco told another state official that Percoco "didn't want to hear . . . any more about it, that it was done, [the state official] wasn't leaving" the Governor's

but enforcing what the Governor wanted," consistent with Percoco's role as the Governor's "right-hand person." Tr. 2414–15; *see also id.* (Percoco's role was to get "what the Governor needed," regardless of whether he was "in the campaign or in the Governor's office").

Additionally, even when working on the campaign, Percoco continued fulfilling some of the responsibilities that he had when he worked in the Executive Chamber. During the campaign, for example, Percoco instructed Kennedy to require a developer in Niagara Falls to execute an agreement with a local building union, thereby continuing in his role as a liaison between the Governor's office and organized labor. *See id.* at 1250–51. Percoco also coordinated at least one state economic development event while working on the campaign, *see id.* at 1249–50, consistent with his prior role as head of the Executive Chamber's Operations team, *see id.* at 457, 460–61, 510–11. And throughout his time on the campaign, Percoco had unrestricted access to the government offices, telephone lines, and administrative assistant that he had while he was a state employee. *See id.* at 479, 485, 1127–28, 1228; GX-1701, GX-1702, GX-840, GX-841, GX-1172B.

In sum, there was more than enough evidence for a reasonable jury to conclude that Percoco stood in a relationship of reliance, *de facto* control, and dominance with state government, both when he worked in the Governor's office and when he was employed by the campaign. There is, therefore, no substantial question regarding the sufficiency of the evidence on this element.

For all these reasons, Percoco and Aiello have failed to raise a substantial question of law or fact regarding the "duty of honest services" element of Count Ten. Their arguments relating to this element do not warrant bail pending appeal.

---

office); GX-676 (during the campaign, Percoco told Howe that he "took care of Kennedy," and Percoco instructed Howe to tell another state official thinking of leaving the Governor's office to "get off his ass and come see me").

## IV.   The Question Whether Official Acts Can Be Performed Only by State Officials Does Not Warrant Bail Pending Appeal

### A.   Introduction

Percoco and Aiello argue that, following *McDonnell*, the only people legally capable of performing "official actions" are those individuals "officially working for, or vested with official authority by, government entities," that is, individuals with "the *de jure* authority (not just the *de facto* power) to act for or on behalf of the government."  Defs.' Mem. of Law at 7–8.  In their view, Percoco was legally "incapable" of performing official actions while he worked on the Governor's campaign, because he was not "officially working for" the state during that time. *See id.*  The Government argued at trial that, as part of the COR Development Scheme, Percoco performed an "official act" while he was working on the campaign (specifically, in late November and early December 2014, Percoco pressured state officials to reverse the requirement that COR Development negotiate an LPA for one of its projects).  *See* Tr. 39–41, 5952–54, 5996–6000, 6383, 6393.  Percoco and Aiello, therefore, argue that their convictions relating to the COR Development Scheme (Count Ten) rely on an erroneous legal theory and must be reversed or retried.  *See* Defs.' Mem. of Law at 7–8.

This argument fails to raise a substantial question of law or fact and, therefore, does not warrant bail pending appeal for either Percoco or Aiello.  *See infra* Part IV.B.  As to Percoco, the argument does not warrant bail pending appeal for an additional reason:  Percoco was convicted of two counts relating to the CPV Scheme (Counts Nine and Eleven), and any error relating to this issue would be harmless as to those counts.  *See infra* Part IV.C; *Randell*, 761 F.2d at 126 (a question warrants bail pending appeal only if it is likely to result in reversal or an order for a new trial on "*all* of the counts" for which the defendant was convicted (emphasis added)).

**B.    The Defense's *McDonnell* Argument Does Not Raise a Substantial Question of Law or Fact**

 Percoco and Aiello's argument can be separated into two questions:  first, who can properly be prosecuted under the federal bribery laws; and second, what is the definition of an "official act"?  *McDonnell* answered only the second question, not the first.

**1.    The Federal Bribery Statutes, Not *McDonnell*, Determine Who Can Be Prosecuted for Corruption Offenses**

The applicable federal statutes—separate and apart from the definition of an "official act"—determine the class of persons that can be prosecuted for bribery offenses.  Each bribery statute contains an element that defines the population to which the statute applies.  To convict a person for accepting bribes and gratuities under the federal-program bribery statute, 18 U.S.C. § 666 *et seq.*, for example, a jury must first find that the person is an "agent" of a state government.  *See* 18 U.S.C. § 666(a)(1)(B).  The statute defines "agent" as "a person authorized to act on behalf of another person or a government."  *Id.* § 666(d)(1).  Similarly, to convict a person under the federal-officer bribery statute, 18 U.S.C. § 201 *et seq.*, a jury must first find that the person is a federal "public official."  *See* 18 U.S.C. § 201(b)(2).  The statute defines the term "public official" as, among other things, "an officer or employee or person acting for or on behalf of the United States . . . in any official function," *id.* § 201(a)(1); the Supreme Court has interpreted this phrase to include any "position of public trust with official federal responsibilities," *Dixson v. United States*, 465 U.S. 482, 496 (1984).  The Hobbs Act, 18 U.S.C. § 1951, contains a similar limitation:  only persons who hold official positions within the government may be prosecuted as principals for extortion under color of official right.  *See* May 10 Opinion, 317 F. Supp. 3d at 828–32 (slip op. at 13) (collecting cases).  And in honest services fraud cases, 18 U.S.C. § 1346, only individuals who owe a duty of "honest services" may be prosecuted for taking bribes.  *See Halloran I*, 821 F.3d at 337; *Rybicki*, 354 F.3d at 142.  In short,

each bribery statute contains an element that defines the class of persons capable of committing the offense.[29]

The "class of persons" requirement is separate and distinct from the principle of law discussed in *McDonnell*. *McDonnell* set forth the definition of an "official act," which, as charged in this case, is the necessary "*quo*" in the *quid pro quo* element of the federal bribery offenses.[30] The *quid pro quo* is a separate element of these offenses from the "class of persons" element. The *quid pro quo* element is a subjective inquiry, focused on the defendant's mental state: it requires the jury to determine whether the defendant intended to enter into an exchange of money for official action.[31] The "class of persons" element, on the other hand, is an objective inquiry: it requires the jury to determine whether the defendant exercised the authority of an "agent," 18 U.S.C. § 666(d)(1), a "public official," *id.* § 201(b)(2), or so forth.[32] In short, the

---

[29]    For purposes of brevity, the Court will refer to this element as the "class of persons" requirement.

[30]    *See McDonnell*, 136 S. Ct. at 2371 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*."); *Silver*, 864 F.3d at 115 ("The Supreme Court in *McDonnell* addressed what qualifies as an 'official act' in [a] . . . *quid pro quo*."); *id.* at 111 (a *quid pro quo* requires the Government to prove "that the defendant received, or intended to receive, something of value in exchange for an *official act*" (emphasis added)); *Bruno*, 661 F.3d at 744 (the "key inquiry" in determining whether a *quid pro quo* exists is "whether, in light of all the evidence, an intent to give or receive something of value in exchange for an *official act* has been proved beyond a reasonable doubt" (emphasis added)).

        As the Court has discussed, although *McDonnell* does not expressly state that the "official act" requirement applies to all of the bribery offenses with which the Defendants were charged, the parties here agreed to charge the jury that it does. *See supra* n.12.

[31]    *See United States v. Ring*, 706 F.3d 460, 467–68 (D.C. Cir. 2013) ("[A]n official must 'agree' to accept a bribe for the requisite *quid pro quo* to occur. . . . [I]n context it is clear that 'agreement' is used as a synonym for specific intent."); *Rosen*, 716 F.3d at 701 (referring to the *quid pro quo* as "the requisite *mens rea*" of the offense); *see also, e.g.*, *United States v. Garrido*, 713 F.3d 985, 996–97 (9th Cir. 2013) ("A *quid pro quo* in bribery is the 'specific intent to give or receive something of value in exchange for an official act.'" (emphasis omitted) (quoting *Sun-Diamond*, 526 U.S. at 404–05)); *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be 'a specific intent to give something of value in exchange for an official act.'" (emphasis omitted) (quoting *Sun-Diamond*, 526 U.S. at 404–05)).

[32]    *See, e.g.*, *Halloran I*, 821 F.3d at 339–40 (examining whether members of a political party "relied on [the party chairs] to make decisions on their behalf," in order to determine whether the chairs owed the party a duty of honest services); *United States v. Manzo*, 636 F.3d 56, 67 (3d Cir. 2011) (in extortion under color of official right, the requirement that the defendant be a state official is "the central status element" of the offense (emphasis

"class of persons" limitations built into the federal bribery laws do not depend on, or find their origins in, the definition of "official action" set forth in *McDonnell*. The two requirements involve different findings of fact, and, thus, are separate elements of bribery.[33]

Defendants' argument confuses these two elements. By predicating their argument on *McDonnell*, Percoco and Aiello have focused on the *quid pro quo* element of bribery. But by arguing that *McDonnell* limited the bribery laws to a narrow class of individuals—those "officially working for, or vested with official authority by, government entities," Defs.' Mem. of Law at 7–8—Percoco and Aiello essentially attempt to use the *quid pro quo* element to limit the class of persons to whom these offenses apply. Put differently, Percoco and Aiello would shoehorn a brand-new "class of persons" limitation into the *quid pro quo* element of bribery.

Among the problems with this argument is that the "class of persons" requirement is already governed by a well-established body of case law. As the Court has discussed at length, it is black-letter law that the honest services fraud statute extends to any individual who exercises "*de facto* control and dominance" over the government or other victim entity. *Halloran II*, 664 F. App'x at 27; *Halloran I*, 821 F.3d at 337; *see also supra* Part III.A.3 (collecting cases). Additionally, longstanding precedent in multiple Courts of Appeals dictates that a person may be an "agent" of a state government for purposes of the federal-program bribery statute, 18 U.S.C.

---

omitted)); *United States v. Lupton*, 620 F.3d 790, 801 (7th Cir. 2010) (examining the defendant's duties and responsibilities to determine whether he was an "agent" of a local government).

[33] Following this principle, courts routinely treat the "class of persons" and the *quid pro quo* requirements as separate elements of bribery offenses. *See, e.g.*, May 10 Opinion, 317 F. Supp. 3d at 830–31 (slip op. at 11) (in extortion under color of official right, the offense's required mental state and "the defendant's objective position" are "separate elements of the offense"); *Halloran I*, 821 F.3d at 337 (distinguishing between the "fiduciary duty" and "bribery and kickback scheme" elements of honest services fraud); *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 8–9 (1st Cir. 2001) (analyzing the defendant's "specific intent" separately from the defendant's status as an "agent" in an appeal of a federal-program bribery conviction); Sand, *Modern Federal Jury Instructions: Criminal* ¶¶ 27A.02, 44.01, 50.03 (treating these requirements as separate elements of federal-program bribery, honest services fraud, and extortion under color of official right; *cf.* Defs.' Reply Mem. of Law at 4 (cautioning the Court not to "confuse[] the fiduciary duty element with the official act element" of honest services fraud).

§ 666(d)(1), or a "public official" for purposes of the federal-officer bribery statute, 18 U.S.C.

§ 201(a)(1), without being on the government payroll or otherwise holding an official position.[34]

Defendants' argument—that *McDonnell* limited the application of these statutes to those

individuals who "officially work[] for" the government or otherwise hold "*de jure* authority,"

Defs.' Mem. of Law at 8—would overturn or, at the very least, significantly narrow these

precedents.  In so doing, Percoco and Aiello would effectively rewrite the plain language of the

federal bribery statutes.

      *McDonnell* cannot sustain this weight.  If Percoco and Aiello were correct, then

*McDonnell* would have dramatically narrowed the population capable of being prosecuted for

bribery offenses—but *McDonnell* would have done so without saying a peep about the decades

of precedent that it was implicitly overruling.  That interpretation of *McDonnell* is utterly

implausible.

      To summarize, the bribery statutes each contain baseline limitations that cabin the

population to whom those laws may apply.  Those limitations do not find their origins in

*McDonnell* or in the definition of an "official act."  By conflating the two elements, Defendants'

---

[34]     As to the federal-program bribery statute:  *see, e.g.*, *Lupton*, 620 F.3d at 801 (a real estate broker assigned to facilitate the sale of a state-owned building could be prosecuted as an "agent" of the state); *United States v. Hudson*, 491 F.3d 590, 594 (6th Cir. 2007) (an independent contractor hired to develop a television station for a school district was an "agent" of the school district); *United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) (a construction manager appointed by a municipal authority was an "agent" of that authority); *Sotomayor-Vazquez*, 249 F.3d at 8–9 (an "outside consultant with significant managerial responsibility" over a federally funded nonprofit organization was an "agent" of that organization).

     As to the federal-officer bribery statute:  *see, e.g.*, *Dixson*, 465 U.S. at 496 (executives of a private nonprofit organization charged with administering a federally funded grant could be prosecuted as federal "public officials"); *United States v. Thomas*, 240 F.3d 445, 448 (5th Cir. 2001) (a guard working for a private prison that housed federal detainees was a federal "public official"); *United States v. Madeoy*, 912 F.2d 1486, 1494–95 (D.C. Cir. 1990) (a private individual who conducted real estate appraisals for a federal agency was a federal "public official").

argument runs afoul of longstanding precedent and, thus, does not present a substantial question of law or fact warranting bail pending appeal.

### 2. *McDonnell*'s Definition of "Official Action" Does Not Limit the Class of Persons to Whom the Bribery Laws Apply

Defendants' argument is also based on a misreading of *McDonnell*. *McDonnell* set forth a two-part test for determining whether an act is an "official act." *See McDonnell*, 136 S. Ct. at 2368. "First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or [that] 'may by law be brought' before a public official." [35] *Id.* The question or matter must involve a "formal exercise of governmental power," and it must be something that falls within "the specific duties of an official's position." *Id.* It must be something that is specific, focused, and concrete: "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369.

Second, the Government must prove that a public official "made a decision or took an action 'on'" the applicable question or matter. *Id.* at 2368. The "decision" or "action" must be something more than merely arranging a meeting, hosting an event, or expressing support for an idea. *See id.* at 2371. The defendant must either perform this "decision" or "action" himself or, alternatively, use his official position to pressure or advise another person to perform the "decision" or "action." *Id.* at 2370.[36]

Percoco and Aiello argue that *McDonnell* requires the *defendant* to engage in "a formal exercise of governmental power," and, therefore, that the only people "capable" of performing official acts post-*McDonnell* are those who are vested with such official power (*i.e.*, people with

---

[35] For brevity, the Court will refer to this part of the test simply as a "question or matter."

[36] If the defendant advises another person to perform the "decision" or "action," the defendant must do so "knowing or intending that such advice will form the basis" for the other person's "decision" or "action." *McDonnell*, 136 S. Ct. at 2370.

"the *de jure* authority . . . to act for or on behalf of the government"). Defs.' Mem. of Law at 8. The premise of this argument is incorrect. Under *McDonnell*, a defendant can perform an "official act" by pressuring or advising *another person* to make a decision or to take an action on a question or matter that involves a formal exercise of governmental power.[37] The defendant need not himself exercise a formal governmental power, so long as he pressures or advises someone else to do so.[38]

 Put differently, Percoco and Aiello's argument conflates the two distinct steps of the *McDonnell* analysis. Under *McDonnell*, only the applicable "question or matter" (the inquiry at Step One) need involve a "formal exercise of governmental power"; there is no requirement that the defendant's act of exerting pressure or providing advice (Step Two) constitute an exercise of such power. *See McDonnell*, 136 S. Ct. at 2369–70. *McDonnell*, therefore, does not necessarily require that the defendant be capable of exercising formal power; it requires that the defendant be *either* capable of exercising formal power *or* capable of pressuring or advising another person to do so. *See id.*

Following these principles, cases decided after *McDonnell* have held that a defendant may be convicted for pressuring *other* public officials to exercise formal governmental powers— regardless of whether the *defendant* was capable of doing so. In *United States v. Boyland*, for example, the Government alleged that a state assemblyman took bribes in exchange for helping his co-conspirators secure permits from city agencies for an upcoming carnival. *See* 862 F.3d

---

[37]     *See McDonnell*, 136 S. Ct. at 2370 ("A public official may . . . make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act.' In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify as a decision or action . . . ." (emphasis in original)).

[38]     *See McDonnell*, 136 S. Ct. at 2369 (the question or matter "may be pending either before the public official who is performing the official act, or before another public official").

34

279, 283–85 (2d Cir. 2017).  The assemblyman wrote numerous letters of support to city agencies, pressuring them to approve the permits.  *See id.* at 284, 291–92.  The defendant was not capable of exercising the relevant government power (the granting of city permits), as he was a *state* legislator and the permits were issued by *city* agencies.  *See id.* at 283–84.  But that did not matter.  What mattered was that (1) the relevant "question or matter" (the award of permits) required a specific and formal exercise of governmental power, and (2) the defendant pressured *other* officials to make a decision or take an action on that question or matter.  *See id.* at 292.  Because these requirements were satisfied, the Second Circuit affirmed the assemblyman's conviction.  *See id.*[39]

Similarly, in *United States v. Fattah*, the Government alleged that a congressman accepted bribes in exchange for his efforts to secure a U.S. ambassadorship for a co-conspirator.  *See* __ F.3d __, Nos. 16-4397+, 2019 WL 209109, at *27–28 (3d Cir. Jan. 16, 2019).  Among other things, the congressman wrote numerous letters to White House officials, attempting to pressure them into appointing the co-conspirator to the ambassadorship.  *See id.* at *10–11.  Clearly, the congressman was legally incapable of exercising the applicable "governmental power," inasmuch as the power to appoint ambassadors is vested in the Executive Branch.  *See id.* at *27–28.  But, as in *Boyland*, the defendant's power was irrelevant:  what mattered was that a rational jury could find that the defendant's actions, directly or indirectly, constituted pressure on *another* official who was capable of exercising the relevant power.  *See id.*  Thus, the

---

[39]  The Second Circuit reviewed the defendant's *McDonnell* argument only for plain error, *see Boyland*, 862 F.3d at 288, but there is no reason to believe that the analysis relevant here would have been any different had it applied a more lenient standard of review.

Third Circuit held that, if properly instructed, a reasonable jury could find that the "official act" element of the offense was satisfied.  *See id.*[40]

Fattah* and *Boyland* do not stand alone.  In cases decided prior to *McDonnell*, defendants were convicted under the bribery laws for committing official acts that had nothing whatsoever to do with their own official responsibilities or formal powers.  In *United States v. Middlemiss*, 217 F.3d 112, 115–16 (2d Cir. 2000), for example, a Secret Service agent assigned to an airport and a public affairs officer working for the airport accepted bribes in exchange for helping the bribe payor obtain a lease to operate a diner at the airport.  On appeal, the defendants argued that they could not be convicted of honest services fraud because their "official job duties had nothing to do with airport leasing."  *Id.* at 119–20.  Put differently, the defendants argued that they were not capable of exercising the governmental power implicated in the official act. *See id.*  The Second Circuit rejected this argument, holding that "as long as [the] defendants engaged in a scheme to deprive [the government] of honest services, there is no requirement that the scheme also implicate [the defendants'] official duties."  *Id.* at 120; *see also, e.g.*, *Kerik*, 615 F. Supp. 2d at 264 ("[A] defendant may be charged with honest services fraud for using his or her influence with governmental decision-makers for personal gain, even if the alleged scheme does not implicate one of the defendant's official duties.").

The common thread through these decisions is that *McDonnell* does not require the defendant to exercise formal "governmental power," or even to be capable of doing so.  Rather, *McDonnell* requires:  first, that there be a "question or matter" that implicates a formal governmental power; and, second, that the defendant either make a decision on that matter

---

[40]    The Third Circuit remanded for a properly-instructed jury to consider this question because it was unclear whether the congressman's letters rose to the level of "pressure," rather than mere expressions of support. *See Fattah*, 2019 WL 209109, at *28.

himself or, alternatively, pressure or advise others, who are responsible for discharging that power, to do so.[41]

Indeed, a requirement that a defendant must exercise a "formal" power within the "specific duties" of his official position in order to commit a bribery offense would eviscerate all common sense from the *McDonnell* decision. Senior Executive Branch advisors such as Percoco are powerful because they provide high-level advice to key decisionmakers, coordinate long-term strategy, and provide general oversight to the functions of government.[42] By definition, these officials exercise influence beyond the specific, concrete, and formal matters that "may by

[41]    The Court notes that *McDonnell* contains language that can arguably be read to support Percoco and Aiello's argument. *McDonnell* stated that a defendant must use his "*official position* to exert pressure on another official to perform an 'official act.'" 136 S. Ct. at 2370 (emphasis added). Read in isolation, this phrase would suggest that only government employees, *i.e.*, people with "official positions," can supply the requisite pressure to cause someone to commit an official act. This Court, however, does not believe that this is a reasonable reading of *McDonnell*. *McDonnell*'s definition of "official action" stems from the language defining that term in the federal-officer bribery statute, 18 U.S.C. § 201(a)(2). *See McDonnell*, 136 S. Ct. at 2368. That statute applies only to federal "public officials," *see* 18 U.S.C. § 201(b)(2); *Dixson*, 465 U.S. at 496, so it makes sense that *McDonnell* would use the terms "official position" and "public official" to refer to the hypothetical defendants to whom the test applies. *See, e.g.*, *McDonnell*, 136 S. Ct. at 2370–71 ("A public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that he agree to do so.").

    Common sense dictates that when the *McDonnell* test is transplanted into the honest services fraud and federal-program bribery contexts, the term "public official" must be replaced by the terms "person who owes a duty of honest services" and "agent of a state," respectively. *See supra* Part IV.B.1; 18 U.S.C. §§ 666(a)(1)(B), 1346. The term "official position" must similarly be translated to match the reach of these statutes (*e.g.*, to "position of *de facto* control" and "position with authorization to act on behalf of the government," respectively). *See supra* Parts III.A.3, IV.B.1; 18 U.S.C. §§ 666(d), 1346; *Halloran I*, 821 F.3d at 339; *Lupton*, 620 F.3d at 801. Holding otherwise would read these terms out of the applicable statutes and contravene clear precedent interpreting these provisions. Accordingly, the Court believes that *McDonnell*'s use of the term "official position" was not intended to, and does not, limit the class of persons to whom the "official act" test applies.

[42]    The Governor of New York, for example, maintained a "senior staff" that included Percoco and a number of other high-level advisors with many nebulous responsibilities, such as the Governor's chief of staff, his communications director, his director of intergovernmental affairs, and the like. *See* Tr. 440–41, 1244. These officials "worked together as a team to help shape, develop, and execute the Governor's agenda." *Id.* at 458; *see also id.* at 537–38. Percoco, in particular, provided "general oversight" of the Governor's office, *id.* at 1103, and served as an "intermediary and liaison to various elected officials and other stakeholders that had [an] interest in New York State government," *id.* at 1248–49; *see also id.* at 442. Other members of senior staff "helped the Governor formulate policy in [a number] of areas," *id.* at 1104, and drafted important speeches for the Governor, *see id.* at 474, 1104–05. All of these officials had "a general advisory role [of] advising the Governor" on all relevant matters. *Id.* at 485; *see also id.* at 625–26.

law be brought" before them.[43]  But by conflating the two steps in *McDonnell*—that is, requiring

that the "official act" be an act "within the specific duties of" the *defendant's* position, rather

than an act within the specific duties of *some* official's position (whether that be the defendant's

position or another person's)—Percoco and Aiello would effectively insulate these officials from

the bribery laws.

Percoco and Aiello might argue that all of these examples—the Executive Branch

advisors, the assemblyman in *Boyland*, the congressman in *Fattah*, and the officials in

*Middlemiss*—fall within their definition of people "capable" of performing official actions:  they

are all individuals "working for, or vested with official authority by, government entities."

Defs.' Mem. of Law at 8.  But nothing in those cases depended on that fact.  In *Boyland*, for

example, the defendant did not need to be a state assemblyman in order to exert pressure on city

agencies to approve his bribe payor's permits.  *See Boyland*, 862 F.3d at 291–92.  He could just

as easily have been a chair of a local political party who exercised *de facto* control over city

government, *see, e.g.*, *Margiotta*, 688 F.2d at 122; *cf. Halloran I*, 821 F.3d at 339, or an

independent contractor responsible for overseeing the city's permit process, *see, e.g.*, *Hudson*,

491 F.3d at 594; *Sotomayor-Vazquez*, 249 F.3d at 8.  As long as a trier of fact could rationally

conclude that the defendant was capable of using his position to pressure the city agencies into

making a "decision" or taking an "action" on the permits, *see McDonnell*, 136 S. Ct. at 2370, the

"official act" element could be satisfied.  And, as long as the defendant fell within the class of

---

[43]     Percoco's relationship with the Governor, for example, allowed him to wield tremendous power throughout state government, well beyond the scope of his ostensible job description.  *See supra* Part III.B; Tr. 752 (when "senior staff" such as Percoco submitted a request to a state agency, agency employees knew that they needed to "attend to those matters in an expedited way and generally make [them] a top priority"); *id.* at 2098 ("When [Percoco] picked up the phone, everybody respected [Percoco], and everybody interpreted that as something that needed to be done."); *id.* at 2414–15 (Percoco's "primary role" was to "enforce[e] what the Governor wanted" throughout state government).

persons to whom the bribery statutes apply, *see, e.g.*, 18 U.S.C. §§ 201(a)(1) ("public official"), 666(d)(1) ("agent" of a state), 1346 (person who owes a duty of "honest services"); *see also supra* Part IV.B.1, he could be properly convicted for his conduct.

All of this is to say that *McDonnell* defined *what* an official act is, but it said nothing about *who* is capable of performing those acts. It did not define that class of persons because it did not need to: in enacting the federal bribery statutes, Congress had already established that limiting principle. In short, Defendants' argument that "official acts must be acts performed by officials," Defs.' Mem. of Law at 8, misreads *McDonnell*, runs afoul of clear precedent, and defies common sense. Accordingly, the argument does not raise a substantial question of law or fact that would warrant bail pending appeal.

### 3. The Court's May 10 Opinion Does Not Compel a Different Conclusion

Percoco and Aiello also argue that this Court's May 10 Opinion supports their view of *McDonnell*. *See* Defs.' Mem. of Law at 12; Defs.' Reply Mem. of Law at 5. Percoco and Aiello are wrong.

Prior to submitting the case to the jury in the January Trial, the Court entered a judgment of acquittal as to Count Eight, which charged Percoco with extortion under color of official right in relation to the COR Development Scheme, in violation of 18 U.S.C. § 1951. *See* Order (Feb. 28, 2018), Dkt. 515. The Court explained the reasons for this ruling in the May 10 Opinion. *See* 317 F. Supp. 3d at 826 (slip op. at 4–5). In that Opinion, the Court stated that extortion under color of official right applies only to "persons who hold official positions within the government" some time before the offense is legally "complete." *Id.* at 832 (slip op. at 13). The Court then concluded that extortion is legally "complete" at the time that the defendant obtains an extortionate payment. *See id.* at 833–34 (slip op. at 16–17). Because Percoco was not a government employee at the time that he obtained payments from COR, and thus at the time that

Count Eight was completed, the Court entered a judgment of acquittal on that count. *See id.* at 834–35 (slip op. at 17–18).

In contrast, Count Ten charges honest services fraud conspiracy, an entirely different crime. Honest services fraud applies to a different class of offenders than extortion under color of official right: honest services fraud, when applied in the public-sector context, applies to individuals who stand in a relationship of "*de facto* control and dominance" vis-à-vis the government, *see supra* Part III.A.3; *Halloran II*, 664 F. App'x at 27; *Halloran I*, 821 F.3d at 339–40; extortion under color of official right, in contrast, applies only to individuals who are actually employed by the government, *see* May 10 Opinion, 317 F. Supp. 3d at 832 (slip op. at 13). In both today's ruling and the May 10 Opinion, the Court drew those conclusions from the language and history of the applicable statutes, not from *McDonnell*. *See id.* at 828–32 (slip op. at 7–13). Both opinions, therefore, stand for the same principle: the language of the federal bribery statutes—not the definition of an "official act" set forth in *McDonnell*—controls the population to whom the anti-corruption laws apply.[44]

---

[44]    Percoco and Aiello also argue that because the May 10 Opinion held that Count Eight was a "completed" offense at the time that Percoco accepted COR's two bribe payments, "the same conclusion follows" for Count Ten. Defs.' Mem. of Law at 12. This argument fails. Count Eight charged extortion, a substantive offense, whereas Count Ten charges conspiracy to commit honest services fraud. It is black-letter law that conspiracy is a "continuing crime" that persists "until the purposes of the conspiracy have been accomplished or abandoned." *United States v. Pizzonia*, 577 F.3d 455, 466 (2d Cir. 2009); *see also, e.g.*, *Smith v. United States*, 568 U.S. 106, 111 (2013) ("Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of [the conspiracy's] existence . . . ." (citations and internal quotation marks omitted) (alteration in original)); *United States v. Martinez*, 862 F.3d 223, 232–33 (2d Cir. 2017). Accordingly, the May 10 Opinion expressly cabined its holdings to *substantive* extortion under color of official right. *See* May 10 Opinion, 317 F. Supp. 3d at 828 n.8 (slip op. at 7 n.8) (the relevant parts of the opinion "pertain only to defendants who are charged as principals with the *substantive* offense of extortion under color of official right" (emphasis added)); *see also id.* at 834–35 & n.20 (slip op. at 17–18 & n.20) (distinguishing continuing offenses).

### C. Any Error in Defining the Class of Persons Capable of Performing Official Actions Would Be Harmless as to Counts Nine and Eleven, Percoco's Convictions Relating to the CPV Scheme

Because Defendants' *McDonnell* argument fails to raise a substantial question of law or fact, the Court need not determine whether the argument would require reversal or a retrial of Percoco's and Aiello's convictions. *See Randell*, 761 F.2d at 124–25. Nevertheless, the Court assumes, without deciding, that the Defendants' argument, if resolved in their favor, would require a new trial on the count relating to the COR Development Scheme, Count Ten (for which both Percoco and Aiello were convicted, and which is Aiello's only count of conviction arising out of the January Trial).[45] As to Percoco, therefore, the Defense's view of *McDonnell* does not warrant bail pending appeal not only because it fails to present a substantial question of law or fact, but also because a favorable appellate ruling on that question would not result in reversal "on *all* of the counts" for which Percoco was convicted. *Randell*, 761 F.2d at 126 (emphasis added).

As an initial matter, Percoco's brief does not specify the standard that the Court should apply in assessing the effect of his argument on the jury's verdict. *See* Defs.' Mem. of Law at 8–10. Without further elaboration, he states simply that the Government introduced evidence that he performed "official actions" while he worked on the campaign and that "[s]uch evidence was key to all three [of his] counts of conviction." *Id.* at 9. If, as it appears, Percoco argued that the Government's case relied on an erroneous legal theory, that argument would be subject to harmless-error review. *See United States v. Martoma*, 894 F.3d 64, 71–72 (2d Cir. 2017) (citing *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008)); *United States v. Sheehan*, 838 F.3d 109, 121 (2d

---

[45]     As discussed, the Court has already ruled that Aiello's convictions arising out of the June Trial would warrant bail pending appeal, if those were his only counts of conviction. *See supra* Background, Part I. Accordingly, if Defendants' argument regarding *McDonnell* presented a substantial question of law or fact, Aiello would be entitled to bail pending appeal. But because it does not, he is not.

Cir. 2016); *United States v. Ferguson*, 676 F.3d 260, 276–77 (2d Cir. 2011). Under that

standard, the Second Circuit would not overturn Percoco's convictions for Counts Nine and

Eleven unless the Government's erroneous theory had a "substantial and injurious effect or

influence in determining the jury's verdict." *Ferguson*, 676 F.3d at 276–77 (quoting *Hedgpeth*,

555 U.S. at 58); *see also Sheehan*, 838 F.3d at 121.

Here, there is no question that any error in defining the class of persons capable of

performing "official action" would be harmless as to Counts Nine and Eleven. Nearly all

relevant parts of the CPV Scheme took place in 2012 and 2013, when Percoco was employed by

the Governor's office.[46] In late 2012, Kelly arranged for CPV to hire Percoco's wife for a

$7,500-per-month "low-show" job; in exchange, Percoco promised to help CPV obtain a PPA

and to perform other actions for CPV's benefit as the opportunity arose. *See* Tr. 2089–91, 2138–

44, 2229–43, 2320, 3415–41, 3446; GX-39, GX-47, GX-1602, GX-1603-N. Throughout 2013,

Kelly asked Percoco to pressure state officials to approve the PPA and the Reciprocity

Agreement. *See* Tr. 2323–70, 2921–31; GX-69, GX-74A, GX-77, GX-81, GX-82, GX-85, GX-

86, GX-217, GX-218, GX-1708. Percoco complied with Kelly's requests (or, at the very least,

agreed to do so), also in 2013.[47] In short, all relevant parts of the CPV Scheme—Percoco's

initial agreement with Kelly (late 2012), Kelly's requests that Percoco take official action for

CPV's benefit (2013), and the official actions that Percoco actually performed or agreed to

---

[46]     The facts relating to the CPV Scheme are discussed in more detail *infra*, in Part V.

[47]     Specifically, in August 2013, Percoco agreed to pressure senior staff in the Governor's office to cause a
state agency to approve the Reciprocity Agreement. *See* Tr. 1899–1901, 1951, 2323–70, 2921–31; GX-284, GX-
1708. In September and October 2013, Percoco agreed to pressure a high-ranking official in the Governor's office
to cause a state agency to modify an upcoming announcement about energy policy, in order to keep alive the
possibility that CPV could be awarded the PPA. *See* Tr. 2351–70, 3533–35; GX-81, GX-82, GX-85, GX-86, GX-
218.

perform (2013)—took place when Percoco was a state employee and, therefore, while Percoco was indisputably "capable" of performing official actions.

CPV continued paying Percoco throughout 2014 and 2015, including during the April–December 2014 period when Percoco was employed by the campaign, but the Government did not argue that Percoco performed any official actions during this time. Rather, the Government argued that, in late 2013, it became clear to Percoco and Howe that CPV was unlikely to be awarded the PPA. *See* Tr. 5950–51, 5977–78, 6382–83, 6404–05; *see also id.* at 2351–53, 2369–70; *cf. id.* at 1561–62, 1811–13, 1821–26. Throughout 2014 and 2015, Percoco and Howe misled Kelly into thinking that CPV could still win the PPA, in order to create the illusion that Percoco was still worth bribing. *See id.* at 2374–2404, 5977–78, 6404–06; GX-117, GX-123, GX-131, GX-134, GX-244, GX-250. During this time, Percoco and Howe arranged a number of meetings for Kelly with high-level state officials, in order to "string [Kelly] along," Tr. 2404, and avoid any "interruption" in CPV's payments, GX-117. *See also* Tr. 2374–2404; GX-123, GX-131, GX-134, GX-244, GX-250. In other words, the Government's theory of the case was that Percoco did not perform official actions for CPV's benefit in 2014—he merely pretended to do so, in order to ensure that CPV would continue paying him.[48]

In short, it is clear that a rational jury would have convicted Percoco of Counts Nine and Eleven, even if the jury had been instructed that Percoco was incapable of performing official

---

[48]     The Court also notes that the evidence of the CPV scheme during the 2014 time period was extremely limited, consisting of approximately six emails and related testimony. *See* Tr. 1569–73, 1581–94, 1883–1901, 2375–2396; GX-117, GX-119, GX-123, GX-131, GX-134, GX-244. In contrast, the Government adduced an overwhelming amount of evidence of the scheme's existence during the 2012–2013 time period. *See, e.g.*, Tr. 1553–69, 2138–39, 2090–91, 2138–41, 2229–43, 2320–70; GX-39, GX-47, GX-69, GX-77, GX-81, GX-82, GX-85, GX-86, GX-217, GX-218, GX-1708 (summary chart citing GX-74, GX-74A, GX-75, GX-75A, GX-231, GX-416, GX-1041, GX-1064, BKX-411A).

action during the period when he worked on the campaign.[49]  Accordingly, even if Percoco were

to prevail in his view of *McDonnell*, any error would be harmless as to Counts Nine and Eleven.

As to Percoco, therefore, the Defense's *McDonnell* argument does not merit bail pending

appeal, both because the argument fails to raise a substantial question of law or fact and because

the argument would not warrant reversal or a retrial of *all* of his counts of conviction.

## V.     The Question Whether There Was Sufficient Evidence on Counts Nine and Eleven Does Not Warrant Bail Pending Appeal

Apart from his argument regarding the scope of *McDonnell*, Percoco also argues that the

evidence adduced at trial was insufficient to support his convictions on Counts Nine and Eleven.

*See* Defs.' Mem. of Law at 13–18; Defs.' Reply Mem. of Law at 10–13.  As to the PPA, Percoco

argues that he did nothing more than arrange meetings for CPV, which is not an "official act"

under *McDonnell*.  *See* Defs.' Mem. of Law at 14–16; Defs.' Reply Mem. of Law at 10–12.  As

to the Reciprocity Agreement, Percoco argues that he "took no action whatsoever" to direct state

officials to approve the agreement.  Defs.' Mem. of Law at 17; *see also* Defs.' Reply Mem. of

Law at 12–13.  The Court finds that Percoco's arguments do not raise a substantial question of

law or fact and, thus, do not warrant bail pending appeal.

### A.     The Applicable Law

As an initial matter, the Government did not need to prove that Percoco actually

performed any official act; it needed to prove only that Percoco agreed to do so as the

opportunity arose.  *See supra* Parts I.B, II.A; *McDonnell*, 136 S. Ct. at 2370–71 ("[A] public

---

[49]     Percoco asserts that the Government improperly argued in summation that the meetings he arranged for Kelly in 2014 were "official actions."  *See* Defs.' Mem. of Law at 9–10; Defs.' Reply Mem. of Law at 9–10.  This argument lacks merit.  The Government's jury addresses drew a clear contrast between Percoco's actions in 2013 (when Percoco believed that CPV had a chance of winning the PPA) and 2014–2015 (when Percoco no longer believed that but continued arranging meetings for Kelly in order to string Kelly along).  *See* Tr. 5950–51, 5977–78, 6382–83, 6404–05.  The Government clearly conveyed to the jury that Percoco did not perform official actions for CPV's benefit in 2014 and 2015—he merely pretended to do so.

official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agree to do so. . . . Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so."); *Rosen*, 716 F.3d at 700. Put differently, the Government was required to prove only that Percoco understood that, in exchange for CPV's payments, he was expected to perform official actions for CPV's benefit as the opportunity arose. *See Rosen*, 716 F.3d at 700; *Bruno*, 661 F.3d at 743–44.

Under *McDonnell*, merely "[s]etting up a meeting" or "expressing support" for an idea does not, without more, qualify as an "official act." 136 S. Ct. at 2371. Nevertheless, meetings and expressions of support may "serve as evidence" of the defendant's *intent* to perform an official act (or to pressure or advise another person to do so). *Id.*; *see also Fattah*, 2019 WL 209109, at *28 (distinguishing between "permissible attempts to 'express[] support" and "impermissible attempts 'to pressure or advise another official'"); *Silver*, 864 F.3d at 120–22 (similar).

## B. Background

### 1. The Origins of the CPV Scheme

As early as 2008, entering into a PPA with New York State was a "critical" priority for CPV, because the PPA would help CPV obtain financing for a power plant that it was planning to build in New York. Tr. 1555; *see also id.* at 1525–32, 1540–45, 1709–10, 1754, 1860, 2136, 2158–64, 2209; GX-405. Kelly, in particular, was under "extreme pressure" from CPV's management to secure the PPA. Tr. 2313; *see also* GX-63. Accordingly, CPV hired Howe's firm as its lobbyist and, between 2010 and early 2012, Kelly and Howe discussed with Percoco strategies to obtain the PPA. *See* Tr. 2136, 2139–41, 2163–64, 2199, 2210–12, 2295–96, 2897–98, 3323–26, 3350. Percoco agreed to assist Kelly with the PPA effort: in 2011 and 2012, when

CPV encountered regulatory hurdles to obtaining the PPA, Percoco helped Kelly arrange a number of meetings with state officials to address those concerns.  *Id.* at 2209–22, 2233–34, 2310–14, 2836–37, 3344–49.

Meanwhile, in mid- to late 2012, Percoco's finances deteriorated, and he repeatedly asked Howe to find clients of Howe's firm who would pay Percoco as a "consultant."  *See id.* at 2089, 2132–38, 2228, 2236–38, 2291–2307, 2848–51, 3415–20, 3478–81; *see also* GX-46, GX-1601, GX-1605.  At around this time, Howe began speaking with Kelly about arranging for CPV to hire Percoco's wife.  *See* Tr. 2090–91, 2229–36, 3415–21, 3433–34; GX-39.  Howe told Kelly that Percoco wanted to "stay removed" from the process, in order to conceal any possible conflicts of interest, as CPV had business before New York State.  Tr. 2239, 3439; GX-47.

In September 2012, Percoco attended a dinner with Howe and Kelly; at the dinner, Percoco told Kelly, "[Howe] has told me you're going to help [my wife] out for this job and, you know, I really appreciate it.  We need a second income. . . . You know, I really appreciate it."  Tr. 2139; *see also id.* at 2243, 3440–41, 3446.  Kelly responded, "We'll get it done."  *Id.* at 2139.  Later in the meal, Percoco stated, "Look, I'll stay on top of the power purchase agreement . . . and [Howe] will keep me abreast of what is going on on that front and how I can be helpful and whatever."  *Id.*; *see also id.* at 2243, 3440–41, 3446.  In the weeks following the meal, Percoco repeatedly followed up with Howe about the CPV job, conveying increasingly panicked requests for additional income.  *See id.* at 2247–49, 2257, 2289–90, 2299, 2307, 2314–15; GX-61, GX-65, GX-197, GX-260.

Shortly thereafter, CPV hired Percoco's wife and paid her $7,500 per month.  *See* GX-1602; GX-1603-N.  Percoco's wife worked only a few hours a month for this salary, often from home.  *See* Tr. 4127–31, 4139–77, 4665–77, 4698–4755; GX-1020R, GX-1072R.  CPV routed

46

Percoco's wife's salary through a shell entity, Tr. 1970–78, 2034–38, GX-1604B, GX-1604C, GX-1604D, and Percoco was aware of this arrangement, *see* Tr. 488–93, 2247–49; GX-198, GX-1218; *cf.* 2239, 3439; GX-47. After CPV hired Percoco's wife, Percoco became "more responsive when issues surfaced from [Kelly] that needed attention." Tr. 2320. Throughout 2013, Kelly made numerous requests to Percoco and Howe regarding the PPA and the Reciprocity Agreement. *See id.* at 2323–70, 2921–31; GX-69, GX-74A, GX-77, GX-81, GX-82, GX-85, GX-86, GX-217, GX-218, GX-1708.

### 2. The PPA

In April 2013, the New York Power Authority ("NYPA") and the state's Public Service Commission ("PSC") released an RFP designed to solicit proposals to create new energy capacity within the state through either "generation" projects or "transmission" projects. *See* Tr. 1548–59; GX-1011. CPV employees hoped that the RFP would award funding for generation projects, because such an award could lead to CPV receiving a PPA (whereas CPV was unlikely to receive the PPA if NYPA and the PSC chose to fund transmission projects).[50] *See* Tr. 1555, 1754, 1798, 2352–63; GX-1011 at *26305. CPV submitted its response to the RFP in May 2013, *see* Tr. 1553, 1561; GX-1012, after which Kelly and Howe asked Percoco "[t]o be an advocate for CPV in the Governor's office and to push on the agenda of securing the [PPA]," Tr. 2341; *see also id.* at 2863–65.

---

[50] "Generation" and "transmission" projects are two different types of energy facilities: generation projects produce electricity, whereas transmission projects build out new electric wiring (in order to increase the system's capacity to carry electricity). *See* Tr. 1547–55. As a new power plant, CPV's project was classified as a "generation" facility. *See id.* at 2308, 2352, 2360. In the 2013 RFP, NYPA and the PSC were considering funding both types of projects. *See* GX-1011 at *26305–07. Additionally, these agencies were considering funding generation projects through PPAs. *See id.* Therefore, if these agencies chose to fund generation projects, CPV would have a chance of winning a PPA; if, on the other hand, the agencies chose to fund transmission projects, CPV would need to look for a different route to obtain a PPA. *See* Tr. 1754, 1798, 2360, 2363, 2879–81.

In September 2013, at Kelly's request, Howe told Percoco that the PSC was considering reopening an inactive power plant, a step that could reduce CPV's chances of receiving the PPA. *See* GX-77; Tr. 2347–51, 2880–83, 2891–92, 3529. Howe told Percoco that a "former Pataki guy" was rumored to be "spearheading" the effort; Percoco responded, "I need that guys [*sic*] name ASAP!" GX-77. The next day, Percoco agreed to meet with Howe to "lay out [a] plan" to address the issue. GX-217; *see also* Tr. 2349–50. Howe expected Percoco to "find out what the story was and then put a stop" to the effort to reopen the old plant. Tr. 2348–49.

In October 2013, the PSC was scheduled to announce its awards from the RFP process. *See* Tr. 1801–02, 2353–69; GX-81. In the week prior to the announcement, Howe repeatedly asked Percoco to pressure Howard Glaser, a high-ranking official in the Governor's office, to convene a meeting of PSC officials, in order for Glaser to make sure that these officials included awards for generation projects in the announcement. *See* Tr. 2354–70, 2864, 3533–35; GX-81, GX-82, GX-85, GX-86, GX-218.[51] In Howe's view, if the PSC awarded transmission projects without at least "referenc[ing]" the possibility of generation projects in the announcement, CPV's planned power plant would be effectively "dead." Tr. 2360.

Percoco told Howe that he would assist in this effort. In one email, for example, Howe asked Percoco to "push on [Glaser]" because Kelly was "sweating it"; Percoco responded that he would "get to" Glaser; and Howe told Percoco to "hold [Glaser's] feet to the fire" in order to keep CPV's payments to Howe and Percoco "flowing." GX-85. Howe testified that, in this

---

[51] *See also, e.g.*, Tr. 2354 (Howe asked Percoco to pressure Glaser to "convene a meeting" because "we wanted generation to be placed in [the October 2013] announcement . . . that they would announce some generation facilities"); *id.* at 2362 (Howe told Percoco to "[m]ake sure that [Glaser] holds that meeting," because Howe "wanted [Glaser] to include generation in that announcement that came out a week later").

email, Howe was "asking [Percoco] to advocate on behalf of CPV and to push [Glaser] to make sure that generation was included in that announcement." Tr. 2362–63.[52]

On October 17, 2013, the PSC announced that it would award funding for several transmission projects but stated that it would not award any new generation projects until a later date (if at all). GX-1201; *see also* Tr. 1561–62, 2351–53, 3537. At this point, Howe understood that CPV was unlikely to receive a PPA, *see* Tr. 2369, 2914–16, 3538 (and, indeed, CPV was never awarded a PPA for its project, *see id.* at 1826). As the Court has discussed, throughout 2014 and 2015, Percoco and Howe arranged a number of meetings for Kelly, in order to mislead Kelly into thinking that CPV could still receive the PPA. *See supra* Part IV.C. CPV continued paying Percoco's wife through early 2016, when Percoco left the Governor's office for a job in the private sector. *See* Tr. 610, 2404–06; GX-1602, GX-1603-N.

### 3. The Reciprocity Agreement

Throughout June and July 2013, Kelly and other CPV representatives lobbied New York State's Department of Environmental Conservation ("DEC") to enter into the Reciprocity Agreement with New Jersey. *See* Tr. 1588–89, 1628–29, 1883–91. Convincing New York State to enter into the Reciprocity Agreement was an important priority for CPV, because it would allow CPV's New Jersey power plant to purchase emissions credits in New York, where the credits were cheaper and more readily available.[53] *See id.* at 1579–88, 1602, 1880–82, 2323.

---

[52]     *See also, e.g.*, GX-82 (Percoco told Howe that Percoco would be "[t]alking to [Glaser]" about the announcement shortly); Tr. 2355 (Percoco "agreed to assist in [this] effort"); *id.* at 2360 (Howe believed that Percoco would "advocat[e] to [Glaser] to hold that meeting," in order to "rein all the staff from all the various state entities in an effort to make sure [that] generation was locked into that announcement that was coming in a couple [of] days.").

[53]     The Reciprocity Agreement related to a different power plant from the one that sought the PPA.

Because the Reciprocity Agreement was an important, interstate compact, DEC sought direction from the Governor's office before committing to it. *See id.* at 1882–83, 1892–97, 1907–08, 1923–27; GX-1041. In August 2013, Kelly told Howe in an email that DEC needed a "push from above" in order to "get [the Reciprocity Agreement] done as a priority." GX-74A; *see also* Tr. 2323–26, 2923. Howe forwarded the email to Percoco, and Percoco followed up two days later to ask if the issue had been "resolved." GX-74A; *see also* GX-1708 (summary chart). Percoco told Howe that Percoco would "check" on the status of the Agreement with DEC's commissioner. GX-74A. When Howe followed up a week later, Percoco told Howe to direct Glaser and another Executive Chamber official, John Regan, to contact DEC, because Percoco was out of the office attending to his mother, who was ill. *See* Tr. 2329–30, 2925–29; GX-74A. Regan promptly contacted DEC's commissioner and asked "what we can do to push the effort along" with respect to the Reciprocity Agreement. GX-416. The commissioner told Regan that DEC would "get it done ASAP." GX-75, GX-284; Tr. 2337–39. Within a few days, DEC reported that it was "no longer seeking direction from the Governor's office," Tr. 1899, and, instead, that it was working to execute the Reciprocity Agreement, *id.* at 1901, 1951; GX-1064.

## C. There Was Sufficient Evidence that Percoco Agreed to Perform Official Acts as Part of the CPV Scheme

This evidence is more than sufficient to persuade a reasonable jury that Percoco intended to enter into a corrupt bargain with Kelly. In particular, the jury could rely on Percoco's understanding of the importance of state action to Kelly, Percoco's desperation for a stream of income from CPV, and the clear language in emails requesting that Percoco "push" on state officials. *See United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990) ("[E]vidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that

the benefits were received for the purpose of being influenced in the future performance of official duties, thereby satisfying the *quid pro quo* element of bribery."); *see also Bruno*, 661 F.3d at 744 (same). Moreover, the Government adduced considerable evidence that Percoco's wife's position at CPV was a "low-show" job, as she worked, at most, only a few hours a month for a $7,500-per-month salary. *See United States v. Triumph Capital Grp.*, 544 F.3d 149, 162 (2d Cir. 2008) (evidence that a public official's associates received pay "for work they did not perform" provided "strong support" for the existence of a bribery scheme). And the Government adduced evidence that Percoco knew that Kelly had taken steps to conceal the hiring of Percoco's wife, including routing her salary through a shell entity. *See Rosen*, 716 F.3d at 702 ("In cases involving public officials, a trier of fact may infer guilt from . . . behavior indicating consciousness of guilt." (quoting *Bruno*, 661 F.3d at 744)).

A reasonable jury could also conclude that Percoco performed official actions for CPV's benefit—or, at the very least, that he agreed to and intended to do so. As to the Reciprocity Agreement, there is ample evidence that Percoco issued a directive to Glaser and Regan to pressure or advise DEC to enter into the Agreement. Viewing this directive in light of the tremendous power that Percoco wielded throughout the government, *see supra* Part III.B, and in light of the fact that these officials complied with Percoco's directive and indeed induced DEC to enter into the Reciprocity Agreement (after months of inaction on the issue, *see* Tr. 1582–90), a rational jury could conclude that Percoco's directive constituted pressure on Glaser and Regan— and thus was an official act, rather than a mere expression of support.[54]

---

[54]    Percoco argues that he could not have intended to pressure Glaser, because "Glaser occupied a position in the Governor's office superior to [him] when it came to energy policy." Defs.' Mem. of Law at 18. Even putting aside the fact that Percoco also issued his directive to Regan, this argument is meritless. Howe testified that even though Percoco was "third or fourth" in the organizational "flowchart" of the Executive Chamber, in practice, Percoco was "the closest" to the Governor out of the entire Chamber staff and, therefore, one of the most powerful members of the Chamber. Tr. 2197; *see also id.* at 2201, 2797–98. Additionally, when Percoco was interviewed by

Even if Percoco had not issued the directive, there is ample evidence that he *intended* to pressure or advise DEC to enter into the Reciprocity Agreement and would have done so had his mother not been ill.  In response to a request from Kelly to give DEC a "push from above," Percoco asked Howe whether the issue had been "resolved" and then promised to "check with" DEC's commissioner about the issue, before telling Howe to direct other officials to attend to it.  GX-74; GX-74A.  Because the bribery laws do not require that Percoco actually performed an official act, only that he agreed to do so, this evidence—combined with the evidence of a corrupt bargain, discussed above—is sufficient to support Percoco's convictions.

As to the PPA, Percoco agreed in emails to "push on" Glaser, and Howe told Percoco to "hold [Glaser's] feet to the fire," in order to pressure Glaser into (in turn) pressuring the PSC to award funding to generation projects (or, at least, to reference generation projects in the October 17, 2013 announcement).  GX-85; *see also* GX-82; Tr. 2354–55, 2361–63.  These emails evince Percoco's intent to pressure Glaser into performing an official act.  Additionally, Howe expressly told Percoco in an email that Percoco's efforts were necessary to keep the payments from CPV "flowing."  GX-85.  And, as the Court has discussed, the Government adduced evidence that Percoco understood the importance of the PPA to CPV; that, during a dinner in which Kelly discussed offering a job to Percoco's wife, Percoco expressly agreed to assist Kelly with the PPA; and that Percoco spent two years misleading Kelly into thinking that CPV could still obtain the PPA, in order to maintain the flow of funds to him from CPV.  This evidence is more than

---

FBI agents, he told them that he was "next in line" in the Executive Chamber hierarchy after the Governor's Secretary (and therefore above Glaser in the Chamber's hierarchy).  *Id.* at 3184.

sufficient for a reasonable jury to conclude that Percoco intended to apply pressure to Glaser to keep the PPA alive (regardless of whether Percoco actually did apply that pressure).[55]

In short, the evidence was more than sufficient to support Percoco's convictions on Counts Nine and Eleven; thus, this argument does not entitle Percoco to bail pending appeal.

## VI. Concluding Note

The Court is mindful that its task is not to determine the ultimate merits of these Defendants' appeals, but only to determine whether the appeals raise a "substantial question" that is "integral to the merits" of their convictions. *Randell*, 761 F.2d at 124–25. Some of the Defendants' arguments relating to the scope of *McDonnell* have not been expressly decided by the Second Circuit. But under the law of this Circuit, that is not enough. To warrant bail pending appeal, the Defense's arguments must present a "*close* question" of law or fact, not merely an open or undecided question. *Id.* at 124 (emphasis added); *see also Perholtz*, 836 F.2d at 555–56; *supra* Part I.A n.10.

Applying this standard, the Court is unable to say that Defendants' arguments present the sort of "close" questions that overcome the post-trial "presumption of [a] valid conviction." *Perholtz*, 836 F.2d at 555–56; *see also Randell*, 761 F.2d at 124–25; *Giancola*, 754 F.2d at 900–01; *cf. Abuhamra*, 389 F.3d at 318–19. Their argument regarding the retainer theory, for example, has been rejected by every court that has addressed the issue; would require

---

[55] For similar reasons, Percoco's argument that he did nothing to support CPV's effort to obtain the PPA other than arrange meetings lacks merit. Although Percoco sought to pressure Glaser to convene a meeting of PSC officials, there was ample testimony that Percoco and Howe wanted Glaser to pressure the PSC to perform an official act (namely, to include generation projects in its upcoming announcement).

Percoco also argues that the Government's response to his sufficiency challenge improperly relied on evidence adduced during the Defense's case-in-chief; Percoco argues that this is inappropriate because he moved for a judgment of acquittal at the close of the Government's case-in-chief, at which point the Court reserved decision. *See* Defs.' Reply Mem. of Law at 8–9; *see also* Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."). All of the evidence that the Court has cited in this section was adduced prior to the time that Percoco moved for a judgment of acquittal.

overturning "crystal clear" Second Circuit precedent, *Rosen*, 716 F.3d at 700; and is not based on the central holding of *McDonnell*. Their argument relating to the class of persons capable of performing official acts calls for an implausibly broad reading of *McDonnell* and would overturn decades of precedent in multiple Courts of Appeals. As to their challenge to the Court's instructions on the duty of honest services, the argument has been squarely and repeatedly rejected by the Second Circuit; it does not warrant bail pending appeal even under the broadest possible standard. The sufficiency challenges also do not present a close question, in light of the overwhelming evidence of a corrupt bargain and the "heavy burden" that a defendant bears in mounting such a challenge. *Vilar*, 729 F.3d at 91. For all these reasons, Percoco and Aiello are not entitled to bail pending appeal.

## CONCLUSION

For all the foregoing reasons, Percoco's and Aiello's motions for bail pending appeal are DENIED. Percoco and Aiello must surrender to begin serving their sentences of imprisonment no later than **March 1, 2019 at 2:00 p.m.**

**SO ORDERED.**

**Dated: February 8, 2019**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**